NOS. 23-35560, 23-35585

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

*Plaintiff-Appellant/Cross-Appellee*,

v.

MYRON KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington, AKA Mike Kreidler; JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington,

*Defendants-Appellees/Cross-Appellants*.

On Appeal from the United States District Court
for the Western District of Washington
Civil Case No. 3:19-cv-05181-BHS

## FIRST BRIEF OF APPELLANT/CROSS-APPELLEE

KRISTEN K. WAGGONER
JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

JAMES A. CAMPBELL
KEVIN H. THERIOT
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85250
(480) 444-0020
jcampbell@ADFlegal.org
ktheriot@ADFlegal.org

DAVID A. CORTMAN
RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFlegal.org

*Counsel for Plaintiff-Appellant/Cross-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Cedar Park Assembly of God of Kirkland, Washington is a non-profit corporation with no parent companies or stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES ...................................................................v

STATEMENT REGARDING ORAL ARGUMENT ...................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES.............................................................3

PERTINENT STATUTES AND REGULATIONS ...................................4

INTRODUCTION ...............................................................................5

STATEMENT OF THE CASE ..............................................................6

    A.    Cedar Park and its religious beliefs about the sanctity of human life...............................................................................6

    B.    Cedar Park's health plan ........................................................8

    C.    Washington's abortion-coverage mandate ...........................10

    D.    Washington's conscience statute ..........................................14

    E.    The impact of Washington's abortion-coverage requirement on Cedar Park and its health plan. .................20

    F.    Proceedings in the district court ..........................................24

        1.    Initial proceedings .........................................................24

        2.    Cedar Park's first appeal.............................................25

        3.    Proceedings on remand................................................26

        4.    The district court's summary judgment ruling ..........27

SUMMARY OF ARGUMENT ...............................................................30

ARGUMENT .....................................................................................31

I.  Standard of review ........................................................................ 31

II.  Cedar Park is entitled to summary judgment on its free
    exercise claim. ......................................................................... 32

    A.  SB 6219 and the conscience law burdens Cedar Park's
        free exercise of religion. .................................................. 32

    B.  Washington's abortion-coverage requirements aren't
        generally applicable or neutral, so they trigger strict
        scrutiny under *Smith*. ................................................... 34

        1.  Defining general applicability ...................................... 35

        2.  Washington's abortion-coverage requirements fail
            the general-applicability test. ..................................... 37

        3.  Defining neutrality ..................................................... 42

        4.  Washington's abortion-coverage requirements
            aren't religiously neutral. ............................................ 43

    C.  The district court's additional reasons for rejecting
        Cedar Park's neutrality and general-applicability
        arguments fail. ................................................................. 49

    D.  Washington's abortion-coverage requirements fail strict
        scrutiny. ........................................................................... 53

    E.  The Free Exercise Clause's text, history, and tradition
        also demonstrate that Washington's abortion-coverage
        requirements are invalid. ................................................. 55

III.  Washington's abortion-coverage requirements violate the
     church autonomy doctrine. ...................................................... 58

    A.  Defining the church-autonomy doctrine ........................... 58

    B.  Washington's abortion-coverage requirements violate
        the church-autonomy doctrine ......................................... 61

IV.  Cedar Park merits a permanent injunction. .............................. 63

CONCLUSION ........................................................................ 65

STATEMENT OF RELATED CASES ..................................... 66

CERTIFICATE OF SERVICE ................................................ 67

ADDENDUM TABLE OF CONTENTS ................................ A.2

# TABLE OF AUTHORITIES

## Cases

*Americans for Prosperity Foundation v. Bonta,*
    141 S. Ct. 2373 (2021) .................................................................... 54

*Arizona Dream Act Coalition v. Brewer,*
    855 F.3d 957 (9th Cir. 2017) ........................................................ 64

*Board of Education of Kriyas Joel Village School District v. Grumet,*
    512 U.S. 687 (1994) ................................................................. 43, 49

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ...................................................................... 53

*Burwell v. Hobby Lobby Stores,*
    573 U.S. 682 (2014) ................................................................. 33, 44

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940) ...................................................................... 32

*Carson ex rel. O.C. v. Makin,*
    596 U.S. 767 (2022) ................................................................. 34, 43

*Cedar Park Assembly of God of Kirkland, Washington v. Kreidler,*
    860 F. App'x 542 (9th Cir. 2021).................................. 25, 33, 50–52

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ...................................................... 36, 42, 47, 50

*City of Cleburne v. Cleburne Living Center,*
    473 U.S. 432 (1985) ...................................................................... 50

*Davis v. Nordstrom, Inc.,*
    755 F.3d 1089 (9th Cir. 2014) ...................................................... 64

*Does 1-3 v. Mills,*
    142 S. Ct. 17 (2021) ...................................................................... 48

*Duquesne University of the Holy Spirit v. NLRB,*
    947 F.3d 824 (D.C. Cir. 2020) ...................................................... 60

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ........................................................................ 63

*EEOC v. Catholic University of America*,
    83 F.3d 455 (D.C. Cir. 1996) ........................................................ 61

*Employment Division, Department of Human Resources of Oregon
    v. Smith*,
    494 U.S. 872 (1990) ................................................................. 28, 35

*Espinoza v. Montana Department of Revenue*,
    140 S. Ct. 2246 (2020) ................................................................. 34

*Fellowship of Christian Athletes v. San Jose Unified School District
    Board of Education*,
    82 F.4th 664 (9th Cir. 2023)
    ......................................... 1, 35–38, 40–41, 43, 49, 51–52, 55, 63– 64

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ........................... 30, 35–36, 40, 42, 51, 54–57

*Granfield v. Catholic University of America*,
    530 F.2d 1035 (D.C. Cir. 1976) ...................................................... 60

*Horphag Research Ltd. v. Garcia*,
    475 F.3d 1029 (9th Cir. 2007) ........................................................ 52

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
    565 U.S. 171 (2012) ........................................................... 29, 58–62

*Innova Solutions, Inc. v. Baran*,
    983 F.3d 428 (9th Cir. 2020) .......................................................... 32

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in
    North America*,
    344 U.S. 94 (1952) ............................................................. 58, 61–62

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) ........................................... 33–35, 41–43, 53

*Korte v. Sebelius,*
   735 F.3d 654 (7th Cir. 2013) .................................................... 59, 61

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   140 S. Ct. 2367 (2020) ............................................................ 44–45

*Lyng v. Northwest Indian Cemetery Protective Association,*
   485 U.S. 439 (1988) ...................................................................... 32

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
   138 S. Ct. 1719 (2018) ................................................. 43, 46, 49, 60

*McGregor v. National Railroad Passenger Corp.,*
   187 F.3d 1113 (9th Cir. 1999) .......................................................... 2

*Milgard Tempering, Inc. v. Selas Corp. of America,*
   902 F.2d 703 (9th Cir. 1990) ......................................................... 52

*NAACP v. Button,*
   371 U.S. 415 (1963) ...................................................................... 63

*National Aeronautics & Space Administration v. Nelson,*
   562 U.S. 134 (2011) ...................................................................... 64

*Nelson v. National Aeronautics & Space Administration,*
   530 F.3d 865 (9th Cir. 2008) ......................................................... 64

*New York State Club Association, Inc. v. City of New York,*
   487 U.S. 1 (1988) .......................................................................... 50

*New York Trust Company v. Eisner,*
   256 U.S. 345 (1921) ...................................................................... 43

*Our Lady of Guadalupe School v. Morrissey-Berru,*
   140 S. Ct. 2049 (2020) ........................................................ 29, 59–60

*Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,*
   393 U.S. 440 (1969) ...................................................................... 61

*Ricci v. DeStefano,*
   557 U.S. 557 (2009) ................................................................. 31–32

*Roberts v. United States Jaycees*,
 468 U.S. 609 (1984) ........................................................................59

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
 141 S. Ct. 63 (2020) ................................................................43, 49

*Salve Regina College v. Russell*,
 499 U.S. 225 (1991) ........................................................................32

*Seattle's Union Gospel Mission v. Woods*,
 142 S. Ct. 1094 (2022) ....................................................................60

*Skagit County Public Hospital District No. 304 v. Skagit County*
 *Public Hospital District No. 1*,
 305 P.3d 1079 (Wash. 2013) ..........................................................22

*Skyline Wesleyan Church v. California Department of Managed*
 *Health Care*,
 968 F.3d 738 (9th Cir. 2020) ..........................................................33

*Tandon v. Newsom*,
 141 S. Ct. 1294 (2021) ......................................................36, 38, 51

*Thomas v. Review Board of Indiana Employment Security Division*,
 450 U.S. 707 (1981) ........................................................................33

*Tolan v. Cotton*,
 572 U.S. 650 (2014) ........................................................................31

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
 582 U.S. 449 (2017) ..........................................................34, 55, 58

*United States v. Cote*,
 51 F.3d 178 (9th Cir. 1995) ......................................................51–52

*United States v. Garcia-Beltran*,
 443 F.3d 1126 (9th Cir. 2006) ........................................................53

*United States v. Lang*,
 149 F.3d 1044 (9th Cir. 1998) ........................................................32

*Watson v. Jones,*
   80 U.S. (13 Wall.) 679 (1871) ........................................................... 59

*Wheaton College v. Burwell,*
   573 U.S. 958 (2014) ........................................................................... 44

*Yeshiva University v. Yu Pride Alliance,*
   143 S. Ct. 1 (2022) ............................................................................. 62

*Zubik v. Burwell,*
   578 U.S. 403 (2016) ........................................................................... 44

## **Statutes**

26 U.S.C. § 4980D ................................................................................. 20

26 U.S.C. § 4980H ................................................................................. 20

28 U.S.C. § 1331 ...................................................................................... 2

28 U.S.C. § 1343 ...................................................................................... 2

42 U.S.C. § 18022 ................................................................................... 20

42 U.S.C. § 18054 ................................................................................... 38

42 U.S.C. § 1983 ...................................................................................... 2

Wash. Admin. Code § 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 ....................................... 10, 11, 20, 39

Wash. Rev. Code § 48.01.080 ............................................................ 12, 21

Wash. Rev. Code § 48.30.010 ................................................................. 21

Wash. Rev. Code § 48.30.300 ................................................................. 21

Wash. Rev. Code § 48.43.005 ............................................................ 13, 38

Wash. Rev. Code § 48.43.065 ........................ 14–15, 17–18, 20, 39, 48, 58

Wash. Rev. Code § 48.43.072 ................................................................. 11

Wash. Rev. Code § 48.43.073 .................................... 10–11, 13, 37–38, 40

Wash. Rev. Code § 48.43.725 ................................................................ 16

**Other Authorities**

Ashli Blow, *In time of Trump, Washington lawmakers want to pass bill mandating abortion coverage*, KIRO 7 News (Jan. 31, 2018) ................................................................ 45–46, 49

FDA Label for Ella ................................................................ 11

FDA Label for Paragard ................................................................ 11

James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), Nat'l Archives ................................................................ 56

Liz McCaman Taylor, National Health Law Program, *In Face of Hostile Trump Administration, Washington State Takes Action to Protect and Expand Access to Reproductive Health Care* (Mar. 26, 2018) ................................................................ 46

Mark L. Rienzi, *The Constitutional Right Not to Kill*, 62 EMORY L.J. 121 (2012) ................................................................ 58

Matt Markovich, *Catholic Bishops of Wash. Ask Gov. Inslee to Veto Abortion Insurance Bill*, KOMO News (Mar. 5, 2018) ....... 12, 46, 49

Press Release, Planned Parenthood Alliance Advocates, *Washington State Senate Passes Reproductive Parity Act Following Six Years of Debate* (Jan. 31, 2018) ................................................................ 46

Rep. Shea, SSB 6219 H AMD 1311 ................................................................ 13, 46

Sen. O'Ban, SSB 6219 – S AMD 380 ................................................................ 13, 46

Sen. Rivers, PSSB 6219 (S-3824.1/18) ................................................................ 13, 46

Thomas Jefferson, *A Bill for Establishing Religious Freedom* (1779), Nat'l Archives ................................................................ 57

Tricare, Maternity Care Brochure ................................................................ 39

Wash. Att'y Gen. Op. 2002 No. 5, *Interpretation of "Conscientious Objection" Statute Allowing Employers to Refrain from Including Certain Items in the Employee Health Care Benefit Package* (Aug. 8, 2002) ...................................................... 15, 20, 22

Wash. State Dep't of Health, Abortion ................................................... 19

Wash. State Dep't of Health, Increasing Access to Reproductive Choice ................................................................................................ 19

Wash. State Legislature, Bill Info. for SB 6219 – 2017–18 ................... 45

**Rules**

Fed. R. Civ. P. 56 .................................................................................... 31

**Regulations**

77 Fed. Reg. 8,725 (Feb. 15, 2012) ............................................ 44, 48, 54

82 Fed. Reg. 47,792 (Oct. 13, 2017) ...................................................... 45

83 Fed. Reg. 57,536 (Nov. 15, 2018) ............................................... 48, 58

Exec. Order No. 13,765, 82 Fed. Reg. 8,351 (Jan. 20, 2017) .................. 45

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................ 32, 55

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Cedar Park respectfully requests oral argument. Washington forces churches and other religious ministries with strong beliefs about the sanctity of human life to include abortion and abortifacient-contraceptive coverage in their health plans. But it provides a litany of secular and religious exemptions for others. This case presents important First Amendment questions regarding how to apply (1) the definitions of general applicability and neutrality this Court recently established in *Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc), and (2) the church autonomy doctrine. Because these matters are developing and complex, oral argument will substantially assist the Court in finding right answers.

## JURISDICTIONAL STATEMENT

Cedar Park Assembly of God of Kirkland brought claims against Washington officials under the First and Fourteenth Amendments through 42 U.S.C. § 1983. Accordingly, the district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.

This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's order denying Cedar Park's motion for summary judgment and granting Washington officials' motion for summary judgment. *E.g.*, *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1114 (9th Cir. 1999).

The district court entered its summary judgment order on July 25, 2023. 1-ER-27. Cedar Park timely filed its Notice of Appeal on August 23, 2023, 5-ER-824–825, within the 30-day period set by 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF THE ISSUES

Washington law requires most employee-health plans issued or renewed after January 1, 2019, to cover abortion if they provide comprehensive maternity care, and the law requires all plans to cover abortifacient contraceptives. This abortion-coverage mandate extends to houses of worship like Cedar Park who sincerely believe and teach that human life is sacred and that abortion ends a human life. But it doesn't apply to various secular plans or any employee health plan provided by health care providers, religiously sponsored health carriers, or health care facilities who object to covering abortion on religious or conscience grounds.

Cedar Park filed suit under the First and Fourteenth Amendments against Washington's abortion-coverage mandate. On summary judgment, the district court held that applying the abortion-coverage requirement to houses of worship like Cedar Park did not violate the Free Exercise Clause or the church autonomy doctrine. Cedar Park presents two questions on appeal:

1.　　Whether Washington's application of the abortion-coverage requirement to houses of worship like Cedar Park violates the Free Exercise Clause of the First Amendment.

2.　　Whether Washington's application of the abortion-coverage requirement to houses of worship like Cedar Park violates the church autonomy doctrine under the First Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent federal constitutional provisions, state statutes, and state regulations are attached as an addendum to this brief.

## INTRODUCTION

Effective January 1, 2019, the State of Washington mandated nearly every employer in the state to maintain a healthcare plan that covers abortions. That mandate directly harmed Cedar Park. The church previously had a plan that excluded abortion and abortifacients, consistent with its beliefs. But as a direct result of Washington's law, Cedar Park's health insurer added the objected-to coverage, and the church has been unable to find a comparable alternative. Today, more than four years later, the church's health plan *still* covers abortion.

The district court wrongly granted summary judgment to the state on Cedar Park's free-exercise and church-autonomy claims. The court erroneously declared Washington's laws neutral and generally applicable even though they have both secular and religious exemptions (none of which benefit Cedar Park), vest the Office of the Insurance Commissioner with discretion to grant still more exemptions, and bear strong indicia of religious hostility. Any one of these features triggers strict scrutiny that Washington cannot satisfy.

As for the church-autonomy doctrine, the district court hardly mentioned it. But if that doctrine means anything, it prohibits the government from requiring a church to provide abortion coverage in its healthcare plan over strong and sincere religious objections.

This Court should reverse and remand for entry of a permanent injunction and final judgment in Cedar Park's favor.

## STATEMENT OF THE CASE

**A.  Cedar Park and its religious beliefs about the sanctity of human life.**

Cedar Park has served the Bothell and greater Eastside communities of Washington for over 50 years. 5-ER-760 (incorporating 5-ER-788). Cedar Park is a Christian church associated with the Assemblies of God, has hundreds of members, and hosts worship services for roughly 1,500 people each weekend. *Id.* The church employs a large team and provides health coverage to about 140 people. *Id.*; Doc. 94-1 at 3.

Like many houses of worship, Cedar Park holds, practices, and teaches the belief that human life is sacred because God formed human beings in His own likeness—therefore, human life should be protected from the moment of conception until natural death. 5-ER-760 (incorporating 5-ER-788—789); 4-ER-558–559, 563. This belief is enshrined in Cedar Park's core governing documents—its Constitution and Bylaws—which proclaim:

> Under the *Imago Dei* principle, all human life is sacred and made by God, in His image. Because all humans are image-bearers, human life is of immeasurable worth in all of its dimensions, including pre-born babies, the aged, the physically or mentally challenged, and every other stage or condition from conception through natural death. As such, we as Christians are called to defend, protect, and value all human life. [5-ER-760 (incorporating 5-ER-789).]

6

Cedar Park's "explicitly-stated teachings are that abortion itself is a sin." 4-ER-559. In fact, abortion violates Cedar Park's religious beliefs in four different ways. First, Cedar Park believes that abortion intentionally destroys innocent human life. 5-ER-760 (incorporating 5-ER-789). Second, Cedar Park views abortion as inconsistent with the dignity God conferred on human beings by creating them in His own image. *Id.* Third, Cedar Park believes that participating in, paying for, or facilitating abortion—in any circumstance—is a grave sin. *Id.* Last, because Cedar Park's faith compels it to recognize and advocate for the sanctity of human life from conception to natural death, any approval of abortion undermines its religious mission and message. *Id.*

Cedar Park does not merely believe and teach that human life is sacred; it lives out those beliefs and messages in concrete ways. The church hosts an annual service known as "Presentation Sunday" in which the congregation prays for and supports couples struggling with infertility. 5-ER-760 (incorporating 5-ER-790). In recent years, Cedar Park has also facilitated around 1,000 embryo adoptions. *Id.* And the church partners with a local pregnancy center that supports women experiencing unplanned pregnancies—to help them see the value of the human life growing inside them. *Id.* Showing its concern for life beyond the womb, Cedar Park hosts an annual camp for vulnerable children in foster care. *Id.* And each year, the church's employees and members

participate in the March for Life in Olympia, Washington, to promote Cedar Park's pro-life views at the state capitol. *Id.*

All Cedar Park's employees must share and abide by the church's religious beliefs—including those about the sanctity of human life—at work and home. 5-ER-760 (incorporating 5-ER-789). Each church employee signs a statement agreeing to "conduct their professional and personal lives in a manner that provides clear evidence of a Christian life and character that commends the Gospel, strengthens the Church[,] and honors God." 5-ER-760 (incorporating 5-ER-789–790). Conversely, Cedar Park's employees agree "to refrain from behavior that conflicts or appears inconsistent with evangelical Christian standards as determined in the sole and absolute discretion of Cedar Park." 5-ER-760 (incorporating 5-ER-790).

## B.    Cedar Park's health plan

Cedar Park puts its beliefs and teachings about the sanctity of human life into practice through its health plan. 5-ER-760 (incorporating 5-ER-791); 4-ER-564. Cedar Park believes it has a religious duty to care for church employees by providing health insurance with full maternity care. 5-ER-760 (incorporating 5-ER-791); 4-ER-563. The church also has a legal obligation to do so under the federal Affordable Care Act ("ACA"). 5-ER-760 (incorporating 5-ER-791). Yet, because of its religious beliefs, Cedar Park intentionally excluded abortion and abortifacient contraceptives—including emergency contraception and

copper intrauterine devices—from its health plan.[1] 5-ER-760
(incorporating 5-ER-791–792); 3-ER-388.

Insurance carriers were happy to provide the church with an
abortion-free plan. 5-ER-760 (incorporating 5-ER-791–792); 3-ER-388.
The market proved no obstacle to Cedar Park obtaining health coverage
consistent with its religious beliefs. 2-ER-66. As recently as 2019 (when
this suit was filed), Cedar Park had a group health plan that excluded
abortion coverage, 5-ER-760 (incorporating 5-ER-792). Cedar Park has
long purchased a group health plan because it is the only viable way for
the church to fulfill its religious calling to safeguard its employees'
health, which is also a legal obligation under the ACA. 5-ER-760
(incorporating 5-ER-791); 2-ER-65–67; 4-ER-577–578.

After evaluating self-insurance, Cedar Park discovered that it
would cost roughly $243,125 more *annually* and that this number would
likely *double* within a few years due to increased plan use. 5-ER-760
(incorporating 5-ER-791); 2-ER-66–67. The church cannot spend
hundreds of thousands of dollars more each year for health insurance
without significantly reducing its other ministries. 5-ER-760

---

[1] Cedar Park obtained repeated assurances from its broker that the
church's health plan excluded coverage of abortifacient contraceptives,
including emergency contraception and copper intrauterine devices. 5-
ER-760 (incorporating 5-ER-792). At one point, Cedar Park discovered
these guarantees were incorrect and it took immediate steps to exclude
abortifacients from its health plan. Id.

(incorporating 5-ER-791). Purchasing group health insurance, regulated by the Washington State Office of the Insurance Commissioner, is the only sustainable way for Cedar Park to keep its ministries intact. *Id.*

### C. Washington's abortion-coverage mandate

"Historically, Washington law has not mandated abortion coverage." 4-ER-648. There was no reason; most health plans in Washington already covered abortion. 4-ER-648. The state never received any complaints about a lack of—or limit on—abortion coverage. 4-ER-674. And no state enforcement actions based on a lack of contraceptive coverage were pending. 4-ER-712–713. Yet the Washington Legislature chose to intervene in the insurance market, ostensibly to "protect[ ] gender equity and women's reproductive health." 5-ER-817. In reality, the legislature made a political statement, decrying any "[r]estrictions on abortion coverage" by employers as "interfere[nce] with a woman's personal, private pregnancy decision making" and (now-defunct) "constitutionally protected right to … abortion." 5-ER-818–819.

The Washington Legislature made this statement through Senate Bill 6219 ("SB 6219"), which requires most health plans that "provide[ ] coverage for maternity care or services" to "also provide a covered person with *substantially equivalent coverage to permit … abortion.*" Wash. Rev. Code § 48.43.073(1); Wash. Admin. Code § 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(2) (emphasis added). SB 6219 reflects the Washington Legislature's moral

10

judgment that childbirth and abortion are equally valid options. And the law enforces that view by generally prohibiting health plans from "*limit[ing] in any way* a person's access to services related to the abortion of a pregnancy." Wash. Rev. Code § 48.43.073(2) (emphasis added).

But SB 6219 doesn't stop there. The law requires group health plans to cover "*[all] contraceptive drugs, devices, and other products, approved by the federal food and drug administration*, including over-the-counter contraceptive drugs, devices, and products," as well as the "consultations, examinations, procedures, and medical services … necessary to prescribe, dispense, insert, deliver, distribute, administer, or remove" those items. Wash. Rev. Code § 48.43.072(1)(a) & (c) (emphasis added); *accord* Wash. Admin. Code § 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(1). This list encompasses emergency contraception and copper intrauterine devices that may prevent a fertilized egg's implantation and have an abortifacient effect.[2]

Anyone who violates Washington's abortion-coverage requirements is guilty of a gross misdemeanor and subject to fines up to $1,000 and imprisonment for up to 364 days, plus other potential

---

[2] FDA Label for Ella at 5, https://bit.ly/47lgU2w (listing "may affect implantation" as a possible mechanism of action); FDA Label for Paragard at 1, 19, https://bit.ly/47wjsKV (citing the "[i]ncreased risk of spontaneous abortion" and "prevention of implantation" as a possible mechanism of action ).

11

penalties. Wash. Rev. Code § 48.01.080. The state may also strip away an offending secular insurance carrier's authorization to do business. *Accord* 4-ER-682–685; 4-ER-709–713. So secular carriers (*i.e.*, 99% of the insurance market) *cannot* accommodate Cedar Park's religious objections and provide it with an abortion-excluding plan without facing potential jail time, fines, or losing all business in Washington.[3]

That dilemma results from SB 6219's lack of an exemption for houses of worship—or other religious ministries—who object to including abortion and abortifacient-contraceptives in their health plans. Churches strongly objected to the lack of a religious exception. *E.g.*, Matt Markovich, *Catholic Bishops of Wash. Ask Gov. Inslee to Veto Abortion Insurance Bill*, KOMO News (Mar. 5, 2018), https://bit.ly/49AJ1wo.[4] But their pleas fell on deaf ears. SB 6219's sponsor, Senator Steve Hobbs, declared Washington "a pro-choice state," said that "[h]ealth care is about the individual, not about" employers, and told churches to sue "if they don't like the bill." *Id.* The Washington Legislature took the same hostile tack towards people of faith, rejecting amendments that would have protected religious organizations three separate times. Sen. Rivers, PSSB 6219 (S-

---

[3] Providence Health Plan is the only religious carrier in Washington. 4-ER-727.

[4] Cedar Park's complaint cites and incorporates this article by reference. 5-ER-761 (incorporating 5-ER-793).

3824.1/18), https://bit.ly/3IXJGew; Sen. O'Ban, SSB 6219 – S AMD 380, https://bit.ly/3YzAfIi; Rep. Shea, SSB 6219 H AMD 1311, https://bit.ly/41XVwy7.

Yet the Washington Legislature made explicit secular carveouts to the abortion-coverage requirement. First, the requirement excludes multistate plans, Wash. Rev. Code § 48.43.073(4), which one carrier offered in Washington in the past, 3-ER-312. Second, the requirement doesn't apply whenever it "results in noncompliance" with federal-funding conditions "to the minimum extent necessary for [Washington] to be in compliance" and receive federal funds. Wash. Rev. Code § 48.43.073(5). So if federal dollars are at stake, Washington's abortion-coverage requirement gives way. No set guidelines determine when or how the funding exception applies; instead, the Office of the Insurance Commissioner has "discretion," 4-ER-653, and applies the exclusion "on a case-by-case basis," 3-ER-309.

Last, the abortion-coverage requirement doesn't apply to (1) self-funded health plans, (2) short-term limited purpose or STLD plans, (3) property/casualty liability plans, or (4) supplemental Medicare or Tricare plans—despite the fact that they may provide coverage or payouts related to maternity care. 4-ER-655; 3-ER-325–327, 333–334, 339; 2-ER-71–72 *accord* Wash. Rev. Code § 48.43.005(31) (excluding these types of insurance from the definition of "health plan").

### D.  Washington's conscience statute

Washington has a statute that purports to safeguard conscience rights in the insurance context. Wash. Rev. Code § 48.43.065(3)(a). But it doesn't alleviate Cedar Park's religious objections in the least. From the start, the statute proclaims that "conscientious objection[s] to participating in specific health services" (*e.g.*, abortion) cannot result in an employer's plan omitting "the full range of services" contained in "the basic health plan." Wash. Rev. Code § 48.43.065(1). The Office of the Insurance Commissioner includes abortion and abortifacient contraceptives in this basic plan. 4-ER-651, 653 ("the OIC could interpret RCW 48.43.065 as applying to all essential health benefits, and any other state mandated benefits"—that is, it could "impose both the [abortion] notice and access requirements found in RCW 48.43.065"); 4-ER-729–730 (describing this interpretation of the statute as "Option 3"); 3-ER-305–304 (the Office of the Insurance Commissioner chose "Number 3").

So regardless of whether Cedar Park objects, abortion and abortifacient-contraceptives are covered by the church's health plan. Under the conscience law, houses of worship like Cedar Park are not "required to purchase coverage" for abortion and abortifacient-contraceptives *directly*. Wash. Rev. Code § 48.43.065(3)(a). But Cedar Park's health plan must still include—at least *indirectly*—"coverage of, and timely access to, any … services [like abortion] excluded from

[employees'] benefits package as a result of their employer's ... exercise of the conscience clause." Wash. Rev. Code § 48.43.065(3)(b). As a result, carriers honoring Washington's "religious exemption" issue an *insurance card*—on Cedar Park's behalf—that provides access to abortion or abortifacient-contraceptives and non-objectionable coverage alike. 2-ER-66, 69.

What's more, the conscience law allows carriers to force houses of worship—like Cedar Park—to pay for nominally "excluded" abortion coverage because nothing "requires a health carrier ... to provide any health care services without appropriate payment of premium or fee." Wash. Rev. Code § 48.43.065(4). Specifically, Washington empowers carriers to pass along the cost of covering abortion and abortifacients to houses of worship in the form of increased premiums, "administrative" or "overhead" expenses, or other fictitious costs. Wash. Att'y Gen. Op. 2002 No. 5, *Interpretation of "Conscientious Objection" Statute Allowing Employers to Refrain from Including Certain Items in the Employee Health Care Benefit Package* (Aug. 8, 2002), https://bit.ly/3fzu14B ("2002 AG Op."). Profit-minded carriers are nearly certain to pass the buck to religious objectors like Cedar Park to pay for (1) abortion coverage and (2) a potential "equity fee" imposed on "health carrier[s] offering a health plan" that "excludes, under state or federal law, any essential health benefit or coverage [*e.g.*, abortion] that is otherwise

required" by the state. Wash. Rev. Code § 48.43.725(2); *accord* E-ER-346–348.

Summed up, Cedar Park cannot obtain a group health plan that *actually* excludes abortion. Under the conscience law, notice of how to obtain abortion and abortifacients is contained "in the plan documents" and "the plan actually provides for access" regardless of Cedar Park's religious objection. 2-ER-254, 257; *accord* 2-ER-255 ("[T]hough their employer may object to providing it, the carrier will make that service available."); 3-ER-404 ("[I]f we expressed our desire to not cover abortions or specific contraceptives, they would be included in our plan."). Plan participants could use Cedar Park's insurance card to access abortion and abortifacients, the same as everything else. 2-ER-66, 69. In addition, carriers willing to attempt the conscience law's scheme could force Cedar Park to pay indirectly for that objectionable coverage. *Supra* p.15. All of this violates the church's religious beliefs against "paying for, facilitating access to, or providing insurance coverage for abortion or abortifacient contraceptives *under any circumstance*," whether that complicity is direct, indirect, or somewhere in between. 5-ER-760 (incorporating 5-ER-798) (emphasis added); *accord* 5-ER-768.

Washington says that carriers could facilitate abortion and abortifacient coverage by distributing the risk through a third party or to all (or some) members of Cedar Park's group health plan. Doc. 95 at

10. But even if Cedar Park was not forced to pay for abortion coverage, which Washington has never suggested carriers *should* do, the violation of the church's beliefs remains because abortion coverage is inserted into Cedar Park's health plan and occurs as a result of its health plan purchase. 5-ER-760 (incorporating 5-ER-789); 5-ER-768.

Other parts of the conscience law prove Washington is willing to *actually* accommodate *other* religious objections to abortion coverage—just not those of houses of worship. The exemption available to this favored class is broad and clear: "No individual health care provider, religiously sponsored health carrier, or health care facility may be required by law or contract *in any circumstances* to participate in the provision of or *payment for* a specific service [*e.g.*, abortion] if they object to so doing for reason of conscience or religion." Wash. Rev. Code § 48.43.065(2)(a) (emphasis added). Critically, this carveout isn't limited to the "provision" of abortion services: it extends to healthcare-related entities' "*payment for*" abortion services "*in any circumstances*," including the purchase of employee health plans. *Id.* (emphasis added).

State officials conceded this below. When Cedar Park asked which of § 49.43.065's subsections "protect religious health care providers and religious health care facilities from having *to pay for* an objectionable health care service like *abortion* and contraception," Defendants' representative cited subsection (2), which applies to healthcare-related entities, and subsection (3), which applies to all objectors. 3-ER-343

(emphasis added). And when counsel questioned whether subsection (2) "protect[s] health providers and health care facilities who have religious convictions against … abortion from having *to pay for health care coverage that covers abortion*," the representative answered, "the statute speaks for itself."[5] 3-ER-342–343 (emphasis added).

Accordingly, the conscience law's plain terms exempt health care providers, religiously sponsored health carriers, and health care facilities from including abortion coverage in their employee health plans. Wash. Rev. Code § 48.43.065(2)(a). Their conscience rights are respected, though not perfectly because § 48.43.065(2)(b) forces referrals to abortion coverage elsewhere and some religious organizations—like Cedar Park—object to facilitating abortion in any way. 4-ER-651 (if neither a religious carrier nor the employer will refer for abortion, "the requirements of the conscience clause cannot be satisfied"); *id.* ("If Providence objects to providing any payments and *any referral*

---

[5] Another Washington representative explained that "[i]f an individual health care provider or a health care facility were payers, if they were paying for a given service [*e.g.*, abortion], then . . . they could not be compelled to" pay. 2-ER-227. She later distinguished a health care facility's "capacity [as] a health care facility" from its "capacity as a private employer" paying for health insurance. 2-ER-230. But that distinction has no basis in § 48.43.065(2)(a)'s text, which protects healthcare-related entities from paying for abortion "in any circum-stances," including when they purchase health plans.

*information* … , they would not be able to satisfy … RCW 48.43.065 and WAC 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.") (emphasis added).

Nor must religiously sponsored carriers include abortion coverage in the group plans they sell to others. 4-ER-682–683; 4-ER-726; 3-ER-299 (discussing Washington's exemption for Providence Health Plan, the only religiously sponsored carrier in the state). So *secular businesses* eligible for a Providence group plan may exclude comprehensive abortion coverage because "the Washington Department of Health … has arranged to provide [abortion] services" to their employees.[6] 2-ER-234. Yet *religious houses of worship* like Cedar Park—which is ineligible for a Providence group plan—cannot. 2-ER-173–174, 176–177 (explaining Providence doesn't offer a large employer group plan in King and Snohomish Counties where Cedar Park operates).

In sum, Washington offers real conscience protection to health care providers, religiously sponsored health carriers, and health care facilities. These religious objectors are exempt from including abortion coverage in their own employee health plans or paying for abortion

---

[6] *Accord* Wash. State Dep't of Health, Abortion, https://bit.ly/3G0Quag ("The state funds abortion care for clients with health plans through Providence Health, which invokes a religious objection to covering abortion services."); Wash. State Dep't of Health, Increasing Access to Reproductive Choice, https://bit.ly/46aui8k ("We will pay for your abortion services if you have Providence Health Plan coverage that originates in Washington State and receive services from a provider who agrees to accept reimbursement from us.").

coverage in any circumstance. Wash. Rev. Code § 48.43.065(2)(a). Yet because Cedar Park is a church and not a healthcare-related entity, Washington forces it to (at least) indirectly include abortion and abortifacient contraceptives in its health plan.[7] Wash. Rev. Code § 48.43.065(1), (3)(a). And the state authorizes health carriers to charge Cedar Park for this abortion coverage surreptitiously. 2002 AG Op.

### E. The impact of Washington's abortion-coverage requirement on Cedar Park and its health plan.

Cedar Park offers its employees a group health plan with comprehensive maternity coverage for religious reasons and because the ACA requires it. 5-ER-760 (incorporating 5-ER-791); *accord* 26 U.S.C. § 4980H; 42 U.S.C. § 18022(b)(1)(D). Cedar Park faces crippling fines of up to $100 per plan participant for *each day* it doesn't provide this coverage. 5-ER-761 (incorporating 5-ER-798–799); *accord* 26 U.S.C. § 4980D. Actually, all approved group health plans in Washington cover maternity care. 2-ER-183. That universally triggers SB 6219's abortion-coverage requirement—just as the Washington Legislature intended.

Less than a month before the church's group health plan was set to renew in 2019, Cedar Park's insurance provider—Kaiser

---

[7] The Insurance Commissioner's regulations implementation SB 6219's abortion-coverage requirement lacks substance and merely states the obvious point that SB 6219 "does not diminish or affect any rights or responsibilities provided under RCW 48.43.065" (*i.e.*, Washington's conscience law). Wash. Admin. Code § 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(3).

Permanente—said that it would directly insert abortion coverage into the church's health plan based on SB 6219's requirements.[8] 5-ER-760; 2-ER-71. In fact, Kaiser took SB 6219's abortion-coverage requirement and severe penalties so much to heart that it stopped "accommodating *any* abortion exclusions for fully insured groups" under § 48.43.065 or otherwise. 2-ER-71 (emphasis added). Kaiser has no independent objection to providing Cedar Park with an abortion-excluding plan, as it had for years. Quite the opposite, Kaiser is ready and willing to remove abortion coverage from Cedar Park's health plan mid-year *if* the church obtains a court-ordered exemption. 5-ER-768; 3-ER-448–449.

Without an injunction, accommodating Cedar Park's religious beliefs about the sanctity of human life poses too great a risk to Kaiser and other secular insurers. Doing so would subject them to jail time and fines under SB 6219, Wash. Rev. Code § 48.01.080, plus potential penalties and ruinous administration action under Wash. Rev. Code § 48.30.010, which outlaws unfair acts or practices, and Wash. Rev. Code § 48.30.300, which outlaws sex discrimination. 5-ER-760 (incorporating 5-ER-797–798). The Attorney General's 2002 opinion suggests *both* types of liability for secular insurance carriers that agree to provide religious objectors—like Cedar Park—comprehensive drug

---

[8] Kaiser Permanente is Cedar Park's long-time insurance carrier. E-ER-387. Before that, the church used a health carrier that Kaiser purchased. 3-ER-388.

coverage, while excluding coverage for abortifacient contraceptives. 2002 AG Op. And that opinion does so by maligning the accommodation of sincerely held religious beliefs about the sanctity of human life as an "unfair practice" and "sex discrimination."[9] *Id.*

Under these conditions, SB 6219's natural result was Kaiser's insertion of direct abortion and abortifacient-contraceptive coverage into Cedar Park's plan and refusal to attempt a religious accommodation. 5-ER-760–761. Once Cedar Park received notice of this involuntary change, the church had only 18 days to act before its policy renewed. 5-ER-760. Unable to find abortion-free replacement coverage, Cedar Park renewed its plan—under protest—to avoid a devastating lapse in coverage for employees and their family members, 5-ER-760; 4-ER-567, some of whom require costly treatments, 5-ER-769; 2-ER-66–67.

Ever since, Cedar Park has sought abortion-free replacement coverage without success. 3-ER-428, 451. Cedar Park isn't eligible for a Providence group plan. 3-ER-428. The fully insured plans available in the church's region "would have provided Cedar Park employees access to abortion and abortion causing drugs through, or as a result of, the

---

[9] Washington didn't actually criminalize health carriers' accommodation of religious employers' beliefs until SB 6219 took effect. The Washington Attorney General's 2002 opinion was unfounded and nonbinding. *E.g.*, *Skagit Cnty. Pub. Hosp. Dist. No. 304 v. Skagit Cnty. Pub. Hosp. Dist. No. 1*, 305 P.3d 1079, 1082 (Wash. 2013) (en banc).

[c]hurch's plan" in violation of Cedar Park's beliefs, 2-ER-65–66. As Defendants' representative said, "they all cover abortion now." 4-ER-682.

So the only abortion-free option is self-insurance. 3-ER-431; 4-ER-571, 574; 2-ER-65–66. But that isn't feasible "because of claims exceeding $1,840,000 for one of Cedar Park's employee's children in plan years 2019 through 2021" alone. 2-ER-67. The church may "not even be able to get the Stop Loss Insurance needed for a self-insured plan" to work. 2-ER-67. In any event, Cedar Park's added health insurance costs would be astronomical, increasing "at least an additional $200,000" for 2020–21, and by 2021–22 "an additional $200,000." 2-ER-67.

Because SB 6219 left Cedar Park with no better options, the church has maintained its Kaiser group plan, which includes direct abortion and abortifacient-contraceptive coverage in violation of the church's beliefs. 3-ER-389–391; 4-ER-558–563. Cedar Park has been forced to fund that coverage with tithes and donations, which church members give with the understanding that Cedar Park will "adhere to and transmit authentic Christian teaching on morality and the sanctity of human life." 5-ER-761 (incorporating 5-ER-799). For over four years, SB 6219 has forced Cedar Park to "violate [that] implicit trust." 5-ER-761 (incorporating 5-ER-799).

### F.    Proceedings in the district court

#### 1.    Initial proceedings

In 2019, Cedar Park was forced to file a pre-enforcement suit in the U.S. District Court for the Western District of Washington against SB 6219's abortion-coverage requirement, just as the bill's sponsor—Senator Hobbs—boasted churches would need to do. 5-ER-761 (incorporating 5-ER-793). The church's Verified Complaint raised, among other things, free exercise and church autonomy claims under the First Amendment. Doc. 1 at 14–18, 21–23. Shortly thereafter, Cedar amended its complaint, Doc. 20, and filed a motion for preliminary injunction, Doc. 29. Washington moved to dismiss, Doc. 25, and opposed the injunction, Doc. 35, while Cedar Park moved to amend its complaint a second time to explicitly challenge Washington's conscience law and correct two inadvertent factual errors, Doc. 42.

The district court granted Washington's motion to dismiss, denied Cedar Park's motion for preliminary injunction, and granted the church's motion to amend. Docs. 45. Cedar Park followed up with a second motion for preliminary injunction, Doc. 49, and, after Kaiser inserted abortion coverage into the church's health plan, a motion to file a supplemental verified complaint, Doc. 51. Washington opposed both motions and filed a renewed motion to dismiss. Docs. 53 & 56.

In 2020, the district court granted Cedar Park's motion to file a supplemental verified complaint, granted Washington's second motion

to dismiss, and denied the church's second motion for preliminary injunction. Doc. 60. Based chiefly on the mistaken belief that Cedar Park could purchase an abortion-free Providence health plan, the district court held Cedar Park had no injury fairly traceable to SB 6219, and thus lacked standing. Doc. 60 at 12–13.

### 2. Cedar Park's first appeal

Cedar Park appealed. Doc. 62. The church raised one issue in its opening brief: "whether Cedar Park has Article III standing to challenge the application of Senate Bill 6219's abortion-coverage mandate to houses of worship," Opening Br., *Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*, No. 20-35507 (9th Cir. Sept. 2, 2020). In 2021, this Court held that Cedar Park had standing.

First, the church "plausibly alleged" an injury "due to the enactment of SB 6219, [as] its health insurer (Kaiser Permanente) stopped offering a plan with abortion coverage restrictions and Cedar Park could not procure comparable replacement coverage." *Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*, 860 F. App'x 542, 543 (9th Cir. 2021). Second, traceability was satisfied because "Kaiser Permanente reasonably understood the plain language of SB 6219 as precluding [abortion] restrictions, and it acted accordingly when it removed the restrictions from Cedar Park's health plan." *Id.*

### 3. Proceedings on remand

On remand, the district court held that "the only remaining claims in this case are Cedar Park's Free Exercise claim and its religious autonomy claim to the extent it is based on the Free Exercise Clause of the First Amendment." 5-ER-758. Washington filed an answer, 5-ER-732, then moved to dismiss Cedar Park's complaint yet again, Doc. 88. Before the court ruled on that motion, the parties filed competing motions for summary judgment. Docs. 103–04. Cedar Park's motion requested a declaratory judgment that SB 6219 and Washington's conscience law violate the First Amendment and a permanent injunction barring Washington "from applying those statutes to Cedar Park" and similar religious organizations. 4-ER-644.

In 2023, the district court denied Washington's motion to dismiss.[10] 1-ER-45. The court acknowledged that after SB 6219 took effect, Cedar Park lost its abortion-free health plan and was unable "to obtain comparable coverage" because "the only plan that would have restricted abortion in a manner consistent with Cedar Park's religious beliefs was self-insurance." 1-ER-45. And "[s]elf-insurance was not a viable option financially to Cedar Park and it is not comparable to a

---

[10] In the same order, the district court denied a motion for sanctions that Washington filed against the church because "Cedar Park did not make factual misrepresentations to this Court or to the Ninth Circuit." 1-ER-39. Though the court "agree[d] with Cedar Park that the State's motion is not meritorious," it deemed that motion "not frivolous" and also denied the church's cross-motion for sanctions. 1-ER-43.

fully insured plan." 1-ER-45. So "the Ninth Circuit's remand require[d] that the [c]ourt deny the State's motion to dismiss." 1-ER-45.

### 4. The district court's summary judgment ruling

About two months later, the district court denied Cedar Park's motion for summary judgment, granted Washington's motion for summary judgment, 1-ER-27, and entered final judgment in the state's favor, 1-ER-2. The court recognized that "SB 6219 require[d] Cedar Park to facilitate access to covered abortion services contrary to Cedar Park's religious beliefs." 1-ER-16. But it upheld that grave burden on the church's religious beliefs and practices as neutral and generally applicable under the Free Exercise Clause. 1-ER-24.

Concerning general applicability, the district court said that a variety of insurance plans exempt from SB 6219's abortion-coverage requirement aren't "comparable" and cannot "defeat SB 6219's general applicability." 1-ER-21. Based on the mistaken belief that comparability under the Free Exercise Clause is the "same" as similarly situated analysis under the Equal Protection Clause, the court refused to consider Washington's exemption of employee health plans purchased by individual health care providers, religiously sponsored health carriers, and health care facilities—citing the inapposite doctrines of "the law of the case and the rule of the mandate." 1-ER-23. The court also discounted the individualized exemptions Washington grants

whenever federal funds are at risk, saying "ensuring compliance with federal law does not defeat SB 6219's general applicability." 1-ER-23.

Regarding neutrality, the district court ignored or dismissed ample evidence of hostility in the record, stating—quite implausibly— there was no proof "SB 6219 was enacted to burden or target religion." 1-ER-18. The court refused to even consider whether "SB 6219 proscribes more [religious] conduct than necessary." 1-ER-18. And the court branded plainly hostile comments by SB 6219's sponsor as either trifling or innocuous. 1-ER-18–19.

Because the district court deemed SB 6219 generally applicable and neutral, it applied rational basis review under *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). 1-ER-12, 24–26. So the court only required "a [conceivable] legitimate governmental purpose" for the abortion-coverage requirement. 1-ER-26. The court named four: "promoting gender equity, promoting economic success of women, improving women's health, and protecting privacy." 1-ER-26. Accordingly, the court granted summary judgment to Washington on Cedar Park's free exercise claim. 1-ER-26.

On church autonomy, the district court's analysis was virtually nonexistent. "[P]urchasing a health insurance plan" for church employees "is not an ecclesiastical decision," the court said, "and thus the religious autonomy doctrine does not apply." 1-ER-27. The court gave no rationale for this conclusion even though courts often apply the

church-autonomy doctrine to religious organizations' employment-related decisions. *E.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060–61 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–90 (2012). Nonetheless, the district court granted summary judgment to Washington on Cedar Park's religious autonomy claim. 1-ER-27.

The end result of over four years of litigation was the district court's dismissal of Cedar Park's case with prejudice. 1-ER-27.

## SUMMARY OF ARGUMENT

Cedar Park is entitled to judgment as a matter of law on its free-exercise claim. Under *Smith*, a law burdening religion like Washington's is subjected to strict scrutiny if it is not generally applicable or non-neutral. Washington's law is not generally applicable because it grants exemptions to secular and other religious organizations but not Cedar Park, and because it vests considerable discretion in Washington's Insurance Commissioner to grant more exemptions. And Washington's law is non-neutral because the history of its enactment shows impermissible anti-religious animus.

Washington cannot satisfy strict scrutiny. Its laundry list of exceptions and system of individualized exceptions undercuts the state's "contention that its [abortion-coverage] policies can brook no departures." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021). Nor is Washington's law narrowly tailored because the state solved a non-existent problem—nearly every Washington employer has a healthcare plan that covers abortion—by forcing Cedar Park to cover abortion when its employees are least likely to want it and the state could have provided such coverage itself.

Washington's law also violates the church-autonomy doctrine. That doctrine prohibits government officials from interfering with a church's internal operations, particularly employment matters. Cedar Park's autonomy includes deciding whether including abortion and

abortifacients in its healthcare plan violates the church's faith and changes its religious teachings. The Constitution prohibits Washington from inserting itself into these internal church matters and coercing Cedar Park to live according to a view of the Bible it believes to be false.

For all these reasons, Cedar Park, not Defendants, is entitled to summary judgment and a permanent injunction. Defendants' conduct has violated Cedar Park's constitutional rights for more than *four years*. Once this Court determines that Cedar Park is entitled to judgment as a matter of law, Cedar Park easily satisfies the four-factor injunction test. Accordingly, Cedar Park respectfully requests that this Court reverse and remand for entry of summary judgment, a permanent injunction, and final judgment in the church's favor.

## ARGUMENT

### I.  Standard of review

Summary judgment is required when movants show "there is no genuine issue as to any material fact" and they prevail "as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)). If "a rational" factfinder couldn't "find for the nonmoving party" based on "the record taken as a whole," summary judgment is fitting because "there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quotation omitted). *Id.* Courts making this evaluation view facts "in the light most favorable to the

nonmoving party only if there is a genuine dispute as to those facts." *Id.* (quotation omitted).

When a district court rules on cross-motions for summary judgment, this Court's review is de novo, *Innova Solutions, Inc. v. Baran*, 983 F.3d 428, 431 (9th Cir. 2020), which means "no form of appellate deference" applies. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991). So this Court resolves "legal questions … independently without deference to the trial court" based on its "institutional advantage" in deciding matters of law. *United States v. Lang*, 149 F.3d 1044, 1046 (9th Cir. 1998).

## II. Cedar Park is entitled to summary judgment on its free exercise claim.

### A. SB 6219 and the conscience law burdens Cedar Park's free exercise of religion.

The First Amendment bars Congress from making laws that "prohibit[ ] the free exercise" of religion, U.S. Const. amend. I, and the Fourteenth Amendment applies that prohibition to the states. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). This "Free Exercise Clause is written in terms of what the government cannot do to the individual." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (quotation omitted). One of the primary ways the government violates that clause is by "coerc[ing] individuals" or private associations of people "into acting contrary to their religious beliefs." *Id.* at 450.

The Free Exercise Clause is triggered whenever government "burden[s] [a] sincere religious practice." *Kennedy v. Bremerton Sch.*

*Dist.*, 142 S. Ct. 2407, 2422 (2022). Here, no one questions the sincerity of Cedar Park's beliefs in the sanctity of human life or the religious basis for the church's exclusion of abortion and abortifacient contraceptives from its health plan. Yet Washington disputes that its law burdens Cedar Park's sincere religious practice. That assertion is baseless.

In our society, an employer's ability to purchase a fully insured health plan is "an important benefit." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717 (1981). Washington effectively "denies" Cedar Park that "benefit because of conduct mandated by religious belief"—namely, the church's longstanding exclusion of abortion from its group plan. *Id.* at 717–18. That denial "put[ ] substantial pressure" on Cedar Park "to modify [its] behavior and to violate [its] beliefs. *Id.* at 718.

Washington's strong-arm tactics worked. Canceling group health coverage was so unfeasible because of the devastating effects on Cedar Park's employees and their families that the church has been compelled for *four years now* to pay for a fully insured plan that includes direct abortion and abortifacient-contraceptive coverage in serious violation of its beliefs. That is a clear "burden upon religion" that triggers the Free Exercise Clause. *Id.*; *accord Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 720–22 (2014); *Cedar Park*, 860 F. App'x at 543; *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020).

It's no answer to say that Cedar Park didn't *have* to purchase a fully insured plan. Government may not "infringe[ ]" religious liberty by "placing … conditions upon a benefit or privilege," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) (quotations omitted),[11] including the ability to purchase a group plan. Though "the Free Exercise Clause protects [even] against indirect coercion or penalties on the free exercise of religion," SB 6219 and the conscience law are hardly indirect. *Id.* (quotation omitted). Washington "outright prohibit[s]" secular health carriers (*i.e.*, the only carriers available)—on pain of "criminal[ ]" penalties, fines, and potential shuttering—from excluding abortion from the church's fully insured plan. *Id.* (quotation omitted); *accord supra* p. 11. That substantially "burdens" Cedar Park's religious practice under any definition of the term.

### B. Washington's abortion-coverage requirements aren't generally applicable or neutral, so they trigger strict scrutiny under *Smith*.

Cedar Park can prove "a free exercise violation in various ways." *Kennedy*, 142 S. Ct. at 2421. One option is *Smith*, which requires the church to show that Washington "burden[s] [its] sincere religious practice pursuant to" laws that aren't "neutral or generally applicable." *Id.* at 2421–22 (cleaned up). If Cedar Park makes that showing, "this Court

---

[11] *Accord Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 778 (2022); *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2256 (2020).

will find a First Amendment violation unless the government can satisfy strict scrutiny." *Id.* at 2422 (quotation omitted).

Despite *Smith*'s many flaws,[12] Cedar Park meets its free-exercise test. As detailed below, Washington's abortion-coverage requirements are neither generally applicable nor neutral. So strict scrutiny applies.

### 1. Defining general applicability

For a law to be generally applicable, the state must "appl[y] [it] in an evenhanded, across-the-board way." *Kennedy*, 142 S. Ct. at 2423. "[A]n *exceptionless* policy" is generally applicable.[13] *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) ("*FCA*") (emphasis in original). A classic example is *Smith*, which confronted "an across-the-board criminal prohibition on a particular form of conduct," 494 U.S. at 884, and deemed that universal ban "generally applicable," *id.* at 884–885.

But a legal mandate "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. In other words, "the government may not treat comparable secular activity more favorably than religious exercise." *FCA*, 82 F.4th at

---

[12] *E.g.*, *Fulton*, 141 S. Ct. at 1883–1924 (Alito, J., concurring in the judgment).

[13] *Accord FCA*, 82 F.4th at 687 (a law is generally applicable if it "appl[ies] . . . *without exception*") (emphasis in original).

686 (cleaned up). And the degree makes no difference. Laws that "'treat *any* comparable secular activity more favorably than religious exercise'" flunk *Smith*'s test. *Id.* at 688 (quoting *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam)) (emphasis in original).

Under the Free Exercise Clause, comparability is "judged against" the effect on the government's "asserted … interest[s]." *Id.* at 689 (quotations omitted). So courts inquire whether those laws allow "nonreligious conduct that endangers" the state's "interests in a similar or greater degree than [prohibited religious conduct] does." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). If denied religious exceptions "pose an identical risk to the [government's] stated interest[s]" as approved secular carveouts, then laws aren't generally applicable. *FCA*, 82 F.4th at 689.

General applicability is also absent if the challenged laws allow "individualized exemptions" based on "the particular reasons for a person's conduct" or "the circumstances underlying each application." *Fulton*, 141 S. Ct. at 1877 (quotations omitted). It makes no difference "whether any exceptions have been given." *Id.* at 1879. "[T]he mere existence of government discretion is enough to render [laws] not generally applicable." *FCA*, 82 F.4th at 685; *accord id.* at 687–88. And rightly so because the Free Exercise Clause bars the state from "refus[ing] to extend [an] exemption system to cases of religious hardship without compelling reason." *Fulton*, 141 S. Ct. at 1878 (cleaned up).

After establishing what matters for general applicability, it's important to clarify what doesn't. "[T]argeting is not required for a government policy to violate the Free Exercise Clause." *FCA*, 82 F.4th at 686. Nor does the state's "good intentions … change the fact that it … treat[s] comparable secular activity more favorably than religious exercise" or allows "a case-by-case analysis … antithetical to a generally applicable" law. *Id.* at 688.

### 2. Washington's abortion-coverage requirements fail the general-applicability test.

Washington's abortion-coverage requirements are not generally applicable. Rather than being "exceptionless," *FCA*, 82 F.4th at 686 (emphasis omitted), SB 6219 and the conscience law—operating together—are "replete with exemptions," *id.* at 694. And those exemptions favor "secular activity" over "religious exercise," *id.* at 688 (quotations omitted), even though the activities "pose an identical risk to [Washington's] stated interest[s]," *id.* at 689.

Consider SB 6219's text, which says the abortion-coverage requirement "does not … apply to a multistate plan that does not provide coverage for … abortion." Wash. Rev. Code § 48.43.073(4). All agree this statutory exemption exists and that one Washington carrier previously offered an abortion-excluding multistate plan. 3-ER-312. The state attempts to justify this exemption by pointing to a federal legal requirement. Wash. Rev. Code § 48.43.073(4) (citing 42 U.S.C.

§ 18054(a)(6)). But "the reasons why" Washington allows an exclusion are irrelevant. *FCA*, 82 F.4th at 689 (quoting *Tandon*, 141 S. Ct. at 1296). Irrelevant too is the fact that no carrier "actual[ly] exercise[s]" that exemption now. *Id.* at 688.

Or take SB 6219's exclusion of any "health plan or student health plan" if applying the abortion-coverage mandate "results in noncompliance with federal requirements that are a prescribed condition to the allocation of federal funds to the state." Wash. Rev. Code § 48.43.073(5). "[C]ommon sense" may dictate an exemption that allows Washington to keep millions of dollars in federal funds. *FCA*, 82 F.4th at 688 (quotation omitted); *accord* 4-ER-652–653. Nonetheless, "it means that the law is not generally applicable." *FCA*, 82 F.4th at 688.

Washington's "health plan" definition also excludes multiple insurance plans from SB 6219's abortion-coverage requirement through the back door. Wash. Rev. Code § 48.43.005(31). Most significant is the carveout of "[e]mployer-sponsored self-funded health plans." *Id.* § 48.32.005(31)(j). This exception allows secular businesses—with greater financial wherewithal—to cover maternity care in their employee health plans while excluding coverage of abortion and abortifacient contraceptives. *Accord* 2-ER-71–72.

But relevant too is the definitional exclusion of short-term limited purpose or STLD plans, property/casualty liability plans, and supplemental Medicare or Tricare plans. Wash. Rev. Code § 48.43.005(31)(b),

(c), (f), & (l). State officials conceded that all these insurance plans may provide coverage or payments related to maternity care.[14] 3-ER-325–327, 333–334, 337; 2-ER-71–72. Yet SB 6219's abortion-coverage requirement doesn't apply to them.

The conscience law also allows individual health-care providers and health-care facilities (religious or not) to exclude abortion from their own employee health plans on moral grounds. Wash. Rev. Code § 48.43.065(2)(a). And religious health carriers like Providence may sell fully insured, abortion-excluding plans to anyone. *Id.* Employers are not required to share religious carriers' beliefs. So secular businesses eligible for a health plan from a religious carrier may provide full maternity coverage but little to no abortion and abortifacient-contraceptive coverage.[15] Wash. Admin. Code § 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(3). Thousands of Washingtonians are potentially eligible for such a plan. 2-ER-177 (Providence "offers individual and large group plans" in Washington).

This litany of secular exemptions demolishes the general applicability of Washington's abortion-coverage requirements. Any permitted

---

[14] Defendants' representative equivocated when it came to supplemental Tricare plans, stating that she didn't know if Tricare itself covers maternity care. 3-ER-327. But Tricare plans clearly provides this coverage. Tricare, Maternity Care Brochure, https://bit.ly/3suL3gU.

[15] For example, Providence "cover[s] abortions only where 'there is a severe threat to the mother, or if the life of the fetus cannot be sustained.'" 4-ER-727.

secular conduct that involves offering insurance coverage for childbirth but not abortion is comparable to Cedar Park's banned religious practice because that "secular conduct … undermines the government's asserted interests in a similar [if not identical] way." *Fulton*, 141 S. Ct. at 1877.

Specifically, Washington says it must demand abortion coverage to promote gender equality and women's economic success, improve women's health, and protect women's privacy. 1-ER-26. But *any* decrease in abortion and abortifacient-contraceptive access undercuts these interests in the same way. Considering Washington's asserted goals, it makes no difference whether the diminishment comes from a multistate plan, an exemption to preserve federal funds, an employer's self-funded health plan, a secular business's purchase of health insurance from a religious carrier, or Cedar Park's sincerely held religious beliefs. The supposed "risk" to women's equality, careers, health, and privacy is "identical." *FCA*, 82 F.4th at 689.

What's more, SB 6219 allows for individualized exemptions based on "the particular reasons" abortion coverage is excluded. *Fulton*, 141 S. Ct. at 1877. Specifically, the law "is inapplicable" to "a health plan or student health plan" whenever mandating abortion or abortifacient-contraceptive coverage "results in noncompliance with federal requirements that are a prescribed condition to the allocation of federal funds to the state." Wash. Rev. Code § 48.43.073(5). In that situation,

Washington exempts "the plan to the minimum extent necessary for the state to be in compliance." *Id.*

State officials do not pretend to know when or how this exception applies, or even who requests it. 4-ER-653; 3-ER-309. Washington admits that the Office of the Insurance Commissioner "has authority and discretion to choose how to implement" it. 4-ER-653. But there is no internal agency review process, let alone guidelines cabining the agency's discretion. 3-ER-308–309. Instead, if the Office of the Insurance Commissioner was "concerned about a possible [federal-funding] issue, [it] would contact [its] attorney" and decide whether to allow an abortion exclusion "on a case-by-case basis." 3-ER-308–309.

So the state "admits that it retains (and exercises) significant discretion in applying [this] exception[ ] to" the abortion-coverage requirements. *FCA*, 82 F.4th at 687. And rightly so, as § 48.43.073(5)'s terms "force [officials] to delve into the specific facts and circumstances or to consider the particular reasons for … individualized exemptions." *Id.* at 688 (cleaned up). This "screening" process "may further important interests for" the state but "the very fact that [it] require[s] a case-by-case analysis is antithetical to a generally applicable" law. *Id.*

Because Washington's abortion-coverage requirements fail the general-applicability test in multiple ways, Washington must withstand strict scrutiny. *Kennedy*, 142 S. Ct. at 2422.

### 3. Defining neutrality

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877. A law "is specifically directed at religious practice" when it "discriminates on its face" or when "religious exercise is otherwise its object." *Kennedy*, 142 S. Ct. at 2422 (cleaned up).

Critically, "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Lukumi*, 508 U.S. at 534. So when the state burdens a religious practice, courts must "survey meticulously the circumstances" resulting in that burden to "eliminate … religious gerrymanders." *Id.* There are "many ways" to demonstrate that a law's "object or purpose … is the suppression of religion or religious conduct." *Id.* at 533. Particularly "strong evidence" is "the effect of a law in its real operation," which may disclose "an impermissible attempt to target [people of faith] and their religious practices." *Id.* at 535.

Another factor is proportionality. Courts may "infer" that the purpose of a law imposing "gratuitous restrictions on religious conduct" is "to suppress [that] conduct." *Id.* at 538 (quotation omitted). For example, if a law "suppress[es] much more religious conduct than is necessary in order to achieve the legitimate ends asserted in their defense," the law is "not neutral." *Id.* at 542.

What's more, religious neutrality precludes "denominational favoritism." *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 787 (2022). State laws aren't neutral if they "favor … one religion over others." *Bd. of Educ. of Kriyas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994).

Laws also lack neutrality when "statements made in connection with the challenged rules can be viewed as targeting [a religious] community." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (per curiam). If those comments amount to "official expressions of hostility to religion," a court will "set aside such [rules] without further inquiry." *Kennedy*, 142 S. Ct. at 2422 n.1 (cleaned up); *accord FCA*, 82 F.4th at 690. Even a "slight suspicion" that state action burdening religious practices "stem[s] from animosity to religion or distrust of its practices" is fatal and voids the action at hand. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731–32 (2018).

### 4. Washington's abortion-coverage requirements aren't religiously neutral.

Washington's abortion-coverage requirements are not neutral. On "this point a page of history is worth a volume of logic." *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). SB 6219 cannot be understood apart from the ACA, which was signed into law by President Obama in 2010. A federal agency tasked with fleshing out the ACA's terms required

many group health plans nationwide to cover all FDA-approved contraceptive methods, including four that may prevent the implantation of a fertilized egg and thus have an abortifacient effect. *Hobby Lobby*, 573 U.S. at 682, 697.

Federal agencies totally (and automatically) exempted houses of worship like Cedar Park from the contraceptive mandate based on free-exercise concerns and because church employees "would be less likely to use [objectionable] contraceptives even if [they] were covered under their health plans." 77 Fed. Reg. 8,725, 8,728 (Feb. 15, 2012). But the agencies refused to grant most other religious organizations the same exemption. *Hobby Lobby*, 573 U.S. at 698–99. That ignited a national firestorm, resulting in years of litigation. *E.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020); *Zubik v. Burwell*, 578 U.S. 403 (2016) (per curiam); *Wheaton Coll. v. Burwell*, 573 U.S. 958 (2014).

This string of public controversies made two things clear. First, objections by secular employers to covering abortifacients in their health plans are slim to none. Secular employers almost universally acceded to the ACA contraceptive mandate without complaint. Second, objections by religious employers to facilitating, in any way, access to abortifacients through their health plans are widespread. Religious employers often have strong beliefs in the sanctity of human life and object to facilitating abortions, even indirectly. *E.g.*, *Little Sisters*, 140

S. Ct. at 2376 ("[r]eligious nonprofit organizations and educational institutions across the country filed … lawsuits").

In 2017, one of President Trump's first acts was to issue a promised executive order instructing federal agencies to "grant exemptions from" the ACA's requirements, including the contraceptive mandate, "[t]o the maximum extent permitted by law." Exec. Order No. 13,765, 82 Fed. Reg. 8,351, 8,351 (Jan. 20, 2017). Before year's end, federal agencies issued interim rules granting other religious organizations a broad exemption to the contraceptive mandate, similar to the one houses of worship enjoyed.[16] 82 Fed. Reg. 47,792 (Oct. 13, 2017).

That's where SB 6219 comes in. Abortion advocates in Washington opposed religious exemptions to the ACA contraceptive mandate and the new administration's decision to broaden them. So less than three months after federal agencies implemented an expanded religious exemption, they introduced SB 6219 as a countermeasure. Wash. State Legislature, Bill Info. for SB 6219 – 2017–18, https://bit.ly/3R66lL1; Ashli Blow, *In time of Trump, Washington lawmakers want to pass bill mandating abortion coverage*, KIRO 7 News (Jan. 31, 2018), https://bit.ly/3sFJs7T.

SB 6219 contained *no* religious exemption, not even for houses of worship. And it upped the ante by requiring churches and most other

---

[16] Federal agencies finalized these regulations in 2018. 83 Fed. Reg. 57,536 (Nov. 15, 2018).

religious organizations to cover not just abortifacient contraceptives but surgical abortions too. Liz McCaman Taylor, National Health Law Program, *In Face of Hostile Trump Administration, Washington State Takes Action to Protect and Expand Access to Reproductive Health Care* (Mar. 26, 2018), https://bit.ly/40KydaK. Senator Hobbs, the bill's sponsor, promoted the measure not as solving a real access problem—there was none—but as an answer to expanded federal religious exemptions. Blow, *supra*, https://bit.ly/3sFJs7T.

Next, legislators proved that forcing religious organizations to cover abortion was SB 6219's object by rejecting—three separate times—amendments that would protect them. Sen. Rivers, PSSB 6219 (S-3824.1/18), https://bit.ly/3IXJGew; Sen. O'Ban, SSB 6219 – S AMD 380, https://bit.ly/3YzAfIi; Rep. Shea, SSB 6219 H AMD 1311, https://bit.ly/41XVwy7. Abortion advocates praised this coercion of religious objectors. *See* Press Release, Planned Parenthood All. Advocs., *Washington State Senate Passes Reproductive Parity Act Following Six Years of Debate* (Jan. 31, 2018), https://bit.ly/47iJ5iN. Again, Senator Hobbs said the silent part out loud, telling churches to sue "if they don't like the bill." Markovich, *supra*, https://bit.ly/49AJ1wo.

SB 6219's "historical background," "the specific series of events leading to [its] enactment," the bill's "legislative … history," and "contemporaneous statements made by" the bill's sponsor all lead to one conclusion. *Masterpiece Cakeshop*, 138 S. Ct. at 1731. The law's "object

… is the suppression of religion or religious conduct." *Lukumi*, 508 U.S. at 533. In fact, hostility towards newly expanded federal religious exemptions under the ACA is why the legislature passed SB 6219. But "[l]egislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices." *Id.* at 547.

Five other factors confirm SB 6219's lack of neutrality. First, there was no neutral justification for the law. Most Washington health plans already included abortion coverage pre-SB 6219. 4-ER-648. And there was zero evidence of an access problem: no one complained to the state about a lack of abortion coverage, 4-ER-674, and Washington had no pending enforcement actions related to contraceptive coverage, 4-ER-712–713.

Second, SB 6219's effect was religious targeting. Years of ACA litigation made clear that objections to abortion coverage in health plans are nearly exclusively religious. And that's how SB 6219 played out. Only houses of worship (Cedar Park), religious schools (Seattle's Jesuit College Preparatory), or religious carriers (Providence) objected to Washington's abortion-coverage requirements. *E.g.*, 5-ER-760; 4-ER-647–648; 4-ER-684–685. In other words, only religious people were "adverse[ly] impact[ed]," and that shows "a religious gerrymander" or "impermissible attempt to target [people of faith] and their religious practices." *Lukumi*, 508 U.S. at 535 (quotation omitted).

47

Third, SB 6219 suppresses much more religious conduct than necessary to achieve the state's asserted goals. Many other states and the federal government care deeply about women's equality, careers, health, and privacy. But they don't force churches to cover abortion and abortifacient contraceptives in their health plans.[17] *E.g.*, 83 Fed. Reg. 57,536, 57,537, 57,543, 57,550 (Nov. 15, 2018). Especially when religious ministries, like Cedar Park, require employees to share and live out their beliefs in the sanctity of human life, it's gratuitous to compel them to provide abortion coverage that violates the agreement each church employee signs. 77 Fed. Reg. at 8,728.

Fourth, Washington favors some religions over others. Denominations that favor, or do not oppose, abortion may freely exercise their faith in the state. And religious individuals or organizations whose faith leads them to serve as a health care provider, religiously sponsored health carrier, or health care facility may freely exercise their religion too—even by purchasing a fully insured health plan. Wash. Rev. Code § 48.43.065(2)(a). But Washington coerces other people of faith who oppose abortion—like Cedar Park—to either change their religious

---

[17] *Accord Does 1-3 v. Mills*, 142 S. Ct. 17, 21–22 (2021) (Gorsuch, J., dissenting from the denial of application for injunctive relief) ("Many other States have made do with a religious exemption," so the "decision to deny a religious exemption in these circumstances . . . borders on the irrational.").

doctrine or exit the state. The Free Exercise Clause bars such religious favoritism. *Grumet*, 512 U.S. at 696.

Last, SB 6219's sponsor championed the law as a means of undoing federal protection of religious organizations' beliefs. Blow, *supra*, https://bit.ly/3sFJs7T. And he responded to houses of worship's plea for a religious exemption by telling churches to sue "if they don't like the bill." Markovich, *supra*, https://bit.ly/49AJ1wo. These comments "target[ ] [a religious] community" of those who believe in the sanctity of human life, *Cuomo*, 141 S. Ct. at 66, and create a strong—not just "slight"—suspicion that SB 6219 "stem[s] from animosity to religion or distrust of its practices," *Masterpiece Cakeshop.*, 138 S. Ct. at 1731–32. Consequently SB 6219's burden on religion must be "set aside." *Id.* at 1724; *accord FCA*, 82 F.4th at 690.

### C. The district court's additional reasons for rejecting Cedar Park's neutrality and general-applicability arguments fail.

The district court gave three other reasons for rejecting Cedar Park's neutrality and general-applicability arguments. Each one is erroneous.

First, the court said Cedar Park's "argument that SB 6219 proscribes more [religious] conduct than necessary" shouldn't be addressed under *Smith*'s neutrality prong. 1-ER-18. That's incorrect. *Lukumi*'s religious-neutrality analysis considered whether the ordi-

nances in question "proscribe[d] more religious conduct than is necessary to achieve their stated ends." 508 U.S. at 538. And the fact that "narrower regulation would achieve the city's [asserted] interests[s]" undermined the ordinances' religious neutrality. *Id.* at 539.

Second, the district court said "[t]he 'similarly situated' question is the same" under the Equal Protection and Free Exercise Clauses. 1-ER-22–23. The court was mistaken. This Court affirmed the dismissal of Cedar Park's equal-protection claim, which focused on the conscience law's exemption of healthcare-related entities. *Cedar Park*, 860 F. App'x at 543–44. But that ruling is immaterial because the equal-protection and free-exercise (general-applicability) inquiries are qualitatively different.

Under the Equal Protection Clause, courts compare "*persons*" to determine whether they're "similarly situated." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (emphasis added). Relatively minor differences in *character*, including entities' "practices, purposes, and structures," may render those entities "different in kind" and allow the state to grant an "exempti[on]" to some categories and not others. *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 18 (1988).

None of this is true under *Smith*'s generally-applicability prong. A court's free-exercise inquiry considers what secular and religious people *are allowed to do* and how their activity impacts the *government's*

asserted interests. Secular and religious actors may have widely different characters. But if their "conduct … undermines the government's asserted interest in a similar way," they are comparable. *Fulton*, 141 S. Ct. 1877. The "reasons" for that conduct are irrelevant. *Tandon*, 141 S. Ct. at 1296; *FCA*, 82 F.4th at 689. So character-based distinctions, such as between "public buildings" and "private buildings," cannot defeat "compara[bility]" under the Free Exercise Clause. *Tandon*, 141 S. Ct. at 1297.

Because the equal-protection and free-exercise (general-applicability) inquiries are worlds apart, nothing bars Cedar Park from using the conscience law's exemption of healthcare-related entities to show that Washington abortion requirements aren't generally applicable.

Third, the district court invoked the law of the case. But that doctrine "clearly does not extend to issues an appellate court did not address." *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995) (quotation omitted). In Cedar Park's prior appeal, this Court *rejected* the church's equal-protection claim after engaging in a character-based, similarly situated inquiry, *Cedar Park*, 860 F. App'x at 543–44, while simultaneously *upholding* its free-exercise claims *in toto*, *id.* at 543. The Court plainly viewed the First and Fourteenth Amendment inquiries as different. Certainly, no aspect of the ruling indicates this Court "actually considered and decided" the general-applicability issue—let alone

decided it against Cedar Park. *Cote*, 51 F.3d at 181. So the law-of-the-case doctrine is inapt. *Id.*

What's more, two exceptions to the doctrine apply. Courts will revisit prior rulings if "an intervening change in the law has occurred." *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990). This Court ruled on Cedar Park's first appeal in July 2021, over two years before an en banc panel substantially revised this Court's free-exercise precedent in *FCA*. 82 F.4th 644 (filed Sept. 13, 2023). Because *FCA* fundamentally altered this Court's general-applicability analysis, any previous ruling on that issue no longer governs. 82 F.4th at 685–90, 694.

Courts will also depart from prior rulings if "the evidence on remand was substantially different." *Milgard Tempering*, 902 F.2d at 715. Cedar Park's verified complaint did not convince this Court that the conscience law protects healthcare-related entities' ability to purchase abortion-free, fully funded health plans for their own employees. *Cedar Park*, 860 F. App'x at 543–44. But on remand, Defendants' representative admitted as much. 3-ER-342–343. So this Court's prior conclusions at the motion-to-dismiss stage "before discovery was completed" and "the evidence was fully developed" on summary judgment are "not binding." *Horphag Rsch. Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007).

Last, the district court said the rule of the mandate precluded Cedar Park from relying on the healthcare-related entities exemption to show a lack of general applicability. 1-ER-22–23. Not so. That rule simply "requires a lower court to act on the mandate of an appellate court, without variance." *United States v. Garcia-Beltran*, 443 F.3d 1126, 1130 (9th Cir. 2006). Because this Court *upheld* Cedar Park's free-exercise claims in all respects, its mandate allowed the district court to rule in the church's favor on that claim, including on the general-applicability issue.

### D.  Washington's abortion-coverage requirements fail strict scrutiny.

Because Washington's abortion-coverage requirements are not generally applicable or neutral, the state must "satisfy strict scrutiny." *Kennedy*, 142 S. Ct. at 2422 (quotation omitted). Washington must show coercing religious objectors' facilitation of abortion "was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* The state cannot carry this burden—not even close.

For Washington to show a compelling interest, it "must specifically identify an actual problem in need of solving and the curtailment of [religious exercise] must be actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up). Yet the state falters out of the gate. Before SB 6219 took shape, most Washington health plans already covered abortion, 4-ER-648, and the state

received no complaints from enrollees about abortion or abortifacient-contraceptive coverage. 4-ER-673–676. There's no proof of a real access problem.

Equally important, Washington cannot succeed by showing "a compelling interest in [expanding abortion access] generally." *Fulton*, 141 S. Ct. at 1881. The compelling interest must be "in denying an exception to" *Cedar Park* and similar religious organizations. *Id.* But there's no reason to think "granting [them] an exception will put [Washington's] goals at risk. *Id.* at 1881–82. Religious nonprofits like Cedar Park only hire employees who share and live out their religious beliefs—both at work and in their private lives. 5-ER-760 (incorporating 5-ER-789). It's unlikely these individuals would use abortion coverage even if they had it. 77 Fed. Reg. at 8,728.

Furthermore, Washington's laundry list of exceptions and system of individualized exceptions undercuts the state's "contention that its [abortion-coverage] policies can brook no departures." *Fulton*, 141 S. Ct. at 1882. The state "offers no compelling reason why it has a particular interest in denying an exception to" Cedar Park and similar religious organizations "while making them available to others." *Id.*

Nor can Washington show narrow tailoring. The law "must [be] the least restrictive means" of achieving the state's purported interest. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (quotation omitted). "[S]o long as the government can achieve its

interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. But Washington didn't "even consider[ ] less restrictive measures than those implemented here," and that "fails … the tailoring prong of the strict scrutiny test." *FCA*, 82 F.4th at 694.

One less restrictive measure is obvious. Washington could itself provide abortion and abortifacient-contraceptive coverage to anyone who lacks it for any reason. Yet Washington placed the burden of covering abortions and abortifacient contraceptives on churches with strong religious objections like Cedar Park.

### E.  The Free Exercise Clause's text, history, and tradition also demonstrate that Washington's abortion-coverage requirements are invalid.

This is the rare case in which a *Smith*-based and *Smith*-free inquiry dictate the same result. But Cedar Park makes and preserves the argument that *Smith* should be overruled and replaced with a test that accords with the Free Exercise Clause's text, history, and tradition. *Accord Fulton*, 141 S. Ct. at 1883–1926 (Alito, J., concurring in the judgment).

Consider the First Amendment's text, which bars Congress from making laws that "prohibit[ ] the free exercise" of religion. U.S. Const. amend. I. That language "guarantees the free *exercise* of religion, not just the right to inward belief (or status)." *Trinity Lutheran*, 582 U.S. at 469 (Gorsuch, J., concurring) (emphasis in original). It says nothing

about neutrality or general applicability. *Fulton*, 141 S. Ct. at 1896 (Alito, J., concurring in the judgment). So *Smith* was wrong to say that "the Free Exercise Clause—lone among the First Amendment freedoms—offers nothing more than protection from discrimination." *Id.* at 1882 (Barrett, J., concurring). Because Washington "forbid[s] or hinder[s]" Cedar Park's "religious practices," it violates the Free Exercise Clause's text. *Id.* at 1896 (Alito, J., concurring in the judgment).

The Free Exercise Clause's history also supports Cedar Park's claims. "[H]istorical instances of religious persecution and intolerance" motivated the founding generation's insistence on and ratification of the First Amendment. *Lukumi*, 508 U.S. at 532 (quotation omitted). And key state-law debates shaped that generation's understanding of religious liberty and the need for a constitutional amendment to safeguard it. Two were especially prominent.

First, James Madison's Memorial and Remonstrance rejected the notion that government could use "force" to countermand individuals' "[r]eligion" or their "manner of discharging" religious "dut[ies]." James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), Nat'l Archives, https://bit.ly/3SmFole. "Religion," Madison said, "must be left to the conviction and conscience of every man" and "every man" has "the right ... to exercise [religion] as these may dictate." *Id.*

Second, a key religious freedom bill penned by Thomas Jefferson declared each individual's freedom of conscience inviolate, not subject to

government "restraint." Thomas Jefferson, *A Bill for Establishing Religious Freedom* (1779), Nat'l Archives, https://bit.ly/3R6662v. The government, Jefferson said, could not make individuals "suffer" or deprive them of "privileges and advantages" based on their religious exercise absent "overt acts against peace and good order." *Id.* And Jefferson condemned attempts to "compel" individuals to support "opinions" or causes they "disbelieve[ ] and abhor[ ]" through "contributions of money." *Id.* (cleaned up).

Washington's abortion-coverage requirements violate each of these principles. They coerce houses of worship and other religious organizations to violate their consciences and religious duties to God, deny them the advantage of a fully insured health plan based on beliefs that threatens no disturbance of the peace or public disorder, and force them to give money to further abortions they abhor.

Additionally, our nation has a longstanding tradition of exempting religious objectors from any involvement in taking human life. Even before the Free Exercise Clause's ratification, colonies, states, and the federal government excused religious objectors from military conscription—even when our fledging nation's existence was at stake. *Fulton*, 141 S. Ct. at 1905–06 (Alito, J., concurring in the judgment). Postratification, this Free Exercise Clause tradition of accommodating religious objectors expanded to cover the death penalty, assisted suicide, and abortion. *E.g.*, Mark L. Rienzi, *The Constitutional Right Not to Kill*,

62 EMORY L.J. 121, 137–52 (2012). Washington laws reflected this tradition until just a few years ago. *But see* Wash. Rev. Code § 48.43.065(2)(a). The laws of most other states still do. *E.g.*, 83 Fed. Reg. at 57,543.

In sum, the Free Exercise Clause's text, history, and tradition bar Washington from applying its abortion-coverage requirements to Cedar Park. And it makes no difference whether those requirements are neutral and generally applicable.

## III. Washington's abortion-coverage requirements violate the church autonomy doctrine.

The Free Exercise Clause establishes a zone "of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Washington's abortion-coverage requirements violate that autonomy, a free-exercise oasis where *Smith* and tiered levels of scrutiny don't apply. *Trinity Lutheran*, 582 U.S. at 461 n.2; *Hosanna-Tabor*, 565 U.S. at 189–90.

### A. Defining the church-autonomy doctrine

The Free Exercise Clause protects religious organizations' right to engage "in the expression and dissemination of any religious doctrine." *Kedroff*, 344 U.S. at 114 (quotation omitted). Religious organizations

are the preeminent example of private associations that serve "as critical buffers between the individual and the power of the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984). Yet these ministries cannot "effective[ly] advocate for [their own] religious vision if [their] conduct fails to live up to the religious precepts [they] espouse[ ]." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring). So religious institutions require "autonomy to shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines." *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013).

This "connection between church governance and the free dissemination of religious doctrine has deep roots in our legal tradition." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring). Self-governance preserves religious ministries' ability to "express[ ] and propogat[e] [their] shared religious ideals." *Id.* at 200. And it does so by providing "voluntary religious association[s]" control over their "members, congregations, … officers," and employees. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728–29 (1871). Everyone who joins "such a body" gives "implied consent to [church] government, and [is] bound to submit to" religious decisions without "appeal" to the state. *Id.* at 729.

Under the church-autonomy doctrine, the pivotal question is whether government intervention "undermine[s] the independence of religious institutions in a way that the First Amendment does not tolerate." *Our Lady of Guadalupe*, 140 S. Ct. at 2055. One example is the

state dictating "internal management decisions that are essential to [a religious] institution's central mission." *Id.* at 2060. Employment-related decisions often implicate this zone of autonomy. *E.g.*, *id.* at 2060–61; *Hosanna-Tabor*, 565 U.S. at 188–90; *accord Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1094–96 (2022) (Alito, J., statement respecting the denial of certiorari).

For instance, courts have held that the church-autonomy doctrine bars the government from interfering with religious organizations' hiring or firing of ministers, *Our Lady of Guadalupe*, 140 S. Ct. at 2060–61; *Hosanna-Tabor*, 565 U.S. at 188–90 ; deprives the NLRB of jurisdiction to order religious schools to bargain with unions, *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 827–36 (D.C. Cir. 2020); *Carroll Coll., Inc. v. NLRB*, 558 F.3d 568, 571–74 (D.C. Cir. 2009); and prohibits judicial interference with clergy salaries in church-related institutions, *Granfield v. Cath. Univ. of Am.*, 530 F.2d 1035, 1047 (D.C. Cir. 1976).

The church-autonomy doctrine isn't limited to employment. In *Masterpiece Cakeshop*, the Supreme Court confirmed that states cannot use antidiscrimination laws to force "clergy who object[ ] to gay marriage on moral and religious grounds … to perform" same-sex wedding ceremonies. 138 S. Ct. at 1727. And the Court reached this conclusion without citing any *Smith*-based concerns. *Id.*

The lesson is that church autonomy applies when the government meddles "with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. Critically, the First Amendment "guard[s] against a political interference with religious affairs," *id.* at 184 (quotation omitted), barring the state from interjecting "secular interests" into purely internal church matters, *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969), or exerting "power to change … ancient faith and doctrine to" a "different doctrine" more to the government's taste, *Kedroff*, 344 U.S. at 108.

## B. Washington's abortion-coverage requirements violate the church-autonomy doctrine.

The church-autonomy doctrine upholds the boundary "between two separate polities, the secular and the religious," guarding religious ministries' "prerogatives … in [their] own sphere." *Korte*, 735 F.3d at 677. Using abortion-coverage requirements as a bridge, Washington crossed the Rubicon to expand its secular territory. But the state's efforts run headlong into a constitutional barricade—"church[es'] sovereignty over [their] own affairs." *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 463 (D.C. Cir. 1996).

The church-autonomy doctrine forbids Washington from (1) forcing abortion and abortifacient-contraceptive coverage into pro-life ministries' health plans, (2) coercing these institutions to violate

61

their beliefs and contradict their teachings, and (3) destroy their ability to advocate the sanctity of human life with integrity. Churches' internal structure, policies, and operations reflect and convey their doctrines to staff, members, and attendees. By coercing Cedar Park to cover (and pay for) abortion and abortifacient access for employees—all of whom share and agree to live out its beliefs, Washington effectively forces the church "to instruct its [congregation] in accordance with what it regards as an incorrect interpretation of [the Bible] and [church] law." *Yeshiva Univ. v. Yu Pride All.*, 143 S. Ct. 1, 2 (2022) (Alito, J., dissenting). But Cedar Park has the right to propagate *its* beliefs, not a "different doctrine" preferred by the state, *Kedroff*, 344 U.S. at 108.

Summed up, "independence from secular control or manipulation" means what it says. *Kedroff*, 344 U.S. at 116. Washington cannot dictate "an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. Cedar Park's exclusion of abortion from its health plan qualifies because the matter is purely internal, affecting employees who represent the church, share its beliefs, and voluntarily consent to its authority. And Washington's overruling of that decision harms Cedar Park's faith and mission by interjecting politics into church governance, squelching the free development of religious doctrine, and effectively coercing Cedar Park to live according to a view of the Bible it believes to be false.

It's no answer to say that obtaining a health plan isn't "an ecclesiastical decision." 1-ER-27. Courts could have said the same about firing teachers, bargaining with unions, and giving priests equal pay. *Supra* p.59. But they didn't because government "cannot foreclose the exercise of constitutional rights by mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963).

## IV. Cedar Park merits a permanent injunction.

Once this Court corrects the District Court's errors on the merits, such that Cedar Park is likely to succeed, the four-pronged standard for a permanent injunction is straightforward. Plaintiffs must demonstrate (1) an irreparable injury, (2) the lack of an available remedy at law, (3) the balance of hardships favors them, and (4) an injunction won't harm the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Because Cedar Park satisfies all four requirements, it merits a permanent injunction.

First, "the loss of First Amendment freedom, for even minimal periods of time, unquestionably constitutes irreparable injury." *FCA*, 82 F.4th at 694 (cleaned up). Cedar Park satisfies this requirement because, as explained, Washington has violated their rights under the Free Exercise Clause and the church autonomy doctrine for over four years.

Second, "[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages." *Nelson v. Nat'l*

*Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011). So Cedar Park has no adequate remedy at law.

Last, where—as here—defendants are government entities, the balance-of-the-equities and public-interest factors merge. *FCA*, 82 F.4th at 695. Both prongs favor "preventing the violation of" Cedar Park's "constitutional rights." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (cleaned up).

Defendants may object that the district court did not analyze these factors, and that this Court typically "does not consider an issue not passed upon below." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1094 (9th Cir. 2014) (quotation omitted). But this Court "has discretion to decide whether to reach such an issue" when "the issue presented is a purely legal one and the record below has been fully developed." *Id.*

Those circumstances are all present here. And it would be untenable to force Cedar Park to continue violating its religious convictions during the pendency of yet *another* lengthy remand proceeding, particularly when the church's merits claims have been resolved. Accordingly, Cedar Park respectfully requests that this Court exercise its discretion and direct the entry of a permanent injunction and final judgment to resolve this case.

## CONCLUSION

Cedar Park respectfully requests that the Court reverse the district court's summary-judgment order and final judgment in Washington's favor, hold that Cedar Park is entitled to summary judgment on its free-exercise and church-autonomy claims, and instruct the district court to issue a permanent injunction and final judgment barring Washington from enforcing its abortion and abortifacient-contraceptive requirements against Cedar Park and similar religious ministries.

Respectfully submitted,

Dated: November 22, 2023

By: */s/ Rory T. Gray*

KRISTEN K. WAGGONER
JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

JAMES A. CAMPBELL
KEVIN H. THERIOT
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85250
(480) 444-0020
jcampbell@ADFlegal.org
ktheriot@ADFlegal.org

DAVID A. CORTMAN
RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFlegal.org

*Counsel for Plaintiff-Appellant/Cross-Appellee*

## STATEMENT OF RELATED CASES

Under this Court's Rule 28-2.6, Appellant states that it is not aware of any related cases.

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2023, I electronically filed the foregoing First Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Rory T. Gray*
Rory T. Gray

Attorney for Plaintiff-Appellant/Cross-Appellee

November 22, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35560, 23-35585

I am the attorney or self-represented party.

**This brief contains** | 13,452 | **words,** including [          ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

⦿ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Rory T. Gray | **Date** | November 22, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

NOS. 23-35560, 23-35585

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

*Plaintiff-Appellant / Cross-Appellee*,

v.

MYRON KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington, AKA Mike Kreidler; JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington,

*Defendants-Appellees / Cross-Appellants*.

On Appeal from the United States District Court
for the Western District of Washington
Civil Case No. 3:19-cv-05181-BHS

# ADDENDUM TO APPELLANT/CROSS-APPELLEE'S FIRST BRIEF

# ADDENDUM TABLE OF CONTENTS

U.S. Const. amend. I.................................................................. A.3

U.S. Const. amend. XIV ........................................................... A.3

Wash. Rev. Code § 48.01.080 ................................................. A.3

Wash. Rev. Code § 48.43.005(31) .......................................... A.4

Wash. Rev. Code § 48.43.065 ................................................. A.5

Wash. Rev. Code § 48.43.072 ................................................. A.7

Wash. Rev. Code § 48.43.073 ................................................. A.10

Wash. Rev. Code § 48.43.725 ................................................. A.12

Wash. Admin. Code § 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 ....................................... A.14

SB 6219 .................................................................................... A.15

## U.S. Const. amend. I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## U.S. Const. amend. XIV, § 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## Wash. Rev. Code § 48.01.080 - Penalties

Except as otherwise provided in this code, any person violating any provision of this code is guilty of a gross misdemeanor and will, upon conviction, be fined not less than ten dollars nor more than one thousand dollars, or imprisoned for not more than three hundred sixty-four days, or both, in addition to any other penalty or forfeiture provided herein or otherwise by law.

A.3

**Wash. Rev. Code § 48.43.005(31)** – **Definitions**

(31) "Health plan" or "health benefit plan" means any policy, contract, or agreement offered by a health carrier to provide, arrange, reimburse, or pay for health care services except the following:

(a) Long-term care insurance governed by chapter 48.84 or 48.83 RCW;

(b) Medicare supplemental health insurance governed by chapter 48.66 RCW;

(c) Coverage supplemental to the coverage provided under chapter 55, Title 10, United States Code;

(d) Limited health care services offered by limited health care service contractors in accordance with RCW 48.44.035;

(e) Disability income;

(f) Coverage incidental to a property/casualty liability insurance policy such as automobile personal injury protection coverage and homeowner guest medical;

(g) Workers' compensation coverage;

(h) Accident only coverage;

(i) Specified disease or illness-triggered fixed payment insurance, hospital confinement fixed payment insurance, or other fixed payment insurance offered as an independent, noncoordinated benefit;

(j) Employer-sponsored self-funded health plans;

(k) Dental only and vision only coverage;

(l) Plans deemed by the insurance commissioner to have a short-term limited purpose or duration, or to be a student-only plan that is guaranteed renewable while the covered person is enrolled as a regular full-time undergraduate or graduate student at an accredited higher education institution, after a written request for such classification by the carrier and subsequent written approval by the insurance commissioner;

(m) Civilian health and medical program for the veterans affairs administration (CHAMPVA); and

A.4

(n) Stand-alone prescription drug coverage that exclusively supplements medicare part D coverage provided through an employer group waiver plan under federal social security act regulation 42 C.F.R. Sec. 423.458(c).

**Wash. Rev. Code § 48.43.065 – Right of individuals to receive services—Right of providers, carriers, and facilities to refuse to participate in or pay for services for reason of conscience or religion–Requirements**

(1) The legislature recognizes that every individual possesses a fundamental right to exercise their religious beliefs and conscience. The legislature further recognizes that in developing public policy, conflicting religious and moral beliefs must be respected. Therefore, while recognizing the right of conscientious objection to participating in specific health services, the state shall also recognize the right of individuals enrolled with plans containing the basic health plan services to receive the full range of services covered under the plan.

(2)(a) No individual health care provider, religiously sponsored health carrier, or health care facility may be required by law or contract in any circumstances to participate in the provision of or payment for a specific service if they object to so doing for reason of conscience or religion. No person may be discriminated against in employment or professional privileges because of such objection.

(b) The provisions of this section are not intended to result in an enrollee being denied timely access to any service included in the basic health plan services. Each health carrier shall:

    (i) Provide written notice to enrollees, upon enrollment with the plan, listing services that the carrier refuses to cover for reason of conscience or religion;

    (ii) Provide written information describing how an enrollee may directly access services in an expeditious manner; and

A.5

(iii) Ensure that enrollees refused services under this section have prompt access to the information developed pursuant to (b)(ii) of this subsection.

(c) The insurance commissioner shall establish by rule a mechanism or mechanisms to recognize the right to exercise conscience while ensuring enrollees timely access to services and to assure prompt payment to service providers.

(3)(a) No individual or organization with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion.

(b) The provisions of this section shall not result in an enrollee being denied coverage of, and timely access to, any service or services excluded from their benefits package as a result of their employer's or another individual's exercise of the conscience clause in (a) of this subsection.

(c) The insurance commissioner shall define by rule the process through which health carriers may offer the basic health plan services to individuals and organizations identified in (a) and (b) of this subsection in accordance with the provisions of subsection (2)(c) of this section.

(4) Nothing in this section requires a health carrier, health care facility, or health care provider to provide any health care services without appropriate payment of premium or fee.

**Wash. Rev. Code § 48.43.072 – Required contraceptive coverage—Restrictions on copayments, deductibles, and other form of cost sharing**

(1) A health plan or student health plan, including student health plans deemed by the insurance commissioner to have a short-term limited purpose or duration or to be guaranteed renewable while the covered person is enrolled as a regular full-time undergraduate or graduate student at an accredited higher education institution, shall provide coverage for:

(a) All contraceptive drugs, devices, and other products, approved by the federal food and drug administration, including over-the-counter contraceptive drugs, devices, and products, approved by the federal food and drug administration. This includes condoms, regardless of the gender or sexual orientation of the covered person, and regardless of whether they are to be used for contraception or exclusively for the prevention of sexually transmitted infections;

(b) Voluntary sterilization procedures;

(c) The consultations, examinations, procedures, and medical services that are necessary to prescribe, dispense, insert, deliver, distribute, administer, or remove the drugs, devices, and other products or services in (a) and (b) of this subsection;

(d) The following preventive services:

(i) Screening for physical, mental, sexual, and reproductive health care needs that arise from a sexual assault; and

(ii) Well-person preventive visits;

(e) Medically necessary services and prescription medications for the treatment of physical, mental, sexual, and reproductive health care needs that arise from a sexual assault; and

(f) The following reproductive health-related over-the-counter drugs and products approved by the federal food and drug administration: Prenatal vitamins for pregnant persons; and breast pumps for covered persons expecting the birth or adoption of a child.

(2) The coverage required by subsection (1) of this section:

(a) May not require copayments, deductibles, or other forms of cost sharing:

(i) Except for:

(A) The medically necessary services and prescription medications required by subsection (1)(e) of this section; and

(B) The drugs and products in subsection (1)(f) of this section; or

(ii) Unless the health plan is offered as a qualifying health plan for a health savings account. For such a qualifying health plan, the carrier must establish the plan's cost sharing for the coverage required by subsection (1) of this section at the minimum level necessary to preserve the enrollee's ability to claim tax exempt contributions and withdrawals from the enrollee's health savings account under internal revenue service laws and regulations; and

(b) May not require a prescription to trigger coverage of over-the-counter contraceptive drugs, devices, and products, approved by the federal food and drug administration, except those reproductive health-related drugs and produces as set forth in subsection (1)(f) of this section.

(3) A health carrier may not deny the coverage required in subsection (1) of this section because an enrollee changed the enrollee's contraceptive method within a twelve-month period.

(4) Except as otherwise authorized under this section, a health benefit plan may not impose any restrictions or delays on the coverage required under this section, such as medical management techniques that limit enrollee choice in accessing the full range of contraceptive drugs, devices, or other products, approved by the federal food and drug administration.

(5) Benefits provided under this section must be extended to all enrollees, enrolled spouses, and enrolled dependents.

(6) This section may not be construed to allow for denial of care on the basis of race, color, national origin, sex, sexual orientation, gender expression or identity, marital status, age, citizenship, immigration status, or disability.

A.8

(7) A health plan or student health plan, including student health plans deemed by the insurance commissioner to have a short-term limited purpose or duration or to be guaranteed renewable while the covered person is enrolled as a regular full-time undergraduate or graduate student at an accredited higher education institution, issued or renewed on or after January 1, 2021, may not issue automatic initial denials of coverage for reproductive health care services that are ordinarily or exclusively available to individuals of one gender, based on the fact that the individual's gender assigned at birth, gender identity, or gender otherwise recorded in one or more government-issued documents, is different from the one to which such health services are ordinarily or exclusively available.

(8) The definitions in this subsection apply throughout this section unless the context clearly requires otherwise.

(a) "Gender expression" means a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's gender assigned at birth.

(b) "Gender identity" means a person's internal sense of the person's own gender, regardless of the person's gender assigned at birth.

(c) "Reproductive health care services" means any medical services or treatments, including pharmaceutical and preventive care service or treatments, directly involved in the reproductive system and its processes, functions, and organs involved in reproduction, in all stages of life. Reproductive health care services does not include infertility treatment.

(d) "Reproductive system" includes, but is not limited to: Genitals, gonads, the uterus, ovaries, fallopian tubes, and breasts.

(e) "Well-person preventive visits" means the preventive annual visits recommended by the federal health resources and services administration women's preventive services guidelines, with the understanding that those visits must be covered for women, and when medically appropriate, for transgender, nonbinary, and intersex individuals.

A.9

(9) This section may not be construed to authorize discrimination on the basis of gender identity or expression, or perceived gender identity or expression, in the provision of nonreproductive health care services.

(10) The commissioner, under RCW 48.30.300, and the human rights commission, under chapter 49.60 RCW[,] shall share enforcement authority over complaints of discrimination under this section as set forth in RCW 49.60.178.

(11) The commissioner may adopt rules to implement this section.


## Wash. Rev. Code § 48.43.073 – Required abortion coverage-- Limitations

(1)(a) Except as provided in subsection (5) of this section, if a health plan issued or renewed on or after January 1, 2019, provides coverage for maternity care or services, the health plan must also provide a covered person with substantially equivalent coverage to permit the abortion of a pregnancy. Except as provided in subsection (5) of this section, if a student health plan, including student health plans deemed by the insurance commissioner to have a short-term limited purpose or duration or to be guaranteed renewable while the covered person is enrolled as a regular full-time undergraduate or graduate student at an accredited higher education institution, issued or renewed on or after January 1, 2022, provides coverage for maternity care or services, the health plan must also provide a covered person with substantially equivalent coverage to permit the abortion of a pregnancy.

(b) Except as provided in (c) of this subsection, for health plans issued or renewed on or after January 1, 2024, a health carrier may not impose cost sharing for abortion of a pregnancy.

(c) For a health plan that provides coverage for abortion of a pregnancy and is offered as a qualifying health plan for a health savings account, the health carrier shall establish the plan's cost sharing for the coverage required by this section at the minimum level necessary to preserve the enrollee's ability to claim tax exempt contributions and

withdrawals from the enrollee's health savings account under internal revenue service laws and regulations.

(2)(a) Except as provided in (b) of this subsection, a health plan or student health plan subject to subsection (1) of this section may not limit in any way a person's access to services related to the abortion of a pregnancy.

(b)(i) Coverage for the abortion of a pregnancy may be subject to terms and conditions generally applicable to the health plan or student health plan's coverage of maternity care or services.

(ii) A health plan or student health plan is not required to cover abortions that would be unlawful under RCW 9.02.120.

(3) Nothing in this section may be interpreted to limit in any way an individual's constitutionally or statutorily protected right to voluntarily terminate a pregnancy.

(4) This section does not, pursuant to 42 U.S.C. Sec. 18054(a)(6), apply to a multistate plan that does not provide coverage for the abortion of a pregnancy.

(5) If the application of this section to a health plan or student health plan results in noncompliance with federal requirements that are a prescribed condition to the allocation of federal funds to the state, this section is inapplicable to the plan to the minimum extent necessary for the state to be in compliance. The inapplicability of this section to a specific health plan or student health plan under this subsection does not affect the operation of this section in other circumstances.

**Wash. Rev. Code § 48.43.725 – Exclusion of mandated benefits from health plan—Carrier requirements—Notice—Fees-Commissioner's duties**

(1) A health carrier that excludes, under state or federal law, any benefit required or mandated by this title or rules adopted by the commissioner from any health plan or student health plan shall:

(a) Notify each enrollee in writing of the following:

(i) Which benefits the health plan or student health plan does not cover; and

(ii) Alternate ways in which the enrollees may access excluded benefits in a timely manner;

(b) Ensure that enrollees have prompt access to the information required under this subsection; and

(c) Clearly and legibly include the information specified in (a)(i) and (ii) of this subsection in any of its marketing materials that include a list of benefits covered under the plan. The information must also be listed in the benefit booklet and posted on the carrier's health plan or student health plan website.

(2) For the purpose of mitigating inequity in the health insurance market, unless waived by the commissioner pursuant to (c) of this subsection, the commissioner must assess a fee on any health carrier offering a health plan or student health plan if the health plan or student health plan excludes, under state or federal law, any essential health benefit or coverage that is otherwise required or mandated by this title or rules adopted by the commissioner.

(a) The commissioner shall set the fee in an amount that is the actuarial equivalent of costs attributed to the provision and administration of the excluded benefit. As part of its rate filing, a health carrier subject to this subsection (2) must submit to the commissioner an estimate of the amount of the fee, including supporting documentation of its methods for estimating the fee. The carrier must include in its supporting documentation a certification by a member of

the American academy of actuaries that the estimated fee is the actuarial equivalent of costs attributed to the provision and administration of the excluded benefit.

(b) Fees paid under this section must be deposited into the general fund.

(c) The commissioner may waive the fee assessed under this subsection (2) if he or she finds that the carrier excluding a mandated benefit for a health plan or student health plan provides health plan enrollees or student health plan enrollees alternative access to all excluded mandated benefits.

(3) Beginning July 1, 2021, the commissioner shall provide on its website written notice of the carrier requirements in this section and information on alternate ways in which enrollees may access excluded benefits in a timely manner.

(4) Nothing in this section limits the authority of the commissioner to take enforcement action if a health carrier unlawfully fails to comply with the provisions of this title.

(5) The commissioner shall adopt any rules necessary to implement this section.

## <u>Wash. Admin. Code § 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</u> – **Coverage required**

A health plan must provide coverage for all services and supplies required under RCW 48.43.072 and 48.43.073. A student health plan must also provide coverage for all services and supplies required under RCW 48.43.072 and 48.43.073.

(1) Required coverage of contraceptive services and supplies includes, but is not limited to:

    (a) All prescription and over-the-counter contraceptive drugs, devices, and other products approved by the Federal Food and Drug Administration;

    (b) Voluntary sterilization procedures; and

    (c) The consultations, examinations, procedures, and medical services that are necessary to prescribe, dispense, insert, deliver, distribute, administer, or remove the drugs, devices, and other products or services in (a) and (b) of this subsection.

(2) A health plan or student health plan that provides coverage for maternity care or services must also provide a covered person with substantially equivalent coverage to permit the abortion of a pregnancy. For the coverage to be substantially equivalent, a health plan or student health plan must not apply cost-sharing or coverage limitations differently for abortion and related services than for maternity care and its related services unless the difference provides the enrollee with access to care and treatment commensurate with the enrollee's specific medical needs, without imposing a surcharge or other additional cost to the enrollee beyond normal cost-sharing requirements under the plan.

(3) This subchapter does not diminish or affect any rights or responsibilities provided under RCW 48.43.065.

**SB 6219**

CERTIFICATION OF ENROLLMENT

**SUBSTITUTE SENATE BILL 6219**

Chapter 119, Laws of 2018

65th Legislature
2018 Regular Session

REPRODUCTIVE HEALTH--HEALTH PLAN COVERAGE

EFFECTIVE DATE: June 7, 2018

Passed by the Senate

March 3, 2018

   Yeas 27   Nays 22

KAREN KEISER

_____

**President of the Senate**

Passed by the House

February 28, 2018

CERTIFICATE

I, Brad Hendrickson, Secretary of the Senate of the State of Washington, do hereby certify that the attached is

**SUBSTITUTE SENATE BILL 6219**

as passed by Senate and the House of Representatives on the dates hereon set forth.

BRAD HENDRICKSON

_____

        **Secretary**

Yeas 50    Nays 48


FRANK CHOPP

_____

**Speaker of the House of**

**Representatives**

Approved March 21, 2018                    FILED

10:53 AM
                                                    March 23, 2018


         JAY INSLEE                  **Secretary of State**

_____       **State of Washington**

**Governor of the State of**

**Washington**


_____

**SUBSTITUTE SENATE BILL 6219**
_____

AS AMENDED BY THE HOUSE

Passed Legislature – 2018 Regular Session

**State of Washington    65th Legislature    2018 Regular Session**

**By** Senate Health & Long Term Care (originally sponsored by Senators
Hobbs, Saldaña, Dhingra, Ranker, Carlyle, Takko, Kuderer, Hasegawa,
Palumbo, Chase, Nelson, Frockt, Keiser, Wellman, Darneille, Mullet,
Billig, Pedersen, Rolfes, Hunt, and Liias)


A.16

READ FIRST TIME 01/23/18.

AN ACT Relating to improving access to reproductive health; adding new sections to chapter 48.43 RCW; and creating new sections.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF WASHINGTON:

NEW SECTION. **Sec. 1.** The legislature finds and declares that:

(1)     Washington has a long history of protecting gender equity and women's reproductive health;

(2)     Access to the full range of health benefits and preventive services, as guaranteed under the laws of this state, provides all Washingtonians with the opportunity to lead healthier and more productive lives;

(3)     Reproductive health care is the care necessary to support the reproductive system, the capability to reproduce, and the freedom and services necessary to decide if, when, and how often to do so, which can include contraception, cancer and disease screenings, abortion, preconception, maternity, prenatal, and postpartum care. This care is an essential part of primary care for women and teens, and often reproductive health issues are the primary reason they seek routine medical care;

(4)     Neither a woman's income level nor her type of insurance should prevent her from having access to a full range of reproductive health care, including contraception and abortion services;

(5)     Restrictions and barriers to health coverage for reproductive health care have a disproportionate impact on low-income women, women of color, immigrant women, and young women, and these women are often already disadvantaged in their access to the resources, information, and services necessary to prevent an unintended pregnancy or to carry a healthy pregnancy to term;

(6)     This state has a history of supporting and expanding timely access to comprehensive contraceptive access to prevent unintended pregnancy;

(7)     Existing state and federal law should be enhanced to ensure greater contraceptive coverage and timely access for all individuals covered by health plans in Washington to all methods of contraception approved by the federal food and drug administration;

(8)     Nearly half of pregnancies in both the United States and Washington are unintended. Unintended pregnancy is associated with negative outcomes, such as delayed prenatal care, maternal depression, increased risk of physical violence during pregnancy, low birth weight, decreased mental and physical health during childhood, and lower education attainment for the child;

(9)     Access to contraception has been directly connected to the economic success of women and the ability of women to participate in society equally;

(10)     Cost-sharing requirements and other barriers can dramatically reduce the use of preventive health care measures, particularly for women in lower income households, and eliminating cost sharing and other barriers for contraceptives leads to sizable increases in the use of preventive health care measures;

(11)     It is vital that the full range of contraceptives are available to women because contraindications may restrict the use of certain types of contraceptives and because women need access to the contraceptive method most effective for their health;

(12)     Medical management techniques such as denials, step therapy, or prior authorization in public and private health care coverage can impede access to the most effective contraceptive methods;

(13)     Many insurance companies do not typically cover male methods of contraception, or they require high cost

sharing despite the critical role men play in the prevention of unintended pregnancy; and

(14)     Restrictions on abortion coverage interfere with a woman's personal, private pregnancy decision making, with his or her health and well-being, and with his or her constitutionally protected right to safe and legal medical abortion care.

NEW SECTION.  **Sec. 2.**  A new section is added to chapter 48.43 RCW to read as follows:

(1) A health plan issued or renewed on or after January 1, 2019, shall provide coverage for:

(a) All contraceptive drugs, devices, and other products, approved by the federal food and drug administration, including over-the-counter contraceptive drugs, devices, and products, approved by the federal food and drug administration;

(b) Voluntary sterilization procedures;

(c) The consultations, examinations, procedures, and medical services that are necessary to prescribe, dispense, insert, deliver, distribute, administer, or remove the drugs, devices, and other products or services in (a) and (b) of this subsection.

(2) The coverage required by subsection (1) of this section:

(a) May not require copayments, deductibles, or other forms of cost sharing, unless the health plan is offered as a qualifying health plan for a health savings account. For such a qualifying health plan, the carrier must establish the plan's cost sharing for the coverage required by subsection (1) of this section at the minimum level necessary to preserve the enrollee's ability to claim tax exempt contributions and withdrawals from his or her health savings account under internal revenue service laws and regulations; and

(b) May not require a prescription to trigger coverage of over-the-counter contraceptive drugs, devices, and products, approved by the federal food and drug administration.

(3) A health carrier may not deny the coverage required in subsection (1) of this section because an enrollee changed his or her contraceptive method within a twelve-month period.

(4) Except as otherwise authorized under this section, a health benefit plan may not impose any restrictions or delays on the coverage required under this section, such as medical management techniques that limit enrollee choice in accessing the full range of contraceptive drugs, devices, or other products, approved by the federal food and drug administration.

(5) Benefits provided under this section must be extended to all enrollees, enrolled spouses, and enrolled dependents.

(6) This section may not be construed to allow for denial of care on the basis of race, color, national origin, sex, sexual orientation, gender expression or identity, marital status, age, citizenship, immigration status, or disability.

NEW SECTION.  **Sec. 3.**  A new section is added to chapter 48.43 RCW to read as follows:

(1) Except as provided in subsection (5) of this section, if a health plan issued or renewed on or after January 1, 2019, provides coverage for maternity care or services, the health plan must also provide a covered person with substantially equivalent coverage to permit the abortion of a pregnancy.

(2)(a) Except as provided in (b) of this subsection, a health plan subject to subsection (1) of this section may not limit in any way a person's access to services related to the abortion of a pregnancy.

(b)(i) Coverage for the abortion of a pregnancy may be subject to terms and conditions generally applicable to the health plan's coverage of maternity care or services, including applicable cost sharing.

(ii) A health plan is not required to cover abortions that would be unlawful under RCW 9.02.120.

(3) Nothing in this section may be interpreted to limit in any way an individual's constitutionally or statutorily protected right to voluntarily terminate a pregnancy.

(4) This section does not, pursuant to 42 U.S.C. Sec. 18054(a)(6), apply to a multistate plan that does not provide coverage for the abortion of a pregnancy.

(5) If the application of this section to a health plan results in noncompliance with federal requirements that are a prescribed condition to the allocation of federal funds to the state, this section is inapplicable to the plan to the minimum extent necessary for the state to be in compliance. The inapplicability of this section to a specific health plan under this subsection does not affect the operation of this section in other circumstances.

NEW SECTION. **Sec. 4.** The governor's interagency coordinating council on health disparities shall conduct a literature review on disparities in access to reproductive health care based on socioeconomic status, race, sexual orientation, gender identity, ethnicity, geography, and other factors. By January 1, 2019, the council shall report the results of the literature review and make recommendations on reducing or removing disparities in access to reproductive health care to the governor and the relevant standing committees of the legislature.

Passed by the Senate March 3, 2018.

Passed by the House February 28, 2018.

Approved by the Governor March 21, 2018.

Filed in Office of Secretary of State March 23, 2018.

--- END ---

A.21