Nos. **23-35560, 23-35585**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

*Plaintiff-Appellant/Cross-Appellee*,

v.

MYRON KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington, AKA Mike Kreidler; JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington,

*Defendants-Appellees/Cross-Appellants*.

---

On Appeal from the United States District Court
for the Western District of Washington
Civil Case No. 3:19-cv-05181-BHS

---

## EXCERPTS OF RECORD OF APPELLANT/CROSS-APPELLEE
## VOLUME 2 OF 5

---

KRISTEN K. WAGGONER
JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

JAMES A. CAMPBELL
KEVIN H. THERIOT
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85250
(480) 444-0020
jcampbell@ADFlegal.org
ktheriot@ADFlegal.org

DAVID A. CORTMAN
RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFlegal.org

*Counsel for Plaintiff-Appellant/Cross-Appellee*

Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CEDAR PARK ASSEMBLY OF GOD OF
KIRKLAND, WASHINGTON,

        Plaintiff,

        v.

MYRON "MIKE" KREIDLER, in his official
capacity as Insurance Commissioner for the State
of Washington; JAY INSLEE, in his official
capacity as Governor of the State of Washington,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 3:19-cv-05181

**PLAINTIFF'S REPLY IN SUPPORT
OF ITS MOTION FOR SUMMARY
JUDGMENT**

**NOTING DATE: APRIL 7, 2023**

**ER-047**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Argument .............................................................................................................. 2

I.   The conceded facts show the abortion mandate restricts the Church's freedom, and has exemptions that undermine Defendants' asserted purposes. ...................................... 3

     A.   SB 6219 burdens the Church's religious beliefs. ..................................... 3

          1.   All the ways carriers may provide access to abortion and abortifacients violate Cedar Park's religious beliefs. ................. 3

          2.   Non-religious carriers cover objectionable items as part of religious objectors' plan. ........................................................ 5

          3.   The alternative plans aren't comparable. ................................... 5

          4.   Kaiser's willingness to offer a plan excluding abortion is supported by the record. ........................................................ 6

     B.   Defendants concede SB 6219 has exemptions but misstate the law on general applicability in a failed attempt to excuse them. ................. 7

          1.   SB 6219's exemptions undermine its purposes. ....................... 7

          2.   The Conscience Clause is not generally applicable. ................. 9

     C.   Defendants misstate the law on neutrality. ............................................ 10

II.  Defendants misstate the law on Church Autonomy. ....................................... 11

III. Seven exemptions undermine Defendants' asserted compelling interest, and the abortion mandate is not the least restrictive means of accomplishing its purported interest. ............................................................................................ 12

Conclusion ........................................................................................................... 13

Certificate of Service ........................................................................................... 14

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

i

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-048**

## TABLE OF AUTHORITIES

**Cases**

*Black Hawk v. Pennsylvania,*
225 F.Supp.2d 465 (D. Pa. 2002)......................................................................... 8

*Burwell v. Hobby Lobby,*
573 U.S. 682 (2014) ................................................................................... 3, 12

*Church of the Lukumi Babalu v. City of Hialeah,*
508 U.S. 520 (1993) ........................................................................................ 12

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,*
170 F.3d 359 (1999) ......................................................................................... 8

*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021) ............................................................................ 3, 10, 12

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,*
565 U.S. 171 (2012) ........................................................................................ 11

*Jones v. Wolf,*
443 U.S. 595 (1979) ........................................................................................ 11

*McElyea v. Babbit,*
833 F.2d 196 (9th Cir. 1987)............................................................................... 3

*Our Lady of Guadalupe School v. Morrissey-Berru,*
140 S. Ct. 2049 (2020) ................................................................................. 2, 11

*Radar v. Johnston,*
924 F.Supp. 1540 (D. Neb. 1996) ....................................................................... 8

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020) ......................................................................................... 8

*Sharpe Holdings, Inc. v. United States Department of Health and Human Services,*
801 F.3d 927 (8th Cir. 2015).............................................................................. 4

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care,*
968 F.3d 738 (9th Cir. 2020)............................................................................ 4, 6

*Tandon v. Newsom,*
141 S. Ct. 1294 (2021) ................................................................................... 2, 7

*Thomas v. Review Board of the Indiana Employment Security Division,*
450 U.S. 707 (1981) ........................................................................................ 13

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

ii

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   137 S. Ct. 2012 (2017) ................................................................................. 11

*Ward v. Polite*
   667 F.3d 727 (6th Cir. 2012)......................................................................... 8

**Other Authorities**

Wash. Op. Att'y Gen. 5 (2002).......................................................................... 4, 10

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

iii

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-050**

**INTRODUCTION**

After multiple rounds of briefing, Defendants don't dispute or have conceded the following operative facts:

(1) Cedar Park's religious beliefs prohibit it from facilitating abortion through its insurance plan; Opp'n to Pl.'s MSJ 5, ECF No. 112 (Opp'n) ("It is undisputed that Cedar Park is opposed to abortion and use of certain contraceptives because of its religious beliefs, though…Cedar Park's opposition to 'any facilitation' of abortion is inconsistent"); *Id.* at 1 ("Cedar Park now claims that it is forced to facilitate abortions because it would indirectly pay for abortion or because its enrollees would still have access to abortions."); Sec. Am. Verified Compl. ¶¶ 29, 63, 131, ECF No. 46, as supplemented by ECF No. 52-1 ("VC"); Smith Decl. ¶ 6, ECF No. 50;

(2) SB 6219 and RCW § 48.43.065 ("Conscience Clause") require Cedar Park employees to receive access to abortion and abortifacients as a result of any suitable group or level-funded insurance plan the church purchases. Opp'n 10 ("The fact that a carrier will provide access to services does not mean that Cedar Park will be paying indirectly for anything."), Defs.' MSJ 20, ECF No. 104 ("Any facilitation or discussion of access occurs between the enrollee and either the carrier or another third party."); *Id.* at 1 (SB 6219 leads to Cedar Park's employees getting "access to services to which Cedar Park objects."); Tocco Dep. 105, ECF No. 93-4 ("the plan actually provides for [abortion] access.");

(3) SB 6219 exempts health plans that provide maternity coverage. Opp'n 12–13 ("These exemptions are not comparable [and] . . . *[m]ost* . . . do not provide for maternity coverage." (emphasis added)); Nollette Dep., 53–54; 58–59, ECF No. 93-5; and

(4) The Conscience Clause contains an exemption for only religious health care organizations, which does not require their employees to receive access to objectionable items as a result of the organizations' health plans. *Id.* at 15 ("While religious providers and carriers can exercise a conscience objection, the enrollees still need to be provided information about how to access services" (but not actual access)).

PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-051**

Defendants also effectively concede that requiring the Church's carrier to provide Cedar Park employees access to abortion and abortifacients is not the least restrictive way the State can accomplish its purpose of increasing women's access to health care. Opp'n 18 (arguing the alternatives the Church suggests are not as effective but not contending SB 6219 is the least restrictive alternative).

These facts are all that are required to show SB 6219 and the Conscience Clause ("Statutes") are unconstitutional under the Free Exercise Clause and the Church Autonomy Doctrine. Defendants attempt to distinguish *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021), by arguing the law there specifically mentions religious organizations, wrongly inferring there must be an intent to discriminate to show lack of general applicability. Opp'n 15. But Defendants cite no language in *Tandon* or any other case supporting their reading and multiple cases have held a law was not generally applicable even though it did not specifically regulate religion. Defendants also mischaracterize *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S.Ct. 2049, 2055 (2020), as holding the Church Autonomy Doctrine does not apply to generally applicable laws. *Id.* at 19. But only the dissent made that assertion and SB 6219 and the Conscience Clause aren't neutral and generally applicable because they have exemptions and discriminate against religious organizations that aren't in the health care industry.

The undisputed facts and caselaw show the Statutes are unconstitutional as a matter of law under the Free Exercise Clause and the Church Autonomy Doctrine. Plaintiff's Motion for Summary Judgment should be granted.

## **ARGUMENT**

While the parties differ on the legal implications of the undisputed facts, binding Supreme Court precedent shows Defendants violated Cedar Park's free exercise and church autonomy rights as a matter of law.

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

2

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-052**

**I. The conceded facts show the abortion mandate restricts the Church's freedom, and has exemptions that undermine Defendants' asserted purposes.**

    **A. SB 6219 burdens the Church's religious beliefs.**

        **1. All the ways carriers may provide access to abortion and abortifacients violate Cedar Park's religious beliefs.**

Defendants contend "[t]he fact that a carrier will provide access to services [a crucial concession showing facilitation] does not mean that Cedar Park will be paying indirectly for anything. Carriers can utilize other methods for enrollees to receive the services." Opp'n 10. Those other methods include payment through overhead, distributing the risk to all or some members of the group health plan, or payment through a third party. *Id.* at 3. All those violate Cedar Park's religious beliefs, as the result is still the same: the Church's purchase of group or level-funded health insurance facilitates providing abortion services to plan participants that they otherwise would lack. VC ¶¶ 29, 63, 131; Smith Decl. ¶ 6.[1]

Defendants also contend that "[e]ven if Kaiser, or Cigna, or some other private carrier used a portion of the monies paid by Cedar Park to pay for services they found objectionable, this does not violate Cedar Park's rights" because it entered into the health insurance market "as a matter of choice." Opp'n 9. But the Church had a plan that complied with its convictions for years and it has no choice because the Affordable Care Act requires it to have health insurance for its more than 50 employees, *Burwell v. Hobby Lobby*, 573 U.S. 682, 696 (2014). And the Church's beliefs require it to provide maternity coverage. VC ¶ 45. Moreover, the Church, not the State, determines whether particular conduct violates its beliefs. The Supreme Court rejected the government's similar argument in *Fulton v. City of Philadelphia*: "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." 141 S.Ct. 1868, 1876 (2021). The Attorney General acknowledged the inability to determine the Church's beliefs in this context in a 2002 opinion: "direct participation in purchasing coverage for

---

[1] Contrary to Defendants' implications, verified complaints are admissible as evidence in summary judgment briefing. *McElyea v. Babbit*, 833 F.2d 196, 197 (9th Cir. 1987).

PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    3

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-053**

objectionable services dilutes their ability to deliver strong messages on their religious or moral views by giving the appearance that the objecting institution does not consistently follow its own announced principles. *We cannot easily assess whether a more indirect payment system would reduce or eliminate these objections*." Wash. Op. Att'y Gen. 5 (2002) (emphasis added).

Yet Defendants say *Hobby Lobby*'s finding that requiring companies to cover abortifacients substantially burdened religious beliefs is distinguishable because Cedar Park "is not required to purchase coverage of services that violate its religion." Opp'n 11. But SB 6219's injury commenced when it took away Cedar Park's religiously-complying health plan. And Defendants concede that all the insurance alternatives they say are comparable provide Cedar Park's employees with access to abortion, at least indirectly. That facilitation violates the Church's beliefs which is all that is required to show a burden under *Skyline Wesleyan Church v. California. Department of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020). That facilitation also neutralizes Defendants' attempt to distinguish *Skyline* because it "never addressed the scenario where an employer can negotiate for a plan that excludes coverage for services to which it objects." Opp'n 11. There is no comparable plan available to Cedar Park that doesn't facilitate abortion.

Defendants claim Cedar Park's beliefs prohibiting facilitation of abortion are unlike those protected in *Sharpe Holdings, Inc. v. United States Department of Health and Human Services*, 801 F.3d 927 (8th Cir. 2015), *vacated on other grounds*, 2016 WL 2842448 (May 16, 2016), because "Cedar Park does not have to submit an accommodation request to the Insurance commissioner or any other government agency." Opp'n 11. But *Sharpe* held that the mandated notice by the religious employer "trigger[ed] the provision of objectionable coverage by their [third party administrators], making them complicit in conduct that violates their religious beliefs." *Sharpe*, 801 F.3d at 939. Likewise, Cedar Park's coerced purchase of a health plan covering abortion triggers the provision of the objectionable coverage.[2]

---

[2]The one-paragraph opinion that granted, vacated, and remanded *Sharpe*, 2016 WL 2842448, merely said the Government could not fine the plaintiff even though it never provided the required notice of its religious beliefs because the government had constructive notice. And the factual

PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

4

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-054**

## 2. Non-religious carriers cover objectionable items as part of religious objectors' plan.

Defendants mischaracterize Ms. Tocco's testimony that "the plan actually provides for access" as being limited to Kaiser's plan. Opp'n 9. That answer was part of a line of questions that started with, "When you're reviewing a plan that excludes an objectionable service, are there specific ways that you've seen that the plan can comply with subsection (3)(b) [of § 48.46.065]?" Tocco Dep. 100. Answer: "(3)(b) is designed to ensure that even if a given benefit isn't included in their benefits package, they can still have access to it." *Id.* at 101. Tocco then testified that employees receive notice that they "still have a right to access this benefit, and here's how you go about doing that….[T]hey provide written notice in the plan documents." *Id.* at 102. That testimony alone shows SB 6219 requires health plans to facilitate abortion coverage through the plan documents in violation of the Church's beliefs. Several questions later, Tocco confirmed that Kaiser is "an example of a health carrier that offers a plan that doesn't cover abortion," but then corrected herself to say, "whose employer doesn't cover. The plan actually provides for access." *Id.* at 105. She did not limit that correction to Kaiser and the context of her statement makes clear that a non-religious carrier's plan must provide access to abortion even if the employer objects to covering it. Regardless, that's what the plain language of the conscience statute requires.

Defendants also summarily argue the Court should disregard other evidence showing the Cigna alternatives would have included abortion and abortifacients as part of the plans it offered for purchase because "Cedar Park has no personal knowledge to make those assertions." Opp'n 10. Yet Defendants acknowledge there is email evidence from Cedar Park's broker supporting these assertions, *see* Defs.' MSJ 8–9. And the broker has now provided sworn testimony confirming that evidence. *See* Hansen Decl.

## 3. The alternative plans aren't comparable.

Defendants don't dispute Cedar Park's contention that self-insurance is not comparable to

---

premise underlying that statement eventually changed. *See* Pl.'s Opp'n to Defs.' MSJ 9 n.7, ECF No. 113.

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

5

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-055**

its pre-SB 6219 plan, Pl.'s MSJ 4, ECF No. 103, and concede that Cedar Park determined the Cigna plans were not comparable "because of speculated increased costs, potential complaints from employees about changing, and Cigna's different method of providing services." Opp'n 6. While a helpful concession, this description of the inadequacies of the Cigna plans is incomplete. The Cigna plans had higher future premiums, and forced employees to find new providers. *See* Orcutt Dep. 64–67, ECF No. 92; Orcutt Decl. ¶¶ 20–22, 29, ECF No. 94-1. And Kaiser had better coinsurance, lower deductibles, and better access to preventive care. Orcutt Decl. ¶¶ 15–17.

Defendants ignore these disadvantages except they attempt to dismiss the cost increase as "speculated." But sworn testimony and the broker's proposals (that Defendants rely on) prove that the very next year, Cigna did not even quote Cedar Park a fully insured plan and the price for a level-funded plan exceeded Kaiser's fully insured bid. Orcutt Decl. ¶¶ 17, 25. Defendants try to explain away this inferior coverage by simply stating it was "unrelated to [Cedar Park's] religious beliefs." Opp'n 9. But that is irrelevant since all Cedar Park needs to show to establish an injury is that it was "worse off than it had been before the" state's abortion mandate. *Skyline*, 968 F.3d at 748–49.

### 4. Kaiser's willingness to offer a plan excluding abortion is supported by the record.

Defendants don't dispute Kaiser excluded abortion from the Church's plan but began including it after SB 6219 took effect in 2019. Opp'n 5 n.4. This shows SB 6219 caused the plan loss and it is confirmed by an August 2014, 2019, email from the Church's Broker describing an "update from Kaiser": "KP will not be accommodating any abortion exclusions for fully insured groups. Upon review of SB 6219, fully insured health plans issued after 1/1/2019 that cover maternity care or services must cover substantially equivalent coverage for abortion." Hansen Decl. ¶ 16.

The Statutes' burden on the Church's religious freedom is undisputed.

PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

6

**ER-056**

**B. Defendants concede SB 6219 has exemptions but misstate the law on general applicability in a failed attempt to excuse them.**

**1. SB 6219's exemptions undermine its purposes.**

Cedar Park's motion for summary judgment shows that at least seven exemptions to SB 6219 include insurance policies that cover maternity, contraception, or both. Pl.'s MSJ 14–15. Defendants don't mention the exemptions for federal funding or policies that don't cover maternity. And they concede the Conscience Clause gives a more favorable exemption to religious health care entities than other religious organizations. Opp'n 15.

Defendants also concede SB 6219 exempts some insurance plans that provide maternity coverage. *Id*. at 12–13 ("*Most*. . .do not provide for maternity coverage."). But they argue that the fact "[t]hat the preexisting statute defining health plans excludes certain types of specific insurance products from its definition…does not mean that SB 6219 contains secular exemptions that undermine the interests in providing women better access to health benefits." *Id*. at 14. That sophistry contradicts the facts. The definition of health plans in RCW § 48.43.005 must be read with SB 6219 because, in Defendants' words, "[t]he Legislature…is presumed to be familiar with prior enactments." Defs.' MSJ 16. And Defendants' 30(b)(6) witness testified that SB 6219's reference to "health plan" is defined by RCW § 48.43.005(31). Tocco Dep. 35–36.

Defendants argue a law only fails general applicability if it "target[s] health plans only for religious entities." Opp'n 14. But the test isn't that narrow. The Supreme Court recently clarified that laws "are not neutral and generally applicable. . .whenever they treat *any* comparable secular activity more favorably than religious exercise. *It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue*." *Tandon,* 141 S.Ct. at 1296 (emphasis added).

Citing no authority, Defendants say *Tandon* is distinguishable because the law struck down there "expressly restricted religious services." Opp'n 15. But this is just another way to read a non-existent religious targeting requirement into the general applicability test. *Tandon* makes clear that

PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

7

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-057**

no such requirement exists by citing with approval Justice Kavanaugh's concurrence in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 73 (2020), which explained that "once a State creates a favored class of businesses. . . the State must justify why houses of worship are excluded from that favored class." *Id. See* Pl.'s Opp'n 11 (showing singling out religion is not part of the general applicability test).

There is no case holding that a law is generally applicable so long as it doesn't expressly restrict religion. But there are cases showing otherwise. *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,* 170 F.3d 359 (1999) (Alito, J.) struck down the City of Newark's policy prohibiting Muslim police officers from growing beards for religious reasons even though the policy didn't expressly limit religious facial hair. 170 F.3d at 360.[3]

Similarly, a university's policy that did not mention religion was not generally applicable because it allowed students in the counseling program to refer practicum clients for various reasons but not for religious convictions. *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012). And in *Waln v. Dysart School District*, 54 F.4th 1152, 1157–59 (9th Cir. 2022), a school district's policy prohibiting students from decorating their graduation caps was not generally applicable because it wouldn't allow the Native American plaintiff to wear a religious eagle feather, but allowed a student in another school to wear a breast cancer awareness sticker on his cap. The policy did not mention religion. *See also Radar v. Johnston*, 924 F.Supp. 1540, 1551–52 (D. Neb. 1996) (requirement that freshman live on campus did not expressly regulate religious students who objected, but was not generally applicable because it allowed, *inter alia*, three categorical secular exemptions); *Black Hawk v. Penn.*, 225 F.Supp.2d 465, 474–75 (D. Pa. 2002) (state law requiring the payment of a fee for keeping bears did not expressly restrict religious conduct but was still not

---

[3] Defendants try to distinguish *Fraternal Order of Police* because "there was no exemption for religion, while there is an exemption here." Opp'n 15. But Defendants' "exemption" still requires health plans to facilitate abortion in violation of Cedar Park's religious beliefs. And under Defendants' theory, the City of Newark would have prevailed if it had some sort of religious exemption, even if it didn't allow Muslims to wear beards.

PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

8

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-058**

generally applicable because it allowed various secular exemptions).

In their neutrality argument Defendants also argue that the exemptions do not undermine general applicability because they "relate to … specific types of insurance products that only incidentally include health care services." Opp'n 12. But that consideration is not implicated by the plans exempted because they affect federal funding, do not cover maternity, or are purchased by religious employers in the health care business. Moreover, one of SB 6219's asserted interests is that "a woman's …type of insurance should [not] prevent her from having access to a full range of reproductive care, including contraception and abortion." Defs.' MSJ 4. All of the seven types of exempted insurance policies implicate the Statute's purported interest in "better access to health benefits."[4]

Defendants next argue that the insurance products exempted "are not designed to be comprehensive health plans due to duration or very limited benefits." Opp'n 12. Once again, this consideration does not apply to religious medical provider plans or those that might affect federal funding and don't cover maternity. And Defendants don't explain how their asserted interest in promoting women's reproductive health is unaffected by policies covering only certain types of women's health care or that are limited in duration. No insurance policy covers everything indefinitely.

Finally, Defendants claim some of the exemptions "are particular health care options funded by entities the Insurance Commissioner does not have jurisdiction over (like Medicare)." Defs.' MSJ 16. But all of the seven exemptions apply to plans that *are* regulated by the Commissioner, including the *supplemental* plans. Nollette Dep. 42–43.

### 2. The Conscience Clause is not generally applicable.

The Conscience Clause exempts religious health care organization employee health plans from facilitating abortion coverage. Defendants concede all they must do is inform employees that

---

[4] The exempted plans also compromise SB 6219's other asserted purposes which Defendants summarize as "providing essential care for women and promoting opportunities for women to participate in society equally." Opp'n 17.

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

9

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-059**

objectionable items like abortion are not covered. Opp'n 15. That's markedly less coercive than the provision partially protecting churches which requires the carrier to actually ensure employees can access the objectionable services. *See* § I(A)(1).

### C.     Defendants misstate the law on neutrality.

Defendants contend SB 6219's multiple secular exemptions do not show it favors secular conduct in violation of the Free Exercise Clause, because the exemptions only incidentally include health care services, are not comprehensive because of limited duration or very limited benefits, or are options the Insurance Commissioner lacks jurisdiction over. Opp'n 12. But as shown above, these excuses do not eliminate the fact that the exemptions favor secular conduct, which is all that matters.

And Defendants claim there's no evidence that SB 6219 proscribes more conduct than necessary in violation of the Free Exercise Clause, speculating that Cedar Park employees don't necessarily share its beliefs about abortion. Defs.' Opp. 13. But all employees must sign an agreement that they share the Church's beliefs, VC ¶¶ 25–32, and Defendants' speculation isn't sufficient to negate that fact.

Defendants concede the Conscience Statute's more favorable treatment of "religious health providers, health carriers, and health facilities" but argue it doesn't affect neutrality because the Ninth Circuit held that discrimination doesn't violate Equal Protection. Opp'n 13. But "[g]overnment fails to act neutrally when it proceeds in a manner *intolerant of religious beliefs*." *Fulton*, 141 S.Ct. at 1877 (emphasis added). The AG's office previously confirmed the Conscience Clause's lack of tolerance when it conceded that "[w]hile some employers may object to even indirect participation, the Legislature balanced the competing values of religious and moral autonomy on the one hand and access to care on the other by providing a limited right of conscientious objection" in RCW § 48.43.065. Wash. Op. Att'y Gen. 5 (2002). And Defendants still haven't explained how a religious hospital's employee health plan is any different than a church's.

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

10

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-060**

The Washington Legislature was intolerant of Cedar Park's religious beliefs because it refused to exempt them from SB 6219 several times. Ignoring the authority Plaintiff cites indicating SB 6219's legislative history shows intentional discrimination (Pl.'s MSJ 19) and citing none of their own, Defendants baldly contend the fact that the legislature specifically refused to amend SB 6219 to include protection for religious organizations three times is "irrelevant." Opp'n 14.

SB S219 is not neutral so it is subject to strict scrutiny.

**II.      Defendants misstate the law on Church Autonomy.**

Defendants assert that generally applicable laws are not subject to the Religious Autonomy Doctrine. Opp'n 19. But the Supreme Court held just the opposite: "This is not to say that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2021 n.2 (2017) (citing *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 190 (2012)).

None of the cases Defendants cite support their assertion. In *Our Lady of Guadalupe,* that was the position of Justice Sotomayor's dissent. 140 S.Ct. at 2076. General applicability was not even mentioned by the majority opinion. And *Jones v. Wolf*, 443 U.S. 595, 602 (1979), merely held that courts can apply neutral principles of law to resolve church property disputes "so long as it involves no consideration of doctrinal matters." *Jones* doesn't mention generally applicable laws either.

Defendants also make the unsupported assertion that "the purchase of a health plan is not an ecclesiastical decision." Opp'n 19. But the Church's testimony, VC ¶¶ 29–41 and the many cases protecting religious employers' right to provide employee health plans consistent with their pro-life beliefs show it is indeed a "matter[ ] of faith and doctrine…closely linked [to] matters of internal government." *Our Lady of Guadalupe*, 140 S.Ct. at 2061. *See*, Pls.' Opp'n 20.

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

11

**ER-061**

**III.  Seven exemptions undermine Defendants' asserted compelling interest, and the abortion mandate is not the least restrictive means of accomplishing its purported interest.**

Defendants claim that "[t]he State has a compelling . . . interest in providing better access to health benefits." Opp'n 17. But "broadly formulated interests" are not compelling and Defendants cannot just show they have "a compelling interest in enforcing [their] . . . policies generally, but [must also have] such an interest in denying an exception to [Cedar Park]." *Fulton*, 141 S.Ct. at 1881 (cleaned up). Defendants do not even attempt to show why exempting Cedar Park's health insurance plan will jeopardize its interest in "promoting public health caused by unintended pregnancies" any more than the exemptions it already provides do.

Defendants insist the admitted lack of complaints about abortion and abortifacient coverage before SB 6219 is a "red herring." Opp'n 17. But that lack of complaints makes it impossible for Defendants to carry their burden of proving an actual problem exists, that it is caused by "the particular claimant[s] whose sincere exercise of religion is being substantially burdened," and that the law will solve it. *Hobby Lobby*, 573 U.S. at 726. Nothing in the legislative record or elsewhere suggests churches exempting abortion and abortifacients from health plans led to their employees not getting access to the medical care they wanted or needed.

Defendants also argue the "exemptions in the definition of 'health plan'" do not undermine their asserted compelling interest because they "exist for separate policy reasons—like they are areas of insurance that do not focus on health care, or are health plans not regulated by the State or OIC." Opp'n 17–18. But Plaintiff has already demonstrated those reasons don't hold water. *See* § I(B)(1). An interest is not compelling when the government "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort." *Church of the Lukumi Babalu v. City of Hialeah*, 508 U.S. 520, 546–47 (1993).

Finally, Washington has many ways to accomplish its asserted interests without compelling churches to violate their beliefs. Pl.'s MSJ 21–22. Defendants acknowledge these options yet make no attempt to show the Statutes employ the least restrictive means. Opp'n 18. *See Thomas v. Rev.*

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

12

*Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981) (the government must also show the law "is the least restrictive means of achieving" its interests).

The Statutes fail strict scrutiny.

## CONCLUSION

Cedar Park's motion for summary judgment should be granted.

Respectfully submitted this 7th day of April, 2023,

*s/Kevin H. Theriot*
Kevin H. Theriot (AZ Bar #030446)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile:  (480) 444-0025
Email: ktheriot@adflegal.org

David A. Cortman (GA Bar #188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30040
Telephone: (770) 339-0774
Email:  dcortman@adflegal.org

*Attorneys for Plaintiff Cedar Park Assembly of God of Kirkland, Washington*
* Admitted *pro hac vice*

PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

13

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-063**

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2023, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Paul M. Crisalli
ATTORNEY GENERAL'S OFFICE
800 5th Ave
Ste 2000
Seattle, WA 98104

Marta U. DeLeon
ATTORNEY GENERAL'S OFFICE
PO Box 40100
Olympia, WA 98504
*Counsel for Defendants*

DATED: April 7, 2023
*s/Kevin H. Theriot*
Kevin H. Theriot (AZ Bar #030446)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0025
Email: ktheriot@adflegal.org

*Attorney for Plaintiff Cedar Park Assembly of God of Kirkland, Washington*

* Admitted *pro hac vice*

PLAINTIFF'S REPLY IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

14

(20 of 232)

Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

        Plaintiff,

    v.

MYRON "MIKE" KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington; JAY INSLEE, in his official capacity as Governor of the State of Washington,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 3:19-cv-05181

**DECLARATION OF JAMI M. HANSEN**

Jami M. Hansen, upon oath and affirmation, hereby deposes and says:

1. I have personal knowledge of all the facts in this declaration and I submit them as a supplement to my June 13, 2020 declaration for this case.

2. I have consulted with Cedar Park to implement and manage its employee benefits program for 14 years and have extensive knowledge of their health care insurance plan needs and coverages.

3. For the 2019–20 plan year, eight carriers were invited to bid fully insured plans. Three chose not to bid, and 3 were uncompetitive—leaving only Kaiser Permanente and Cigna.

4. Excepting only self-insurance, all of the plans available to and suitable for Cedar Park that I was aware of for the 2019–20 plan year would have provided Cedar Park employees

DECLARATION OF
JAMI M. HANSEN

1

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

access to abortion and abortion causing drugs through, or as a result of, the Church's plan.

5. Since the 2019–20 plan year, excepting only self-insurance, all of the plans available to and suitable for Cedar Park that I was and am aware of provide Cedar Park employees access to abortion and abortion causing drugs through, or as a result of, the Church's plan.

6. Employer-sponsored self-funded insurance is the only possible option available to Cedar Park that completely exempts abortion and abortifacients and does not provide abortion and abortion causing drugs through, or as a result of, the Church's plan.

7. In 2019 I advised Cedar Park that Cigna could not in fact completely exclude abortion and abortifacients in their group and level-funded plans like it could for self-insurance. They would still be part of Cedar Park's health insurance plan because of SB 6219's requirements.

8. For example, if abortifacients were excluded, enrollees in Cedar Park's health plan would use the same insurance card to obtain abortifacients as non-objectionable drugs. *See* August 8, 2010 email from Hansen to Orcutt, attached as Exhibit 1.

9. In group and level-funded plans, health plan documents would include notice to Cedar Park employees of how to obtain abortion and abortifacients as part of their coverage.

10. Before SB 6219 went into effect, Kaiser Permanente and most other carriers were willing and able to completely exclude abortions and abortifacients for churches.

11. With a level-funded plan like Cigna's, Cedar Park would pay more over time because Cigna typically raises the second year premiums to make up for the prior year's loss. For example, Cigna's 2020–21 bid increased the level-funded premiums because of Cedar Park's high utilization of insurance during 2019–20.

12. With a self-insured plan, Cedar Park would have had to purchase a Stop Loss Insurance Policy to cover any insurance costs for an individual Cedar Park employee during a given calendar over a set amount—usually $100,000. After a year like 2019–20, when Cedar Park had a covered person spend upwards of $1,000,000, the Stop Loss Insurance Company would raise the premiums significantly the next year.

DECLARATION OF
JAMI M. HANSEN

2

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-066**

13.     A self-insured plan's second year costs for 2020–21 would have likely been at least an additional $200,000 more than the $243,125 estimated 2019-20 cost. And by year three (2021–22) an additional $200,000 because of claims exceeding $1,840,000 for one of Cedar Park's employee's children in plan years from 2019 through 2021.

14.     I was concerned that Cedar Park would not even be able to get the Stop Loss Insurance needed for a self-insured plan after a 2019–20 plan year $1,000,000 claim for that child.

15.     SB 6219's abortion mandate caused much confusion among health insurance carriers, brokers, and purchasers. In 2019 it was nearly impossible, and even since then it's been difficult, to get clear answers on whether plans exclude abortion and abortifacients.

16.     My August 14, 2019 email to the Church, attached as Exhibit 2, was an "update from Kaiser" taken directly from my correspondence with that carrier's representative whose exact words were: "KP will not be accommodating any abortion exclusions for fully insured groups. Upon review of SSB 6219, fully insured health plans issued after 1/1/2019 that cover maternity care or services must cover substantially equivalent coverage for abortion."

I hereby declare under penalty of perjury, including pursuant to 28 U.S.C. § 1746, that the foregoing factual allegations are true and correct.

Executed on this 4th day of April, 2023 in Bellevue, Washington.

*s/ Jami M. Hansen*
Jami M. Hansen

DECLARATION OF
JAMI M. HANSEN

3

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-067**

# Exhibit 1

 Gmail

Melissa Knauss <melissa.k@cedarpark.org>

## Objected Coverage Logistics

2 messages

**Melissa Knauss** <melissa.k@cedarpark.org>     Thu, Aug 8, 2019 at 11:11 AM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <melinda_hansen@ajg.com>

Hi Jami,

I have two important questions regarding objected coverages:

1.)  For companies that have gone with the option for the carrier to cover contraceptives +, how does this work on the user/employee side.  For instance, does the employee still present the medical center/hospital with the same insurance card or do they have a different card they use?

2.)  For companies that have gone with the option for the carrier to cover contraceptives +, can you confirm that the cost of the services/prescriptions the carrier is covering are excluded from the Deductible Met amount and are therefore ineligible for HRA reimbursements by that company?

All the best,



**Jami Hansen** <Jami_Hansen@ajg.com>     Thu, Aug 8, 2019 at 12:23 PM
To: Melissa Knauss <melissa.k@cedarpark.org>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Hi Melissa!

On question #1 there wouldn't be different ID Cards.  It would work the same way and is an internal process.  On question #2 if it's covered at 100% the deductible and HRA wouldn't apply.

Let me know if you have any additional questions.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Aug 8, 2019, at 11:11 AM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

> [EXTERNAL]

[Quoted text hidden]

**ER-069**

Cedar Park 000294

# Exhibit 2

**From:** Steve Orcutt <steve.o@cedarpark.org>
**Date:** August 14, 2019 at 1:21:56 PM PDT
**To:** Jami Hansen <Jami_Hansen@ajg.com>
**Cc:** Melinda Hansen <Melinda_Hansen@ajg.com>, "melissa.k@cedarpark.org"
<melissa.k@cedarpark.org>
**Subject: Re: Kaiser**

---

[EXTERNAL]

---

I understand that the final implementation rules for SSB 6219 have not yet been released. If an exception is made for churches or houses of worship such as Cedar Park to allow exclusion of abortions, will Cedar Park be able to exclude that coverage immediately during the Sept 1, 2019 to Aug 31, 2020 Plan Year? Or will we need to wait until renewal on Sept 1, 2020? Thanks. Steve.

On Wed, Aug 14, 2019 at 1:00 PM Jami Hansen <Jami_Hansen@ajg.com> wrote:

> We just received an update from Kaiser:
>
> **Contraceptives**
>
> Currently while we do cover contraceptives outside the contracts for Moral Objectors, that is required by law (Nationally). That waiver provision is currently being challenged in the courts.
>
> **Abortion Exclusion for Fully Insured Groups:**
>
> KP will not be accommodating any abortion exclusions for fully insured groups. Upon review of SSB 6219, fully insured health plans issued after 1/1/2019 that cover maternity care or services must cover substantially equivalent coverage for abortion.
>
> **Self-Funded**
>
> KP leadership has provided exception for the following: any religious groups

ER-071

opposing the abortion exclusion may go self-funded (even if they did not previously meet size requirements). Self-funded groups may carve out abortion.

Let me know if you have any questions.

Jami Hansen

Area Vice President

Arthur J Gallagher

425-891-1325

**NOTICE TO RECIPIENT:**  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

Update:


**Contraceptives**

Currently while we do cover contraceptives outside the contracts for Moral Objectors, that is required by law (Nationally).  That waiver provision is currently being challenged in the courts.


**Abortion Exclusion for Fully Insured Groups:**

KP will not be accommodating any abortion exclusions for fully insured groups. Upon review of SSB 6219, fully insured health plans issued after 1/1/2019 that cover maternity care or services must cover substantially equivalent coverage for abortion.


**Self-Funded**

KP leadership has provided exception for the following: any religious groups opposing the abortion exclusion may go self-funded (even if they did not previously meet size requirements). Self-funded groups may carve out abortion.


We realize that Cedar Park may not want to go self-funded, if that is the case we do understand they may choose to switch carriers to accommodate for their abortion request, as KP cannot accommodate the abortion exclusion on fully insured groups.


Please let me know what the group prefers to do.


**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales


**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office**: 206-448-2845

**Cell**  206-218-6395

**Email**  Nicole M1.Gomez@kp.org



*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license  Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage  solicitation  negotiating with underwriters  and binding.  The following activities do not require a producer license  Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues  gathering information so that a licensed individual can finish an insurance transaction  taking claims information but not interpreting or commenting on coverage  and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information  http //www.insurance.wa.gov/for-producers/*

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

CEDAR PARK ASSEMBLY OF GOD OF
KIRKLAND, WASHINGTON,

Plaintiff,

v.

MYRON "MIKE" KREIDLER, et al.,

Defendants.

NO. 3:19-cv-05181-BHS

DEFENDANTS' REPLY IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR:
APRIL 7, 2023

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

**ER-074**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ..................................................................................................... 1

    A. Cedar Park Relies on Speculation and Inadmissible Hearsay ................................ 1

    B. Cedar Park's Free Exercise Claim Fails as a Matter of Law .................................. 3

        1. The statutes do not impermissibly burden religion ........................................... 4

        2. The statutes are neutral..................................................................................... 6

        3. The statutes are generally applicable ............................................................... 9

        4. The statutes are rationally related to legitimate governmental purposes ........ 10

    C. Cedar Park's "Religious Autonomy" Claim Fails ................................................. 11

III. CONCLUSION ................................................................................................. 12

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

i

**ER-075**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

# TABLE OF AUTHORITIES

## Cases

*Bollard v. Cal. Province of Soc'y of Jesus,*
196 F.3d 940 (9th Cir. 1999) ................................................................... 11

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ................................................................................. 5

*Cedar Park Assembly of God. v. Kreidler,*
860 Fed. App'x 542 (9th Cir. 2021) ................................................... 8, 11

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ......................................................................... 6, 7, 9

*Dep't of Health & Hum. Servs. v. CNS Int'l Ministries,*
No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016) ............................ 6

*Elk Grove Unified Sch. Dist. v. Newdow,*
542 U.S. 1 (2004) .................................................................................... 6

*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021) ......................................................................... 5, 9

*Garcia v. San Antonio Metro. Transit Auth.,*
469 U.S. 528 (1985) .............................................................................. 10

*Hernandez v. Spacelabs Med. Inc.,*
343 F.3d 1107 (9th Cir. 2003) ................................................................ 1

*JL Beverage Co., LLC v. Jim Beam Brands Co.,*
828 F.3d 1098 (9th Cir. 2016) ................................................................ 1

*Jones v. Wolf,*
443 U.S. 595 (1979) .............................................................................. 12

*Kennedy v. Bremerton Sch. Dist.,*
142 S. Ct. 2407 (2022) ............................................................................ 3

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
485 U.S. 439 (1988) ................................................................................ 6

*Marshall v. United States,*
414 U.S. 417 (1974) .............................................................................. 10

*Orr v. Bank of Am., NT & SA,*
285 F.3d 764 (9th Cir. 2002) .................................................................. 1

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
140 S. Ct. 2049 (2020) .......................................................................... 12

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

ii

**ER-076**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Religious Sisters of Mercy v. Azar*,
513 F. Supp. 3d 1113 (D. N.D. 2021) .................................................................. 10

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ............................................................................................ 10

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
801 F.3d 927 (8th Cir. 2015) ................................................................................ 6

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
968 F.3d 738 (9th Cir. 2020) ................................................................................ 5

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .............................................................................................. 6

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) ......................................................................... 6, 7

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021) .......................................................................................... 5

*Tingley v. Ferguson*,
47 F.4th 1055 (9th Cir. 2022) ...................................................................... 6, 8, 9

*United States v. Lee*,
455 U.S. 252 (1982) ......................................................................................... 4, 11

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) .............................................................................................. 6

*Zubik v. Burwell*,
578 U.S. 403 (2016) .............................................................................................. 6

## **Statutes**

2018 Wash. Sess. Laws, ch. 119, § 1 ....................................................................... 7

RCW 48.43.005(31) ................................................................................................... 7

RCW 48.43.065(2)(b) .............................................................................................. 11

RCW 48.43.065(3) ..................................................................................................... 9

RCW 48.43.073(5) ............................................................................................... 8, 10

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

iii

ER-077

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## I.    INTRODUCTION

This case has been extensively briefed, and Cedar Park's Response to Defendants' Summary Judgment Motion offers purely speculative and blatantly inconsistent arguments that are not well taken. The Court should dismiss Cedar Park's claims with prejudice. The statutes are neutral and generally applicable because they do not target religion and because religious employers like Cedar Park can refuse to purchase coverage for services to which they object. The statutes are not only rationally related to legitimate government purposes, but satisfy strict scrutiny because they are narrowly tailored to achieve the compelling state interests.

## II.    ARGUMENT

### A.    Cedar Park Relies on Speculation and Inadmissible Hearsay

There are a few points worth emphasizing when analyzing the cross-motions for summary judgment. First, Cedar Park's claims rely on speculation and inadmissible hearsay. The Court can only consider admissible evidence in ruling on a motion for summary judgment and cannot rely on unsupported conjecture or conclusory statements. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-774 (9th Cir. 2002); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). To consider some forms of hearsay, the proponent needs to demonstrate that the hearsay declarants would be available to testify at trial and that its evidence would be admissible at trial in some other form. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).

Here, Cedar Park speculates or relies on hearsay. There is no evidence supporting the following facts, among others:

- No evidence that Kaiser's plan preceding SB 6219's enactment forbade providing abortion services to Cedar Park's enrollees outside of Cedar Park's plan;

- No evidence that Kaiser's plan preceding SB 6219's enactment did not "facilitate" abortion to other enrollees;

- No evidence that Cigna's level-funded or fully funded plans required Cedar Park to indirectly pay for abortion or certain contraceptives;

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

1

**ER-078**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

- No evidence how Cigna would provide access to the excluded services "outside the plan;"

- No evidence that Cigna offered a self-funded plan;

- No evidence that all Cedar Park enrollees, including employees and their family members, share Cedar Park's views towards abortion and certain contraceptives;

- No evidence that Cedar Park had to pay an extra premium, fee, or payment because of its objection to abortion, either when using Kaiser or using a Cigna plan;

- No evidence that Cedar Park would actually facilitate access to abortion through Kaiser's or Cigna's plans; and

- No evidence that any Cedar Park enrollee obtained access to abortion or contraceptives through Cedar Park's health plans.

Cedar Park incorrectly relies on inadmissible hearsay and speculation. This testimony largely consists of statements by Cedar Park's CFO and its broker. The CFO speculates about how insurance companies offered and implemented their plans and impermissibly relays his understandings of the broker's understandings of what insurance carriers were willing to offer Cedar Park. This includes the inadmissible testimony about using insurance cards to obtain excluded services and testimony about Kaiser's refusal to offer a plan. Dkt. # 113 at 4. There is no indication that this hearsay testimony would be admitted at trial.

Second, Cedar Park again argues that Cigna did not offer a plan that excluded abortion and certain contraceptives. The emails and broker presentations undisputedly show that Cigna offered plans that excluded abortion and certain contraceptives, through unequivocal answers to Cedar Park's questions. This is an undisputed fact.

Third, Cedar Park ignores undisputed facts in arguing that the Cigna plans were not cheaper. The June 10, 2019, presentation offered two options from Cigna that are cheaper than Kaiser's plan options. Dkt. # 105-1, Ex. C at 60-61. The July 18, 2019 bid included two additional options that were cheaper. *Id.*, Ex. I.

Regarding Cedar Park's argument that the Cigna prices went up, for 2020, the initial presentation was that it would cost $1,149,384 to renew the Kaiser plan. *Id.*, Ex. C at 69-70.

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

2

ER-079

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

There was a negotiated rate from Kaiser for $1,099,092. *Id.* Cigna offered a level-funded option with an exclusion that cost $1,140,925. *Id.* at 70. Cigna's option is cheaper than renewing Kaiser's plan. Only by renegotiating Kaiser's plan (through increased deductibles), was it cheaper than Cigna's.

Cedar Park's argument that Cigna raised its rates in 2020 lacks context. Kaiser increased its rates for renewing its plan more than Cigna's increase. It would cost $233,070 more to renew with Kaiser, while Cigna increased its rates only $227,544. Cedar Park negotiated with Kaiser in 2020 to obtain worse coverage, despite an initially cheaper Cigna bid that excluded coverage of abortion and certain contraceptives, which shows Cedar Park did not base its insurance decisions on its views about abortion.

Fourth, without any support, Cedar Park states that Cigna's fully insured plan options did not exclude abortion. Dkt. # 113 at 4-5. This ignores the repeated assertions *from Cigna* that all plans have the exclusion. Just because Cedar Park says something doesn't mean it's true.

Fifth, without any support, Cedar Park posits that Cigna's plans are not comparable. But Cedar Park only discusses Cigna's level-funded plan. *Id.* at 6-7. That Cigna structures its plans differently than Kaiser does not mean that it is not comparable. Cigna offers health plans that provide coverage for services (while excluding abortion and certain contraceptives). Like all employers purchasing large group health plans, Cedar Park can determine what structure works best for its business model. But Cedar Park admits it made that decision not because of its religion.

**B.    Cedar Park's Free Exercise Claim Fails as a Matter of Law**

Cedar Park fails its burden to show that Washington's statutes are not neutral or generally applicable and thus subject to strict scrutiny. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (describing burden on plaintiff).

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

3

**ER-080**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**1.      The statutes do not impermissibly burden religion**

Washington law allows Cedar Park to purchase a health insurance plan that excludes coverage to which Cedar Park objects. Cedar Park negotiated with Cigna for such a plan, but purchased the more expensive with no exclusion. Because the statutes allow Cedar Park to purchase a plan that excludes services consistent with its beliefs, the statutes do not impermissibly burden religion.

Cedar Park repeatedly misstated Defendants' 30(b)(6) testimony to imply that, even when exercising the conscience objection, Cedar Park could indirectly pay for abortion services. Kim Tocco never testified that when a plan provides an abortion exclusion, the services are still included in the plan or that the carrier still has to provide the services. Dkt. # 105-1, Ex. A at 102-105. Rather, when a plan excludes coverage, the plan documents need to notify enrollees that the employer chose not to provide benefits but that the enrollee still can access benefits. *Id.* at 102. The carrier might provide the benefits, but they might be provided by someone else. *Id.* And Tocco stating "[the] plan actually provides for access" refers to a specific Kaiser plan. *Id.* at 105.

Even if carriers provide "access" to services, nothing requires Cedar Park to indirectly pay for the services, and no evidence shows that Cedar Park would indirectly pay for them. Even if Kaiser, Cigna, or another carrier used a portion of the monies paid by Cedar Park to pay for services it found objectionable, that does not violate Cedar Park's free exercise rights. Money is fungible and cannot have a "no abortion services" label on it. Cedar Park chose to engage in commercial activity, so it cannot dictate what others do in the market. *See United States v. Lee*, 455 U.S. 252, 261 (1982). The Free Exercise Clause is not a sword to permit religious objectors to impose their beliefs on private companies, or their employees' families. *See id.* Even if a carrier provides access to services does not mean that Cedar Park pays indirectly for anything. Carriers utilize other methods for enrollees to receive the services, including through third parties.

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

4

**ER-081**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Cedar Park argues that this nonetheless violates its exercise rights. Kaiser and Cigna can provide abortion services to its enrollees regardless of an employer's religious objection. Cedar Park essentially seeks an enforceable ban from its enrollees being able to receive abortion in any form, or a ban on any carrier contracted with Cedar Park from offering any abortions or certain contraceptives to any person, as it would cause Cedar Park to "facilitate" abortions. There is no legally cognizable claim that a church's free exercise rights are violated when a third party provides information and access to its enrollees or a carrier provides services to other enrollees.

The cases cited by Cedar Park prove that its claims are not legally supported. In *Fulton v. City of Philadelphia*, the law required religious organizations to provide a certification of same-sex couples as foster couples. 141 S. Ct. 1868, 1876-1877 (2021). Here, Cedar Park provides no certification. It exercises its religion by finding a plan consistent with its beliefs. It negotiates for a health plan, just like every other employer purchasing a large group plan. Any additional obligation is on the carrier to confirm at filing what will occur in the absence of coverage for the objected services. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), the law mandated employers cover the contraceptives, violating the employers' beliefs. Cedar Park expressly can refuse to purchase coverage, so it is not required to violate its religion. Nor did SB 6219 immediately remove Cedar Park's exclusion, and in fact, it actually negotiated for plans consistent with its beliefs, unlike the circumstances in *Skyline Wesleyan Church v. California Department of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020). The *Skyline* Court didn't address the scenario where an employer can negotiate for a plan that excludes coverage to which it objects. *Id.*

Cedar Park is wrong in arguing *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021), changes the burdens analysis. Dkt. # 113 at 10-11. The law expressly restricted religious services while exempting comparable secular activity. *Tandon*, 141 S. Ct. at 1296. The case does not address the situation where, as here, the laws do not restrict religious expression, but, in fact, ensure religious employers can refuse to purchase coverage.

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

5

**ER-082**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Cedar Park does not have to submit an accommodation request to the Insurance Commissioner, or any government agency, unlike in *Sharpe Holdings, Inc. v. United States Department of Health and Human Services*, 801 F.3d 927, 938-941 (8th Cir. 2015). In fact, the Supreme Court reversed *Sharpe*, pointing to precedence requiring that nothing affects the government's ability to ensure that women subject to a religious plan be able to obtain, without cost, the full range of contraceptives. *Dep't of Health & Hum. Servs. v. CNS Int'l Ministries*, No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016); *see also Zubik v. Burwell*, 578 U.S. 403 (2016).

No case confers standing on a church to invalidate enrollees' individual rights to a medical procedure or contraceptives. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 9, 15 n.7 (2004); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471-473 (1982). No free exercise case has been used as a sword to deny third parties of their rights in favor of a church. "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448 (1988) (quoting *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986)). Following Cedar Park's argument, even an order requiring Kaiser to provide a plan excluding abortion would violate its beliefs, as Kaiser still offers plans covering abortion. This claim is patently legally baseless. Cedar Park's operative complaint did not make this strange argument. If anything, this argument shows the mental gymnastics this Court must undergo to exercise to grant relief.

### 2. The statutes are neutral

The statutes, read together, are neutral towards religion. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Tingley v. Ferguson*, 47 F.4th 1055, 1085 (9th Cir. 2022); *Stormans, Inc. v. Wiesman* (*Stormans* II), 794 F.3d 1064, 1075-1076 (9th Cir. 2015). The object of the statutes is neutral—none of the legislative purposes target religion, but

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

6

**ER-083**

focus on improving the health and welfare of Washington citizens and improving equal economic opportunity for women. 2018 Wash. Sess. Laws, ch. 119, § 1. The text is neutral—it doesn't reference any religious practice, conduct, or motivation. The statutes operate neutrally— Cedar Park can refuse to purchase coverage for services to which it objects, and enrollees can access the services outside the plan.[1]

Cedar Park again wrongly argues that SB 6219 is impermissibly gerrymandered. Cedar Park can refuse to purchase abortion coverage and in fact, engaged in negotiations to do so. Since Cedar Park can exercise its beliefs, the statutes are neutral towards religion. Cedar Park makes the nonsensical argument the exemption shows the law is not neutral to religion. But statutes are neutral towards religion if they allow religious employers to exercise their beliefs. *Lukumi*, 508 U.S. at 533 ("if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral[.]").

Cedar Park tries to point to seven "exemptions" to SB 6219 to show the law is not neutral. Four "exemptions" apply to the "health plan" definition and aren't in SB 6219. *See* RCW 48.43.005(31). This definition preexists SB 6219, focusing on which insurance constitutes a "health plan" and, thus, is subject to all health plan requirements. That other insurance forms are subject to other legal requirements (and thus don't include maternity coverage requirements or corresponding abortion coverage requirements) says nothing about the law's neutrality. These other insurance forms are (1) specific types of insurance products that only incidentally include health care services (but are not health plans); (2) are not designed to be comprehensive health plans due to duration or very limited benefits; or (3) are particular healthcare options funded by entities that the Insurance Commissioner does not have jurisdiction over (like Medicare). These exemptions are "tied directly to limited, particularized, business-related, objective criteria." *Stormans* II, 794 F.3d at 1082. Just because those insurance types

---

[1]Cedar Park is mistaken arguing that Defendants never argued that the statutes operated neutrally—they did so expressly. Dkt. # 104 at 15; Dkt. # 112 at 12.

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

7

**ER-084**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

might incidentally relate to maternity services does not mean that the laws are not neutral towards religion.

Cedar Park asks this Court to disregard the Supremacy Clause in saying that the law is discriminates on the basis of religion because SB 6219 is inapplicable to the minimum extent necessary if a plan that would result in noncompliance with federal requirements that are a precondition to the allocation of federal funds. RCW 48.43.073(5). The statute makes clear that the applicable federal laws govern, consistent with the Supremacy Clause. This does not mean that neutrality has been destroyed, lest any time a state statute provides that it is interpreted to comply with the Supremacy Clause would destroy neutrality towards religion.

This Court and the Ninth Circuit confirmed that the conscience objection statute's treatment of religious providers, carriers, and facilities does not render the conscience objection statute discriminatory. "To the extent the conscience objection statute treats religious organizations like Cedar Park differently than individual health care providers, religiously sponsored health carriers, and health care facilities . . . , such differential treatment does not constitute discrimination because the providers are not similarly situated to religious organizations." *Cedar Park Assembly of God. v. Kreidler*, 860 Fed. App'x 542, 543-544 (9th Cir. 2021). "This is because the providers are in the business of providing health services, while religious organizations merely purchase health coverage." *Id.*

Cedar Park misreads the legislative history to argue that SB 6219 discriminates against religion. The legislative findings made clear that SB 6219 is read alongside the already-existing conscience objection statute, and which the Insurance Commissioner promulgated by rule. It is irrelevant that the Legislature rejected proposals to add exemptions, where the conscience objection statute already existed. One legislator's statement that religious organizations can sue if they do not want to provide insurance coverage for abortion proves only that religious organizations can still seek a remedy in court. *See Tingley*, 47 F.4th at 1086 (stray, out of context statements by a legislator not relevant to assess law's neutrality). And a legislator stating

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

8

ER-085

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

"[h]ealth care is about the individual, not about [religious organizations]" shows the neutrality of the law. Dkt. # 113 at 18-19. The focus is on individual access to health care to improve health and welfare, not to benefit or harm religion.

### 3.      The statutes are generally applicable

General applicability turns on whether the law selectively imposes "burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. SB 6219 applies to all health plans and does not target health plans only for religious entities. The Insurance Commissioner does not make discretionary decisions approving exemptions for religious reasons.

As explained above, the existence of categorical "exemptions" do not defeat general applicability. The statutes permit Cedar Park to purchase a plan that excludes coverage for services to which it objects. SB 6219 does not create secular exemptions to the detriment of religious organizations.

Cedar Park points to individualized exemptions, relying on *Fulton*. But *Fulton* proves the Defendants' point, because that law was not generally applicable when a governmental agency exerts discretion whether to make individualized exemptions so as to deny an entity the ability to avoid objectionable conduct. 141 S. Ct. at 1877. Nothing in the conscience objection statute nor do any facts show that the Insurance Commissioner makes discretionary decisions approving exemptions for employers exercising a conscience objection. The Insurance Commissioner has to approve plans excluding coverage for services by reason of religion or conscience. RCW 48.43.065(3). The Insurance Commissioner only reviews health plans to ensure compliance with the laws, including the conscience objection. Any discretion is by the carrier and the employer to negotiate a plan consistent with their beliefs and business models. Here, there is no "individual exceptions that would allow secular exemptions but not religious ones." *Tingley*, 47 F.4th at 1088. The statutes here clearly satisfy *Fulton*.

Cedar Park's discussion of a nonbinding legal memorandum analyzing the Weldon Amendment is a red herring. There is no evidence that the Weldon Amendment is at issue here.

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

9

**ER-086**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Nothing shows that this case implicates RCW 48.43.073(5). The Insurance Commissioner has discretion to promulgate policies to ensure compliance with the Weldon Amendment, not *individualized* discretion over whether specific health plans or religious organizations are able to be exempt from SB 6219 or the conscience objection statute.

### 4. The statutes are rationally related to legitimate governmental purposes

The briefing amply shows not only that the statutes are rationally related to legitimate governmental purposes but also that they satisfy strict scrutiny. The legislative findings detail 14 different governmental purposes served by the law—any is sufficient. Many of those interests are recognized compelling state interests, like providing better access to health benefits and "[a]ssuring women equal access to such goods, privileges, and advantages." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984); *see Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985); *Marshall v. United States*, 414 U.S. 417, 427 (1974).

Cedar Park argues that because OIC received no complaints about health care plans not covering abortions before SB 6219, the law is unnecessary. Complaints to OIC have nothing to do with the law, but the legislative findings do. They show the purposes of the law.

The "exemptions" posited by Cedar Park actually show the careful balance and care the Legislature exerted when enacting SB 6219—it ensured that the legislation fit within the many interests Washington has for its citizens, from protecting the health and welfare of its citizens, ensuring women have opportunities to participate equally in society, protecting religious beliefs, and regulating different insurance markets, to name a few. These are not broadly stated interests "in ensuring nondiscriminatory access to healthcare" but specific interests in women's access to contraceptives and reproductive health services and their opportunity for equal access to participate in society. *Contra Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1148 (D. N.D. 2021).

SB 6219 not only rationally implements its purposes but is narrowly tailored to satisfy strict scrutiny. It implements the purposes set out by the legislative findings. Read along with

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

10

**ER-087**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

the conscience objection statute, they balance the compelling interest in providing health care and opportunities for women to have access to an equal share in society with a religious employer's right to exercise with an enrollee's right to receive services notwithstanding that objection with a secular carrier's right to offer services in a regulated market.

Cedar Park repeats its own policy options it claims would avoid this problem. Defendants have already addressed these arguments, but Cedar Park's first option demonstrates the fatal flaws in its entire case. Cedar Park proposes that it should be excused like religious health care providers, religiously sponsored health carriers, and religious health care facilities from "the possibility of facilitating abortion coverage in any way." Dkt. # 103 at 22. But the undisputed facts are that those entities (1) provide notification about the exclusion of coverage of those services; and (2) provide contact information for enrollees to learn from third parties how to receive those services. RCW 48.43.065(2)(b). This is exactly what Cedar Park could get from a carrier like Cigna. For Cedar Park to hale this as the preferred method while simultaneously arguing that its exercise rights are violated if its enrollees received information about access outside Cedar Park's plan shows the weakness of Cedar Park's position. The Court should reject Cedar Park's arguments.

Further, as this Court and the Ninth Circuit recognized, employers, carriers, and providers all serve different roles in the health insurance market, so tailoring the objections and mechanisms for those market purposes is necessary. *Cedar Park*, 860 Fed. App'x at 543-544; *see Lee*, 455 U.S. at 261. The statutes are narrowly tailored to serve compelling state interests, so they satisfy strict scrutiny.

**C.    Cedar Park's "Religious Autonomy" Claim Fails**

SB 6219 and the conscience objection statute together do not interfere with Cedar Park's right to decide for itself, free from state interference, matters of church governance as well as those of faith and doctrine. *See Bollard v. Cal. Province of Soc'y of Jesus*, 196 F.3d 940, 945 (9th Cir. 1999); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

11

**ER-088**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

(2020). Courts can adjudicate matters dealing with churches if the dispute requires "neutral principles of law, developed for use" in those kinds of disputes, which includes generally applicable laws. *Jones v. Wolf*, 443 U.S. 595, 599-605 (1979); *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

As explained, purchasing a health insurance plan is not an ecclesiastical decision but one about the involvement in the marketplace for health care, so the laws are generally applicable. Churches can refuse to purchase coverage for services to which they object, so they can still choose to practice and maintain their beliefs. Nothing prevents the negotiation for those services either. But Cedar Park cannot use this claim to make the State force private companies to create products on the market simply because it's what Cedar Park wants.

Nor does the law force Cedar Park to choose between purchasing coverage for abortion or purchase inferior health care services. Cedar Park clearly exercised a different choice when negotiating with Cigna. Defendants didn't even know about those negotiations until discovery, showing that they had no role in regulating Cedar Park's internal administration. Cedar Park cannot claim that a decision that they hid from the Defendants was somehow dictated by the Defendants. This claim fails.

Cedar Park argues that Defendants' summary judgment motion did not address a claim that the conscience clause violates the Free Exercise Clause and religious autonomy by interfering with internal operations and treating religious health care entities more favorably than churches. Dkt. # 113 at 1 n.2. Not so. That motion, the Defendants' response to Cedar Park's summary judgment motion, and this brief expressly argued that those statutes read together do not violate the Free Exercise Clause and religious autonomy, and they make clear that the end result is that all claims should be dismissed with prejudice. *See, e.g.*, Dkt. # 104 at 2, 21-22. Simply reading the motion defeats the argument.

### III. CONCLUSION

The Court should dismiss this case with prejudice.

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT -- NO. 3:19-cv-05181-BHS

12

ER-089

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

DATED this 7th day of April 2023.

ROBERT W. FERGUSON
Attorney General

/s/ Paul M. Crisalli
PAUL M. CRISALLI, WSBA #40681
Assistant Attorney General
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Paul.Crisalli@atg.wa.gov

MARTA DELEON, WSBA #35779
Senior Assistant Attorney General
Government Compliance & Enforcement Division
1125 Washington Street SE
Olympia, WA  98504-0100
(360) 664-9006
Marta.Deleon@atg.wa.gov
Attorneys for Defendants

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

13

ER-090

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CEDAR PARK ASSEMBLY OF GOD OF
KIRKLAND, WASHINGTON,

        Plaintiff,

    v.

MYRON "MIKE" KREIDLER, in his official
capacity as Insurance Commissioner for the State
of Washington; JAY INSLEE, in his official
capacity as Governor of the State of Washington,

        Defendants.

Civil No. 3:19-cv-05181

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

**NOTING DATE: APRIL 7, 2023**

**ER-091**

# TABLE OF CONTENTS

Table of Authorities .............................................................................................................. iii

Introduction ........................................................................................................................... 1

Statement of Facts ................................................................................................................ 2

    A.    Cedar Park's religious beliefs broadly prohibit facilitating access to abortion through its insurance plan. ................................................................. 2

    B.    The record shows that after SB 6219, all the plans available to Cedar Park, except self-insurance, facilitated access to abortion. ................................ 3

    C.    Besides facilitating abortion, the Cigna plans were not cheaper and were not comparable to Cedar Park's plan SB 6219 made illegal. .................... 6

        1.    The Cigna plans were not cheaper. ................................................... 6

        2.    The Cigna Plans were not comparable. .............................................. 6

Argument ............................................................................................................................... 7

I.    Defendants' version of the facts is not supported by the record. ........................... 8

II.    Defendants defy the Supreme Court's recent decisions in *Tandon* and *Fulton* in an unsuccessful attempt to obtain judgment as a matter of law. ............................ 8

    A.    SB 6219 burdens the Church's religious convictions. ............................... 8

    B.    Defendants concede SB 6219 has exemptions but misstate the law on general applicability in a failed attempt to excuse them. .................... 10

        1.    Categorical exemptions ................................................................. 12

        2.    Individualized exemptions ............................................................ 15

    C.    Defendants misstate the law on neutrality. ............................................. 16

        1.    SB 6219 is impermissibly gerrymandered. ................................... 17

        2.    Legislative history shows SB 6219 intentionally discriminates against religious organizations like Cedar Park. .......................... 18

III.    Defendants misstate the law on Church Autonomy. ........................................... 19

IV.    Defendants make no real attempt to show SB 6219 surives strict scrutiny. ..................... 21

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

i

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-092**

A.    SB 6219 does not serve a rational, much less compelling, government interest. ........................................................................... 22

B.    SB 6219 is not narrowly tailored. ................................................. 23

Conclusion ........................................................................................................... 24

Certificate of Service ........................................................................................... 26

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ii

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................... 18

*Bollard v. California Province of the Society of Jesus,*
    196 F.3d 940 (9th Cir. 1999) ....................................................................... 20

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011)...................................................................................... 22

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014)................................................................................... 9, 20

*Cedar Park Assembly of God of Kirkland v. Kreidler,*
    860 Fed. App'x 542 (2021).............................................................................. 7

*Church of the Lukumi Babalu v. City of Hialeah,*
    508 U.S. 520 (1993)............................................................................... passim

*Espinoza v. Montana Department of Revenue,*
    140 S. Ct. 2246 (2020).................................................................................. 22

*Foothill v. Watanabe,*
    __ F.Supp.3d___ (2022), 2022 WL 3684900 (E.D. Cal. 2022)................... 16, 24

*Frisby v. Schultz,*
    487 U.S. 474 (1988)...................................................................................... 23

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021)............................................................................ passim

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006).................................................................................. 22, 23

*Grutter v. Bollinger,*
    539 U.S. 306 (2003)...................................................................................... 24

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,*
    565 U.S. 171 (2012).................................................................................. 20, 21

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,*
    344 U.S. 94 (1952).................................................................................... 1, 20

*Kennedy v. Bremerton School District,*
    142 S. Ct. 2407 (2022).................................................................................. 18

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

iii

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-094**

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
  138 S. Ct. 1719 (2018) ............................................................................ 16, 18

*Our Lady of Guadalupe School v. Morrissey-Berru,*
  140 S. Ct. 2049 (2020) ............................................................................. 1, 20

*Religious Sisters of Mercy v. Azar,*
  513 F. Supp. 3d 1113 (D.N.D. 2021) ............................................................. 23

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
  141 S. Ct. 63 (2020) ....................................................................................... 11

*Sharpe Holdings, Inc. v. U.S. Department of Health and Human Services,*
  801 F.3d 927 (8th Cir. 2015) ........................................................................... 9

*Skyline Wesleyan Church v. California Department of Managed Health Care,*
  968 F.3d 738 (9th Cir. 2020) ...................................................................... 9, 20

*Stormans, Inc. v. Wiesman,*
  794 F.3d 1064 (9th Cir. 2015) ............................................................ 14, 15, 18

*Tandon v. Newsom,*
  141 S. Ct. 1294 (2021) ......................................................................... 1, 11, 21

*Thomas v. Review Board of the Indiana Employment Security Division,*
  450 U.S. 707 (1981) ....................................................................................... 23

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022) ............................................................ 14, 15, 19

*United States v. Playboy Entertainment Group, Inc.,*
  529 U.S. 803 (2000) ................................................................................. 23, 24

*Watson v. Jones,*
  80 U.S. 679 (1871) ......................................................................................... 20

*Zubik v. Burwell,*
  578 U.S. 403 (2016) ......................................................................................... 9

**Statutes**

RCW § 48.43.005 ................................................................................... 4, 12, 24

RCW § 48.43.065 ................................................................................... passim

RCW § 48.43.072 ........................................................................................ 1, 10

RCW § 48.43.073 ................................................................................... passim

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

iv

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-095**

**Other Authorities**

*Does Medicare Cover Pregnancy?*,
    Medicare.org, http://bit.ly/3ZPS5HJ ..................................................................... 12

*Maternity (Pregnancy) Care, Covered Services*,
    Tricare.mil, http://bit.ly/3IYMV5z ....................................................................... 12

Matt Markovich, *Catholic Bishops of Wash. ask Gov. Inslee to Veto Abortion Insurance Bill*,
    KOMO News (March 5, 2018), https://bit.ly/2Uuu5Nf. ...................................... 19

*Over-the-Counter Drugs and Supplies, Covered Services*,
    Tricare.mil, http://bit.ly/3ymtTBo ....................................................................... 12

U.S. Department of Labor, *FAQs About Affordable Care Act Implementation Part 36*
    (Jan. 9, 2017), https://bit.ly/2Sv6Q3z. ............................................................... 10

**Regulations**

77 Fed. Reg. 8,725, 8,728 (Feb. 15, 2012) .............................................................. 17

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

v

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-096**

# INTRODUCTION

This case is about whether churches may operate according to their religious beliefs on the sanctity of human life—"free from state interference." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Cedar Park was free to do so; the Church could have a health care plan that provided necessary medical coverage to its employees and their families while excluding elective abortion and abortifacients, consistent with its beliefs. SB 6219 changed that in violation of the Free Exercise Clause and Church Autonomy Doctrine.[1]

Defendants' Motion for Summary Judgment must be denied because their version of the facts is not supported by the record and their legal analysis defies recent Supreme Court precedent. SB 6219 contains secular exemptions that undermine its alleged purpose of protecting women's reproductive health but has no corresponding exemption for health plans of religious organizations like Cedar Park. And legislative history shows SB 6219 *purposely* does not accommodate Cedar Park's religious beliefs and is gerrymandered accordingly. So SB 6219's abortion-coverage mandate is not neutral and generally applicable, subjecting it to strict scrutiny which it cannot survive under *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021), and *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021).

Defendants also fail to properly apply recent Supreme Court precedent holding that government interference with a religious organization's supervision of its employees violates the Church Autonomy Doctrine. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020). It is undisputed that SB 6219 inhibits Cedar Park's ability to provide health insurance to its employees in accordance with its religious beliefs. The statute is therefore unconstitutional.[2]

---

[1] SB 6219, codified at RCW §§ 48.43.072 & .073, states, "if a health *plan* provides coverage for maternity care or services, the health *plan* must also provide a covered person with substantially equivalent coverage to permit the abortion of a pregnancy." (emphasis added).

[2] Defendants' motion for summary judgment does not address Cedar Park's claim that the Conscience Clause, RCW § 48.43.065, also violates the Free Exercise Clause and religious autonomy because it interferes with internal operations and treats religious health care entities more favorably than churches. Second Am. Verified Compl. ¶¶ 59-72, ECF No. 46, as supplemented by ECF No. 52-1 ("Am. VC"). So this opposition brief does not address that claim

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

1

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-097**

Defendants' Motion for Summary Judgment must be denied.

## **STATEMENT OF FACTS**

**A. Cedar Park's religious beliefs broadly prohibit facilitating access to abortion through its insurance plan.**

Many of the "facts" Defendants cite are either not supported by the record, or are selective excerpts that are conflicting or cited out of context. For example, Defendants selectively cite the complaint and other evidence to suggest that Cedar Park's religious beliefs prevent it only from *paying* for insurance that directly covers abortion and abortifacients. Defs.' Mot. for Summ. J. 11, ECF No. 104 (Defs.' MSJ). That is wrong. Cedar Park made clear from its very first pleading that even *indirectly facilitating* abortion violates its religious beliefs.

The Church alleged that it "believes and teaches that participation in, *facilitation of*, or payment for abortion *in any circumstance* is a grave sin." V. Compl. ¶ 29, ECF No. 1 (VC); Am. VC ¶ 29, ECF No. 46, as supplemented by ECF No. 52-1 ("Am. VC") (emphasis added). And the Church alleged that "Defendants have made no allowance for the religious freedom of religious employers and churches, such as Cedar Park, who object to paying for, *facilitating access to*, or providing insurance coverage for abortion or abortifacient contraceptives *under any circumstance*." VC ¶ 63; Am. VC ¶ 78 (emphasis added); *accord*, *e.g.*, VC ¶ 131; Am. VC ¶ 153 ("Defendants implemented and enforce SB 6219 with full knowledge that some religions and denominations object to participating in, paying for, *facilitating, or otherwise supporting abortion*, while others do not.") (emphasis added); VC ¶ 142; Am. VC ¶ 165 ("Cedar Park cannot provide insurance coverage for abortion or abortifacient contraceptives in its employee health plan.").

The Church's briefs said the same thing. For example, its renewed preliminary injunction motion noted that "[p]aying premiums or fees for any plan that covers these procedures or items, whether expressly or surreptitiously under another label like 'overhead expense,' would violate

---

in any depth, but Cedar Park's motion for summary judgment explains why the Church is entitled to summary judgment on it. Plaintiff incorporates herein all of the legal arguments and factual statements in that motion.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

2

Cedar Park's beliefs." Renewed Mot. For Prelim. Inj. 3, ECF No. 49. That motion also noted that, as a result of SB 6219, even when Cedar Park does not directly pay for objectionable coverage, "access to such coverage is *facilitated* by Cedar Park's health care plan." *Id*. at n.1 (emphasis added). It relies on Pastor Smith's September 13, 2019, Declaration which states:

> It violates the religious beliefs of Cedar Park to provide any sort of payment, premium, or fee for a health care plan that provides coverage of or facilitates access to abortion or arbortifacient drugs, either directly or indirectly. Accordingly, it would violate Cedar Park's beliefs to pay an extra premium, fee, or any payment to its insurer for the payment of abortions and abortifacient contraceptives for plan beneficiaries, *even in an instance where Cedar Park's health insurance plan did not directly provide coverage of abortion or abortifacient drugs*.

Smith Decl. ¶ 6, ECF No. 50 (emphasis added).

In sum, the Church's beliefs prohibit purchasing a plan that results in its employees having access to abortion and abortifacients they otherwise would not have. Defendants mischaracterize this belief as "a right to prohibit a third party from facilitating coverage for abortion or certain contraceptives." Defs.' MSJ 20. But that distortion ignores the crucial fact that, under SB 6219, the Church's own health plan itself includes, or at the very least triggers provision of abortion or contraception by the carrier or a third party. That complicity violates Cedar Park's convictions.

**B. The record shows that after SB 6219, all the plans available to Cedar Park, except self-insurance, facilitated access to abortion.**

Defendants' contention that the Church's broker presented it with two plans that "accommodated Cedar Park's beliefs by excluding abortion," Defs.' MSJ 7, is also not supported by the record. Defendants themselves concede that SB 6219 leads to Cedar Park's employees getting "access to services to which Cedar Park objects." *Id*. at 1. In fact, this is precisely what SB 6219 requires: that "the health plan must also provide a covered person with substantially equivalent coverage to permit the abortion of a pregnancy," RCW § 48.43.073(1). Similarly, the Conscience Clause stipulates "[t]he provisions of this section shall not result in an enrollee being denied coverage of, and timely access to, any service or services excluded from their benefits package as a result of their employer's or another individual's exercise of the conscience clause." RCW § 48.43.065(3)(b).

| | | |
|---|---|---|
| PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT | 3 | ALLIANCE DEFENDING FREEDOM<br>15100 N. 90th Street<br>Scottsdale, Arizona 85260<br>(480) 444-0020 |

**ER-099**

The State's 30(b)(6) witness also confirmed that even if an employer chooses to exclude abortion in group or level funded insurance, "the plan actually provides for [abortion] access." Tocco Dep. 105, ECF No. 93-4; *accord* Orcutt Dep., ECF No. 92 at 45–46 [3] ("It is my understanding from my discussions with Jami [our insurance broker] that even if we—if we expressed our desire to not cover abortions or specific contraceptives, they would be included in our plan."). Tellingly, enrollees in group or level-funded health plans would use the same insurance card to obtain abortifacients as non-objectionable drugs. Orcutt Decl. ¶ 12, ECF No. 94-1 (citing August 8, 2019, email from Hansen to Orcutt, ECF No. 92 at 216).[4]

Ignoring these facts and the sworn testimony of their own witness, Defendants rely on conflicting email statements which fail to establish any facts at all. Defs.' MSJ 8–9. First, they cite a June 25, 2019, Cigna email that says Cigna policies "including coverage for maternity care must also include abortion care" *and* "may exclude coverage," in the same breath. *Id*. at 8 (Citing Ex. E to Defs.' MSJ, ECF No. 105-1 at 335–341). That email also states that "enrollees cannot be denied coverage for any service excluded from their benefit package" as a result of the employer's opposition to providing a specific service. *Id*.[5] So the email confirms that Cedar Park's employees would have received access to abortion as a result of the Church's plan despite Cigna's assurances

---

[3] Citations to ECF No. 92 refer to the ECF heading page numbers.

[4] In other briefing Defendants assert that "nothing in the email on which Cedar Park relies describes Cigna's procedures: by this time, Cedar Park's emails discussed only Kaiser and not Cigna." MTD Reply 7. But the email specifically asks for information about "companies." It doesn't limit the information provided to Kaiser or any other carrier. August 8, 2019 email from Hansen to Orcutt, Ex. J to Defs.' Renewed MTD, ECF No. 92 at 216. And Cedar Park still had not decided whether to go with Kaiser and didn't do so until on or about August 14, 2019. *Id.* at 184–185.

[5] Defendants appear to conflate self-funded with level funded plans. Defs.' MSJ 8. Their assertion that Cigna's self-funded plan excluded both contraception and abortion is correct because SB 6219 does not apply to those more expensive and less comprehensive plans. RCW § 48.43.005(31)(j); Orcutt Decl. ¶ 18. But level funded plans *are* subject to SB 6219 because they are a hybrid between self-insurance and fully funded plans. Orcutt Decl. ¶ 10.They cannot simply exclude abortion and abortifacients like self-funded plans but must facilitate access to abortion under SB 6219.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

4

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-100**

in the email that the objectionable coverage would be "outside of their plan." And Ms. Tocco's testimony, referenced above, also confirms this fact.

Defendants next cite a July 8, 2019, email where Cedar Park asked Cigna and Kaiser if they will be able to exclude abortions and abortifacients and "provid[e] the details if they select Yes." Ex. F to Renewed MTD, ECF No. 92 at 147. Cigna responded with, "Yes. Legal and administrative approval from CIGNA," but it did not provide any details as requested. *Id*. A week later Cedar Park's broker confirmed that "[t]he only reason Cigna is confirming [exclusion of objectionable coverage], is because it's a self funded plan." Ex. G to Renewed MTD, ECF No. 92 at 153. Self-funded plans are neither affordable nor comparable to the plan that SB 6219 took away from the Church. Orcutt Decl. ¶¶ 18–28.

Finally, Defendants contend a July 16, 2019, email exchange between Cedar Park's broker and Cigna vaguely stating that "[a]ll of the answers provided apply to both Level and Fully insured with exception of transgender services" suggests that Cigna's fully insured plan allowed for excluding abortion coverage. Defs.' MSJ 9. But it is unclear what "answers" that email refers to. The emails between the broker and Cedar Park immediately preceding that exchange don't contain any answers to questions about coverage of abortion and abortifacients. Theriot Decl. Ex. 3, ECF No. 102-4, Cedar Park Bates No. 221–3, 232. The only answers were about administrative matters like decision dates, deductibles, and COBRA. *Id*.

In short, the record clearly supports and Cedar Park understood—correctly and as required by Washington law—that the Cigna plans would have facilitated access to abortion and abortifacients through, or as a result of, the Church's plan. Either violates Cedar Park's religious beliefs. Defendants do not dispute that Cedar Park's purchase of a group or level-funded plan from Cigna would still have facilitated abortion coverage for its employees as required by Washington law. Defs.' MSJ 20. And in response to the evidence that coverage would have actually been part of Cedar Park's plan, Defendants rely on selective readings of confusing and ultimately unhelpful

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

emails, while ignoring contradictory emails and sworn testimony. Defendants' selective record cites establish no facts at all, never mind any that contradict Plaintiff's.

### C. Besides facilitating abortion, the Cigna plans were not cheaper and were not comparable to Cedar Park's plan SB 6219 made illegal.

#### 1. The Cigna plans were not cheaper.

Defendants' assertion that "[t]he cost of both Cigna options was *cheaper* than the proposed plan the broker had negotiated with Kaiser for the same plan year," Defs.' MSJ 7, is not supported by the record either. And while this mischaracterization is not relevant since the Cigna plans actually facilitated abortion in violation of Cedar Park's beliefs, it is important to keep the record straight.

Defendants' "cheaper" argument ignores the fact that although the Cigna plan premiums may have been less expensive the first year, rates would have gone up—and in fact did go up significantly—in later years, which is hardly a "comparable" alternative. Orcutt Dep. at 64. ("Our broker had advised us that Cigna generally brings in a low rate in the first year and then significantly increases rates in future years, so the ability for Cedar Park in future years to provide high-quality health plans for our employees would've been in question because of increased costs among other things."). And that's exactly what happened: the very next year, Cigna did not even quote Cedar Park a fully insured plan, Orcutt Decl. ¶ 17, or a plan without an HMO option, and its level-funded, first-year 2020–21 cost was more expensive than Kaiser's fully insured plan. Ex. L to Defs.' Renewed MTD, ECF No. 92 at 260–87. Cigna raised the level-funded cost in its 2020–21 bid by $227,544 (24.9%). That made Cigna's level-funded bid $41,833 more expensive than Kaiser's 2020–21 fully insured bid. Orcutt Decl. ¶ 25. The record clearly shows that the Cigna plans facilitated abortion in violation of the Church's beliefs, and were considerably more expensive.

#### 2. The Cigna Plans were not comparable.

Defendants do not argue that the Cigna plans were comparable to Cedar Park's pre-SB 6219 plan even though the Ninth Circuit determined that is an important factor in assessing the

| | |
|---|---|
| PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT | ALLIANCE DEFENDING FREEDOM<br>15100 N. 90th Street<br>Scottsdale, Arizona 85260<br>(480) 444-0020 |

6

**ER-102**

Statute's harm. *Cedar Park Assembly of God of Kirkland v. Kreidler*, 860 Fed. App'x 542, 543 (2021) ("Cedar Park's complaint plausibly alleged that, due to the enactment of SB 6219, its health insurer (Kaiser Permanente) stopped offering a plan with abortion coverage restrictions and Cedar Park could not procure *comparable replacement coverage*." (emphasis added)). That is because it is undisputed that neither the Cigna level-funded plan nor any other plan was comparable to the fully insured Kaiser Permanente plan that Cedar Park had in place before SB 6219.[6] Unlike fully insured plans, level-funded plan carriers do not bear all risk for claims exceeding premiums. The majority of increased high-cost claims pass through to employers in higher future premiums. *See* Orcutt Dep. 64–67; Orcutt Decl. ¶¶ 20–22. What's more, switching to Cigna's level-funded plan would require all Cedar Park employees and family members using Kaiser HMO to find new providers. *Id*.; Orcutt Decl. ¶ 29.

And the benefits for both Cigna plans were not comparable. For example, for the plan year 2019–20, Kaiser offered 5% enhanced coinsurance after deductible for office and specialist visits which no other carrier offered. Orcutt Decl. ¶¶ 15–17. Cigna plans had the added disadvantage of including a $4,500/$9,000 higher out-of-network annual deductible than Kaiser, and Cigna provided no out-of-network coverage for preventive care, while Kaiser's plan did. *Id*. Neither Cigna's level-funded plan nor its group plan was comparable to the Church's fully insured, pre-SB 6219 plan. Defendants' implication otherwise comes from whole cloth.

## ARGUMENT

Defendants cannot succeed on their motion for summary judgment because their arguments contradict recent Supreme Court cases like *Tandon*, *Fulton*, and *Our Lady of Guadalupe*, which show they violated Cedar Park's right to free exercise and church autonomy as a matter of law.

---

[6] Defendants make the unsupported allegation that "Cedar Park cannot show that, prior to this case, it had a plan that did not facilitate abortion or contraceptives." Defs.' MSJ 20. But the evidence that the Church's pre-SB 6219 plan from Kaiser excluded abortion (Am. VC ¶ 47) and that Kaiser will offer that plan again if this Court enjoins SB 6219 (Am. VC ¶ 48.3) is uncontradicted and actually conceded in Defendants' summary judgment motion. Defs.' MSJ 7.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

7

The undisputed facts show that SB 6219 burdens the Church's beliefs against facilitating abortion. And the law is not generally applicable because Defendants exempt multiple insurance plans covering maternity and contraception, which undermines the State's asserted interest in furthering women's reproductive health. Those exemptions and SB 6219's lack of neutrality warrant strict scrutiny under the compelling interest test which Defendants cannot satisfy. And SB 6219's abortion and abortifacient mandates violate the Church Autonomy Doctrine because they interfere with Cedar Park's ability to manage its internal affairs in accordance with its religious teachings.

Defendants' motion for summary judgment must be denied.

## I. Defendants' version of the facts is not supported by the record.

Cedar Park's claim has not "evolved." Defs.' MSJ 19. As shown above, the Church's religious beliefs and SB 6219's burden on those beliefs have been consistently plead and argued from the outset. And none of the health plans available to the Church are comparable to the one it had in place before SB 6219, which its carrier will offer again if the Court enjoins SB 6219. Defendants' mischaracterization of those beliefs and alternative plans is unsupported by the evidence and cannot justify awarding them summary judgment.

## II. Defendants defy the Supreme Court's recent decisions in *Tandon* and *Fulton* in an unsuccessful attempt to obtain judgment as a matter of law.

### A. SB 6219 burdens the Church's religious convictions.

Defendants argue SB 6219 does not require Cedar Park to facilitate abortion because "[a]ny facilitation or discussion of access occurs between the enrollee and either the carrier or another third party." Defs.' MSJ 20. But the Church, not the State, determines whether particular conduct makes it complicit with abortion. The Supreme Court rejected the government's similar argument in *Fulton*, where the religious adoption agency alleged Philadelphia's law requiring it to certify same-sex couples as foster parents required it to "approv[e] relationships inconsistent with its beliefs" because "certification is tantamount to endorsement." 141 S. Ct. at 1876. The City argued there was no endorsement since "certification reflects only that foster parents satisfy the statutory criteria." *Id.* But the Court was not convinced: "it is plain that the City's actions have burdened

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

8

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-104**

CSS's religious exercise . . . .[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.*

SB 6219 burdens Cedar Park's free exercise of religion by coercing it to facilitate abortion as a result of offering a group health plan. This is a prototypical substantial burden on religion. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720–22 (2014) (requiring companies to cover abortifacients in their employee health insurance plans substantially burdened their religious beliefs not to facilitate abortion); *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020) (church "suffered an injury in fact" when California mandated "immediate[]" coverage of elective abortion in violation of the church's beliefs).

Because Cedar Park believes that abortion ends a life, the Church teaches that participating in, facilitating, or paying for abortion in any circumstance is a grave sin. This includes indirect payments such as increased premiums, or abortion coverage triggered by the Church's plan, even if it is not included within the plan. Am. VC ¶ 29; Smith Decl. ¶ 6. That belief is constitutionally protected. For example, even submitting an accommodation request substantially burdened religious business owners' beliefs because it "trigger[ed] the provision of objectionable coverage by their [third party administrators], making them complicit in conduct that violates their religious beliefs." *Sharpe Holdings, Inc. v. U.S. Dep't of Health and Hum. Services*, 801 F.3d 927, 938–41 (8th Cir. 2015), *vacated on other grounds*, 2016 WL 2842448 (May 16, 2016). "That they themselves do not have to arrange or pay for objectionable contraceptive coverage is not determinative of whether the required or forbidden act is or is not religiously offensive." *Id*. at 942.[7]

---

[7] Defendants cite *Zubik v. Burwell*, 578 U.S. 403 (2016), for the proposition that government can ensure that women working for religious employers who object to including coverage for abortifacient contraceptives in their health plans still have access to them as a result of the plan. But, unlike Cedar Park, the religious organizations suing did not object to the insurance company providing the objectionable items as result of their plan so long the "plan …does not include coverage for some or all forms of contraception." *Id.* at 408. And while the federal government initially said that it was feasible to provide abortifacient contraceptive coverage outside religious objectors' plan, it changed its mind. The very next year it said that it was impossible to modify the

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

9

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-105**

The undisputed facts also show that, unless the Church self-insures with a more expensive yet inferior policy, SB 6219 requires Cedar Park's group health plan to cover abortion and abortion causing drugs. The statute itself dictates: "A health plan issued or renewed on or after January 1, 2019, shall provide coverage for all contraceptive drugs," including arbortifacients, and "if a health plan provides coverage for maternity care or services, the health plan must also provide a covered person with substantially equivalent coverage to permit the abortion of a pregnancy." RCW §§ 48.43.072(1)(a) and .073(1) (cleaned up). Defendants' 30(b)(6) witness and insight provided by Cedar Park's insurance broker confirmed that, in practice, abortion is included in its plan, even if Cedar Park objects. Tocco Dep., 102 & 105 ("the plan actually provides for access"); Orcutt Dep. 45–46; Orcutt Decl. ¶ 12.

The exemption in RCW § 48.43.065(3) does not alleviate this burden because Washington's conscience statute specifically provides that "[t]he provisions of this section shall not result in an enrollee being denied coverage of, and timely access to, any service or services excluded from their benefits package as a result of their employer's or another individual's exercise of the conscience clause." *Id*. at 3(b).

SB 6219's barefaced requirement that Cedar Park's health plan facilitate abortion and abortifacient coverage burdens the Church's religious beliefs. Defendants can cite no facts that say otherwise.

**B.      Defendants concede SB 6219 has exemptions but misstate the law on general applicability in a failed attempt to excuse them.**

Defendants concede that there are exemptions to SB 6219, but claim that they do not undermine the State's purpose in promoting reproductive health. Defs.' MSJ 16–17. That argument fails because at least seven of the exemptions include policies that cover maternity and/or contraception. Excluding those policies from SB 6219's abortion mandate means that women covered by them do not receive the Statute's purported benefits, undermining the Statute's alleged

---

accommodation to resolve objectors' concerns. U.S. Dep't of Labor, *FAQs About Affordable Care Act Implementation Part 36* (Jan. 9, 2017), https://bit.ly/2Sv6Q3z.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

10

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-106**

purpose of advancing access to women's reproductive health care.

Defendants begin by misstating the test for general applicability as "whether the law selectively imposes burdens *only on conduct motivated by religious belief.*" Defs.' MSJ 15 (cleaned up, emphasis added). The test isn't that narrow. The Supreme Court recently clarified that:

> government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise. *It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue.*

*Tandon,* 141 S. Ct. at 1296 (emphasis added). *Tandon* cites with approval Justice Kavanaugh's concurrence in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 73 (2020), which rejects the government's argument that there was no free exercise violation because some secular businesses were "treated less favorably than houses of worship." Justice Kavanaugh explained that:

> under this Court's precedents, it does not suffice for a State to point out that, as compared to houses of worship, *some* secular businesses are subject to similarly severe or even more severe restrictions. Rather, once a State creates a favored class of businesses. . . the State must justify why houses of worship are excluded from that favored class.

*Id.* (emphasis in original).

In *Fulton,* the Court summarized the test as: "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions. . . . A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. Nowhere does the Court suggest the law must single out religion to lack general applicability.

SB 6219 fails the general-applicability test both ways.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

11

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-107**

## 1. Categorical exemptions

Washington law exempts 13 types of insurance plans from the definition of "health plans." RCW § 48.43.005(31). These include four plans that the abortion mandate would otherwise govern because they cover maternity and abortifacients, such as short-term, limited-purpose plans; property/casualty liability plans; supplemental Medicare; and supplemental Tricare. Nollette Dep., 46–61, ECF No. 93-5.[8] SB 6219 also exempts plans if necessary to avoid violating federal conditions on state funding, and plans that do not provide comprehensive maternity care coverage. RCW § 48.43.073(1) & (5). And Washington exempts insurance plans provided by religious health care organizations. RCW § 48.43.065(2)(a); Tocco Dep. 74–75; Nollette Dep. 64. So at least seven exemptions undermine SB 6219's asserted purpose of protecting women's health.

Defendants contend that these exemptions don't affect general applicability because they are "tied directly to limited, particularized, business-related, objective criteria so they do not give the Insurance Commissioner unfettered discretion to discriminate." Defs.' MSJ 16–17.[9] But Defendants don't explain what the "limited, particularized, business-related, objective criteria"

---

[8] Nollette testified that the short term, limited purpose plans, and property/casualty liability plans could cover maternity. Nollette Dep., 53–54; 58–59. She also testified that the supplemental plans cover maternity and contraception if it is covered by "the base plan." *Id.* at 46–48; 60–61. Medicare covers maternity and Tricare covers both maternity and contraception. *Does Medicare Cover Pregnancy?*, MEDICARE.ORG, http://bit.ly/3ZPS5HJ (last visited March 9, 2023) (noting "All pregnancy-related care you get when you are formally admitted into the hospital is covered by Original Medicare Part A hospital insurance. Medicare Part B covers all doctors' visits and other outpatient services and tests related to your pregnancy."); *Maternity (Pregnancy) Care, Covered Services*, TRICARE.MIL, http://bit.ly/3IYMV5z (last visited March 9, 2023) (noting "TRICARE covers all medically-necessary pregnancy care"); *Over-the-Counter Drugs and Supplies, Covered Services*, TRICARE.MIL, http://bit.ly/3ymtTBo (last visited Feb. 16, 2023) (noting "TRICARE covers some over-the-counter (OTC) drugs and supplies. . . . Levonorgestrel (Plan B One-Step Emergency Contraceptive) is covered without a prescription from your doctor.").

[9] Unfettered discretion is not relevant to whether SB 6219 has categorical exemptions for insurance policies. The exemptions make SB 6219 underinclusive and therefore not generally applicable, just like in *Church of the Lukumi Babalu v. City of Hialeah*, 508 U.S. 520 (1993), where the law at issue prohibited animal sacrifice but not hunting. Both affected the City's interest in proper disposal of animal carcasses, and "this and other forms of underinclusiveness meant the ordinances were not generally applicable." *Fulton*, 141 S. Ct. at 1877. Unfettered discretion was irrelevant for the underinclusiveness analysis in *Lukumi*. 508 U.S. at 542–45.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

12

they rely on are. Instead, they make three general arguments that the exemptions do not undermine general applicability. The first is the exemptions "relate to …specific types of insurance products that only incidentally include health care services." Defs.' MSJ 16. But that consideration is not implicated by plans exempted because they affect federal funding, do not cover maternity, or are purchased by religious employers in the health care business. Moreover, all of the seven types of exempted insurance policies listed above implicate the Statute's purported interests even if they only incidentally include health care services. Defendants summarize those asserted interests as:

(1) "better access to health benefits, which provides … healthier and more productive lives";

(2) "protecting gender equity and women's reproductive health";

(3) "providing essential primary care to women and teens, …since reproductive health issues are the primary reason they seek routine medical care";

(4) "access to contraceptives,… which is connected to economic success of women and the ability to participate in society equally"; and

(5) "minimizing restrictions on abortion coverage that would interfere with a woman's …pregnancy decision-making and her …right to safe and legal abortion care."

*Id.* at 18.

Defendants next argue that the insurance products exempted "are not designed to be comprehensive health plans due to duration or very limited benefits." *Id*. at 16. Once again, this consideration does not apply to religious medical provider plans or those that might affect federal funding and don't cover maternity. And Defendants don't explain how their asserted interest in promoting women's reproductive health is unaffected by policies covering only certain types of women's health care or that are limited in duration. No insurance policy covers everything indefinitely.

Finally, Defendants claim some of the exemptions "are particular health care options funded by entities the Insurance Commissioner does not have jurisdiction over (like Medicare)." Defs.' MSJ 16. But all of the seven exemptions listed above apply to plans that *are* regulated by

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

13

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-109**

the Commissioner, including the *supplemental* plans. Nollette Dep. 42–43.

Most importantly, all seven of the exemptions undermine the State's asserted interest in protecting women's access to health care. This is very different than Defendant's primary authority, *Stormans, Inc. v. Wiesman*, 794 F.3d 1064 (9th Cir. 2015) (*Stormans II*), where the "enumerated exemptions" did not undermine the State's interest in furthering access to emergency contraception because "the absence of these exemptions would likely drive pharmacies out of business or, even more absurdly, mandate unsafe practices. . . .[T]he exemptions actually increase access to medications by making it possible for pharmacies to comply with the rules, further patient safety, and maintain their business." *Id.* at 1080. Defendants cite no evidence that the exemptions to SB 6219 make health care more accessible to women or that insurance companies would be driven out of business without them.

Moreover, much of *Stormans II's* analysis is outdated because it did not have the benefit of the Supreme Court's direction in *Tandon* and *Fulton*. For example, it misstates the general applicability test as "if a law pursues the government's interest *only* against conduct motivated by religious belief but fails to include in its prohibitions *substantial, comparable secular conduct* that would similarly threaten the government's interest, then the law is not generally applicable." 794 F.3d at 1079 (emphasis added). But *Tandon* made clear that a law does not have to single religious conduct to lack general applicability and *any* exemption threatening the government's interest in regulating churches renders the law not generally applicable. 141 S. Ct. at 1696.

As the Ninth Circuit more recently held, a law is not generally applicable "if the law prohibits religious conduct while permitting secular conduct that also works against the government's interest in enacting the law." *Tingley v. Ferguson*, 47 F.4th 1055, 1088 (9th Cir. 2022) (cleaned up). The Ninth Circuit found the law at issue there to be generally applicable because, unlike the undisputed facts here, "Tingley is unable to show that Washington's law permits secular conduct that undermines the same interest Washington asserted in enacting SB 5722." *Id.* at 1089 (finding that the harms from exempting "gender affirming" care were different

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

14

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-110**

from the harms the legislature was trying to address by blocking conversations by minors with counselors about unwanted same-sex attraction).

### 2. Individualized exemptions

The government may not withhold a religious exemption without compelling reason "where the State has in place a system of individual exemptions." *Fulton*, 141 S. Ct. at 1877. In *Fulton*, the City of Philadelphia refused to contract with Catholic Social Services (CSS) unless the organization agreed to certify same-sex couples as foster parents in violation of its beliefs. *Id*. at 1875–76. The city invoked the contract's nondiscrimination provision, claiming that it categorically prohibited CSS from declining to certify same-sex couples based on its religious beliefs. *Id*. at 1875. But exceptions from the nondiscrimination provision were available at the city's "sole discretion." *Id*. at 1878. That discretion, the Court held, created "a system of individual exemptions," making the nondiscrimination provision not generally applicable. *Id*.

"Animus" is not even mentioned in *Fulton*, yet Defendants still maintain it is required. Defs.' MSJ 18. They rely on *Stormans II*, which held that "[t]he mere existence of an exemption that affords some minimal government discretion does not destroy a law's general applicability." 794 F.3d at 1082 (noting other circuits "apply a fact-specific inquiry to determine whether the regulation at issue was motivated by discriminatory animus" in the land use context).[10] But that is no longer good law because in *Fulton*, the Supreme Court held: "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude." 141 S. Ct. at 1879 (cleaned up).

SB 6219 exempts plans from its abortion and contraceptive mandate if necessary to avoid violating federal conditions on state funding, and in doing so allows for individualized exemptions like Philadelphia did in *Fulton*. RCW § 48.43.073(5). For example, the Weldon Amendment

---

[10] Defendants also cite *Tingley*, but the law at issue there had "no exemption system whatsoever, not even one that affords some minimal governmental discretion." 47 F.4th at 1088 (cleaned up).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

15

restricts federal funding to states that discriminate against health plans refusing to cover abortion. Philhower memorandum to Nollette at 2, ECF No. 103-5. So Defendants exempt plans from SB 6219's abortion mandate if there is a Weldon Amendment problem, but they have no process governing that determination. Nollette Dep. at 29–30 ("If the office were concerned about a possible Weldon Amendment issue, we would contact our attorney"). Defendants resolve that dilemma case-by-case and in their sole discretion. *Id.* at 30; May 8, 2018, DeLeon memo to Nollette, at 7, ECF No. 103-1 ("because the language of the savings clause in SB 6219 requires an exemption 'to the minimum extent possible,' the OIC has authority and *discretion* to choose how to implement this exemption" (emphasis added)).

Similarly, the State of California's abortion mandate was subject to strict scrutiny under the Free Exercise Clause because the director's "discretion" to allow exemptions was not governed by "any written rules, policies, or procedures for requesting an exemption." *Foothill v. Watanabe*, __ F.Supp.3d___ (2022), 2022 WL 3684900 at *4 (E.D. Cal. 2022). And just like the OIC official here, when asked about whether she would approve a plan without abortion, the California state official said "she would need to consult with DMHC attorneys." *Id.* at *8. That discretion makes SB 6219 subject to strict scrutiny.

## C. Defendants misstate the law on neutrality.

Defendants assert that "[a] law operates neutrally so long as it does not target a religious tenet or practice while appearing neutral on its face," Defs.' MSJ 14, but those are only two of four indicators that a lack of neutrality exists. Courts also consider the real-world operation of the law, as well as "circumstances surrounding the enactment," including historical background, precipitating events, and legislative history. *Lukumi*, 508 U.S. at 535, 540; *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018).

"Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. SB 6219 is not neutral because the secular exemptions catalogued above show the law is

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

16

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-112**

gerrymandered in its real-world operation. Legislative history shows it also targets conscientious objectors like Cedar Park.

### 1. SB 6219 is impermissibly gerrymandered.

A law is impermissibly gerrymandered against religious organizations like Cedar Park if it favors secular conduct, *Lukumi*, 508 U.S. at 537, or "proscribe[s] more religious conduct than is necessary to achieve [its] stated ends." *Id*. at 538. SB 6219 suffers from both fatal flaws.

By offering multiple secular exemptions, Washington has failed to pursue its proffered objectives "with respect to analogous non-religious conduct." *Id*. at 546. The First Amendment prevents Cedar Park and other similarly situated organizations from "being singled out for discriminatory treatment," including Defendants' refusal to grant them an exemption that would not adversely affect the government's stated interest more than the secular exemptions the state already gives. *Id*. at 538. Providing secular exemptions "while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under *Smith* and *Lukumi*." *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.).

SB 6219 also proscribes more conduct than is necessary to achieve its end of furthering women's access to health care. *Lukumi*, 508 U.S. at 542 (law hindering "much more religious conduct than is necessary in order to achieve the legitimate ends asserted in [its] defense," is "not neutral."). Exempting Cedar Park would affect Church employees, all of whom share its beliefs about abortion. Am. VC ¶¶ 25–32. Forcing Cedar Park to provide abortion coverage that its employees will not use makes SB 6219 broader than necessary and impermissibly gerrymandered. And it lacks any rational basis. *See* 77 Fed. Reg. 8,725, 8,728 (Feb. 15, 2012) (exempting churches from the ACA's contraception mandate because churches' employees "would be less likely to use contraceptives even if contraceptives were covered under their health plans.").

Defendants' primary authority, *Stormans II*, ignores this aspect of *Lukumi*, simply stating that the contraceptive coverage rules it upheld were neutral because they "prescribe and proscribe

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

17

**ER-113**

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

the same conduct for all, regardless of [religious] motivation." 794 F.3d at 1077. But whether a law is neutral is not limited to assessing whether it targets conduct based on religious motivation. "Government fails to act neutrally when it proceeds in a manner *intolerant of religious beliefs*." *Fulton*, 114 S. Ct. at 1877 (emphasis added). The Washington Legislature was intolerant of Cedar Park's religious beliefs because it refused to actually exempt them several times.[11]

## 2. Legislative history shows SB 6219 intentionally discriminates against religious organizations like Cedar Park.

Discriminatory intent is unnecessary to show a lack of neutrality, but it can show an anti-religious objective. "[U]pon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and the rights it secures." *Lukumi*, 508 U.S. at 547; *Kennedy v. Bremerton Sch. Dis.*, 142 S. Ct. 2407, 2422 n.1 (2022) ("A plaintiff may also prove a free exercise violation by showing that official expressions of hostility to religion accompany laws or policies burdening religious exercise" (cleaned up)). "Factors relevant to the assessment of governmental neutrality include the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece*, 138 S. Ct. at 1731 (cleaned up).

Three times, the legislature specifically refused to amend SB 6219 to include protection for religious organizations. Moreover, Washington State Senator Steve Hobbs, SB 6219's sponsor, stated that religious organizations can sue if they do not want to provide insurance coverage for abortion. Sec. Am. VC ¶ 54. Responding to religious organizations' strong protests that SB 6219 would compel them to pay for abortions, Senator Hobbs quipped: "Health care is about the

---

[11] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), was a *Bivens* action that is not relevant here because the Court imposes special requirements in that context. *Iqbal* cites the passage of *Lukumi* addressing the City of Hialeah's discriminatory purpose, but as shown above, intentional discrimination is just one way to demonstrate lack of neutrality. *Id.* at 666–67.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

18

individual, not about [religious organizations]."[12] This legislative history rejecting religious exemptions shows SB 6219 targets religious organizations that believe in the sanctity of life.

Senator Hobbs' statements were not, as Defendants allege (Defs.' MSJ 15 n. 4), merely "stray comments from Washington legislators speaking for themselves about experiences of friends and constituents" as was the case in *Tingley*, 47 F.4th at 1086. There the Ninth Circuit determined legislators' statements about the harms caused by modes of treatment and lack of success of conversion therapy did not show hostility toward religion sufficient to eliminate neutrality. *Id.* Here, the sponsor of the bill specifically mentions churches, refusing to accommodate their religious beliefs and requiring them to sue. And the legislature rejected attempts to include a broad exemption for churches providing more proof of legislative intent.

SB 6219 is not neutral because it is gerrymandered to target religious conduct as the legislature intended. It is thus subject to strict scrutiny.

## III. Defendants misstate the law on Church Autonomy.

SB 6219's abortion mandate interferes with the ability of Washington churches like Cedar Park to teach their members, live by, and govern their internal affairs according to their religious doctrine. Before SB 6219, churches and religious organizations could freely ensure the integrity of their teaching and practice by declining to facilitate abortion. After SB 6219, churches must choose between their legal obligations and their faith. They cannot comply with both without spending more money for inferior health protection that will also limit their religious ministry.

Defendants' argument for judgment as a matter of law hinges on its unsupported assertion that "the purchase of a health plan is not an ecclesiastical decision." Defs.' MSJ 22. But the Church Autonomy Doctrine protects "the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion. . . .[A]ny attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an

---

[12] Matt Markovich, *Catholic Bishops of Wash. ask Gov. Inslee to Veto Abortion Insurance Bill*, KOMO NEWS (March 5, 2018), https://bit.ly/2Uuu5Nf.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

19

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

ER-115

establishment of religion." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. Defendants do not dispute that Cedar Park believes the health insurance coverage the ACA and its religious convictions require it to purchase for Church employees must reflect its pro-life views. Am. VC ¶¶ 45–47. The many cases protecting religious employers' right to provide employee health plans consistent with their pro-life beliefs show it is indeed a "matter[ ] of faith and doctrine…closely linked [to] matters of internal government." *Our Lady of Guadalupe*, 140 S. Ct. at 2061, *see, e.g.*, *Hobby Lobby*, 573 U.S. at 720–22 (requiring religious company owners to cover abortifacients in their employee health insurance plans substantially burdened their religious beliefs not to facilitate abortion); *Skyline Wesleyan Church,* 968 F.3d at 747 (church "suffered an injury in fact" when California mandated "immediate[]" coverage of elective abortion in violation of the church's beliefs).[13]

"[C]ivil courts exercise no jurisdiction" over "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson v. Jones*, 80 U.S. 679, 733 (1871). Here, Cedar Park's pro-life beliefs and health plan decisions are based in (1) ecclesiastical government and (2) the conformity of its employees to a particular (pro-life) standard of morality. The religious autonomy doctrine protects both things, especially as Washington is trying to control and manipulate Cedar Park's internal decisions and expressions of its faith. *Kedroff*, 344 U.S. at 116 (churches are constitutionally protected "from secular control or manipulation").

The Church doesn't forfeit its religious autonomy when it "cho[oses] to enter the

---

[13] *Our Lady of Guadalupe* does not hold that "[g]enerally applicable laws are not subject to the religious autonomy doctrine." Defs.' MSJ 21. That was the position of Justice Sotomayor's dissent, which only garnered two votes. 140 S. Ct. at 2076. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017) ("This is not to say that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause" (citing *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 190 (2012))). Likewise, *Bollard v. Calif. Province of the Soc'y of Jesus*, 196 F.3d 940, 948 (9th Cir. 1999), merely held that the ministerial exception did not preclude a sexual harassment claim against a religious organization: "[b]ecause the Jesuit order doctrinally disavows the harassment, the danger that the application of Title VII in this case will interfere with its religious faith or doctrine is particularly low."

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

20

ER-116

marketplace for health care." Defs.' MSJ 22. That's particularly true when the Affordable Care Act *requires* Cedar Park to have maternity coverage for its 150 plus employees. *Hobby Lobby*, 573 U.S. at 696; Sec. Am. VC ¶ 94. And the Church is not trying to "dictate to the State what private companies make available on the market," or "that private parties outside the church must comply with the church's religious views." Defs.' MSJ 22. Private companies like Kaiser *want* the freedom to offer abortion-free insurance coverage to churches like they did before SB 6219. Am. VC ¶ 48.3.

SB 6219 violates Cedar Park's church autonomy and, at minimum, cannot survive strict scrutiny as shown below. Moreover, church autonomy violations are per se unconstitutional so SB 6219 should be summarily enjoined without subjecting it to the compelling interest test. *See Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 194 (2012) (summarily dismissing Title VII claim violating church autonomy without applying strict scrutiny or any other test).

**IV.    Defendants make no real attempt to show SB 6219 surives strict scrutiny.**

Defendants' one paragraph strict scrutiny analysis, Defs.' MSJ 19, fails to carry their burden of proving why completely exempting church health insurance policies from the abortion and abortifacient mandates undermines SB 6219's purpose any more than completely exempting short term, limited purpose, and supplemental policies as well as those implicating federal funding, purchased by religious health care entities for their employees, or those not covering maternity. *Tandon*, 141 S. Ct. at 1297 ("instead of requiring the State to explain why it could not safely permit at-home worshipers to gather in larger numbers while using precautions used in secular activities, the Ninth Circuit erroneously declared that such measures might not translate readily to the home." (cleaned up)).

Under strict scrutiny, "a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546 (cleaned up). Defendants summarily claim that "SB 6219 serves the compelling state interest in

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

21

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-117**

promoting public health caused by unintended pregnancies." Defs.' MSJ 19. But

> [r]ather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants. The question, then, is not whether the [government] has a compelling interest in enforcing its . . . policies generally, but whether it has such an interest in denying an exception to [Cedar Park].

*Fulton*, 141 S. Ct. at 1881 (cleaned up). Defendants do not even attempt to show why exempting Cedar Park's health insurance plan will jeopardize its interest in "promoting public health caused by unintended pregnancies."

### A. SB 6219 does not serve a rational, much less compelling, government interest.

First, Washington must "identify an 'actual problem' in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). It has not done so. The OIC received no complaints about health care plans not covering abortion before the State enacted SB 6219. Daniel Dep. 13, ECF No. 103-3. And the only pre-SB 6219 complaints it received about health care plans not covering contraception concerned birth control pills and vasectomies. Daniel Dep. 14. Cedar Park does not object to covering either of those.

Moreover, SB 6219's variety of secular exemptions prove it "does not advance an interest of the highest order [because] it leaves appreciable damage to that supposedly vital interest unprohibited." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) (cleaned up). An interest is not compelling when the government "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort." *Lukumi*, 508 U.S. at 546–47. The underinclusiveness of SB 6219 demonstrated above "is alone enough to defeat" the state's asserted interest. *Brown*, 564 U.S. at 802; *see also Lukumi*, 508 U.S. at 546–47.

For example, in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), there was no exception to the government's ban on hallucinogenic tea. But a single exemption for peyote in another part of the controlled substances law showed no compelling interest because both substances undermined the government's asserted interest. The many exemptions to SB 6219 far exceed the one exception in *O Centro*. So the state must show that

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

22

"granting the requested religious accommodations would seriously compromise its ability to administer the program." *Id*. at 435. It cannot do so because Washington itself has "seriously compromised" SB 6219's universality through multiple exemptions. And the people primarily affected by an exemption for Cedar Park would be its employees, all of whom share the Church's beliefs about abortion. Am. VC ¶¶ 25–32. The government does not have a rational—much less compelling—interest in forcing a pro-life church to provide insurance coverage for abortion to people who will not use it.

Defendants must prove they have a compelling interest in applying the mandates to "the particular claimant[s] whose sincere exercise of religion is being substantially burdened." *Hobby Lobby*, 573 U.S. at 726. No broadly stated interest "in ensuring nondiscriminatory access to healthcare" is enough. *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1148 (D.N.D. 2021).

**B.      SB 6219 is not narrowly tailored.**

"A statute is narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (cleaned up). Under strict scrutiny, the government must also show the law "is the least restrictive means of achieving" its interests. *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). If means less burdensome on religious freedom exist, the government "must use [them]." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

Washington has many ways to accomplish its asserted interests without compelling churches to violate their beliefs. First, it could provide religious organizations an exemption from SB 6219 that does not require their carriers to provide objectionable coverage as a result of the plan or permit charging churches higher premiums. This would allow the government to enforce the law against those who do not object based on religion, while respecting the religious beliefs of churches like Cedar Park. The government has already demonstrated it can do this. Washington excuses religious health care providers, religiously sponsored health carriers, and religious health

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

23

care facilities from the possibility of facilitating abortion coverage in any way. RCW § 48.43.065(2)(a); *accord Hobby Lobby*, 573 U.S. at 730–31 (noting that the government had shown its ability to provide an exemption to the Petitioners because it had granted such an exemption to a different class of religious objectors).

Moreover, Washington law completely exempts 13 different types of health care plans by excluding them from the definition of "health plan." RCW § 48.43.005(31). Defendants could extend this provision to Cedar Park and other similarly situated religious employers. *See Foothill*, 2022 WL 3684900 at *11 (holding California could more narrowly further its interest in its abortion mandate by creating an exemption for "employers who provide coverage to employees who share their religious beliefs"). Finally, the government itself could provide abortion coverage directly to employees whose health plans exclude coverage of abortion. Washington already has a fund to cover the costs of abortion for insureds with religious insurance carrier policies that exempt that procedure. Defs.' MSJ 6 n.3.

All these options are "workable," *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003), and much "less restrictive" of religious freedom, *Playboy*, 529 U.S. at 824. SB 6219 therefore is not narrowly tailored or the least restrictive means of serving the state's interest, and fails strict scrutiny.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment must be denied and Cedar Park's cross-motion granted.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

24

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-120**

Respectfully submitted this 31st day of March, 2023,

*s/Kevin H. Theriot*
Kevin H. Theriot (AZ Bar #030446)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile:  (480) 444-0025
Email: ktheriot@adflegal.org

David A. Cortman (GA Bar #188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30040
Telephone: (770) 339-0774
Email: dcortman@adflegal.org

*Attorneys for Plaintiff Cedar Park Assembly of God
of Kirkland, Washington*
* Admitted *pro hac vice*

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

25

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-121**

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2023, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Paul M. Crisalli
ATTORNEY GENERAL'S OFFICE
800 5th Ave
Ste 2000
Seattle, WA 98104

Marta U. DeLeon
ATTORNEY GENERAL'S OFFICE
PO Box 40100
Olympia, WA 98504
*Counsel for Defendants*

DATED: March 31, 2023

*s/Kevin H. Theriot*
Kevin H. Theriot (AZ Bar #030446)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0025
Email: ktheriot@adflegal.org

*Attorney for Plaintiff Cedar Park Assembly of God of Kirkland, Washington*

* Admitted *pro hac vice*

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

26

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

**ER-122**

The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

Plaintiff,

v.

MYRON "MIKE" KREIDLER, et al.,

Defendants.

NO. 3:19-cv-05181-BHS

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR: APRIL 7, 2023

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

**ER-123**

**TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................................. 1

II.    RELIEF REQUESTED ......................................................................................... 2

III.   EVIDENCE RELIED UPON ................................................................................ 2

IV.    FACTS ................................................................................................................... 2

       A.   Washington Law Allows Religious Organizations to Refuse to Purchase
            Health Care Coverage to Which They Have a Moral or Religious Objection ......... 2

       B.   In Practice, Religious Employers—Including Cedar Park—Could Negotiate
            for Plans That Excluded Services to Which They Object ........................................ 4

       C.   Cedar Park in Fact Negotiated for a Plan That Excluded Services to Which It
            Objects ...................................................................................................................... 5

V.     ARGUMENT ......................................................................................................... 6

       A.   Summary Judgment Standard ................................................................................... 6

       B.   Cedar Park's Free Exercise Claim Fails as a Matter of Law .................................... 8

            1.   The statutes do not impermissibly burden religion ........................................... 8

            2.   The statutes are neutral ................................................................................... 12

            3.   The statutes are generally applicable .............................................................. 14

            4.   The statutes are rationally related to legitimate governmental purposes ........ 17

       C.   Cedar Park's "Religious Autonomy" Claim Fails .................................................. 19

VI.    CONCLUSION .................................................................................................... 20

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

i

**ER-124**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Albino v. Baca,*
747 F.3d 1162 (9th Cir. 2014) .......................................................................... 6

*Bollard v. Cal. Province of Soc'y of Jesus,*
211 F.3d 1331 (9th Cir. 2000) ........................................................................ 19

*Braunfeld v. Brown,*
366 U.S. 599 (1961).......................................................................................... 12

*Burch v. Regents of Univ. of Cal.,*
433 F. Supp. 2d 1110 (E.D. Cal. 2006) .......................................................... 10

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014).......................................................................................... 11

*Califano v. Webster,*
430 U.S. 313 (1977).......................................................................................... 17

*Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler,*
860 Fed. App'x 542 (9th Cir. 2021) ....................................... 1, 11, 13, 18

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).......................................................................................... 7

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)......................................................................................... 12

*Dep't of Health & Hum. Servs. v. CNS Int'l Ministries,*
No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016)................................. 11

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith,*
494 U.S. 872 (1990)...................................................................................... 8, 17

*FDIC v. N.H. Ins. Co.,*
953 F.2d 478 (9th Cir. 1991) ........................................................................ 7

*Fraser v. Goodale,*
342 F.3d 1032 (9th Cir. 2003) ...................................................................... 7

*Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark,*
170 F.3d 359 (3d Cir. 1999) ........................................................................ 15

*Frlekin v. Apple, Inc.,*
979 F.3d 639 (9th Cir. 2020) ........................................................................ 6

*Fulton v. City of Phila., Pa.,*
141 S. Ct. 1868 (2021)................................................................................... 16

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

ii

**ER-125**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Garcia v. San Antonio Metro. Transit Auth.*,
   469 U.S. 528 (1985)...................................................................................... 17

*Hector v. Wiens*,
   533 F.2d 429 (9th Cir. 1976) ........................................................................ 7

*Hernandez v. Spacelabs Med., Inc.*,
   343 F.3d 1107 (9th Cir. 2003) ................................................................. 7, 10

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
   565 U.S. 171 (2012)...................................................................................... 19

*Jacobson v. Massachusetts*,
   197 U.S. 11 (1905)........................................................................................ 17

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
   828 F.3d 1098 (9th Cir. 2016) ...................................................................... 7

*Jones v. Wolf*,
   443 U.S. 595 (1979)...................................................................................... 19

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022) .................................................................................. 8

*Lew v. Kona Hosp.*,
   754 F.2d 1420 (9th Cir. 1985) ...................................................................... 7

*Marshall v. United States*,
   414 U.S. 417 (1974)...................................................................................... 17

*Midrash Sephardi, Inc. v. Town of Surfside*,
   366 F.3d 1214 (11th Cir. 2004) .................................................................... 15

*Miller v. Reed*,
   176 F.3d 1202 (9th Cir. 1999) ...................................................................... 8

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ...................................................................... 7

*Orr v. Bank of Am., NT & SA*,
   285 F.3d 764 (9th Cir. 2002) ........................................................................ 7

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020).................................................................................. 19

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984)...................................................................................... 17

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020)...................................................................................... 15

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

iii

**ER-126**

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  801 F.3d 927 (8th Cir. 2015) .................................................................................. 11

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
  968 F.3d 738 (9th Cir. 2020) .................................................................................. 11

*Stormans, Inc. v. Weisman*,
  794 F.3d 1064 (9th Cir. 2015) ............................................................... 8, 12, 13, 17

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021).............................................................................................. 15

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022) ........................................................................... passim

*United States v. Lee*,
  455 U.S. 252 (1982).................................................................................. 9, 10, 18

**Statutes**

2018 Wash. Sess. Laws, ch. 119, § 1 ................................................................................ 3

RCW 48.43.005 ................................................................................................................ 12

RCW 48.43.005(31)........................................................................................................... 12

RCW 48.43.065(3) ................................................................................................. 1, 16, 18

RCW 48.43.065(3)(a) ........................................................................................................ 3

RCW 48.43.065(3)(b) ........................................................................................................ 3

RCW 48.43.072 .......................................................................................................... 2, 12

RCW 48.43.072(1).............................................................................................................. 2

RCW 48.43.073 .................................................................................................................. 2

RCW 48.43.073(1).............................................................................................................. 2

RCW 48.43.073(5).............................................................................................................. 16

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................... 6

**Regulations**

WAC 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 ............................................................................................................. 3

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

iv

**ER-127**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Other Authorities**

Wash. Op. Att'y Gen. 5 (2002)........................................................................................ 3

Wash. Op. Att'y Gen. 10 (2006)...................................................................................... 3

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

v

**ER-128**

## I. INTRODUCTION

Washington statutes plainly allow employers, like Cedar Park, to refuse to purchase coverage for services to which it has a religious or conscience objection. RCW 48.43.065(3). This statute is known to Cedar Park—the undisputed evidence shows that Cedar Park negotiated with carriers who offered plans that would exclude abortion and certain contraceptives, as Cedar Park desired. Once that evidence was finally disclosed, Cedar Park shifted its argument in this case yet again. Cedar Park now claims that it is forced to facilitate abortions because it would indirectly pay for abortion or because its enrollees would still have access to abortions. Cedar Park has no factual basis for this argument, and thus cannot meet its burden on summary judgment.

There is no evidence in the record that Cedar Park would indirectly pay for abortion services—the only evidence is that coverage would occur outside the plan, but Cedar Park has no evidence as to how this would occur. Further, Cedar Park has no standing to claim injury if its enrollees receive services through third parties.

The undisputed record shows that Cedar Park cannot meet its burden to show that Washington's statutes burden Cedar Park's religion, that the laws are not neutral or generally applicable, and that the Washington statutes further legitimate governmental interests. This Court and the Ninth Circuit in ruling on the equal protection claim held that, "[t]o the extent the conscience objection statute treats religious organizations like Cedar Park differently than individual health care providers, religiously sponsored health carriers, and health care facilities . . . , such differential treatment does not constitute discrimination because the providers are not similarly situated to religious organizations." *Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*, 860 Fed. App'x 542, 543-544 (9th Cir. 2021). "This is because the providers are in the business of providing health services, while religious organizations merely purchase health coverage." *Id.* at 544.

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

1

**ER-129**

The Court should grant summary judgment to the Defendants and dismiss the operative complaint with prejudice.

## II.     RELIEF REQUESTED

The Court should deny Cedar Park's motion for summary judgment, grant summary judgment to Defendants, and dismiss Cedar Park's operative complaint with prejudice.

## III.     EVIDENCE RELIED UPON

Defendants rely upon the Declaration of Paul M. Crisalli, filed in support of Defendants' Motion for Summary Judgment, and exhibits attached thereto (*see* Dkts. # 105, # 105-1), as well as the pleadings and transcripts already filed in this matter.

## IV.     FACTS

**A.     Washington Law Allows Religious Organizations to Refuse to Purchase Health Care Coverage to Which They Have a Moral or Religious Objection**

The Court is well aware of the statutory landscape, and Defendants' motion for summary judgment (Dkt. # 104) provides an explanation. For context, this brief will summarize the relevant statutes.

In 2018, Washington enacted the Reproductive Parity Act, SB 6219, codified at RCW 48.43.072 and 48.43.073. This law provides that health insurance plans must provide coverage for all contraceptives approved by the federal Food and Drug Association.[1] RCW 48.43.072(1). The law also provides that insurance plans that provide coverage for maternity care or services must also provide substantially equivalent coverage to permit the abortion of a pregnancy. RCW 48.43.073(1).

When passing the Reproductive Parity Act, the Legislature detailed 14 findings explaining the reasoning for the law, including that health benefits and preventative services leads Washingtonians to lead healthier and more productive lives, that neither a woman's income

---

[1]The Affordable Care Act (ACA) includes similar contraceptive coverage requirements, and that the ACA includes a mechanism for religious objections. Cedar Park does not challenge those provisions, which are outside Defendants' control.

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

2

**ER-130**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

level nor her type of insurance should prevent her from having a full range of reproductive health care, that access to contraception is directly connected to the economic success of women and their ability to participate in society equally, and that restricting abortion coverage interferes with women's personal, private pregnancy decision making. 2018 Wash. Sess. Laws, ch. 119, § 1.[2]

For decades, Washington has had a conscience objection statute that provides that no individual or organization can be required to purchase coverage for a service to which they have a religious objection. RCW 48.43.065(3)(a). But enrollees cannot be denied coverage of or timely access to the services excluded from the benefits package as a result of their employer's exercise of the conscience objection. RCW 48.43.065(3)(b). Nothing in this law prevents a health carrier from providing services without payment of a premium or fee.[3] It is undisputed that the conscience objection statute is read together with the Reproductive Parity Act, and the Insurance Commissioner promulgated an administrative rule making that clear. WAC 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.

Washington law does not direct how carriers, providers, employers, or enrollees implement the conscience objection, so they are free to negotiate as to the best mechanism to comply with the statutes. For example, carriers can choose not to itemize the costs and just have a general overhead category that includes management costs, wages, rent, and costs for the services to which employers object. Carriers could distribute the risk caused by the objections to all members of the plan, where the overhead is a generally applicable cost spread among all members of the group health plan. Carriers could distribute the risk caused by objectors to the other non-objecting members of the plan, much like uninsured/underinsured insurance.

---

[2]Cedar Park cites as support that the Office of the Insurance Commissioner (OIC) received no complaints about health care plans not covering abortion and that a "state attorney tasked with enforcing insurance regulations" was unaware of any enforcement actions against carriers for failing to cover contraceptives. Dkt. # 103 at 6. Neither person can speak for the legislative purpose of SB 6219. The legislative findings make clear the many purposes served by the legislation.

[3]Attorney General Opinions have explained that carriers cannot simply forward the costs for objected services to enrollees when an employer exercises a conscience objection, but the carrier can utilize recognized insurance principles to handle those costs. Wash. Op. Att'y Gen. 5 (2002); Wash. Op. Att'y Gen. 10 (2006).

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT -- NO. 3:19-cv-05181-BHS

3

**ER-131**

Or carriers could fund the services through third parties, like related foundations or grant funding sources.

### B. In Practice, Religious Employers—Including Cedar Park—Could Negotiate for Plans That Excluded Services to Which They Object

Cedar Park's "Statement of Undisputed Facts" contains misleading, incorrect statements. Cedar Park makes assertions that are not in the record or derive from inadmissible testimony (largely hearsay and speculation). Here are the undisputed facts supported by admissible evidence.

The Insurance Commissioner regulates insurance health plans, not employers. Dkt. # 105-1, Ex. A at 28. For large health plans, like Cedar Park's, employers and carriers can negotiate about the contents of the plan. *Id.* at 23-24. The Insurance Commissioner reviews whether the statutory and regulatory requirements have been met after the plan has been agreed, but does not review on behalf of an individual or organization. *Id.* at 96, 115-116; Dkt. # 105-1, Ex. B at 28. Compliance with the conscience objection statute is the responsibility of the health carrier, not the employer, and the Insurance Commissioner "does not have involvement in a given employer's decision to purchase health insurance for its employees." *Id.*, Ex. A at 98-99.

If a health plan contains a conscience objection, the Insurance Commissioner will determine if the plan form follows the statutes and usually expects to see a notification to enrollees about the exclusion of the service from the benefit plan, but notifying the enrollee about their rights to access the benefit elsewhere. *Id.* at 102. Usually carriers simply provide a direct contact number for enrollees to get information about how to access the benefit and the associated cost sharing amounts. *Id.* The Insurance Commissioner does not learn the mechanism for who pays for objected services from the form filing submitted by the carrier, but only that the employer is not paying for the objected services. *Id.* at 103. The mechanism for providing access differs based on the carrier and depends on the business models, as any entity, as part of its business model, can choose to offer a product tailored towards employers that have

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

4

**ER-132**

objections. *Id.* at 106-109. The Insurance Commissioner can ask the *carrier* to identify how it will comply with the access requirements of the conscience clause. Cedar Park presents no admissible evidence disputing these facts.

## C. Cedar Park in Fact Negotiated for a Plan That Excluded Services to Which It Objects

Cedar Park is a Christian church in Kirkland, Washington, affiliated with the Assemblies of God, and operates schools, a funeral home, a missionary car ministry, a Christian counseling network, and a Christian club sports program, which collectively yield estimated yearly revenues between $25 million and $30 million. Dkt. # 105-1, Ex. C at 16-17, 19. Cedar Park's businesses pay state business and organization (B&O) taxes and sales taxes. *Id.* at 18.

It is undisputed that Cedar Park is opposed to abortion and use of certain contraceptives because of its religious beliefs, though as explained in the argument section below, Cedar Park's opposition to "any facilitation" of abortion is inconsistent and not legally cognizable.

For about the last six years, Cedar Park used Kaiser Permanente (Kaiser) as its health insurance carrier (and Group Health before that). *Id.* at 26-27. Each plan lasted a fiscal year from September 1 until August 31 of the following year. It is undisputed that before 2019, Kaiser's plan excluded coverage for abortion, though covered all contraceptives. *Id.* at 27.

In early 2019, Kaiser informed Cedar Park that it would not exclude coverage for abortion services in its plan, beginning in the 2019-2020 plan year. *Id.* at 36. Cedar Park submits no testimony or evidence from Kaiser about the rationale for its decision to no longer offer the exclusion.[4]

Defendants' motion and supporting exhibits detail Cedar Park's 2019 negotiations for plan excluding abortion and certain contraceptives. It is undisputed that, in 2019, Cedar Park solicited for and received an offer from Cigna for two plan options that would exclude coverage

---

[4]Cedar Park posits that "because of SB 6219, Kaiser offers no abortion exclusions to fully insured groups like Cedar Park." Dkt. # 103 at 9. Citing only its own complaint, Cedar Park alleges that "as a direct result of Washington enacting SB 6219, Kaiser Permanente inserted abortion coverage into Cedar Park's health plan." *Id.* at 10. There is no admissible testimony supporting either of these statements.

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

5

**ER-133**

for abortion and certain contraceptives (as determined by Cedar Park) and which were cheaper than the negotiated plan offered by Kaiser. Dkt. # 93-6 at 2; Dkt. # 105-1, Exs. D, E, F. During negotiations, there were two even cheaper options submitted by Cigna, which also excluded coverage for abortions. Dkt. # 105-1, Ex. I. It is undisputed that Cigna's offered plans did not include abortion coverage in the benefits package but would provide information (expressly by a separate letter) to enrollees "notifying them of their rights to access these excluded services outside of their plan." *Id.*, Ex. E. There is no evidence as to how enrollees under a Cigna plan would obtain access to the objected services nor who would provide those services.

Despite the availability of multiple Cigna plans, Cedar Park decided to stay with Kaiser. Cedar Park rejected the Cigna options because of speculated increased costs, potential complaints from employees about changing, and Cigna's different method of providing services. Dkt. # 92 at 64-65. Cedar Park agrees that none of these reasons are based on its religious beliefs. *Id.* at 65-67.

Cedar Park again solicited for bids for the 2020-2021 plan year, and received an offer from Cigna for a level-funded plan. Dkt. # 92 at 261. It is undisputed that Cigna's offered plan was cheaper than renewing Kaiser's plan. *Id.* Only through a renegotiated plan with Kaiser, that altered the terms of the plan, was a Kaiser plan cheaper. *Id.* Cedar Park purchased that renegotiated Kaiser plan. *Id.*

## V. ARGUMENT

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020). The Court views the evidence "in the light most favorable to the non-moving party." *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc). All reasonable doubt as to the existence of a

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

6

**ER-134**

genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

A "moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A moving party cannot simply rely on assertions in its operative complaint to establish undisputed material facts. *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423-1424 (9th Cir. 1985). Although a verified complaint can be treated as an affidavit, that is only "to the extent that the complaint is based on personal knowledge and sets forth facts admissible in evidence and to which the affiant is competent to testify." *Id.* at 1423. Summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

This Court can only consider admissible evidence in ruling on a motion for summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-774 (9th Cir. 2002). A party cannot rely on unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). When evidence is not presented in an admissible form in the context of a motion for summary judgment, but it may be presented in an admissible form at trial, a court may still consider that evidence. *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). The party proposing the evidence needs to demonstrate, at a minimum, that the hearsay declarants would be available to testify at trial and that its hearsay evidence would be admissible at trial in some other form. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). Objections can be waived by the opposing parties. *Orr*, , 285 F.3d at 776; *FDIC v. N.H. Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991) ("[d]efects in evidence

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

7

**ER-135**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

submitted in opposition to a motion for a summary judgment are waived absent a motion to strike or other objection.") (cleaned up).

Here, much of Cedar Park's argument relies on inadmissible speculation and hearsay about the conduct of third parties, which cannot be the basis for any factual assertion relied on in deciding summary judgment.

## B. Cedar Park's Free Exercise Claim Fails as a Matter of Law

Cedar Park cannot meet its burden to demonstrate that Washington's statutes are not neutral or generally applicable and thus subject to strict scrutiny. It is well settled that on a Free Exercise claim, the plaintiff bears the burden to demonstrate an infringement of its rights. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (collecting cases). This includes the burden to show that a government entity has burdened plaintiff's sincere religious practice pursuant to a policy that is not neutral or generally applicable. *Id.*; *See Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878-79 (1990). Even when a law incidentally burdens a particular religion or practice, it can be upheld if it is a "valid and neutral law of general applicability" and is rationally related to a legitimate governmental interest. *Stormans, Inc. v. Weisman* (*Stormans* II), 794 F.3d 1064, 1075-1076 (9th Cir. 2015) (cleaned up); *see Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999) (DMV can require applicant to divulge social security number in conflict with plaintiff's religious beliefs); *Tingley v. Ferguson*, 47 F.4th 1055, 1085, 1088 (9th Cir. 2022) (availability of religious exemption does not destroy neutrality or general applicability). Cedar Park's strained and speculative arguments cannot establish any part of a free exercise or religious autonomy claim, so its motion should be denied and summary judgment should be granted to the Defendants.

### 1. The statutes do not impermissibly burden religion

Cedar Park fails to show that Washington's Reproductive Parity Act, read alongside the conscience objection statute, burdens its religious exercise. As Defendants have maintained throughout this case, Washington law allows Cedar Park to purchase a health insurance plan that

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

8

**ER-136**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

excludes coverage of services to which Cedar Park objects. Cedar Park negotiated with Cigna for such a plan, but decided against purchasing that plan for reasons unrelated to its religious beliefs. Because the statutes allow Cedar Park to negotiate and purchase a plan that excludes services consistent with its beliefs, the statutes do not impermissibly burden religion.

Throughout its brief (and in other briefs), Cedar Park misstates Defendants' 30(b)(6) testimony to imply that even when exercising the conscience objection, Cedar Park could indirectly pay for abortion services. However, Cedar Park reads Kim Tocco's testimony out of context. *E.g.*, Dkt. # 103 at 12. Kim Tocco never testified that when a plan provides an exclusion for abortion, the services are still included in the plan or that the carrier still *has* to provide the services. Dkt. # 105-1, Ex. A at 102-105. Instead, she testified that, when a plan excludes coverage for services, the plan documents need to notify the enrollees that the employer has chosen not to provide such benefits but that the enrollee still has a right to access benefits. *Id.* at 102. Thus, the benefits might be provided by the carrier but they also might be provided by someone else. *Id.* And the quote "plan actually provides for access" refers to a specific Kaiser plan that excludes coverage for abortion, not a mandate as to how all carriers must handle the exclusions. *Id.* at 105.

Even assuming Cedar Park were correct that the law requires the carrier to provide "access" to the services, there is nothing that requires Cedar Park to indirectly pay for those services, and there is no evidence here that Cedar Park would indirectly pay for the services. Even if Kaiser, or Cigna, or some other private carrier used a portion of the monies paid by Cedar Park to pay for services they found objectionable, this does not violate Cedar Park's free exercise rights. "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *United States v. Lee*, 455 U.S. 252, 261 (1982) (payment of social security taxes does not violate Free Exercise Clause). The Free Exercise Clause does not permit religious objectors to impose their

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

9

**ER-137**

beliefs on private companies, or their employees and employees' families. *See id.* The fact that a carrier will provide access to services does not mean that Cedar Park will be paying indirectly for anything. Carriers can utilize other methods for enrollees to receive the services, including through third parties.

Cedar Park speculates as to the reasons why Kaiser will not offer a plan that excludes coverage for abortion services, notwithstanding the conscience objection statute. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Hernandez*, 343 F.3d at 1112. While the record includes some email communications, there is no testimony explaining Kaiser's reasoning and position. Cedar Park has to ask the Court to speculate that Kaiser is not offering an exclusion because of its failure to understand the conscience objection statute and not some business reason. There is no evidence showing that Cedar Park has the knowledge to make assertions about Kaiser's decision-making process.

The Court should similarly disregard Cedar Park's assertions that Cigna's offered plans would require Cedar Park to pay for coverage for abortion, that its enrollees would use the same insurance card to receive abortion benefits, and that Cigna's plans would become more expensive after the passage of years. Dkt. # 103 at 7. Cedar Park has no personal knowledge to make these assertions, and there is no indication from the communications with Cedar Park's broker or Cigna that support Cedar Park's assertions.

Likewise, the Court should disregard Cedar Park's attempt to cherry-pick statements out of context and out of chronological order. For example, Cedar Park relies on emails from its broker that Cigna only offered the abortion coverage exclusion for the level-funded plan, yet later emails from Cigna confirmed that the exclusion would apply to all plans. Dkt. # 105-1 at 334, 349. And Cedar Park relies on an unrelated email about insurance cards to say that because enrollees would use their insurance cards when obtaining abortion services, the services are part of the plan. Particularly on summary judgment, the Court should not rely on

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

10

**ER-138**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

these speculative, out-of-context statements, where all reasonable inferences should be viewed in the light most favorable to the non-moving party.

The cases cited by Cedar Park are inapposite. Unlike the circumstance in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), Cedar Park is expressly permitted to exclude coverage for services to which it objects, so it is not required to purchase coverage of services that violate its religion. Cedar Park was not mandated to provide immediate coverage of elective abortion in violation of its beliefs, and in fact, it actually negotiated for plans consistent with its beliefs, unlike the circumstances in *Skyline Wesleyan Church v. California Department of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020). The *Skyline* Court never addressed the scenario where an employer can negotiate for a plan that excludes coverage for services to which it objects. *Id.* While Cedar Park relies on the Ninth Circuit's decision in this case, Cedar Park misses the part where it held that a predicate to Cedar Park's standing was that there were no comparable plans available to Cedar Park, which the Court and Defendants now know to be incorrect (and Cedar Park knew that fact to be incorrect at the time). *Cedar Park*, 860 Fed. App'x at 543. In fact, Cedar Park could purchase a plan that excluded abortion services in 2019, as evidenced by its negotiations with Cigna.

Cedar Park does not have to submit an accommodation request to the Insurance Commissioner or any government agency, unlike in *Sharpe Holdings, Inc. v. United States Department of Health and Human Services*, 801 F.3d 927, 938-941 (8th Cir. 2015), which was overturned by the Supreme Court, pointing out that the case did not affect the government's ability to ensure that women subject to a religious plan be able to obtain, without cost, the full range of FDA approved contraceptives. *Dep't of Health & Hum. Servs. v. CNS Int'l Ministries*, No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016). Cedar Park doesn't even have to file the insurance plan—that obligation is on its carrier. All health plans have to be filed, regardless of whether there is a conscious objection. There has never been any evidence that Cedar Park would be subject to criminal liability, and the Insurance Commissioner doesn't even

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

11

**ER-139**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

regulate employers. *Contra Braunfeld v. Brown*, 366 U.S. 599, 606 (1961). Cedar Park thus fails to show the statutes burden its religious exercise.

### 2. The statutes are neutral

As discussed in Defendants' motion for summary judgment, Washington's Reproductive Parity Act, read alongside the conscience objection statute, are neutral towards religion. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Tingley*, 47 F.4th at 1085; *Stormans* II, 794 F.3d at 1075-1076. The object of the statutes is neutral: none of the express legislative findings target religion, but instead focus on the purpose of improving the health and welfare of Washington citizens and in promoting equal economic opportunity for women. The text of the laws is neutral: the law does not reference any religious practice, conduct, or motivation. The statutes operate neutrally. Cedar Park can exercise its rights to refuse to purchase coverage for services to which it objects and enrollees can maintain their rights to still have access to the services outside the plan.

First, Cedar Park's argument that SB 6219 is impermissibly gerrymandered is baseless. Dkt. # 103 at 17-18. Cedar Park can refuse to purchase coverage for abortion in its health plan, and in fact, engaged in negotiations to do so. That fact alone defeats the argument. But Cedar Park's premise is wrong too. Cedar Park bases its argument on the definition of "health plan", which excludes different types of insurance that are separately regulated or subject to different statutory requirements (sometimes federal requirements). *See* RCW 48.43.005(31); RCW 48.43.072. These exemptions are not comparable. All of them predate SB 6219, and relate to (1) specific types of insurance products that only incidentally include health care services; (2) are not designed to be comprehensive health plans due to duration or very limited benefits; or (3) are particular health care options funded by entities that the Insurance Commissioner does not have jurisdiction over (like Medicare or Workers' Compensation).

There is nothing about the definition of "health plan" that evidences treating religious views differently. Most of the specific insurance coverages listed in RCW 48.43.005, such as

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

12

**ER-140**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

auto insurance, long term care insurance, and vision and dental only insurance do not provide for maternity coverage, and therefore do not have to provide coverage triggered by the Reproductive Parity Act. Other insurance coverages are regulated by other agencies and were created for different purposes than simply providing health care coverage. It is not discriminatory on the basis of religion to permit specific types of insurance coverages that do not cover reproductive care from the definition of "health plan."

Cedar Park also argues the Reproductive Parity Act proscribes more conduct than is necessary because "[e]xempting Cedar Park would primarily affect the church's employees, all of whom share the Church's beliefs about abortion." Dkt. # 103 at 18. This is unsupported by the record. While some employees likely share Cedar Park's views, there is no evidence in the record that all employees share those beliefs. Nor is there is any evidence in the record that the employees' family members, who are also enrollees on Cedar Park's plan, share the same beliefs as Cedar Park.

Second, Cedar Park's already-rejected argument that the conscience objection statute treats religious health providers, health carriers, and health facilities differently than employers does not demonstrate that the conscience objection statute is not religiously neutral. Dkt. # 103 at 18-19. As this Court ruled and the Ninth Circuit affirmed, "[t]o the extent the conscience objection statute treats religious organizations like Cedar Park differently than individual health care providers, religiously sponsored health carriers, and health care facilities . . . , such differential treatment does not constitute discrimination because the providers are not similarly situated to religious organizations." *Cedar Park*, 860 Fed. App'x at 543-544. "This is because the providers are in the business of providing health services, while religious organizations merely purchase health coverage." *Id.* Although this holding was in the context of Cedar Park's equal protection argument, that analysis is coextensive to the neutrality argument. *Stormans* II, 794 F.3d at 1085 (equal protection claim analysis is coextensive with free exercise claim).

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

13

ER-141

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Third, SB 6219 does not intentionally discriminate against religious organizations like Cedar Park. The legislative findings made clear that SB 6219 would be read alongside the already-existing conscience objection statute, and the Insurance Commissioner promulgated a rule confirming that fact. It is irrelevant that the Legislature rejected proposals to add exemptions, where the conscience objection statute was already in force. Further, one legislator's statement that religious organizations can sue if they do not want to provide insurance coverage for abortion proves nothing except that religious organizations can still seek a remedy in courts if their religious rights are violated. *See Tingley*, 47 F.4th at 1086 (stray, out of context statements by a legislator not relevant to concluding law was not neutral). And a legislator stating that "[h]ealth care is about the individual, not about [religious organizations]" actually shows the neutrality of the rule. Dkt. # 103 at 19. The focus of the law is on individual access in an effort to improve the health and welfare of individuals, not to benefit or harm a religion. Cedar Park cannot meet its burden to show that the statutes are not neutral.

**3.     The statutes are generally applicable**

Defendants' motion for summary judgment amply explains why the statutes are generally applicable. SB 6219 applies to all health plans in Washington and does not target health plans only for religious entities. The Insurance Commissioner does not make discretionary decisions about approving exemptions for religious reasons.

First, Cedar Park argues that the existence of categorical exemptions in the definition of "health plan" defeat the general applicability of SB 6219. As explained previously, this argument is wrong because the statutes permit Cedar Park to purchase a plan that excludes coverage for services to which it objects. Also, SB 6219 does not create secular exemptions—it simply applies to health plans. That the preexisting statute defining health plans excludes certain types of specific insurance products from its definition—Worker's Compensation, auto accident coverage, dental only or vision only coverage, etc.—does not mean that SB 6219 contains secular exemptions that undermine the interests in providing women better access to health benefits. The

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

14

**ER-142**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

purpose of SB 6219 is to improve access to reproductive care through health plans, and it does not need to apply to every conceivable type of insurance product to do so.

Second, as explained above, Cedar Park is wrong in arguing that Washington law completely exempts insurance plans provided by religious health care organizations from the abortion insurance requirement so as to undermine the Defendants' purpose of protecting women's access to reproductive health care. Dkt. # 103 at 15. While religious providers and carriers can exercise a conscience objection, the enrollees still need to be provided information about how to access services outside of the objection. In practice, there is a government fund used to provide the abortion services. Dkt. # 105-1, Ex. B at 194.

The cases cited by Cedar Park show that Washington's law is generally applicable. Dkt. # 103 at 13-14. Unlike the law at issue in *Tandon v. Newsom*, which expressly restricted religious services while exempting comparable secular activity like hair salons, movie theaters, and restaurants, Washington's laws do not expressly restrict religious expression, and in fact ensure religious employers can refuse to purchase coverage for services to which they object. 141 S. Ct. 1294, 1296 (2021). Similarly, in *Roman Catholic Diocese of Brooklyn v. Cuomo*, the attendance cap on houses of worship focused on religious worship while treating secular schools and factories more favorably. 141 S. Ct. 63, 66-67 (2020). Cedar Park is not restricted because of its religion compared to other employers purchasing health plans. In *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999), there was no exemption for religion, while there is an exemption here. And *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1234-1235 (11th Cir. 2004), deals with focused zoning restrictions that exclude religious organizations, not health plans. All of these cases either expressly limited religious worship or did not include exemptions for religious organizations. Neither of those pitfalls are present here.

Third, Cedar Park's argument about individualized exemptions shows the futility of its claim. As Cedar Park points out, a law is not generally applicable if a governmental agency

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

15

**ER-143**

exerts discretion whether to make individualized exemptions so as to deny an entity the ability to avoid conduct it believes to be objectionable. *Fulton v. City of Phila., Pa.*, 141 S. Ct. 1868, 1877 (2021). Here, nothing in the conscience objection statute nor do any facts show that the Insurance Commissioner makes discretionary decisions about approving exemptions for employers exercising a conscience objection. The conscience objection statute requires the Insurance Commissioner to approve plans that exclude coverage for services by reason of religion or conscience objection. RCW 48.43.065(3). It is a mandatory obligation on the Insurance Commissioner not to compel employers to pay for services to which they object. The Insurance Commissioner thus reviews health plans to ensure compliance with the laws, including the conscience objection. To the extent there is any discretion, such discretion is held by the carrier and the employer to negotiate a plan consistent with its beliefs. "There is no provision in the Washington law for individual exceptions that would allow secular exemptions but not religious ones." *Tingley*, 47 F.4th at 1088.

Cedar Park's reference to an unrelated provision requiring the Insurance Commissioner to interpret SB 6219 in a manner that would not violate an applicable federal law, the Weldon Amendment, is baffling. There is no evidence that the Weldon Amendment is at issue here. There is no allegation that Cedar Park, Kaiser, Cigna, or any other part of this case implicates RCW 48.43.073(5). There is no evidence that the Insurance Commissioner has ever had to address a situation involving RCW 48.43.073(5). Cedar Park's references to testimony about implementing the Weldon Amendment is out of place. Moreover, there is a difference between giving the Insurance Commissioner discretion to promulgate policies to ensure compliance with the Weldon Amendment and exercising discretion over whether specific health plans or religious organizations are able to be exempt from SB 6219 or the conscience objection statute. Cedar Park again asks the Court to speculate about an unrelated provision that has not been used and which has no factual or legal basis.

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

16

**ER-144**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

In sum, Cedar Park fails to meet its burden to demonstrate that the statutes are not neutral or generally applicable. As a result, it must show that the statutes are not rationally related to their purpose, which it similarly fails.

**4.      The statutes are rationally related to legitimate governmental purposes**

As explained in Defendants' motion for summary judgment, SB 6219 is "rationally related to a legitimate governmental purpose." *Stormans II*, 794 F.3d at 1084. Looking <u>first</u> at the governmental purposes, the legislative findings detail at least 14 different governmental purposes served by the law, including improving health benefits for Washingtonians so they can lead healthier, more productive lives, providing essential care for women, and promoting opportunities for women to participate in society equally.

These purposes are not only legitimate public purposes but are compelling state interests. The State has a compelling state interest in providing better access to health benefits. *See, e.g.*, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985); *Marshall v. United States*, 414 U.S. 417, 427 (1974); *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905); *Tingley*, 47 F.4th at 1077-1078; *see also Smith*, 494 U.S. at 885-887. The State also has a compelling state interest in ensuring that equal economic opportunities for women and their ability to participate in society. "Assuring women equal access to such goods, privileges, and advantages clearly furthers compelling state interests." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984); *see also Califano v. Webster*, 430 U.S. 313, 317 (1977).

Cedar Park argues that there is no problem to solve because OIC received no complaints about health care plans not covering abortion before SB 6219 existed. Dkt. # 103 at 20. This is a red herring. The Legislature didn't enact SB 6219 because of complaints to the OIC but for the reasons set forth in the legislative findings. Nothing in Cedar Park's argument disputes the legislative findings.

Cedar Park argues that the exemptions in the definition of "health plan" somehow show that no governmental interest is served. But those exclusions exist for separate policy reasons—

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

17

**ER-145**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

like they are areas of insurance that do not focus on health care, or are health plans not regulated by the State or OIC. Cedar Park again ignores the conscience objection statute by arguing that this situation is the government exercising an "interest in forcing a pro-life church to provide insurance coverage for abortion to people who will not use it." Dkt. # 103 at 21. Cedar Park is not forced to purchase a plan that covers services to which it objects. RCW 48.43.065(3).

Second, SB 6219 not only rationally implements its purposes but is narrowly tailored to satisfy strict scrutiny. SB 6219 requires health plans to provide contraceptive care, and if the plan includes maternity care to provide substantially equivalent coverage for abortion services. These provisions inherently promote access to health services for women. And as the legislative findings make clear, access to contraceptives and abortion services not only can help women lead healthier and more productive lives, but providing these services is tied to increasing their opportunities for economic success and equal participation in society.

SB 6219 read alongside with the conscience objection are narrowly tailored. The statutes balance the important governmental interest in providing health care with a religious employer's right to exercise with an enrollee's right to receive services notwithstanding that objection with a secular carrier's right to offer services in a regulated market. And the statutes do not require Cedar Park to do anything special to exercise its rights—it simply needs to negotiate for a health plan in keeping with its rights, like any other large employer purchasing health insurance.

In arguing that SB 6219 is not narrowly tailored, Cedar Park lobbies for several policy alternatives that Washington did not enact. Dkt. # 103 at 21-22. Providing all religious organizations a blanket exemption ignores the realities of different parties in the market. As this Court and the Ninth Circuit recognized, employers, carriers, and providers all serve different roles in the health insurance market, so tailoring the objections for those market purposes is necessary. *Cedar Park*, 860 Fed. App'x at 543-544; *see Lee*, 455 U.S. at 261. Cedar Park already

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

18

**ER-146**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

has an exemption because of its role as an employer in the market.[5] SB 6219 and the conscience objection statute read together are narrowly tailored to serve compelling state interests, so thus satisfy strict scrutiny.

## C.    Cedar Park's "Religious Autonomy" Claim Fails

Cedar Park's right to decide for itself, free from state interference, matters of church governance as well as those of faith and doctrine, is not implicated here. *See Bollard v. Cal. Province of Soc'y of Jesus*, 211 F.3d 1331, 1332 (9th Cir. 2000) (Wardlaw, C.J. dissenting). While courts cannot wade into governance of "religious" or "ecclesiastical" matters, courts can adjudicate matters dealing with churches if the dispute requires "neutral principles of law, developed for use" in those kinds of disputes, which includes generally applicable laws. *Jones v. Wolf*, 443 U.S. 595, 599-605 (1979); *see Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012).

The purchase of a health insurance plan is not an ecclesiastical decision but a choice to enter the marketplace for health care. As explained already, the statutes are generally applicable and do not force a particular religious beliefs. Religious organizations, like churches, can refuse to purchase coverage for services to which they object, so they can still choose to practice and maintain their beliefs. But Cedar Park cannot use the religious autonomy claim to make the State force other private companies to create products on a market simply because Cedar Park desires it so.

Cedar Park wrongly argues that it has to choose between purchasing coverage for abortion or purchase inferior health care services. This is a choice that does not exist under Washington law, and it is not the choice Cedar Park was exercising. Cedar Park negotiated with Cigna for a plan that excluded abortion. Defendants didn't even know about these negotiations

---

[5]Cedar Park's argument that the government could pay for the services is equally unavailing. Cedar Park pays taxes, so under its own theory, it would indirectly "facilitate" abortions through the government.

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

19

**ER-147**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

until after the fact, late in discovery, undisputedly proving that Defendants were not involved in Cedar Park's internal administration. Cedar Park chose, for reasons that it admits had nothing to do with its religious beliefs, to select and pay for a health plan that included abortion services, despite an offer that would be less expensive, for a health plan that excluded abortion and specific contraceptives. Cedar Park cannot claim a decision that they hid from the Defendants was somehow dictated by them. The religious autonomy claim lacks any merit.

## VI.   CONCLUSION

The Court should dismiss this case with prejudice.

DATED this 31st day of March 2023.

ROBERT W. FERGUSON
Attorney General

*/s/ Paul M. Crisalli*
PAUL M. CRISALLI, WSBA #40681
Assistant Attorney General
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Paul.Crisalli@atg.wa.gov

MARTA DELEON, WSBA #35779
Senior Assistant Attorney General
Government Compliance & Enforcement Division
1125 Washington Street SE
Olympia, WA  98504-0100
(360) 664-9006
Marta.Deleon@atg.wa.gov
*Attorneys for Defendants*

DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT -- NO. 3:19-cv-05181-BHS

20

**ER-148**

The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON, <br><br> Plaintiff, <br><br> v. <br><br> MYRON "MIKE" KREIDLER, et al., <br><br> Defendants. | NO. 3:19-cv-05181-BHS <br><br> DECLARATION OF PAUL M. CRISALLI IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT <br><br> NOTE ON MOTION CALENDAR: MARCH 31, 2023 |

I, PAUL M. CRISALLI, declare as follows:

1.      I am over the age of 18, am competent to testify on the matters contained in this declaration, and make this declaration based on my personal knowledge.

2.      I am an attorney licensed to practice law in Washington State. I am an Assistant Attorney General in the Complex Litigation Division of the Washington State Attorney General's Office (AGO) and am one of the attorneys representing the Defendants in this action.

3.      Because several of the exhibits at the depositions are voluminous and not relevant to this motion, the following paragraphs identify exhibits that are relevant to this motion.

4.      Attached as Exhibit A is a true and correct copy of the transcript from the 30(b)(6) deposition of Kim Tocco, taken on November 16, 2022.

DECLARATION OF PAUL M. CRISALLI
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

1

**ER-149**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

5.      Attached as Exhibit B is a true and correct copy of the transcript from the 30(b)(6) deposition of Molly Nollette, taken on November 17, 2022.

6.      Attached as Exhibit C is a true and correct copy of the transcript from the 30(b)(6) deposition of Steve Orcutt, taken on November 21, 2022.

7.      Attached as Exhibit D is a true and correct copy of a slide show created by Gallagher and presented to Cedar Park on June 10, 2019.

8.      Attached as Exhibit E is a true and correct copy of an email chain between insurance broker Jami Hansen and a representative from Kaiser Permanente, forwarded to Cedar Park representatives Steve Orcutt and Melissa Knauss on June 24, 2019.

9.      Attached as Exhibit F is a true and correct copy of an email chain between insurance broker Jami Hansen and Cigna representative Mark Croff, forwarded to Cedar Park representatives Melissa Knauss and Steve Orcutt on July 8, 2019.

10.     Attached as Exhibit G is a true and correct copy of an email chain between insurance broker Jami Hansen and Cigna representative Mark Croff, forwarded to Cedar Park representatives Steve Orcutt and Melissa Knauss on July 18, 2019.

11.     Attached as Exhibit H is a true and correct copy of an email chain between insurance broker Jami Hansen and Cedar Park representatives Steve Orcutt and Melissa Knauss containing an updated proposal from Cigna on July 18, 2019.

12.     Attached as Exhibit I is a true and correct copy of a slide show created by Gallagher and attached to the email in Exhibit H.

13.     Attached as Exhibit J is a true and correct copy of the Deposition Transcript Errata signed by Steve Orcutt on December 29, 2022.

14.     Attached as Exhibit K is a true and correct copy of the transcript from the 30(b) deposition of Jason Smith, taken on November 21, 2022.

15.     Attached as Exhibit L is a true and correct copy of the Deposition Transcript Errata signed by Jason Smith on December 29, 2022.

DECLARATION OF PAUL M. CRISALLI
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

2

**ER-150**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

16. Plaintiffs did not disclose until it produced documents in response to Defendants' discovery requests that it had received offers from Cigna for plans that would exclude coverage for abortion and certain contraceptives.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the forgoing is true and correct and of my own knowledge.

DATED and SIGNED this 9th day of March 2023, at Seattle, Washington.

/s/ Paul M. Crisalli
PAUL M. CRISALLI, WSBA #40681
Assistant Attorney General

DECLARATION OF PAUL M. CRISALLI
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT --
NO. 3:19-cv-05181-BHS

3

**ER-151**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# Exhibit A

Honorable Benjamin H. Settle

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

Civil Action No. 3:19-cv-05181

CEDAR PARK ASSEMBLY OF GOD OF
KIRLAND, WASHINGTON,

          Plaintiff,

vs.

MYRON "MIKE" KREIDLER, in his official
capacity as Insurance Commissioner for
the State of Washington; JAY INSLEE, in his
official capacity as Governor of the State
of Washington,

          Defendants.
_____

 VIDEOCONFERENCE and 30(b)(6) DEPOSITION of DEFENDANTS

     MYRON "MIKE" KREIDLER and GOVERNOR JAY INSLEE

               REPRESENTATIVE KIM TOCCO

_____

          PURSUANT TO NOTICE, the above-entitled

deposition was taken on behalf of the Plaintiff on

Wednesday, November 16, 2022, at 10:02 a.m. PST, before

Jana Mackelprang, Certified Realtime Reporter,

Registered Professional Reporter, and Notary Public.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

2

APPEARANCES:

For the Plaintiff:
          Kevin H. Theriot, Esq.
          Alliance Defending Freedom
          15100 N. 90th Street
          Scottsdale, Arizona 85260
          480.444-0020
          ktheriot@adflegal.org

For the Defendant:
          Paul M. Crisalli
          Jeffrey Todd Sprung
          Attorney General's Office
          800 5th Avenue, Suite 2000
          Seattle, Washington 98104
          paul.crisalli@atg.wa.gov

          Marta U. DeLeon
          Attorney General's Office
          PO Box 40100
          Olympia, Washington 98504
          marta.deleon@atg.wa.gov


Also Present:
          Daniel Bagley

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

3

EXAMINATION INDEX

By Mr. Theriot                                        Page 5

EXHIBIT INDEX
FOR IDENTIFICATION                                   INITIAL
                                                     REFERENCE

Exhibit 1  Plaintiff's Notice of Rule 30(b)(6)          9
           Deposition

Exhibit 2  WA ST 48.43.005 - Definitions               32

Exhibit 3  Substitute Senate Bill 6219                 35

Exhibit 4  WA ST 48.43.065                             66

Exhibit 5  WA ST 48.43.725                             91

Exhibit 6  WAC 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                            113

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

4

P R O C E E D I N G S

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

\*     \*     \*     \*     \*

THE COURT REPORTER:  Will counsel please stipulate that the court reporter is authorized to administer the oath remotely; that no objection to admissibility of the deposition will be made based on validity of the oath; and that Ms. Tocco is who she says she is so that I may swear her in remotely?

MR. THERIOT:  The Plaintiff stipulates.

MR. CRISALLI:  Defendants stipulate.

KIM TOCCO, having been first duly sworn to state the whole truth, testified as follows:

MR. CRISALLI:  Before we begin and turn it over to Mr. Theriot, Defendants want to note for the record first that while this is being recorded for Zoom, we all agree that this is not a videotape deposition under the Federal Rules of Civil Procedure. We did not receive notice of that and that was not the intent of the Plaintiff in this matter.

Second, we received notice that a Topic 6 was changed to cover RCW 48.43.005, subsection (31).

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

5

We have prepared a witness to testify regarding that statute as relevant, and we'll reserve any objections to specific questions.

Last, I would note a general objection to the definition of "employee" within the notice, as can't make heads or tails of why California -- I'll use the language -- why California Department of Managed Health Care is relevant to this case, but we understand -- that term is not used in the topics, so we prepared our witnesses as needed.

MR. THERIOT: Okay. So there may be -- are you saying that the notice actually refers to the California Department of Health Care?

MR. CRISALLI: Yes.

MR. THERIOT: Well, that is a problem, and that's my fault. It should not. I appreciate you mentioning that. All right.

EXAMINATION

BY MR. THERIOT:

Q. Ms. Tocco, my name is Kevin Theriot. I'm counsel for Cedar Park, and we are here to take your deposition today.

We've got a couple preliminaries to go through, but I think it really just starts off with: Have you ever given a deposition before?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

6

A.    No.

Q.    **Have you ever testified in court before?**

A.    No.

Q.    **What is your current position?**

A.    I'm currently employed as the health forms program manager at the Washington State Office of the Insurance Commissioner.

Q.    **How long have you been in that position?**

A.    I have been in this position since April 1 of 2020.

Q.    **What was your occupation before that?**

A.    Prior to that, I was also with the Office of the Insurance Commissioner.  I started with the Agency in December of 2018, and I was working as an insurance enforcement specialist.

Q.    **So before 2018, what was your occupation?**

A.    I was a regulatory compliance consultant for a health plan.

Q.    **Okay.  Which health plan was that?**

A.    It was Providence Health Plan in Portland, Oregon.

Q.    **Have you ever been charged with any kind of -- well, let me rephrase that.**

**Have you ever been charged with any sort of criminal charge other than a traffic violation?**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                                fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

7

A.      No.

Q.      Okay.  So I know that you have spoken with your attorneys and they gave you some instructions.  I'm certainly not going to ask you about those instructions.

I'm not going to go over all the rules, but just to reiterate things, because this is sort of an unnatural thing, especially since you haven't been deposed before, but you understand you're under oath today and this would be just as if you were testifying in a courtroom?

A.      Yes.

Q.      Okay.  And that was going to be my next thing, that one of the awkward things is you actually have to answer the question and say "yes" or "no," instead of nod your head or say "uh-huh" or "huh-uh." I will probably make the same mistake.  I'll try to remind you when you're doing that.

Is there anything that would prevent you from thinking clearly or testifying truthfully today?

A.      No.

Q.      Are you on any medications that affect your memory or your cognitive ability?

A.      No.

Q.      I think the other thing that is

Electronically signed by Jana Mackelprang (001-409-517-3774)                          fe265592-9478-4d73-bcd5-ebcc840c6c96

8

especially true in a video deposition is waiting for me to finish my question before you answer, which I'm sure your attorney spoke with you about; but also that goes both ways, I need to wait until you finish your answer before I ask another question. I'll do my best to do that.

Of course, the biggest thing is that we enunciate clearly and we give verbal responses and verbal interactions so that the court reporter can take those down.

Of course, we can take a break when you're ready.

MR. THERIOT: I believe, Paul, you mentioned that you want to break at noon Pacific Standard Time. So that's in a couple hours.

MR. CRISALLI: Yes, please. Thank you.

MR. THERIOT: We can definitely do that, not to say that we can't take a break before then, but we can definitely do that. Do you know about how long that will take?

MR. CRISALLI: I was thinking of trying to shoot for half an hour, make it the lunch hour for us, if that works for you.

MR. THERIOT: Yes, that's fine.

MR. CRISALLI: It may be longer depending

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

on how we want to do lunch.

MR. THERIOT: Right.

Q. (By Mr. Theriot) I'm going to be bringing some exhibits up when I share my screen. You should be able to see them. And, of course, if you can't see them, let me know, but let's start with what I'm going to mark as Exhibit 1. It's the Plaintiff's Notice of Rule 30(b)(6) Deposition. Let's see if I can do this in a way that makes sense.

Okay. Can you see that on your screen?

A. I can.

Q. Okay. So have you seen this -- this is Plaintiff's Notice of Rule 30(b)(6) Deposition -- have you seen this before?

A. Yes.

Q. Okay. We're going to designate this as Exhibit 1. This is our notice, Plaintiff's Notice of Rule 30(b)(6) Deposition.

(Exhibit 1 was remotely introduced and provided electronically to the reporter.)

Q. (By Mr. Theriot) And you understand, Ms. Tocco, that you've been designated by the Defendants to testify on their behalf for some of the topics listed in this deposition notice?

A. Yes, I do.

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

Q.    Based upon the email from your counsel, it's my understanding that you're going to testify as to the following topics.  And I'm going to scroll down here so you can see them, and I just want you to confirm that that's correct.  Let me try to get this right.  All right.

So my understanding is that you are prepared to testify today regarding Topics 1, 2, and 3.  Those are on the page I'm showing you now.

Is that correct?

A.    Yes, that's correct.

Q.    Thank you.  I'm going to scroll down to 6, 7, and 8 here, actually, and 9.

And you're also prepared to testify as to Topics 6, 7, 8, and 9; is that correct?

A.    Yes, that's correct.

Q.    And then lastly, Topics 11 and 12 in Exhibit 1?

A.    Yes, correct.

Q.    All right.

MR. CRISALLI:  Kevin, can I interject a quick question or request?  Not necessarily for this exhibit or subsequent exhibits, to have them be downloadable for the witness and myself.  This one is fine because she's viewed it and I have it with me, but

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

just that way we have the ability for the witness to review the whole document.

MR. THERIOT: You certainly can make that request, but I'm not sure that I know how to do that.

Jana, what's the --

MR. CRISALLI: Should we go off the record?

MR. THERIOT: Yes, let's go off the record.

(There was a brief discussion off the record.)

**Q.      (By Mr. Theriot) Ms. Tocco, we're back on the record.**

**What did you do to prepare for today's deposition?**

A.      I met for a couple hours with my attorneys. I reviewed the deposition notice. I reviewed our responses to interrogatories, and I briefly reviewed some of the statutes at issue.

**Q.      Okay. Do you remember which statutes you reviewed?**

A.      Yes, I do.

**Q.      Which ones were they?**

A.      I reviewed the session law 6219. I reviewed RCW 48.43, and I don't recall which specific

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

Case 3:19-cv-05181-BHS Document 180-1, Filed 03/09/23, Page 13 of 33

sections of 48.43.

Q.     Okay.  How much time did you spend preparing for today's deposition?

A.     Total, approximately -- approximately four hours.

Q.     So remind me of your job title again.

A.     Health forms program manager.

Q.     As health forms program manager, what is your job description?

A.     I oversee a team of analysts who are responsible for reviewing certain health form filings for compliance, for legal compliance with laws and regulations.

Q.     What Is your education?

A.     I received my JD in 2019.  So I have an active bar license.  I also have a master's degree in social work and an undergraduate degree in psychology.

Q.     All right.  Prior to coming to work for the Office of the Insurance Commissioner, you worked for Providence; is that right's?

A.     I did.

Q.     And what was your position there?

A.     I worked as a regulatory compliance consultant.

Q.     Okay.  Have you ever practiced law with a

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

Case 3:19-cv-05181-BHS Document 155, Filed 03/09/23, Page 14 of 33

firm or anything like that?

A.   No.

Q.   Approximately how long did you work with Providence?

A.   Approximately four and a half years.

Q.   Okay.  And prior to that, where did you work?

A.   Prior to that, I held a variety of contract positions, but I was working for the State of Oregon, Department of Justice, most recently before Providence.

Q.   And what did you do for the State of Oregon, Department of Justice?

A.   I was doing complex document review.

Q.   And that complex document review, is that within the insurance industry?

A.   No, it wasn't.

Q.   What kinds of documents did you review?

A.   It was related to the nationwide tobacco litigation.

Q.   Okay.  I'd like to move to the first topic in the notice that says, "The State of Washington's policies, procedures, and practices related to review and approval of health care plans." Assuming that I got your -- the questions I have for

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

14

you right, that's one of the ones you're going to testify to.

So what agency regulates health plans in Washington?

MR. CRISALLI: Object to the extent it goes beyond the scope of the notice.

MR. THERIOT: Okay. Are you instructing her not to answer?

MR. CRISALLI: No.

Q.    (By Mr. Theriot) Go ahead.

A.    Can you repeat the question, please?

Q.    What agency regulates health plans in Washington?

A.    The Washington State Office of the Insurance Commissioner reviews commercial health plans.

Q.    Are there any -- does the Office of the Insurance Commissioner, does it regulate all forms of insurance in Washington?

A.    I don't know.

Q.    But it does regulate health plans, right?

A.    Fully insured commercial health plans, yes.

Q.    Okay. What's an example of a health plan that is not a fully insured commercial health plan that it does not regulate?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

15

A.    The Medicaid plan.

Q.    **Okay.  Are there any others that fall into that category?**

A.    In what category is that?

Q.    **Into the category that the Office of the Insurance Commissioner does not regulate?**

A.    Yes, there are.

Q.    **Can you give me a couple more examples besides the Medicaid plan?**

MR. CRISALLI:  I'm going to object to the extent it goes beyond the scope.

THE DEPONENT:  Another example would be the Medicare coverage.

Q.    **(By Mr. Theriot) So within the area where the Office of the Insurance Commissioner does regulate, are there different types of health plans that it regulates?**

A.    What do you mean by "types"?  Can you clarify, please?

Q.    **So the phrase you used to describe the types of plans it regulates, can you repeat that for me?  Commercial ...**

A.    Commercial fully insured.

Q.    **Commercial fully insured.  So what are some plans that, for instance, are -- that fall into**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(123 of 232)

30(b)(6) Deposition of Kim Tocco

16

that category?  Are there different types of plans that fall into commercial fully insured plans?

A.    Yes.

Q.    Okay.  So give me some examples of those, please.

A.    There could be an individual health plan. There can be a group health plan, whether or not there can be a small group health plan or a large group health plan.  And those refer to employer groups.

Q.    But all of those are regulated by the Office of the Insurance Commissioner, right?

A.    Yes.

Q.    Are there basic coverage requirements for each type of health plan that is regulated by the OIC?

A.    Yes, there are requirements for each type of health plan.

Q.    Where are those requirements found?

A.    They are found in the Washington code, RCW, and also the Washington administrative code.

Q.    And how would you refer to those?  Are those minimum requirements that must be covered, or how are those referenced?

A.    It would depend on the specific citation we were talking about.

Q.    Okay.  Could you describe the general

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(124 of 232)

Case 3:19-cv-06181-RJB Document 306-1, Filed 03/09/23, Page 28 of 33
Case 3:19-cv-06181-RJB Document 306-1, Filed 03/09/23, Page 28 of 33

30(b)(6) Deposition of Kim Tocco

17

**process by which the Office of the Insurance Commissioner reviews a health plan submitted for approval?**

A.      Yes, I can speak to how the health plan forms are reviewed for approval.

**Q.      Okay.  How does that process work?**

A.      It would start with us, the Agency, receiving a filing from a carrier.

**Q.      And then what's the next step?**

A.      That filing would come to our intake team.  And then if it is -- each filing has a designation as far as the type of insurance.  And if it is a health plan, it would be assigned to my team.

**Q.      Okay.  What materials must be submitted as part of that application?**

A.      We require that all forms that comprise the insurance contract be filed with us.

**Q.      So those forms that comprise the insurance contract would be the forms that the carrier would provide to whoever is purchasing -- who would purchase the plan?**

A.      Yes.

**Q.      And you said your team is responsible for reviewing those materials?**

A.      Yes.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

Q.    How does your team communicate with the carrier throughout that process?

A.    We use a system called the system for Electronic Rate and Forms Filing, referred to as SERFF.

Q.    So it's all online?

A.    It is an electronic system, yes.

Q.    Electronic system.  Are all communications in writing?

A.    It varies.

Q.    So there could be some phone calls?

A.    There could be some phone calls of a nonsubstantive nature.

Q.    Okay.  And how is approval of that plan communicated to you?

A.    Ultimately, we would complete a disposition on the filing, and that would be -- that would be a formal approval.

Q.    Okay.  And that formal approval is communicated to the carrier through the system, or is there some other way that that's done?

A.    Correct, the status would change in the SERFF system --

Q.    I see.

A.    -- once the --

Q.    Sorry, I interrupted you.  Would you

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

19

repeat that?

A. Sure. I just said the status would change in SERFF once our review was complete.

Q. And how does the OIC keep track of the plans that it approves or objects to?

A. Approving and objecting aren't mutually exclusive for us.

Q. Okay. So maybe I should ask it this way: How does OIC keep track of health plans that it approves?

A. Those are all maintained as a public record.

Q. I see. And are those -- how are those organized as a public record? By the organization, or how are you able to -- well, how are they organized, let's just say?

A. They are accessible in SERFF and they are accessible from our public-facing website with a search function.

Q. Okay. And you can search by type of plan?

A. I don't know.

Q. You can search by carrier?

A. Yes.

MR. CRISALLI: I'm going to put in an

Calderwood-Mackelprang, Inc. 303.477.3500
**ER-171**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(127 of 232)

20

objection there.  Because she referenced there were two different ways, SERFF and the public-facing program, it's unclear to me which one we're talking about with those two questions.

MR. THERIOT:  Well, I think I was first of all talking about if the ones that are searchable as a public-facing -- as a public-facing program.  That's which one I was referring to.

**Q.     (By Mr. Theriot) Is that the way you understood it, Ms. Tocco?**

A.     Yes, I was speaking to that.

**Q.     Okay.  All right.  Are there currently approved health plans that do not cover abortion in Washington?**

A.     Yes.

**Q.     Are those health plans offered by religious organizations?**

MR. CRISALLI:  Object to form.  Vague.

THE DEPONENT:  I can't search by a given employer group.  So I wouldn't know which employer group of any kind purchased a health plan.

**Q.     (By Mr. Theriot) Okay.  So do you know approximately how many health plans, approved health plans, in Washington don't cover abortion?**

A.     I don't know for sure.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

(128 of 232)

Q.      Is it more than five?  Less than five?

A.      More than five.

Q.      More than five.  Who would know the identity of those health plans that don't cover abortion?

MR. CRISALLI:  Let me get an objection in there.  That's vague.  Are you talking as to OIC?

MR. THERIOT:  Yes, as to OIC.

THE DEPONENT:  I don't know who would know off the top of their head.  It's information that can be accessed in our SERFF system.

Q.      (By Mr. Theriot) And how -- and that information could be accessed by the public?

A.      All of our approved, filed and approved, health plans would be accessible to the public to search.

Q.      Can you search those plans that are accessible to the public based upon whether or not they cover abortion?

MR. CRISALLI:  Object to form.  Vague.

THE DEPONENT:  No.

Q.      (By Mr. Theriot) Do you know if any of those plans are available in King County?

A.      Yes, I do.

Q.      And are there any that are available in

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(129 of 232)

22

King County?

A.      I am aware of -- yes.

Q.      Which plan is that?

A.      I am aware of a small group health plan offered by Premera.

Q.      When you say "a small group health plan," how is that defined?

A.      A small group would be a plan offered for sale to an employer having 50 or fewer employees.

Q.      Did you say 50 or fewer?

A.      5-0, yes.

Q.      Okay.  Are you aware of any others except -- or besides, excuse me, Premera that offer a health plan that excludes abortion in King County?

A.      Do you mean -- can you clarify?  Do you mean for a larger employer?

Q.      Well, I was just asking for any other employer, not necessarily a larger employer, but -- I'm sorry, for any employer.  I'll ask the question again. Let me just clarify:  I'm not necessarily asking for a larger employer.

So are there any health care plans that exclude abortion available in King County other than the Premera plan that we just discussed?

MR. CRISALLI:  Object to form.  Vague.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

23

THE DEPONENT: There may be. In terms of a larger employer, they have the ability to negotiate certain terms.

Q. (By Mr. Theriot) Okay. So you're saying there may be, but you're not aware of any as you sit here today?

MR. CRISALLI: Object to form. Vague.

THE DEPONENT: Sorry. Correct, I can't search by an employer group.

Q. (By Mr. Theriot) But you are -- I understand your testimony to be, though, that if a larger group wanted to attempt to negotiate a plan, they could try?

A. Correct.

Q. And how would they go about doing that?

MR. CRISALLI: Object to form. Beyond the scope.

THE DEPONENT: I don't know. That would be between the employer and the carrier.

Q. (By Mr. Theriot) Okay. How do you know that they could attempt to negotiate a plan from a carrier as a larger group?

A. My understanding is that an employer who wishes to purchase a health plan to cover its employees can contact carriers to make that purchase.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(131 of 232)

30(b)(6) Deposition of Kim Tocco

24

Q.     Are you aware --

A.     And --

Q.     I'm sorry.  Go ahead.  I interrupted you.

A.     And the nature of a large group product is that there are terms that they can negotiate.

Q.     But you're not aware of a large -- well, strike that.

Are you aware of a large employer, more than 50 employees, that has negotiated such a plan in King County?

A.     Can you clarify your time frame?

Q.     Well, let's start with currently.

A.     Currently I am not aware of any negotiated large group plan.

Q.     Are you aware of any since 2018?

A.     Are we still in King County?

Q.     Yes.

A.     No, I'm not aware of any.

Q.     Are you aware of any outside of King County?

A.     Yes.

Q.     Which plan is that?

A.     I don't have the plan name.  I know that there is a product, a health plan, approved for sale by Kaiser Foundation of the Northwest.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                fe265592-9478-4d73-bcd5-ebcc840c6c96

Q.    Do you know which county that is -- I'm sorry -- do you know which county that is offered in?

A.    I would have to look at the plan documents to identify the service area.

Q.    And that plan is currently available in those counties, as far as you know?

A.    It is currently available in some counties.  I don't know which counties.

Q.    Are you aware of any plans that exclude abortion in Snohomish County?  Am I pronouncing that right?

A.    I don't know by county.

Q.    Okay.

A.    I wasn't done identifying the other plans, though.

Q.    Oh, I'm sorry.  Go right ahead.

A.    I was just going to state that I know, as a carrier, Providence Health Plan also offers individual and large group plans in the state of Washington.

Q.    Do you know if Providence offers those in King or Snohomish County?

A.    No, I would have to look at the plan documents.

Q.    What are the reasons why a carrier may

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

offer a plan in certain counties and not others?

MR. CRISALLI:  Object.  Speculation.

THE DEPONENT:  That would be a business decision.

Q.    (By Mr. Theriot) There's no -- is there any rule or law that would make some -- offering plans in some counties more so than others?

A.    Sir, can you repeat that?

Q.    Is there any Washington rule or law that would make a carrier think that offering a health plan in some counties is more desirable than others?

MR. CRISALLI:  Object.  Speculation. Vague.

THE DEPONENT:  I don't know what a carrier would think.

Q.    (By Mr. Theriot) Are there any Washington laws or regulations that limit or apply to health care plans that only apply in certain counties in Washington?

A.    Could you repeat that?

Q.    Sure.  Are you aware of any Washington law or regulation that regulates health care plans only in certain counties?

MR. CRISALLI:  Object.  Beyond the scope and vague.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

27

THE DEPONENT:  No, I'm not aware of any.

Q.    (By Mr. Theriot) Are you familiar with Providence's plan that it offers?

A.    Generally familiar with Providence's health plan, yes.

Q.    Does it cover drugs that are -- strike that.

Does it cover all forms of birth control?

MR. CRISALLI:  I'm going to object to form as well as potentially beyond the scope.

THE DEPONENT:  I would have to review plan documents.  In general, it does cover contraception.

Q.    (By Mr. Theriot) Are you aware of any plans offered by carriers in King and Snohomish Counties that do not cover all contraception?

A.    I'm not aware of any.

Q.    Are you aware of any other currently approved health plans that don't cover abortion in all contraception?

MR. CRISALLI:  Object to form.

THE DEPONENT:  Can you repeat?  Are you asking about two types of coverage?

Q.    (By Mr. Theriot) Well, I can split it up.

Are you aware of any other health plans

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

that are currently offered that don't cover abortion?

MR. CRISALLI:  Object to form.

THE DEPONENT:  Other than the ones I've stated, no.

Q.    (By Mr. Theriot) Are you aware of any health plans, currently approved health plans, that don't cover contraception?

MR. CRISALLI:  Object to form.

THE DEPONENT:  I am not.

Q.    (By Mr. Theriot) Is there any state law or rule that requires employers to offer health plans?

A.    Can you repeat that?

Q.    Yes.  Is there any state law or rule that requires employers to offer health plans to their employees?

A.    Well, the Office of the Insurance Commissioner would not regulate employers.

Q.    I'm sorry, can you repeat that answer again?

A.    I said the Office of the Insurance Commissioner would not be regulating an employer.

Q.    I understand that, but is there a state law or rule that actually requires employers to offer insurance that you're aware of?

A.    Within the entire Washington code, not

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

29

that I'm aware of.

Q.     I understand that you came to work for the Office of the Insurance Commissioner about the time that SB 6219 was enacted, but I'm going to ask this question anyway.

A.     Okay.

Q.     So before SB 6219 was enacted, had the Office of the Insurance Commissioner approved health plans that limited or excluded coverage for abortion?

A.     I don't know.

Q.     Before SB 6219, had the Office of the Insurance Commissioner approved health plans that limited or excluded coverage for contraception?

MR. CRISALLI:  Object to form.

THE DEPONENT:  Actually, I have a clarifying -- I have a clarifying on the prior question.

Can you repeat the prior question?

Q.     (By Mr. Theriot) I'm going to try.  If I get it wrong, let me know.

Prior to Senate Bill 6219 being enacted, did the Office of the Insurance Commissioner approve health plans that limited or excluded coverage for abortion?

A.     Yes, I would know that only from my

Calderwood-Mackelprang, Inc.  303.477.3500

**ER-181**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

capacity working with Providence Health Plan.

Q. I see. So after -- so prior to the enactment of 6219, Providence offered a plan that covered abortion -- excuse me, that excluded abortion, correct?

A. Providence offered products in the large group market that excluded abortion, yes.

Q. And after SB 6219 was enacted, how did that affect that plan?

MR. CRISALLI: Object to form.

Q. (By Mr. Theriot) Or those plans?

A. Well, currently, Providence continues to offer products in the large group market that exclude abortion. They've also moved into the individual market in the last couple years.

Q. Prior to -- and we've already -- just strike that -- we've already discussed where Providence offers those plans currently.

Do you know whether it offered those plans statewide prior to SB 6219 being enacted?

MR. CRISALLI: Object to the extent this is beyond the scope and form.

THE DEPONENT: I don't recall their service areas.

Q. (By Mr. Theriot) Before SB 6219 was

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

(138 of 232)

31

enacted, did the Office of the Insurance Commissioner approve health care plans that limited or excluded coverage for contraception?

A.    I don't know.

Q.    Okay.  How you doing?

A.    I'm good.

Q.    I'm moving to another topic, so that's why I asked.

A.    Okay.

Q.    Are there approved health plans that don't cover maternity?

MR. CRISALLI:  Object to form.

THE DEPONENT:  Not that I'm aware of.

Q.    (By Mr. Theriot) Are there approved, currently approved, health plans that don't cover contraception?

MR. CRISALLI:  Object to form.

THE DEPONENT:  Not that I'm --

Q.    (By Mr. Theriot) I'm sorry, can you repeat that?

A.    Sure.  Not that I'm aware of.

Q.    As used in Senate Bill 6219, the term or the phrase "health plan" is defined by 48.43.005, 31; is that correct?

And I will -- that's the question

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

32

pending.  You don't have to answer yet.  I'm going to show you that statute.  And I will -- and I will put it into chat, if I can.

MR. CRISALLI:  I'm going to object.  This calls for a legal conclusion and the law speaks for itself.

MR. THERIOT:  All right, let me see if I can do this here.

Q.     (By Mr. Theriot) I actually scrolled down.  Let me scroll up so you can see it, and then I'm going to try to put it into chat here.

So that's what we're looking at.

A.     Okay.

Q.     Okay.  Let's see here.  All right.  Bear with me for a moment.  All my options went away.

MR. CRISALLI:  If you minimize, I think those will appear, not full screen.

MR. THERIOT:  Yeah, I'm just -- chat, there we are, but that was only to Daniel.  Can you all see that in the chat?

MR. CRISALLI:  We can, thank you.

MR. THERIOT:  You're welcome.

(Exhibit 2 was remotely introduced and provided electronically to the reporter.)

Q.     (By Mr. Theriot) Do you want me to repeat

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

33

the question, Ms. Tocco?

A.    I actually can't open it.  When I click on it, I get a series of windows.

Q.    Well, that's weird.  You get a series of windows instead of a document?

A.    I do.  I get a "save as" option.

Q.    Let me try it one more time.

So you can see the definitions PDF, but when you click on it, it doesn't load?

A.    Correct.

Q.    What if I were to email that to you? That I know how to do.  Do you have access to a computer?

A.    I do.

MR. THERIOT:  So I'm going to send it to you, Paul, and to Jeff.

Q.    (By Mr. Theriot) What's the best email for you, Ms. Tocco?

A.    It's Kim, K-I-M, dot, Tocco, T-O-C-C-O, at OIC.wa.gov.

Q.    Kim.tocco@oic.wa.gov?

A.    Yes.

MR. THERIOT:  Ms. DeLeon, would you like me to send it to you as well?

MS. DeLEON:  That would be great.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

34

(There was a brief discussion off the record.)

Q.    (By Mr. Theriot) So as used in SB 6219, "health plan" is defined by 48.43.005, subsection (31), correct?

MR. CRISALLI:  Object to calling for a legal conclusion.

THE DEPONENT:  I would have to see the text of 6219.

Q.    (By Mr. Theriot) Okay, I can show you that.

MR. THERIOT:  So let's call this Exhibit 2, by the way.

MR. CRISALLI:  I think it would be 3 because Exhibit 1 is the notice.

MR. THERIOT:  What was Exhibit 2?

MR. CRISALLI:  Exhibit 2 is the definitions you just put up, and Exhibit 3 will be 6219.

MR. THERIOT:  Oh, I'm sorry, I was referring to the definitions.  I should have been more clear.

MR. CRISALLI:  No problem.

MR. THERIOT:  So we're going to make Exhibit 2 the definitions.  I just want to make sure I

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(142 of 232)

35

got my records correct here, so whether we come back later, we know what we're talking about.

(Exhibit 3 was remotely introduced and provided electronically to the reporter.)

**Q.   (By Mr. Theriot) I'll stop sharing that and get you 6219, which will be Exhibit 3.  I'm just going to send it to you.**

**Did you get that email, Kim, that I sent you, or did you just pull it up?**

A.    My Outlook is spinning right now.  I will tell you when it loads.

**Q.    So you must have just pulled it off the chat, then.  No?**

A.    I have pulled the definitions off the chat, and my Outlook is not opening at the moment.

**Q.    I sent it to the wrong address.  I'll put in the chat again, or I'll try.**

**Can you see that in the chat?**

A.    Yes, I can.

**Q.    And I'm going to share my screen with you too, so you can see that.**

A.    Okay.

**Q.    So I'm referring, in SB 6219, which we're going to call Exhibit 3, to New Section, Section 2.  It says, A new section is added to chapter 48.43 RCW and**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

36

reads as follows:  A health plan issued or renewed on or after January 1, 2019.

And the question is:  Is that term defined by 48.43.005, 31?

MR. CRISALLI:  Objection.  Calls for a legal conclusion.  The law speaks for itself.

THE DEPONENT:  So, yes, that definition would be in 48.43.005.

Q.     (By Mr. Theriot) Okay.  Subsection (31)?

A.     Correct.

Q.     All right.

MR. CRISALLI:  The same objection.

Q.     (By Mr. Theriot) So I will give you a moment to look at the subsections under 31, but subsection (31) says, "'Health plan' or 'health benefit plan' means any policy, contract, or agreement offered by a health carrier to provide, arrange, reimburse, or pay for health care services except the following."

So I'd like to spend some time talking about those exceptions.  Would you like a moment to review those?  There are multiple ones.

A.     Yes.

Q.     Okay.

A.     Okay.

Q.     Is there an overarching reason that

Electronically signed by Jana Mackelprang (001-409-517-3774)                                          fe265592-9478-4d73-bcd5-ebcc840c6c96

(144 of 232)

37

you're aware of that these plans are excluded from the definition of "health plan" or "health benefit plan"?

MR. CRISALLI:  Objection.  Beyond the scope and asks for a legal conclusion.

THE DEPONENT:  I don't know why the legislature would except those, would list those out as the exceptions.

Q.    (By Mr. Theriot) Do these plans cover health care?

MR. CRISALLI:  Object to form.  The same objection as before.

Q.    (By Mr. Theriot) Do the plans in subsection (31), listed as exceptions, do those cover health care?

MR. CRISALLI:  Calls for a legal conclusion.  Object to form.

And beyond the scope.  Sorry.

THE DEPONENT:  I think it may depend on which subsection, which of the sub letters you're looking at.

Q.    (By Mr. Theriot) Okay.  Why don't we just go through them, and then I can ask my questions about each.  That will probably be the easiest way.

In Exhibit 2, which is RCW 48.43.005, subsection (31)(a) refers to "Long-term care insurance

**ER-189**

Electronically signed by Jana Mackelprang (001-409-517-3774)          fe265592-9478-4d73-bcd5-ebcc840c6c96

38

governed by chapter 48.84 or 48.83 RCW."

What kinds of -- what kinds of things do these plans cover?

MR. CRISALLI: Object to form. Calls for a legal conclusion. Also beyond the scope.

THE DEPONENT: I don't know.

Q. (By Mr. Theriot) You don't know. Do you know if long-term care insurance governed by chapter 48.84 could cover maternity?

MR. CRISALLI: Object to form. Calls for a legal conclusion. Beyond the scope.

THE DEPONENT: I don't know.

Q. (By Mr. Theriot) Who would know?

MR. CRISALLI: Object. Beyond the scope.

THE DEPONENT: Are you asking who would know if a long-term care insurance, under those chapters, could -- would be permitted to provide maternity coverage?

Q. (By Mr. Theriot) Yes.

MR. CRISALLI: Object to form. Beyond the scope and speculation.

THE DEPONENT: I'm not familiar with chapter 48.84 or 48.83. Those are outside of the insurance code.

Q. (By Mr. Theriot) So maybe a different

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

**question is:  Does the Office of the Insurance**

**Commissioner, does it oversee long-term care insurance**

**governed by chapter 48.84 or 48.83?**

         A.      I would have to look at those chapters.

               MR. CRISALLI:  The same objection.

         **Q.      (By Mr. Theriot) Okay.  We can come back**

**to that one.  Let's go down through the rest of them**

**and see if you know about any of the rest of them.**

               **Let's go to subsection (b) of Exhibit 2,**

**subsection (31)(b), "Medicare health supplemental**

**insurance governed by chapter 48.66 RCW."**

               **Are you familiar with what those types of**

**plans cover?**

               MR. CRISALLI:  Object to form.  Calls for

a legal conclusion.  Beyond the scope.

               THE DEPONENT:  No, neither me nor my team

review Medicare supplements.

         **Q.      (By Mr. Theriot) Do you know whether**

**those are covered by -- are governed by or regulated**

**by -- strike that.  Let me start over.**

               **Do you know whether the Medicare**

**supplemental insurance governed by chapter 48.66 is**

**governed by the Office of the Insurance Commissioner?**

               MR. CRISALLI:  It calls for a legal

conclusion.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

40

THE DEPONENT: I don't know with certainty.

Q. (By Mr. Theriot) It may; is that what you're saying?

MR. CRISALLI: It's your testimony and legal conclusion. Sorry.

Q. (By Mr. Theriot) Might it be regulated by the Office of the Insurance Commissioner?

MR. CRISALLI: The same objection.

THE DEPONENT: Medicare is a federal program. Some aspects of those products may be regulated by the OIC, but I don't know for sure.

Q. (By Mr. Theriot) It looks like subsection (b) refers to supplemental Medicare insurance. So are you familiar with whether the Office of the Insurance Commissioner regulates supplemental Medicare health insurance?

MR. CRISALLI: The same objection.

THE DEPONENT: My answer is the same. The OIC may regulate some aspects, but I don't know which for sure.

Q. (By Mr. Theriot) Okay. And who would know whether the Office of the Insurance Commissioner regulates Medicare supplemental health insurance?

MR. CRISALLI: Object to form.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(148 of 232)

41

THE DEPONENT:  I don't know without seeing the 48.66.  I don't know what the statute states.

Q.      (By Mr. Theriot) Okay.

A.      Or that chapter.

Q.      All right.  Let's go to subsection (c) of Exhibit 2, (31)(c).  "Coverage supplemental to the coverage provided under chapter 55, Title 10," of the United States Code.

Are you familiar with what those plans cover?

A.      Again, not without looking up chapter 55, title 10, of the US Code.

Q.      All right.  Let's go to subsection 31(d) of Exhibit 2, "Limited health care services offered by limited health care service contractors in accordance with RCW 48.44.035."

Are you familiar with those plans?

A.      Very generally.

Q.      What do those types of plans cover?

MR. CRISALLI:  Objection.  Calls for a legal conclusion.  Speculation.

THE DEPONENT:  I believe it varies depending on the product that's offered.

Q.      (By Mr. Theriot) Is there -- may the

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

plans referred to in subsection (d), 31(d), of Exhibit 2, could those cover contraception?

MR. CRISALLI: Objection. Calls for a legal conclusion. Speculation.

THE DEPONENT: I don't know.

Q. (By Mr. Theriot) Could the plans governed by -- or, excuse me, could the plans, "limited health care services offered by limited health care service contractors in accordance with RCW 48.44.035," could those cover abortion?

MR. CRISALLI: Objection. Calls for a legal conclusion. Speculation.

THE DEPONENT: Again, I don't know without looking at those titles and section.

Q. (By Mr. Theriot) Are you aware of anything that would prohibit that plan listed in subsection (31)(d) of Exhibit 2 from covering contraception or abortion?

MR. CRISALLI: Object to form. Beyond the scope and a legal conclusion.

THE DEPONENT: I don't know without further research.

Q. (By Mr. Theriot) So I'm referring now to subsection (31)(d) of Exhibit 2, "disability income."

Do you know if there is any specific

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

Case 3:19-cv-06518-BHS Document 62-11 Filed 03/09/23 Page 34 of 233

30(b)(6) Deposition of Kim Tocco

43

statute that governs these types of plans.

MR. CRISALLI: Object to form. Beyond the scope.

THE DEPONENT: Yes, I do know.

Q. (By Mr. Theriot) Okay. And which statute is that?

A. Again, I would have to look in my statute book for disability income beyond title 48.

Q. Is it governed by title 48.20?

MR. CRISALLI: Object to form. Calls for a legal conclusion.

THE DEPONENT: I would need to look at 48.20. I would look at the text of 48.20 to see what it refers to.

Q. (By Mr. Theriot) Let's look -- we'll move down to "coverage incidental to a property" in (31)(f), subsection (31)(f) of Exhibit 2. "Coverage incidental to a property/casualty liability insurance policy such as automobile personal injury protection coverage and homeowner guest medical."

Are you familiar with the types of things that those plans cover?

MR. CRISALLI: Object to form.

THE DEPONENT: Generally, yes.

Q. (By Mr. Theriot) Could those plans cover

Calderwood-Mackelprang, Inc. 303.477.3500

**ER-195**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

health insurance?

MR. CRISALLI:  Object to form.  Vague.

THE DEPONENT:  Are you asking whether a property insurance policy can cover a health insurance policy?

Q.      (By Mr. Theriot) No.  That was a poor question.

Could the policy listed in subsection (31)(f) of Exhibit 2 cover health needs --

MR. CRISALLI:  Object to form.  Vague.

Q.      (By Mr. Theriot) -- services?

MR. CRISALLI:  The same objection.  Calls for a legal conclusion.

THE DEPONENT:  I don't know for sure.  My unit doesn't review those products.

Q.      (By Mr. Theriot) Who would know the answer to that question?

MR. CRISALLI:  Object to form.  Beyond the scope.

THE DEPONENT:  I would have to find out who our subject matter expert would be with regard to property and casualty insurance, P&C.

Q.      (By Mr. Theriot) Are you aware of any laws or regulations that would prohibit the coverage listed in Exhibit 2, subsection (31)(f)), from covering

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(152 of 232)
Case 3:19-cv-05181-BHS Document 281-1, Filed 03/09/23, Page 46 of 232

45

abortion --

MR. CRISALLI: Objection.

Q. (By Mr. Theriot) -- or contraception?

MR. CRISALLI: My apologies.

Calls for a legal conclusion. Beyond the scope.

THE DEPONENT: I am not familiar with the regulations that apply to those types of policies.

Q. (By Mr. Theriot) All right. Let's move to subsection (g), 31(g) of Exhibit 2, "Workers' compensation coverage." Are you familiar with the coverage that those policies -- excuse me, strike that.

Are you familiar with the coverage in those policies listed that could be called workers' compensation coverage?

MR. CRISALLI: Objection. Vague. Beyond the scope. Legal conclusion.

THE DEPONENT: Generally I know what workers' compensation coverage is.

Q. (By Mr. Theriot) What do those plans usually cover?

MR. CRISALLI: Object to form. Calls for a legal conclusion. Misstates Washington law.

THE DEPONENT: I understand they're designed to compensate for workplace injuries.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

Q.    (By Mr. Theriot) Do you know what statutes govern workers' compensation coverage?

MR. CRISALLI:  Object to form.  Beyond the scope.  Calls for a legal conclusion.

THE DEPONENT:  I do not without looking at the statutes.

Q.    (By Mr. Theriot) Is there any Washington law or regulation that would prohibit workers' compensation coverage from including coverage for abortion or contraception?

MR. CRISALLI:  Objection.  Beyond the scope.  Calls for a legal conclusion.  Vague.

THE DEPONENT:  I don't know.

Q.    (By Mr. Theriot) Who would know the answer to that question?

MR. CRISALLI:  Objection.  Beyond the scope.  Calls for a legal conclusion.

THE DEPONENT:  Can you repeat the question?

Q.    (By Mr. Theriot) Yes.  Who would know the answer -- who would know whether workers' compensation coverage could cover abortion or contraception?

MR. CRISALLI:  The same objections.

THE DEPONENT:  I believe that would be the authority that regulates workers comp in

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

Washington.

Q.      (By Mr. Theriot) What authority is that?

MR. CRISALLI:  Objection.  Beyond the scope.  Calls for a legal conclusion.

THE DEPONENT:  I believe that's the Department of Labor, L&I.

Q.      (By Mr. Theriot) What was the last thing you said?  The Department of Labor -- what?

A.      Oh, it's the labor and industries, L&I.

Q.      Referring again to Exhibit 2, subsection (31)(h), "accident only coverage," what types of -- what does "accident only coverage" cover?

MR. CRISALLI:  Objection.  Calls for a legal conclusion.  Beyond the scope.

THE DEPONENT:  I don't know without further research.

Q.      (By Mr. Theriot) Are you aware of any Washington law or regulation that would prohibit accident only coverage from covering abortion and maternity -- I'm sorry, I'm sorry, from covering contraception or abortion?

MR. CRISALLI:  Objection.  Beyond the scope.  Calls for a legal conclusion.

THE DEPONENT:  I'm not familiar with any legal requirements in general related to that type of

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

coverage.

Q.     (By Mr. Theriot) All right.  Let me ask this a different way, instead of going through this. Are there any of the plans listed in 48.43.005, 31, subsection (31), that may cover maternity?

MR. CRISALLI:  Objection.  Calls for speculation and a legal conclusion.  Also beyond the scope.

THE DEPONENT:  I don't know.

Q.     (By Mr. Theriot) Who would know the answer to that question?

MR. CRISALLI:  The same objection.

THE DEPONENT:  I would see that as eight different questions.  So I would say depending on the regulatory authority for each of those types of products.

Q.     (By Mr. Theriot) Okay.  Does the Office of the Insurance Commissioner regulate any of the products listed in 48.43.005, subsection (31)?

MR. CRISALLI:  Objection.  Calls for a legal conclusion.

THE DEPONENT:  Does the OIC regulate anything from A through ...

Q.     (By Mr. Theriot) A through N of subsection (31).

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

49

A.    Yes.

Q.    **Which ones does it regulate?**

MR. CRISALLI:  Calls for a legal conclusion.

THE DEPONENT:  I'm looking through them now.

Q.    **(By Mr. Theriot) Okay.**

A.    The OIC might regulate some aspects of B.

Q.    **Did you say B, as in bravo?**

A.    I did.

C, I don't know unless I were to look up that section of the federal code.

D would be the Office of the Insurance Commissioner.

Q.    **I'm sorry, did you say D --**

A.    D, as in David, yes.

Q.    **David.  So B and D.**

A.    E, as in elephant, would be under the OIC's authority.

Q.    **Disability income?**

A.    Yes.  F.

Q.    **F, as in "coverage incidental to a property/casualty liability insurance policy"?**

A.    Correct.

Q.    **Okay.**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(157 of 232)

30(b)(6) Deposition of Kim Tocco

50

A.    H, accident only.

Q.    **Okay.**

A.    I, specified disease.

K, dental only and vision only.

L.

Q.    **Okay.  And possibly some aspects of N, as in Nancy.**

**What aspects of N, as in Nancy, might the Office of the Insurance Commissioner regulate?**

A.    I would need to look up the cite in CFR, but, in general, we may do some review of what's considered a wrap plan.  It's prescription drug coverage that wraps around a Medicare part D policy.

MR. CRISALLI:  If I could interject. I've let you go quite a bit on the subject of these exemptions, but this is an argument that the District Court has rejected from Cedar Park and the Ninth Circuit did not touch that aspect of its ruling.

So I've given you some leeway on this and tried to prepare someone to testify to this, but our position is this is irrelevant, and going too much further is improper considering the District Court and Ninth Circuit's rulings.

MR. THERIOT:  Well, I disagree with you because it goes to our free exercise, what exceptions.

Calderwood-Mackelprang, Inc.  303.477.3500

**ER-202**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                fe265592-9478-4d73-bcd5-ebcc840c6c96

And we still have a valid, free exercise agreement, and that's clear.

So I can ask about this. And not only that, but I'm going to, unless you have somebody prepared to testify as to what we've asked about in the 30(b)(6) notice, then we're going to have to do this again.

MR. CRISALLI: We have additional witnesses that may touch on some of this, but I'm just saying, this argument has been rejected -- this aspect of this argument has been rejected by the District Court, and the Ninth Court did not change. We have the ruling from the District Court that focuses on the free exercise claim that resulted from that.

I've given a little bit of leeway because I understand where your argument is on this, but I think, you know, wasting all this time on other agencies that are not parties to this case, that's why I've been objecting as beyond the scope and why I think it's inappropriate, in addition to being that I think this argument has already been rejected.

MR. THERIOT: When you say "other agencies," Ms. Tocco just listed 10 of these plans that are regulated by the Office of the Insurance Commissioner. So what do you mean by "other agencies"?

Electronically signed by Jana Mackelprang (001-409-517-3774)                     fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

52

MR. CRISALLI: Well, you went at length about labor and industries. There's some aspects of this to the extent --

MR. THERIOT: All right.

MR. CRISALLI: -- as well as others.

MR. THERIOT: But not all of them, but some of them.

MR. CRISALLI: Not all of them, but I still disagree with the parts that are some of them because it's not based on any kind of religion basis, which is the ruling of the Ninth Circuit and the District Court.

I mean, I understand it's your deposition. I'm not trying to -- I just want to say I'm voicing my objection. If it goes too far, I'm going to make an issue of it later.

MR. THERIOT: Okay. I think I'm entitled to the answers to these questions. I understand that Ms. Tocco may not know the answer to those questions, although, you did indicate that she would be able to answer the questions on the topic of 6, and this is clearly within that topic.

So if we can't get answers to them, then, as I said, by Ms. Tocco or someone else, then we'll have to find somebody who will give us answers to them,

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

53

and we can talk about that off the record.

MR. CRISALLI: Okay.

**Q. (By Mr. Theriot) So we've got about 30 minutes before lunchtime, but I think -- if I can just ask some general questions to make sure I understand your testimony, Ms. Tocco, about Exhibit 2, subsection (31), and the subsections within that.**

**And it's my understanding that with regard to those types of policies listed in there, you're not familiar with each of those -- I'm sorry, let me say this: Is it true that you don't know whether any of those listed in Exhibit 2, subsection (31), cover maternity?**

MR. CRISALLI: Objection. Beyond the scope, calls for speculation, and a legal conclusion.

THE DEPONENT: I can only speak to the ones that I and my team have oversight for, that we'd actually review.

**Q. (By Mr. Theriot) So which ones do you and your team have oversight for?**

A. Certainly health plans, which is everything but what's in here.

**Q. Okay.**

A. So these are the exceptions to what I do review. The one caveat is my team reviews dental only

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

54

and vision only coverage as well.  I oversee health plan and I oversee dental-only and vision-only reviews.

Q.    So dental only and vision only is subsection (k); is that right?

A.    Correct.

Q.    And let me then ask some specific questions about that.

All right.  What do dental only and vision only -- yeah, dental-only and vision-only coverage, what types of things do those plans usually cover?

MR. CRISALLI:  Objection.  Calls for a legal conclusion.  Beyond the scope.

THE DEPONENT:  Dental only is going to provide coverage for things like basic dental exams, cleaning, fillings, crowns, possibly TMJ.

Vision only is going to cover basic vision services, exams, hardware, contacts.

Q.    (By Mr. Theriot) Could any of the dental only or vision only plans cover maternity?

MR. CRISALLI:  Objection.  Calls for a legal conclusion.  Are you arguing that vision plans should include maternity care services?

MR. THERIOT:  I'm not arguing.  I'm asking Ms. Tocco, could they?

Electronically signed by Jana Mackelprang (001-409-517-3774)                                          fe265592-9478-4d73-bcd5-ebcc840c6c96

55

MR. CRISALLI: The same objections.

THE DEPONENT: Could a dental only carrier offer maternity care in addition to dental services?

Q. (By Mr. Theriot) Yes. I'm sorry. Could a dental-only carrier include maternity care in one of its policies?

MR. CRISALLI: Objection. Calls for a legal conclusion. Outside the scope.

THE DEPONENT: We ...

MR. CRISALLI: And vague.

THE DEPONENT: I don't know that we could accept a filing for review that was a dental/maternity plan. We would probably require that to be filed differently or rejected.

Q. (By Mr. Theriot) Could a vision-only plan that's governed by (31), subsection (k), include coverage for maternity?

MR. CRISALLI: The same objection.

THE DEPONENT: The same answer.

Q. (By Mr. Theriot) Okay.

A. I would say I don't believe the providers that would be required to access -- they would have to be licensed to practice within the scope of their license. So that would likely be outside the scope of

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

56

the Division currently.

Q.      Could a dental-only plan cover contraception?

MR. CRISALLI:  The same objections.

THE DEPONENT:  My answer would be the same.

Q.      (By Mr. Theriot) Could a vision-only plan cover contraception?

MR. CRISALLI:  The same objection.

THE DEPONENT:  The same answer.

Q.      (By Mr. Theriot) And the same answer is ...

A.      I don't know what a product would look like that was a bundle of vision and maternity.  It would not only have to meet form requirements, but it would have to meet network and rating requirements.  So I'm not sure that's even a reviewable product within Washington.  But a vision/maternity plan, I've never heard of those.

Q.      Are there any rules or regulations that would prohibit dental only and vision only coverage from covering maternity?

MR. CRISALLI:  Objection.  Calls for a legal conclusion.  Vague.

THE DEPONENT:  Well, for --

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

57

MR. CRISALLI: And I think misstates the testimony.

MR. THERIOT: I didn't state the testimony. I'm just asking --

MR. CRISALLI: Well, the testimony is that it's vision only. So how can it have anything aside from vision?

MR. THERIOT: That's not the question.

**Q. (By Mr. Theriot) The question is: Are there any rules that prohibit dental only and vision only plans from covering maternity?**

MR. CRISALLI: The same objection.

THE DEPONENT: I don't know how such a product would even be able to be submitted to us because it's submitted based on a type of insurance.

**Q. (By Mr. Theriot) I understand that. That's not the question. The question is: Are there any rules that prohibit a product from being submitted and covering -- the dental only and vision only from covering maternity?**

MR. CRISALLI: Asked and answered. The same objections.

MR. THERIOT: And I'm going to object to you coaching the witness. She's basically taking what you just said and using it in her answer.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

MR. CRISALLI: Counsel, I've said objection to form, beyond the scope, legal conclusion. I've said the same objection.

MR. THERIOT: Yes, but before you said the objection was -- I can't even think -- it misstates the testimony and I can't think of a plan that would allow that. And again that's what she basically said. So I object to your coaching the witness.

**Q.** **(By Mr. Theriot) Now, I'm going to ask one more time: Are there any rules or regulations that prohibit dental only or vision only coverage from including maternity?**

MR. CRISALLI: Objection. Asked and answered. The same objection as before.

THE DEPONENT: We have -- we have general filing instructions that all carriers must follow, and they are requirements for how forms and rates and network filings can be submitted for our review. So based on those filing instructions, which are grounded in our administrative code and/or statutes, that type of product wouldn't be able to get in the door for our review because it wouldn't meet the basic filing requirements to even get to a team for review.

**Q.** **(By Mr. Theriot) Okay. All right. Are there any other products or types of plans listed in**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

subsection (31) of Exhibit 2 that your office has --
that your office has authority over?  Is that the right
word.  I'm going to object to my own question.

MR. CRISALLI:  Object to form.

THE DEPONENT:  So I think I've
distinguished between which ones the Agency has
authority for and then which types I oversee.

Q.     (By Mr. Theriot) Right.

A.     So can you repeat your question, then?

Q.     Yes.  Are there any other plans listed in
subsection (31) of Exhibit 2 that your department has
authority over?

A.     My department has authority for health
plans, and the only exception is dental only and vision
only.

Q.     Okay.

A.     "My department" as in my health forms
unit.

Q.     Okay.  And then as far as the other types
of plans listed in subsection (31), you wouldn't know
anything about what they cover except by what's listed
in the statutes that's referenced in some of them; is
that right?

MR. CRISALLI:  Objection.  Misstates the
testimony, beyond the scope, and calls for a legal

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

Case 3:19-cv-05181-BHS Document 305-1, Filed 03/09/23, Page 61 of 233

30(b)(6) Deposition of Kim Tocco

60

conclusion.

THE DEPONENT: I wouldn't know in my capacity as a representative of the OIC, no.

Q. (By Mr. Theriot) Would you know in some other capacity?

A. I'm familiar with --

MR. CRISALLI: Objection. Beyond the scope.

MR. THERIOT: Do you want to state your objection more fully?

MR. CRISALLI: Yeah, beyond the scope.

Q. (By Mr. Theriot) Go ahead.

A. I would be generally familiar with, for example, an auto insurance policy, but that's by the nature of being a policyholder.

Q. If we go another 15 minutes, that would probably be better than taking a break now.

A. Sure.

Q. When your department reviews a plan and responds to it with a general objection, can you describe for me what that is? What's a general objection?

A. Well, in our process, we have -- we use what we call an analyst's checklist. And it's a compliance tool that analyzes all the requirements that

Electronically signed by Jana Mackelprang (001-409-517-3774)          fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

61

a given plan that's submitted to us has to meet.  So an objection from us would mean, in our review of that filing, there is -- there is an item that's deficient.  So that's going to be a citation to RCWs or RACs.  That's our objection process.

**Q.    Okay.  As far as the OIC is aware, have all health plans currently approved in Washington complied with SB 6219?**

MR. CRISALLI:  Objection.  Calls for a legal conclusion.

We'll see if this is the witness.  We have a compliance person.  If she can answer it, that's fine by me.  I don't mean to stop the answer, but, also, since she's not on the compliance side, I just want to draw that distinction.

MR. THERIOT:  I understand.  It was a little unclear whether she could answer that question.

**Q.    (By Mr. Theriot) If you can, go ahead and answer it.**

A.    Could you repeat that question?

**Q.    As far as the Office of the Insurance Commissioner is aware, have all health plans approved in Washington complied with the requirements set forth in SB 6219?**

MR. CRISALLI:  Objection.  Calls for a

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

62

legal conclusion.

You may answer if you know.

THE DEPONENT: Sure. I think there's two aspects to the process. Myself and my team, we review these filings typically prior to being sold, at least in the individual and small group market. So what occurs during the administration of a plan, after it's purchased, after a consumer is actively using their plan, that wouldn't come to my team.

**Q. (By Mr. Theriot) And just to make sure I understand your answer, does your team -- does your team review large group policies or just small group policies?**

A. Individual, small group, and large group.

**Q. So, as I understand it, what you're saying is you're not aware of any plan that's currently approved that doesn't comply with SB 6219?**

A. That's correct.

**Q. Are you aware of the -- do you know the consequences of noncompliance, or is that a different witness?**

A. Sorry, can you repeat that? I just didn't hear the end.

**Q. Do you know the consequences of noncompliance with SB 6219?**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                fe265592-9478-4d73-bcd5-ebcc840c6c96

63

MR. CRISALLI:  I object to the extent it's beyond the scope of this witness.

MR. THERIOT:  Of this witness.  Okay.

MR. CRISALLI:  If she knows, I don't want to step on her, if she has an answer for you.  We do have compliance -- although I'm not sure that's identified as one of your topics.  We have prepared for 14, which I think you're trying to get at the consequences; but it's also a legal conclusion.

I don't believe I saw one that addressed what is a consequence of the failure to comply with 6219 or any --

MR. THERIOT:  Well, I think that falls within Washington's knowledge of insurance compliance requirements.  But we can bicker about that later.

Q.     (By Mr. Theriot) The question is:  Do you know?

A.     And can you repeat the question.

Q.     Do you know the consequences of noncompliance with SB 6219?

MR. CRISALLI:  And calls for a legal conclusion as well as speculation.

THE DEPONENT:  Generally, yes, I do.

Q.     (By Mr. Theriot) Okay.  What are those consequences?

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

64

A.    In my position, it would depend on when we see that noncompliance.  For example, if we identify a deficiency in the form based on noncompliance, we would address that in the objection process.  So that would be the consequence while it's under our review.

Q.    Okay.  So one of the consequences would be that the plan just wouldn't get approved?

A.    Ultimately, yes.  We typically work through several rounds of objections to get to approval; but if a carrier refuses to comply, we would not be able to approve the plan.

Q.    I see.  So your team would not be involved in assessing fines or taking any other action besides not approving the plan?

A.    Correct.  Noncompliance after it is in the market would be within our enforcement division.

Q.    What contraception is required by SB 6219?

MR. CRISALLI:  Objection.  Calls for a legal conclusion and beyond the scope.

THE DEPONENT:  Is that with -- am I able to reference the statute?

Q.    (By Mr. Theriot) Yes.

A.    Okay.  So 6219, you're asking?

Q.    Yes.  So what drugs are required by

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

65

**SB 6219?**

MR. CRISALLI:  The same objection.

THE DEPONENT:  I don't have knowledge of specific drug names.

**Q.      (By Mr. Theriot) Okay.**

A.      If that's your question.

**Q.      Yes, that was my question.**

**Do you have general knowledge that all FDA approved contraception is required by SB 6219?**

A.      Yes.

MR. CRISALLI:  I'm going to object as beyond the scope with respect to this witness.

**Q.      (By Mr. Theriot) Did you say yes?**

A.      I said yes.

**Q.      Okay.  All right.**

MR. THERIOT:  I know this isn't a great place to take a break, but it makes sense because I'd be switching topics.  Let me just double-check here.

Yeah, I think it would be better just to wait and then come back on the next one.

(The luncheon recess was taken from 11:52 p.m. to 12:34 p.m. PST.)

MR. THERIOT:  We're back on the record.

**Q.      (By Mr. Theriot) Ms. Tocco, you understand you're still under oath?**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

A.     Yes, I do.

Q.     All right.  I put in the chat -- well, actually, before we get there -- yeah, so we're going to mark as -- I believe we are on Exhibit 4.

MR. THERIOT:  Is that right, Jana?

THE REPORTER:  Yes.

(Exhibit 4 was remotely introduced and provided electronically to the reporter.)

Q.     (By Mr. Theriot) This is Statute RCW 48.43.065, and I put that in the chat.  And would you -- do you want me to share my screen too, Ms. Tocco, or do you care?

A.     I don't mind looking at it on my screen, if it's clear what you're looking at.

Q.     Okay, let's just do that, because actually when I share my screen, everybody gets smaller, and so it's easier for me if we don't do that.

I am looking at what's been marked as Exhibit Number 4, RCWA 48.43.065.  Do you see that, Ms. Tocco?

A.     Yes, I do.

Q.     In subsection (2)(a) of that statute, it says, "No individual health care provider."  It begins with.

A.     Uh-huh.

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

Q.    Are you -- is "health care provider" defined by what we've previously marked as Exhibit 2, RCW 48.43.005?  And I can direct you specifically to subsection (27).

MR. CRISALLI:  Objection to the extent it calls for a legal conclusion.

THE DEPONENT:  What is the question?

Q.    (By Mr. Theriot) The question is:  For purposes of Exhibit 4, 48.43.065, is the definition for "health care provider," as it's used in that statute, found in 48.43.005, subsection (27)?

MR. CRISALLI:  Objection.  Legal conclusion.

THE DEPONENT:  Oh, sorry.

MR. CRISALLI:  And I think misstates -- I think you're focusing on subsection (28).

MR. THERIOT:  I'm sorry about that, if I misstated it.

THE DEPONENT:  I have health care provider at sub (28).

Q.    (By Mr. Theriot) Yes.  And I meant to ask you about health care facility.  So if I misstated the question, then let's go with health care provider.

So is health care provider, as that's used in 48.43.065, is that defined in subsection (28)

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

of Exhibit 2?

MR. CRISALLI:  The same objection to a legal conclusion.

THE DEPONENT:  Yes, it is.

Q.     (By Mr. Theriot) And if you look at, again, at Exhibit 4, it uses the term "health care facility."  Is that term defined in 48.43.005, subsection (27)?

MR. CRISALLI:  The same --

THE DEPONENT:  Yes, it is.

MR. CRISALLI:  -- objection.

THE DEPONENT:  Oh, sorry.  Yes, it is.

Q.     (By Mr. Theriot) It's a lot easier to do this when you're live.  The objection seems to work better.  But this is much more convenient.

So looking at that, is it your understanding that "health care facility," as that term is used in 48.43.065, includes religious hospitals?

MR. CRISALLI:  The same objection.

THE DEPONENT:  My understanding is that the hospital license is not -- does not specify secular versus religious.

Q.     (By Mr. Theriot) Okay.

A.     So a health care facility would be a hospital.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(176 of 232)

30(b)(6) Deposition of Kim Tocco

69

Q.    Okay.  So it would include hospitals?

A.    It would include a hospital, yes.

Q.    And health care provider, does that include a sole practitioner?

MR. CRISALLI:  The same objection.

I usually hate to do standing objections, but as we're asking what the statutes say, can I have a standing objection that that's asking for a legal conclusion?

MR. THERIOT:  Yes.

MR. CRISALLI:  I'll pipe in when it changes subjects, but I didn't want to interrupt your flow.

MR. THERIOT:  Okay.

THE DEPONENT:  Can you repeat that question, please?

Q.    (By Mr. Theriot) Yes.  The definition for -- health care provider, as that term is used in Exhibit 4, 48.43.065, does that include a sole practitioner?

MR. CRISALLI:  Vague.

THE DEPONENT:  I don't believe "sole practitioner" is a category of license under Title 18.

Q.    (By Mr. Theriot) All right.  What would it include?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

MR. CRISALLI: Objection. Vague.

Q. (By Mr. Theriot) What does "health care provider" mean, as that term is used in 065 and as it's defined in 005?

A. It's going to be any person regulated under Title 18 or under that other chapter of 70.127. So those are going to be all your licensed persons under the Department of Health's licensing section.

Q. Okay. So that would include medical doctors?

A. It would.

Q. And it would include their employees?

MR. CRISALLI: Objection. Beyond the scope and vague.

THE DEPONENT: It would include employees or agents by statute, by 28(b).

Q. (By Mr. Theriot) All right. Let's look at Exhibit 4, 48.43.065. Just so -- I want to make sure we're not wasting our time here -- so are you, in your duties in the Office of the Insurance Commissioner, are you responsible for understanding what this statute means and how it applies in particular situations?

A. Yes, this is one that we would apply.

Q. Okay. So I'm looking at

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

subsection (2)(a) of Exhibit 4.  And it applies to -- well, let me just ask you:  How does that part of the statute work with regard to health care providers and health care facilities?  I want to talk about carriers first.

MR. CRISALLI:  Object to form.  Vague.

THE DEPONENT:  The OIC does not regulate individual providers or the individual facilities.  So I wouldn't be applying it in the context of a provider or a facility.

Q.     (By Mr. Theriot) Okay.  So if a -- but you would apply it in the context of a health insurance policy purchased by an individual health care provider or a health care facility?

MR. CRISALLI:  Object to form.

THE DEPONENT:  No, that is not my understanding.

Q.     (By Mr. Theriot) Okay.  So in what context do you apply 48.43.065?

A.     We would apply it, my unit would apply it as it relates to a religiously sponsored health carrier that is submitting health forms for our approval.

Q.     Okay.  So do you have any knowledge about how subsection (2)(a) applies to health care providers and health care facilities?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

MR. CRISALLI:  Object to form.  Beyond the scope.

THE DEPONENT:  Can you repeat the question?

Q.      (By Mr. Theriot) Do you have any knowledge about how subsection (2)(a) of 065 applies to health care providers and health care facilities?

MR. CRISALLI:  The same objection.

THE DEPONENT:  I do have knowledge.  I just wouldn't be applying it to those entities.

Q.      (By Mr. Theriot) Okay.  So what's your understanding of how subsection (2)(a) applies to health care providers and health care facilities?

MR. CRISALLI:  The same objection.

THE DEPONENT:  To my understanding, an individual health care provider would be an individual health care provider who has a conscience or a religious-based objection to providing a certain service in the patient setting, that they are not required by law to do that.

Q.      (By Mr. Theriot) So --

A.      And then --

Q.      Go ahead.  I interrupted you.

A.      And to the extent a carrier wants to contract with a particular provider to provide services

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

to their enrollees, if the provider objects to that inclusion, they can't be forced to contract.

Q. **They can't be forced to contract with the carrier?**

A. To contract as a participating provider in a network. It's in a network. It may be a carrier's network; it may be a different network.

Q. **I see. So if a carrier -- I'm sorry, an individual health care provider could still be part of a carrier's health care network even though they don't participate in abortion?**

MR. CRISALLI: Object to form. Vague.

THE DEPONENT: Sorry, can you repeat that?

Q. **(By Mr. Theriot) I'm just making sure I understand your testimony, that this provision protects a health care provider who is part of a network of carriers from being forced to provide abortion?**

MR. CRISALLI: Object to form.

THE DEPONENT: Correct. My understanding is they cannot be compelled to provide that given service to an enrollee if they object by reason of conscience.

Q. **(By Mr. Theriot) And that same thing would apply to contraception, right?**

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

MR. CRISALLI: The same objection.

THE DEPONENT: It applies -- it applies to any service, any specific service to which they may have an objection, a religious or conscience objection.

Q. **(By Mr. Theriot) So if you'll look in the middle of that subsection, it says that "to participate in the provision of or payment for a specific service."**

A. Okay.

Q. **So what does the "payment for" refer to?**

MR. CRISALLI: Object to form.

THE DEPONENT: Well, that -- payment for a specific service applies to the carrier who would not be required to pay for an objectionable service that the carrier objects to providing by reason of conscience.

Q. **(By Mr. Theriot) Is there anything in that provision that indicates that that payment is limited to carriers?**

MR. CRISALLI: Object to form. Possible legal conclusion.

THE DEPONENT: The text of that provision does not include a limitation.

Q. **(By Mr. Theriot) The text of the provision, it could apply to providers and health care providers, the protection of having to pay for a**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(182 of 232)

75

specific service, right?

MR. CRISALLI: The same objection.

THE DEPONENT: If an individual health care provider or a health care facility were payers, if they were paying for a given service, then that's correct, they could not be compelled to be. Typically, your individual provider or your facility are not the payers for care.

Q. (By Mr. Theriot) But an individual provider or a facility could pay for health care insurance, though, right?

MR. CRISALLI: Object to form. Vague. Calls for a legal conclusion.

THE DEPONENT: Are you asking if a health care facility would buy health care insurance?

Q. (By Mr. Theriot) I'm asking -- yes, let's start there. The health care facilities and health care providers could purchase insurance, correct?

MR. CRISALLI: The same objection.

THE DEPONENT: A given health care facility, in its context, if a health care facility were also in the capacity of an employer, then certainly any employer group could purchase insurance for its employees.

Q. (By Mr. Theriot) Right. And does -- and

Electronically signed by Jana Mackelprang (001-409-517-3774)          fe265592-9478-4d73-bcd5-ebcc840c6c96

(183 of 232)

76

this provision in subsection (2)(a) protects them from having to pay for abortion as part of that health care insurance?

MR. CRISALLI: Object to form.

Q. (By Mr. Theriot) Or any objectionable service?

MR. CRISALLI: Object to form. Calls for a legal conclusion.

THE DEPONENT: That is not how -- that's not how that is applied.

Q. (By Mr. Theriot) Okay. Is there anything other than the statute that you are referring to that says that's not how that's applied?

MR. CRISALLI: The same objection.

THE DEPONENT: There is -- no employer of any kind can be compelled to purchase a policy to which that -- again, "employer" is broader than "health care facility."

Q. (By Mr. Theriot) I understand that. What I'm driving at is, what I'm asking you is: This subsection (2)(a) doesn't apply to just any employer; it applies to health care providers and health care facilities as well as carriers, but we're just talking about health care providers and facilities right now. So it protects them specifically, correct?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(184 of 232)

77

MR. CRISALLI:  Object to form.  Calls for a legal conclusion.

THE DEPONENT:  I don't agree with that characterization.

**Q.      (By Mr. Theriot) Okay.  So what do you disagree with about that characterization?**

MR. CRISALLI:  The same objection.

THE DEPONENT:  So no individual health care provider or facility -- I'm leaving out the carrier for now -- could be required to provide a given service, whether that's rendering a certain service to a patient, whether that is allowing certain services to occur within their facility --

**Q.      (By Mr. Theriot) So it's your -- I'm sorry.**

A.      But this is not -- I guess I'm still not familiar with how a provider or a health care facility would be functioning as a payer.  And what I mean is paying for the provision of services.  You're providing the services, but you wouldn't be paying for them, if you were, let's say, an individual physician.

**Q.      But I believe you testified that they wouldn't pay for health insurance for their employees, correct?**

MR. CRISALLI:  Object to form.

Calderwood-Mackelprang, Inc.  303.477.3500
**ER-229**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(185 of 232)

78

THE DEPONENT:  Not in the capacity of a health care facility.  It would be in their capacity as a private employer.

Q.     (By Mr. Theriot) And do you have any authority for that distinction?  What are you basing that distinction on?

MR. CRISALLI:  The same objection.

THE DEPONENT:  I base that on the text of the provision.

Q.     (By Mr. Theriot) All right.  Let's talk about the carriers in subsection (2)(a).

A.     Okay.

Q.     So how does this provision protect carriers that have objections to certain health care services?

MR. CRISALLI:  Object to form.

THE DEPONENT:  A carrier that has an objection to covering, paying for, a particular service by reason of conscience or religion would not have to include those services as part of its package of benefits.

Q.     (By Mr. Theriot) So how do the provisions in subsection (b) work with regard to health care? They only apply to health care, right?  In subsection (b), (2)(b)?

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

A.    (2)(b) is specific to the health carrier, yes.

**Q.    And walk me through what the health carrier is required to do if they object to covering a certain service like abortion or contraception.**

MR. CRISALLI:  Object to form.

THE DEPONENT:  So provision -- well, with (2)(a) and (2)(b), basically a carrier -- a carrier is not required to provide or pay for those services.  At the same time, (b) states that an enrollee, someone who's purchased that coverage, cannot be denied access to whatever services the carrier has objected to.

So what the carrier would be required to do, if the carrier has an objection for reasons of conscience or religion, they are required to include certain information to the enrollees.

So just based on (b)(i), there has to be notice provided telling the enrollees -- and "enrollees" meaning these are people who have already purchased the plan -- there must be notice provided to the enrollees advising them of what services this carrier does not cover and therefore this plan does not provide by reason of conscience.

So that would be -- we, in our forms review, would be looking for that notice.

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

80

Q.     (By Mr. Theriot) Okay.  So subsection (2)(b)(iii) says, "Ensure that enrollees refused services under this section have prompt access to the information."

And does that mean they just have to send it to them?  How do you ensure that they have prompt access?

MR. CRISALLI:  The same objection.

THE DEPONENT:  First, I guess I would go back and just provide -- I would state the other requirement in (ii), which is -- so in addition to (i), where you've told the enrollees what the plan does not cover, you then also have to provide written information as to how that enrollee may still access those services.

Q.     (By Mr. Theriot) So when you're looking for that in there, in a plan, how does a carrier comply with that requirement in (ii)?

A.     In (ii), we're going to -- are we in (2)(b)(ii)?

Q.     Yeah, yeah.  So (2)(b)(ii), the one that reads "Provide written information describing how an enrollee may directly access services in an expeditious manner."

MR. THERIOT:  I'm sorry, I was a little

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(188 of 232)

fast on that, Jana.

THE DEPONENT: So compliance with specifically (ii), the "written information describing how an enrollee may directly access services," we are going to look for that language in the plan, in the plan language, in the forms that we're reviewing.

Q. (By Mr. Theriot) What's an example of some language that would meet that requirement?

MR. CRISALLI: Object to form.

THE DEPONENT: So I would -- again, typically, we're going to see the information required by (b)(i) and (b)(ii), little Is. We're going to see that together.

So an example could be -- again, this would just be -- typically in the plan booklet that the enrollee has, there would be a statement that -- again, this is just as an example -- but for reasons of conscience or religion, your carrier does not cover A, B, and C services. In order to access these services, you may do A, B, and C in order to receive them.

Q. (By Mr. Theriot) All right. And you may do A, B, and C in order to receive them. What would that be? What would satisfy that requirement?

A. We're going to be looking at it from an enrollee's perspective. So an enrollee who, let's say,

Electronically signed by Jana Mackelprang (001-409-517-3774)          fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

82

is seeking abortion services, they happen to have a plan sponsored by a religious carrier who doesn't provide that, we're going to be looking from the enrollee's standpoint, is, A, how would they know what's not covered?  So that's where we would look to the listing of services or the statement of what's not covered.

And then we're also going to be looking, again as an enrollee, how can I -- how can I access those?  So is that a -- I've seen some carriers have a specific contact phone number to reach out for more information on how to receive those calls.

In the case of -- I've also seen, as an example, referrals to the Washington Department of Health, who can then -- who has arranged to provide those services in some cases.  And I'm speaking specific to Providence Health Plan.

**Q.     Okay.  So how does -- how does that objected-to service get paid?  Who pays for it?**

MR. CRISALLI:  Object to form.  Beyond the scope.

THE DEPONENT:  It is going to depend on the process that the carrier has put in place in order for the order -- in order for the enrollee to get that service.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

83

Q.      (By Mr. Theriot) So if they put in place the one you mentioned about Providence, where they call the Department of Health in order to get an abortion, who pays for that?

MR. CRISALLI:  Object to form.  Beyond the scope.

THE DEPONENT:  My understanding is -- my understanding of the arrangement is that is paid with funds through the Department of Health.

Q.      (By Mr. Theriot) Okay.  Are you aware of -- or do you know if there's any document that describes that arrangement with the Department of Health?

MR. CRISALLI:  Object to form.  Beyond the scope.

THE DEPONENT:  I don't know.

Q.      (By Mr. Theriot) And then if we're looking at, once again, subsection (2)(c), it says, "The insurance commissioner shall establish by rule of mechanism or mechanisms to recognize the right to exercise conscience while ensuring enrollee's timely access to services and to assure prompt payment to service providers."

Has the Commissioner promulgated such a rule?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

84

MR. CRISALLI: It may be another witness who has worked on rule-making who can better answer that question, but to the extent that this designee knows, please feel free to answer.

THE DEPONENT: Rule-making specific to 48.43.065, I would have to take -- I would have to review the WACs.

**Q.      (By Mr. Theriot) Okay. So when you are looking and making sure that 48.43.065 is followed and complied with, there's not a rule that you're looking at outside of the statute?**

A.      In our review of the plan documents, no. We're using (2)(b)(i) and (ii).

When you get down to, let's say, (iii) and then (c), in terms of timely access and payment, those -- that's going to occur after -- that's not going to occur within my unit. That's after the plan is being administered, being used by the enrollees.

So I wouldn't receive any information about how timely an enrollee was accessing something or how timely or promptly a payment occurred. So that's outside of my unit.

**Q.      With regard to carriers who have a religious exemption that are protected by subsection (2)(a), how does that protection apply to**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

Case 3:19-cv-05181-BHS Document 61-5, Filed 03/09/23 Page 96 of 233

30(b)(6) Deposition of Kim Tocco

85

that carrier's health plan for its own employees?

MR. CRISALLI: Object to form. Calls for a legal conclusion. Misstates the law.

THE DEPONENT: Sorry, can you repeat that?

Q. (By Mr. Theriot) Yes. How does the protection in subsection (2)(a) apply to an objecting carrier, like Providence, how does it apply to the health care benefits for its own employees?

MR. CRISALLI: The same objection.

THE DEPONENT: I wouldn't know. The carrier, as an employer, makes use to self-fund, for example. And that would be something not regulated by the OIC.

Q. (By Mr. Theriot) Right, I understand that, but what if they had a group health insurance policy for their own employees that is governed by the OIC?

MR. CRISALLI: The same objection. Also speculation.

THE DEPONENT: Can you repeat the rest of the question, then?

Q. (By Mr. Theriot) Yes. So if a provider like Providence has a health care plan for its own employees, and that health care plan -- and they object

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

to providing services like abortion or contraception to those employees, then how does subsection (2)(a) of 48.43.065 protect them?

MR. CRISALLI:  The same objections.

THE DEPONENT:  I don't know based on the premise of that question.

Q.     (By Mr. Theriot) So are you saying that they would have to cover abortion in their employee benefit plan for their own employees?

MR. CRISALLI:  Objection.  Misstates the testimony.  The same objections as before.

THE DEPONENT:  I think what's being conflated here for me is the protections that apply to the carrier and what's generally available for a large group employer -- in this case, I assume it's a larger group -- what's available to a large group employer in the market, in general, despite -- I don't read this as religiously sponsored employer.  I read this as a religiously sponsored health carrier.  So, to me, those are getting conflated.

Q.     (By Mr. Theriot) Is there anything you rely upon for that reading outside of the statute?

MR. CRISALLI:  The same objection.

THE DEPONENT:  I rely on the text that states "religiously sponsored health carrier."

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

Q.    (By Mr. Theriot) Okay.  So if Providence doesn't want to pay for abortions for its own employees, what does it need to do?

MR. CRISALLI:  Objection.  Calls for speculation.  Legal conclusion.  Beyond the scope.

THE DEPONENT:  Again, I can speak to the context of any large group employer, any large group employer that would not wish to provide a certain service.

Q.    (By Mr. Theriot) So it would be in the same boat or be regulated the same way as the organizations in subsection (3)?

A.    Well, I think there's other -- for us, 065 isn't in isolation.  That applies as does -- as does 6219 and the statutes enacted pursuant to that.

Q.    What other statutes -- I'm sorry, go ahead.

A.    So when we are -- again, we're reviewing a plan and we're considering, let's say we're considering general, we're looking in general at contraceptive coverage.  So we are going to consider -- we call it a conscience clause in the case of a religiously sponsored health carrier.

If we're reviewing, let's say, any large group plan, they -- I'm trying to say -- a large group

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

plan purchasing from the carrier, the carrier is still going to be bound by -- I'd like to look at 48.43 -- I don't want to guess -- I think 072 and 073, the enactment of the codification of 6219. And I would confirm it in the RCW.

Q. Okay. So what if -- so let's assume for a second that Providence has a health care plan -- and I think you've testified previously that they do, but it doesn't cover abortion, and --

A. Providence as a health carrier? I'm sorry.

Q. Yes, Providence as a health carrier. It doesn't cover abortion. It does not want to provide -- its religious convictions prohibit it from providing the notice that's required in subsection (2)(b). Then is it still protected? Can it still offer the plan?

MR. CRISALLI: Objection. Calls for speculation and a legal conclusion.

Also, I'm a little concerned with this line of questioning just in that they've only -- it's unclear to me whether this particular type of request has ever come before the Insurance Commissioner for evaluation. And going into what it would approve versus not, I think can be inappropriate as far as it's in this vacuum and going down hypotheticals and

Electronically signed by Jana Mackelprang (001-409-517-3774)                                fe265592-9478-4d73-bcd5-ebcc840c6c96

speculation, when that is their specific job.

I understand why you want to get into this. I'm trying to give you a little space on this, but I also want to make sure that we don't have something where the Office of the Insurance Commissioner is out there saying, "I will approve this plan," when that plan has not been presented before them. We don't have the specifics of the plan before them, and I don't want something under oath out there saying that this is the type of plan that would be accepted.

**Q. (By Mr. Theriot) So Providence, as you understand the plan now, provides the notice required in (2)(b); is that correct?**

A. As I understand now, Providence, as a carrier, includes the required notices in the health plan products that have been approved by our office.

**Q. And have you had an occasion to address a plan where a carrier who has a plan doesn't want to cover abortion and also doesn't want to provide the notice?**

A. We have not seen a religiously sponsored carrier object to providing the required notice.

**Q. And if you had one, you're unsure as to how you would handle that; is that what your testimony**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

90

is?

MR. CRISALLI: Object to speculation. Beyond the scope.

THE DEPONENT: My factual understanding is that Providence is the only religiously sponsored health care currently offering products in Washington. So I can only speak to how we've addressed it with them.

Q. (By Mr. Theriot) I think I might have misunderstood your answer. Why don't you restate it to make sure because I think you might have forgotten a word. Can you say that answer again?

A. Sure. Can you restate the question?

Q. Yeah, sure. The question is: Have you had another -- any carrier who objects to providing abortion or contraception that also objects to providing notice?

A. I have not, no.

Q. And is it true that Providence is the only carrier that you're aware of that has a plan that does not cover abortion at this time?

MR. CRISALLI: Objection. Misstates the record.

THE DEPONENT: No. My testimony is that Providence is the only religiously sponsored health

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

carrier that offers plans that do not include abortion.

Q.  (By Mr. Theriot) Okay, great.  Are there other plans that aren't religiously sponsored that don't cover abortion?

A.  Sorry, can you repeat that?

Q.  Are there other carriers who offer plans that do not cover abortion besides Providence?

A.  Yes.  Those would be the ones I mentioned earlier.

Q.  Okay.  All right.

I've put in the chat Statute 48.43.725.  And we're going to mark that as Exhibit 5.

(Exhibit 5 was remotely introduced and provided electronically to the reporter.)

Q.  (By Mr. Theriot) Would you open that up and take a moment to familiarize yourself with it, please.

A.  Okay.

Q.  Let me get my exhibit number right here so I can ask you a question about it and so I don't confuse myself.

So Exhibit 5 is RCW 48.43.725.  Does your office interpret and apply this statute?

A.  Does our office?  Yes.

Q.  Okay.  So can you explain to me what this

Electronically signed by Jana Mackelprang (001-409-517-3774)          fe265592-9478-4d73-bcd5-ebcc840c6c96

statute does and what it requires?

A.     Sure.  Well, there's a few parts to it and some I apply in our unit more than other parts of it, but sure.

Q.     Just with regard to the ones that you're knowledgeable on.

A.     Okay.  So subsection (1), and that is going to apply to a health carrier who is offering a health plan or a student health plan.

Sub (i) and its parts, they include a notice requirement.  So that, again, is going to be language that we are looking for in the plan during our review process.

Q.     Okay.

A.     And so, again, that's going to be a written notice of benefits that are not covered -- mandated benefits, I should say, that are not covered and alternate ways that enrollee could access those services.

Q.     Okay.  So this appears to be similar or maybe even the same as the notice requirements in 48.43.065?

A.     Similar notice requirements, yes.

Q.     What are the differences?

A.     What are the differences between .725 and

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

.065?

Q.	Yeah, the difference in the notice requirements.

A.	Can I look at them both on screen?

Q.	Oh, sure.

A.	Okay.

MR. CRISALLI:	I'm going to object as it calls for a legal conclusion.

THE DEPONENT:	Well, in terms of the notice requirement, 065 again is going to be required by a carrier, and it will be the carrier's statement that we, as a carrier, have a religious objection to providing A, B, and C services.

In the 725, it's not -- it's not specific to a religious carrier.  Any health carrier that excludes benefits is going to provide -- is going to, again, state that this plan does not provide A, B, C.

Q.	(By Mr. Theriot) Okay.  Do you apply any of the other aspects of 285 -- I'm sorry, 725?

A.	The (1)(c) addresses marketing materials, and that is outside the scope of our unit.

Q.	Okay.  What about subsection(2)?

A.	The fee assessment is not specific to our unit.

Q.	Who assesses that fee?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

A. Those are -- information is reviewed by -- my understanding is that the carrier will submit information in its rate filing sufficient for the actuaries to determine that fee. And then a payment would be made, I believe, through our fiscal office.

Q. All right. So does -- can this fee be assessed against a religious health care provider?

MR. CRISALLI: Object to form.

THE DEPONENT: Well, by statute, this fee is assessed on a health carrier, not on a provider.

Q. (By Mr. Theriot) I'm sorry, that was a poor question.

Is this fee paid by the health carrier?

MR. CRISALLI: Is that your question?

MR. THERIOT: Yes.

MR. CRISALLI: Objection. Vague. Speculation. Calls for a legal conclusion. I think you might be missing a word.

MR. THERIOT: Oh.

Q. (By Mr. Theriot) Does this fee in subsection (2) have to be paid by a health insurance carrier?

MR. CRISALLI: Object to form. Speculation. Calls for a legal conclusion.

THE DEPONENT: Just by statutory text,

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

(c), that fee -- the fee must be assessed, but (c) allows for waiver by the Commissioner.

Q. (By Mr. Theriot) Are you involved in that process at all?

A. No, I'm not.

Q. Do you know how it works?

A. No, I don't.

Q. Do you know if it applies to religious health care insurance carriers?

MR. CRISALLI: Object to form. Vague.

THE DEPONENT: I don't know what a health care insurance carrier is. This applies to a health carrier. And then I would go back to 48.43.005 to look back to the definition of health carrier.

Q. (By Mr. Theriot) Okay. So there's no exemption -- it applies to those who are protected by 065?

MR. CRISALLI: Object to form. Calls for a legal conclusion.

THE DEPONENT: This applies -- the term "health carrier" would include religiously sponsored health carriers that are subject to 065.

Q. (By Mr. Theriot) Okay. Let's go back to 065, which is Exhibit 4. Is your office responsible for ensuring that this statute, this part of the

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

statute is applied properly?

MR. CRISALLI: Object to form.

THE DEPONENT: Is our office? Yes, the OIC.

Q. (By Mr. Theriot) The OIC, okay. And what about your team that you supervise, is it responsible for making sure this provision is complied with?

A. We are -- we would be responsible for the written notice requirements. And so we would be responsible to ensure that the plan documents, the plan language would include the required information. To the extent there may be issues later about timely access or prompt payment, that is outside of the scope of the health forms unit.

Q. Okay. So your -- so what exactly are you looking for in a plan to make sure that subsection (3)(a) is properly complied with?

A. Can you repeat that again, please?

Q. Yeah. What are you looking for in a proposed plan that helps you ensure that (3)(a) is complied with?

A. I wouldn't be reviewing anything on behalf of an individual or an organization.

Q. Okay. So if a religious organization, like Cedar Park, for instance, wants to take advantage

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

97

of subsection (3)(a) of 065, what do they need to do?

MR. CRISALLI:  Object to form.
Speculation.

THE DEPONENT:  This protection extends
to -- an individual or organization who has a moral
objection can't be required to purchase a policy that
has it.

Q.      (By Mr. Theriot) Okay.

A.      Again, I wouldn't be -- I'm not reviewing
an individual or the organization.  I don't receive
anything from either entity.

Q.      So looking at subsection (b), it says "an
enrollee being denied coverage of, and timely access
to, any service or services excluded from their
benefits package as a result of their employer's or
another individual's exercise of the conscience clause
in (a) of this subsection."

So what are the options for a health care
plan to exclude coverages that are objected to pursuant
to (3)(a) to make sure that the enrollee is not denied
coverage?

MR. CRISALLI:  Object to form.  Compound.

THE DEPONENT:  Can you repeat your
question?

Q.      (By Mr. Theriot) How does a health care

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

98

plan comply with the requirements of (3)(a)

and (3)(b) --

MR. CRISALLI: Object to form.
Speculation.

Q. (By Mr. Theriot) -- in the context of a
church like Cedar Park who doesn't want to cover
abortion or certain types of contraception?

MR. CRISALLI: Object to form. I would
also advise the witness not to provide legal advice to
the extent that such answer would do so.

THE DEPONENT: The compliance obligation
in 065 is on the health carrier under (2)(b) and the
subsections. 3(a) is not a compliance requirement. It
doesn't -- it addresses an individual and an
organization to the extent that they are required to do
anything to which -- they aren't required to make a
purchase to which they object.

So I'm not reviewing an individual and an
organization for compliance with this statute.

Q. (By Mr. Theriot) So is it -- so it's up
to the church or other religious organization to find a
plan that would exclude abortion or contraception, and
the insurance -- the OIC doesn't have anything to do
with that; is that what you're saying?

MR. CRISALLI: Object to form.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

THE DEPONENT:  The OIC would not -- does not have involvement in a given employer's decision to purchase health insurance for its employees.

**Q.    (By Mr. Theriot) So one of the ways -- is one of the ways -- well, strike that.**

**There's a rule in (3)(c) of 065.  It says, "the insurance commissioner shall define by rule the process through which health carriers may offer the basic health plan services to individuals and organizations identified in (a) and (b) of this subsection."**

**Is there a rule that defines the process.**

MR. CRISALLI:  And I'm going to object because it asks for a legal conclusion as well as does not state the complete law.

THE DEPONENT:  Again, I would -- I would need to look at the administrative code to see if rule-making was undertaken specifically for 065.

MR. CRISALLI:  And I'll represent we do have a designee slated to cover that aspect of this topic.  So I don't want to necessarily be held -- this witness might know some things.  I wasn't trying to hold you back from asking this witness, but we do have other witnesses that can address the rule-making.

**Q.    (By Mr. Theriot) But as far as when you**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

are applying 065, there's not a rule that you look to that would explain that process that's described in 065, subsection (3)(c)?

A.    No, not beyond the notice requirements that are set forth in the statute above.

Q.    Do you have any knowledge of how -- of which plans might properly comply with subsection (b)?

MR. CRISALLI:  Object to form.

THE DEPONENT:  Can you repeat that, please?

Q.    (By Mr. Theriot) Do you have any knowledge of how health care plans might comply with subsection (b), (3)(b) of 065?

MR. CRISALLI:  Object to speculation. Again, I think it should be limited more to what she's seeing, not to speculate what might come before her in the evaluation process.

THE DEPONENT:  I'm sorry, can you repeat that?

Q.    (By Mr. Theriot) Do you have -- strike that.

When you're reviewing a plan that excludes an objectionable service, are there specific ways that you've seen that the plan can comply with subsection (3)(b)?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

MR. CRISALLI:  Object to form.

THE DEPONENT:  So those -- again, (3)(b) is designed to ensure that even if a given benefit isn't included in their benefits package, they can still have access to it.  So even if their employer may object to it and doesn't want it as part of the package, the enrollee still has access to it.  And that's by means of the examples I provided earlier.

**Q.      (By Mr. Theriot) All right.  And you're talking about the examples you provided earlier with regard to Providence's plan.**

**Are you aware of any other -- I'm sorry, that's two questions -- are you talking about the examples you provided earlier about Providence's plan?**

A.      Yeah, I'm talking about the context of a religious carrier and the notice that they have to provide and the information that they have to disclose to an enrollee as to how to access those services.

**Q.      What about with regard to a nonreligious carrier?**

A.      So -- can you ask the question again, please?

**Q.      Yes.  With regard to a nonreligious carrier, how do you ensure that subsection -- if they have a plan that excludes abortion for a purchaser of**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                          fe265592-9478-4d73-bcd5-ebcc840c6c96

the plan, an employer, how do they comply with subsection (3)(b)?

MR. CRISALLI: Object to form.

THE DEPONENT: So in the example that you provided, the employer group has an objection and not the carrier. And what we would expect to see is notification to an enrollee that -- this is an example -- your employer has chosen not to provide such and such a benefit. You still have a right to access this benefit, and here's how you go about doing that.

Q. (By Mr. Theriot) Okay. And how -- for instance, in the plan that you're aware of, by a nonreligious carrier, how do tell the employee they can access the benefit that's not covered?

MR. CRISALLI: Form. Vague.

THE DEPONENT: They provide -- they provide written notice in the plan documents, stating what services are not covered. They provide usually a direct contact number to get information about how to access them. And they will also provide -- they may also provide the associated cost shares. So this is how an enrollee can access these services, and this is what the services will cost, even though their employer may object to providing --

Q. (By Mr. Theriot) I'm sorry, what was the

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

last thing you said?

A.    Even though -- as an enrollee, even though their employer may object to providing it, the carrier will make that service available.

Q.    And you said it will also tell them how it's paid for?

A.    It's --

MR. CRISALLI:  Object to form.

THE DEPONENT:  It may.  That is an example of one that I've seen.

Q.    (By Mr. Theriot) And who pays for that service that's objected to?

MR. CRISALLI:  Object to form.

You're speaking about this specific instance, right?

MR. THERIOT:  Yes.

THE DEPONENT:  I don't know the payment mechanism.

Q.    (By Mr. Theriot) You just know that it's not the employer who purchased the plan?

A.    Correct.

MR. CRISALLI:  Would now be a good time for a brief break?

MR. THERIOT:  Yeah, we can take a brief break.  Let me just see how much longer I have left.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                fe265592-9478-4d73-bcd5-ebcc840c6c96

MR. CRISALLI: Off the record.

(A recess was taken from 1:49 p.m. to 2:04 p.m. PST)

MR. CRISALLI: I think the witness has something to clarify before we get to the next line of questions.

MR. THERIOT: Okay.

THE DEPONENT: I want to do it on the record.

I realize that I may have suggested that, in our review of compliance with the conscience statute, that we don't use WACs. Excuse me. And that's because the specific cite escaped me, but there is a WAC that requires the information to actually be filed with us.

So we're looking at that information in the context of a filing, but there is a separate WAC that says it must be filed, and that's the notice information.

Q. (By Mr. Theriot) And which WAC is that?

A. 284.43.5020. And just kind of the nature of our reviews -- I think I mentioned this -- that there's a master checklist, compliance checklist, and it's topical. So by each topic, we're going to have a combination of RCWs and WACs.

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

But I didn't have that specific cite in front of me.  Sorry about that.

Q.     That's all right.  That's the last thing I want to talk to you about.  So I'll put that statute up in front of you here in a little bit.

A.     Okay.

Q.     I have a few more questions about 065, though.

A.     Okay.

Q.     So we were talking about a nonreligious carrier's coverage of offering a health plan that doesn't cover abortion or some other objection for service.  And I think we were specifically talking about Kaiser's that you referenced before; is that right?

A.     Kaiser as an example of a health carrier that offers a plan that doesn't cover abortion?

Q.     Correct.

A.     Correct.

Q.     That's not religious?

A.     That is not religious, right.

Q.     And --

A.     Or I should say whose employer doesn't cover.  The plan actually provides for access.

Q.     Okay, good.  So the plan -- so let's talk

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

about how that's done.  In that particular context of that plan that you're referring to, the employer provides the objectionable -- I'm sorry, excuse me.

In that particular plan that you're referring to, the carrier provides the objectionable coverage?

A.    Yes.  So in that particular plan, I'm seeing the product before it's offered for sale.

Q.    Right.

A.    And so I'm looking at a product where there is language in the plan that says:  Your employer does not provide these services; however, you can still access them through us, your carrier, and here's how.

Q.    And that "here's how," what is the "here's how"?  What do they say as to how to do it?

A.    Typically -- and, again, I'm thinking of the Kaiser one we're talking about -- for them, for enrolling, there's actually a number to call to find out how to access that care.

But I would caveat that when we're talking about Kaiser, they're an HMO.  So they're kind of a closed system.  So that health plan has its own providers.  So it's a distinction that may make a difference.  Not every carrier will do it that way; that's what I'm saying.  They happen to be an HMO, and

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

their mechanism may be different than others.

Q.    So, as I understand it, the enrollee can call the number, find out how to access the objectionable service; but you're not sure what they tell them, what Kaiser tells the enrollee?

A.    I'm not involved in anything after the plan is in effect, so to speak.  So I don't know the information that they get from their carrier.

Q.    Okay.  In that plan that we're talking about, does Kaiser pay for the objectionable coverage?

MR. CRISALLI:  Object to form.

THE DEPONENT:  It doesn't state that in the documents.  My understanding is that's how it happens, but I don't know the payment mechanism.  Again, Kaiser is unique, that entity is unique as an HMO.

Q.    (By Mr. Theriot) Okay.  As I recall, that entity and the product that we're talking about that's offered by that Kaiser entity is a small --

A.    Small group employer.

Q.    A small group employer.  So that's employers of 50 and less.

A.    Correct.

Q.    Could one of the ways that the objectionable coverage gets paid for, could that be --

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

Case 3:19-cv-05181-RMP-S02 Document 28185-1, Filed 03/09/23, Page 2169 of 2433

strike that.

Could Kaiser use the method of payment for the objectionable coverage that Providence uses in their plan, which is referring them to the Department of Health?

MR. CRISALLI: Object to form. Speculation.

THE DEPONENT: The referral process that Kaiser uses is a means of access. It's not the means of payment.

So we're ensuring that an enrollee whose employer might otherwise or does otherwise object can still access that care. And our division, our unit, is not overseeing the payment mechanism for it.

Q. (By Mr. Theriot) And you don't oversee how they access that care?

A. Not beyond -- not beyond the information -- not beyond the notice requirement that we look for in the forms. We can certainly follow up via objection if we have concerns.

Q. Okay. And is there -- what are the options that a carrier has to provide the objectionable coverage?

MR. CRISALLI: Objection. Speculation. Calls for a legal conclusion.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

109

THE DEPONENT: Sorry, can you clarify that?

Q. (By Mr. Theriot) What are the options a carrier has to provide the objectionable coverage in a plan like we've been talking about that's the Kaiser entity?

A. Well, any entity, any carrier, as part of its business model, can certainly choose to design products. It can choose to offer a product tailored towards employers that may object to certain services.

Q. Are there any other ways besides Kaiser's use of its HMO network to provide the objectionable service or Providence's referral to the Department of Health that a carrier can comply with the requirements of 48.43.065 (3)(b)?

MR. CRISALLI: Objection. Speculation, compound, and a legal conclusion.

THE DEPONENT: Again, (3)(a) and (b) are not regulating the -- they're not as applied to the carrier.

Q. (By Mr. Theriot) So what does apply to the carrier is (2)(c)?

A. Not if we're still talking about nonreligious carriers.

Q. Oh, okay. So we're not -- so what are

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

the nonreligious carriers governed by when they are trying to offer a plan that complies with 065 (3)?

MR. CRISALLI: Object to form. Speculation.

THE DEPONENT: The carrier is -- a nonreligious carrier is not attempting to comply with 065.

Q. (By Mr. Theriot) Who does attempt to comply with 065?

A. A religiously sponsored --

MR. CRISALLI: Objection. Vague.

065 in general or are we talking about --

MR. THERIOT: I'm sorry. 065 (3)(a).

THE DEPONENT: So 065 (3)(a) is not -- is not a compliance requirement on the carrier. It protects -- it protects an individual or an employer group from having to purchase coverage that they object to.

Q. (By Mr. Theriot) How does a nonreligious carrier offer coverage that complies -- that allows the employer to take advantage of (3)(a) and (b)?

MR. CRISALLI: Object to form. Speculation. Legal conclusion.

THE DEPONENT: A nonreligious carrier is complying with many, many requirements beyond 065. So

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

a health carrier is bound by 6219, which is going to mandate coverage for contraception and abortion.  So a nonreligious carrier, a health carrier is required, if they offer maternity coverage, to offer, for example, the abortion coverage; but they are recognizing that some employers may have an objection and may wish to purchase a plan in which they, the employer, aren't paying for the services.

**Q.    (By Mr. Theriot) Okay.  And then how does subsection (4) of 065 apply to those types of plans?**

MR. CRISALLI:  Object to form.  Legal conclusion.  Speculation.

THE DEPONENT:  And can you repeat the question?

**Q.    (By Mr. Theriot) How does subsection (4) of 065 apply to those types of plans that a nonreligious carrier offers to employers who are taking advantage of 3, of subsection (3)?**

MR. CRISALLI:  The same objection.

THE DEPONENT:  Nothing in this section -- I'm going back up to this section -- nothing -- health carriers are not required to -- they may still charge a premium.  So there's nothing about these conscience clauses or accommodations that prevents the carrier from still charging for the service.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

Q.    (By Mr. Theriot) And is there any entity other than the employer that they could charge for the service?

MR. CRISALLI:  Object to form.  Beyond the scope and a legal conclusion.

THE DEPONENT:  Can you repeat that?

Q.    (By Mr. Theriot) Is there any entity other than the employer that the carrier could charge for the services as described in subsection (4) of 065?

MR. CRISALLI:  The same objections.

THE DEPONENT:  I don't know.

Q.    (By Mr. Theriot) So the State doesn't have a program for paying for the premium for the objectionable services that you're aware of?

MR. CRISALLI:  Object to form.  Beyond the scope.

THE DEPONENT:  The only program I'm aware of is in the context of a religiously sponsored health carrier, being Providence, and the arrangement that's in place with the Washington Department of Health.

Q.    (By Mr. Theriot) All right.  Let's look at the WAC you were referring to earlier, 284.43.5020. I'll get that up in the chat.

MR. THERIOT:  We're on Exhibit 6, Jana?

THE REPORTER:  Yes.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

113

(Exhibit 6 was remotely introduced and provided electronically to the reporter.)

THE DEPONENT: I don't see it yet, if it's there.

Q. (By Mr. Theriot) I didn't stick it in there yet. I tried to do something and it wouldn't let me do it.

There we go. I was trying to do a shortcut. There we go. I apologize.

I'm going to go back to 065 really quick, a question that I forgot to ask regarding (4)(c) again.

(4)(c) says that a carrier can't be required to pay for services without the payment of a premium or fee. Can the carrier include the cost of the premium or fee in the actuarial analysis of assessing rates?

MR. CRISALLI: Object to form and speculation. Calls for a legal conclusion.

THE DEPONENT: I don't know. That's outside of my scope. That would be with our rates and actuaries.

Q. (By Mr. Theriot) Okay. So let's go back to Exhibit 6 now. All right.

So we've talked about -- Exhibit 6 is Washington Administrative Code 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. I get to

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

say my dashes now.

We talked about this a little bit earlier. Can you just describe what this regulation does and how you apply it when you are doing your job?

A. Give me a moment.

MR. CRISALLI: Object to the extent it calls for a legal conclusion.

THE DEPONENT: Can you repeat the question now, please?

Q. (By Mr. Theriot) Yes. Can you describe for me how you apply WAC 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 in your job of reviewing health care plans?

MR. CRISALLI: The same objection.

THE DEPONENT: I can. There are, I would say, a two-part, two parts to my response. One is that the WAC, this WAC refers to something called the model plan or basic health plan services, which I'm not knowledgeable about those.

My understanding is that was a plan that predated the ACA. So there may be some remaining text here that is sort of a carryover from pre-ACA times.

But in terms of how -- how we're applying this currently to our reviews, what we're doing is, again, it specifically goes to the -- well, I should back up and say: As I mentioned before, all forms that

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

(222 of 232)

115

comprise the policy contract have to be filed with us. And so as part of that filing, we would expect to see -- again, this would be from a religiously sponsored carrier -- and if they have opted not to provide certain services, they may still offer those plans as long as they ensure that enrollees will have access to whatever those objectionable services are.

And I'm going back to the last sentence of (1) there, which is: "This process may not affect a nonobjecting enrollee's access to coverage."

So, again, our role in this is, with other requirements that we're looking for in a plan, we're going to assure that the proper notice has been provided to the enrollee. So it's specifically the notification and the explanation of what's not covered.

Q. (By Mr. Theriot) Okay. So does this regulation only apply to religiously sponsored carriers, or does it also apply to plans like Kaiser, who are offering a plan that respects an organization or individual's conscience?

MR. CRISALLI: Object to form.

THE DEPONENT: All carriers have to file their forms with us, but the specific notice, the notice requirement here is referring to a religiously sponsored carrier.

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

Case 3:19-cv-05181-BHS Document 28-5, Filed 03/09/23, Page 237 of 243

30(b)(6) Deposition of Kim Tocco

116

Q.    (By Mr. Theriot) Okay.  So in the first couple lines of subsection (1) of Exhibit 6, it says that "all carriers required pursuant to law to offer and file with the commissioner a plan."

Which carriers are required pursuant to the law to offer and file with the Commissioner a plan providing benefits identical to the basic health services model?

MR. CRISALLI:  Object to form.

THE DEPONENT:  I don't know based upon the reference to -- the reference to the model plan that may have predated the ACA.  I don't know the statutory history.

Q.    (By Mr. Theriot) So that language may be outdated?

A.    It's possible.  I don't know either way.

Q.    Okay.  But as far as in your day-to-day work, you use this only with regard to religiously sponsored carriers?

A.    I would cite, if I were going to cite this statute, this citation 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, (2), would be an objection to a religiously sponsored carrier.

Q.    So are you -- the last line of subsection (1) in Exhibit 6 says, "This process may not affect a nonobjecting enrollee's access to coverage for

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

those services."

Are you aware of any other processes other than what we've talked about with regard to the Kaiser plan and Providence plan that could be used by a carrier so as not to affect a nonobjecting enrollee's access to coverage?

MR. CRISALLI: Object to form. Calls for speculation.

THE DEPONENT: Can you repeat the question?

Q.    (By Mr. Theriot) Are you aware of any other processes other than what we've talked about with regard to the Kaiser plan and Providence plan that could be used so as not to affect a nonobjecting enrollee's access to coverage for these services?

MR. CRISALLI: Form. Calls for speculation.

THE DEPONENT: I know generally, based on the other plan, again, mentioned this morning -- and this would be a nonreligious carrier, and this was the Premera plan that I mentioned. So they would also have a process in place for enrollees to access services.

Q.    (By Mr. Theriot) Do you know what process Premera uses?

A.    I don't know the details without looking.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

118

And, again, we would be looking for the required notice to enrollees of how they can get there, how they can get those services.

Q.    You wouldn't be looking exactly as to what the process is?

A.    Not in our unit, no.

Q.    Which unit looks at that?

A.    Generally speaking, for issues or questions that come up during the administration of a plan, while enrollees are actively using the plan, those types of questions or issues are going to come to our consumer department.  I think it's consumer protection.

MR. CRISALLI:  And I'll represent -- have you finished your answer?

THE DEPONENT:  Oh, I was just going to say, possibly, possibly our market conduct oversight. They work fairly closely together.

MR. CRISALLI:  And I will represent that we have a designee who deals with compliance who is prepared to testify about aspects of the questions that you're getting at.

MR. THERIOT:  Okay.

Q.    (By Mr. Theriot) So I was going to ask you about -- maybe I shouldn't -- subsection (3)(a),

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

"The commissioner will not disapprove processes that meet the following criteria:  Enrollee access to all basic health plan services is not impaired in any way."

You don't assess for that; am I correct?

MR. CRISALLI:  Object to form.

THE DEPONENT:  We would assess for, again, based on the plan language, whether -- if there are any obvious impairments, anything that, you know, might limit access, we might see that in the plan documents.  But, typically, issues of access are going to come up later as enrollees are using their plan.

Q.    (By Mr. Theriot) So when you're looking to see if there is an impairment, what kinds of things might impair an enrollee's access that you would see and object to?

MR. CRISALLI:  Object to the extent it calls for speculation.

THE DEPONENT:  I don't have anything that comes to mind based on what we see.

Q.    (By Mr. Theriot) Have you ever objected to a plan that is governed by Exhibit 6 because you suspected that the enrollee's access might be impaired in some way?

A.    I don't recall at that level of specificity.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

120

MR. THERIOT: Okay. Why don't we -- give me five minutes and let me look. I may be done.

MR. CRISALLI: Sounds good.

(A recess was taken from 2:38 p.m. to 2:44 p.m. PST.)

MR. THERIOT: Back on the record for me just to say I don't have any other questions, but I reserve the right to recall the witness after Paul and I have some discussion, and maybe even have some Court intervention, but we'll see. I don't have any further questions.

MR. CRISALLI: No questions for me at this time. Thanks.

Can she go?

MR. THERIOT: Yes, thank you, you can go. I appreciate your time. I know it's not a fun process, but you did a good job.

THE REPORTER: Paul, do you want to order a copy?

MR. CRISALLI: If they order, we'll order as well.

MR. THERIOT: Yes, we're ordering. The question is whether I need an expedited. We both have to order.

Jana, let's hold off on the expedited for

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

121

now.

                (WHEREUPON, the deposition was concluded at 2:45 p.m. PST.)

Electronically signed by Jana Mackelprang (001-409-517-3774)       fe265592-9478-4d73-bcd5-ebcc840c6c96

I have read the foregoing transcript of my testimony and have indicated the same by my signature.

_____
                              KIM TOCCO

STATE OF _____

CITY OF _____ AND COUNTY OF _____

          Subscribed and sworn to before me by KIM TOCCO, on this _____, 2022.

          My commission expires:_____.

                    _____
                              Notary Public

                    _____
                              Address

Reporter:  JM
Trial/hearing date:  None

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

                    CERTIFICATE

STATE OF COLORADO          )
                           )ss.
CITY AND COUNTY OF DENVER  )

            I, Jana Mackelprang, Certified Realtime
Reporter, Registered Professional Reporter, and Notary
Public for the State of Colorado, do hereby certify
that previous to the commencement of the examination,
the said KIM TOCCO was duly sworn by me to testify the
truth in relation to the matters in controversy between
the said parties.
            I further certify that said deposition was
taken in shorthand by me and was reduced to typewritten
form by computer-aided transcription, that the
foregoing is a true transcript of the questions asked,
testimony given, and proceedings had.
            I further certify that I am not an
attorney nor counsel nor in any way connected with any
attorney or counsel for any of the parties to said
action or otherwise interested in its event.
            I further certify that, pursuant to
Rule 30(e)(1), review of the transcript was requested.
            IN WITNESS WHEREOF, I hereunto affix my
hand and notarial seal this 29th day of November, 2022.
My commission expires January 24, 2024.




                            _____
                            Jana Mackelprang
                            CRR, RPR, Notary Public
                            Calderwood-Mackelprang, Inc.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

CALDERWOOD-MACKELPRANG, INC.
9745 East Hampden Avenue, Suite 220
Denver, Colorado  80231
(303) 477-3500

November 29, 2022

Paul M. Crisalli
Jeffrey Todd Sprung
Attorney General's Office
800 5th Avenue, Suite 2000
Seattle, Washington 98104

Re: Cedar Park Assembly of God of Kirkland, WA v.
Kreidler and Inslee

Deposition of: KIM TOCCO

The deposition in the above-entitled matter is ready for reading and signing.  Please attend to this matter by complying with ALL blanks checked below:

_____    arranging with us at the number listed below
           to read and sign the deposition in our
           office.

   XXX    having deponent read your copy and sign
          amendment sheets, if any (original signature
          page enclosed.)

_____    reading enclosed deposition, signing
           signature page and correction sheets, if any.


   XXX    within 30 days of the date of this letter.


_____    by_____due to trial/hearing date of
           _____.

Please be sure that the signature page and amendment sheets, if any, are signed before a notary public and returned to our office.  If this matter has not been taken care of within said period of time, the deposition will be filed unsigned pursuant to the Rules of Civil Procedure.

JANA MACKELPRANG, CRR, CSR, RPR
cc:  Counsel of Record

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

CALDERWOOD-MACKELPRANG, INC.
9745 East Hampden Avenue, Suite 220
Denver, Colorado  80231
(303) 477-3500


Kevin H. Theriot, Esq.
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260

Re: Cedar Park Assembly of God of Kirkland, WA v. Kreidler and Inslee

Dear Mr. Theriot:

Enclosed is the deposition of:  KIM TOCCO

_____ Previously filed.  Forwarding signature page and amendment sheets.

_____ Signed, no changes.

_____ Signed, with changes, copy enclosed.

_____ Unsigned, notice duly given _____, pursuant to the Rules of Civil Procedure.

_____ Not signed, notice duly given _____, since trial is set for _____.

_____ No signature required.

_____ Signature waived.

_____ To be signed in court.

_____ Signature pages/amendment sheets to be returned to court on date of trial.

_____ Mailed by Priority Mail on _____.

_____ Hand-delivered on approximately _____.


JANA MACKELPRANG, CRR, CSR, RPR

cc:  Counsel of Record

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96