Nos. 23-35560, 23-35585

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,
*Plaintiff-Appellant/Cross-Appellee*,

v.

MYRON KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington, AKA Mike Kreidler; and JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington,
*Defendants-Appellees/Cross-Appellants.*

On Appeal from the United States District Court
for the Western District of Washington
Case No. 3:19-cv-05181-BHS

**BRIEF OF *AMICI CURIAE* STATES OF SOUTH CAROLINA, ALABAMA, ALASKA, ARKANSAS, GEORGIA, IDAHO, IOWA, KANSAS, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE, TEXAS, VIRGINIA, AND WEST VIRGINIA SUPPORTING PLAINTIFF-APPELLANT/CROSS-APPELLEE AND REVERSAL**

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ALAN WILSON |
| OFFICE OF THE ATTORNEY | *Attorney General* |
| GENERAL | Robert Cook |
| 1000 Assembly St. | *Solicitor General* |
| Columbia, SC 29201 | J. Emory Smith, Jr. |
| (803) 734-3371 | *Deputy Solicitor General* |
| josephspate@scag.gov | Thomas T. Hydrick |
| | *Asst. Dep. Solicitor General* |
| | Joseph D. Spate |
| | *Asst. Dep. Solicitor General* |
| | Counsel of Record |
| November 28, 2023 | *Attorneys for Amici Curiae* |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION AND INTERESTS OF *AMICI CURIAE* ................................... 1

BACKGROUND ................................................................................................ 2

SUMMARY OF ARGUMENT ............................................................................ 5

ARGUMENT ..................................................................................................... 5

    I.    Churches Enjoy Religious Autonomy Under the
         First Amendment ................................................................................ 5

    II.   By Upholding SB 6219's Application to Cedar Park,
         the District Court Violated Cedar Park's Religious Autonomy ........ 9

CONCLUSION ................................................................................................ 13

ADDITIONAL COUNSEL .............................................................................. 14

CERTIFICATE OF SERVICE ......................................................................... 15

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Bollard v. California Province of the Society of Jesus*,
   196 F.3d 940 (1999) ................................................................................... 7
*Erdman v. Chapel Hill Presbyterian Church*,
   175 Wash. 2d 659, 286 P.3d 357 (2012) ................................................... 6
*Fulton v. City of Philadelphia, Pennsylvania*,
   141 S. Ct. 1868 (2021) ........................................................................ 11, 12
*Jones v. Wolf*,
   443 U.S. 595 (1979) ................................................................................ 7, 8
*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
   344 U.S. 94 (1952) ........................................................................... 1, 2, 3, 6
*Lemon v. Kurtzman*,
   403 U.S. 602 (1971) .................................................................................. 11
*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*,
   179 F.3d 1244 (9th Cir. 1999) ................................................................. 7, 8
*N.L.R.B. v. Cath. Bishop of Chicago*,
   440 U.S. 490 (1979) .................................................................................. 11
*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) ..................................................................... 1, 10, 11
*Puri v. Khalsa*,
   844 F.3d 1152 (9th Cir. 2017) ............................................................ 6, 7, 8
*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*,
   426 U.S. 696 (1976) ........................................................................ 5, 6, 7, 8
*Watson v. Jones*,
   80 U.S. 679 (1871) ............................................................................ 5, 6, 7

**Statutes**

RCW 48.43.073 ............................................................................................ 3, 4

**Other Authorities**

SB 6219 ................................................................................................... passim
Carl H. Esbeck, *An Extended Essay on Church Autonomy*,
   22 FED. SOC. REV. 244 (2021) .................................................................. 7
Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*,
   81 COLUM. L. REV. 1373 (1981) ............................................................ 5, 6

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*

American law embodies a "a spirit of freedom for religious organizations, an independence from secular control or manipulation . . . ." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). As such, it comes as no surprise that "[t]he First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (quoting *Kedroff*, 344 U.S. at 116). Put another way, the First Amendment protects religious institutions' "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id*. at 2060.

However, the District Court frustrated this foundational legal principle. By upholding a Washington state law ("SB 6219") requiring religious institutions such as Plaintiff-Appellant/Cross-Appellee Cedar Park Assembly of God of Kirkland, Washington ("Cedar Park") to provide health insurance coverage for abortions and abortion-inducing drugs in violation of their central organizational mission, the District Court summarily disregarded the constitutionally protected religious autonomy of such organizations.

South Carolina and *Amici* States[1] share a deep concern for upholding the First Amendment rights of the religious organizations within their jurisdictions. The District Court's disregard for those rights is alarming, and the undersigned seek to help this Court right the underlying wrong. This Court should reverse.

## BACKGROUND

Cedar Park is a Christian church that believes "*participating in, facilitating, or paying for abortion is a grave sin*." 4-ER-621 (emphasis in original). Further, Cedar Park "believes that any facilitation of abortion, directly or indirectly, injures its religious mission of recognizing and preserving human life from conception until natural death." *Id.*

Organizationally, Cedar Park pursues that mission in a variety of ways. For example, Cedar Park partners with a local pregnancy center that supports women experiencing unplanned pregnancies, and the church has facilitated about 1,000 embryo adoptions in recent years. 4-ER-622. The church has also hosted a mobile ultrasound unit on campus so that women considering abortion could make a more informed decision about the life of their unborn child. *Id.* And the church hosts an annual service known as "Presentation Sunday" in which the congregation prays for and supports couples experiencing infertility. *Id.*

---

[1] The *Amici* States are authorized to file this brief without the consent of the parties or the leave of the Court. Fed. R. App. P. 29(a)(2).

Cedar Park's mission to protect and preserve unborn life also manifests in its operations through multiple internal policies. Cedar Park only hires employees who agree with and live by the church's religious teachings, including those about the sanctity of life, at work and in their private lives. 4-ER-622. Each church employee signs an agreement to "liv[e] a life that reflects the values, mission, and faith of Cedar Park." *Id*. Church employees are barred from engaging in "behavior that conflicts or appears inconsistent with evangelical Christian standards as determined in the sole and absolute discretion of Cedar Park." *Id*. And like its other programs, Cedar Park's employee health plan (prior to SB 6219) affirmed the church's religious belief in the sanctity of life. *Id.* The health plan included comprehensive maternity care but excluded abortion coverage. *Id.*

SB 6219 requires all health plans issued or renewed on or after January 1, 2019, to cover all FDA-approved prescription and over-the-counter contraceptive drugs, devices, and products. 1-ER-4 (citing RCW 48.43.073). It also requires such health plans that provide coverage for maternity care or services to provide the covered person "with substantially equivalent coverage to permit the abortion of a pregnancy." *Id.* In effect, SB 6219 "require[s] all non-exempt employers in Washington who are covered by the Affordable Care Act to provide their employees health insurance coverage for abortion services." *Id.* Cedar Park is one such employer. 1-ER-6.

3

Unfortunately, SB 6219 presents Cedar Park with an unconstitutional Hobson's choice: adopt a group health plan that funds abortions in violation of its central mission of protecting unborn life, or be punished.[2] Becoming self-insured is virtually not an option, as it would cost the church roughly $243,125 more annually, with that number expected to double within a few years. 4-ER-623. And self-insurance does not provide comparable benefits, as it would require Cedar Park to assume 100% of the risk of claims exceeding premiums, unlike fully insured plans that place all risk on the carrier. *Id*. Ironically, the only way for Cedar Park to continue funding its mission is to purchase health insurance that directly contradicts its mission.

Cedar Park challenged SB 6219. In three short paragraphs, the District Court summarily disposed of Cedar Park's religious autonomy claim. Without further explanation, the District Court reasoned that the religious autonomy doctrine did not govern the present case because "purchasing a health insurance plan is not an ecclesiastical decision . . . ." 1-ER-27. This conclusion is at odds with the religious autonomy guarantees of the First Amendment.

---

[2] Anyone who violates SB 6219's abortion-coverage mandate is guilty of a gross misdemeanor and may be fined up to $1,000 and imprisoned up to 364 days, in addition to other potential penalties. 4-ER-624.

## SUMMARY OF ARGUMENT

SB 6219 unconstitutionally requires Cedar Park to provide its employees with health insurance coverage for abortions and abortion-inducing drugs. Religious autonomy principles bar the state of Washington from forcing a pro-life church to include abortion coverage in its employee health plan, an internal management decision that is essential to Cedar Park's beliefs, teaching, and mission.

## ARGUMENT

### I. Churches Enjoy Religious Autonomy Under the First Amendment.

Under the Free Exercise clause of the First Amendment, churches have the right to autonomously "select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions." Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 COLUM. L. REV. 1373, 1389 (1981) (internal citations omitted); *see also Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 714 (1976) (recognizing that civil courts exercise no jurisdiction "in a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them . . . .") (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1871)). "This right of autonomy logically extends to all aspects of church operations. There is nothing in the cases to indicate that the Supreme Court would

disagree. The Court has consistently extended the right of church autonomy as far as necessary to include the cases before it." 81 COLUM. L. REV. at 1397.

In other words, civil courts may not interfere with a church's ecclesiastical decisions. *See Milivojevich*, 426 U.S. at 713 ("[A] civil court must accept the ecclesiastical decisions of church tribunals as it finds them."); *see also Erdman v. Chapel Hill Presbyterian Church*, 175 Wash. 2d 659, 682, 286 P.3d 357, 370 (2012) ("[A] civil court is required to defer to the church's ecclesiastical decision."); *see also Kedroff*, 344 U.S. at 113 ("'[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.'") (quoting *Watson*, 80 U.S. at 727).

The Supreme Court has "developed a doctrine, grounded originally in common law but later in the First Amendment, 'limiting the role of civil courts in the resolution of religious controversies that incidentally affect civil rights.'" *Puri v. Khalsa*, 844 F.3d 1152, 1162 (9th Cir. 2017) (quoting *Milivojevich*, 426 U.S. at 710). Under this doctrine of "ecclesiastical abstention," also known as "church

6

autonomy"[3] or "religious autonomy,"[4] states may adopt any one of various approaches for resolving church disputes "so long as it involves no consideration of doctrinal matters." *Puri*, 844 F.3d at 1162 (quoting *Jones v. Wolf*, 443 U.S. 595, 602 (1979)). Such approaches must be employed to "decide disputes involving religious organizations 'without resolving underlying controversies over religious doctrine.'" *Id*. at 1164 (quoting *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999)). The Supreme Court has identified two primary approaches to deciding church disputes under the religious autonomy doctrine.

The first approach, "derived from *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872), and its progeny, is simply to 'accept[ ] the decision of the established decision-making body of the religious organization.'" *Id*. at 1162 (quoting *Kianfar*, 179 F.3d at 1248). Under this approach,

> [w]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church . . . but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.

---

[3] *See* Carl H. Esbeck, *An Extended Essay on Church Autonomy*, 22 FED. SOC. REV. 244 n.1 (2021) ("In lieu of church autonomy, some courts use the term 'ecclesiastical abstention.'"); *see also* 81 COLUM. L. REV. at 1417 n.2 (discussing the doctrine of church autonomy generally, while noting that the use of "church" in this context is used "to refer to any religious group; the term is not limited to organized Christian churches.").

[4] *See* 1-ER-26–27 (discussing the "religious autonomy doctrine . . . .") (citing *Kedroff*, 344 U.S. at 116).

*Puri*, 844 F.3d at 1162 (quoting *Milivojevich*, 426 U.S. at 709).

The second approach is known as the "neutral principles of law" approach. *Id.* at 1163. This method seeks to apply secular legal principles to church disputes only where there is no danger that doing so "will thrust the secular courts into the constitutionally untenable position of passing judgment on questions of religious faith or doctrine." *Id.* (quoting *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 947 (1999)). For example, this Court applied the neutral principles of law approach to a dispute as to whether individuals were properly elected or designated to disputed positions on boards of religious organizations. *Puri*, 844 F.3d at 1167. Additionally, "[p]roperty disputes have proved especially amenable to application of the neutral-principles approach." *Id.* at 1165 (citing *Kianfar*, 179 F.3d at 1249).

Yet even in the property dispute context, this second approach has its limits. Indeed, "'there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property,' and, '[i]f in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.'" *Id.* (quoting *Jones*, 443 U.S. at 604).

8

Ultimately, the first approach is applicable in the present case. This is not a simple property dispute or a determination of whether a board member was properly appointed. This is a case of a state law directly infringing on the central mission of a church, which is a matter of doctrinal conviction. *See Puri*, 844 F.3d at 1162. But even if this Court applied the "neutral principles of law" approach, the Court would be compelled to defer to church discretion since the lower court resolved a "religious controversy" by ignoring the "religious concepts" incorporated directly into the church's mission and operation. *See id.* at 1165.

## II. By Upholding SB 6219's Application to Cedar Park, the District Court Violated Cedar Park's Religious Autonomy.

Protecting unborn life is essential to Cedar Park's religious beliefs, central mission, and operation. Yet SB 6219 requires Cedar Park to facilitate access to abortion services contrary to those religious beliefs, central mission, and operation. In light of the religious autonomy doctrine, the lower court erred by upholding the application of SB 6219 to Cedar Park.

As the District Court acknowledged, "[b]ecause of SB 6219, Cedar Park's employees gained coverage for abortion services under their employer-sponsored health insurance plan that they would not otherwise have." 1-ER-15–16. The lower court further admitted that "SB 6219 requires Cedar Park to facilitate access to covered abortion services contrary to Cedar Park's religious beliefs. *Thus, SB 6219, under certain circumstances, could burden religion.*" 1-ER-16 (emphasis added).

9

Yet the District Court confusingly held that SB 6219 did not actually burden religion because, *inter alia*, "purchasing a health insurance plan is not an ecclesiastical decision . . . ." 1-ER-27. This conclusion not only contradicts the District Court's earlier finding that SB 6219 burdens religion, but it also misapprehends the issue in this case. The District Court focuses on the act of "purchasing a health insurance plan" at a high level of generality rather than the actual issue, namely SB 6219's requirement that Cedar Park facilitate access to abortions.

The Supreme Court has clearly established that religious organizations enjoy First Amendment protection regarding the ways in which they participate in seemingly secular activities, especially relating to the care of children, when those activities implicate the religious beliefs, central mission, and operation of the religious organizations.

Consider the education of children for example. One could argue that reading, writing, phonics, and math are not religious topics, and thus decisions governing the instruction of those topics are not "ecclesiastical decision[s]." Under that line of reasoning, religious organizations should have no First Amendment protections when it comes to the operation of parochial schools under their control in providing education to children. However, the Supreme Court soundly rejected that reasoning in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020).

In that case, the Supreme Court examined the application of religious autonomy in the parochial school context, specifically the hiring and firing of teachers. *Morrissey-Berru*, 140 S. Ct. at 2055. As the Supreme Court observed,

> [t]he religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission. Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

*Morrissey-Berru*, 140 S. Ct. at 2055. Interfering with the mission of the religious organization was not acceptable.

In *N.L.R.B. v. Cath. Bishop of Chicago*, 440 U.S. 490 (1979), the Supreme Court considered a National Labor Relations Board enforcement action against church-run schools that refused to recognize or bargain with unions representing lay faculty members at the schools. Some might consider the decision to engage or not engage with faculty unions to be a merely secular function. However, the Court found that the NLRB's "exercise of jurisdiction over teachers in church-operated schools would implicate the guarantees" of the First Amendment, *id*. at 507, because doing so would have a chilling effect on the church's exercise of "control of the religious mission of the schools." *Id*. at 496 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 616 (1971)).

Consider another example: the regulation of foster care agencies. The year after *Morrissey-Berru* was decided, the Supreme Court considered a city's refusal to contract with a religiously affiliated state-licensed foster care agency unless the agency agreed to certify same-sex couples as foster parents. *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868 (2021). The Supreme Court ultimately concluded that "the City's actions have burdened [the foster care agency's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs," and the Court held that the burden on religious exercise was not constitutionally permissible. *Fulton*, 141 S. Ct. at 1876.

So too here. The state of Washington has presented Cedar Park with the choice of either curtailing its mission or approving (and even facilitating access to) abortion services inconsistent with its beliefs and mission. Promoting the sanctity of unborn life is key to Cedar Park's mission as a Christian ministry, and its operational discretion over the range of procedures covered by health insurance provided to its employees is central to that ministry's objective. As in *Fulton*, the state's actions have impermissibly burdened Cedar Park's religious autonomy through SB 6219 by effectively deciding that the church's doctrine is incorrect and requiring the church to change its operations to comply with the state's violative edicts if the church wants to continue operating in the same capacity. The District Court erroneously upheld this unconstitutional burdening of Cedar Park's religious autonomy.

## CONCLUSION

Because the State of Washington's actions have burdened Cedar Park's religious exercise by putting it to the choice of curtailing its mission or approving procedures inconsistent with its beliefs, *Fulton*, 141 S. Ct. at 1876, this Court should reverse.

Respectfully submitted,

s/ Joseph D. Spate
Alan Wilson
*Attorney General*
Robert Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
Thomas T. Hydrick
*Asst. Dep. Solicitor General*
Joseph D. Spate
*Asst. Dep. Solicitor General*
STATE OF SOUTH CAROLINA
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly St.
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General of Alabama

TREG TAYLOR
Attorney General of Alaska

TIM GRIFFIN
Attorney General of Arkansas

CHRISTOPHER M. CARR
Attorney General of Georgia

RAÚL LABRADOR
Attorney General of Idaho

BRENNA BIRD
Attorney General of Iowa

KRIS KOBACH
Attorney General of Kansas

JEFF LANDRY
Attorney General of Louisiana

LYNN FITCH
Attorney General of Mississippi

ANDREW BAILEY
Attorney General of Missouri

AUSTIN KNUDSEN
Attorney General of Montana

MICHAEL T. HILGERS
Attorney General of Nebraska

MARTY JACKLEY
Attorney General of South Dakota

JONATHAN SKRMETTI
Attorney General of Tennessee

KEN PAXTON
Attorney General of Texas

JASON MIYARES
Attorney General of Virginia

PATRICK MORRISEY
Attorney General of West Virginia

## CERTIFICATE OF SERVICE

I certify that on November 28, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that the foregoing document is being served on this day to all counsel of record registered to receive a Notice of Electronic Filing generated by CM/ECF.

s/ Joseph D. Spate<br>Joseph D. Spate

November 28, 2023

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35560, 23-35585

I am the attorney or self-represented party.

**This brief contains** | 2,825 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Joseph D. Spate | **Date** | 11/28/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | Rev. 12/01/22