No. 23-35560, 23-35585

In the

# United States Court of Appeals
## for the Ninth Circuit

_____

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,
*Plaintiff-Appellant/Cross-Appellee*,

v.

MYRON KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington, AKA Mike Kreidler; JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington,
*Defendants-Appellees/Cross-Appellants*.

**On Appeal from the United States District Court
for the U.S. District Court for Western Washington, Tacoma
Civil Case Number 3:19-cv-05181-BHS**

_____

**BRIEF OF INSTITUTE FOR FAITH AND FAMILY AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLANT/CROSS-APPELLEE
AND REVERSAL**

_____

Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554

*Attorney for Amicus Curiae
Institute for Faith and Family*

## CORPORATE DISCLOSURE STATEMENT FRAP 26.1

Institute for Faith and Family is a nonprofit, tax-exempt organization that does not issue stock and has no parent corporation.

Dated: November 28, 2023      Respectfully submitted,

/s/Deborah J. Dewart
Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554

*Attorney for Amicus Curiae*
*Institute for Faith and Family*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT FRAP 26.1 ...................................... i

TABLE OF AUTHORITIES ........................................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................. 1

ARGUMENT .............................................................................................. 3

I.     THE CHURCH'S FUNDAMENTAL RIGHT TO INTERNAL GOVERNANCE RESPECTING EMPLOYEE BENEFITS FITS THE WELL-ESTABLISHED DOCTRINE OF CHURCH AUTONOMY. .......... 3

II.    CHURCH AUTONOMY DEMANDS MORE THAN A RIGHT TO EQUAL TREATMENT-THE FIRST AMENDMENT GIVES "SPECIAL SOLICITUDE" TO RELIGIOUS ORGANIZATIONS. ............ 8

III.   CHURCH AUTONOMY HAS DEEP ROOTS IN AMERICAN HISTORY. .............................................................................. 10

CONCLUSION ........................................................................................... 12

CERTIFICATE OF COMPLIANCE ................................................................. 14

CERTIFICATE OF SERVICE ........................................................................ 15

# TABLE OF AUTHORITIES

## Cases

*American Legion v. American Humanist Assoc.*,
    139 S. Ct. 2067 (2019) ................................................................ 4, 11

*Capitol Hill Baptist Church v. Bowser*,
    496 F. Supp. 3d 288 (D.C. Dist. Ct. 2020) ...................................... 10

*Cedar Park Assembly of God v. Kreidler*,
    2023 U.S. Dist. LEXIS 128295 ...................................................... 3, 8

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
    508 U.S. 520 (1993) ............................................................................ 9

*Church of the Holy Trinity v. United States*,
    143 U.S. 457 (1892) .......................................................................... 12

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ....................................................................... 8

*Employment Division v. Smith*,
    494 U.S. 872 (1990) ............................................................................ 8

*EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*,
    597 F.3d 769 (6th Cir. 2010) .............................................................. 9

*Engel v. Vitale*,
    370 U.S. 421 (1962) ............................................................................ 4

*Everson v. Board of Education of Ewing Township*,
    330 U.S. 1 (1947) ....................................................................... 5, 7, 8

*Hosanna-Tabor Lutheran v. Perich*,
    565 U.S. 171 (2012) ......................................................... 2, 5, 6, 7, 9

*Jones v. Wolf*,
    443 U.S. 595 (1979) ............................................................................ 6

*Kedroff v. St. Nicholas Cathedral,*
    344 U.S. 94 (1952) ................................................................ 5, 7

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022) ...................................................... 3, 11

*Lemon v. Kurzman,*
    403 U.S. 602 (1971) ................................................................ 11

*Maryland & Va. Churches v. Sharpsburg Church,*
    396 U.S. 367 (1970) .................................................................. 6

*McCollum v. Board of Educ.,*
    333 U.S. 203 (1948) .................................................................. 4

*Nally v. Grace Community Church of the Valley,*
    763 P.2d 948 (Cal. 1988) .......................................................... 7

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) .................................................... 2, 5, 6, 7

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,*
    393 U.S. 440 (1969) .................................................................. 2

*School Dist. of Abington Township v. Schempp,*
    374 U.S. 203 (1963) ................................................................ 10

*Serbian Eastern Orthodox Diocese v. Milivojevich,*
    426 U.S. 696 (1976) .......................................................... 4, 6, 7

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014) ................................................................ 11

*Van Orden v. Perry,*
    545 U.S. 677 (2005) ............................................................ 4, 10

*Wallace v. Jaffree,*
    472 U.S. 3 (1985) .................................................................... 11

iv

*Watson v. Jones*,
    80 U.S. 679 (1872) ....................................................................... 4, 5, 7

*Westbrook v. Penley*,
    231 S.W.3d 389 (Tex. 2007) .............................................................. 7


## State Statutes

RCW 48.43.072 .................................................................................... 1

RCW 48.43.073 .................................................................................... 1


## Other Authorities

Samuel E. Ericsson, *Clergyman Malpractice: Ramifications of a New Theory*,
    16 Val.U.L.Rev. 163 (1981) ............................................................... 7

Carl H. Esbeck, *Article: An Extended Essay on Church Autonomy*,
    22 Federalist Soc'y Rev. 244 (2021) ........................................... 3, 4, 5

Declaration of Independence ................................................................. 10

James Madison*, Memorial and Remonstrance Against Religious Assessments*
    (June 20, 1785), in Selected Writings of James Madison 21, 22
    (Ralph Ketcham ed., 2006) .......................................................... 10, 11

James Madison, *The Papers of James Madison*, Henry Gilpin, editor
    (Washington: Langtree and O'Sullivan, 1840),
    Vol. II, June 28, 1787 ...................................................................... 12

Letter (Oct. 11, 1798), reprinted in
    9 Works of John Adams 229 (C. Adams ed. 1971) ........................... 12

Thomas Jefferson, *Notes on the States of Virginia*
    (Philadelphia: Mathew Carey, 1794), Query XVIII ......................... 12

## INTEREST OF AMICUS CURIAE[1]

The Institute for Faith and Family, as *amicus curiae*, respectfully urges this Court to reverse the decision of the district court and remand for further proceedings.

The Institute for Faith and Family is a North Carolina nonprofit organization that exists to preserve and promote faith, family, and freedom through public policies that protect constitutional liberties, including speech and religion. See https://iffnc.com.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The State of Washington demands that a *church*—committed to honoring the Creator by preserving the sanctity of human life in the womb—provide abortion coverage for its employees. The law requires all health plans that provide coverage for maternity care or services to also provide each covered person "with substantially equivalent coverage to permit the abortion of a pregnancy." RCW 48.43.072; RCW 48.43.073 (the "Abortion Mandate"). This pernicious mandate encroaches on the sanctity of the church and warrants this Court's examination under the doctrine of

---

[1] *Amicus curiae* certifies that no counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to its preparation or submission. All parties consent to the filing of this brief.

church autonomy. The harm to the church is far more egregious than any ordinary Free Exercise violation.

Church autonomy was the "constitutional foundation" for the Supreme Court's holding in *Hosanna-Tabor Lutheran v. Perich*, 565 U.S. 171 (2012) ("*Hosanna*"), specifically, "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe School v. Morrissey-Berru,* 140 S. Ct. 2049, 2061 (2020) ("*OLG*"). Like the ministerial employee exception upheld in *Hosanna* and further defined in *OLG*, a church's internal decision about the benefits provided to those employees is a "closely linked matter[] of internal government," impacting both employees and the donors who provide the financial support to pay their compensation and benefits.

This case raises the question: Does the state have broad jurisdiction to dictate a church's internal decision about the employment benefits it must provide its employees—even ministerial employees? The long-established doctrine of church autonomy answers unequivocally that it does not. The right of the *church itself* to make such decisions is an internal matter of "church doctrine and practice" protected from state intrusion. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 445 (1969). It is not an ordinary Free Exercise claim. The state is not at liberty to require a place of worship to ensure its employees access to abortion.

# ARGUMENT

## I. THE CHURCH'S FUNDAMENTAL RIGHT TO INTERNAL GOVERNANCE RESPECTING EMPLOYEE BENEFITS FITS THE WELL-ESTABLISHED DOCTRINE OF CHURCH AUTONOMY.

Church autonomy is "not a personal right rooted in an individual's religious beliefs, but a zone of protection for an entity's internal governance that is derived from the organization's religious character." Carl H. Esbeck, *Article: An Extended Essay on Church Autonomy*, 22 Federalist Soc'y Rev. 244, 246 (2021). The church is more than the accumulation of its members' individual rights. A careful reading of the First Amendment's text reveals that the church itself, as an entity, enjoys protection drawn from both the Free Exercise and Establishment Clauses. The Supreme Court recently recognized the inextricable intertwining in the First Amendment, including the two clauses protecting religion as well as the Free Speech Clause. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022). These three are not at war with one another, but complementary. The Religion Clauses are two sides of the same coin, together guarding liberty for both individuals and religious organizations.

The district court brushed aside Cedar Assembly's religious autonomy argument, summarily agreeing with the State that "purchasing a health insurance plan is not an ecclesiastical decision." *Cedar Park Assembly of God v. Kreidler*, 2023 U.S. Dist. LEXIS 128295, *30. But the Supreme Court has long recognized church

autonomy as a legal doctrine that provides structural protection—a legal "sanctuary" for religious organizations, free of government interference even through allegedly neutral laws. This crucial autonomy properly recognizes church and state as separate spheres with separate powers. The Free Exercise Clause protects individual rights while the Establishment Clause guards the appropriate separation of church and state. *See, e.g., McCollum v. Board of Educ.*, 333 U.S. 203, 212 (1948) ("religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere"); *Engel v. Vitale*, 370 U.S. 421, 431 (1962) ("a union of government and religion tends to destroy government and to degrade religion"). The Supreme Court has repeatedly reaffirmed the appropriate separation that allows church and state "each to flourish in its separate sphere." *American Legion v. American Humanist Assoc.*, 139 S. Ct. 2067, 2091 (2019) (Breyer, J., concurring), citing *Van Orden* v. *Perry*, 545 U.S. 677, 698 (2005) (cleaned up).

Church autonomy undergirds several earlier Supreme Court decisions and "has its own exclusive line of precedent." Esbeck, *Church Autonomy*, 22 Federalist Soc'y Rev. at 245. *See, e.g.*, *Watson v. Jones*, 80 U.S. 679, 728-729 (1872) ("[t]he right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine . . . is unquestioned"); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 710 (1976) (courts must accept church's internal decisions of "discipline, or of faith, or ecclesiastical rule, custom,

or law"). *Kedroff v. St. Nicholas Cathedral* contains a frequently quoted comprehensive description of church autonomy—"a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." 344 U.S. 94, 116 (1952); *see Hosanna,* 565 U.S. at 186; *OLG,* 140 S. Ct. at 2055. These cases ensure that *Everson*'s "high and impregnable" "wall" is one that guards church autonomy. *Everson v. Board of Education of Ewing Township*, 330 U.S. 1, 17 (1947). "The doctrine thus affords the church a defense in the nature of a categorical immunity— something like a government-free zone." Esbeck, *Church Autonomy*, 22 Federalist Soc'y Rev. at 246.

Church autonomy is a comprehensive doctrine that has historically encompassed several key areas. One is religious doctrine. "The law knows no heresy, and is committed to the support of no dogma . . . ." *Watson v. Jones*, 80 U.S. at 728. Internal church governance, organization, and administration is another. *Kedroff*, 344 U.S. at 107-108. Selection of church leadership is a major emphasis in church autonomy case law (*Hosanna*, *OLG*). Admission, discipline, and removal of members is also a broadly protected area. *Watson v. Jones*, 80 U.S. at 733 ("conformity of the members of the church to the standard of morals required of them"). As the Supreme Court has observed, "doctrinal matters" encompass "the

ritual and liturgy of worship" as well as "the tenets of faith." *Jones v. Wolf*, 443 U.S. 595, 602 (1979), citing *Maryland & Va. Churches v. Sharpsburg Church*, 396 U.S. 367, 368 (1970) (Brennan, J., concurring).

The Supreme Court has developed church autonomy doctrine in recent years through ministerial employment cases such as *Hosanna* and *OLG*. In addition to decisions about *who* to employ, decisions about employee benefits also "affect the faith and mission of the church itself." *Hosanna*, 565 U.S. at 190. Indeed, "the autonomy of religious groups . . . has often served as a shield against *oppressive civil laws*." *Ibid.* (Alito, J., concurring) (emphasis added). The Abortion Mandate is the epitome of an "oppressive civil law"—a draconian requirement that a church facilitate abortion through its health insurance plan, in direct conflict with its "own rules and regulations for internal discipline and government." *Milivojevich*, 426 U.S. at 724. Government attempts "to dictate or even influence" a church's decisions on such matters of "faith and doctrine" "would constitute one of the central attributes of an establishment of religion," thus transgressing the First Amendment. *OLG*, 140 S. Ct. at 2060. The church must retain the power to determine what benefits to offer those who carry out its mission, "without interference by secular authorities." *Ibid.* Much like the ministerial exception that protects the church's right to select its leaders, courts must "preserve a church's independent authority to determine" whether and what sort of employment benefits to offer those leaders. *Id*. at 2061.

Church autonomy is not limited to the selection of ministerial employees, important as that is to the life of a church. *Watson*, *Milivojevich* and *Kedroff* form the backdrop for this Court's more recent consideration of church autonomy in *Hosanna*, although "none was exclusively concerned with the selection or supervision of clergy." *OLG,* 140 S. Ct. at 2061 (2020) (describing church autonomy as a broad principle of "independence in matters of faith and doctrine and in closely linked matters of internal government"). Church autonomy has been applied in cases about pastoral counseling, including judicial rejection of "clergy malpractice" claims that would entangle courts in setting a standard of care for pastors who counsel church members. "[T]he secular state is not equipped to ascertain the competence of counseling when performed by those affiliated with religious organizations." *Nally v. Grace Community Church of the Valley,* 763 P.2d 948, 960 (Cal. 1988), quoting Samuel E. Ericsson, *Clergyman Malpractice: Ramifications of a New Theory*, 16 Val.U.L.Rev. 163, 176 (1981). The Texas Supreme Court, upholding the dismissal of a lawsuit against a pastor who was formerly a professional counselor, "zealously protected" "the constitutional interest in prohibiting judicial encroachment upon a church's ability to manage its affairs and discipline its members." *Westbrook v. Penley*, 231 S.W.3d 389, 403 (Tex. 2007). These cases are consistent with *Everson's* admonition that "[n]either a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice*

7

*versa*.“ 330 U.S. at 16. The same is true, not only with respect to a church's decision about *who* to hire to fulfill its religious mission, but also the employment benefits it offers to such persons.

## II. CHURCH AUTONOMY DEMANDS MORE THAN A RIGHT TO EQUAL TREATMENT—THE FIRST AMENDMENT GIVES "SPECIAL SOLICITUDE" TO RELIGIOUS ORGANIZATIONS.

The district court applied the wrong standard of review, utterly bypassing current Supreme Court precedent concerning basic religious liberty—let alone church autonomy. The court relied on the "neutral, generally applicable" standard established by *Employment Division v. Smith*, 494 U.S. 872 (1990). *Cedar Park Assembly*, *12-29. The court applied the lowest level of scrutiny and found the law was "rationally related" to a laundry list of purportedly "legitimate" government purposes, including "better access to health benefits," "gender equity and women's reproductive health," "access to contraceptives, which is connected to economic success of women and the ability to participate in society equally," and interference "with a woman's personal, private pregnancy decision-making and her constitutionally protected right[2] to safe and legal abortion care." *Id*., *27. According

---

[2] Abortion is no longer recognized as a federal constitutional right. "We hold that *Roe* and *Casey* must be overruled. The Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision, including the one on which the defenders of *Roe* and *Casey* now chiefly rely— the Due Process Clause of the Fourteenth Amendment." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022).

to the district court, these purposes trumped the fundamental right of a church to operate and make internal decisions according to its religious doctrine. The very wording of these "legitimate" purposes assaults the church's internal doctrine and practice. Even under *Smith*, these purposes are openly hostile to the religious convictions of many religious organizations and the clash with religious doctrine is eminently foreseeable to legislators.

In cases where religion is expressly targeted for unfavorable treatment, *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) offers religious liberty claimants a better chance of success. But in a matter that "affects the faith and mission of the church itself" (*Hosanna*, 565 U.S. at 190), equality is not the correct standard. In *Hosanna*, the lower court only required equality, reasoning that "Congress intended the ADA to broadly protect employees of religious entities from retaliation on the job, subject only to a narrowly drawn religious exemption." *EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.,* 597 F.3d 769, 777 (6th Cir. 2010). But this Court found that position "untenable . . . hard to square with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations." *Hosanna,* 565 U.S. at 188-189. The Abortion Mandate is equally "hard to square" with the First Amendment's text.

## III. CHURCH AUTONOMY HAS DEEP ROOTS IN AMERICAN HISTORY.

Washington's unprecedented Abortion Mandate finds no support in historical precedent. Religious freedom, especially for religious organizations, has deep roots in American history, both for individual citizens and the entities or associations they form for religious purposes.

"Th[e] instinct to protect religious freedom has roots that predate the Constitution." *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 288, 293 (D.C. Dist. Ct. 2020), citing James Madison*, Memorial and Remonstrance Against Religious Assessments* (June 20, 1785), in Selected Writings of James Madison 21, 22 (Ralph Ketcham ed., 2006) ("The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate.") The Constitution protects certain inalienable rights because the Framers were convinced that all persons were "endowed by their Creator with certain unalienable Rights" (Declaration of Independence). "The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself. . . ." *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 213 (1963); *Van Orden v. Perry,* 545 U.S. at 683.

The Founders recognized religion as both a human right and "a duty towards the Creator." *Wallace v. Jaffree,* 472 U.S. 3, 54 n. 38 (1985), citing James Madison's "Memorial and Remonstrance Against Religious Assessments." The duty to protect human life is "a duty towards the Creator" of that life. In examining the state's intrusion on the church's ability to fulfill that duty, "[a]ny test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014). A few years after *Town of Greece*, this Court affirmed that it now "looks to history for guidance" in Establishment Clause cases. *American Legion v. American Humanist Assoc*., 139 S. Ct. at 2087. The Supreme Court has officially abandoned the frequently criticized, "abstract, and ahistorical approach" set forth in *Lemon v. Kurzman,* 403 U.S. 602 (1971). *Kennedy*, 142 S. Ct. at 2427. The historical approach now adopted by the Court is perhaps even more critical when the rights of the church as an independent entity are at stake.

Religion is a vital element of American history and government. But if the rights guaranteed by the Religion Clauses are severed from their roots, they will wither and die. They will no longer be inalienable but will hang by the thread of human whim. No one will be free—not even the atheists who loudly proclaim "separation of church and state" in misguided attempts to purge religious expression from the public square. Thomas Jefferson cautioned against discarding America's

religious roots, questioning how "can the liberties of a nation be thought secure when we have removed their only firm basis—a conviction in the minds of the people that these liberties are the gift of God?" Thomas Jefferson, *Notes on the States of Virginia* (Philadelphia: Mathew Carey, 1794), p. 237, Query XVIII. America has long been known as "a religious people." *Church of the Holy Trinity v. United States*, 143 U.S. 457, 465 (1892). The American judicial system is inescapably linked to religion:

> We have no government armed with power capable of contending with human passions unbridled by morality and religion. . . . Our constitution was made only for a moral and religious people. It is wholly inadequate to the government of any other.

Letter (Oct. 11, 1798), reprinted in 9 Works of John Adams 229 (C. Adams ed. 1971).

James Madison said it well: "If a sparrow cannot fall to the ground without His notice, is it probable that an empire can rise without His aid? We've been assured in the sacred writing that, 'Except the Lord build the house, they labor in vain that build it.'" James Madison, *The Papers of James Madison*, Henry Gilpin, editor (Washington: Langtree and O'Sullivan, 1840), Vol. II, p. 185, June 28, 1787.

Church autonomy must be protected and preserved. The district court improperly disregarded this important historically grounded doctrine.

## CONCLUSION

*Amicus curiae* urges this Court to reverse the district court ruling and remand for further proceedings.

Dated:  November 28, 2023            Respectfully submitted,

/s/Deborah J. Dewart
Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554

*Attorney for Amicus Curiae*
*Institute for Faith and Family*

13

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 2,829 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED: November 28, 2023          /s/Deborah J. Dewart_____
                                  Deborah J. Dewart

                                  *Attorney for Amicus Curiae*
                                  *Institute for Faith and Family*

14

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 28, 2023. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: November 28, 2023          /s/Deborah J. Dewart
                                  Deborah J. Dewart

                                  *Attorney for Amicus Curiae*
                                  *Institute for Faith and Family*