**Nos. 23-35560, 23-35585**

**In the United States Court of Appeals
for the Ninth Circuit**
_____

**Cedar Park Assembly of God of Kirkland, Washington**,
*Plaintiff-Appellant/Cross-Appellee*

*v.*

**Myron Kreidler**, in his official capacity as Insurance Commissioner
for the State of Washington, AKA Mike Kreidler; **Jay Robert Inslee**,
in his official capacity as Governor of the State of Washington,
*Defendants-Appellees/Cross-Appellants*
_____

On Appeal from the United States District Court
for the Western District of Washington
No. 3:19-cv-05181-BHS, Hon. Benjamin H. Settle
_____

# Brief of Amicus Curiae Oregon Right to Life Supporting Plaintiff-Appellant/Cross-Appellee and Reversal

James Bopp, Jr.
  jboppjr.@aol.com
Richard E. Coleson
  rcoleson@bopplaw.com
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street
Terre Haute, IN 47807
(812) 232-2434 Telephone
(812) 235-3685 Facsimile
*Attorneys for Amicus Curiae*

November 28, 2023

# Corporate Disclosure Statement

Oregon Right to Life, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock. Fed. R. App. P. ("**FRAP**") 26.1.

# **Table of Contents**

Table of Authorities ................................................................................iv

Identity and Interest of Amicus ............................................................1

Argument ...................................................................................................4

    I.    Generality is based on inclusiveness relative to asserted interests and is not limited to *Fulton*'s tests. ................................................4

        A.  Generality controls scrutiny level. .......................................4

        B.  Generality is based on inclusiveness relative to asserted interests. .......6

        C.  *Fulton*'s non-generality tests are necessarily nonexclusive. .................7

    II.   Washington's and Oregon's abortion-coverage mandates are non-general. ................................................................................17

Conclusion ...............................................................................................25

# Table of Authorities

***Cases***

*Boerne v. Flores*, 521 U.S. 507 (1997) ....................................................................5

*Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014)..................................2, 12, 18

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ......................................................11

*Christian Legal Society Chapter of the University of California, Hastings College of Law v. Martinez*, 561 U.S. 661 (2010)..................................................10

*Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520 (1993) ........ 5-7, 9, 12, 21, 24

*EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610 (9th Cir. 1988).......................2

*Employment Division v. Smith*, 494 U.S. 872 (1990) .....................................*passim*

*Fellowship of Christian Athletes*, 82 F.4th 664 (9th Cir. 2023) ......... 3, 5, 10, 16-17

*First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978) ....................................................7

*Foothill Church v. Watanabe*, 623 F. Supp. 3d 1079 (E.D. Cal. 2022) ... 3, 8, 14-15

*Foothill Church v. Watanabe*, No. 2:15-cv-02165, 2023 WL 1767748 (E.D. Cal. Feb. 3, 2023) ...............................................................................................3

*Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868 (2021) ............*passim*

*Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136 (1987) ......10

*In re S. Bay United Pentecostal Church*, 992 F.3d 945 (9th Cir. 2021)..................9

*Kennedy v. Bremerton School District*, 142 S.Ct. 2407 (2022).............................10

*Oregon Right to Life v. Stolfi*, No. 6:23-cv-01282-MK (D. Or.).............................2

*Rep. Party Minn. v. White*, 536 U.S. 765 (2002) ........................................................7

*S. Bay United Pentecostal Church v. Newsom*, 141 S.Ct. 716 (2021) ....................7

*Sherbert v. Verner*, 374 U.S. 398 (1963) ...........................................5, 10-11, 14-15

*Skyline Wesleyan Church v. CDMHC*, 968 F.3d 738 (9th Cir. 2020) .....................3

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ..................................2 ,10

*Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. ...................................5

*Stormans, Inc. v. Wiesman*, 579 U.S. 942 (2016) .....................................................6

*Tandon v. Newsom*, 141 S.Ct.1294 (2021) .......................................2, 3, 5, 9, 12, 20

*United States v. Lee*, 455 U.S. 252 (1982) ..............................................................11

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) .................................................................

### Constitutions, Statutes & Rules
26 U.S.C. § 501(c)(4) .................................................................................................1

Consolidated Appropriations Act, 2018, Pub. L. 115-41, Div. H, § 507(d), 132
    Stat. 348 (Mar. 23, 2018) ................................................................................22

FRAP 26.1 .....................................................................................................................i

FRAP 29(a)(2) .............................................................................................................1

FRAP 29(a)(4)(E) .......................................................................................................1

ORS § 743A.066...........................................................................................................21

ORS §§ 743A.066-067 ...............................................................................................18

RCW § 48.43.073(5) ...................................................................................................23

Supremacy Clause, U.S. Const. art. VI, cl. 2 ..........................................................23

***Other Authorities***

Milken Inst. Sch. Pub. Health, *Equity vs. Equality: What's the Difference?*,
onlinepublichealth.gwu.edu/resources/equity-vs-equality/, ...........................18

Ore. Health Auth., *House Bill 3391: Reproductive Health Equity Act: Report
to the Legislature* (2018) ..................................................................19

# Identity and Interest of Amicus[1]

Oregon Right to Life, Inc. ("**ORTL**") is an Oregon, non-stock, membership corporation, nonprofit under § 501(c)(4) of the U.S. Internal Revenue Code. It was formed in 1970 to proclaim and advocate for the inherent dignity of human life and to promote respect and protection for human life regardless of race, sex, age, or stage of development. ORTL has over 25,000 members and supporters.

ORTL's religious belief in the sanctity of human life from conception to natural death arises from Judeo-Christian religious beliefs—traditionally incorporated into Western Civilization—to which ORTL and those who control it subscribe. Those beliefs include the Bible's command against intentional destruction of innocent human life, making such destruction a grave sin. Those beliefs include the consequent belief that it is a grave religious and moral wrong to deliberately cooperate, facilitate, or otherwise participate in providing abortion,[2] which precludes ORTL from providing insurance coverage for that without violating conscience.

---

[1] No party counsel authored this brief in whole or part, and no party, party counsel, or other person (other than amicus, its members, or its counsel) contributed money intended to fund preparing or submitting this brief. FRAP 29(a)(4)(E). All parties consented to filing this brief. FRAP 29(a)(2). All hyperlinks were correct and functional at filing.

[2] ORTL's opposition to "abortion" herein includes opposition to "contraceptives" that act as abortifacients.

1

ORTL is controlled by a Board of Directors who share those religious beliefs and operate ORTL under those beliefs. So ORTL can assert a Free Exercise Clause violation as did the corporations in *Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014). The Ninth Circuit has similarly looked to the beliefs of those who control a corporation where the corporation asserts religious beliefs. *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 619-20 (9th Cir. 1988); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009).

ORTL's *general* interest here is protecting it and similar prolife organizations from being compelled to facilitate abortion against conscience by mandated health-insurance coverage for abortion. ORTL's *specific* interest here is in advancing the proper Free Exercise Clause analysis in support of ORTL's challenge to Oregon's similar abortion-coverage mandate compelling ORTL to cover abortion services against its sincerely held religious beliefs. ORTL's Verified Complaint for Declaratory and Injunctive Relief was filed on September 5, 2023, in *Oregon Right to Life v. Stolfi*, No. 6:23-cv-01282-MK, in the U.S. District Court for the District of Oregon. On September 12, 2023, ORTL filed a motion for a preliminary injunction (ECF #11) and a motion to consolidate the preliminary-injunction and merits hearings under Fed. R. Civ. P. 65(a)(2) (ECF #13).

ORTL filed its case shortly after the free-exercise sea-change wrought by *Tandon v. Newsom*, 141 S. Ct.1294 (2021) (per curiam), and *Fulton v. City of*

2

*Philadelphia, Pennsylvania*, 141 S.Ct. 1868 (2021), based on which California churches recently won challenges similar to the one ORTL brings. The churches' similar challenges were to California's 2014 abortion-coverage mandate. *Foothill Church v. Watanabe*, 623 F. Supp. 3d 1079 (E.D. Cal. 2022) (summary judgment); *Foothill Church v. Watanabe*, No. 2:15-cv-02165, 2023 WL 1767748, at *5 (E.D. Cal. Feb. 3, 2023) (Order granting permanent injunction on free-exercise claim and ordering DMHC Director to process exemption for "abortion care coverage comporting with their religious beliefs").[3] ORTL seeks relief similar to that obtained by the California churches and sought here by Cedar Park Assembly of God of Kirkland ("**Cedar Park**").

This Court's free-exercise analysis in this case will control or inform ORTL's challenge. A proper analysis will give ORTL success. ORTL here particularly focuses on what makes provisions "generally applicable" under precedents such as *Employment Division v. Smith*, 494 U.S. 872 (1990), clarified in *Tandon*, 141 S.Ct.1294, and *Fulton*, 141 S. Ct. 1868, as recognized in *Fellowship of Christian Athletes*, 82 F.4th 664 (9th Cir. 2023) (en banc) ("**FCA**").

---

[3] This followed remand for consideration in light of *Fulton*, 141 S.Ct. 1868. *Foothill Church v. Watanabe*, 3 F.4th 1201 (9th Cir. 2021). *See also Skyline Wesleyan Church v. CDMHC*, 968 F.3d 738 (9th Cir. 2020) (similar free-exercise challenge held justiciable); Order Granting Joint Motion and Entering Judgment, *Skyline*, Doc. 141, No. 3:16-cv-00501 (S.D. Cal. May 11, 2023) (agreed permanent injunction for Skyline and ordered relief).

# Argument

*Smith* (5-4) altered free-exercise analysis by removing neutral, "generally applicable" laws from strict scrutiny. *Compare* 494 U.S. at 879 *with id.* at 894 (O'Connor, J., joined by Brennan, Marshall, and Blackmun, JJ., concurring in judgment with strict-scrutiny analysis) (collecting cases). This brief focuses on what makes provisions *general* versus *non-general*. As established: (**I**) generality is based on inclusiveness relative to asserted interests and is not limited to *Fulton's* tests and (**II**) Washington's and Oregon's abortion-coverage mandates are non-general.

## I.
### Generality is based on inclusiveness relative to asserted interests and is not limited to *Fulton*'s tests.

As established next, (**A**) generality controls scrutiny level, (**B**) generality is based on inclusiveness relative to asserted interests, and (**C**) *Fulton*'s tests for non-generality tests are necessarily nonexclusive.

### A. Generality controls scrutiny level.

*Smith* held that a "valid and neutral law of general applicability . . . that . . . proscribes (or prescribes) conduct that [one's] religion prescribes (or proscribes)" is subject to rational-basis review. 494 U.S. at 879 (citation omitted) (emphasis added).[4] Conversely, laws that are *non*-neutral, *non*-general, or both, get strict

---

[4] Congress quickly reinstated strict scrutiny for federal free-exercise burdens: *Smith*'s impact was quickly felt, and Congress was inundated with reports of

scrutiny. *Id.* at 886 n.3. *Accord Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015), *cert. denied*, 579 U.S. 942 (2016).[5] Under strict scrutiny, "law[s] . . . must be justified by a compelling governmental interest and . . . narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 531-32 (1993). "The tests for '[n]eutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied.'" *Stormans*, 794 F.3d at 1076 (quoting *Lukumi*, 508 U.S. at 531). "Nevertheless, we must consider each criterion separately so as to evaluate the text of the challenged law as well as the 'effect . . . in its real operation.'" *Id.* (quoting *Lukumi*, 508 U.S. at 535). *Fulton* applied strict scrutiny under

---

the decision's consequences.[footnote omitted] In response, it attempted to restore the *Sherbert*[ *v. Verner*, 374 U.S. 398 (1963),] test. In the House, then-Representative Charles Schumer introduced a bill that made a version of that test applicable to all actions taken by the Federal Government or the States. H. R. 1308, 103d Cong., 1st Sess. (1993). This bill, which eventually became the Religious Freedom Restoration Act (RFRA), passed in the House without dissent, was approved in the Senate by a vote of 97 to 3, and was enthusiastically signed into law by President Clinton. 139 Cong. Rec. 27239–27341 (1993) (House voice vote); *id.*, at 26416 (Senate vote); Remarks on Signing the Religious Freedom Restoration Act of 1993, 29 Weekly Comp. of Pres. Doc. 2377 (1993).

*Fulton*, 141 S.Ct. at 1893-94 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in judgment). Though RFRA originally reached state-imposed burdens, *Boerne v. Flores*, 521 U.S. 507 (1997), held Congress lacked that power. Many states have RFRAs, but Oregon and Washington don't.

[5] Though *Stormans* is correct on strict scrutiny, where its analysis varies from the Supreme Court's the latter controls. *See FCA*, 82 F.4th at 685-88 (required changes to Ninth Circuit free-exercise analysis after *Tandon* and *Fulton*).

5

*Smith* to strike a requirement that a religious, state-licensed, foster-care agency certify same-sex couples as foster parents against belief. 141 S.Ct. at 1882. Despite non-neutrality evidence, it was "more straightforward" to use a non-generality analysis. *Id.* at 1877. That analysis is also straightforward here.

**B. Generality is based on inclusiveness relative to asserted interests**.

To avoid strict scrutiny under *Smith*, a law had to be a "*general* law," *Smith*, 494 U.S. at 879 (emphasis added), of "*general* applicability," *id.* (emphasis added), applicable "*across-the-board*," *id.* at 884, to all to whom asserted interests apply, as in *Smith*, where the controlled-substances ban applied to all without exception. A law is not "generally applicable," *id.* at 880, if it is *underinclusive* (or overbroad) in relation to those to whom "the government's asserted interest" applies. *Fulton*, 141 S.Ct. at 1877; *accord Lukumi*, 508 U.S. at 543 ("ordinances are underinclusive for those ends."); *id.* ("underinclusiveness is substantial"); *id.* at 544 ("underinclusive with regard to . . . interest"); *id.* at 545 ("underinclusive . . . with regard to [interest]"); *id.* ("underinclusive on its face"); *id.* at 546 ("ordinances are overbroad or underinclusive in substantial respects."). *See also Stormans, Inc. v. Wiesman*, 579 U.S. 942 (2016) (Alito, J., joined by Roberts, C.J., and Thomas, J., dissenting from denial of certiorari) (questioning Ninth Circuit's finding that Christian pharmacists weren't targeted and demonstrating law was non-

general as "underinclusive").

Underinclusiveness *also* can establish that: (i) an asserted interest can't be taken seriously, *see Rep. Party Minn. v. White*, 536 U.S. 765, 766 (2002) ("as a means of pursuing this interest, . . . clause is so woefully underinclusive that the Court does not believe it was adopted for that purpose." (citation omitted)); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 793 (1978) (underinclusiveness "undermines the likelihood of a genuine state interest"); (ii) an asserted interest isn't "compelling," *Lukumi*, 508 U.S. at 546-47; or (iii) a provision is not narrowly tailored, *id.* at 546; *S. Bay United Pentecostal Church v. Newsom*, 141 S.Ct. 716, 718 (2021) (statement of Gorsuch, J., joined in relevant part by four other Justices) (citing *Bellotti*, 435 U.S. at 793) (underinclusivity is a "telltale sign[] th[e] Court has long used to identify laws that fail strict scrutiny."). But if a law doesn't apply to all to whom asserted interests apply, it *also* is non-general for free-exercise analysis.

## C. *Fulton*'s non-generality tests are necessarily nonexclusive.

*Fulton* provided two tests that can establish free-exercise non-generality, 141 S.Ct. at 1877, but those are necessarily nonexclusive.

*Fulton* cited *Smith* for one of the tests, herein the "**particular-reason analysis**": "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct' by providing '"a mechanism for indi-

vidualized exemptions.'" *Id.* (quoting *Smith*, 494 U.S. at 884). So laws with individual-exemption mechanisms, are non-general, as in *Fulton*, 141 S.Ct. at 1878, and *Foothill*, 623 F. Supp. 3d at 1092-93 ("A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." (cleaned up)). But *Fulton* emphasized what lies *behind* such a mechanism, i.e., "government . . . consider[ing] . . . particular reasons" when exempting. This reading was confirmed when *Fulton* rejected the argument that the mechanism was "irrelevant because the Commissioner ha[d] never granted one," 141 S.Ct. at 1872, saying the issue was whether government was invited "'to decide which reasons for not complying with the policy are worthy of solicitude.'" *Id.* (quoting *Smith*, 494 U.S. at 884). So if particular reasons are, or can be, considered for granting exemptions, a law is non-general. Also, *Fulton* decided that if *part* of a law has such a particular-reason mechanism, though another doesn't, they must be read together and the *whole* is non-general. 142 S.Ct. at 1879. *Cf. id.* at 1928-29 (Gorsuch, J., joined by Thomas and Alito, JJ., concurring in judgment) (Majority position is that "the City's power to grant exemptions from its nondiscrimination policy *anywhere* 'undercuts its asserted interests' and thus 'trigger[s] strict scrutiny for applying the policy *everywhere*.'" (emphasis in original; citation omitted)).

    *Fulton* provided a second test: "A law also lacks general applicability if it pro-

8

hibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." 141 S.Ct. at 1877 (citation omitted) ("**comparable-exemption analysis**"). This example was from *Lukumi*, 508 U.S. 520, where a law was non-general for barring animal sacrifice based on a public-health interest concerning animal carcass disposal that logically applied to exempted hunters and restaurants. *Fulton*, 141 S.Ct. at 1877 (citation omitted). *See also Rom. Cath. Diocese Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020) (pandemic-based law non-general for restricting worship sites to ten persons but not restricting "many whose services are not limited to those . . . regarded as essential"); *Tandon*, 141 S.Ct. at 1296, 1298 (granting injunction pending appeal) (COVID-19 restrictions "contain[ing] myriad exceptions . . . for . . . activities" "comparable" to restricted religious exercise "not . . . generally applicable"); *In re S. Bay United Pentecostal Church*, 992 F.3d 945, 948 (9th Cir. 2021). The comparable-exemption analysis can't logically be restricted to *secular* exemptions (at issue in these cases) because comparable *religious* exemptions also make laws not "generally applicable," *Smith*, 494 U.S. at 879, in relation to asserted interests. *See Tandon*, 141 S.Ct. at 1298 ("contains myriad exceptions and accommodations for *comparable activities*" (emphasis added)).

These two *Fulton* analyses are necessarily *nonexclusive* because the sole *over-*

*arching test* is whether a law is "general," *Smith*, 494 U.S. at 874, 879, "generally

applicable," *id.* at 879-80, "across-the-board," *id.* at 884. *See also Kennedy v.*

*Bremerton School District*, 142 S.Ct. 2407, 2423 (2022) (supervisory requirement

was non-general because it "was not applied in an evenhanded, across-the-board

way"). *Cf., e.g.*, *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S.

136, 141 (1987) ("neutral and uniform"); *Wisconsin v. Yoder*, 406 U.S. 205, 220

(1972) ("applies uniformly to all citizens of the State"). Notably, *Sherbert* in-

volved non-general work requirements because those declining to work on Sunday

would not be penalized like those who declined to work on Saturday, as the Court

noted, 374 U.S. at 406, so strict scrutiny was proper even under *Smith*.[6] In *FCA*,

this Court noted that the general applicability of an all-comers policy in *Christian*

*Legal Society Chapter of the University of California, Hastings College of Law v.*

*Martinez*, 561 U.S. 661 (2010), turned on the fact that "the stipulated facts in *Mar-*

*tinez* provid[ed] for an *exceptionless* policy." *FCA*, 82 F.4th at 686 (emphasis in

original). *See also id.* at 694 ("The narrowness of the [*Martinez*] Court's holding is

evident by its repeated emphasis that the policy was applicable 'across-the-board'

. . . ."). Whether a law is generally applicable has long been a key issue in free-

---

[6] For free-exercise analysis, the sole generality issue for determining scrutiny level is whether a provision is generally applicable. So it matters not whether the exception that makes it non-general might be an accommodation of religious beliefs (for those observing Sunday in *Sherbert*, but not for Sabbatarians).

exercise cases as *Smith* noted. 494 U.S. at 878-80. For example, *Cantwell v. Connecticut*, 310 U.S. 296 (1940), which incorporated the Free Exercise Clause into the Fourteenth Amendment, *id.* at 303, began its analysis of a free-exercise challenge to a solicitation licensing requirement by saying that "*general* and non-discriminatory legislation" regulation of solicitation would not violate the Fourteenth Amendment, *id.* at 304 (emphasis added). *See also id.* at 305 (The *general* regulation, in the public interest, of solicitation . . . would not constitute a prohibited previous restraint on the free exercise of religion . . . ." (emphasis added)).

That an *exceptionless* policy is required under *Smith* to avoid strict scrutiny is logically required for at least two reasons. First, to *justify* changing from strict scrutiny for all free-exercise cases under *Sherbert*, 374 U.S. 398, to rational-basis scrutiny for general laws, *id.* at 879, the majority *relied* on cases applying lower scrutiny based on general applicability. But that justification does not logically apply to non-general laws, whatever the non-generality reason. Second, by enacting general laws, legislatures implicitly assert that the law *needs* to be generally applicable, which government also asserts when resisting granting exceptions. A needs-general-application argument is sometimes argued (under strict scrutiny) as a compelling interest, e.g., *United States v. Lee*, 455 U.S. 252 (1982), upheld requiring Amish employers and employees to participate in the social-security system against conscience because "[m]andatory participation is indispensable to the

fiscal vitality of the social security system," *id.* at 259.[7] *See also Fulton*,141 S.Ct. at 1882 (exception mechanism undercuts claim that law "can brook no departures"). But by enacting a *non*-general law, the legislature acknowledges at the beginning that the law does not *need* general application. Thus, it eliminates any needs-general-application interest and justifies the strict-scrutiny analysis to provide for required conscience exemptions.

So *Fulton*'s particular-reason and comparable-exemption analyses are merely two ways to satisfy the overarching generality test. And the actual generality test is general applicability itself, based on inclusion relative to interests.

The foregoing free-exercise analysis from the U.S. Supreme Court necessarily controls over any contrary lower-court analysis. For example, in *Tandon*, 141 S.Ct. 1294 (per curiam), the Court noted that "[t]his is the fifth time the Court has summarily rejected the Ninth Circuit's analysis of California's COVID restrictions on religious exercise," *id.* at 1297-98 (collecting cases). The Court reiterated that California's regulation "contains myriad exceptions and accommodations for comparable activities," *id.* at 1298, and strict scrutiny "'is not watered down'; it 'really means what it says,'" *id.* (quoting *Lukumi*, 508 U.S. at 546).

---

[7] In *Hobby Lobby*—when "HHS . . . argu[ed] that applying the contraceptive mandate to for-profit employers with sincere religious objections is essential to the comprehensive health-insurance scheme that ACA establishes," 573 U.S. at 733-34—the Court distinguished *Lee* and held that "comprehensive" interest was insufficient to justify not allowing conscience exemptions, *id.* at 735.

Thus, the High Court's analysis controls over any contrary Ninth Circuit analysis in cases such as *Stormans*, 794 F.3d 1064, which involved rules compelling pharmacists to act against conscience. *Stormans* (i) noted the Supreme Court's "'individualized exemption' doctrine," *id.* at 1081; (ii) said *Smith* "limited that doctrine," *id.*; (iii) noted the "substantially similar" and "good faith compliance" language in the rules plaintiffs identified as "discretionary text," *id.*; (iv) concluded "the rules do not afford unfettered discretion that could lead to religious discrimination because the provisions are tied to particularized, objective criteria," *id.* at 1081-82; (v) said "[t]he mere existence of an exemption that affords some minimal governmental discretion does not destroy a law's general applicability," *id.* at 1082; and (vi) agreed with courts that "have rejected a *per se* approach and instead apply a fact-specific inquiry to determine whether the regulation at issue was motivated by discriminatory animus, or whether the facts support an argument that the challenged rule is applied in a discriminatory fashion that disadvantages religious groups . . . ,'" *id.* (citation omitted). That narrowing of *Smith*'s "generally applicable" test erred under *Smith* and fails under *Fulton*.

While just comparing *Stormans*'s narrowed test with *Fulton*'s reveals the errors, note five highlights. First, *Fulton* nowhere endorsed the Ninth Circuit's notion that the generally applicable inquiry requires a "fact-specific inquiry to determine whether the regulation at issue was motivated by discriminatory animus." *Id.*

(citation omitted). Under *Fulton*, "animus" might apply to the *neutrality* analysis, but not to the *generality* analysis, which simply identifies non-generality alone.

Second, *Fulton* reaffirmed that "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing '"a mechanism for individualized exemptions."'" 141 S.Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). So individual-exemption mechanisms make laws non-general without more, as in *Fulton*, 141 S.Ct. at 1878, and *Foothill*, 623 F. Supp. 3d at 1092-93.

Third, the Ninth Circuit claim that the "mere existence" of such a mechanism "does not destroy a law's general applicability," 794 F.3d at 1082, is erroneous since *Fulton* rejected the argument that the mechanism was "irrelevant because the Commissioner ha[d] never granted one," 141 S.Ct. at 1872, and decided that if *part* of a law has such a mechanism, though another does not, they must be read together and the *whole* is non-general, *id.* at 1879.

Fourth, the *Stormans* claim that *Smith* "limited" the "individualized exemption doctrine," 794 F.3d at 1081, is erroneous because *Smith* instead declined to apply the "*Sherbert* test to analyze free exercise challenges to . . . laws" "with an across-the-board criminal prohibition on a particular form of conduct," 494 U.S. at 884, that did *not* have a "a system of individual exemptions," *id.* (citations omitted). That *Stormans* claim also errs under *Fulton*'s reaffirmation of the *Smith* analysis

14

that such a mechanism makes a law non-general. 141 S.Ct. at 1877.

Fifth, the Ninth Circuit belief that "unfettered discretion" is required for an individualized-exemption mechanism to make a law non-general, 794 F.3d at 1081-82, fails under both *Smith* and *Fulton*. As *Stormans* noted, *Smith* showed that precedent had established the "'individualized exemptions' doctrine." *Id.* at 1081. But *Smith*'s discussion neither mentioned "unfettered discretion" nor established such a requirement for a "mechanism for individualized exemptions" or "a system of individual exemptions." 494 U.S. at 884. *Smith* cited the unemployment compensation law at issue in *Sherbert* "as allowing benefits for employment caused by at least some 'personal reasons,'" *id.* (citation omitted), which limited discretion to such reasons. *Foothill* correctly understood *Fulton* that the non-generality test asks only if there *is* an individualized-exemption mechanism without any consideration of the scope of the discretion: "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." 623 F. Supp. 3d at 1092-93 (cleaned up). *After* stating this, *Foothill* added *other* approaches involving discretion:

> Nor is it generally applicable if it includes "a formal system of entirely discretionary exceptions . . . ." [141 S.Ct.] at 1878. Such a mechanism or formal system might include a "good cause" standard permitting the government to grant exemptions, *Smith*, 494 U.S. at 884, or a provision in the law allowing exceptions at the "sole discretion" of a government agent, *Fulton*, 141 S.Ct.

15

at 1878.

*Id.* at 1093. This correctly recognizes that the mentions of "sole discretion" and "entirely discretionary" in *Fulton* were *describing* a provision that had such language: "'unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion,'" 141 S.Ct. at 1878 (citation omitted). *Fulton* made clear that this "sole discretion" language was *descriptive*, not *prescriptive* of language formal mechanisms require. *Compare id.* at 1877 (test stated as "a mechanism for individualized exemptions" with no mention of "sole discretion") *with id.* at 1878 ("in this case at the 'sole discretion' of the Commissioner") *and id.* at 1879 ("here, at the Commissioner's 'sole discretion'"). So where an individualized-exemption mechanism exists, it makes a law non-general without any consideration of how much discretion it affords. And assuming *arguendo* that the *Stormans* "minimal governmental discretion" language survives *Fulton*, which it doesn't, the existence of a *formal* exemption mechanism differs in kind from the "substantially similar" and "good faith compliance" language at issue in *Stormans*.

This Court en banc in *FCA*, 82 F.4th 664, expressly recognized that key parts of its analysis under *Smith* were abrogated by *Fulton*. For example, *Fulton* "refin[ed] what it means to be 'generally applicable' under *Smith*," *id.* at 687, "clearly reject[ing the Ninth Circuit] 'targeting' requirement for demonstrating a Free Exercise violation," *id*. 686. *FCA* expressly overruled precedent requiring

16

plaintiffs to prove "targeting" (a "purpose" requirement). *Id. FCA* expressly distinguished "an *exceptionless* policy" from one allowing exception discretion in the Free Exercise Clause analysis, *id.* (emphasis in original), emphasizing again that to be generally applicable a provision must apply "without exception" and "'across-the-board,'" and not be "replete with exemptions," *id.* at 694 (citations omitted). And *FCA* recognized that "unfettered discretion" was not required to make a law non-general because "*Fulton* counsels that the mere existence of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable regardless of the actual exercise." *Id.* at 687-68. So *Fulton* changed free-exercise law in ways favoring Cedar Park and ORTL, e.g., by not requiring that they prove targeting or unfettered discretion.

## II.
### Washington's and Oregon's abortion-coverage mandates are non-general.

*Washington's* abortion-coverage mandate is non-general as Cedar Park shows.. Appellant's First Br. 34-41. While ORTL doesn't repeat that, ORTL notes that non-generality is self-evident under *Smith*'s actual test—general applicability based on inclusion relative to interests, *supra* Part I.

ORTL next demonstrates why *Oregon's* similar abortion-coverage mandate is *also* non-general for the purpose of illustrating the proper application of the general-applicability test established in Part I.

Oregon's mandate was imposed by § 2 ("**Oregon Mandate**") of 2017 Enrolled
House Bill ("**HB 3391**"/"**Bill**"), in the Reproductive Health Equity Act
("**RHEA**"), codified in Oregon Revised Statutes ("**ORS**") §§ 743A.066-067. *See*
olis.oregonlegislature.gov/liz/2017R1/Downloads/MeasureDocument/HB3391
(Bill text); www.oregonlegislature.gov/bills_laws/lawsstatutes/2017orlaw0721.pdf
(Oregon Laws). The 2017 Oregon Mandate requires "health benefit plans" to
cover abortion and contraception services.

The "generally applicable" analysis, *Smith*, 494 U.S. at 880, first asks what is
the asserted interest.[8] Oregon's interest was asserted in the name of the act impos-
ing Oregon's Mandate, the "Reproductive Health Equity Act," i.e., an *equal-
outcome* interest, *see, e.g.*, Milken Inst. Sch. Pub. Health, *Equity vs. Equality:
What's the Difference?*, onlinepublichealth.gwu.edu/resources/equity-vs-equality/,

---

[8] The interest supporting an act like RHEA differs from the interest govern-
ments must show to justify not granting exemptions from, e.g., the abortion-cover-
age mandates. For denying an exemption, the inquiry is whether *denying an ex-
emption* "advances 'interests of the highest order' and is narrowly tailored to
achieve those interests," *Fulton*, 141 S.Ct. at 1881 (citation omitted). If "the gov-
ernment can achieve its interests in a manner that does not burden religion, it must
do so." *Id.*; *accord Hobby Lobby*, 573 U.S. at 728. "Rather than rely on 'broadly
formulated interests,' courts must 'scrutinize[ ] the asserted harm of granting spe-
cific exemptions to particular religious claimants.'" *Fulton*, 141 S.Ct. 1881 (cita-
tion omitted)). "The granting of an exemption from a generally applicable law is
tantamount to a holding that a law is unconstitutional as applied to a particular set
of facts [citation omitted], and cases holding generally applicable laws unconstitu-
tional as applied are unremarkable." *Fulton*, 141 S.Ct. at 1916-17 (Alito, J., joined
by Thomas and Gorsuch, JJ., concurring in judgment).

in providing financial coverage for "reproductive health" services for all. RHEA's requirements confirm this cover-all interest by mandating health-benefit plans to cover "reproductive health," Bill § 2, and funding the same coverage for some, Bill §§ 4-5, 11. That cover-all interest is confirmed by officials: "House Bill (HB) 3391 ensures that Oregonians have access to comprehensive reproductive health care regardless of their income, citizenship or immigration status, gender identity, or insurance coverage," since "everyone deserves access to" such care. Ore. Health Auth., *House Bill 3391: Reproductive Health Equity Act: Report to the Legislature* 1 (2018).[9] Governor Brown confirmed the purpose to "'expand[] access to basic reproductive health services for all Oregonians . . . .'" *Id.*

The general-applicability test next asks whether Oregon's Mandate is under-inclusive in relation to that cover-all interest. It is, in at least four ways.

First, the Oregon Mandate is underinclusive due to the grandfathering exemption, Bill § 2(7)(e), which excludes covering "[a]bortion if the insurer offering the health benefit plan excluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year." This exempted Providence Health Plans ("**PHP**") and one other entity from the Mandate. Under *Smith*'s overarching "generally applicable" test, 494 U.S. at 880, this

---

[9] Available at
www.oregon.gov/oha/PH/HEALTHYPEOPLEFAMILIES/REPRO-DUCTIVESEXUALHEALTH/Documents/RHEA/HB3391-Leg-Report.pdf.

exemption makes the Oregon Mandate non-general because the cover-all interest logically applies to all health-benefit plans. Under *Fulton*'s comparable-exemption analysis, 141 S.Ct. at 1877, the Mandate is non-general because this exemption excludes abortion coverage on the secular ground of 2017 plan coverage while not exempting ORTL on religious grounds. And if, despite that secular language, it is argued that the legislature created this exemption for the particular reasons stated in the PHP Letter—such as PHP being faith-based and "Oregon's largest health care provider, largest health plan, and the largest private employer," PHP Letter at 1—that makes the exemption non-general under particular-reason analysis.[10] That PHP is the "largest" makes the Mandate *substantially* underinclusive.

Second, the Oregon Mandate is underinclusive for exempting "religious employers"[11] from abortion and contraceptive coverage. Bill § 2(9). Though that is an appropriate accommodation under establishment-clause analysis, the present context is the free-exercise "generally applicable" test, and *Smith*'s free-exercise analysis asks *solely* whether a law is "generally applicable" to all to whom an interest logically extends, 494 U.S. at 879, not *how* non-generality occurs. *See Tandon*, 141 S.Ct. at 1298 (per curiam) (strict scrutiny applies because provision "contains

---

[10] Note that ORTL asserts that the exemption is based on *secular* grounds and does *not* suggest or concede that the secular-language *is* a religious accommodation, only that even if it were so deemed the Mandate is still non-general.

[11] ORTL doesn't fit the narrow "religious employer" definition. Bill § 2(9).

myriad exceptions and accommodations for comparable activities"). Though the exemptions *Fulton* cited from *Lukumi* were *secular*, 141 S.Ct. at 1877, the cover-all interest logically extends to all plans covering all entities (and beyond), so this exemption makes the Oregon Mandate non-general. And in administering this exemption, Defendants must consider particular reasons, i.e., whether "religious employers" (a) have the right purpose, (b) primarily employ like-values persons, (c) primarily serve like-values persons, and (d) are nonprofit. Bill § 2(1)(d) (incorporating ORS § 743A.066). That makes the Oregon Mandate non-general under *Fulton*'s particular-reason analysis, 141 S.Ct. at 1877.

Third, the Mandate is underinclusive because it has a *formal* mechanism for individualized exemptions—to avoid loss of federal funding, but only as far as necessary:

> If [DCBS] concludes that enforcement of this section may adversely affect the allocation of federal funds to this state, the department may grant an exemption to the requirements but only to the minimum extent necessary to ensure the continued receipt of federal funds.

Bill § 2(10). That mechanism alone makes the Oregon Mandate not "generally applicable" under *Smith*. 494 U.S. at 880, 884-85. And under *Fulton*, it doesn't matter whether exemptions are *granted*. 141 S.Ct. at 1872. Under *Fulton*'s particular-reason analysis, *id.* at 1877, this formal mechanism allows Defendants to consider particular reasons why exemptions are sought—as in an unsuccessful exemption

request ORTL had filed under this provision[12]—and balance reasons to grant as little conscience protection as necessary to save federal funding. So it is readily non-general under that analysis. Since *Fulton* held that if *part* of a law has such a particular-reason mechanism it makes the *whole* non-general, *id.* at 1879; *id.* at 1928-29 (Gorsuch, J., joined by Thomas and Alito, JJ., concurring in judgment), this formal mechanism for individualized exemptions makes the Oregon Mandate as a whole non-general. The Oregon Mandate is also non-general under *Fulton*'s comparable-exemption analysis because it authorizes an exemption for a *secular* reason, i.e., assuring federal funds, while not exempting ORTL for a *religious* reason. ORTL argued that it objected because it believes that abortion is a grave

---

[12] ORTL argued that DCBS should grant the requested exemption because the Oregon Mandate as applied to those unwilling to "provide coverage of . . . abortions" jeopardizes Oregon's receipt of federal funds under the Weldon Amendment ("**Weldon**"), which provides as follows:

> (1) None of the funds made available in this Act may be made available to a Federal agency or program, or to a *State* or local government, if such agency, program, or government subjects any institutional or individual health care entity to *discrimination* on the basis that the health care entity does not provide, pay for, *provide coverage of*, or refer for *abortions*.

> (2) In this subsection, the term "*health care entity*" includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a *health insurance plan*, or *any other kind of health care* facility, organization, or *plan*.

*See, e.g.*, Consolidated Appropriations Act, 2018, Pub. L. 115-41, Div. H, § 507(d), 132 Stat. 348 (Mar. 23, 2018) (emphasis added). Under Trump administration interpretations of Weldon's provisions, ORTL could make this argument, though those changed in the next administration.

moral wrong and religiously forbidden under the traditional Judeo-Christian be-liefs that motivate the actions of ORTL and its board members.[13]

Before leaving this formal, save-federal-funds, exemption mechanism, ORTL notes that it is no answer for purposes of the general-applicability test to say the mechanism is required to comply with federal law, including the Supremacy Clause, U.S. Const. art. VI, cl. 2. The test asks only if a law applies to all to whom the asserted interest applies, not *why* exemptions are made, so the mechanism makes the mandate non-general. And while federal law requires compliance with, e.g., the Weldon Amendment *to receive* linked federal funds, federal law does *not* require states to receive those federal funds. The mechanism exists by choice.

Fourth, the Oregon Mandate is underinclusive because it excludes certain types of health plans. For example Bill § 2(1)(c) defines "health benefit plan" to exclude certain plans:

> (c) "Health benefit plan" has the meaning given that term in ORS 743B.005, excluding Medicare Advantage Plans and including health benefit plans offering pharmacy benefits administered by a third party administrator or pharmacy benefit manager.

Far from expanding "reproductive health" services funding under all plans, the Oregon Mandate advances the cover-all interest only for those with health-benefit plans (or who qualify for public funding, Bill § 5). This leaves countless em-

---

[13] Washington has a formal mechanism for individualized exemptions to pre-serve federal funds. RCW 48.43.073(5).

23

ployed, self-employed, and unemployed persons unaided by the Oregon Mandate. These coverage gaps undermine the cover-all interest and make the Oregon Mandate not "generally applicable," 494 U.S. at 880, in relation to that interest under *Smith*. And the legislature had to consider particular reasons for why the Mandate excludes all of these situations when there is no exemption for ORTL's health-benefit plan, which makes the Oregon Mandate non-general under *Fulton*'s particular-reasons analysis. 141 S.Ct. at 1877.[14]

The above exemptions and gaps make the Oregon Mandate non-general since they undermine the government's asserted interest "in a similar or greater degree" to granting ORTL an exemption. *Lukumi*, 508 U.S. at 543. For example, exempting "religious employers" would undermine the cover-all interest in a similar degree to exempting ORTL because like-values employees in both cases don't want the objectionable coverage. The other exceptions and gaps undermine the cover-all interest to a "greater degree," *id.*, based on comparing ORTL employees *not* wanting objectionable coverage to others *wanting* that coverage.

In sum, the Oregon Mandate is non-neutral and it is non-general in multiple ways in relation to the cover-all interest under *Smith*'s overarching "generally applicable" test and *Fulton*'s non-exclusive, non-generality tests. So the free-

---

[14] Washington has similar gaps in its mandate that make it non-general. Appellant's First Br. 37-40.

24

exercise analysis proceeds under strict scrutiny.

# Conclusion

Under *Smith*, 494 U.S. 872, the free-exercise test for whether a law is gener-ally applicable turns on inclusiveness relative to asserted interests. Consequently, the general-applicability test is not limited to two tests *Fulton* mentions. Under *Smith*'s general-applicability test, Washington's and Oregon's abortion-coverage mandates are non-general. So strict scrutiny applies, under which both are uncon-stitutional. The district court should be reversed.

Respectfully submitted,

<u>s/ James Bopp, Jr.</u>
James Bopp, Jr.
  jboppjr.@aol.com
Richard E. Coleson
  rcoleson@bopplaw.com
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street
Terre Haute, IN 47807
(812) 232-2434 Telephone
(812) 235-3685 Facsimile
*Attorneys for Amicus Curiae*

# Certificate of Service

I hereby certify that, on November 28, 2023, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

s/ James Bopp, Jr.
James Bopp, Jr.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | Nos. 23-35560, 23-35585

I am the attorney or self-represented party.

**This brief contains** | 5,824 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ James Bopp, Jr. | **Date** | November 28, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*