**23-35560, 23-35585**

# United States Court of Appeals for the Ninth Circuit

**CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,**

*Plaintiff-Appellant/Cross-Appellee*

*v.*

**MYRON KREIDLER**, *in his official capacity as Insurance Commissioner for the State of Washington, AKA Mike Kreidler*; **JAY ROBERT INSLEE**, *in his official capacity as Governor of the State of Washington,*

*Defendants-Appellees/Cross-Appellants.*

On Appeal from the United States District Court
for Western District of Washington
Civil Case No. 3:19-cv-05181-BHS
Hon. Benjamin H. Settle

**BRIEF OF LIFE LEGAL DEFENSE FOUNDATION AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT/CROSS-APPELLEE**

CATHERINE W. SHORT
    Counsel of Record
SHEILA A. GREEN
Life Legal Defense Foundation
PO Box 1313
Ojai, CA 93024-1313
(707) 337-6880
kshort@lldf.org
Counsel to *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Life Legal Defense Foundation is a non-profit corporation with no stock or parent corporations.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ........................................................... iii

INTEREST OF *AMICUS* CURIAE ...................................................... 1

SUMMARY OF ARGUMENT ........................................................... 2

ARGUMENT ........................................................................... 4

   I.   The Free Exercise Clause Must Be Interpreted According to Its Text and Informed by History and Tradition. ..................................................... 4

   II.   American History and Tradition Support the Right of Conscience of Individuals Who Refuse to Participate in the Taking of Human Life......... 6

     A.   The Right Not to Kill Has Been Respected Since Colonial Times. 6

     B.   The Right Not to Kill Continued Under the Constitution ............ 10

       1. Exemptions from Military Service................................... 11

       2. Exemptions from participating in capital punishment .................... 16

   III.   Exemptions from participating in or paying for abortions. ............. 17

     A.   Church Amendments ..................................................... 19

     B.   Coats-Snowe Amendment to Public Health Service Act ............. 21

     C.   The Weldon Amendment.............................................. 21

     D.   The Affordable Care Act ............................................. 22

     E.   Conscience Protections in the States ............................. 23

   IV.   Exemptions from participating in assisted suicide. ......................... 24

   V.   The Relief Cedar Park Seeks Falls Squarely Within the Historical Tradition of Granting Religious Exemptions From Coerced Participation in the Taking of Human Life.................................................... 26

CONCLUSION ......................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Baxter v. State*, 224 P.3d 1211 (Mont. 2009) ................................................ 25

*Dist. of Columbia v. Heller*, 554 U.S 570 (2008) ...................................... 4, 6

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ............................................................... 3, 4, 18, 19

*Fulton v. City of Phila.*, 141 S. Ct. 1868 (2021) ................................. 4, 5, 10

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .......... 7

*Planned Parenthood of Minn., N.D., S.D. v. Rounds*,
    530 F.3d 724 (8th Cir. 2008) .................................................................. 5

*Roe v. Wade*, 410 U.S. 113 (1973) ............................................................. 18

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981) ................................................................ 13, 14, 15, 16

*U.S. v. Seeger*, 380 U.S. 163 (1965) .......................................................... 11

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ........................................ 24

## Statutes

18 U.S.C. § 3597(b) .................................................................................... 16

42 U.S. Code § 18023 .................................................................................. 22

42 U.S.C. § 18113(a) ................................................................................... 26

42 U.S.C. § 238n ......................................................................................... 21

42 U.S.C. § 300a ................................................................................... 20, 21

Ala. Code Title 15. Criminal Procedure § 15-18-82.1(j) ............................ 17

Ariz. Dep't of Corrections, Dep't Ord. 710:
    Execution Procedures 2, § 3.3.4 .......................................................... 17

Cal. Health & Saf. Code § 443.14 ............................................................... 25

Cal. Penal Code § 3605(c) ........................................................................... 17

Colo. Rev. Stat. § 25-48-116(2), 117 ......................................................... 25

Conn. Dep't of Corr. Admin. Directive 6.15:
    Admin. of Capital Punishment, para. 1 .................................................. 17

Consol. Appropriations Act, 2022, Pub. L. No. 117-103,
    § 507(d)(1), 136 Stat. 496, 448 (2022) .................................................. 22

D.C. Law 21-182 § 11 ................................................................................. 25

Ga. Code Title 17. Criminal Procedure § 17-10-38(d) ............................... 17

Hawaii Rev. Stat. § 327L-19 ....................................................................... 25

**Statutes (cont.)**

Me. Rev. Stat. Title 22, § 2140(21).............................................................. 25

Mont. Code Ann. 50-9-203 ........................................................................ 25

N.J. Stat. §§ 26:16-17 ............................................................................... 25

N.M. Stat. § 24-7C-7(A)(3) ...................................................................... 25

Rev. Code Wash. 70.245.190(1)(b)........................................................... 25

Vt. Title 18, Ch. 13 § 5285........................................................................ 25

**Other Authorities**

Bruce M. Carlson, *Patten's Foundations of Embryology* (6th ed. 1996)....... 5

Death Penalty Information Center,
https://deathpenaltyinfo.org/states-landing ............................................... 16

Joseph W. Dellapenna, *Dispelling the Myths of Abortion History* 1070
(2006) ..................................................................................................... 24

*Journals of the Continental Congress, 1774-1789,* ed.
Worthington C. Ford et al. (Washington, D.C., 1904-37), 2:189 ............... 9

*Letter from James Madison to Edward Livingston, 10 July 1822,*
National Archives, https://founders.archives.gov/documents/
Madison/04-02-02-0471........................................................................... 8

Mark L. Rienzi, *The Constitutional Right Not to Kill,*
62 Emory L. Rev. 121 (2012) ...................................................... 11, 12, 17

Michael W. McConnell, *The Origins and Historical Understanding of Free
Exercise of Religion,* 103 Harvard Law Review 1409 (1989) ........... passim

Nadia Sawicki, *Procedural Protections in Reproductive Health Care
Conscience Laws,* The Policy Surveillance Program: A LawAtlas
Project,https://lawatlas.org/datasets/procedural-protections-in-
reproductive-health-care-conscience-laws ............................................... 23

*Patient Choice at End of Life Frequently Asked Questions,* Vermont
Department of Health,
https://www.healthvermont.gov/sites/default/files/document/Patient%20C
hoice%20FAQ_8-24-23.pdf...................................................................... 25

*Quakers Battle of Guilford Courthouse,* National Park Service,
https://www.nps.gov/articles/000/quakers-at-the-battle-of-guilford-
courthouse.htm .......................................................................................... 9

*Religion and the Founding of the American Republic,* Library of Congress,
https://www.loc.gov/exhibits/religion/rel01.html ....................................... 3

Ronan O'Rahilly, *Human Embryology & Teratology* (3d ed. 2001) ............. 5

**Regulations**

45 C.F.R. § 147.132(a) ................................................................. 23

U.S. Dep't of Def. Instruction 1300.06, § 3.2 ............................... 13

**Constitutional Provisions**

Cal. Const. Art. I, § 1.1 ............................................................... 18

Mich. Const. Art. I., § 28 ............................................................ 18

Ohio Const. Art. I, § 22 .............................................................. 18

U.S. Const. Art. VI ..................................................................... 10

U.S. Const. Arts. I, II, VI ............................................................ 10

Vt. Const. Art. 22 ....................................................................... 18

## INTEREST OF *AMICUS* CURIAE[1]

*Amicus* Life Legal Defense Foundation ("Life Legal") is a California non-profit 501(c)(3) public interest legal and educational organization that works to assist and support those who advocate in defense of life. Its mission is to give innocent and helpless human beings of any age, particularly unborn children, a trained and committed defense against the threat of death, and to support their advocates in the nation's courtrooms. Life Legal believes life begins at the moment of conception and does not end until natural death. It litigates cases to protect human life, from preborn babies targeted by a billion-dollar abortion industry to the elderly, disabled, and medically vulnerable denied life-sustaining care. Life Legal is alarmed by Appellee State of Washington's use of S.B. 6219 as a cudgel to impermissibly eliminate religious dissent from the abortion debate. Life Legal supports the right of conscientious objection for anyone who refuses to facilitate abortion in any manner.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for amicus represent that no counsel for a party authored this brief in whole or in part and that no person or entity, other than amicus or their counsel, made a monetary contribution to the preparation or submission of this brief. Counsel for all parties consented to the filing of this brief.

## SUMMARY OF ARGUMENT

From the colonial period to the present, our nation has embraced a tradition of respect for individual conscience and has excused individuals and entities from participating in the taking of life when such conduct violates their religious beliefs. Religious objectors have always had the right to refuse to take up arms or to participate in executions. These exemptions are evidence of the strength and depth of the belief that, even in areas where the government has long been considered to have a legitimate right to take human life, it cannot mandate that citizens be involved in that action. This respect for individual conscience was enshrined in the Bill of Rights through the adoption of the Free Exercise Clause of the First Amendment.

But more recently, the federal and some state governments have moved from protecting human life to tolerating and even promoting the taking of life in ways that for centuries had been criminalized – abortion and assisted suicide. As part of this movement toward a culture of death, Washington's S.B. 6219 and laws like it diminish the longstanding right of religious objection to the taking of life in these new and highly controversial areas.

The conviction that abortion ends a human life is shared by tens of millions of Americans. As Justice Alito noted in *Dobbs v. Jackson Women's Health*

2

*Organization*, 142 S. Ct. 2228, 2240 (2022): "Some [Americans] believe fervently that a human person comes into being at conception and that abortion ends an innocent life." Objective science fully supports this conviction. Vigorous enforcement of the Free Exercise clause is necessary to protect those holding this belief from being forced to violate their consciences with respect to this matter of such extreme importance – the taking of human life.

America was first settled by people escaping religious oppression in Europe,[2] and the Religion Clauses of the First Amendment were intended to prevent history from repeating itself. By requiring churches to purchase health insurance that facilitates abortion, S.B. 6219 does not honor our longstanding history of respect for the right of individual conscience to refuse to be complicit in taking human life. Therefore, the District Court opinion denying summary judgment for Cedar Park and granting summary judgment to the Defendants should be reversed.

---

[2] "Many of the British North American colonies that eventually formed the United States of America were settled in the seventeenth century by men and women, who, in the face of European persecution, refused to compromise passionately held religious convictions and fled Europe. The New England colonies, New Jersey, Pennsylvania, and Maryland were conceived and established 'as plantations of religion.'" *Religion and the Founding of the American Republic*, Library of Congress, https://www.loc.gov/exhibits/religion/rel01.html (last visited Nov. 6, 2023).

**ARGUMENT**

**I. The Free Exercise Clause Must Be Interpreted According to Its Text and Informed by History and Tradition.**

Constitutional interpretation begins with the text of the instrument "which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs,* 142 S. Ct. at 2244-45 (2022) (cleaned up) (striking down the federal right to abortion because no such right can be found in the text or history of the Constitution). The Constitution is properly understood according to its original meaning, rather than any subsequent understandings of the text. *Dist. of Columbia v. Heller*, 554 U.S 570, 576 (2008) (striking down a District of Columbia gun law as violating the original meaning of the Second Amendment because "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning").

The First Amendment Religion Clauses, adopted on December 15, 1791, state, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." In *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), the Supreme Court upheld the Free Exercise claim of Catholic Social Services (CSS) against the City of Philadelphia when it refused to contract with CSS for the provision of foster care services unless CSS agree to certify same-sex couples as foster parents. After exploring the meanings of the core terms of the Free Exercise clause as defined in an influential dictionary from 1755, Justice Alito

4

concluded that "the ordinary meaning of 'prohibiting the free exercise of religion' was (and still is) forbidding or hindering unrestrained religious practices or worship." *Id*. at 1896. (Alito, J., concurring). This expanded version of the Free Exercise Clause underscores that it protects not just beliefs, not just worship, but *applications* of one's belief that can occur in daily life. Also, the protection for religious individuals extends not just to outright prohibitions, but also to *impediments* to the free practice, including applications to action, of one's beliefs. The Clause, either in its original or expanded form, says nothing about the intent of the government, only about the effect of governmental action.

Requiring a church to facilitate an act of abortion, a practice Cedar Park teaches is a sin because it is the taking of an innocent human life,[3] certainly is an "impediment" to the church's ability both to act according to its beliefs, as well as

---

[3] Scientific authorities support Cedar Park's conviction that a unique human being comes into existence at the time of fertilization. *See, e.g.*, Ronan O'Rahilly, *Human Embryology & Teratology* 8 (3d ed. 2001) ("Although life is a continuous process, fertilization (which, incidentally, is not a 'moment') is a critical landmark because, under ordinary circumstances, a new, genetically distinct human organism is formed when the chromosomes of the male and female pronuclei blend in the oocyte"); Bruce M. Carlson, *Patten's Foundations of Embryology* 3 (6th ed. 1996) ("Almost all higher animals start their lives from a single cell, the fertilized ovum (zygote) . . . . The time of fertilization represents the starting point in the life history, or ontogeny, of the individual."). *See also Planned Parenthood of Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 735-36 (8th Cir. 2008) (en banc) (upholding statutory requirement of physician to inform patient before abortion "[t]hat the abortion will terminate the life of a whole, separate, unique, living human being").

its ability to teach its members not only how to believe, but also how to apply those beliefs in the outward performance of daily life. It puts the church in the position of saying one thing while doing another, i.e., acting hypocritically. This fact could over time erode congregants' confidence in the leadership and authenticity of the church and its reliability in matters of faith and practice, which could in turn undermine the church's ability to carry out its mission to the community. Governmental interference in the practice of religion therefore has the potential to destroy those it places under its controlling requirements. It is antithetical not only to the text of the Free Exercise Clause but also to the history and tradition of our country to invest such unfettered power in the government.

## II. American History and Tradition Support the Right of Conscience of Individuals Who Refuse to Participate in the Taking of Human Life.

### A. The Right Not to Kill Has Been Respected Since Colonial Times.

The words of the Constitution are to be interpreted according to their "normal and ordinary" meaning. "In interpreting this text, we are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Dist. of Columbia v. Heller*, 554 U.S 570, 576-77 (2008) (striking down a New York gun law on the basis of the Second Amendment, which protects an individual right to bear arms unconnected with service in a militia). It is therefore necessary to examine history and tradition at the time of enactment to

6

determine how ordinary citizens would have understood the pertinent clause. As the Court stated in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022),

> In keeping with *Heller,* we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's *historical tradition* of firearm regulation. Only if a firearm regulation is consistent with this Nation's *historical tradition* may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen, 142 S. Ct.* at 2126 (emphases added).

A review of colonial era exemptions from military service provides ample evidence that Free Exercise included the individual's right to not kill in violation of conscience.

The first colony to adopt a free exercise statute was Maryland in 1649. It stated "noe person . . . professing to believe in Jesus Christ, shall from henceforth bee any waies troubled . . . for . . . his or her religion nor in the free exercise thereof . . . nor any way [be] compelled to the beliefe or exercise of any other Religion against his or her consent."[4] Rhode Island added freedom of conscience to its charter, which already included freedom of religion, in 1663. Carolina,

---

[4] Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion,* 103 Harvard Law Review 1409, 1425 (1989).

Delaware, New Jersey and Pennsylvania adopted similar provisions in colonial times.[5] By 1789, the constitutions of twelve of the thirteen states (excepting only Connecticut) had provisions protecting religious freedom, which was understood by all to be an unalienable right according to which "opinion, expression of opinion, and practice were all expressly protected."[6] Nine of these limited the right to "actions that were 'peaceable' or would not disturb the 'peace' and 'safety' of the state."[7] This further underscored that the protection extended to "peaceable" *actions*, not just beliefs, that might conflict with generally applicable laws. As James Madison noted in 1822, "I observe with particular pleasure the view you have taken of the *immunity of Religion from Civil Jurisdiction*, in every case where it does not trespass on private rights or the public peace."[8]

In practice, during colonial times religious objectors were allowed to be exempt from the taking of oaths, from military conscriptions, and from religious assessments.[9] Of particular relevance to this case are the exemptions from military

---

[5] *Id.* at 1427.

[6] *Id.* at 1455-56, 1459.

[7] *Id.* at 1461.

[8] *Letter from James Madison to Edward Livingston, 10 July 1822*, National Archives, https://founders.archives.gov/documents/Madison/04-02-02-0471 (emphasis added). Also, this "peace and safety" limitation on colonial government's power to compel religious objectors' compliance with generally applicable laws was narrower than the "compelling state interest" standard currently used today. McConnell, at 1464.

[9] McConnell, at 1467-71.

8

conscriptions, which were based on religious opposition to the taking of a human life.[10]  In the 1670s, Rhode Island, North Carolina, and Maryland granted Quakers exemptions from military service.  New York initially refused (New York lacked an explicit free exercise clause) but reversed course in 1755 to allow the exemption in exchange for payment of a fee or sending a substitute.  Massachusetts, Virginia, New Hampshire, and Pennsylvania similarly provided exemptions.[11] Faced with the overwhelming task of defeating the British army, the Continental Congress nevertheless exempted people with religious objections from serving in the newly formed Continental Army:

> As there are some people, who, *from religious principles*, cannot bear arms in any case, this Congress intend no *violence to their consciences*, but earnestly recommend it to them, to contribute liberally in this time of universal calamity, to the relief of their distressed brethren in the several colonies, and to do all other services to their oppressed Country, which they can consistently with their religious principles.[12]

---

[10] Were there any doubt, it can be inferred that the religious objection to military service was based on opposition to the taking of human life because Quakers, who embraced pacificism and opposition to violence, were often the recipients of military exemptions. *Id*. at 1668; *see also Quakers Battle of Guilford Courthouse,* National Park Service, https://www.nps.gov/articles/000/quakers-at-the-battle-of-guilford-courthouse.htm (last visited Nov. 20, 2023).

[11] McConnell, at 1468.

[12] *Journals of the Continental Congress, 1774-1789,* ed. Worthington C. Ford et al. (Washington, D.C., 1904-37), 2:189 (emphasis added).

The raising of the army was of course of paramount, even compelling, importance to the success of their endeavors, yet respecting *religious* objections to killing was accorded greater significance by the Continental Congress.

These exemptions, which predated the adoption of the Constitution and Bill of Rights, were the result of legislative enactment, not judicial opinion. Thus they provide strong support for the Founders' respect for conscientious objection to killing, as that objection was accommodated in colonial laws. *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1907 (2021) (Alito, J., concurring) ("legislatures provided those accommodations before the concept of judicial review took hold, and their actions are therefore strong evidence of the founding era's understanding of the free-exercise right").

### B. The Right Not to Kill Continued Under the Constitution

The Constitution of 1787 did not contain the Bill of Rights, but it did prohibit religious tests as a qualification for public office (U.S. Const. Art. VI) and allowed the giving of an affirmation in the place of taking an oath to support the Constitution (U.S. Const. Arts. I, II, VI). Popular pressure for the protection of individual rights resulted in seven state proposals, five of which included protections for religious freedom.[13] The final Bill of Rights included the Free Exercise Clause, which was largely modeled on state constitutional provisions. As

---

[13] McConnell, at 1480.

10

minority sects, such as Roman Catholics and Baptists, were concerned that their rights might be merely hindered rather than completely banned by the new government, the adoption of the Clause by all parties reflects their understanding that it protected against governmental hindrances, as well as outright prohibitions.[14]

### 1. Exemptions from Military Service

With the Civil War, the federal government began to grant exemptions from military service for religious objectors. Under General Order No. 99, which was issued pursuant to the Federal Militia Act of 1862, the federal government excluded from the draft anyone exempted under state law, thereby incorporating state religious exemptions to military service into federal law.[15]

In the Federal Conscription Act of 1863 and the 1864 Draft Act, the federal government took control of the issue and extended exemptions to conscientious objectors who, by the articles of faith in their denominations, were opposed to the bearing of arms. The Confederacy also exempted certain pacifist groups from military service. *Seeger*, 380 U.S. at 171.

---

[14] *Id.* at 1486-88.

[15] Mark L. Rienzi, *The Constitutional Right Not to Kill,* 62 Emory L. Rev. 121, 131 (2012); *see also U.S. v. Seeger*, 380 U.S. 163 (1965) (tracing history of conscientious objector exemptions).

The federal government again gave exemptions to conscientious objectors in the Draft Act of 1917 during World War I.[16] Conscientious objectors were allowed to perform noncombatant service, further underscoring that the basis for religious objection to military service was based on opposition to killing, not necessarily opposition to war itself.

The 1940 Selective Training and Service Act broadened the exemption to those who, though they did not belong to a religious sect, were nevertheless personally opposed to all war based on "religious training and belief."[17] The Court focused on the sincerity of the belief. "A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition."[18]

Under current Department of Defense guidelines, conscientious objector status will be granted for religious beliefs or "on personal beliefs that are purely moral or ethical in source or content" if they fill the same place as traditional religious convictions. The sincerity with which the belief is held is "a primary

---

[16] *Seeger*, 380 U.S. at 171; Rienzi, at 133.
[17] *Seeger*, 380 U.S. at 170-71; Rienzi, at 134.
[18] *Seeger*, 380 U.S. at 170-76; Rienzi, at 134.

12

factor" in assessing whether to grant conscientious objector status.[19] An applicant can request assignment to a noncombatant role or discharge.[20]

It is true that these exemptions were and are enunciated and regulated by legislative or executive action, rather than by explicit application of the colonial, state, or federal Free Exercise Clauses. However, the fact that these military exemptions were commonly granted as far back as colonial times under the then-existing charters protecting religious freedom indicates that the federal Free Exercise Clause was intended to include protection against being forced by laws of general applicability to kill against one's conscience. Since the United States government incorporated the military exemption into law fairly early in the country's history, this obviated the need for any judicial ruling on the application of the federal Free Exercise Clause to conscientious objection.

Nevertheless, in more recent years, the Supreme Court decided that the Free Exercise Clause goes beyond the statutory protections in this area and is broad enough to protect a religiously motivated conscientious objector from even *indirectly* participating in war. In *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707 (1981)*,* the plaintiff, a Jehovah's Witness, was denied unemployment compensation when he quit his job because his employer

---

[19] U.S. Dep't of Def. Instruction 1300.06, § 3.2 (July 12, 2017).
[20] *Id*. at § 4.

had transferred him to a department that produced weapons, in violation of his

religious opposition to war. The plaintiff had stated that, although he could not

work directly with the production of armaments, he could work in a roll foundry

which might produce steel that could be used to make weapons because his

participation would be more remote. *Id*. at 714. The Indiana Supreme Court

denied his claim in part because the court decided that any burden placed on his

right to free exercise of his religion was indirect and justified by legitimate state

interests. *Id.* at 713. Furthermore, the Indiana Supreme Court made the judgment

that his willingness to work in a foundry was inconsistent with his stated religious

beliefs. *Id.* at 715. The Supreme Court reversed, stating,

> The determination of what is a "religious" belief or practice is
> more often than not a difficult and delicate task, as the division
> in the Indiana Supreme Court attests. However, the resolution
> of that question is not to turn upon a judicial perception of the
> particular belief or practice in question; religious beliefs need
> not be acceptable, logical, consistent, or comprehensible to
> others in order to merit First Amendment protection. . . .
> Thomas drew a line, and it is not for us to say that the line he
> drew was an unreasonable one. Courts should not undertake to
> dissect religious beliefs because . . . his beliefs are not
> articulated with the clarity and precision that a more
> sophisticated person might employ . . . *Particularly in this
> sensitive area*, it is not within the judicial function and judicial
> competence to inquire whether the petitioner or his fellow
> worker more correctly perceived the commands of their
> common faith. Courts are not arbiters of scriptural
> interpretation.

*Id.* at 714-16 (emphasis added).

14

The Court further rejected the Indiana Supreme Court's judgment that the burden on religion was "indirect" and therefore insufficient. Because the state had conditioned receipt of a benefit upon conduct proscribed by the plaintiff's religion, "thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." *Id.* at 717-18. As in the area of free speech, the Court's reasoning reflects a desire to allow "breathing space" for the Free Exercise of religion, so that personal freedoms would not be subject to the judgments of juries, judges, or, by implication, governments. *Snyder v. Phelps,* 562 U.S. 443, 458 (2011) (holding that the First Amendment shielded Westboro Baptist Church from state tort liability, including for intentional infliction of emotional distress; "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." (*quoting Boos v. Barry,* 485 U.S. 312, 322 (1988))).

Like the plaintiff in *Thomas* whose job facilitated the taking of life by providing the weapons necessary to accomplish that purpose, Cedar Park has been forced by the enactment of S.B. 6219 to purchase insurance coverage that enables enrollees to access abortion against their religious beliefs. Like the weapons in *Thomas*, the insurance is a means to accomplish the procuring of an abortion, the

15

taking of a life. Because the purchase of insurance is only indirectly related to the act of abortion, Cedar Park's objection may not seem "acceptable, logical, consistent, or comprehensible," *Thomas*, 450 U.S. at 714, to the State. Regardless, Cedar Park's sincerely held belief is entitled to the same deference to conscientious objection to facilitating the taking of human life that the Supreme Court gave to the plaintiff's beliefs in *Thomas*.

### 2. Exemptions from participating in capital punishment

Exemptions from assisting in capital punishment provide another example of the respect given to freedom of conscience even in an area where the government has for millennia exercised the power to take human life. Today, the federal government and twenty-seven states have laws that permit the death penalty. Three of the states have governor-imposed moratoriums preventing any executions from being carried out.[21] In 1988, the federal government adopted a conscience provision protecting employees and contractors of State departments of corrections, the U.S. Department of Justice, the Federal Bureau of Prisons, or the U.S. Marshals Service from attending or participating in a prosecution or execution if it would violate that individuals' religious or moral convictions to do so.[22] Some states, such as Arizona and California, address the issue by requiring that all

---

[21] Death Penalty Information Center, https://deathpenaltyinfo.org/states-landing (last visited Oct. 25, 2023).
[22] 18 U.S.C. § 3597(b).

16

participants in an execution be volunteers.[23]  Others, like Georgia and Connecticut,

provide that no one will be required to participate in executions.[24]  These states do

not require proof of any moral or religious objection to capital punishment in order

for an individual to be excused. Other states, like the federal government, require a

moral or ethical reason for refusing to participate.[25]  A few states require strict

scrutiny for any substantial burden on religion, either through their constitutional

religious freedom clause, or through state Religious Freedom Restoration Acts,

which would protect religious individuals from participation.[26]  Most of these

statutes protect individuals not just from administering the lethal injection, but also

from participating in activities that are part of the procedure, or even attending it.[27]

Following the tradition of allowing religious exemptions in war, protections

against even attending or participating in the taking of life in the context of capital

punishment are rooted in the historical tradition of respect for individual

conscience.

**III.      Exemptions from participating in or paying for abortions.**

---

[23] Ariz. Dep't of Corrections, Dep't Ord. 710: Execution Procedures 2, § 3.3.4 (2017); Cal. Penal Code § 3605(c); Rienzi at 140.

[24] Rienzi, at 140; Ga. Code Title 17. Criminal Procedure § 17-10-38(d); Conn. Dep't of Corr. Admin. Directive 6.15: Admin. of Capital Punishment, para. 1 (5/14/2014).

[25] Ala. Code Title 15. Criminal Procedure § 15-18-82.1(j); Rienzi at 141.

[26] Rienzi, at 143.

[27] *Id*. at 141-42.

17

There are no colonial examples of exemptions from participating in abortions because abortion was a "heinous misdemeanor", and not a governmental mandate, at the time of the adoption of the First Amendment. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2251 (2022). Indeed, this was the case in England as well, dating back to the thirteenth century. In certain cases, and at certain times, it was classified as murder. *Id.* at 2249. Our constitutional rights are a product of the Anglo-American common law tradition. *Id.* at 2247. It therefore is reasonable to conclude that the Free Exercise Clause, as a historical matter, would today support a religious exemption from participating in abortion, because, at the time the Bill of Rights was adopted, abortion was treated as a heinous criminal act involving the destruction of human life.

Today, the morality of abortion is a hotly contested matter, as it has been since even before *Roe v. Wade*, 410 U.S. 113 (1973), forced states to allow abortion. Now that *Roe* has been overturned by *Dobbs*, the debate continues in full force as some states are seeking to solidify a right to abortion in state law.[28] Yet, as Justice Alito noted at the beginning of the Court's opinion in *Dobbs*:

> Abortion presents a profound moral issue on which Americans hold sharply conflicting views. Some believe fervently that a human person comes into being at conception and that abortion ends an innocent life. Others feel just as strongly that any regulation of abortion invades a woman's right to control her own body and

---

[28] *See, e.g.*, Ohio Const. Art. I, § 22; Cal. Const. Art. I, § 1.1; Vt. Const. Art. 22; Mich. Const. Art. I., § 28.

prevents women from achieving full equality. Still others in a third group think that abortion should be allowed under some but not all circumstances, and those within this group hold a variety of views about the particular restrictions that should be imposed."

*Dobbs,* 142 S. Ct. at 2240.

Now, with the debate over abortion raging, enforcement of the Bill of Rights is necessary to protect individuals from state coercion to violate their conscience to conform with the state's preferred ideology, particularly when the state's ideology attempts to force religious citizens to participate in an act of the utmost moral gravity – the killing of an innocent child.

The myriad exemptions crafted in recent years to protect religious individuals and entities from participating in abortions demonstrate that there has been a continuous tradition of respecting religious objectors to abortion that is contemporaneous with its legalization. Statutory exemptions at both the federal and state level protecting individuals and health care entities from violating their consciences with respect to abortion go well beyond merely protecting individuals from having to perform abortions. The protections also reach training, arranging for, or referring for abortions; participating in programs that violate an individual's conscience; and providing coverage for abortions.

## A.  Church Amendments

After *Roe* was decided, federal legislators moved quickly to establish conscience protections for individuals who were opposed to abortion on the basis

19

of religious or moral convictions. First came the Church Amendments, passed in 1973, which contained four conscience provisions. The first conscience provision prevented any public officials or authorities from requiring any recipient of Health and Human Services ("HHS") grants, loans or loan guarantees to perform or assist in sterilization procedures or abortions, to make its facilities available for such procedures, or to provide personnel for the performance or assistance in such procedures, if that individual or entity is opposed to the procedures for religious or moral reasons.[29] The second conscience provision prevents entities which receive HHS grants, loans or contracts for research from discriminating in the employment, promotion or termination of employment of any doctor or health care personnel for, on the basis of religious or moral conviction, either participating in, or refusing to participate in, an abortion or sterilization procedure.[30] The third provision protects individuals from performing or assisting in any part of a health service program or research activity funded in whole or in part by HHS if it would be contrary to that person's religious or moral beliefs.[31] The final provision prevents entities receiving HHS funds, whether through grants, contracts, or other channels, from discriminating against individuals in admission for training or study

---

[29] 42 U.S.C. § 300a-7(b)
[30] 42 U.S.C. § 300a-7(c)
[31] 42 U.S.C. § 300a-7(d)

20

because of the applicant's reluctance to participate *in any way* with abortions or sterilizations.[32]

### B.    Coats-Snowe Amendment to Public Health Service Act

Enacted in 1996, the Coats-Snowe Amendment[33] prohibits any federal, state or local government which receives federal financial assistance from discriminating against any health care entity, including individuals, if it refuses to undergo, require or provide training in the performance of abortions; or if it refuses to perform, provide referrals for, or arrange for, abortions or training for abortions. The same provision also protects from discrimination entities that have attended health profession training programs that did not include performance, training, or *arrangements for training* in induced abortions.

### C.    The Weldon Amendment

Each year since 2004, Congress has attached the Weldon Amendment to the Consolidated Appropriations Act, which provides money to the Departments of Labor, Health and Human Services, and Education. The Amendment provides that none of the funds provided in the Act shall be made available to any federal agency or program, or State or local government, if it discriminates against any individual

---

[32] 42 U.S. C. §300a-7(e)
[33] 42 U.S.C. § 238n

or institutional health care entity for not providing for, paying for, *providing coverage for*, *or referring* for abortions.[34]

### D. The Affordable Care Act

The Affordable Care Act ("ACA") continued in the long tradition of providing conscience exemptions for those unwilling to participate in, facilitate, or pay for abortions. Under the ACA, states may decide to prohibit abortion coverage.[35] Qualified health plans are not required to include abortion.[36] Like the Weldon Amendment, the ACA provides that no qualified health plan offered through the health exchange may discriminate against any individual provider or health care facility because of its refusal to provide, pay for, *provide coverage for, or refer for* abortions.[37] Finally, the ACA exempts various employers, including churches, having a religious objection to contraception (including abortifacients) from providing such coverage in group health plans. Significantly, this exemption applies both to providing coverage or payments for contraception directly, *or through "a plan, issuer, or third party administrator that provides or arranges such coverage or payments*."[38]

---

[34]Consol. Appropriations Act, 2022, Pub. L. No. 117-103, § 507(d)(1), 136 Stat. 496, 448 (2022).

[35] 42 U.S. Code § 18023(a)(1)

[36] 42 U.S. Code § 18023(b)(1)

[37] 42 U.S. Code § 18023(b)(4)

[38] 45 C.F.R. § 147.132(a)

### E. Conscience Protections in the States

As of 2019, every state and the District of Columbia had conscience laws allowing individual and institutional health care providers to refuse to provide services to which they have a moral objection. These exemptions overwhelmingly include participation in abortion as a practice that may not be coerced.[39]  The right of doctors and other medical employees to refuse to participate in the abortion procedure as an appropriate protective measure was recognized at the very beginning of the legalization of abortion in *Doe v. Bolton*, 410 U.S. 179, 197-98 (1973), the companion case to *Roe*: "Under § 26-1202(e) . . . a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure."

These federal and state exemptions reinforce the longstanding American tradition of giving wide latitude to the right of religious people and other conscientious objectors from participating, even indirectly, in the taking of human life.  The Church Amendments protect individuals who refuse to participate *in any way* in training to perform abortions.  The Coats-Snowe Amendment protects

---

[39] Nadia Sawicki, *Procedural Protections in Reproductive Health Care Conscience Laws,* The Policy Surveillance Program: A LawAtlas Project, https://lawatlas.org/datasets/procedural-protections-in-reproductive-health-care-conscience-laws (last updated Dec. 31, 2019).

individuals from *making arrangements for training* in abortions. The Weldon Amendment and the ACA protect individuals who do not wish to *provide coverage for or refer for* abortions. The ACA protections go further to prevent the requirement that a religious employer *purchase a plan that provides for third party arrangements* for objectionable contraception and abortifacients. In short, federal and state laws routinely protect an individual's conscience with regard to abortion.

### IV.     Exemptions from participating in assisted suicide.

As with abortion, for centuries suicide and assisting a suicide were felonies at common law.[40] In America, the U.S. Supreme Court noted, "In almost every State-indeed, in almost every western democracy - it is a crime to assist a suicide. The States' assisted-suicide bans are not innovations. Rather, *they are longstanding expressions of the States' commitment to the protection and preservation of all human life*." *Washington v. Glucksberg*, 521 U.S. 702, 710 (1997) (holding that Washington's prohibition against assisting suicide does not violate the Due Process Clause of the Fourteenth Amendment) (emphasis added). Since that case was decided, ten states plus the District of Columbia have legalized assisted suicide.[41] In each case, the law allowing assisted suicide includes

---

[40] Joseph W. Dellapenna, *Dispelling the Myths of Abortion History* 1070 (2006).
[41] In addition to Washington, D.C., those states are Oregon, Washington, Montana, Vermont, California, Colorado, Hawai'i, New Jersey, Maine, and New Mexico. *States Where Medical Aid in Dying is Authorized*, Compassion & Choices,

exemptions for health care providers who do not wish to participate.[42] New Mexico provides the broadest exemption by allowing objecting health care providers to refuse  to participate in an assisted suicide "in any way, which includes refusing to provide information on medical aid in dying to a patient and refusing to refer a patient to any entity or individual who is able and willing to assist the patient in obtaining medical aid in dying."[43]

The ACA also protects individuals and health care entities against discrimination by federal, state or local governments or by any health care provider that receives financial assistance under the ACA for refusing to provide health care or services "for the purpose of causing, *or for the purpose of assisting in causing, the death of any individual*, such as by assisted suicide, euthanasia, or mercy killing."[44] All of these exemptions from participating in assisted suicide display the same solicitude for the individual conscience in matters of taking human life that is evident throughout our nation's history.

---

https://www.compassionandchoices.org/resource/states-or-territories-where-medical-aid-in-dying-is-authorized (last visited Oct. 26, 2023).

[42] Rev. Code Wash. 70.245.190(1)(b); *Baxter v. State*, 224 P.3d 1211 (Mont. 2009), Mont. Code Ann. 50-9-203 (2021); Vt. Title 18, Ch. 13 § 5285; *Patient Choice at End of Life Frequently Asked Questions,* Vermont Department of Health, https://www.healthvermont.gov/sites/default/files/document/Patient%20Choice%20FAQ_8-24-23.pdf; Cal. Health & Saf. Code § 443.14; Colo. Rev. Stat. § 25-48-116(2), 117 (2021); D.C. Law 21-182 § 11; Hawaii Rev. Stat. § 327L-19; N.J. Stat. §§ 26:16-17; Me. Rev. Stat. Tit. 22, § 2140(21); N.M. Stat. § 24-7C-7(A)(3)

[43] N.M. Stat. § 24-7C-7(A)(3)

[44] 42 U.S.C. § 18113(a)

**V. The Relief Cedar Park Seeks Falls Squarely Within the Historical Tradition of Granting Religious Exemptions From Coerced Participation in the Taking of Human Life.**

In each of the areas where state and federal governments have granted religious exemptions from killing against one's conscience, the authority has given great deference to religious objectors' concern.  Exemptions from military service since colonial times have included the option of participating in war as a noncombatant or not participating at all.  The high respect afforded to individual conscience is very evident in the Continental Congress's grant of an exemption at a time when the success of the colonies' quest for independence was in grave doubt.  That tradition of respect for individual conscience continues today in the Department of Defense Instruction regarding conscientious objectors.  (Section II *supra*).

Exemptions from participating in abortion, capital punishment and assisted suicide typically protect the individual from indirect as well as direct participation in the act of killing.  Opponents of capital punishment are allowed to avoid even attending an execution.  (Section II.B.2, *supra*).  Religious exemptions from participating in abortion go so far as to protect individuals from participating in the abortion itself, in training for abortions, in making facilities or personnel available for abortions, or providing coverage or referrals for abortions.  The ACA protects

26

churches from having to purchase insurance coverage that provides for third party arrangements for abortifacients. (Section III, *supra*).

These broad historical protections are analogous to the protection that Cedar Park is seeking for itself. Even if, as the State claims, it is the insurance carrier or another third party that is "tasked with the duty to inform Cedar Park's insureds of their ability to access covered abortion services" (1-ER-015), Cedar Park's insurance policy is the mechanism by which the referral would be made. The policy is the means by which "arrangements" would be made for abortions to occur. Cedar Park does not wish to provide the instrument for arrangements or referrals for abortions or abortifacients.

The District Court acknowledged that S.B. 6219 requires Cedar Park to facilitate access to covered abortion services, contrary to the church's beliefs, and that this is a burden on religion. 1-ER-015-016. In disallowing Cedar Park's claim, the District Court therefore digressed from the long tradition of protecting conscience rights from even indirect facilitations of killing, including through abortion. Cedar Park's request for relief from S.B. 6219's mandate to facilitate abortion is in the mainstream of the historical and traditional protections for rights of conscience against the taking of human life. Cedar Park should be granted the same respect that religious objectors have received throughout our nation's history.

27

## CONCLUSION

It is beyond dispute that our nation has a rich history of protecting the individual right of conscience against state coercion, including coercion to participate or assist in taking human life. This history goes back to the founding and indeed is one of the main reasons many of the early settlers came to America. If religious freedom has protected the individual right to object in the areas of war and capital punishment, traditionally recognized as legitimate state-sponsored takings of life, how much more should religious freedom protect objectors from being forced by the government to participate in "private" killing, such as abortion. S.B. 6219 contradicts our rich history of respect for conscience in violation of the First Amendment. The District Court opinion should be reversed.


Respectfully submitted,


CATHERINE W. SHORT
    Counsel of Record
Sheila A. Green
Life Legal Defense Foundation
PO Box 1313
Ojai, CA 93024-1313
(707) 337-6880
kshort@lldf.org
Counsel to *Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** | 23-35560, 23-35585

I am the attorney or self-represented party.

**This brief contains** | 6,453 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Catherine W. Short | **Date** | 11/29/2023

*(use "*s/[typed name]*" to sign electronically-filed documents)*

**Form 8** | *Rev. 12/01/22*