No. 23-35560

# In the United States Court of Appeals for the Ninth Circuit

Cedar Park Assembly of God of Kirkland, Washington,
Plaintiff-Appellant,
v.
Myron Kreidler, et al.,
Defendants-Appellees.

Appeal from the United States District Court for the Western District of Washington
Honorable Benjamin H. Settle
(3:19-cv-05181)

## Brief *Amicus Curiae* of Sutherland Institute Supporting Plaintiff-Appellant

William C. Duncan
Sutherland Institute
420 E South Temple, Suite 510
Salt Lake City, UT 84111
bill@sifreedom.org

Daniel W. Bowers
Morris Bowers & Haws LLC
305 12th Ave. Rd.
Nampa, Idaho 83686
jdanner@morrisbowerhaws.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus* has no parent corporation and no stock.

/s/William C. Duncan
William C. Duncan

Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................ iii

TABLE OF AUTHORITIES ..................................................... iv

INTRODUCTION AND INTEREST OF AMICUS .................................. 1

ARGUMENT ....................................................................... 1

I.   The Decision of the Court Below is at Odds with the Constitutional Guarantee of Religious Autonomy. ...................................................... 3

A.   The First Amendment Guarantees the Autonomy of Religious Organizations ......................................................................... 3

B.   Washington's Abortion Mandate Violates Appellant's Religious Autonomy. ............................................................................ 5

II.   Washington's Denial of Appellant's Religious Autonomy is Not Justified by Other Constitutional Principles. ..................................... 12

III.   The Question of Religious Autonomy Holds Exceptional Importance for *Amicus*. .................................................................... 13

CONCLUSION ..................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Church of Scientology Flag Service Organization, Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993)......................................7

*City of Boerne v. Flores*, 521 U.S. 507 (1997).........................................14

*Corp. of Presiding Bishop of The Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 341 (1986) ...............................................5

*Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022) .................................................................................................................13

*Hosanna-Tabor Evangelical Lutheran School v. EEOC*, 565 U.S. 171, 186–87 (2012)......................................................................... 4, 5, 12

*Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 391 (1990) ...................................................................................11

*Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)......................................................................4, 14

*Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 637 (2019)................15

*Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 116 (1960) .............4

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2376–77 (2020)............................................................10

*Maher v. Roe*, 432 U.S. 464, 474 (1977) .................................................13

*Our Lady of Guadalupe*, 140 S. Ct. 2049, 2060–61 (2020).............4, 7, 11

*People v. Worldwide Church of God*, 178 Cal. Rptr. 913, 915 (Cal. Ct. App. 1981) ................................................................................................7

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 447 (1969) ....................................4

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 721– 22 (1976).........................................................................4

*Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 304–05 (1985) ......................................................................................................11

*Watson v. Jones*, 80 U.S. (13 Wall.) 697, 733 (1871) .........................4, 14

*Zorach v. Clauson*, 343 U.S. 306, 314 (1952)...........................................8

## Statutes

215 Ill. Ins. Code ch. 215, § 5/356z.4a(a) ...............................................15

42 U.S.C. 2000e- 1 ......................................................................8
42 U.S.C. 238n ...........................................................................9
42 U.S.C. 300a-7.........................................................................8
Cal. Health & Safety Code .......................................................15
Consolidated Appropriations Act, Pub. L. No. 116-260, 134 Stat. 1182,
   at sec. 507(d)(1) (2020) .......................................................9
Me. Rev. Stat. Ann. tit. 24, § 4320-M(1) ..........................15, 16
Or. Rev. Stat. § 743A.066(4)....................................................16
Or. Rev. Stat. § 743A.067(2)(g) ...............................................15
Revised Code of Washington 48.43.065 ..............................1, 3

## Other Authorities

1 W. Cole Durham et al., Religious Organizations and the Law § 3:27
   (2020) ....................................................................................14
Cal. Code Regs. tit. 28, § 1300.67............................................15
Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 U. Ill. L.
   Rev. 839, 867.........................................................................6
Kathleen A. Brady, *The Disappearance of Religion from Debates About
   Religious Accommodation*, 20 Lewis & Clark L. Rev. 1093, 1110 (2017)
   ...............................................................................................12
Mark E. Chopko & Michael F. Moses, *Freedom to Be a Church:
   Confronting Challenges to the Right of Church Autonomy*, 3 Geo. J.L.
   & Pub. Pol'y 387, 449 (2005) ..............................................12
Press Release, U.S. Dep't Health & Human Servs., HHS to Disallow
   $200M in California Medicaid Funds Due to Unlawful Abortion
   Insurance Mandate (Dec. 16, 2020) ......................................9
Wash. Admin. Code § 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 .........................................15

## INTRODUCTION AND INTEREST OF AMICUS[1]

This case involves a Washington statute requiring employee healthcare plans to cover abortion. It has virtually no religious exemption since while "[n]o individual or organization with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reasons of conscience or religion. . . . The provisions of this section shall not result in an enrollee being denied coverage of, and timely access to, any service or services excluded from their benefits package as a result of their employer's or another individual's exercise of the conscience clause." Revised Code of Washington 48.43.065(3). *Amicus* is a nonprofit, nonpartisan public policy organization with a substantial interest in the Constitution's guarantee that religious institutions are free to govern their own ecclesiastical affairs. Unless the decision of the court below is reversed, it will undermine the crucial principle of religious autonomy.

## ARGUMENT

---

[1] All parties consent to this brief's filing. No party's counsel authored any part of this brief. No party or party's counsel, or person other than *amicus*, contributed money to the brief's preparation.

1

Abortion has been at the center of a religious, moral, political, and judicial firestorm for decades. It has deeply divided our Nation. Centuries-old faith traditions and tens of millions of their adherents consider terminating the life of an unborn child to be a grave evil. Until recently, supporters and opponents of abortion rights acknowledged that coercing religious organizations to support abortion triggers profound questions of religious freedom. Dragooning religious organizations into becoming complicit in abortion is no mere health-and-safety regulation: it is an intolerable invasion of religious autonomy.

For 150 years, the U.S. Supreme Court has affirmed and re-affirmed that the government may not intervene in religious matters. Religious doctrine, polity, administration, and finance belong (within broad limits nowhere approached here) to a religious body alone.

The abortion mandate offends the doctrine of religious autonomy in this uniquely sensitive area in two ways. It uses the State's control of insurance plans to force religious employers to subsidize abortion for their employees despite their profound religious objections. And it blocks religious employers from modeling and expressing their beliefs authentically.

The statutory exemption does not allow religious organizations to avoid paying for abortion coverage since their employees cannot be "denied coverage of, and timely access to, any service or services excluded from their benefits package as a result of their employer's or another individual's exercise of the conscience clause." Revised Code of Washington 48.43.065(3). This exaction invades religious autonomy.

Washington cannot justify its incursion into religious autonomy as necessary to comply with the U.S. Supreme Court's abortion precedents since that Court has clearly directed that States alone may regulate abortion. Forcing appellant to subsidize abortion reflects State policy—not obedience to binding precedent.

## I. The Decision of the Court Below is at Odds with the Constitutional Guarantee of Religious Autonomy.

### A. The First Amendment Guarantees the Autonomy of Religious Organizations.

The question of religious autonomy presented here holds exceptional importance for *amici*. Faith communities rely on the doctrine of religious autonomy to carry out their vital work. Without this Court's intervention, religious institutions in Washington will have to subsidize and facilitate conduct that they believe to be grave sin. Other States may follow. That will fuel a dangerous trend where States exert regulatory

power to override the autonomy guaranteed to religious institutions by the First Amendment.

For 150 years, this Court has held that the government holds no authority to act in any matter that is "ecclesiastical in its character." *Watson v. Jones*, 80 U.S. (13 Wall.) 697, 733 (1871). The First Amendment guarantees religious organizations the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Decisions since *Kedroff* consistently deny the government authority to intervene in ecclesiastical matters. *See, e.g., Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 116 (1960) (per curiam); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 447 (1969); *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 721– 22 (1976); *Hosanna-Tabor Evangelical Lutheran School v. EEOC*, 565 U.S. 171, 186–87 (2012); *Our Lady of Guadalupe*, 140 S. Ct. 2049, 2060–61 (2020).

The First Amendment secures the freedom of religious institutions to "select their own leaders, define their own doctrines, resolve their own

4

disputes, and run their own institutions." *Corp. of Presiding Bishop of The Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 341 (1986) (Brennan, J., concurring) (quotation omitted). This doctrine of religious autonomy reflects the "special solicitude" that both Religion Clauses accord religious institutions. *Hosanna-Tabor*, 565 U.S. at 189.

The religious autonomy doctrine operates as a kind of immunity, not as a balancing standard. *Hosanna-Tabor* illustrates the point. Once the Court found that Cheryl Perich was a minister in the constitutional sense, "the First Amendment require[d] dismissal of [her] employment discrimination suit against her religious employer." *Hosanna-Tabor*, 565 U.S. at 194. No judicial balancing is permitted because "the First Amendment has struck the balance for us." *Id*. at 196. Intrusion into any matter covered by the religious autonomy doctrine dooms a law. Washington's abortion mandate and religious exemption cross that forbidden line at several points. Any one of them renders its regulatory scheme void.

## B. Washington's Abortion Mandate Violates Appellant's Religious Autonomy.

The abortion mandate infringes on appellant's religious autonomy by using their employee health- care plans to compel support for conduct

they believe to be immoral. Requiring appellant to purchase employee health insurance that covers abortion compels it to subsidize and facilitate an act they understand as offensive to God.

This conflict between appellant's faith and the demands of State law calls for an accommodation under the Free Exercise Clause. But the failure to exempt appellant is not the law's only defect. Appellant's autonomy as a religious institutions is also at stake. Like the hotly disputed contraceptive mandate imposed by the U.S. Department of Health & Human Services, Washington's abortion mandate "impos[es] secular morality inside religious institutions." Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 U. Ill. L. Rev. 839, 867 (emphasis added) (footnote omitted). Specifically, it forces religious organizations like appellant to use their sacred funds and institutional structures to sponsor and facilitate abortion. By overriding appellant's management of its religious institution on a matter of profound doctrinal and ecclesiastical importance, the abortion mandate violates the doctrine of religious autonomy.

In case after case, the Supreme Court has affirmed that the First Amendment safeguards religious institutions' "autonomy with respect to

internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. Deciding whether to cover abortion as part of an employee healthcare plan is among the "internal management decisions that are essential to the … central mission" of appellant—as well as many other religious institutions. *Id*. at 2060. Control of property and finances for religious purposes is inseparable from "the ecclesiastical functions" of a religious institution. *People v. Worldwide Church of God*, 178 Cal. Rptr. 913, 915 (Cal. Ct. App. 1981). The Eleventh Circuit saw this connection in *Church of Scientology Flag Service Organization, Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993). There, a municipal ordinance required a religious organization to disclose its financial information to the public and to church members. Mandatory disclosure of the church's finances offended "the principle that civil authorities must abstain from interposing themselves in matters of church organization and governance." *Id*. at 1537. Washington's abortion mandate violates the same principle.

Forcing religious employers to subsidize and facilitate abortion for their own employees is a shocking invasion of religious autonomy and a

stark departure from the "the best our traditions," which have long "respect[ed] the religious nature of our people." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). Abortion is uniquely controversial. Strong-arming religious organizations into becoming complicit in abortion is an intolerable incursion into religious autonomy.

The State's utter disregard for the religious significance of abortion is at odds with an established tradition of legislative respect for religious institutions. Congress signaled that regard when enacting Title VII of the Civil Rights Act of 1964. Even as it enacted that historic guarantee of workplace equality, Congress carved out exemptions for religious organizations and religious schools. *See* 42 U.S.C. 2000e- 1(a), 2000e-2(e)(2).

Working in the same tradition, lawmakers have long shown appropriate respect for religious belief and practice when addressing abortion and contraception. Congress has repeatedly expressed a particular concern for religious objections to abortion. *See*, *e.g.*, Church Amendment, 42 U.S.C. 300a-7 (for any program funded by HHS, a person or entity need not perform or assist in the performance of an abortion or sterilization procedure contrary to religious beliefs or moral convictions);

8

Danforth Amendment, 20 U.S.C. 1688 (requiring neutrality toward abortion in federally funded education programs); Coates-Snow Amendment, 42 U.S.C. 238n (no government receiving federal aid may discriminate against a health care entity because it refuses to participate in training to perform abortions).

The Weldon Amendment deserves special mention. That provision withholds HHS funding from a government program that discriminates against a "health care entity" (including a health insurance plan) that "does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act, Pub. L. No. 116-260, 134 Stat. 1182, at sec. 507(d)(1) (2020).

Noncompliance can lead to dire financial consequences. Only last December, HHS withheld $200 million in Medicaid funds from California after concluding that a State law requiring employers to cover abortion in their health insurance plans violates the Weldon Amendment. See Press Release, U.S. Dep't Health & Human Servs., HHS to Disallow $200M in California Medicaid Funds Due to Unlawful Abortion Insurance Mandate (Dec. 16, 2020) ("California has refused to come into

compliance with the Weldon Amendment, despite demands from OCR to do so and offers of OCR technical assistance.").

The abortion mandate here closely resembles California's.[2] Serious questions about Washington's compliance with the Weldon Amendment demonstrate how far the abortion mandate intrudes into a matter long recognized by State and federal governments as raising significant religious autonomy concerns.[3] By commandeering a religious employer's financial and organizational resources to implement religiously objectionable ends, Washington has patently breached appellant's religious autonomy.

---

[2] Similarities between Washington's abortion mandate and California's ought to inform petitioners' challenge under the Free Exercise Clause. Washington can hardly say that its regulatory scheme serves a legitimate interest, much less a compelling one, when the abortion mandate appears to contradict federal law.

[3] An exception to the federal government's customary respect for religious institutions is the HHS contraceptive mandate. See 29 C.F.R. 2590.715-2713. Its departure from the long-standing pattern of governmental sensitivity toward religious institutions ignited nationwide litigation by religious employers—including multiple cases before this Court. *See Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2376–77 (2020).

Of course, religious institutions have no "general immunity" from state regulation. *Our Lady of Guadalupe*, 140 S. Ct. at 2060. A church or religious charity must comply with religiously uncontroversial health and safety regulations no less than any other institution. *See*, *e.g.*, *Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 391 (1990); *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 304–05 (1985). But the First Amendment "does protect [appellant's] autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. A religiously sensitive "internal management decision[]" that a religious organization must make is whether an employee health insurance plan should cover abortion. *Id*. When a religious organization's religious doctrines condemn abortion as immoral, excluding coverage for it is "essential to the institution's central mission." *Id*. Overriding that decision to achieve the State's contrary goals undeniably invades religious autonomy.

The abortion mandate also infringes on religious autonomy by undermining appellant's ability to communicate their religious identity authentically. A key aspect of religious autonomy means that "[a] religion

cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring). So too here. Washington's abortion mandate compels an employer religiously opposed to abortion to fund and facilitate it anyway. Complying with that mandate defeats appellant's ability to practice what they preach. The State's compulsion "severs the vital link between religious teaching and the living out of that teaching in church outreach." Mark E. Chopko & Michael F. Moses, *Freedom to Be a Church: Confronting Challenges to the Right of Church Autonomy*, 3 Geo. J.L. & Pub. Pol'y 387, 449 (2005). Without that link, a religious institution's identity will be eroded or distorted. "[L]egal rules that require the [religious] group to assist prohibited conduct and relationships interfere with the ability of the group to model and express the group's beliefs." Kathleen A. Brady, *The Disappearance of Religion from Debates About Religious Accommodation*, 20 Lewis & Clark L. Rev. 1093, 1110 (2017).

## II. Washington's Denial of Appellant's Religious Autonomy is Not Justified by Other Constitutional Principles.

Washington might have tried in the past to justify its invasion of appellant's religious autonomy as an attempt to comply with the

Supreme Court's abortion precedents, but it manifestly cannot do so now. In *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022), the Supreme Court held that "procuring an abortion is not a fundamental constitutional right because such a right has no basis in the Constitution's text or in our Nation's history." *Id*. at 2283. Thus, Washington has no constitutional duty to subsidize abortion. Of course, the State is free to pursue policies supporting or opposing abortion and "to implement that judgment by the allocation of public funds." *Maher v. Roe*, 432 U.S. 464, 474 (1977), but it must not deny appellant the freedom of choice that the State enjoys.

## III. The Question of Religious Autonomy Holds Exceptional Importance for *Amicus.*

This friend-of-the-court brief attests to the importance of the questions presented—especially the question of religious autonomy. *Amicus* supports petitioners out of a surpassing concern with the far-reaching implications of Washington's incursion into religious autonomy.

Religious institutions rely on the doctrine of religious autonomy to govern their religious affairs while complying with State and federal

law. The barrier recognized in *Watson* and constitutionalized in *Kedroff* safeguards the generative freedom of self- government for religious institutions of all kinds. Under the Constitution's aegis, a homeless shelter operated by a religious charity may place a cross over the entrance and offer prayer before every meal. An assisted living center for the elderly may be overseen by an order of nuns dressed in full habit. An elementary school may be sponsored by a local synagogue and staffed by Orthodox Jews who commit to live by shared religious standards in and out of the workplace. Countless decisions about how to form and maintain religious institutions depend on the freedom to adopt policies and practices dictated by the institution's faith. Allowing the State to control those policies for secular purposes would undercut the capacity of religious institutions to thrive.

Review is made more urgent by *City of Boerne v. Flores*, 521 U.S. 507 (1997). There, the Supreme Court concluded that the Religious Freedom Restoration Act is unavailable as a defense to State law. *Id*. at 536. Washington has no statute modeled after RFRA. *See* 1 W. Cole Durham et al., Religious Organizations and the Law § 3:27 (2020) (chart showing that Washington has no state RFRA). Appellant and

14

other religious organizations must therefore rely on statute- and regulation-specific exemptions or on their constitutional rights. Since Washington does not exempt appellant, its only recourse is to invoke its rights under the First Amendment. Reliance on *Smith* is unsure because it "drastically cut back on the protection provided by the Free Exercise Clause." *Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 637 (2019) (statement of Alito, J.). Besides, the confusion among lower courts as to *Smith's* application makes constitutional protection an accident of jurisdiction.

Allowing Washington's regulatory scheme to go unreviewed will encourage other States to follow suit. Already, other States require employee health plans to cover abortion. *See* Cal. Health & Safety Code § 1367(i); Cal. Code Regs. tit. 28, § 1300.67; 215 Ill. Ins. Code ch. 215, § 5/356z.4a(a); Me. Rev. Stat. Ann. tit. 24, § 4320-M(1); Or. Rev. Stat. § 743A.067(2)(g); Wash. Admin. Code § 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. Of these, Oregon and Maine exempt religious employers. See Or. Rev. Stat. § 743A.067(9); Me. Rev. Stat. Ann. tit. 24, § 4320-M(4). Oregon limits its exemption to religious employers whose "purpose is the inculcation of religious values" and to those who primarily employ "persons who share

the religious tenets of the employer" and that "primarily serves persons who share the religious tenets of the employer". *See* Or. Rev. Stat. § 743A.066(4). Maine's religious exemption is slightly broader. Me. Rev. Stat. Ann. tit. 24, § 4320-M(4) (religious employer includes "a church, a convention or association of churches" or a K-12 school controlled or "principally supported" by them but not religious charities and other religious organizations). This pattern of State-law incursions into religious autonomy should be stopped—not encouraged.

\*    \*    \*

Abortion remains one of the most deeply divisive topics in American law and society. It is a matter of enormous religious and moral significance to millions of Americans and their faith communities. Washington's abortion mandate commandeers a religious employer's healthcare plan to subsidize and facilitate abortion for its own employees. By doing so, the mandate interjects State power into the internal management of a religious organization precisely where religious beliefs are at their most intense. Few religious beliefs carry greater force than the divine mandate "[t]hou shalt not kill." Exodus

20:13 (King James). Because the decision below disregards appellant's religious autonomy, it richly deserves reversal.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the court below.

<div style="margin-left:40%">

Respectfully submitted,
/s/William C. Duncan
William C. Duncan
Sutherland Institute
420 E South Temple, Suite 510
Salt Lake City, UT 84111
bill@sifreedom.org

Counsel for *Amicus Curiae*

</div>

November 28, 2023

17

## CERTIFICATE OF COMPLIANCE

I hereby certify that this amici brief complies with Federal Rule of Appellate Procedure 29(a)(5) and 9th Circuit Rule 32-3(2) as it contains 3,037 words, excluding the portions exempted by Fed. R. App. P. 32(f).

The brief's typesize and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point Century Schoolbook, a proportionally spaced font.

Dated: November 28, 2023

/s/William C. Duncan
William C. Duncan

Counsel for *Amici Curiae*

18

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

Dated: November 28, 2023

/s/William C. Duncan
William C. Duncan

Counsel for *Amicus Curiae*