**Nos. 23-35560, 23-35585**

In the United States Court of Appeals
for the Ninth Circuit

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

*Plaintiff-Appellant / Cross-Appellee*,

*v.*

MYRON "MIKE" KREIDLER, in his official capacity as Insurance
Commissioner for the State of Washington; JAY INSLEE, in his official
capacity as Governor of the State of Washington,

*Defendants-Appellees / Cross-Appellant.*

Appeal from the United States District Court
for the Western District of Washington
Civil Case No. 3:19-cv-05181-BHL
Honorable Benjamin H. Settle

**BRIEF *AMICUS CURIAE* OF THE
NOTRE DAME LAW SCHOOL RELIGIOUS LIBERTY CLINIC
SUPPORTING PLAINTIFF-APPELLANT**

Francesca Matozzo
John Meiser
Notre Dame Law School
Religious Liberty Clinic
1338 Biolchini Hall of Law
Notre Dame, IN 46556
(574) 631-3106
fgenova@nd.edu

*Counsel for* Amicus Curiae

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amicus has no parent corporation and no stock.

*/s/ Francesca Matozzo*
Francesca Matozzo

*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................ii

TABLE OF CONTENTS ......................................................... iii

INTEREST OF AMICUS CURIAE ...........................................viii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................1

ARGUMENT ......................................................................5

I.    Cedar Park's free-exercise claim is fundamentally distinct from—and demands closer scrutiny than—its equal-protection claim. ......................................................................5

    A.    The Equal Protection Clause protects against invidious and arbitrary discrimination. ..................................5

    B.    Beyond the demands of equal protection, the Free Exercise Clause requires religious exercise to be treated as favorably as any similar secular activity.............................10

    C.    An equal-protection ruling cannot dispose of a free-exercise claim.................................................15

II.    The law-of-the-case doctrine does not control this Court's analysis of Cedar Park's free exercise claim. ...............................17

CONCLUSION ..................................................................20

CERTIFICATE OF COMPLIANCE.........................................22

CERTIFICATE OF SERVICE................................................23

# TABLE OF AUTHORITIES

## Cases

*Agudath Israel of Am. v. Cuomo*,
   980 F.3d 222 (2d Cir. 2020) ................................................................ 14

*Arnold v. City of Columbia*,
   197 F.3d 1217 (8th Cir. 1999) ............................................................... 8

*Ashaheed v. Currington*,
   7 F.4th 1236 (10th Cir. 2021) ............................................................... 6

*Brikova v. Holder*,
   699 F.3d 1005 (8th Cir. 2012) ............................................................... 9

*Cedar Park Assembly of God of Kirkland v. Kreidler*,
   860 F. App'x 542 (9th Cir. 2021) .................................................... 2, 18

*Cedar Park Assembly of God of Kirkland v. Kreidler*,
   No. 19-cv-5181, 2023 WL 4743364 (W.D. Wash. July 25, 2023).......... 3

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ............................................................................. 11

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) ..................................................................... 3, 5, 6

*Conyers v. Abitz*,
   416 F.3d 580 (7th Cir. 2005) ............................................................... 16

*Doe v. Settle*,
   24 F.4th 932 (4th Cir. 2022) ................................................................. 8

*Does 1-6 v. Mills*,
   16 F.4th 20 (1st Cir. 2021) ................................................................. 16

*E. Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) ............................................................ 19

*FCC v. Beach Commc'ns,*
508 U.S. 307 (1993) .................................................................7

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Ed.,*
82 F.4th 664 (9th Cir. 2023) (en banc) ...............................10

*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021) ......................................................1, 11

*Gallinger v. Becerra,*
898 F.3d 1012 (9th Cir. 2018) ..............................5, 6, 7, 8, 9

*Gonzalez v. Arizona,*
677 F.3d 383 (9th Cir. 2012) ..............................................17

*Harris v. McRae,*
448 U.S. 297 (1980) ........................................................5, 10

*Hart v. Massanari,*
266 F.3d 1155 (9th Cir. 2001) .............................................19

*Kirola v. City and County of San Francisco,*
860 F.3d 1164 (9th Cir. 2017) .............................................19

*Liberty Mutual Ins. Co. v. EEOC,*
691 F.2d 438 (9th Cir. 1982) ........................................17, 19

*Loving v. Virginia,*
388 U.S. 1 (1967) ..................................................................6

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ........................................................5, 10

*Milgard Tempering, Inc. v. Selas Corp. of Am.,*
902 F.2d 703 (9th Cir. 1990) ..............................................17

*N.Y. State Club Ass'n, Inc. v. City of New York,*
487 U.S. 1 (1988) ..................................................................7

*Nordyke v. King*,
681 F.3d 1041 (9th Cir. 2012) (en banc) ............................................ 10

*Plyler v. Doe*,
457 U.S. 202 (1982) ................................................................................ 6

*Raidoo v. Moylan*,
75 F.4th 1115 (9th Cir. 2023) ........................................................... 6, 8

*Railway Express Agency v. New York*,
336 U.S. 106 (1949) ................................................................................ 6

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020) .............................................................................. 14

*Seaplane Adventures, LLC v. County of Marin*,
71 F.4th 724 (9th Cir. 2023) ........................................................... 15, 16

*St. John's United Church of Christ v. City of Chicago*,
502 F.3d 616 (7th Cir. 2007) ................................................................ 16

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021) ....................................................... 1, 11, 12, 13

*Tandon v. Newsom*,
992 F.3d 916 (9th Cir. 2021) ............................................................... 12

*Thornton v. City of St. Helens*,
425 F.3d 1158 (9th Cir. 2005) ........................................................... 7, 8

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ................................................................................ 6

*United States v. Alahmad*,
211 F.3d 538 (10th Cir. 2000) ............................................................... 9

*United States v. Virginia*,
518 U.S. 515 (1996) ................................................................................ 6

*Village of Willowbrook v. Olech,*
  528 U.S. 562 (2000)............................................................5

*We the Patriots USA, Inc. v. Ct. Off. of Early Childhood Dev.,*
  76 F.4th 130 (2d Cir. 2023).............................................16

*Williamson v. Lee Optical,*
  348 U.S. 483 (1955)..........................................................6

*Wirzburger v. Galvin,*
  412 F.3d 271, 282 (1st Cir. 2005) ..................................16

## INTEREST OF AMICUS CURIAE[1]

The Notre Dame Law School Religious Liberty Clinic promotes and defends religious freedom for all people. It advocates for the right of all people to exercise, express, and live according to their religious beliefs. And it defends individuals and organizations of all faith traditions against interference with these fundamental liberties. It has represented groups from an array of faith traditions to defend the right to religious exercise, to preserve sacred lands from destruction, to promote the freedom to select religious ministers and shape religious doctrine, and to prevent discrimination against religious institutions and believers. The Clinic has participated in proceedings at all levels of federal and state courts, in administrative agencies, and before foreign courts and other governmental bodies around the world. It seeks to ensure that government officials do not compel religious institutions to act in a manner that violates their deeply held religious beliefs.

---

[1] Counsel for all parties consented to this brief's filing. No party's counsel authored the brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Free Exercise Clause of the First Amendment does not allow the government to privilege secular activity over religious exercise. Laws that "prohibit religious conduct while permitting secular conduct that undermines the government's interests in a similar way" must be subject to strict scrutiny. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). And, as the Supreme Court recently made clear, this demands that courts actually inspect whether the government has restricted religious exercise more tightly than "*any* comparable secular activity." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Here, that answer is clearly yes: the State of Washington allows a host of secular exemptions to its requirement to provide insurance coverage for abortions, while failing to give a similar exemption to institutions with religious objections like Cedar Park Assembly of God. *See* Opening Br. 37-41.

Yet the district court nullified the exacting demands of the Free Exercise Clause by erroneously assuming that they should rise or fall with Cedar Park's previously rejected *equal protection* claim. Specifically, in a prior appeal, this Court upheld the dismissal (for lack

1

of standing) of Cedar Park's claim that Washington's differential treatment violated the Equal Protection Clause. *Cedar Park Assembly of God of Kirkland v. Kreidler*, 860 F. App'x 542, 543-44 (9th Cir. 2021). This Court reasoned—in two sentences—that, for purposes of the Equal Protection Clause, Cedar Park was not "similarly situated" to healthcare providers who could receive an exemption, because "[healthcare] providers are in the business of providing health services, while religious organizations [like Cedar Park] merely purchase health coverage." *Id.* The Court said nothing more. And critically, in the same decision, this Court *reversed* the dismissal of Cedar Park's free-exercise claim, and remanded for further litigation. *Id.*

On remand, the district court ended that litigation largely by importing this Court's equal-protection ruling into the free-exercise analysis, effectively sidestepping Cedar Park's argument that the law is not generally applicable under the Free Exercise Clause. Worse still, the district court did so without any analysis. Instead, it merely contended that it was duty-bound under the law of the case to conclude that Cedar Park was not comparable for First Amendment purposes to those entities that are treated more freely under Washington's law

2

because this Court had said they are not "similarly situated" for purposes of an equal-protection claim. *Cedar Park Assembly of God of Kirkland v. Kreidler*, No. 19-cv-5181, 2023 WL 4743364, at *10 (W.D. Wash. July 25, 2023). Thus, the court opined, Cedar Park could not prevail in showing that the State has violated the Free Exercise Clause by granting exemptions to secular entities that it denies to Cedar Park's similar religious exercise.

This holding was manifestly wrong—and it threatens to do significant damage to the protections of the First Amendment. This Court's prior statement regarding Cedar Park's *equal protection* claim says nothing about the merits of Cedar Park's *free exercise* claim. Rather, this Court's passing use of the phrase "similarly situated" simply reflects what the Equal Protection Clause requires: that like individuals be treated alike. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause protects against invidious discrimination and ensures that like cases—and like people—are treated the same. It demands close scrutiny where the government has regulated based on "suspect" classifications of identity

3

like race or sex, but it otherwise ensures only that the government does not act arbitrarily.

The Free Exercise Clause, by contrast, protects the fundamental and substantive right to religious exercise. It demands that the court closely scrutinize the government's decision to regulate *any* secular activity more favorably than comparable religious exercise. And it does not ask—like the equal protection analysis often does—merely whether the government *might* have some legitimate reason to treat two groups differently but rather whether the government has *actually* pursued its regulatory interests more zealously against religious activity than against other activity that presents similar consequences.

This Court must correct the district court's fundamental misunderstanding and clarify that the Free Exercise Clause is not simply a repackaging of a baseline antidiscrimination rule under the Equal Protection Clause.

# ARGUMENT

## I. Cedar Park's free-exercise claim is fundamentally distinct from—and demands closer scrutiny than—its equal-protection claim.

The district court erred in conflating this Court's prior equal-protection ruling with the separate and more demanding inquiry required to evaluate Cedar Park's free-exercise claim. That error both is wrong under the law and, if left uncorrected, would undermine the critical protections that the First Amendment affords against government actions that disfavor religious exercise.

### A. The Equal Protection Clause protects against invidious and arbitrary discrimination.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne*, 473 U.S. at 439. The core "purpose" of the clause is to protect persons against "arbitrary discrimination." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quotation marks and citation omitted); *see McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) (calling it an "antidiscrimination rule"); *Harris v. McRae*, 448 U.S. 297, 322 (1980)

5

(similar). To that end, equal-protection analysis focuses on regulatory classifications of persons and the government's choice to regulate different groups of people differently. *See Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018); Appellant's Br. 49-51.

Because all policies require some lines to be drawn, the government generally enjoys wide latitude to regulate under the Equal Protection Clause, so long as it does not draw those lines based on protected characteristics like a person's race or sex. Laws that discriminate on such invidious bases receive "strict" or "heightened" scrutiny. *See Loving v. Virginia*, 388 U.S. 1 (1967); *United States v. Virginia*, 518 U.S. 515 (1996); *see also Ashaheed v. Currington*, 7 F.4th 1236, 1251 (10th Cir. 2021) (religious classification suspect); *Perrier-Bilbo v. United States*, 954 F.3d 413, 432 (1st Cir. 2020) (similar). Likewise, equal protection requires strict scrutiny of laws that target a group based on animus, *see City of Cleburne*, 473 U.S. at 447; *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), or that discriminate between people based on their exercise of a fundamental right, *see Gallinger*, 898 F.3d at 1016.

But otherwise, courts evaluating equal-protection claims are highly deferential to government line-drawing. *See, e.g.*, *Raidoo v. Moylan*, 75 F.4th 1115, 1125 (9th Cir. 2023). Where suspect classifications are not at issue, the Equal Protection Clause requires only that the government's differentiation between groups "bears some fair relationship to a legitimate public purpose." *Plyler v. Doe*, 457 U.S. 202, 216 (1982); *see, e.g.*, *Williamson v. Lee Optical*, 348 U.S. 483 (1955); *Railway Express Agency v. New York*, 336 U.S. 106 (1949). But the government's need to define the scope of its laws "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line." *FCC v. Beach Commc'ns*, 508 U.S. 307, 315-16 (1993) (internal quotation marks and citation omitted). Thus, if "practices, purposes, and structures" of regulated entities are not "identical," governments are often allowed to "exempt[]" certain entities from "coverage" with little scrutiny. *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 18 (1988). And the question, ultimately, is whether the government might have *any* legitimate reason for distinguishing between the two groups. *Gallinger*, 898 F.3d at 1017.

It is thus critical to equal-protection analysis to identify the "factor motivating the alleged discrimination"—that is, whether the government has drawn distinctions between groups based on suspect classifications or for some legitimate basis. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005). Stated differently, this Court asks whether the government has drawn invidious or arbitrary lines between otherwise "similarly situated" groups or instead has acted within its broad authority to regulate based on rational distinctions between groups with different characteristics. *See id.* To be sure, this Court has stated that the inquiry conceptually involves "look[ing] for a control group composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policy." *Gallinger*, 898 F.3d 1016. But in practice, this inquiry is quite deferential to legislative classifications, and courts have upheld relatively thin distinctions between non-suspect groups. *See, e.g.*, *Thornton*, 425 F.3d at 1167 (distinguishing "auto wreckers" from other "heavy industry" businesses without analysis); *Arnold v. City of Columbia*, 197 F.3d 1217, 1220 (8th Cir. 1999) (distinguishing police officers from "other employees [who] fall within the same grade

8

classification under the City's pay plan" "with respect to work hours"). And, likely because of the similarity between this question and ultimate rational basis review, in cases without any alleged suspect classification, courts often *assume* that two groups are similarly situated and then simply uphold their differential treatment as reasonably related to a government interest. *See, e.g.*, *Gallinger*, 898 F.3d at 1017, 1021; *Raidoo*, 75 F.4th at 1125; *Doe v. Settle*, 24 F.4th 932, 943 (4th Cir. 2022); *Brikova v. Holder*, 699 F.3d 1005, 1009 (8th Cir. 2012); *United States v. Alahmad*, 211 F.3d 538, 541 (10th Cir. 2000).

This Court's opinion in *Gallinger v. Becerra* is a good example of the regulatory leeway the Equal Protection Clause allows for non-suspect classifications. There, a group of concealed-carry permit holders brought an equal-protection claim against a law that denied them the ability to have guns on school property while allowing retired police officers to do so. *Gallinger*, 898 F.3d at 1015. They argued that the "retired-officer exception" was an impermissible result of lobbying that unfairly privileged that group over other permit-holders, even though both may be expected to use firearms responsibly. *Id.* at 1020. This

9

Court rejected the argument, explaining that the state was "free to conclude that retired peace officers, as a class, are more skilled in the use of firearms" and that "[a]ccommodating one interest group is not equivalent to intentionally harming another." *Id.* at 1021. Thus, even if the government cannot be motivated by "bare legislative desire to harm a politically unpopular group," the Equal Protection Clause does not prevent it from regulating in a way that privileges one group over another with similar interests. *Id.* (quotation omitted). Rather, "where a statutory classification does not itself impinge on a right or liberty protected by the Constitution, the validity of the classification must be sustained" unless it "rests on grounds wholly irrelevant to the achievement of any legitimate governmental purpose." *Harris*, 448 U.S. at 322 (cleaned up); *see Nordyke v. King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc).

### B. Beyond the demands of equal protection, the Free Exercise Clause requires religious exercise to be treated as favorably as any similar secular activity.

The Free Exercise Clause, by contrast, requires significantly greater scrutiny of government actions that privilege secular activity over religious conduct. That clause protects the substantive right to

religious exercise; it is not merely an "antidiscrimination rule," but prohibits even "nondiscriminatory abridgments" of the right to the "freedom of religion." *McDonald*, 561 U.S. at 778. In addition to prohibiting outright religious hostility, it bars the government from disfavoring religious activity by "treat[ing] . . . comparable secular activity more favorably than religious exercise." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Ed.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) ("*FCA*") (quoting *Tandon*, 141 S. Ct. at 1296); *see Fulton*, 141 S. Ct. at 1877.

This inquiry requires inspection of whether a permitted secular activity is "comparable" to a more tightly restricted religious activity. But that question differs critically from whether two groups are "similarly situated" in an equal-protection case. First, as Cedar Park points out, whether religious and secular activities are comparable for purposes of the Free Exercise Clause is judged by the *effect* those activities have on the government's *interests* underlying the regulation. Appellant's Br. 35-37, 50-51. Unlike with equal protection, the question is not whether the *classes of regulated entities* are for all purposes the same but whether the permitted secular conduct "endangers [the

government's] interests in a similar or greater degree than" the prohibited religious conduct. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993).

This inquiry is far more probing than merely asking whether two groups are in some way distinct. That question asks only whether two groups display some differences that policymakers might reasonably take into account when crafting a law. The question of comparability for free-exercise cases requires courts instead to inspect the government's actual (not hypothetical) interests and it demands that the court examine the degree to which those interests would be affected by the relevant activities. *See Tandon*, 141 S. Ct. at 1296-97. Further, the Supreme Court has made clear that a law "trigger[s] strict scrutiny" under the Free Exercise Clause "whenever [it] treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296. Even the State's favorable treatment of a single comparable secular activity is enough to require exacting review. *Id.*

The teeth of these demands were made clear in the Supreme Court's recent cases concerning public-health regulations that restricted social gatherings to limit the spread of COVID-19. Consider *Tandon v.*

12

*Newsom*, in which this Court had upheld California's restrictions on in-home worship services, on the theory that they were "analogous [to] secular in-home private gatherings," which had also been so restricted. *Tandon v. Newsom*, 992 F.3d 916, 920 (9th Cir. 2021). In so holding, this Court rejected the argument that the Free Exercise Clause required in-home worship to be treated more leniently because a variety of activities had been allowed more freely *outside* the home—opining that such out-of-home activities were not comparable to residential gatherings. *Id.* The Supreme Court reversed and made clear that such an approach was far too deferential to the government. For its part, the Supreme Court did not ask whether the *most* directly comparable activities had been treated the same as in-home worship. *See Tandon*, 141 S. Ct. at 1296 ("It is no answer that the State treats some comparable secular businesses or other activities as poorly as . . . the religious exercise at issue."). Instead, it compared the potential effects of in-home worship to those of *all other* secular activities that were more leniently regulated. *See id.* (strict scrutiny for laws that "treat any comparable secular activity more favorably than religious exercise"). This included comparisons to entities that—for equal protection

purposes—would be indisputably distinct from at-home worshippers, including "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants." *Id.* at 1297; *see also id.* (rejecting distinction between activities in "public buildings as opposed to private buildings"). Despite their obvious differences, the relevant question was the *effect* those activities would have on the government's interest in disease mitigation—and whether those effects were similar to the effects expected from in-home worship. *Id.* at 1296.

So too in *Roman Catholic Diocese of Brooklyn v. Cuomo*, in which the Second Circuit had upheld government restrictions on houses of worship, determining that regulations treated them better than "schools, restaurants, and comparable secular public gatherings." *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 227 (2d Cir. 2020). The Supreme Court disagreed. It rejected the Second Circuit's narrow focus on whether some facially similar groups had been treated the same and asked instead whether *all* secular activities presenting similar risks of disease spread had been restricted as tightly as churches. The Court ultimately concluded that New York's closure of churches could not be

14

justified because it more freely opened "acupuncture facilities, camp grounds, [and] garages"—all of which presented comparable health risks to houses of worship. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66-67 (2020). No one could doubt that garages and acupuncture facilities are different in kind than houses of worship. But, for the purposes of the Free Exercise Clause, those differences were irrelevant because each of these activities endangered the government's interest in the same way.

### C. An equal-protection ruling cannot dispose of a free-exercise claim.

The comparability analysis demanded in Free Exercise cases like these is not only different from that required by the equal protection framework. It is also far stricter. Indeed, this Circuit recently recognized as much in *Seaplane Adventures, LLC v. County of Marin*, 71 F.4th 724 (9th Cir. 2023). There, a recreational air travel corporation claimed that the government violated equal protection by ordering it to shut down during the COVID-19 pandemic while allowing non-recreational air travel carriers to continue to operate. *Id.* at 727-30. This Court held that Seaplane Adventures had no equal-protection claim, concluding that, "[t]o the extent that the relevant distinction

15

defining the scope of the class is recreational and non-recreational flights, the rational basis is abundantly clear: to lower transmission of COVID-19 by restricting activities not defined as essential." *Id.* at 731. Critically, this Court emphasized that its analysis would have been different if the regulation treated *religious* conduct less favorably than comparable secular conduct. Citing *Cuomo*, the court explained, "[U]nlike in those cases, where free exercise claims were involved that necessitated strict scrutiny analysis, the County's regulation of Seaplane's business activities falls under rational basis review." *Id.* at 731. That review "does not require the [government] to behave optimally, but only rationally." *Id.* The Free Exercise Clause demands significantly closer scrutiny when the line that has been drawn is between religious conduct and secular.

Given free exercise's more stringent demands, the bare rejection of a rational-basis equal protection claim cannot dispose of a related free-exercise claim. Courts must engage with free-exercise claims independently of equal-protection claims. *See, e.g.*, *Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005); *We the Patriots USA, Inc. v. Ct. Off. of Early Childhood Dev.*, 76 F.4th 130, 158 (2d Cir. 2023); *Does 1-6 v.*

*Mills*, 16 F.4th 20, 35 (1st Cir. 2021); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 638 (7th Cir. 2007); *Wirzburger v. Galvin*, 412 F.3d 271, 282, 282 n.5 (1st Cir. 2005).[2] The district court's contrary approach would effectively nullify *Tandon*'s rule.

## II. The law-of-the-case doctrine does not control this Court's analysis of Cedar Park's free exercise claim.

Because equal protection and free exercise require fundamentally distinct inquiries, the law of the case is inapposite here, and the district court wrongly applied it. *See* Appellant's Br. 51-53.

Law of the case is a prudential doctrine that generally precludes courts from "reconsider[ing] an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012). For the doctrine to apply, the issue in question must have been decided explicitly or by necessary implication. *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990). The doctrine does not preclude consideration of

---

[2] Plaintiffs may of course have separate free exercise and equal protection claims based on the same facts (for instance, if someone faced discrimination for being Hindu and Indian). *See, e.g.*, *Wirzburger*, 412 F.3d at 282 n.5.

an issue on which a prior ruling was wholly silent. *See Liberty Mutual Ins. Co. v. EEOC*, 691 F.2d 438, 441-42 (9th Cir. 1982).

In the prior appeal here, this Court made only one ruling on the free-exercise claim: to revive it by concluding that Cedar Park had standing to pursue it. *Cedar Park Assembly of God*, 860 F. App'x at 543-44. Otherwise, the prior opinion did not say *anything* about the merits of Cedar Park's free exercise claim. Indeed, the district court had not considered that claim on the merits in the first instance, so this Court had no occasion to do so either. This Court then briefly affirmed the dismissal of the equal-protection claim for lack of standing by holding that religious employers are not "similarly situated" to healthcare providers. *Id.* But this Court said nothing to suggest that the merits of the free-exercise claim ought to be governed by that dismissal of Cedar Park's equal protection claim—an idea that would have been utterly bizarre given that this Court *remanded* the case for further litigation of the free-exercise claim.[3] *See id.*

---

[3] Indeed, in the prior appeal, the State never even argued that the equal protection analysis would also relate to Cedar Park's free exercise claim. *See generally* Defendants-Appellees' Answering Brief, *Cedar*

In the face of this silence, the law-of-the-case doctrine does not apply. *See Liberty Mutual Ins. Co.*, 691 F.2d at 441-42. It would be all the worse to apply the doctrine here, to use a prior ruling about *standing* to preclude a determination on the *merits* of a totally separate legal claim. *Cf. E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1261-65 (9th Cir. 2020) (holding that "some functional overlap" between two doctrines is not enough to apply law of the case); *Kirola v. City and County of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017) (stating that standing is different from merits). And it would be especially inappropriate to apply the doctrine based on two sentences from an unpublished memorandum disposition. Memorandum dispositions exist to free panels to "spend the requisite time drafting precedential opinions" in other matters. *Hart v. Massanari*, 266 F.3d 1155, 1178 (9th Cir. 2001). That value would "vanish" if "conscientious judges would have to pay much closer attention to the way they word their unpublished rulings"—including even for their impact on *constitutional claims not addressed* in the memorandum disposition. *Id.* The panel, in

---

*Park Assembly of God v. Kreidler*, 860 F. App'x 542 (9th Cir. 2021) (No. 20-35507).

disposing of the equal-protection claim on standing, surely did not expect that it was also making a merits ruling on the free-exercise claim that it revived. It is one thing for a panel to agree that the equal-protection claim lacks standing. It is wholly another to assume that the panel's members would all agree that they were analyzing, sub silentio, the distinct and more complex legal question of how comparability works in the free-exercise context.

Law of the case does not control Cedar Park's free exercise claim, which must succeed or fail on its own merits—not on prudential doctrines barring a party's relitigation of issues already decided. The merits of Cedar Park's general applicability argument on its free-exercise claim have not been fully litigated either here or in the court below. The district court erred in relying on law of the case to avoid engaging with it in the first instance.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's rejection of Cedar Park's free-exercise claim based upon an inapposite ruling from the prior appeal. [4]

Dated: November 29, 2023      Respectfully submitted,

*/s/ Francesca Matozzo*
Francesca Matozzo
John Meiser
Notre Dame Law School
Religious Liberty Clinic
1338 Biolchini Hall
Notre Dame, IN 46556
fgenova@nd.edu
Telephone: (574) 631-3106

*Counsel for* Amici Curiae

---

[4] The Religious Liberty Clinic would like to thank students Nick Grandpre, Charlie Nugent, Hadiah Mabry, and Bernadette Shaughnessy for their work on this brief.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this amicus brief complies with Federal Rule of Appellate Procedure 29(a)(5) and 9th Circuit Rule 29-2(c)(2) as it contains 4078 words, excluding the portions exempted by Fed. R. App. P. 32(f).

The brief's typesize and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point Century Schoolbook, a proportionally spaced font.

Dated: November 29, 2023        */s/ Francesca Matozzo*
Francesca Matozzo

*Counsel for* Amicus Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

Dated: November 29, 2023        */s/ Francesca Matozzo*
                                    Francesca Matozzo

                                    *Counsel for Amicus Curiae*