NO. 23-35560

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

Plaintiff-Appellant,

v.

MYRON KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington, AKA Mike Kreidler; JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

No. 3:19-cv-05181-BHS
The Honorable Benjamin H. Settle
United States District Court Judge

## DEFENDANTS-APPELLEES' ANSWERING BRIEF

ROBERT W. FERGUSON
*Attorney General*

TERA M. HEINTZ, WSBA 54921
*Deputy Solicitor General*
MARTA DELEON, WSBA 35779
*Senior Assistant Attorney General*

1125 Washington Street SE
Olympia, WA 98504
(360) 664-9006
Tera.Heintz@atg.wa.gov
Marta.DeLeon@atg.wa.gov

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................... 1

II.   JURISDICTION ............................................................... 3

III.  STATUTORY AUTHORITIES ...................................... 3

IV.  ISSUES PRESENTED ..................................................... 3

V.   STATEMENT OF THE CASE ........................................ 5

    A.  Washington Law Allows Organizations to Refuse to Purchase Health Care Coverage to Which They Have a Moral or Religious Objection ................................................................ 5

    B.  Washington Enacted the Reproductive Parity Act While Preserving the Conscience Objection Statute ............................ 7

    C.  In Practice, Employers and Carriers Negotiate for Plans That Accommodate Religious Objections ........................................ 11

    D.  Cedar Park's Pre-Enforcement Challenge and the District Court's Initial Dismissal of Cedar Park's Claims .................... 13

    E.  The Ninth Circuit Affirmed Dismissal of Cedar Park's Equal Protection and Establishment Clause Claims, But Found Cedar Park Had Alleged Standing for Its Free Exercise Claim .......... 15

    F.  On Remand, the District Court Dismissed Cedar Park's Free Exercise and Church Autonomy Claims on the Merits ............. 16

VI.  SUMMARY OF ARGUMENT ....................................... 19

VII. STANDARD OF REVIEW ............................................ 21

VIII. ARGUMENT ................................................................. 22

i

A. Cedar Park Lacks Standing to Challenge SB 6219 or the Conscience Objection Statute................................................... 22

    1. Cedar Park is not required to pay for or provide a health plan that includes abortion coverage.......................................... 22

    2. Nor does Cedar Park show that it is required to provide or pay for abortion coverage indirectly ................................. 28

B. SB 6219 Comports with the Free Exercise Clause ................. 31

    1. SB 6219 does not impermissibly burden Cedar Park's free exercise of religion ........................................................... 31

        a. SB 6219 does not require employers to pay for or provide coverage for any service to which they have a moral or religious objection......................................... 31

        b. Requiring insurance carriers to provide notice to enrollees does not burden Cedar Park's Free Exercise rights .......................................................... 35

    2. SB 6219 is a neutral, generally applicable law under *Employment Division v. Smith* that is rationally related to a legitimate governmental interest ....................................... 38

        a. SB 6219 does not provide for individualized exemptions ................................................. 40

        b. SB 6219 does not treat comparable secular organizations better than religious organizations ............................... 44

        c. SB 6219 is not hostile to religion................................ 52

        d. SB 6219 are rationally related to legitimate governmental purposes ............................................... 54

C. SB 6219 Does Not Violate the Church Autonomy Doctrine..... 56

D.  This Court Should Affirm the District Court's Denial of Cedar Park's Permanent Injunction ..................................................... 58

IX.  CONCLUSION ................................................................................. 59

# TABLE OF AUTHORITIES

## Cases

*Abraham v. Corizon Health, Inc.*,
  985 F.3d 1198 (9th Cir. 2021) .................................................... 33

*Am. Legion Post 149 v. Wash. State Dep't of Health*,
  192 P.3d 306 (Wash. 2008) ........................................................ 32

*Ariz. Dream Act Coal. v. Brewer*,
  855 F.3d 957 (9th Cir. 2017) ................................................45, 48

*Ashaheed v. Currington*,
  7 F.4th 1236 (10th Cir. 2021) ................................................... 45

*Bras v. Cal. Pub. Utilities Comm'n*,
  59 F.3d 869 (9th Cir. 1995) ...................................................... 23

*Burwell v. Hobby Lobby Stores*,
  573 U.S. 682 (2014) ................................................................. 37

*Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*,
  458 F. Supp. 3d 1290 (W.D. Wash. 2020),
  *aff'd in part, rev'd in part*, 860 F. App'x 542 (9th Cir. 2021) .................... 14

*Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*,
  860 F. App'x 542 (9th Cir. 2021) .................................... 15-16, 48

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ...........................................................37, 39

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) ................................................... 21

*Emp. Div. v. Smith*,
  494 U.S. 872 (1990) ........................................................ 38-39, 45

iv

*Fellowship of Christian Athletes v. San Jose Unified*
  *Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) ...........................................37, 39-41, 44-47, 49

*Fulton v. City of Philadelphia*,
  593 U.S. ___, 141 S. Ct. 1868 (2021) ............................ 37, 40-42, 44, 47, 49

*Garcia v. San Antonio Metro. Transit Auth.*,
  469 U.S. 528 (1985) ..................................................................................... 55

*Hernandez v. Comm'r*,
  490 U.S. 680 (1989) ..................................................................................... 35

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
  565 U.S. 171 (2012) ..................................................................................... 57

*Johnson v. Stuart*,
  702 F.2d 193 (9th Cir. 1983) ....................................................................... 26

*Jones v. L.A. Cent. Plaza LLC*,
  74 F.4th 1053 (9th Cir. 2023) ................................................................ 22-24

*Jones v. Wolf*,
  443 U.S. 595 (1979) ..................................................................................... 57

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ...............................................................................31, 37

*Lopez v. Candaele*,
  630 F.3d 775 (9th Cir. 2010) ....................................................................... 26

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555............................................................................................... 23

*Marshall v. United States*,
  414 U.S. 417 (1974) ..................................................................................... 55

*Navajo Nation v. U.S. Forest Serv.*,
  535 F.3d 1058 (9th Cir. 2008) ..................................................................... 36

v

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   591 U.S. ____, 140 S. Ct. 2049 (2020) ...................................................... 57

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ................................................................................. 55

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   595 U.S. 14 (2020) ................................................................................... 37

*Sherbert v. Verner*,
   374 U.S. 398 (1963) ................................................................................. 40

*Silverstreak, Inc. v. Wash. State Dep't of Lab. & Indus.*,
   154 P.3d 891 (Wash. 2007) ...................................................................... 33

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
   968 F.3d 738 (9th Cir. 2020) .................................................................... 29

*State v. Moreno*,
   499 P.3d 198 (Wash. 2021) ...................................................................... 33

*Stoianoff v. Montana*,
   695 F.2d 1214 (9th Cir. 1983) .................................................................. 24

*Stormans, Inc. v. Weisman* (*Stormans II*),
   794 F.3d 1064 (9th Cir. 2015) .......................................................38, 44, 49

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................................. 22

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ........................................................................ 24, 28-29

*Tandon v. Newsom*,
   593 U.S. 61 (2021) ...........................................................38, 45-46, 49

*Thomas v. Anchorage Equal Rights Comm'n*,
   220 F.3d 1134 (9th Cir. 2000) (en banc) .................................................. 24

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
  50 U.S. 707 (1981) ................................................................ 38

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022) .............................................39, 54

*Twitter v. Paxton*,
  56 F.4th 1170 (9th Cir. 2022) ................................................ 21

*W. Mining Council v. Watt*,
  643 F.2d 618 (9th Cir. 1981),
  *cert. denied*, 454 U.S. 1031 (1981) .....................................24, 26

*Wash. Physicians Serv. Ass'n v. Gregoire*,
  147 F.3d 1039 (9th Cir. 1998),
   *as amended on denial of reh'g and
   suggestion for reh'g en banc* (Aug. 24, 1998)............................ 50

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................ 58

*Zubrik v. Burwell*,
  578 U.S. 403 (2016) ............................................................ 53

## Constitutional Provisions

U.S. amend. I (Free Exercise Clause)................................... 2, 4, 31, 36, 39, 48

U.S. Const. art. III........................................... 1, 20, 22, 24, 28-29, 59

## Federal Statutes

10 U.S.C. § 55 ................................................................ 50

28 U.S.C. § 1291................................................................ 3

28 U.S.C. § 1331................................................................ 3

28 U.S.C. § 1343................................................................ 3

42 U.S. Code § 18023(b)(1)(B) ........................................................ 42

42 U.S.C. § 18054(a)(6) .............................................................9, 41

## State Statutes

2018 Wash. Sess. Laws, ch. 119, § 1 ............................................... 8

Substitute S.B. 6219, 65th Leg., Reg. Sess. (Wash. 2018) ...................... passim

Wash. Rev. Code § 48.11.040 ....................................................... 51

Wash. Rev. Code § 48.11.070 ....................................................... 51

Wash. Rev. Code § 48.43 ........................................................... 51

Wash. Rev. Code § 48.43.005(31) .............................................9, 40, 43

Wash. Rev. Code § 48.43.065 ........................................................ 5

Wash. Rev. Code § 48.43.065(1) ..............................................5, 47

Wash. Rev. Code § 48.43.065(2)(a) .................................................. 6

Wash. Rev. Code § 48.43.065(2)(b) ............................................... 5-6

Wash. Rev. Code § 48.43.065(3)(a) ...........................................5, 32

Wash. Rev. Code § 48.43.072(1) .............................................. 7-8, 42

Wash. Rev. Code § 48.43.072(5) ..................................................... 8

Wash. Rev. Code § 48.43.073(1) .............................................. 7-8, 42

Wash. Rev. Code § 48.43.073(4) ..............................................9, 41

Wash. Rev. Code § 48.43.073(5) ...........................................9, 41, 49

Wash. Rev. Code § 48.66.020(1)(d) ............................................... 52

Wash. Rev. Code § 48.84.020(1) ................................................... 51

Wash. Rev. Code § 51.04.020 ...................................................... 50

Rules

Fed. R. Civ. P. 56(e) ................................................................ 23

Regulations

Wash. Admin. Code § 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(1) ........................................... 7

Wash. Admin. Code § 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 (3) ...................................11, 26

Wash. Admin. Code § 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(1)(c) ..................................... 52

Wash. Admin. Code § 284-50-360 ............................................... 51

Wash. Admin. Code §§ 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 to 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 ................................ 10

Other Authorities

S.B. Rep. on SB 6219, 65th Leg., Reg. Sess., at 5 (Wash. 2018).................... 10

Wash. House Health Care & Wellness Comm.,
    Pub. Hr'g: SB 5722, SSB 6219, (Feb. 7, 2018 8:00 AM),
    *video recording by* TVW, Washington State's Public Affairs Network,
    https://tvw.org/video/house-health-care-wellness-committee-
    2018021058/?eventID=2018021058 (remarks of Sarah Ainsworth) .......... 10

## I.    INTRODUCTION

The State has unequivocally disavowed that Senate Bill 6219 requires Cedar Park to purchase a health plan that covers abortions. The plain text of Washington's conscience objection law makes this clear. The regulations implementing Senate Bill 6219 state so explicitly. And the Insurance Commissioner has even approved health plans that exclude such coverage. Cedar Park has nevertheless persisted with this pre-enforcement challenge based on its false assertion that Senate Bill 6219 "mandate[s] **nearly** every employer in the state to maintain a healthcare plan that covers abortions." Opening Brief at 1. Contrary to Cedar Park's assertions, Senate Bill 6219 does not apply to employers at all. And it requires absolutely nothing from Cedar Park. It does not require Cedar Park to pay for or provide abortion coverage or provide any information to enrollees about how to obtain such coverage. Cedar Park's core complaint against Senate Bill 6219 is illusory and the district court properly dismissed its claims. This Court should affirm for at least four reasons.

First, Cedar Park cannot show Article III standing. In Cedar Park's prior appeal, this Court held that Cedar Park plausibly alleged standing based on its assertion that its insurer, Kaiser Permanente, chose not to offer Cedar Park a health plan excluding abortion coverage due to Senate Bill 6219, but would offer

such coverage if this Court enjoined the law. But Cedar Park never proved its allegations at the summary judgment stage, instead relying on the same inadmissible hearsay emails cited in its complaint. Cedar Park thus cannot prove injury in fact or redressability. And regardless, the Insurance Commissioner adopted administrative rules during the course of this litigation making clear that Senate Bill 6219 does not diminish any rights under Washington's conscience objection statute. As such, Cedar Park cannot show a genuine risk of prosecution as required to establish standing in this pre-enforcement challenge.

Second, Cedar Park's primary complaint under the Free Exercise Clause is invented. Neither Senate Bill 6219 nor the Insurance Commissioner requires Cedar Park to purchase or provide health plans that include abortion coverage. And its objection against insurance carriers providing information and access to abortion coverage for Cedar Park's enrollees does not coerce Cedar Park into violating its religious beliefs or deprive it of an otherwise generally available public benefit as required to state a cognizable Free Exercise claim. Cedar Park cannot show that Senate Bill 6219 substantially burdens its Free Exercise rights.

Third, even if Cedar Park could identify a legally cognizable burden, Cedar Park's Free Exercise claim still fails because Senate Bill 6219 is a religiously neutral and generally applicable law that is rationally related to the

many government interests it addresses. Cedar Park's tortured efforts to portray the law as permitting ad hoc decision-making or favoring comparable secular organizations misstates both Senate Bill 6219 and Free Exercise case law.

And fourth, Senate Bill 6219 does not interfere with Cedar Park's ecclesiastical decision-making. The law regulates the insurance market, not Cedar Park. Cedar Park's efforts to expand the church autonomy doctrine to laws that require nothing of a religious organization would put those organizations above the law. The claim necessarily fails here.

## II. JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291.

## III. STATUTORY AUTHORITIES

Except for the statutory authorities appearing in the Addendum to this brief, all applicable statutes are contained in the Addendum of Cedar Park.

## IV. ISSUES PRESENTED

1.    Does Cedar Park lack standing to bring this pre-enforcement challenge to Senate Bill 6219 when it failed to proffer admissible evidence that its insurance company refused to provide an insurance policy excluding abortion coverage due to Senate Bill 6219 or would provide Cedar Park such coverage if

this Court enjoined the law, and when the State has explicitly disavowed that it would enforce the law to prevent any insurance company from offering such a policy in the future?

2.      Does Cedar Park fail to allege a cognizable burden under the Free Exercise Clause when its central complaint that Senate Bill 6219 requires it to provide abortion coverages conflicts with the plain text of Washington's conscience objection statute, Washington's administrative rules implementing Senate Bill 6219, and the Insurance Commissioner's approval of other health plans excluding abortion coverage?

3.      Does Cedar Park fail to demonstrate a Free Exercise Claim when Senate Bill 6219 is neutral as to religion and does not provide for individualized exemptions or treat comparable secular organizations better than Cedar Park, and when the State has honored religious objections rather than act with hostility towards religion?

4.      Does Cedar Park's invocation of the Church Autonomy doctrine fail when Senate Bill 6219 regulates insurance carriers and the insurance market and does not control Cedar Park's internal management decisions that are essential to the institution's central mission?

## V.    STATEMENT OF THE CASE

**A.    Washington Law Allows Organizations to Refuse to Purchase Health Care Coverage to Which They Have a Moral or Religious Objection**

Washington has long recognized a balance between ensuring that enrollees receive coverage for a full range of health services, while preserving the free exercise of religion. Wash. Rev. Code § 48.43.065. In 1995, the Legislature adopted the conscience objection statute, which "recognizes that every individual possesses a fundamental right to exercise their religious beliefs and conscience" and "that in developing public policy, conflicting religious and moral beliefs must be respected." Wash. Rev. Code § 48.43.065(1). To that end, "No individual or organization with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion." Wash. Rev. Code § 48.43.065(3)(a).

The conscience objection statute frees insurance companies to offer insurance plans that accommodate employers' religious or moral objections. Wash. Rev. Code § 48.43.065(3)(a). For any such plan, Washington requires insurance carriers, not employers, to ensure that objecting organizations do not pay for such services, and to provide information to enrollees about how to access such services elsewhere. Wash. Rev. Code § 48.43.065(2)(b).

Specifically, the carrier must provide written notice to enrollees about the employer's objection, "describing how an enrollee may directly access services in an expeditious manner," and ensure that enrollees have "prompt access" to information about such services. Wash. Rev. Code § 48.43.065(2)(b). The law does not require any action by religious employers objecting to a particular service.

The conscience objection statute also includes an exemption for an "individual health care provider, religiously sponsored health carrier, or health care facility." Wash. Rev. Code § 48.43.065(2)(a). That provision provides that such entities may not be required "by law or contract in any circumstances to participate in the provision of or payment for a specific service if they object to so doing for reason of conscience or religion." Wash. Rev. Code § 48.43.065(2)(a). But just as with any other health plan that excludes abortion coverage under the conscience objection statute, a religious insurance carrier must still provide notice to enrollees about how to obtain access to services to which the religious insurer objects. Wash. Rev. Code § 48.43.065(2)(b).

After adoption of the conscience objection statute in 1995, the Insurance Commissioner adopted implementing regulations consistent with this plain text

and purpose. While insurance carriers are not required to provide a health plan that accommodates religious objections, an insurance carrier that chooses to do so must include in the plan "a full description of the process it will use to recognize an organization or individual's exercise of conscience based on a religious belief or conscientious objection to the purchase of coverage for a specific service." Wash. Admin. Code § 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(1). That "process may not affect a nonobjecting enrollee's access to coverage for those services." *Id.*

**B.     Washington Enacted the Reproductive Parity Act While Preserving the Conscience Objection Statute**

Against the backdrop of the conscience objection statute, in 2018, Washington State enacted Senate Bill 6219, the Reproductive Parity Act (SB 6219) (Substitute S.B. 6219, 65th Leg., Reg. Sess. (Wash. 2018)). SB 6219 regulates the insurance market and insurance carriers, not employers. SB 6219 requires that all "health plans" provide contraceptive coverage and that any health plan providing coverage for maternity care or services also include "substantially equivalent" coverage for abortion services. Wash. Rev. Code §§ 48.43.072(1); .073(1). The Legislature found that access to a full range of health benefits and preventative services "provides all Washingtonians with the opportunity to lead healthier and more productive lives;" that "[n]either a woman's income level nor her type of insurance should prevent her from having

access to a full range of reproductive health care, including contraception and abortion services;" that "[a]ccess to contraception has been directly connected to the economic success of women and the ability of women to participate in society equally;" and that restricting "abortion coverage interfere[s] with a woman's personal, private pregnancy decision making, with his or her health and well-being, and with his or her constitutionally protected right to safe and legal medical abortion care." 2018 Wash. Sess. Laws, ch. 119, § 1.

Relevant here, SB 6219 has two parts. First, subject to exceptions, health plans issued or renewed after January 1, 2019, must provide coverage for all contraceptives approved by the federal Food and Drug Administration, voluntary sterilization procedures, and any services necessary to provide the contraceptives. Wash. Rev. Code § 48.43.072(1). These benefits must be offered to all enrollees, and their enrolled spouses and dependents. Wash. Rev. Code § 48.43.072(5).

Second, subject to exceptions, health plans issued or renewed after January 1, 2019, that "provide[] coverage for maternity care or services" must "also provide a covered person with substantially equivalent coverage to permit the abortion of a pregnancy." Wash. Rev. Code § 48.43.073(1). SB 6219 identifies two exceptions to this requirement. First, the requirement does not

apply to multistate plans that excludes abortion coverage, pursuant to 42 U.S.C. § 18054(a)(6); Wash. Rev. Code § 48.43.073(4). This is because the Affordable Care Act previously required that, when multistate plans are offered through a health exchange, at least one multistate plan must not include abortion coverage so that there is an "assured availability of varied coverage" for those who object to abortions. 42 U.S.C. § 18054(a)(6). But this program no longer exists at the federal level. As such, there are no multistate plans. 3-ER-310-311. Second, the requirement does not apply if it would violate federal requirements attached to federal funds and result in the loss of federal funding to the state, "to the minimum extent necessary for the state to be in compliance" with federal law. Wash. Rev. Code § 48.43.073(5).

SB 6219 applies to any "health plan," a term that predates SB 6219, and is defined in the general definitions section of the Insurance Code. Wash. Rev. Code § 48.43.005(31). A "health plan" is "any policy, contract, or agreement offered by a health carrier to provide, arrange, reimburse, or pay for health care services," not including certain insurance products. Wash. Rev. Code § 48.43.005(31). The fourteen insurance products that are not "health plans" include products that the Insurance Commissioner has no authority to regulate or that do not provide comprehensive health benefits. *Id.*

The text of SB 6219 nowhere indicates that it supersedes the conscience objection statute. To the contrary, the Legislature intended that SB 6219 be applied consistent with the conscience objection statute. Opponents of SB 6219 argued it "would violate the constitutionally protected conscious rights of religious organizations and individuals." S.B. Rep. on SB 6219, 65th Leg., Reg. Sess., at 5 (Wash. 2018). Proponents responded that the bill "is a compromise bill that protects religious organizations but still protects women's reproductive health." *Id.* Those with conscience or religious objections could still utilize the protections of the conscience objection statute to avoid purchasing services to which they object. Wash. House Health Care & Wellness Comm., Pub. Hr'g: SB 5722, SSB 6219, (Feb. 7, 2018 8:00 AM), at 33:12-39, *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/house-health-care-wellness-committee-2018021058/?eventID=2018021058 (remarks of Sarah Ainsworth).

The Insurance Commissioner promulgated regulations implementing SB 6219 consistent with this statutory text and intent during the pendency of this litigation. Wash. Admin. Code §§ 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 to 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. Those rules make clear that SB 6219 "does not diminish or affect any rights or

responsibilities provided under [Washington's conscience objection statute]."
Wash. Admin. Code § 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(3).

**C.      In Practice, Employers and Carriers Negotiate for Plans That Accommodate Religious Objections**

The Insurance Commissioner regulates insurance health plans, not employers. 2-ER-180. Employers with large health plans, like Cedar Park's, individually negotiate the terms of such plans. 2-ER-175-76. The Insurance Commissioner reviews only whether the health plans meet relevant statutory and regulatory requirements, but does not review the terms of such plans on behalf of any individual or organization. 2-ER-248, 266.

Implementing the conscience objection statute is the responsibility of the insurance carrier, not the employer, and the Insurance Commissioner "does not have involvement in a given employer's decision to purchase health insurance for its employees." 2-ER-250-51. If an insurance carrier offers a health plan accommodating a conscience objection, the Insurance Commissioner will review the plan form to determine that the insurance carrier ensures notification to enrollees about their rights to access the benefit elsewhere. 2-ER-254.

If an insurance carrier chooses to offer a health plan tailored towards employers with religious or conscience objections, the insurance carrier determines how access to objected-to coverage will be provided, based on its

own business model, or the parties' negotiations. 2-ER-258-261. Generally, insurance carriers will provide a direct contact number for enrollees to get information about how to access benefits and the associated cost-sharing amounts. 2-ER-258-259. The plan form filed by the insurance carrier must confirm that the employer is not paying for the objected services, but the Insurance Commissioner does not otherwise require the insurance carrier to specify how payment for the services will occur. 2-ER-258-259.

After passage of SB 6219 and during the course of this litigation, the Insurance Commissioner approved numerous health plans that exclude coverage of abortion under the conscience objection statute, even when the health plan provides maternity coverage. 2-ER-172-177; 2-ER-182. For example, the Insurance Commissioner approved a health plan offered by Providence, a religious insurance carrier, which excludes coverage for abortions. 2-ER-176-77, 182. It also approved such a plan by a secular carrier, Premera. 2-ER-172-174. And contrary to Cedar Park's claims, enrollees of the Providence health plans can still access coverage for abortion services that may be excluded from the health plan due to Providence's religious objection. 2-ER-241. Providence, as the insurance carrier, must provide notice of how to obtain such

coverage. 2-ER-241. Providence did not object to providing such notice on religious or moral grounds. 2-ER-241.

**D.    Cedar Park's Pre-Enforcement Challenge and the District Court's Initial Dismissal of Cedar Park's Claims**

Cedar Park is a church in Kirkland, Washington. In addition to church services, Cedar Park operates schools, a funeral home, a missionary car ministry, a counseling network, and a club sports program. 3-ER-376-378.

For about six years before the passage of SB 6219, Cedar Park used Kaiser Permanente (Kaiser) as its health insurance carrier. 3-ER-387-388. During this time, Cedar Park's health plan covered all contraceptives, including contraceptives to which Cedar Park objects, but excluded coverage for abortion services. 3-ER-388.

In March 2019, Cedar Park filed a pre-enforcement challenge to SB 6219 against Governor Jay Inslee and Insurance Commissioner Myron Kreidler. 1-ER-8-9. Cedar Park's arguments morphed as the case worked its way through the district court. Its original complaint ignored the conscience objection statute completely. It instead alleged that SB 6219 "forces Cedar Park to choose between violating state law and violating its deeply held religious beliefs by paying for abortion coverage;" and that SB 6219 required churches and other

13

religious employers to provide insurance coverage for abortion against their religious beliefs. Dkt. 1, ¶¶ 67, 83.

The State moved to dismiss Cedar Park's complaint, arguing that Cedar Park did not allege an injury in fact and its claims were not ripe. 1-ER-9. The district court granted the motion to dismiss, but granted Cedar Park leave to file an amended complaint. 1-ER-9. Cedar Park did so and the State again moved to dismiss. While its motion was pending, Cedar Park moved for leave to file a third amended complaint, alleging that Kaiser had informed Cedar Park that it would not offer a fully insured plan that excluded coverage of abortion services, that Cedar Park renewed its plan anyway, and that Kaiser had indicated it would be willing to change plans mid-year to eliminate coverage for abortion services if SB 6219 is enjoined. 5-ER-760.

The district court accepted the third amended complaint and granted the State's motion to dismiss. *Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*, 458 F. Supp. 3d 1290, 1297-98 (W.D. Wash. 2020), *aff'd in part, rev'd in part*, 860 F. App'x 542 (9th Cir. 2021). The district court ruled that Cedar Park had failed to establish that any injury was fairly traceable to SB 6219. *Id.* The district court also dismissed Cedar Park's Establishment Clause and Equal Protection claims. *Id.* Regarding Cedar Park's Equal Protection claim, the

district court concluded that Cedar Park had failed to establish that it was similarly situated to health care providers, religiously sponsored health carriers, or health care facilities, to demonstrate unequal treatment based on religious belief. *Cedar Park*, 458 F. Supp. 3d at 1297-98. Washington law distinguishes these entities "because these entities are in the business of providing health care instead of purchasing health care." *Id.* at 1298. As such, Cedar Park could not demonstrate injury in fact for its equal protection claim. *Id.*

**E.  The Ninth Circuit Affirmed Dismissal of Cedar Park's Equal Protection and Establishment Clause Claims, But Found Cedar Park Had Alleged Standing for Its Free Exercise Claim**

On appeal, this Court affirmed in part and reversed in part. It affirmed the district court's dismissal of Cedar Park's equal protection claim, concluding that the complaint did "not plausibly allege that Cedar Park suffered a denial of equal treatment due to SB 6219's interaction with Washington's conscience objection statute." *Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*, 860 F. App'x 542, 543-44 (9th Cir. 2021). This Court held that, to the extent the conscience objection statute treats religious organizations like Cedar Park differently than individual health care providers, religiously sponsored health carriers, or health care facilities, that "differential treatment does not constitute discrimination because the providers are not similarly situated to religious

organizations . . . because the providers are in the business of providing health services, while religious organizations merely purchase health coverage." *Cedar Park Assembly of God*, 860 F. App'x at 543-44. This Court also held that Cedar Park forfeited any argument challenging the dismissal of its Establishment Clause claim by failing to appeal that decision. *Id.*

This Court, however, reversed on the issue of Cedar Park's standing to bring a Free Exercise Claim. *Id.* at 543. It held that Cedar Park "plausibly alleged that, due to the enactment of SB 6219, its health insurer (Kaiser Permanente) stopped offering a plan with abortion coverage restrictions and Cedar Park could not procure comparable replacement coverage," which sufficed at the pleading stage to allege "injury in fact that is fairly traceable to SB 6219." *Id.* The Court also held that Cedar Park had sufficiently alleged redressability because "the fact that Cedar Park had access to an acceptable plan is strong evidence that Cedar Park could obtain a similar plan from Kaiser Permanente or another health insurer if the state is enjoined from enforcing SB 6219." *Id.*

**F.      On Remand, the District Court Dismissed Cedar Park's Free Exercise and Church Autonomy Claims on the Merits**

On remand, discovery revealed that, before filing its complaint, Cedar Park had received six or seven bids for health plans that excluded coverage for abortion and contraceptives to which it objected, and that two different plans

offered by Cigna would have been cheaper than the negotiated cost to renew its insurance plan with Kaiser. 3-ER-397-398, 404-405, 487, 420-22. Emails between Cedar Park, its broker, and Cigna show that Cigna offered to accommodate Cedar Park's religious objections in either a fully insured or self-insured level-funded health plan. 3-ER-487. And unlike Kaiser, which did not have the administrative ability to carve out certain contraceptives, Cigna offered a plan that would exclude the contraceptives that Cedar Park identified as inconsistent with its religious beliefs. 3-ER-487, 404-405. The cost for both Cigna options were cheaper than the proposed plan the broker had negotiated with Kaiser. 3-ER-420-22. Despite these options, Cedar Park chose to remain with Kaiser for the 2019–2020 plan year and in the years since filing this lawsuit, paying Kaiser's higher rates, and opting to pay for and provide coverage for both abortion and contraceptives to which it objected instead of purchasing a plan that excluded such services. 3-ER-420-23.

After completion of discovery, the parties each moved for summary judgment. The State also moved to dismiss Cedar Park's Free Exercise claims on standing grounds. 2-ER-28-29. The district court granted the State's summary judgment motion. The district court determined that SB 6219 is a neutrally and generally applicable law that is rationally related to the State's legitimate

governmental purposes and thus does not violate Cedar Park's Free Exercise rights. 1-ER-16-26. The district court rejected Cedar Park's arguments that SB 6219 constituted "religious gerrymandering," holding that SB 6219 "does not favor secular conduct" by, for example, "exempt[ing] non-religious organizations while targeting religious organizations." 1-ER-18-19. The district also rejected Cedar Park's argument that SB 6219 proscribes more conduct than necessary, and concluded that Cedar Park's characterizations of comments by a bill sponsor "do not support the assertion that the Washington legislature impermissibly targeted religion" because the comments do not demonstrate religious hostility and are, in any event, the weakest indicator of legislative intent. 1-ER-19.

The district court also rejected Cedar Park's argument that it would be charged indirectly for abortion coverage due to SB 6219 as lacking any evidentiary support. 1-ER-14, n.3. The Court held that "Cedar Park carries the burden of demonstrating that, despite its objections and the statute's language, it will facilitate the provision of abortion services by paying for them in some fashion, and it has not met that burden." 1-ER-14, n.3.

The district court also agreed with the State that "purchasing a health insurance plan is not an ecclesiastical decision and thus the religious autonomy

doctrine does not apply." 1-ER-27. It accordingly dismissed Cedar Park's claim under the church autonomy doctrine. *Id.*

## VI.   SUMMARY OF ARGUMENT

Contrary to Cedar Park's arguments, Washington enacted a conscience objection statute thirty years ago that allows employers to refuse to purchase or provide coverage for services to which they object on religious or moral grounds. The Legislature enacted SB 6219 against the backdrop of this law, preserving its protections. Cedar Park is simply wrong that SB 6219 undermines these protections or burdens Cedar Park's Free Exercise rights. This Court should affirm the district court's ruling granting summary judgment for four reasons.

First, Cedar Park did not and cannot produce admissible evidence establishing Article III standing because it was not injured by SB 6219. In attempting to prove injury, Cedar Park relied on the same hearsay allegations cited in its initial pleadings, but its burden of proof is higher at summary judgment. Cedar Park never deposed Kaiser or obtained an affidavit and thus cannot provide admissible evidence that Kaiser refused to accommodate a plan excluding abortion coverage due to SB 6219, or that Kaiser would offer such a plan if this Court enjoined SB 6219. And any decision by Kaiser would not be fairly traceable to the State in any event because the Insurance Commissioner

promulgated implementing regulations during the course of this litigation that explicitly state that SB 6219 does not diminish any rights under Washington's conscience objection statute. Cedar Park cannot demonstrate injury in fact, or a genuine risk of prosecution by the State as required to establish Article III standing in this pre-enforcement challenge.

Second, even if this case were justiciable, Cedar Park's claims fail on the merits. As a threshold matter, SB 6219 does not burden Cedar Park's Free Exercise rights because it does not require Cedar Park to pay for or provide a health plan that covers abortion. Nor has Cedar Park shown that insurance carriers would charge Cedar Park even indirectly for such services. And Cedar Park's objection that SB 6219 requires insurance carriers to provide notice about how to obtain such coverage elsewhere is not a cognizable burden under Free Exercise case law because it does coerce Cedar Park into violating its religious beliefs or deprive it of some generally available public benefit on account of exercising its beliefs.

Third, even if Cedar Park could identify a cognizable burden on its Free Exercise rights, SB 6219, in conjunction with the conscience objection statute, is a neutral, generally applicable law that is rationally related to the State's many legitimate interests. Cedar Park conflates provisions of three different statutes—

SB 6219, the conscience objection statute, and the general insurance code—to suggest that SB 6219 is riddled with exceptions. It is not. And none of the laws cited by Cedar Park permit ad hoc decision-making or treat comparable secular organizations better than Cedar Park. Moreover, Cedar Park's accusation that SB 6219 is hostile to religion rests on mischaracterizations of both the law's requirements and the statements of a legislator. SB 6219 and the conscience objection statute, in fact, honor religious exercise: they are not hostile to it.

And finally, Cedar Park advocates a legally unsupportable interpretation of the church autonomy doctrine that would put religious organizations above the law. No court has ever applied the doctrine to a law like SB 6219, which does not regulate Cedar Park's internal management decisions, but instead regulates the broader insurance market. The district court properly rejected this claim.

The district court's dismissal of Cedar Park's claims should be affirmed.

## VII.   STANDARD OF REVIEW

This Court reviews de novo a district court's decision to grant summary judgment. *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015). The district court's decision may be affirmed on any ground supported by the record, even if not relied on by the district court. *Twitter v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022).

# VIII.  ARGUMENT

**A.    Cedar Park Lacks Standing to Challenge SB 6219 or the Conscience Objection Statute**

### 1.    Cedar Park is not required to pay for or provide a health plan that includes abortion coverage

This Court should affirm the district court's dismissal because Cedar Park's claims are not justiciable. Cedar Park never produced admissible evidence supporting its allegations of injury in fact or redressability as required to support Article III standing on summary judgment.

The elements of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1057 (9th Cir. 2023) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561) (reversing district court's determination of standing based on adequacy of the complaint's allegations of Article III standing at summary judgment stage); *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (courts have an "independent obligation to assure that standing exists" at summary judgment stage, which requires admissible evidence of Article III elements by affidavit or otherwise). Although at the pleading stage, a plaintiff need only "allege sufficient facts that,

taken as true, "' demonstrat[e] each element' of Article III standing," at summary judgment, Cedar Park "can no longer rest on 'mere allegations' but must set forth by affidavit or other admissible evidence 'specific facts' as delineated in Federal Rule of Civil Procedure 56(e) as to the existence of such standing." *Jones*, 74 F.4th at 1058 (citing *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008)).

To satisfy this burden, Cedar Park must proffer admissible evidence demonstrating specific facts showing: (1) it suffered an "injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" (2) the injury is "fairly traceable" to the challenged action of the defendant, and not the "result of the independent action of some third party not before the court;" and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (internal quotation marks omitted). And because Cedar Park seeks prospective injunctive and declaratory relief, Cedar Park cannot rely on a past injury alone: it "must instead show a very significant possibility of future harm." *Bras v. Cal. Pub. Utilities Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995).

This Court has repeatedly admonished that "[t]he mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983) (citation omitted); *see also W. Mining Council v. Watt*, 643 F.2d 618, 627 (9th Cir. 1981), *cert. denied*, 454 U.S. 1031 (1981) (same language). Instead, since the State has not enforced the statute against Cedar Park or any insurer, Cedar Park must demonstrate, at minimum, "a credible threat of prosecution" under the statute in the future. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted). This Circuit relies on a three-factor inquiry to determine whether a threat of enforcement is sufficiently genuine to establish Article III injury: (1) whether the plaintiff has a "concrete plan" to violate the law; (2) whether the enforcement authorities have "communicated a specific warning or threat to initiate proceedings;" and (3) whether there is a "history of past prosecution or enforcement." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).

Here, Cedar Park failed to submit admissible evidence meeting any of the Article III elements. Cedar Park's pleading-stage allegations about Kaiser's decision-making cannot sustain Cedar Park's burden on the merits. *Jones*, 74

F.4th at 1057-58. Cedar Park never deposed Kaiser or obtained a sworn declaration from Kaiser and, as such, proffered *no* admissible evidence showing that Kaiser refused to accommodate an abortion exclusion because of SB 6219. 2-ER-133, 78-79. Nor did Cedar Park offer any admissible evidence that Kaiser would offer Cedar Park a policy excluding such coverage if this Court enjoined SB 6219. *Id.*

The three hearsay documents Cedar Park cites to prove these facts are not admissible on summary judgment: (1) 5-ER-768, a declaration by Cedar Park's pastor regarding his understanding of hearsay communications between Kaiser and Cedar Park's insurance broker that Kaiser would not accommodate an exclusion for abortion coverage; (2) 3-ER-448-449, deposition testimony from Cedar Park's Chief Information Officer about his understanding of these same hearsay communications; and (3) 2-ER-71, a hearsay email from Cedar Park's insurance broker restating Kaiser's hearsay position. *See* Opening Br. at 21- 22; *also* 2-ER-78-79, 133; 138 (state's objections to Cedar Park's reliance on speculative and inadmissible hearsay from Kaiser).

Regardless, even if Cedar Park had submitted admissible evidence, it would still be inadequate. The Insurance Commissioner issued administrative rules implementing SB 6219 during the course of this litigation, explicitly

providing that SB 6219 "does not diminish or affect any rights or responsibilities provided under [Washington's conscience objection statute] RCW 48.43.065." Wash. Admin. Code § 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 (3). Any interpretation by Kaiser contrary to the regulations are not fairly traceable to the State, and cannot demonstrate an imminent risk of enforcement as required to establish injury in fact. *W. Mining Council*, 643 F.2d at 626 ("Plaintiffs cannot . . . create a justiciable case or controversy simply by misreading statutes and claiming as injury fears born of their own error."). The State has disavowed that it would prosecute any insurance company for offering an insurance policy that excludes abortion coverage under the conscience objection statute, precluding standing here. *See, e.g.*, *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (plaintiff cannot establish pre-enforcement standing when "the enforcing authority has disavowed the applicability of the challenged law" to the plaintiffs); *Johnson v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983) (dismissing claims for lack of standing when Oregon Attorney General and the school district's lawyer "disavowed any interpretation of [the statute] that" applied to teachers).

Indeed, not only has the State disavowed such future enforcement, but the Insurance Commissioner has actually approved fully insured group health plans excluding abortion coverage. 2-ER-172-174, 176-177; 182. The Insurance

Commissioner specifically approved a health plan by Providence that excludes coverage of abortions, and also approved such plans by Premera, a secular insurance carrier. 2-ER-172-74, 176-77, 182. And Cedar Park is wrong that the Providence health plan qualified for a broader exemption than would apply to an insurance carrier offering a health plan to Cedar Park. Like any plan offered to Cedar Park, the Providence health plan required Providence, as the insurance carrier, to provide notice to enrollees about how to obtain coverage for services to which Providence objected. 2-ER-241. Providence simply did not object to providing such notice on religious grounds. 2-ER-241.

And, while Cedar Park has argued that it cannot purchase a specific policy from Providence because that policy is not offered in King County, that is irrelevant. The point is that SB 6219 does not preclude *any* insurance company, whether religious or secular, from offering policies that exclude coverage for abortion or objected-to contraceptives. Kaiser's decision not to offer Cedar Park a policy that excludes abortion coverage is not fairly traceable to the State. Moreover, given the plain language of the law, the explicit incorporation of the conscience objection statute in regulations implementing SB 6219, the State's approval of plans excluding abortion coverage after passage of SB 6219, and the State's repeated disavowal of an intent to prosecute an insurance carrier for

offering health plans to religious employers that excludes abortion coverage, Cedar Park simply cannot establish "a credible threat of prosecution" as required to establish Article III standing in a pre-enforcement challenge to a statute. *Driehaus*, 573 U.S. at 159 (2014).

### 2. Nor does Cedar Park show that it is required to provide or pay for abortion coverage indirectly

Cedar Park's evolving claims of injury in this case are also far too speculative to establish Article III standing. Cedar Park cites two prior Attorney General Opinions to argue that "carriers willing to attempt the conscience law's scheme *could* force Cedar Park to pay indirectly for that objectionable coverage." Opening Br. at 16 (emphasis added). But the district court rightly concluded that Cedar Park had failed to produce any admissible evidence showing that Cedar Park actually would be required to pay for abortion coverage, even indirectly. 1-ER-14, n.3. Cedar Park does not challenge this determination; it instead argues that the mere possibility of indirect charges in the future burdens its religious exercise. But this argument has been rejected by courts time and again. *Driehaus*, 573 U.S. at 157 (an allegation of future injury may suffice to establish standing only if the threatened injury is "certainly impending," or there is a "'substantial risk' that the harm will occur").

Moreover, these hypothetical future injuries conflict with the actual facts of this case. Cedar Park's concerns about indirectly paying for abortion coverage would come into play only if Cedar Park switched insurers because, since this lawsuit was filed, Cedar Park has been paying *directly* for abortion coverage based on a business decision by Kaiser that was not required by SB 6219. And Cedar Park decided *not* to switch to an insurance carrier that offered to exclude abortion coverage because it feared that that other carrier had a reputation for raising premiums after the first year and that its employees would lose access to Kaiser's network of providers. 3-ER-420-23. Cedar Park's arguments about the possibility of indirectly paying for coverage of abortion *if* it switches away from Kaiser are thus based on a hypothetical chain of events that has not occurred and has not been proven likely to occur. Its alleged injury is not only unproven, it is also far too speculative to support Article III standing here. *Driehaus*, 573 U.S. at 158.

For all of these reasons, this case is distinguishable from *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020). There, the California Department of Managed Health Care sent letters to the only seven insurers in the State that offered insurance plans excluding abortion coverage, directing that, "effective [immediately]," they "must comply

with California law with respect to the coverage of legal abortions." *Id.* at 750. Unlike in this case, *Skyline* involved a "post-enforcement challenge" because California had already taken action to stop insurers from offering plans excluding abortion coverage, "and all of them (including Skyline's insurer) ha[d] already complied." *Id.* at 748. The Court acknowledged that "[t]he situation might be different if [California] had made clear that no coverage changes would be required until individualized exemption requests had been presented and reviewed." *Id.* Without such caveats, the Court held that there was a "direct chain of causation from [California's] directive requiring seven insurers to change their coverage, to Skyline's insurer's doing so." *Id.* at 748. The Court held that the acts of insurers were fairly traceable to the State because the letters "produce[d] injury" through their "determinative or coercive effect upon the action of someone else." *Id.* at 749 (citing *Dep't of Com. v. New York*, ___ U.S. ___ (2019)).

No similar facts are present here. To the contrary, the Insurance Commissioner's regulations make clear that insurers may offer policies excluding coverage for any service to which religious employers object under the conscience objection statute. The State has disavowed any intent to enforce SB 6219 as Cedar Park interprets it. Cedar Park cannot show any coercion, any

genuine risk of prosecution, any injury in fact, or any redressability. This Court should affirm the dismissal of its claims.

**B.    SB 6219 Comports with the Free Exercise Clause**

Even if Cedar Park's claims were justiciable, its Free Exercise claim also fails on the merits. As plaintiff, Cedar Park bears the burden to demonstrate an infringement of its Free Exercise rights. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523-24 (2022) (collecting cases). Cedar Park cannot meet this burden here. First, Cedar Park has not demonstrated that SB 6219 imposes a cognizable burden on Cedar Park's Free Exercise rights. And second, Cedar Park cannot show that Washington's statutes are not neutral or generally applicable, and thus subject to strict scrutiny. Cedar Park's strained and speculative arguments do not establish any part of a Free Exercise claim.

**1.    SB 6219 does not impermissibly burden Cedar Park's free exercise of religion**

**a.    SB 6219 does not require employers to pay for or provide coverage for any service to which they have a moral or religious objection**

Cedar Park's central assertion about the alleged "burden" imposed by SB 6219 is manufactured. Cedar Park asserts that "Washington 'outright prohibit[s]' secular health carriers . . . on pain of "'criminal[] penalties, fines, and potential shuttering—from excluding abortion from the church's fully

insured plan." Opening Br. at 33; *see also id.* at 12 (asserting that "secular carriers . . . cannot accommodate Cedar Park's religious objections and provide it with an abortion-excluding plan without facing potential jail time, fines, or losing all business in Washington"). But this core complaint is demonstrably false.

As detailed above, Washington law allows insurance carriers to sell Cedar Park a fully insured health plan that excludes coverage of services to which Cedar Park objects. Wash. Rev. Code § 48.43.065(3)(a). And the Office of the Insurance Commissioner has approved numerous such plans after passage of SB 6219. 2-ER-172-177, 182.

Moreover, Washington courts would construe SB 6219 and the Washington conscience statute consistently to avoid unnecessary conflicts between the laws, in a manner that avoids constitutional difficulties, and with substantial deference to the Insurance Commissioner's interpretation of both laws as allowing insurance carriers to exclude abortion coverage under the conscience objection statute. *See, e.g.*, *Am. Legion Post 149 v. Wash. State Dep't of Health*, 192 P.3d 306, 314 (Wash. 2008) (the "goal is to avoid interpreting statutes to create conflicts between different provisions so that we achieve a harmonious statutory scheme."); *State v. Moreno*, 499 P.3d 198, 201 (Wash.

2021) (in general, "[w]e construe statutes to avoid constitutional doubt" when such construction is "consistent with the purposes of the statute."); *Silverstreak, Inc. v. Wash. State Dep't of Lab. & Indus.*, 154 P.3d 891, 900 (Wash. 2007) ("This court has made clear that we will give great deference to an agency's interpretation of its own properly promulgated regulations, 'absent a compelling indication' that the agency's regulatory interpretation conflicts with legislative intent or is in excess of the agency's authority.").[1]

From its fundamental mischaracterization about the law, Cedar Park and *amici* imagine all manner of injuries, including that SB 6219 targets religion by "requiring churches and most other religious organizations to cover not just abortifacient contraceptives[2] but surgical abortions too"; that it is over-inclusive

---

[1] If this Court has any doubt about how Washington courts would construe SB 6219 in connection with the conscience objection statute, it should certify this question to the Washington Supreme Court rather than interpret the statutes as a matter of first impression in a way that creates avoidable statutory conflicts and a possible constitutional issue, and overrides the substantial deference accorded to the interpretation of the Insurance Commissioner. *See, e.g., Abraham v. Corizon Health, Inc.*, 985 F.3d 1198, 1202 (9th Cir. 2021), *certified question accepted*, 481 P.3d 920 (2021), and *certified question answered*, 511 P.3d 1083 (2022) (federal court will consider certification of state law question to state highest court based on such factors as "(1) whether the question presents important public policy ramifications yet unresolved by the state court; (2) whether the issue is new, substantial, and of broad application; (3) the state court's caseload; and (4) the spirit of comity and federalism.").

[2] SB 6219 says nothing about "abortifacient contraceptives," which is a medically inaccurate and misleading term.

by forcing "churches to cover abortion and abortifacient contraceptives in their health plans," and that it "coerces other people of faith who oppose abortion—like Cedar Park—to either change their religious doctrine or *exit the state*." Opening Br. at 45-49 (emphasis added); *see also*, *e.g.*, Dkt. 22, South Carolina's Amicus Br. at 1 (district court's order "require[s] religious institutions" like Cedar Park "to provide health insurance coverage for abortions and abortion-inducing drugs in violation of their central organizational mission"); Dkt. 23, Institute for Faith & Fam.'s Amicus Br. at 1 ("The State of Washington demands that a *church*—committed to honoring the Creator by preserving the sanctity of human life in the womb—provide abortion coverage for its employees."); Dkt. 27, Robertson's Amicus Br. at 11 ("While religiously sponsored health insurance carriers and health care facilities may omit abortion coverage from their plans under Washington Revised Code section 48.43.065(2), churches like Cedar Park may not.").[3] But these injuries are not real: these briefs cite no instance in which the State or any court has interpreted SB 6219 in the manner

---

[3] *See also* Dkt. 35, Life Legal Def. Amicus Br. at 3 ("By requiring churches to purchase health insurance that facilitates abortion, S.B. 6219 does not honor our longstanding history of respect for the right of individual conscience to refuse to be complicit in taking human life."); Dkt. 36, Sutherland Inst. Amicus Br. at 2 (SB 6219 "uses the State's control of insurance plans to force religious employers to subsidize abortion for their employees despite their profound religious objections.").

they claim. This core argument about the "burden" imposed by SB 6219 is specious.

> **b.** **Requiring insurance carriers to provide notice to enrollees does not burden Cedar Park's Free Exercise rights**

Cedar Park's Free Exercise claim fails even when Cedar Park limits its challenge to the requirement that insurance carriers provide enrollees notice of how to obtain coverage for objected-to services. Opening Br. at 16. These are requirements on the insurance carrier, and do not coerce Cedar Park from freely exercising its beliefs. Cedar Park also objects to enrollee's use of the insurance card associated with its plan to access such services, but that is nowhere required by the law, and similarly imposes no burden on Cedar Park. Opening Br. at 16. Cedar Park simply cannot show that SB 6219 coerces Cedar Park to do anything at all, let alone anything contrary to its religious beliefs.

The "free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). An en banc panel of the Ninth Circuit has held that a "substantial burden" exists only when individuals are "forced to choose between following the tenets of their religion and receiving a governmental benefit," or "coerced to act contrary to their religious beliefs by

the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008). While *Navajo Nation* interpreted the requirements for proving a "substantial burden" under the Religious Freedom Restoration Act (RFRA), it found that "substantial burden" is the same as required for a Free Exercise claim. *Id.* And Cedar Park itself agrees that the "Free Exercise Clause is written in terms of what the government cannot do to the individual." Opening Br. at 32 (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988)). It acknowledges that "one of the primary ways the government violates that clause is by 'coerc[ing] individuals' or private associations of people 'into acting contrary to their religious beliefs.'" Opening Br. at 32.

Here, however, SB 6219 does not coerce Cedar Park with the threat of any civil or criminal sanction, or deprive it of any generally available public benefit. Not only are the potential fines or penalties identified by Cedar Park only possible against insurance companies, the State has disavowed that insurance companies will be penalized for offering employers policies excluding abortion coverage based on religious or moral objections. As such, Cedar Park's challenge to SB 6219 is different from every single Free Exercise case on which it relies, each of which involved coercion in the form of a financial penalty or

threat of imprisonment, or a denial of rights, public benefits, or privileges enjoyed by other citizens. *See, e.g.*, *Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014) (concluding that Affordable Care Act's contraceptive mandate imposed "substantial burden" because law forced plaintiff to choose between fines of up to $475 million per year or providing insurance coverage in accordance with religious beliefs); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) (striking down ordinances that prohibited religious animal sacrifice, punishable by fines and imprisonment); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ. (FCA)*, 82 F.4th 664 (9th Cir. 2023) (enjoining school district's revocation of religious student organization's status as student club based on club's religious beliefs excluding homosexuals from leadership positions); *Fulton v. City of Philadelphia*, 593 U.S.___, 141 S. Ct. 1868 (2021) (finding Free Exercise violation in City's decision to stop referring children to religious foster care agency for refusing to certify same-sex couples as potential foster parents due to its religious beliefs); *Kennedy*, 597 U.S. 507 (upholding Free Exercise claim by school employee terminated as high school football coach after praying on football field after games); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 595 U.S. 14 (2020) (enjoining emergency order imposing "very severe restrictions" on attendance

at religious services); *Tandon v. Newsom*, 593 U.S. 61 (2021) (enjoining restrictions on private religious gatherings when State exempted hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants from restrictions); *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717 (1981) (finding that denial of state unemployment compensation benefits due to exercise of religious beliefs substantially burdened Free Exercise rights).

SB 6219 does not substantially burden Cedar Park's Free Exercise rights, providing additional grounds for affirming the district court decision.

**2.    SB 6219 is a neutral, generally applicable law under *Employment Division v. Smith* that is rationally related to a legitimate governmental interest**

Even if Cedar Park could show a cognizable burden, SB 6219, read in conjunction with the conscience objection statute, is also valid under *Employment Division v. Smith* because it is a "valid and neutral law of general applicability" and is rationally related to a legitimate governmental interest. *Emp. Div. v. Smith*, 494 U.S. 872 (1990); *Stormans, Inc. v. Weisman* (*Stormans II*), 794 F.3d 1064, 1075-76 (9th Cir. 2015); *see Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999) (DMV can require applicant to divulge social security number in conflict with plaintiff's religious beliefs); *Tingley v. Ferguson*, 47

F.4th 1055, 1085, 1088 (9th Cir. 2022) (availability of religious exemption does not destroy neutrality or general applicability), *cert. denied*, 144 S. Ct. 33 (2023). As detailed above, SB 6219 is facially neutral as to religion. And, as made clear by Washington's conscience objection statute, Cedar Park can refuse to purchase coverage for abortion in its health plan. Cedar Park's attacks on the neutrality of these statutes are based on mischaracterizations of the statutes themselves and Free Exercise case law generally.

This Court's recent en banc decision in *FCA*, 82 F.4th at 686, distilled three basic requirements of a "neutral and generally applicable law" under *Employment Division v. Smith*. First, the law "may not have 'a mechanism for individualized exemptions.'" *Id.* (citing *Fulton*, 141 S. Ct. at 1877). Second, "the government may not 'treat . . . comparable secular activity more favorably than religious exercise.'" *Id.* (citing *Tandon*, 593 U.S. at 62). And third, the "government may not act in a manner 'hostile to . . . religious beliefs' or inconsistent with the Free Exercise Clause's bar on even 'subtle departures from neutrality.'" *Id.* (citing *Masterpiece Cakeshop, Ltd v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018); *Lukumi*, 508 U.S. at 534).

SB 6219 and the conscience objection statute readily meets all three requirements.

### a. SB 6219 does not provide for individualized exemptions

SB 6219 does not contain a "mechanism for individualized exemptions." *FCA*, 82 F.4th at 686; *Fulton*, 141 S. Ct. at 1877. A policy is not "generally applicable" under this prong if "it invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877. For example, in *Sherbert v. Verner*, 374 U.S. 398, 401 (1963), the Court found that a "good cause" policy for granting workers' compensation benefits was not generally applicable because it permitted the government to grant exemptions based on the circumstances underlying each application, and the government "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id*. Similarly, in *FCA*, the Court held that a school district policy was not "generally applicable" because it granted the district discretion to decide on "on an ad hoc basis" whether to allow student groups to exclude other students on prohibited grounds. *FCA*, 82 F.4th at 687.

Here, SB 6219 has no exemptions that require or permit individualized exemptions. Cedar Park's arguments to the contrary conflate the provisions of three different statutes—the definitions section of the Insurance Code under Wash. Rev. Code § 48.43.005(31), the conscience objection statute, and

SB 6219—to obfuscate the scope, purpose, and application of each of the laws. And none of the provisions cited by Cedar Park invite the type of ad hoc decision-making found problematic in *Fulton* and *FCA*.

SB 6219 itself contains only two exemptions: (1) for multistate plans, pursuant to 42 U.S.C. § 18054(a)(6), that already exclude abortion coverage (which no longer exist as a matter of federal law); and (2) when the law would conflict with federal funding requirements and result in the loss of federal funding, to the minimum extent necessary to bring the state into compliance. Wash. Rev. Code § 48.43.073(4), (5). But neither of these exemptions require individualized consideration of each employer's circumstances. Even setting aside the fact that the program no longer exists, a multi-state plan is a defined term under federal law, 42 U.S.C. § 18054(a)(6), and whether a plan meets that definition and excludes abortion coverage is an objective matter readily determinable from policy documents.

The second exemption likewise does not require consideration of each employer's circumstances. It applies only when federal law would prohibit application of SB 6219 as a condition for receiving federal funds and only to the minimum extent necessary to avoid a conflict with federal law. Wash. Rev. Code § 48.43.073 (5). Cedar Park misleadingly argues that this exemption

allows individualized exceptions because, in the rare circumstances in which it is implicated, the Insurance Commissioner refers questions about its application to its attorneys on a case-by-case basis. Opening Br. at 41. But this does not invite consideration of every employer's reasons for its conduct. For example, the Hyde Amendment precludes use of federal funds to pay for abortions. *See, e.g.*, 42 U.S. Code § 18023(b)(1)(B). Just because attorney input may be needed to determine whether or how the Hyde Amendment applies does not mean that applying the Hyde Amendment itself is purely discretionary or invites the Government "to consider the particular reasons for a person's conduct" in every case. *Fulton*, 141 S. Ct. at 1877. Nor could this exemption possibly apply to Cedar Park's circumstances, where no federal funding condition is at issue, such that the State would need a "compelling reason" not to extend the exemption to Cedar Park. *Id.* at 1878.

Cedar Park also argues that SB 6219 grants individualized exemptions to certain types of insurance products, but it conflates multiple distinct statutes. The insurance products identified by Cedar Park are not "exemptions" to SB 6219. Instead, SB 6219 applies only to "health plans." Wash. Rev. Code §§ 48.43.072(1); .073(1). And under the general Insurance Code, certain insurance products do not meet the definition of a "health plan." Wash. Rev.

Code § 48.43.005(31). These include (1) products with terms over which the Insurance Commissioner does not have jurisdiction (like ERISA plans, Medicare, Tricare, or Workers' Compensation); (2) products that only incidentally pay for health care services related to a covered event, such as auto insurance or accident insurance; and (3) products that are not designed to be comprehensive health plans due to their limited duration or very limited benefits, such as short-term plans lasting no longer than 90 days, or vision- and dental-only policies.

Most of the insurance products listed in Wash. Rev. Code § 48.43.005(31), such as auto insurance, long-term care insurance, and vision- and dental-only insurance, do not provide for maternity coverage, and therefore are not implicated by SB 6219. And, as detailed below, the remaining insurance products are regulated by other agencies or the federal government, or were created for different purposes than providing comprehensive health care coverage. But the bottom line is, even if these products were treated as "exemptions" to SB 6219, none require individualized consideration of an employer's circumstances to determine when their definitions are met. Whether an insurance product constitutes an "auto policy" or a "vision-only" policy is

discernable from the plan documents and "tied directly to limited, particularized, business-related, objective criteria." *Stormans II*, 794 F.3d at 1082.

The first prong of *FCA* and *Fulton* is clearly met here.

### b. SB 6219 does not treat comparable secular organizations better than religious organizations

SB 6219 likewise does not treat comparable secular organizations better than religious organizations. Again, each of Cedar Park's arguments is based on fundamental mischaracterizations of both Washington law and Free Exercise precedent.

Cedar Park advances a tortured interpretation of this prong to suggest that the exemptions in three different statutes—SB 6219, the conscience objection statute, and the general insurance code definitions of a "health plan"—must advance the specific interests articulated in SB 6219, at all costs, or the law cannot be deemed generally applicable. Opening Br. at 40. It argues, incredibly, that the State must be willing to lose all federal funding (including for such programs likes Medicare or Medicaid) to enact a generally applicable law expanding access to reproductive healthcare. Opening Br. at 38. But this is nonsense and finds no support in Free Exercise case law. States almost never enact laws without consideration of the costs or accommodating conflicting policy interests. Under Cedar Park's interpretation, virtually any law with

exceptions would fail this test because an exception to almost any requirement will not advance the original purpose of the requirement. But nothing in Free Exercise case law suggests that only exceptionless laws meet the general applicability requirements in *Employment Division v. Smith* (Opening Br. at 37), or that a State must pursue a statutory goal at all costs for its laws to be treated as generally applicable. Opening Br. at 37-38.

Rather, *FCA* and *Tandon* simply recognized that there are different ways to assess comparability, and that distinctions between otherwise comparable organizations or activities that are not relevant to the policy interests at issue will not defeat comparability. This is an unremarkable and commonsense way to distinguish between relevant and irrelevant distinctions. *See, e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 967 (9th Cir. 2017) ("the 'similarly situated' analysis [for Equal Protection claims] must focus on factors of similarity and distinction pertinent to the state's policy."); *Ashaheed v. Currington*, 7 F.4th 1236, 1251 (10th Cir. 2021) ("a person is similarly situated to others if they are alike in 'all relevant respects'—not all respects."). *FCA* and *Tandon* did not redefine "comparability" to include things that are utterly dissimilar. Under Cedar Park's reasoning, an auto insurance policy is "comparable" to a full-coverage health insurance plan because requiring Geico to provide coverage for

abortions would expand access to reproductive health care. But that is not what *FCA* or *Tandon* means or requires.

Cedar Park also confusingly argues that the State's reasons for providing a particular exemption are "irrelevant" in assessing comparability, while at the same time arguing that the State's reasons for the law are somehow dispositive. Opening Br. at 37. But Cedar Park misleadingly quotes *FCA* and *Tandon*. Opening Br. at 38. Both cases held only that "*the reasons why people gather*" were not relevant to the government's policy interests at issue in those cases, i.e., protecting against COVID, or preventing discrimination. *FCA*, 82 F.4th at 689 (quoting *Tandon*, 593 U.S. at 62) (emphasis added). This does not mean that the reasons for exemptions are never relevant. For example, one of the self-evident purposes of the Insurance Code definitions is to identify products over which the Insurance Commissioner does and does not have regulatory authority. Excluding a product over which the federal government has exclusive jurisdiction certainly advances that purpose.

Cedar Park not only misstates governing case law, it also misstates the exemptions of SB 6219, the conscience objection statute, the general Insurance Code definition of "health plan," and the evidence in this case. As detailed above, SB 6219 does not itself grant any exemptions for health plans provided

to or by health care providers, religiously sponsored health carriers, or health care facilities. This exemption is in the conscience objection statute, which has a different purpose than SB 6219. The State's interest in the conscience objections statute is to "recognize[] that in developing public policy, conflicting religious and moral beliefs must be respected" while also "recogniz[ing] the right of individuals enrolled with plans containing the basic health plan services to receive the full range of services covered under the plan." Wash. Rev. Code § 48.43.065(1). Nothing about granting an exemption to health care providers, religiously sponsored health carriers, or health care facilities undermines this purpose. Moreover, the exemptions do not treat comparable *secular* organizations or activity better than religious organizations or activity, which is the relevant inquiry under *FCA* and *Fulton*. *FCA*, 82 F.4th at 686; *Fulton*, 141 S. Ct. at 1878.

Cedar Park is also wrong that health care providers, religiously sponsored health carriers, or health care facilities are treated any differently than Cedar Park in obtaining or offering a health plan. Like Cedar Park, they are not required to pay for or provide coverage for services to which they have a religious or moral objection. 2-ER-176-77, 182. But just like any insurance carrier that would provide a health plan to Cedar Park, a religious insurance carrier like

Providence is required to provide notice to enrollees about where to obtain services that are excluded from the policy on moral or religious grounds. 2-ER-247. The exemption for health carriers is no broader than the exemption granted to religious employers like Cedar Park with respect to purchasing or offering a health plan.

Moreover, as both the District Court and the Ninth Circuit found, the exemption in the conscience objection statute for health care providers, religiously sponsored health carriers, or health care facilities cannot demonstrate religious discrimination because these entities are not "similarly situated" to Cedar Park. 1-ER-21-23; *Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*, 860 F. App'x 542, 543-44 (9th Cir. 2021). As explained by this Court, "the providers are in the business of providing health services, while religious organizations merely purchase health coverage." *Id.* Cedar Park argues that the comparability analysis under the Free Exercise Clause is different than the "similarly situated" analysis under Equal Protection case law because "comparability" must be measured against the statutory interests identified by the State. But the same is true for equal protection. *Ariz. Dream Act Coal.*, 855 F.3d at 967 ("the 'similarly situated' analysis [for Equal Protection claims] must focus on factors of similarity and distinction pertinent to the state's policy");

*Stormans II*, 794 F.3d at 1085 (equal protection claim analysis is coextensive with Free Exercise claim). Cedar Park also argues this Court should ignore its prior determination because this Court's decision in *FCA* later changed the law on general applicability. Opening Br. at 52. But *FCA* merely "distilled" the principles from *Fulton* and *Tandon*, both of which pre-date this Court's prior ruling. *FCA*, 82 F.4th at 686.

Cedar Park also argues that SB 6219 discriminates on the basis of religion because it is inapplicable if it results in noncompliance with federal preconditions to obtaining federal funds. Wash. Rev. Code § 48.43.073(5). SB 6219, however, simply makes clear that the applicable federal laws control, consistent with the Supremacy Clause. Neutrality cannot be destroyed any time a state statute provides that it is interpreted to comply with the Supremacy Clause. In any event, Cedar Park has not shown that this exception can be applied to treat a comparable secular organization or secular activity better than Cedar Park: the only circumstances in which Cedar Park has identified it applies is when federal laws require accommodation of religious objections to abortion, or prohibit spending federal funds on abortions.

Finally, Cedar Park again cites to exclusions from the definition of "health plan" as destroying general applicability and neutrality. But these exclusions are

perfectly consistent with at least one purpose of the Insurance Code definition: to identify products the Insurance Commissioner has no power to regulate, or that are not designed and thus not required to provide the type of comprehensive benefits a "health plan" is designed to provide. Cedar Park, for example, focuses heavily on employer sponsored self-funded health plans. Opening Br. at 38. But such plans are exclusively regulated under the Employee Retirement Income Security Act (ERISA), which broadly preempts state regulation of such plans. *See, e.g., Wash. Physicians Serv. Ass'n v. Gregoire*, 147 F.3d 1039, 1044 (9th Cir. 1998), *as amended on denial of reh'g and suggestion for reh'g en banc* (Aug. 24, 1998) ("exclusion of self-funded plans in RCW 48.43.005(9)(i) is quite obviously intended to save the Act from ERISA preemption" which "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan"). Similarly, medical coverage provided to the armed forces, commonly known as Tricare, is governed by federal law, specifically 10 U.S.C. § 55. Similar to Tricare, CHAMPVA is a program of the Federal Veterans Affairs Administration and is not subject to state regulation. 3-ER-326-327. The Insurance Commissioner also does not regulate workers' compensation insurance, or define coverage included in supplemental Medicare coverage. Wash. Rev. Code § 51.04.020; 3-ER-325-326. Nothing in Free

Exercise case law requires the State to write self-defeating legislation that runs headlong into federal preemption, or to eliminate distinctions between different regulatory regimes to maintain general applicability.

The remaining products that are not "health plans" are excluded from the numerous requirements imposed on health plans throughout Wash. Rev. Code 48.43 because such plans are not designed to cover comprehensive medical services, or comprehensive maternity benefits. For example, long-term care insurance does not cover health services at all. 3-ER-324. It provides "coverage or services for either institutional or community-based convalescent, custodial, chronic, or terminally ill care." Wash. Rev. Code § 48.84.020(1). Disability income insurance similarly provides a replacement for income due to a severe injury: it is not health insurance. ER-331; Wash. Admin. Code § 284-50-355(1). Property and casualty insurance policies cover damages or losses incurred as a result of an accident, but are not designed to cover comprehensive medical services. Wash. Rev. Code §§ 48.11.040, .070; Wash. Admin. Code § 284-50-360; 3-ER-332-333. As evident from the name, dental- and vision-only plans cover only dental and vision benefits. 3-ER-328. Short term and limited duration plans are designed to fill in the gaps some consumers may face between jobs or while waiting for

coverage at a new job to become effective. These plans cannot exceed three months of coverage in any twelve-month period and are subject to deduction caps. Wash. Admin. Code § 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(1)(c). Requiring these policies to cover either maternity services or abortion care would undermine this specific purpose. Finally, Medicare Part D coverage only applies to prescription drug benefits. It does not provide comprehensive medical benefits or cover general maternity benefits. Wash. Rev. Code § 48.66.020(1)(d).

Cedar Park's argument that the State is not permitted to regulate these products differently than comprehensive health plans without compromising the general applicability of its laws has no support in the case law and should be rejected.

### c.    SB 6219 is not hostile to religion

SB 6219 also survives the third prong: it is not hostile to religion. The legislative findings make clear that SB 6219 should be read alongside the already-existing conscience objection statute. And the Insurance Commissioner promulgated a rule confirming this intent and purpose. It is irrelevant that the Legislature rejected proposals to add religious exemptions when the conscience objection statute already provides them.

Cedar Park suggests that the history of ACA litigation demonstrates that SB 6219's purpose was hostile to religion. Not so. Indeed, the federal government settled a high profile Free Exercise challenge to the ACA's contraceptive mandate after the Supreme Court had granted certiorari based on the parties' agreement that "contraceptive coverage could be provided to petitioners' employees, through petitioners' insurance companies, without any such notice from" the challenging religious organization. *Zubrik v. Burwell*, 578 U.S. 403, 407 (2016). The religious organizations "clarified that their religious exercise is not infringed where they 'need to do nothing more than contract for a plan that does not include coverage for some or all forms of contraception,' even if their employees receive cost-free contraceptive coverage from the same insurance company." *Id.* at 407-08. This is exactly the arrangement permitted under the Washington conscience objection statute. The ACA's history shows that SB 6219 and the conscience objection statute honors religion: it is not hostile to it.

Finally, Cedar Park relies heavily on a news article reporting out-of-context statements by one legislator that religious organizations can sue if they do not want to provide insurance coverage for abortion. Opening Br. at 46. But the district court correctly determined that it does not evince hostility to religion.

1-ER-19. There is no information about what question the legislator was answering and, standing alone, the district court properly determined that the legislator's comment was simply a statement of fact, not of hostility. 1-ER-19. The district court also appropriately determined that a stray, out of context statement of a single legislator is the weakest evidence of statutory intent. 1-ER-19; *Tingley*, 47 F.4th at 1086. Cedar Park has not demonstrated that SB 6219 is hostile to religion.

Cedar Park also argues SB 6219 proscribes more conduct than is necessary because other states "don't force churches to cover abortion and abortifacient contraceptives in their health plans." Opening Br. at 48. But neither does Washington. And Cedar Park's assertion that its employees should not have access to abortion coverage because they signed agreements supporting the sanctity of life is unsupported by the record. Opening Br. at 48. While some employees may share Cedar Park's views, there is no record evidence that all employees share those beliefs, or that employees' family members, who are also enrollees on Cedar Park's plan, share the same beliefs as Cedar Park.

### d. SB 6219 are rationally related to legitimate governmental purposes

As a neutral, generally applicable law, SB 6219 is rationally related to legitimate governmental purposes. But even if it were not neutral, SB 6219 also

satisfies strict scrutiny. The legislative findings detail 14 different governmental purposes served by the law—any is sufficient. Many of those interests are recognized compelling state interests, like providing better access to health benefits and "[a]ssuring women equal access to such goods, privileges, and advantages." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984); *see Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985); *Marshall v. United States*, 414 U.S. 417, 427 (1974).

Cedar Park argues that because the Insurance Commissioner received no complaints about health care plans not covering abortions before SB 6219, the law is unnecessary. Opening Br. at 53. Complaints to the Insurance Commissioner have nothing to do with the law, but the legislative findings do. They show the purposes of the law. The "exemptions" posited by Cedar Park actually show the careful balance and care the Legislature exerted when enacting SB 6219—it ensured that the legislation fit within the many interests Washington has for its citizens, from protecting the health and welfare of its citizens, ensuring women have opportunities to participate equally in society, protecting religious beliefs, and regulating different insurance markets, to name a few. These are not broadly stated interests "in ensuring nondiscriminatory access to healthcare" but specific interests in women's access to contraceptives

and reproductive health services and their opportunity for equal access to participate in society.

SB 6219 not only rationally implements its purposes, but is narrowly tailored to satisfy strict scrutiny. Read along with the conscience objection statute, they balance the compelling interest in providing health care and opportunities for women to have access to an equal share in society, with a religious employer's right to freely exercise religion, with an enrollee's right to receive services notwithstanding that objection, with a secular carrier's right to offer services in a regulated market.

## C.    SB 6219 Does Not Violate the Church Autonomy Doctrine

Cedar Park's right to decide for itself, free from state interference, matters of church governance as well as those of faith and doctrine are not implicated here. To start, Cedar Park's argument is based on its false assertion that SB 6219 "coerc[es] Cedar Park to cover (and pay for) abortion and abortifacient access for employees," which is wrong for all the reasons stated above. Opening Br. at 62. It is also wrong that SB 6219 implicates the doctrine at all. While courts cannot wade into governance of "religious" or "ecclesiastical" matters, courts can adjudicate matters dealing with churches if the dispute requires "neutral principles of law, developed for use" in those kinds of disputes, including

application of generally applicable laws. *Jones v. Wolf*, 443 U.S. 595, 599-605 (1979); *see Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. ____, 140 S. Ct. 2049, 2060 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012).

The church autonomy doctrine protects the right of churches and other religious institutions "to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 20690. As explained in *Our Lady of Guadalupe Sch.*, "the independence of religious institutions in matters of 'faith and doctrine' is closely linked to independence in what we have termed 'matters of church government.'" *Id.* The Court made clear, however, that the doctrine "does not mean that religious institutions enjoy a general immunity from secular laws." *Id.* The doctrine instead protects "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.*

Courts primarily apply the doctrine to prevent interference in "the selection of the individuals who play certain key roles" within the Church. *Id.* But Cedar Park cites no case applying the doctrine to strike down a law that does not regulate the church at all, but simply the marketplace for particular products. The purchase of a health insurance plan is not an ecclesiastical decision, but a

choice to enter the marketplace for health care. Cedar Park cannot use the religious autonomy doctrine to make the State force private companies to create products on a market simply because Cedar Park desires it. Cedar Park's radical interpretation of the doctrine would make religious organizations virtually immune from all manner of laws.

**D.     This Court Should Affirm the District Court's Denial of Cedar Park's Permanent Injunction**

For reasons state above, Cedar Park's motion for a permanent injunction is moot. But on the long chance that this Court reaches the question of injunctive relief, it should remand to the district court for consideration of the issue. Cedar Park's request that the Ninth Circuit affirmatively enter an injunction on appeal is both highly unusual and unsupported by any case law.

Moreover, the arguments above make plain that Cedar Park does not and cannot satisfy the factors for a permanent injunction. And injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Cedar Park was required to prove (1) the merits of its claim, (2) it would suffer irreparable harm absent the injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20 (2008).

Cedar Park cannot even prove Article III standing, much less that it will suffer irreparable harm absent an injunction. Ultimately, no Court can force Kaiser to offer Cedar Park a policy giving Cedar Park everything it wants at the price Cedar Park wants it. And Cedar Park has demonstrated through its actions that, without such an order, it will continue to pay Kaiser's higher prices for a policy in which it directly pays for coverage of abortion and all contraceptives.

## IX. CONCLUSION

This Court should affirm the judgment of the district court.

RESPECTFULLY SUBMITTED this 22nd day of January 2024.

ROBERT W. FERGUSON
Attorney General

*s/ Tera M. Heintz*
Tera M. Heintz, WSBA 54921
Deputy Solicitor General
MARTA DELEON, WSBA 35779
Senior Assistant Attorney General
1125 Washington Street SE
Olympia, WA 98504-0100
(360) 664-9006
Tera.Heintz@atg.wa.gov
Marta.DeLeon@atg.wa.gov

*Attorneys for Defendants-Appellees*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule of Appellate Procedure 28-2.6, Defendants-Appellees, by and through their undersigned counsel, hereby states that they are unaware of any related cases to the instant appeal that are currently pending in this Court.

> *s/ Tera M. Heintz*
> Tera M. Heintz, WSBA 54921
> *Deputy Solicitor General*

# CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule of Appellate Procedure 32-1, the attached brief is proportionately spaced, has a typeface of 14 points or more and contains 12292 words.

*s/ Tera M. Heintz*
Tera M. Heintz, WSBA 54921
*Deputy Solicitor General*

# CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, that I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 22nd day of January 2024, at Olympia, Washington.

*s/ Tera M. Heintz*
Tera M. Heintz, WSBA 54921
*Deputy Solicitor General*

\

Table of Contents
Addendum – Pages 1 to 11

| Statute | Description | Page |
|---|---|---|
| 10 U.S.C. § 55 | Medical & Dental Care | 1 |
| 42 U.S.C. § 18023(b)(1)(B) | Special Rules | 2 |
| Wash. Rev. Code § 48.11.040 | Property Insurance | 3 |
| Wash. Rev. Code § 48.11.070 | General Casualty Insurance | 4 |
| Wash. Rev. Code § 48.66.020(1)(d) | Outpatient Prescription Drug Plans | 5 |
| Wash. Rev. Code § 48.84.020(1) | Long-term care insurance | 6 |
| Wash. Rev. Code § 51.04.020 | Powers and duties | 7 |
| Wash. Admin. Code § 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 | Clinical trials | 8 |
| Wash. Admin. Code § 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(1)(c) | Definition of short-term limited duration medical plan | 9 |
| Wash. Admin. Code § 284-50-355(1) | Disability income protection coverage | 10 |
| Wash. Admin. Code § 284-50-360 | Accident only coverage | 11 |

**10 U.S.C. § 55**

"Creditable coverage" defined as in this section for purposes of increased portability through limitation on preexisting condition exclusions, see 26 USCA § 9801.

"Excepted benefits" defined as in this section for purposes of benefits not subject to requirement if offered as separate insurance policy, see 42 USCA § 300gg-91.

Medicare supplemental health insurance coverage supplemental to this chapter, see 26 USCA § 9832.

Member of Coast Guard Reserve on active duty other than for training or when retired for disability entitled to benefits of this chapter, see 14 USCA § 3705.

Third-party tort liability to United States for hospital and medical care, see 42 USCA § 2651 et seq.

**42 U.S.C. § 18023(b)(1)(B)**

(b) Special rules relating to coverage of abortion services
(1) Voluntary choice of coverage of abortion services
(A) In general
Notwithstanding any other provision of this title (or any amendment made by this title)--
(i) nothing in this title (or any amendment made by this title), shall be construed to require a qualified health plan to provide coverage of services described in subparagraph (B)(i) or (B)(ii) as part of its essential health benefits for any plan year; and
(ii) subject to subsection (a), the issuer of a qualified health plan shall determine whether or not the plan provides coverage of services described in subparagraph (B)(i) or (B)(ii) as part of such benefits for the plan year.
(B) Abortion services
(i) Abortions for which public funding is prohibited
The services described in this clause are abortions for which the expenditure of Federal funds appropriated for the Department of Health and Human Services is not permitted, based on the law as in effect as of the date that is 6 months before the beginning of the plan year involved.

**Wash. Rev. Code § 48.11.040**

 "Property insurance" is insurance against loss of or damage to real or personal property of every kind and any interest therein, from any or all hazard or cause, and against loss consequential upon such loss or damage.

**Wash. Rev. Code § 48.11.070**

"General casualty insurance" includes vehicle insurance as defined in RCW 48.11.060, and in addition is insurance:

(1) Against legal liability for the death, injury, or disability of any human being, or for damage to property.

(2) Of medical, hospital, surgical and funeral benefits to persons injured, irrespective of legal liability of the insured, when issued with or supplemental to insurance against legal liability for the death, injury or disability of human beings.

(3) Of the obligations accepted by, imposed upon, or assumed by employers under law for workers' compensation.

(4) Against loss or damage by burglary, theft, larceny, robbery, forgery, fraud, vandalism, malicious mischief, confiscation or wrongful conversion, disposal or concealment, or from any attempt of any of the foregoing; also insurance against loss of or damage to moneys, coins, bullion, securities, notes, drafts, acceptances or any other valuable papers or documents, resulting from any cause, except while in the custody or possession of and being transported by any carrier for hire or in the mail.

(5) Upon personal effects against loss or damage from any cause.

(6) Against loss or damage to glass, including its lettering, ornamentation and fittings.

(7) Against any liability and loss or damage to property resulting from accidents to or explosions of boilers, pipes, pressure containers, machinery, or apparatus and to make inspection of and issue certificates of inspection upon elevators, boilers, machinery, and apparatus of any kind.

(8) Against loss or damage to any property caused by the breakage or leakage of sprinklers, water pipes and containers, or by water entering through leaks or openings in buildings.

(9) Against loss or damage resulting from failure of debtors to pay their obligations to the insured (credit insurance).

(10) Against any other kind of loss, damage, or liability properly the subject of insurance and not within any other kind or kinds of insurance as defined in this chapter, if such insurance is not contrary to law or public policy.

**Wash. Rev. Code § 48.66.020(1)(d)**

(1) "Medicare supplemental insurance" or "medicare supplement insurance policy" refers to a group or individual policy of disability insurance or a subscriber contract of a health care service contractor, a health maintenance organization, or a fraternal benefit society, which relates its benefits to medicare, or which is advertised, marketed, or designed primarily as a supplement to reimbursements under medicare for the hospital, medical, or surgical expenses of persons eligible for medicare. Such term does not include:
(a) A policy or contract of one or more employers or labor organizations, or of the trustees of a fund established by one or more employers or labor organizations, or combination thereof, for employees or former employees, or combination thereof, or for members or former members, or combination thereof, of the labor organizations; or
(b) A policy issued pursuant to a contract under section 1876 of the federal social security act (42 U.S.C. Sec. 1395 et seq.), or an issued policy under a demonstration specified in 42 U.S.C. Sec. 1395(g)(1); or
(c) Medicare advantage plans established under medicare part C; or
(d) Outpatient prescription drug plans established under medicare part D; or
(e) Any health care prepayment plan that provides benefits pursuant to an agreement under section 1833(a)(1)(A) of the federal social security act.

**Wash. Rev. Code § 48.84.020(1)**

Unless the context requires otherwise, the definitions in this section apply throughout this chapter.

(1) "Long-term care insurance" or "long-term care benefit contract" means any insurance policy or benefit contract primarily advertised, marketed, offered, or designed to provide coverage or services for either institutional or community-based convalescent, custodial, chronic, or terminally ill care. Such terms do not include and this chapter shall not apply to policies or contracts governed by chapter 48.66 RCW and continuing care retirement communities.

**Wash. Rev. Code § 51.04.020**

The director shall:

(1) Establish and adopt rules governing the administration of this title;

(2) Ascertain and establish the amounts to be paid into and out of the accident fund;

(3) Regulate the proof of accident and extent thereof, the proof of death and the proof of relationship and the extent of dependency;

(4) Supervise the medical, surgical, and hospital treatment to the intent that it may be in all cases efficient and up to the recognized standard of modern surgery;

(5) Issue proper receipts for moneys received and certificates for benefits accrued or accruing;

(6) Investigate the cause of all serious injuries and report to the governor from time to time any violations or laxity in performance of protective statutes or regulations coming under the observation of the department;

(7) Compile statistics which will afford reliable information upon which to base operations of all divisions under the department;

(8) Make an annual report to the governor of the workings of the department;

(9) Be empowered to enter into agreements with the appropriate agencies of other states relating to conflicts of jurisdiction where the contract of employment is in one state and injuries are received in the other state, and insofar as permitted by the Constitution and laws of the United States, to enter into similar agreements with the provinces of Canada; and

(10) Designate a medical director who is licensed under chapter 18.57 or 18.71 RCW.

**Wash. Admin. Code § 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**

Recognizing the exercise of conscience by purchasers of basic health plan services and ensuring access for all enrollees to such services.

(1) All carriers required pursuant to law to offer and file with the commissioner a plan providing benefits identical to the basic health plan services (the model plan) shall file for such plan a full description of the process it will use to recognize an organization or individual's exercise of conscience based on a religious belief or conscientious objection to the purchase of coverage for a specific service. This process may not affect a nonobjecting enrollee's access to coverage for those services.

(2) A religiously sponsored carrier who elects, for reasons of religious belief, not to participate in the provision of certain services otherwise included in the model plan, shall file for such plan a description of the process by which enrollees will have timely access to all services in the model plan.

(3) The commissioner will not disapprove processes that meet the following criteria:

(a) Enrollee access to all basic health plan services is not impaired in any way;

(b) The process meets notification requirements specified in RCW 48.43.065; and

(c) The process relies on sound actuarial principles to distribute risk.

**Wash. Admin. Code § 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(1)(c)**

1.      Definition of short-term limited duration medical plan.

(1) "Short-term limited duration medical plan" means a policy, contract or agreement offered or issued by a health carrier with an effective date on or after January 1, 2019, that:

(c) Has an expiration date specified in the contract (taking into account any extensions that may be elected by the member with or without the carrier's consent) that is not more than three months after the original effective date of the policy, contract or agreement.

(2) Any carrier offering a short-term limited duration medical plan must offer at least one such plan with a deductible stated on a per person basis of two thousand dollars or less.

(3) A short-term limited duration medical plan cannot be issued if it would result in a person being covered by a short-term limited duration medical plan for more than three months in any twelve-month period.

(4) A carrier must not issue a short-term limited duration medical plan during an annual open enrollment period, as defined in WAC 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, for coverage beginning in the upcoming year.

(5) Short-term limited duration medical plan has the same meaning as short-term limited duration insurance, as used in 26 C.F.R. 54.9801-2, 29 C.F.R. 2590.701-2 and 45 C.F.R. 144.103, except that:

(a) The duration of a short-term limited duration medical plan cannot exceed three months;

(b) A short-term limited duration medical plan cannot be renewed or extended, except as provided in subsection (1)(a)(ii)(C) of this section; and

(c) A short-term limited duration medical plan cannot be issued if it would result in a person being covered by a short-term limited duration medical plan for more than three months in any twelve-month period.

**Wash. Admin. Code § 284-50-355(1)**

1. Disability income protection coverage.

(1) "Disability income protection coverage" is a policy which provides for periodic payments, weekly or monthly, for a specified period during the continuance of disability resulting from either sickness or injury or a combination thereof which:

(a) Provides that periodic payments which are payable at ages after 62 and reduced solely on the basis of age are at least 50% of amounts payable immediately prior to age 62.

(b) Contains an elimination period no greater than:

(i) Ninety days in the case of coverage providing a benefit of one year or less;

(ii) One hundred eighty days in the case of coverage providing a benefit of more than one year but not greater than two years; or

(iii) Three hundred sixty-five days in all other cases during the continuance of disability resulting from sickness or injury.

(c) Has a maximum period of time for which it is payable during disability of at least six months except in the case of a policy covering disability arising out of pregnancy, childbirth, or miscarriage in which case the period for such disability may be one month.

(2) No disability income protection policy shall contain any provision permitting a reduction in benefits because of an increase in Social Security benefits.

(3) This section does not apply to those policies providing business buyout coverage.

**Wash. Admin. Code § 284-50-360**

1.      Accident only coverage.

"Accident only coverage" is a policy of accident insurance which provides coverage, singly or combination, for death, dismemberment, disability or hospital and medical care caused by accident. Accidental death and double dismemberment amounts under such a policy shall be at least $1,000 and a single dismemberment amount shall be at least $500.