# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

*Plaintiff-Appellant/Cross-Appellee*,

v.

MYRON KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington, AKA Mike Kreidler; JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington,

*Defendants-Appellees/Cross-Appellants*.

On Appeal from the United States District Court
for the Western District of Washington
Civil Case No. 3:19-cv-05181-BHS

## THIRD BRIEF OF APPELLANT/CROSS-APPELLEE

KRISTEN K. WAGGONER
JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

JAMES A. CAMPBELL
KEVIN H. THERIOT
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85250
(480) 444-0020
jcampbell@ADFlegal.org
ktheriot@ADFlegal.org

DAVID A. CORTMAN
RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFlegal.org

*Counsel for Plaintiff-Appellant/Cross-Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF THE ISSUES ........................................................ 1

STATEMENT OF THE CASE ........................................................... 1

SUMMARY OF THE ARGUMENT ................................................. 1

ARGUMENT ..................................................................................... 3

I.    Standard of Review ................................................................. 3

II.   Cedar Park has standing. ...................................................... 3

    A.    Article III standing elements ................................... 4

    B.    Cedar Park's evidence shows a completed and ongoing injury in fact. .................................................. 4

        1.    Under *Skyline* and *Cedar Park*, the church established an injury in fact. ........................... 5

        2.    This is a post-enforcement lawsuit, not a pre-enforcement challenge. ................................... 7

        3.    Washington's evidentiary argument is waived, baseless, and self-contradictory. ...................... 9

        4.    Washington's other arguments against Cedar Park's ongoing injury are meritless. .............. 13

    C.    Cedar Park's injury in fact is fairly traceable to SB 6219's operation and enforcement. ......................... 19

    D.    Judicial relief would redress Cedar Park's injuries. ............ 20

    E.    Other federal appellate court decisions support Cedar Park's standing here. ........................................... 21

III.   Cedar Park is entitled to summary judgment on its free exercise claim. .................................................................. 22

A.    SB 6219 and the conscience law substantially burden Cedar Park's free exercise of religion. ..................................22

    1.    Cedar Park showed a substantial burden on its free exercise under *Apache Stronghold*. ......................22

    2.    Washington's substantial-burden argument is inconsistent with this Court's prior decision, as well as rulings by the Supreme Court. ........................25

    3.    The Supreme Court has already rejected Washington's "cognizable burden" theory. ..................27

    4.    There is no basis for certification. ................29

B.    Washington's abortion-coverage requirements aren't generally applicable. ...........................................................29

    1.    Washington's outdated definition of general applicability is wrong. ..................................30

    2.    Washington's abortion-coverage requirements fail the general applicability test. ......................36

C.    Washington's abortion-coverage requirements aren't religiously neutral. ...............................................................44

D.    Washington eschews any reliance on the law of the case or the rule of the mandate. ...................................................48

E.    Washington's abortion-coverage requirements can't withstand strict scrutiny. ...................................................48

F.    The Free Exercise Clause's text, history, and tradition also demand a religious exception. .......................................51

IV.    Cedar Park is entitled to summary judgment on its church autonomy claim. ...........................................................52

V.    Cedar Park merits a permanent injunction now. ..........................59

CONCLUSION ...................................................................60

CERTIFICATE OF SERVICE..................................................................62

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ........................................................ 5

*Advocate Health Care Network v. Stapleton,*
581 U.S. 468 (2017) ...................................................... 37

*Americans for Prosperity Foundation v. Bonta,*
141 S. Ct. 2373 (2021) .................................................. 51

*Apache Stronghold v. United States,*
2024 WL 884564 (9th Cir. Mar. 1, 2024) ........................... 23, 25, 40

*Arizona Dream Act Coalition v. Brewer,*
855 F.3d 957 (9th Cir. 2017) ................................... 34–35

*Babbitt v. United Farm Workers National Union,*
442 U.S. 289 (1979) ........................................................ 8

*Bennett v. Spear,*
520 U.S. 154 (1997) ........................................................ 4

*Board of Education of Kiryas Joel Village School District v. Grumet,*
512 U.S. 687 (1994) ...................................................... 41

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) .............................................. 28, 53

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ....................................... 54

*Calvary Chapel Dayton Valley v. Sisolak,*
140 S. Ct. 2603 (2020) .......................................... 31–32

*Cedar Park Assembly of God of Kirkland v. Kreidler,*
860 F. App'x 542 (9th Cir. 2021) .................. 3, 6–7, 19, 21, 26, 29

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................... 30–32, 35, 41, 46–47

*Church of Scientology Flag Service Organization, Inc. v. City of Clearwater,*
  2 F.3d 1514 (11th Cir. 1993) ........................................ 53

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) .................................................. 48

*Combs v. Central Texas Annual Conference of the United Methodist Church,*
  173 F.3d 343 (5th Cir. 1999) ........................................ 52

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ............................................... 19

*Department of Education v. Brown,*
  600 U.S. 551 (2023) .................................................. 19

*Easton v. Asplundh Tree Experts Company,*
  2018 WL 1306456 (W.D. Wash. Mar. 13, 2018) ...................... 12

*EEOC v. Catholic University of America,*
  83 F.3d 455 (D.C. Cir. 1996) ........................................ 57

*Employment Division, Department of Human Resources of Oregon v. Smith,*
  494 U.S. 872 (1990) .................................................. 31

*Farnes v. Metropolitan Group Property & Casualty Insurance Company,*
  2019 WL 4044102 (W.D. Wash. July 31, 2019) ...................... 12

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education,*
  82 F.4th 664 (9th Cir. 2023) .................... 31–39, 42–44, 46, 50

*Flores v. Huppenthal,*
  789 F.3d 994 (9th Cir. 2015) ......................................... 3

*Foothill Church v. Watanabe,*
  623 F. Supp. 3d 1079 (E.D. Cal. 2022) ............................ 51

*Fowler v. Rhode Island,*
    345 U.S. 67 (1953) ........................................................... 40

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ............................... 34, 42–43, 49, 51

*Gonzalez v. United States Immigration & Customs Enforcement,*
    975 F.3d 788 (9th Cir. 2020) ........................................... 3

*Grand Canyon Trust v. Provencio,*
    26 F.4th 815 (9th Cir. 2022) ........................................ 5, 7

*Grosz-Salomon v. Paul Revere Life Insurance Company,*
    237 F.3d 1154 (9th Cir. 2001) ....................................... 13

*Harman v. Apfel,*
    211 F.3d 1172 (9th Cir. 2000) ......................................... 3

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
    565 U.S. 171 (2012) ......................................................... 54

*Independent Towers of Washington v. Washington,*
    350 F.3d 925 (9th Cir. 2003) ......................................... 11

*Janus v. American Federation of State, County, & Municipal Employees, Council 31,*
    585 U.S. 878 (2018) ......................................................... 26

*Jones v. Wolf,*
    443 U.S. 595 (1979) ......................................................... 56

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,*
    344 U.S. 94 (1952) ........................................................... 58

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) ................................... 42–44, 48, 51

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ................................... 21, 57

*Lambert v. Blodgett,*
    393 F.3d 943 (9th Cir. 2004) ........................................ 30

*Larson v. Valente,*
    456 U.S. 228 (1982) .................................................... 20

*Liberty University, Inc. v. Lew,*
    733 F.3d 72 (4th Cir. 2013) ......................................... 21

*Little Sisters of the Poor Saints Peter and Paul Home v.*
    *Pennsylvania,*
    140 S. Ct. 2367 (2020) ..................................... 27–28, 54

*Lopez v. Candaele,*
    630 F.3d 775 (9th Cir. 2010) ......................................... 8

*Marbled Murrelet v. Babbitt,*
    83 F.3d 1060 (9th Cir. 1996) ...................................... 10

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
    584 U.S. 617 (2018) ........................................... 2, 44, 58

*Meese v. Keene,*
    481 U.S. 465 (1987) .................................................... 20

*Moran v. Selig,*
    447 F.3d 748 (9th Cir. 2006) ...................................... 46

*Murphy v. Collier,*
    139 S. Ct. 1475 (2019) ............................................... 40

*Navajo Nation v. United States Forest Service,*
    535 F.3d 1058 (9th Cir. 2008) .................................... 22

*New York v. United States,*
    505 U.S. 144 (1992) .................................................... 58

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ............................................... 55

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) ....................................................... 37

*Pennsylvania v. President United States*,
    930 F.3d 543 (3d Cir. 2019) ............................................ 54

*Pfingston v. Ronan Engineering Co.*,
    284 F.3d 999 (9th Cir. 2002) .......................................... 10

*Priests for Life v. United States Department of Health & Human
    Services*,
    772 F.3d 229 (D.C. Cir. 2014).......................................... 22

*Printz v. United States*,
    521 U.S. 898 (1997) ...................................................... 57

*Rollins v. Dignity Health*,
    830 F.3d 900 (9th Cir. 2016) .......................................... 37

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ................................................... 31–32

*Seaplane Adventures, LLC v. Cnty. of Marin*,
    71 F.4th 724 (9th Cir. 2023) .......................................... 11

*Serbian Eastern Orthodox Diocese for United States & Canada v.
    Milivojevich*,
    426 U.S. 696 (1976) ...................................................... 56

Skyline Wesleyan Church v. California Department of Managed
    Health Care,
    968 F.3d 738 (9th Cir. 2020) ....................... 5–6, 8–9, 17, 19–20, 59

*Sprint Communications Company, L.P. v. APCC Services, Inc.*,
    554 U.S. 269 (2008) ...................................................... 20

*Stormans, Inc. v. Weisman*,
    794 F.3d 1064 (9th Cir. 2015) ................................... 30, 35

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) ........................................................ 5

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ................................... 30, 33, 48–49

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ................................................................ 4, 19

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
582 U.S. 449 (2017) ...................................................................... 46

*United States v. Christie,*
825 F.3d 1048 (9th Cir. 2016) ..................................................... 49

*United States v. Gomez-Norena,*
908 F.2d 497 (9th Cir. 1990) ....................................................... 10

*United States v. Lindell,*
766 F. App'x 525 (9th Cir. 2019) .................................................. 11

*United States v. Lischewski,*
860 F. App'x 512 (9th Cir. 2021) ................................................. 11

*United States v. Lovett,*
2013 WL 1405421 (D. Nev. Apr. 5, 2013) ................................... 12

*United States v. Olson,*
988 F.3d 1158 (9th Cir. 2021) ....................................................... 5

*Utah v. Evans,*
536 U.S. 452 (2002) ...................................................................... 20

*Vietnam Veterans of America v. Central Intelligence Agency,*
811 F.3d 1068 (9th Cir. 2016) ....................................................... 3

*Washington v. Davis,*
426 U.S. 229 (1976) ...................................................................... 35

*Watson v. Jones,*
80 U.S. (13 Wall.) 679 (1871) ................................................ 50, 58

*Werft v. Desert Southwest Annual Conference of the United
Methodist Church,*
377 F.3d 1099 (9th Cir. 2004) ..................................................... 52

*Wieland v. United States Department of Health & Human Services,*
793 F.3d 949 (8th Cir. 2015) ....................................................... 21

*Zubik v. Burwell,*
578 U.S. 403 (2016) ...................................................................... 26

**Statutes**

26 U.S.C.A. § 4980D(d) ................................................................... 24

28 U.S.C. § 1746 .............................................................................. 12

42 U.S.C. § 18054 ............................................................................ 36

42 U.S.C. § 2000bb-1 ...................................................................... 27

Wash. Admin. Code § 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 ......................................... 7, 17, 39

Wash. Rev. Code § 48.43.005 .................................................... 24, 37–38

Wash. Rev. Code § 48.43.065 ......................................... 15, 24, 39–40, 45

Wash. Rev. Code § 48.43.073 ........................................................ 9, 36, 42

Wash. Rev. Code § 48.44.023 ......................................................... 24

Wash. Rev. Code § 48.44.024 ......................................................... 24

**Other Authorities**

Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 U.
ILL. L. REV. 839 (2014) .......................................................... 56, 58

Douglas Laycock, *Towards a General Theory of the Religion Clauses:
The Case of Church Labor Relations and the Right to Church
Autonomy*, 81 COLUM. L. REV. 1373 (1981) ....................... 50, 55–56

Kathleen A. Brady, *The Disappearance of Religion from Debates
About Religious Accommodation*, 20 LEWIS & CLARK L. REV.
1093 (2017) ............................................................................. 55, 59

*Law, Religion, and Freedom: Conceptualizing a Common Right* (W.
Cole Durham et al., eds., 2021) ............................................... 58

Mark E. Chopko & Michael F. Moses, *Freedom to be a Church: Confronting Challenges to the Right of Church Autonomy*, 3 GEO. J. L. & PUB. POL'Y 387 (2005).................................................57

Religious Organizations and the Law § 5:13 (2d) (Dec. 2023 Update) ..55

*Religious Organizations in the United States: A Study of Identity, Liberty, and the Law* (James Serritella et al., eds., 2006) ............55

U.S. Dep't of Labor, *FAQs About Affordable Care Act Implementation Part 36* (Jan. 9, 2017) .........................................26

U.S. Office of Personnel Management, *Privacy Impact Assessment for Multi-State Program Plan System (MSPPS)* (Feb. 21, 2020) ..36

## Rules

Fed. R. Evid. 803 ............................................................... 11–12

## Regulations

80 Fed. Reg. 41,318 (July 14, 2015) .......................................54

83 Fed. Reg. 57,536 (Nov. 15, 2018).......................................27

## STATEMENT OF THE ISSUES

In addition to the two issues described in Cedar Park's opening brief, Washington's cross-appeal presents the following question:

3.     Whether Cedar Park has standing to challenge Washington's application of the abortion-coverage requirements to houses of worship like the church under the First Amendment's Free Exercise Clause and church autonomy doctrine.

## STATEMENT OF THE CASE

Cedar Park incorporates by reference the statement of the case included in its opening brief.

## SUMMARY OF THE ARGUMENT

Washington tries hard to avoid the merits of Cedar Park's claims but to no avail. This Court correctly has already held that Cedar Park has standing in this post-enforcement—not pre-enforcement challenge—and that's the law of the case. Washington relies on evidentiary arguments to deprive Cedar Park of an injury in fact, but those claims are waived, baseless, and self-contradictory. And there's no serious argument that traceability and redressability are lacking here. So Article III's requirements are met and the Free Exercise Clause triggered because Washington's abortion-coverage requirements substantially burden Cedar Park's free exercise in multiple ways.

After five years of litigation, Washington must answer for violating Cedar Park's religious liberty, and it can't. General applicability is lacking because Washington allows blanket and

individualized exceptions to the State's abortion-coverage requirements, and those exceptions undermine the State's interest to the same degree as exempting churches. Moreover, the State's "reasons for the exceptions do not matter," Mont.Pub.Policy.Ctr.Amicus.Br.9, so Washington can't "fine-tun[e] the level of generality up or down" to evade strict scrutiny, *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 652 (2018) (Gorsuch, J., concurring).

Neutrality is missing too. "The unique burdens SB 6219 places on churches like Cedar Park demonstrate that it targets religious exercise." Christian.Legal.Soc'y.Amicus.Br.12. And in "drafting, promoting, passing, and implementing SB 6219, Washington state actors demonstrated that they were both aware of and intended the law's burdens on religious organizations." *Id.* at 13. So strict scrutiny applies and Washington's arguments are insufficient to meet it.

Church autonomy also bars SB 6219's application to Cedar Park. Excluding abortion from the church's health plan is "an internal management decision that is essential to Cedar Park's beliefs, teaching, and mission." States.Amicus.Br.5. Washington can't force churches "religiously opposed to abortion to fund and facilitate it" because that "defeat[s] [their] ability to practice what they preach" and "communicate … authentically." Sutherland.Inst.Amicus.Br.11–12.

Cedar Park merits a permanent injunction now. So this Court should reverse and direct the district court to enter a permanent injunction and final judgment in the church's favor.

## ARGUMENT

### I. Standard of Review

On summary judgment, the Court reviews legal conclusions—including standing determinations—de novo and factual findings for clear error. *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 802 (9th Cir. 2020); *Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016). In other words, this Court accords the district court "no deference" on legal questions, *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000), but is "highly deferential to the trial court" on factual questions, reversing only if it has "the definite and firm conviction that the court committed a clear error of judgment," *Flores v. Huppenthal*, 789 F.3d 994, 1001 (9th Cir. 2015) (quotation omitted).

### II. Cedar Park has standing.

Washington's brief evokes a sense of déjà vu. This Court has already ruled that Cedar Park has standing. *Cedar Park Assembly of God of Kirkland v. Kreidler*, 860 F. App'x 542, 543 (9th Cir. 2021). On remand, the district court held the same. 1-ER-045. Yet Washington persists in challenging jurisdiction. *E.g.*, Defs.-Appellees' Answering Br.

("Wash.Br.") at 22–28. This escape hatch is closed. Because the State's arguments are waived, meritless, and flout the law of the case, this Court should reject them. After roughly five years of litigation, it's high time Washington answered for violating Cedar Park's religious liberty.

### A. Article III standing elements

Plaintiffs have Article III standing if they suffered an "injury in fact" that is concrete and particularized, and actual or imminent, it's likely defendants caused the injury, and it's likely the injury would be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). In other words, plaintiffs must have an injury caused by defendants that a court can remedy. *Id.* Cedar Park made that showing, as this Court and the district court agreed.

### B. Cedar Park's evidence shows a completed and ongoing injury in fact.

An injury in fact is the invasion of a cognizable interest that is (1) concrete, (2) particularized, and (3) actual (not conjectural) or imminent (not hypothetical). *Bennett v. Spear*, 520 U.S. 154, 167 (1997). The injury to Cedar Park's right to free exercise and religious autonomy meets all these requirements: it's real, personal, and actual in the past and present, plus ongoing in the future. So Cedar Park had standing to seek declaratory and injunctive relief when the complaint was filed, and the church's need for that relief remains active and pressing today.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210–11 (1995).

> **1.    Under *Skyline* and *Cedar Park*, the church established an injury in fact.**

This Court has held—twice—that a church's loss of its abortion-excluding, fully insured health plan as a result of state insurance regulation is an injury in fact. Washington effectively asks the Court to override these decisions. *E.g.*, Wash.Br.25–31. But "a three-judge panel may not overrule a prior decision of the court" absent exceptional circumstances not present here. *United States v. Olson*, 988 F.3d 1158, 1163 (9th Cir. 2021) (per curiam) (quotation omitted). Indeed, no daylight exists between the allegations of Cedar Park's complaint and the facts in the summary judgment record. So the Court's prior determination that Cedar Park has standing is the law of the case. *Grand Canyon Trust v. Provencio*, 26 F.4th 815, 821 (9th Cir. 2022).

The teaching of *Skyline Wesleyan Church v. California Department of Managed Health Care*, 968 F.3d 738 (9th Cir. 2020), is clear: a church suffers an injury in fact when state health-carrier regulations lead to the church losing its abortion-excluding health plan and gaining an abortion-including health plan, in violation of its religious beliefs. *Id.* at 747. In those circumstances, "[t]here is nothing hypothetical" or "preenforcement" about the church's injury because health carriers have "already complied" with the State's command in

the past and will continue to do so in the future absent an injunction. *Id.* at 747–48.

Previously, this Court applied *Skyline*'s standing rule and determined that Cedar Park established "an injury in fact." *Cedar Park*, 860 F. App'x at 543. The Court reasoned that "Kaiser Permanente dropped Cedar Park's abortion coverage restrictions due to SB 6219, and there is no evidence in the record clearly demonstrating that Cedar Park could obtain acceptable [health] coverage." *Id.*

On remand, the district court confirmed that after SB 6219 took effect, "Kaiser dropped Cedar Park's abortion coverage restrictions" and Cedar Park was unable "to obtain comparable coverage." 1-ER-045. That's because "the only plan that would have restricted abortion in a manner consistent with Cedar Park's religious beliefs was self-insurance," which is "not a viable option financially … and it is not comparable to a fully insured [health] plan." *Id.* So, the court said, "the Ninth Circuit's remand require[d] [it to] deny [Washington's] motion to dismiss." *Id.*

Summary-judgment evidence confirmed this result. The district court found it was "undoubtedly true" that SB 6219 caused "Cedar Park's employees [to] gain[ ] coverage for abortion services under their employer-sponsored health insurance plan that they would not otherwise have." 1-ER-015–16. Nor could Cedar Park evade this harm, because currently available "self-funded and level-funded [health] plans

6

are not comparable to the Kaiser fully-insured plan" that Cedar Park lost. 1-ER-007. So the district court found that "SB 6219 requires Cedar Park to facilitate access to covered abortion services contrary to [its] religious beliefs." 1-ER-016. That is an injury in fact, as *Skyline* and *Cedar Park* held.

The State tries to distinguish *Skyline* based on an SB 6219-implementing regulation that points to the existence of Washington's conscience law. Wash.Br.29–31 (referencing Wash. Admin. Code § 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(3)). That argument fails. This Court was well aware of the Commissioner's regulation during Cedar Park's first appeal. *E.g.*, Pl.-Appellant's Opening Br. at 11 n.3, 17 n.4, *Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*, No. 20-35507 (Sept. 2, 2020). And the Court nonetheless concluded that Cedar Park's case is comparable to *Skyline*, applied the same standing analysis, and reached the same result. *E.g.*, *Cedar Park*, 860 F. App'x at 543. Because that determination is the law of the case, it controls this appeal. *Grand Canyon Trust*, 26 F.4th at 821.

### 2. This is a post-enforcement lawsuit, not a pre-enforcement challenge.

Washington says that because this case is a pre-enforcement challenge, Wash.Br.1, Cedar Park must show "a credible threat of prosecution." Wash.Br.24. Wrong. Pre-enforcement plaintiffs file suit when they have not yet "suffer[ed] a direct injury from the challenged

restriction," *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010), but there is "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). This case is entirely different.

SB 6219's operation and enforcement caused Cedar Park to lose its abortion-excluding, fully insured health plan in 2019, and the statute continues to prevent the church from obtaining comparable replacement coverage today—over four years later. 3-ER-388–91, 397–99, 403–04, 420–22, 428. In other words, Cedar Park suffered a direct injury from SB 6219 in the *past*, continues to experience that harm in the *present*, and will continue to do so in the *future* absent injunctive relief from this Court. There's nothing uncertain or theoretical about Cedar Park's harm.

*Skyline* made this plain. This Court identified "an injury in fact" when California law deprived a church of "insurance that excluded abortion coverage in a way that was consistent with its religious beliefs," resulting in health "coverage [that] violated its religious beliefs." *Skyline*, 968 F.3d at 747. California raised a "preenforcement" argument, just like Washington here. *Id.* But the Court rejected that theory, holding that "a genuine threat of imminent prosecution" was "simply irrelevant" because *Skyline* "involve[d] a *postenforcement challenge*." *Id.* at 748 (emphasis added) (quotation omitted). Specifically, California "told … insurers that they were required to immedi-

ately change their coverage [to include abortion], and all of them (including Skyline's insurer) ha[d] already complied." *Id.* at 748. "There [was] nothing hypothetical about the situation." *Id*. at 747.

The same is true here. SB 6219 directed insurers to insert abortion and abortifacient-contraceptive coverage into churches' health plans as soon as it took effect. Wash. Rev. Code § 48.43.073(1). For plans issued or renewed in 2019 or later, that's exactly what insurers like Kaiser Permanente did. 2-ER-065, 3-ER-397, 447, 4-ER-567. As a result, Cedar Park's employee health plan has included abortion and abortifacient-contraceptive coverage for over four years. So Cedar Park showed a (post-enforcement) completed and ongoing injury, not a (pre-enforcement) potential threat of future harm.

### 3. Washington's evidentiary argument is waived, baseless, and self-contradictory.

Washington's main counter to Cedar Park's injury in fact is an evidentiary argument. The State admits that Cedar Park presented evidence "that Kaiser refused to accommodate an abortion exclusion because of SB 6219" and that "Kaiser would offer Cedar Park a policy excluding such overage if [a court] enjoined SB 6219."[1] Wash.Br.25. But

---

[1] Kaiser's willingness to offer Cedar Park an abortion-excluding health plan goes to redressability, not injury in fact. But for ease of reference, Cedar Park addresses all the State's evidentiary arguments together.

Washington says that evidence is "hearsay" and "not admissible on summary judgment. *Id.*

This argument fails for three reasons. First, hearsay objections are waived unless a party "make[s] a specific objection" below. *United States v. Gomez-Norena*, 908 F.2d 497, 500 (9th Cir. 1990). Washington had to "move to strike" Cedar Park's evidence or present a similar "filing [that] adequately put the district court on notice of its [specific] objection, and thus, preserves the issue for appeal." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1003 (9th Cir. 2002). Washington did neither. The State merely grumbled about hearsay in its briefs *after* the district court rejected its renewed motion to dismiss and Cedar Park moved for summary judgment. *E.g.*, Doc. 112 at 8; Doc. 114 at 2.

Because Washington failed to make a specific and timely hearsay objection, the district court never ruled on the matter, and "opposing counsel" never had an opportunity "to take corrective measures," if necessary. *Gomez-Norena*, 908 F.2d at 500 (quotation omitted). So the State's hearsay objections are waived because Washington "evaded" the lower "court's decision of the issue, and denied [Cedar Park] the opportunity to lay a better foundation for the evidence," if the district court so desired. *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996). Indeed, Washington's position below was that trial courts "may still consider" inadmissible evidence on summary judgment if "it may be presented in an admissible form at trial." Doc. 112 at 7. And

that gave the district court no reason to rule on Washington's vague hearsay complaints.

Moreover, the district court never questioned the admissibility of Cedar Park's evidence, which—on its face—evokes the business-records exception to the general rule against hearsay. Fed. R. Evid. 803(6). This Court reviews the trial court's evidentiary determinations "for [an] abuse of discretion." *Seaplane Adventures, LLC v. Cnty. of Marin*, 71 F.4th 724, 729 (9th Cir. 2023). Washington never claims the district court abused its discretion by considering Cedar Park's evidence. So these arguments are doubly waived. *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929–30 (9th Cir. 2003).

Second, email exchanges between Cedar Park, its insurance broker (Jami Hansen), and its health carrier (Kaiser Permanente), *e.g.*, 2-ER-071, 5-ER-771, "are not excluded by the rule against hearsay" because they fall under the business-records exception, Fed. R. Evid. 803, which Washington's brief ignores, *e.g.*, Wash.Br.2, 19, 25. This Court has affirmed that the business-records exception applies to similar business-related emails. *E.g.*, *United States v. Lischewski*, 860 F. App'x 512, 516 (9th Cir. 2021); *United States v. Lindell*, 766 F. App'x 525, 530 n.4 (9th Cir. 2019). It should do the same here.

The emails in question were sent contemporaneously by Kaiser Permanente's representative to Cedar Park's agent (*i.e.*, insurance broker), and forwarded to Cedar Park's senior leadership (*i.e.*,

pastorate), who responded with questions and concerns. *E.g.*, 2-ER-071, 5-ER-771. Cedar Park's agent and leadership, jointly engaged in arms-length negotiations about Cedar Park's health coverage, qualify as "someone with knowledge." Fed. R. Evid. 803(6)(A). It's apparent from the conversation—as well as the participants' roles, official email addresses, and signature blocks—that sending emails was "a regular practice" of Cedar Park and its insurance agent in negotiating benefits, and that these records were "kept in the course of [their] regularly conducted [business or nonprofit] activity." Fed. R. Evid. 803(6)(B) & (C).

What's more, a participant, or "qualified witness," testified to personal knowledge of the negotiations and the emails' true and correct nature under penalty of perjury pursuant to 28 U.S.C. § 1746. Fed. R. Evid. 803(6)(D); 2-ER-065–67; 5-ER-767–69. And Washington does not claim that the emails are untrustworthy. Fed. R. Evid. 803(6)(E). So they are admissible as business records, as district courts have concluded under similar facts. *E.g.*, *Farnes v. Metro. Grp. Prop. & Cas. Ins. Co.*, No. 2:18-cv-1882, 2019 WL 4044102, at *1 (W.D. Wash. July 31, 2019) (MetLife emails were business records); *Easton v. Asplundh Tree Experts Co.*, No. 16-cv-1694, 2018 WL 1306456, at *2 (W.D. Wash. Mar. 13, 2018) (emails were business records); *United States v. Lovett*, No. 2:11-cv-00165, 2013 WL 1405421, at *7 (D. Nev. Apr. 5, 2013) (Lockheed emails were business records).

Last, Washington's hearsay objection is self-contradictory. The State cites numerous emails to support its claims. *E.g.*, Wash.Br.17; Doc. 104 at 8–9, 12, 20 n.7. But what's "sauce for the gander must be sauce for the goose." *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1161 (9th Cir. 2001). If Cedar Park cannot point to email evidence on summary judgment, the State cannot either. Yet Washington regularly engages in that practice, which shows the State doesn't credit its own hearsay argument. This Court shouldn't either.

### 4. Washington's other arguments against Cedar Park's ongoing injury are meritless.

Washington disputes Cedar Park's ongoing injury on three additional grounds. None have merit. First, Washington claims that Cedar Park's injury is self-inflicted. *E.g.*, Wash.Br.16–17. That accusation is wrong and has no factual basis. For over four years, Cedar Park has tried—without success—to find a comparable abortion-excluding, fully insured group plan to replace the one it lost after SB 6219 took effect. 3-ER-397–99, 403–04, 420–22, 428. The State never established an exemption process for churches or other religious organizations that object to facilitating abortion. 2-ER-250–51. So it's no surprise that insurers added abortion coverage to these ministries' health plans, over their strong objections, but with Washington's approval. 4-ER-684–87.

There is no factual dispute on this point. "Excepting only self-insurance, all of the plans available to and suitable for Cedar Park … would have provided Cedar Park employees access to abortion and abortion causing drugs through, or as a result of, the [c]hurch's plan" in violation of its religious beliefs. 2-ER-065–66. Or, as the Insurance Commissioner's representative put it, nearly "all [plans] cover abortion now," except self-insurance. 4-ER-682. And self-insurance is not comparable to the fully insured plan that Cedar Park lost after SB 6219 took effect because it costs hundreds of thousands of dollars more each year and requires a stop-loss insurance policy that the church may not even be able to obtain. 2-ER-066–67.

The district court sided with Cedar Park on both counts. First, the court found that "the only [health] plan that would have restricted abortion in a manner consistent with Cedar Park's religious beliefs was self-insurance," 1-ER-045, and that "only [a] self-funded plan would fully exclude abortion coverage," 1-ER-007–08. Second, the court found—twice—that "self-funded and level-funded plans are not comparable to fully-insured plans." 1-ER-005, 007 (citing 1-ER-045). Washington can't show that these factual findings are clearly erroneous; it doesn't even try.

Washington also insists that abortion-including or non-comparable Cigna plans were "cheaper" than the fully insured Kaiser Permanente plan that Cedar Park kept. Wash.Br.17. But abortion-

*including* plans don't solve Cedar Park's injury. Also, the church proved that Cigna charged more over time, 2-ER-066, and Kaiser Permanente had better coinsurance, lower deductibles, and enhanced preventive care, Doc. 94-1 at 3—*i.e.*, better value for money.

Second, Washington contends that the Insurance Commissioner approved abortion-excluding, fully insured health plans while this case was pending. Wash.Br.26–27. Washington fails to mention that Cedar Park *isn't eligible* for those plans. 2-ER-173–74, 177, 179; Doc. 93-3 at 5–7. And even if Cedar Park became eligible in the future, Washington's conscience law mandates that church employees have abortion and abortifacient-contraceptive coverage as a direct result of Cedar Park's health plan, Wash. Rev. Code § 48.43.065(1), (2)(b)–(c), (3)(b)–(c); 2-ER-253–55, 257—using the same insurance card, 2-ER-066, 069—in violation of the church's religious beliefs, 5-ER-760 (incorporating 5-ER-798). So Cedar Park's injury remains.

Washington specifically cites abortion-excluding group plans offered by Providence and Premera. Wash.Br.27. Providence enjoys the conscience law's generous protection of "religiously sponsored health carrier[s]" that are exempt from being "required … in any circum-stances to participate in the provision of or payment for [abortion] service[s] if they object [based on] religion." Wash. Rev. Code § 48.43.065(2)(a). But Providence doesn't offer a fully insured, large-employer health plan in King and Snohomish Counties—where Cedar

Park is located. 2-ER-176–77; Doc. 93-3 at 5–7. So Providence's religious exemption does Cedar Park no good.

Washington also cites a Premera health plan for those with 50 or fewer employees. 2-ER-174. But Cedar Park has over 200 employees eligible for health insurance, Doc. 94-1 at 2. Small-employer plans don't help. Inaccessible plans like these don't lessen Cedar Park's injury; they highlight the discriminatory nature of Washington's regime, which favors some religious organizations (health carriers like Providence) over others (houses of worship like Cedar Park).

Third, Washington says that *if* a secular insurer was willing to take the risk of applying Washington's conscience law and *if* that insurer offered Cedar Park a comparable group plan, *then* the church wouldn't have to pay for abortion coverage. Wash.Br.28. That's not how Washington's conscience law works, OpeningBr.14–16, as "there's nothing about [Washington's] conscience clauses or accommodations that prevents the carrier from still charging for the service," 2-ER-263. Also, these hypotheticals are irrelevant to Cedar Park's standing. In the real world, SB 6219's mandate forced Cedar Park to pay for abortion coverage for years. That harm continues to this day and qualifies as an injury in fact. 3-ER-388–90; 4-ER-567; *accord* Wash.Br.29.

As this Court said in *Skyline*, perhaps things would be different if Washington had established a formalized system for religious exemptions from SB 6219's mandate and "made clear that *no coverage changes*

16

*would be required* until individualized exemption requests had been presented and reviewed, but that is not what happened." 968 F.3d at 748 (emphasis added). The Insurance Commissioner took a year and a half to establish regulations implementing SB 6219 and the conscience law. Wash. Admin. Code § 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 (2019). When he finally did, the regulations were devoid of substance, merely stating: "This subchapter does not diminish or affect any rights or responsibilities provided under RCW 48.43.065." *Id.* Washington still has no religious-exemption process for employers. 2-ER-249–51. So houses of worship and other religious organizations continue to face injury. 2-ER-067.

Fourth, Washington says it has "disavowed" enforcing SB 6219 against a health carrier that offers Cedar Park an abortion-free plan. *E.g.*, Wash.Br.4, 26. That is pure sophistry; the State hasn't "disavowed" anything. Washington has fought Cedar Park's request for a religious exemption—stridently—for five years. It continues to oppose Cedar Park's request for an injunction that would *actually* allow the church to obtain an abortion-free plan. *E.g.*, Wash.Br.58–59. That's enforcement, not disavowal.

Tellingly, Washington never mentioned "disavowal" in the district court. And none of the cases it cites for this argument are remotely on point. Wash.Br.26. If the State had actually "disavowed any interpreta- tion of [SB 6219] that applied" to houses of worship, Wash.Br.26 (quota-

tion omitted), Cedar Park would be focused on its religious mission, not litigating a second time before this Court.

What the State means by "disavowal" is that Washington's conscience law applies. Or, as the State puts it, "the Insurance Commissioner adopted administrative rules during the course of this litigation making clear that Senate Bill 6219 does not diminish *any rights* under Washington's conscience objection statute." Wash.Br.2 (emphasis added). But the regulation doesn't say what those rights are or prohibit SB 6219's application to houses of worship. It adds nothing to the conversation and does not change Cedar Park's injury in fact.

Nor is Washington's conscience law capable of barring the courthouse doors to houses of worship. That law hasn't *actually* prevented Cedar Park's harms and can't *potentially* remedy them either. Under the conscience law, "even if [Cedar Park] may object to [abortion coverage] and doesn't want it as part of the package, the enrollee still has access to it," 2-ER-253, because "[t]he plan actually provides for access," 2-ER-257. Indeed, employees would use the same insurance card for abortion that they use for everything else. 2-ER-066, 069. And that violates Cedar Park's religious belief against facilitating abortion in any way, including through—or as a result of—purchasing an employee health plan. 5-ER-760 (incorporating 5-ER-789). So even if a secular health carrier risked the conscience law in the future, Cedar Park would experience the same harm it faces now.

### C. Cedar Park's injury in fact is fairly traceable to SB 6219's operation and enforcement.

A plaintiff's injury in fact "must [also] be fairly traceable to the challenged action of the defendant[s]." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quotation omitted). In other words, Cedar Park's "injury [must be] likely caused by" the enactment of SB 6219 or its enforcement against houses of worship. *TransUnion*, 594 U.S. at 423. Standing depends on realities, not formalism. So "no more than *de facto* causality" is required for Cedar Park to meet this requirement. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (quotation omitted).

Washington says that Cedar Park didn't show "Kaiser refused to accommodate a plan excluding abortion coverage due to SB 6219." Wash.Br.19. That's wrong, 5-ER-771, and irrelevant. As a factual matter, "Kaiser Permanente reasonably understood the plain language of SB 6219 as precluding [abortion] restrictions, and it acted accordingly when it removed the restrictions from Cedar Park's health plan." *Cedar Park*, 860 F. App'x at 543. But traceability doesn't turn on that evidentiary showing; it's merely icing on the cake.

As a legal matter, *Skyline* again controls. *Skyline* held that traceability exists even if defendants' actions aren't "the sole source of injury" and "there are multiple links in the chain connecting the defendant[s'] unlawful conduct to the plaintiff's injury." 968 F.3d 748 (quotation omitted). Here, as in *Skyline*, "there is a direct chain of

causation from [SB 6219's] directive requiring … insurers to [insert abortion] coverage, to [Cedar Park's] insurer's doing so, to [Cedar Park] losing access to the type of coverage it wanted." *Id.*; 2-ER-065–67; 4-ER-681–82. That showing of *de facto* causality meets Article III's traceability requirement. *Skyline*, 968 F.3d at 748–49.

### D. Judicial relief would redress Cedar Park's injuries.

Redressability means the plaintiffs' injury "is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008). Plaintiffs need not "show that a favorable decision will relive [their] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). A judicial decision that would "relieve a discrete injury to" the plaintiff, *id.*, or "at least partially redress" the plaintiff's harm is enough, *Meese v. Keene*, 481 U.S. 465, 476 (1987). So courts ask if the "practical consequence" of a court order is "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002). If yes, redressability is met.

Washington says *Cedar Park* "never produced admissible evidence supporting its allegations of … redressability." Wash.Br.22. That's wrong two ways. To begin, Cedar Park showed that Kaiser Permanente was willing to "support a mid-year change" if houses of worship obtained an exception from the abortion-coverage mandate. 5-ER-771.

Moreover, because Cedar Park "had access to an acceptable plan before SB 6219 took effect," this Court held it was likely that "Cedar Park could obtain a similar plan from Kaiser Permanente or another health insurer if the State is enjoined from enforcing SB 6219." *Cedar Park*, 860 F. App'x at 543. On remand, Cedar Park showed that "[b]efore SB 6219 went into effect, Kaiser Permanente and most other carriers were willing and able to completely exclude abortions and abortifacients for churches." 2-ER-066. Redressability is satisfied.

**E.    Other federal appellate court decisions support Cedar Park's standing here.**

Lawsuits about abortion or abortifacient-contraceptive coverage abounded over the last decade. In every relevant case, federal appellate courts said the plaintiff had Article III standing. This Court's decisions in *Skyline* and *Cedar Park* are part of a five-circuit consensus that Washington asks this Court to repudiate. The Court should decline.

In addition to *Skyline* and *Cedar Park*, rulings by the Fourth, Seventh, Eighth, and D.C. Circuits support Cedar Park's standing to challenge Washington's abortion-coverage mandates. *E.g.*, *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013) (religious university had standing to challenge an abortifacient-contraceptive mandate); *Korte v. Sebelius*, 735 F.3d 654, 667–68 (7th Cir. 2013) (same for religious owners of closely held businesses); *Wieland v. U.S. Dep't of Health & Hum. Servs.*, 793 F.3d 949, 954–56 (8th Cir. 2015) (same for

religious state employee and his wife); *Priests for Life v. U.S. Dep't of Health & Hum. Servs.*, 772 F.3d 229, 241–44 (D.C. Cir. 2014) (same for Catholic nonprofits challenging the mandate and the adequacy of a religious exception). Concluding that Cedar Park lacks standing would flout the law of the case and create a lopsided circuit split. The Court should decline Washington's invitation to do so.

## III. Cedar Park is entitled to summary judgment on its free exercise claim.

Washington's abortion-coverage requirements substantially burden Cedar Park's religious liberty. They lack general applicability *and* neutrality, and badly fail strict scrutiny. Cedar Park is entitled to summary judgment on its free exercise claim.

### A. SB 6219 and the conscience law substantially burden Cedar Park's free exercise of religion.

Washington says Cedar Park's free exercise isn't substantially burdened. But that fantastic claim is counter-factual, inconsistent with this Court's prior ruling, and barred by Supreme Court precedent.

#### 1. Cedar Park showed a substantial burden on its free exercise under *Apache Stronghold.*

Washington's position turns on the narrow definition of "substantial burden" adopted in *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc). Wash.Br.35–36. But *Navajo Nation*'s holding on that point is irrelevant because this Court overruled it in *Apache Stronghold v. United States*, No. 21-15295, 2024 WL 884564, at

*3 (9th Cir. Mar. 1, 2024) (per curiam) (en banc). Now, this Court recognizes a substantial burden on religion when government action (1) "tend[s] to coerce individuals into acting contrary to their religious beliefs," (2) "discriminate[s] against religious adherents," (3) "penalize[s] them," or (4) "den[ies] them an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.* (quotations omitted).

SB 6219 and the conscience law substantially burden Cedar Park's free exercise in all four ways. First, after SB 6219 took effect, Cedar Park lost its fully insured group health plan, which excluded abortion and abortifacient-contraceptive coverage, and no comparable replacement policy is available. *Supra* pp.6–9. That's because such plans "all cover abortion now," 4-ER-682, either directly through SB 6219—as happened to Cedar Park—or indirectly via the conscience law, which mandates that "[t]he plan actually provides for [abortion] access" regardless of any religious objection. 2-ER-257. So Cedar Park may *only* fulfill its religious and legal obligation to provide health insurance by purchasing a fully insured group plan that includes abortion coverage. That tends to coerce Cedar Park into violating its religious beliefs; in fact, Washington's regime has forced Cedar Park to *actually* violate its beliefs against facilitating abortion for years. 3-ER-388–91.

Second, Washington law discriminates generally against religious adherents who believe that human life is sacred and specifically against houses of worship like Cedar Park. Religious organizations that teach in

favor of abortion may operate, grow, employ large staffs, and provide health insurance to their employees without hindrance. But Washington forces faith-based groups that teach against abortion to contradict their beliefs, shrink their staff to avoid the health-insurance mandate,[2] or leave the State to survive.

What's more, the conscience law favors some religious adherents over others. Health care providers, religiously sponsored health carriers, and health care facilities may not be forced "*in any circumstances* to participate in the provision of or payment for" abortion—including in their own health plans and in the plans religious carriers sell to others—if they object on religious or conscience grounds. Wash. Rev. Code § 48.43.065(2)(a) (emphasis added); *accord* 3-ER-342–43. But houses of worship must have abortion and abortifacient-contraceptives included in their employee health plans—at least indirectly—because they cannot be "excluded from their benefits package as a result of their … exercise of the conscience clause." Wash. Rev. Code § 48.43.065(3)(b).

Third, Washington enacted SB 6219 without any meaningful religious exemption to penalize believers and religious organizations like Cedar Park because—after years of litigation—they obtained broad exemptions from the federal abortifacient-contraceptive mandate.

---

[2] 26 U.S.C.A. § 4980D(d); Wash. Rev. Code § 48.43.005(44); Wash. Rev. Code §§ 48.44.023–.024.

OpeningBr.43–47. Indeed, enhanced conscience protections authorized by the Trump Administration were the reason for the law. *Id.* at 45.

Last, Washington conditions the important benefit or privilege of a fully insured group health plan on Cedar Park's willingness to discard or contradict its religious teachings. That benefit or privilege was so important to Cedar Park's employees and their families—including a severely ill child—that Cedar Park has been compelled for *over four years* to pay for a plan that includes abortion and abortifacient-contraceptive coverage in serious violation of everything it believes. OpeningBr.22–23. Washington made "abandonment of [Cedar Park's] own religion or conformity to the religious beliefs of others the price of an equal place in the civil community" and imposed "benefit conditions that put substantial pressure on [Cedar Park] to modify [its] behavior and to violate [its] beliefs." *Apache Stronghold*, 2024 WL 884564, at *15, *17 (Collins, J.) (cleaned up).

The question is not whether Cedar Park showed a substantial burden on its free exercise of religion but in how many ways. Here, it's a *Choose Your Own Adventure* because any one will suffice.

> **2. Washington's substantial-burden argument is inconsistent with this Court's prior decision, as well as rulings by the Supreme Court.**

Washington previously asked this Court to rule that Cedar Park's free-exercise claim "fail[ed] as a matter of law." Defs.-Appellees'

Answering Br. at 35, *Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*, No. 20-35507 (Dec. 2, 2020). If Cedar Park hadn't alleged "a cognizable legal theory," including a substantial burden on religious exercise, the Court would have obliged. *Id.* at 17 (quotation omitted); *accord id.* at 28 n.5. Yet the Court allowed Cedar Park's free exercise and other claims to proceed to summary judgment. *Cedar Park*, 860 F. App'x at 543.

Of course, in the prior appeal, Washington largely conceded that SB 6219 "incidentally burdens [Cedar Park's] particular religion or practice." Defs.-Appellees' Answering Br. at 36, *Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*, No. 20-35507 (Dec. 2, 2020). Washington cannot "den[y] the obvious" now. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 908 (2018).

Legal challenges to ineffective conscience protections from abortion mandates—like Washington's conscience law—are hardly new. The Supreme Court consolidated seven such cases in *Zubik v. Burwell*, 578 U.S. 403 (2016) (per curiam). On remand, the federal government and the parties determined that there was no way to make the existing accommodation work.[3] So the government issued broader religious

---

[3] U.S. Dep't of Labor, *FAQs About Affordable Care Act Implementation Part 36* at 4 (Jan. 9, 2017), https://bit.ly/2Sv6Q3z ("no feasible approach has been identified at this time that would resolve the concerns of religious objectors").

exceptions to address "the substantial burden identified by the Supreme Court in *Hobby Lobby*," 83 Fed. Reg. 57,536, 57,545 (Nov. 15, 2018). And the Supreme Court approved that action in *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).

None of the Supreme Court's actions are consistent with Washington's claim of lack of a cognizable burden on religion. In fact, myriad federal exemption cases were litigated under the Religious Freedom Restoration Act, which only applies if government "substantially burden[s] a person's exercise of religion." 42 U.S.C. § 2000bb-1(a).

### 3. The Supreme Court has already rejected Washington's "cognizable burden" theory.

Washington doesn't deny that SB 6219 and the conscience law substantially burden Cedar Park's religious beliefs. It says that any such burden is not "cognizable." Wash.Br.2, 31. Cedar Park, the State says, has no right to object that, under the conscience law, abortion and abortifacient coverage would be included in the church's health plan, albeit indirectly. Or as Washington puts it, that "insurance carriers [would] provid[e] information and access to abortion coverage for Cedar Park's enrollees" under the conscience law is not "a cognizable Free Exercise" Clause burden. Wash.Br.2. That's so, Washington says, because the abortion-coverage "requirements [are] on the insurance carrier," not the church. Wash.Br.35.

The Supreme Court rejected Washington's argument a decade ago. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 723 (2014), the government similarly claimed "that the connection between what the objecting [religious] parties must do" under the Affordable Care Act ("ACA"), *i.e.*, provide abortifacient-contraceptive coverage in their health plans, "and the end that they find to be morally wrong," *i.e.*, the destruction of human life, was "simply too attenuated." But the Court rejected that claim, which "dodge[d] the [relevant] question … and instead address[d] a very different question that the federal courts have no business addressing"—namely, "whether the religious belief asserted … is reasonable." *Id.* at 724.

It's for religious believers, not government officials, to determine when "it is wrong for a person to … enabl[e] or facilitat[e] the commission of an immoral act by another." *Id.* Officials can't tell people of faith "that their religious beliefs are" unreasonable, "mistaken[,] or insubstantial." *Id.* at 725. Their "narrow function" is to "determine whether the [moral] line" believers have "drawn reflects an honest conviction." *Id.* (quotations omitted).

Just as in *Hobby Lobby*, "there is no dispute" that Cedar Park's religious objection to facilitating abortion through its own health plan is sincere. *Id.* So the church showed a substantial free exercise burden. *Accord Little Sisters of the Poor*, 140 S. Ct. at 2389–91 (Alito, J., concurring). Washington's contrary arguments rest on the conscience

law. But that statute is deeply flawed because it tells Cedar Park that its beliefs about complicity in abortion are unreasonable or mistaken, which *Hobby Lobby* doesn't allow.

### 4. There is no basis for certification.

Washington says that if the Court has any doubt how SB 6219 and the conscience law work, "it should certify this question to the Washington Supreme Court." Wash.Br.33 n.1. There's no basis for this. The text of SB 6219 and the conscience law are straightforward, which is presumably why Washington never requested certification below. *Accord Cedar Park*, 860 F. App'x at 543 (citing SB 6219's "plain language"). Moreover, the parties engaged in extensive discovery regarding how Washington's abortion-coverage requirements work. And the district court had no trouble concluding, based on the record, that it's "undisputed and undoubtedly true" that the church's "employees would not have access to covered abortion services absent Cedar Park's post-SB 6219 plan." 1-ER-015. That's a "substantial burden" on Cedar Park's belief against facilitating abortion in any way. 5-ER-760 (incorporating 5-ER-789).

### B. Washington's abortion-coverage requirements aren't generally applicable.

Washington says it's abortion-coverage requirements are generally applicable. But Washington denies what the Supreme Court and

this Court have said that generally applicability means. *E.g.*, Wash.Br.21, 43, 45–46. That's a losing proposition from the start.

### 1. Washington's outdated definition of general applicability is wrong.

Washington's view of general applicability ignores recent precedent construing the Free Exercise Clause. The State attempts to turn back the clock by applying outdated circuit decisions like *Stormans, Inc. v. Weisman*, 794 F.3d 1064 (9th Cir. 2015), *e.g.*, Wash.Br.38, 44, 49, which contributed to the Supreme Court "summarily reject[ing] the Ninth Circuit's analysis of … COVID restrictions on religious exercise" five times, *Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (per curiam). *Current* law governs this appeal. *Lambert v. Blodgett*, 393 F.3d 943, 973 n.21 (9th Cir. 2004). So Washington's definition of general applicability is wrong.

Washington admits there are exceptions to its abortion-coverage requirements, then tries to write off those outside SB 6219's text. *E.g.*, Wash.Br.40–42, 47. This argument fails. Washington's defense rests on the premise that state insurance requirements and the conscience law must be "read in conjunction." Wash.Br.38. That's precisely how the Supreme Court approached *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543–45 (1993), where rules and exceptions in multiple ordinances showed the city's ban on animal killings wasn't generally applicable. So that argument doesn't save Washington.

Next, Washington says that no authority "suggests that *only* exceptionless laws meet the general applicability requirement[ ]." Wash.Br.45 (emphasis added). But Cedar Park never claimed that an exceptionless policy is required. OpeningBr.35. Under *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), states may have exceptions that don't "treat any comparable secular activity more favorably than religious exercise." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) ("*FCA*") (cleaned up).

So Washington moves the target, complaining that it shouldn't have to "pursue [its] statutory [abortion-coverage] goal at all costs." Wash.Br.45. But even though a secular exception may be good policy or reflect "common sense," it often "means that the law is not generally applicable." *FCA*, 82 F.4th at 688 (quotation omitted). Of course, states can—and should—"consider[ ] … the costs" and "accomodat[e] conflicting policy interests" in enacting laws. Wash.Br.44. But states cannot "devalue[ ] religious reasons for" an exception. *Lukumi*, 508 U.S. at 537; *accord Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2614 (2020) (Kavanaugh, J., dissenting from denial of application for injunctive relief), *incorporated by Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 29 (2020) (per curiam) (Kavanaugh, J., concurring).

More concretely, that means "once a [s]tate creates a favored class," it must include "houses of worship" in that category. *Diocese of Brooklyn*, 592 U.S. at 29 (Kavanaugh, J. concurring). Anything less amounts to the "discriminatory treatment" of "religious practice." *Lukumi*, 508 U.S. at 538. So Washington can't relegate churches like Cedar Park to second-tier status without triggering strict scrutiny. *Diocese of Brooklyn*, 592 U.S. at 17–18; *accord Calvary Chapel*, 140 S. Ct. at 2612–13 (Kavanaugh, J., dissenting).

Yet Washington refuses to take Cedar Park's religious need for an abortion exemption seriously. The State says that other exceptions to the abortion-coverage requirements have different (and more valuable) purposes, including (1) preserving funding, Wash.Br.44; (2) unburdening non-comprehensive-benefit plans, Wash.Br.50; and (3) shielding healthcare providers, religiously sponsored health carriers, and healthcare facilities' from facilitating abortion (including in their health plans), Wash.Br.47. So Washington staunchly refuses Cedar Park "[ ]equal treatment." *Lukumi*, 508 U.S. at 542 (quotation omitted). But lionizing secular exceptions as "important" or "obviously justified" and dismissing an authentic religious exemption for churches as worthless violates the Free Exercise Clause. *Id.* at 544 (quotations omitted); *accord Diocese of Brooklyn*, 592 U.S. at 22 (Gorsuch, J., concurring). (*Tandon* treats Justice Gorsuch's concurrence in *Roman Catholic Diocese of Brooklyn* as authoritative. 593 U.S. at 62.)

Moreover, "the reasons why" others desire—and Washington grants—exceptions to the abortion-coverage requirements are irrelevant. *FCA*, 82 F.4th at 689 (quotation omitted); *accord Tingley v. Ferguson*, 47 F.4th 1055, 1088 (9th Cir. 2022) ("Whether secular and religious activity are 'comparable' is evaluated 'against the asserted government interest that justifies the regulation at issue' and requires looking at the risks posed, *not the reasons for* the conduct.") (quotation omitted) (emphasis added). *Contra* Wash.Br.43, 46–47 (citing exemptions' "purpose"). The State's "design or intent" doesn't affect the analysis, *FCA*, 82 F.4th at 689, because official "targeting [of religion] is not required," *id.* at 686. General applicability turns on whether state laws "treat[ ] any comparable secular activity more favorably than religious exercise." *Id.* (cleaned up). So courts inquire whether any denied religious and granted secular exceptions pose "similar risks" to "the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. If so, the regulation isn't generally applicable, and strict scrutiny applies. *Id.* at 63–65.

Washington claim—that "an exception to almost any requirement will not advance the original purpose of the requirement," Wash.Br.45—refuses to compare *activities* and their risks to the State's asserted interests, juxtaposing *persons* instead, Wash.Br.48. Yet comparability depends not on who secular and religious groups are but what they do. That's apparent from the correct standard, *i.e.*, whether

state law "prohibits religious *conduct* while permitting secular *conduct* that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021) (emphasis added).

Take *FCA*, for example, where this Court held that "selective secular [and religious] organizations" were "comparable" because their "membership requirements pos[ed] an identical risk to the [school's] stated interest in ensuring equal access." 82 F.4th at 689–90. What mattered was that officials allowed "comparable secular student groups" to have "membership [that] was limited" but "penalized" a faith-based group for limiting leadership "based on its religious beliefs." *Id.* at 672. Secular and religious groups engaged in comparable acts with similar effects on the government's asserted interest. In those circumstances, "the Constitution prohibits ... a double standard—even in the absence of any [discriminatory] motive." *Id.*

With no support in recent free exercise precedent, Washington turns to cases applying the Equal Protection Clause, Wash.Br.45, 48–49, which ensures the State treats comparable "*persons*" (not actions) "alike," *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017) (emphasis added). These Fourteenth Amendment decisions aren't relevant to Cedar Park's First Amendment claims. OpeningBr.50–51.

*Stormans* never claimed that comparability under the Free Exercise Clause mirrors similarly situated analysis under the Equal

Protection Clause. Wash.Br.49. There, the plaintiffs didn't "advance any equal protection arguments independent of their arguments concerning the Free Exercise Clause," so both claims rose or fell together. *Stormans*, 794 F.3d at 1085. Moreover, *Stormans* was decided in 2015, and free exercise precedent has substantially changed since. *E.g.*, *FCA*, 82 F.4th at 685 (the Supreme Court refined "what it means to be 'generally applicable'"). Nor is *Arizona Dream Act Coalition* on point. The Court there merely applied standard equal-protection analysis, asking whether "*persons*"—there, "groups of immigrants"—were "similarly situated" in ways "pertinent to the … policy" at issue. 855 F.3d at 966–67 (emphasis added). It never mentioned the Free Exercise Clause or examined whether the State's policy discriminated against comparable religious *conduct*.

In short, Washington can't evade *Diocese of Brooklyn*, *Tandon*, *Fulton*, and *FCA* by appealing to the Equal Protection Clause. Analysis under the Free Exercise Clause is fundamentally different. To give one more example, equal protection violations generally require discriminatory intent. *Washington v. Davis*, 426 U.S. 229, 238–45 (1976). But free exercise violations do not. *FCA*, 82 F.4th at 672, 686. This Court should require Washington officials to respect—not dodge—the Free Exercise Clause and "the rights it secures." *Lukumi*, 508 U.S. at 547.

### 2. Washington's abortion-coverage requirements fail the general applicability test.

Washington's abortion-coverage requirements are "replete with exemptions" and miles away from a generally applicable law. *FCA*, 82 F.4th at 694.

*SB 6219 exemptions*. Two exemptions are in SB 6219's text. The first is for multistate plans, Wash. Rev. Code § 48.43.073(4), at least one of which Congress said must exclude abortion coverage, 42 U.S.C. § 18054(a)(6). Washington argues those plans no longer exist. Wash.Br.41. But they did for years, 3-ER-312, and Congress's requirement that the government offer at least one abortion-free multistate plan is still on the books. Because the program is merely "suspended" (in apparent violation of the Affordable Care Act), nothing prevents the federal government from restoring it. U.S. Office of Personnel Management, *Privacy Impact Assessment for Multi-State Program Plan System (MSPPS)* at 1 (Feb. 21, 2020), https://bit.ly/4caZUPk.

The second exception is for any situation in which applying the abortion-coverage mandates would violate a federal funding condition. Wash. Rev. Code § 48.43.073(5). In defense, Washington says it must comply with the Supremacy Clause. Wash.Br.49. But that argument is a non-starter. Abiding by federal funding conditions "is voluntary," and Washington is "given the choice of complying with [those] conditions … or forgoing the benefits of federal funding." *Pennhurst State Sch. &*

*Hosp. v. Halderman*, 451 U.S. 1, 11 (1981). Nothing forces Washington's hand.

*Health plan exemptions.* Other carveouts are inherent in exceptions to Washington's definition of a "health plan." Wash. Rev. Code § 48.43.005(31). The most sweeping example is for "self-funded health plans." *Id.* 48.32.005(31)(j). For-profit businesses with large profit margins may self-insure, offer comprehensive maternity coverage in their health plans, and still exclude abortion and abortifacient-contraceptive coverage. Employees of these secular businesses do not have alternative access to abortion coverage as a result of the plan. But churches like Cedar Park—who rely on tithes and offerings, and cannot afford self-insurance—are forced to cover abortion in *their* plans. 2-ER-067.

Washington says this exception exists because ERISA preempts state regulation of self-insured plans. Wash.Br.50. But only "the risk involved and not the reasons why" matter. *FCA*, 82 F.4th at 689 (quotation omitted); *accord Tingley*, 47 F.4th at 1088. ERISA exempts church plans to safeguard religious liberty and church autonomy. 29 U.S.C. § 1003(b)(2); *Rollins v. Dignity Health*, 830 F.3d 900, 910–12 (9th Cir. 2016), *rev'd on other grounds by Advocate Health Care Network v. Stapleton*, 581 U.S. 468 (2017). Washington can't leverage ERISA's church exemption (and lack of preemption) to violate both.

Washington's "health plan" definition also excludes short-term limited purpose (or STLD) plans, property/casualty liability plans, and supplemental Medicare or Tricare plans, Wash. Rev. Code § 48.43.005(31)(b), (c), (f), & (l), which may cover or provide payments related to maternity care, 3-ER-325–27, 333–34, 337; 2-ER-071–72. The State doesn't dispute that it *could* mandate abortion coverage in STLD and property/casualty liability plans. It just says those plans weren't "designed to be comprehensive." Wash.Br.43. But Washington's "design or intent" is irrelevant. *FCA*, 82 F.4th at 689. What matters is "risk to the [government's] stated interest." *Id.* So the only valid defense, which Washington never raised, is that exempting Cedar Park would harm that interest to a greater degree. The State can't make that showing here. Every Cedar Park employee agrees to live out the church's religious beliefs—at work and at home. 5-ER-760 (incorporating 5-ER-789–790). Because Cedar Park's employees are extremely unlikely to use abortion and abortifacient-contraceptive coverage, granting the church an exception would have little-to-no effect on Washington's interests, certainly less than the exceptions already allowed.

Concerning supplemental Medicare or Tricare plans, Washington say federal preemption applies. Wash.Br.50–51. Yet federal and state regulations operate in tandem on the health-insurance market. Even if the federal government's different policy choices make it difficult for Washington to fashion a generally applicable law, that doesn't mean the

State gets a pass. When government favors "any comparable secular activity"—here, providing maternity care with no mandatory abortion coverage—over Cedar Park's "religious exercise," the rule in question isn't generally applicable. *FCA*, 82 F.4th at 686 (cleaned up). Full stop.

*Conscience law exemptions.* Still more exceptions stem from the conscience law. Washington allows secular "individual health care provider[s]" and "health care facilit[ies]" to exclude abortion from their employee health plans "for reason of conscience." Wash. Rev. Code § 48.43.065(2)(a); *accord* 3-ER-342–343. Individual believers and faith-based facilities enjoy the same exception on "religio[us]" grounds. Wash. Rev. Code § 48.43.065(2)(a). On top of that, Washington allows "religiously sponsored health carrier[s]" to exclude abortion from their own health plans *and* sell abortion-excluding plans to others—including secular for-profit businesses. *Id.*

Washington doesn't contest that these exceptions allow abortion exclusions from employee health plans that offer comprehensive maternity care. It just makes three excuses for the disparate treatment. First, Washington says the conscience law has "a different purpose" than SB 6219. Wash.Br.47. But the State's "design or intent" is irrelevant. *FCA*, 82 F.4th at 689. Moreover, it's undisputed that both statutes operate together, Wash. Admin. Code § 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(3), and exempting Cedar Park wouldn't harm Washington's interest in ensuring that employees "'receive [a] full range of services'" any more

than excepting pro-life providers, facilities, and carriers would, Wash.Br.47 (quoting Wash. Rev. Code § 48.43.065(1)). A meaningful church exception would *better ensure* that "'conflicting religious and moral beliefs [are] respected.'" *Id.* (quoting Wash. Rev. Code § 48.43.065(1)).

Second, Washington says "the exemptions do not treat comparable *secular* organizations or activity better." Wash.Br.47. That's incorrect. Nothing in the conscience law requires that providers or facilities be religious; in fact, the statute allows secular individuals and organizations to object on grounds of "conscience" or "moral belief[ ]," instead of "religi[on]." Wash. Rev. Code § 48.43.065(1) & (2)(a). Of course, objecting providers or facilities may be religious—and carriers must be. But religious carriers' *secular* clients enjoy a derivative exception that's inaccessible to Cedar Park.

Plus, Washington's decision to "prefer[ ] some religious [individuals and] groups over" churches like Cedar Park poses deeper problems than a lack of general applicability. *Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953). There's "always been widespread acceptance that discrimination *between* religions is repugnant to the" Free Exercise Clause. *Apache Stronghold*, 2024 WL 884564, at *72 n.14 (Vandyke, J., concurring); *accord Murphy v. Collier*, 139 S. Ct. 1475, 1475 (2019) (Kavanaugh, J., concurring in grant of application for stay). So when it comes to abortion coverage in employee health plans, Washington can't

deny houses of worship the same free-exercise protections that it grants to religious providers, facilities, and carriers. *Accord Lukumi*, 508 U.S. at 532–33; *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994).

Third, Washington says that "[t]he exemption for health carriers is no broader than the exemption granted to religious employers" because they are "required to provide notice to enrollees about where to obtain services that are excluded from the policy on moral or religious grounds." Wash.Br.48. But the State ignores providers and facilities, as well as carriers' secular and religious clients. Nothing in Washington law requires *them* to facilitate abortion by providing an objectionable notice to employees. Also, the conscience law protects providers and facilities from being forced to pay for abortion or abortifacient-contraceptive coverage in any way, 2-ER-227, whereas "nothing … prevents the carrier from still charging [Cedar Park] for the service," 2-ER-263.

What's more, the carrier exception *is* broader. Under the conscience law, even if Cedar Park objects "to [abortion coverage] and doesn't want it as part of the package, 2-ER-253, "[t]he plan actually provides for access." 2-ER-257. Employees could still use the same insurance card for abortion coverage that they use for everything else. 2-ER-066, 069. That's not true of plans offered by religious carriers. In that scenario, "the Washington Department of Health … provide[s]

[abortion] services" separately to enrollees, 2-ER-234, and pays for them too, 2-ER-235. That gives religious carriers and their clients a higher degree of separation from facilitating abortion than churches like Cedar Park.

Given this laundry list of exceptions, Washington can't show that its abortion-coverage requirements are generally applicable. Whenever Washington allows health coverage for childbirth but not abortion, it undermines the State's asserted interests for imposing SB 6219 in a similar, if not identical, way. *Fulton*, 593 U.S. at 533; *accord* Wash.Br.45. It also begs the question why Washington is intent on imposing abortion-coverage requirements on houses of worship like Cedar Park when it makes real exceptions for many others, including hospital facilities, which employ significantly more people. 2-ER-220–21.

*Individualized exemptions.* In addition, SB 6219's proviso to conserve federal funding constitutes "a mechanism for individualized exemptions." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (quotation omitted). Washington "retains discretion to grant individualized exemptions," *FCA*, 82 F.4th at 687, to "a health plan or student health plan" whenever mandating abortion coverage would violate a federal funding condition, Wash. Rev. Code § 48.43.073(5). That discretion extends to the remedy, as Washington exempts each "plan to the minimum extent necessary for the state to be in

compliance." *Id.* State officials apply this exemption mechanism "on a case-by-case basis," 3-ER-308–09, and have "authority and discretion to choose how to implement" it, 4-ER-653. So Washington "admits that it retains (and exercises) significant discretion in applying" this exemption system, *FCA*, 82 F.4th at 687, and that officials "delve into the specific facts and circumstances" to do so, *id.* at 688. *Accord* 3-ER-308–09.

This Court has already established "that the *mere existence* of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable, regardless of the actual exercise." *FCA*, 82 F.4th at 687–88 (emphasis added). That's the case here. So strict scrutiny applies. *Id.* at 687; *accord Kennedy*, 597 U.S. at 526; *Fulton*, 593 U.S. at 540–41. Washington tries to dodge that conclusion. *E.g.*, Wash.Br.41–42. But its efforts fail for two main reasons. First, Washington's exemption system doesn't have to leave officials with "unfettered discretion" for SB 6219 to lack general applicability. *FCA*, 82 F.4th at 687. Second, it's not true that Washington's exemption system couldn't "possibly apply to Cedar Park[ ]." Wash.Br.42. The federal government initially concluded that California violated the Weldon Amendment by mandating abortion coverage in objecting church's health plans. HHS Office for Civil Rights, Notice of Violation – OCR Transaction Nos. 17-274771 & 17-283890 (Jan. 24, 2020), https://bit.ly/4cedy4t. Although that conclusion was

rescinded, HHS, State of California Letter (Aug. 13, 2021), https://bit.ly/49VgbpX, it shows the matter is hardly cut and dry.

Summed up, Washington's abortion-coverage requirements doubly lack general applicability because they "prohibit[ ] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way" and they "provide[ ] a mechanism for individualized exemptions." *Kennedy*, 597 U.S. at 526 (cleaned up). That means strict scrutiny applies. *Id.*

## C. Washington's abortion-coverage requirements aren't religiously neutral.

Cedar Park has already shown that SB 6219 was "motivated by animosity to religion or distrust of its practices." *FCA*, 82 F.4th at 693 (quotation omitted); OpeningBr.43–49. Washington can't dispute any of this. So it breezes past the law's "historical background" and the "specific series of events leading to [its] enactment." *Masterpiece Cakeshop,* 584 U.S. at 639; *accord* Wash.Br.53, 55. But those factors show palpable religious hostility. In fact, Washington's primary motivation for enacting SB 6219 was to counteract expanded federal religious accomodations issued after religious objectors filed (and won) dozens of lawsuits challenging the ACA's abortifacient-contraceptive mandate. OpeningBr.43–47. That's the definition of "impos[ing] regulations that are hostile to the religious beliefs of affected citizens" and "act[ing] in a manner that passes judgment upon or presupposes

the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop*, 584 U.S. at 638.

Washington's answer focuses on *Zubik* but misunderstands that case's result. Wash.Br.53. There was no kumbaya on remand. Religious objectors and the federal government reached an impasse, *supra* p.26 & n.3, which resulted in the expanded religious accomodations that Washington enacted SB 6219 to countermand.

Washington never disputes that SB 6219's effect was religious targeting. OpeningBr.47; *accord* Wash.Br.52–54. That's probably because the religious gerrymander is obvious. The State does answer Cedar Park's claim that SB 6219 suppresses much more religious conduct than necessary, but only by botching what the conscience law does. It's wrong to say that Washington doesn't force Cedar Park "to cover abortion and abortifacient contraceptives in [its] health plan[ ]." Wash.Br.54 (quotation omitted). Both the conscience law's language, Wash. Rev. Code § 48.43.065(3)(b) & (c), and the Insurance Commissioner's representative's testimony, 2-ER-253, 257, prove the opposite. *Accord supra* p.18.

Likewise, Washington's claim that "no record evidence [shows] that all employees share [Cedar Park's] beliefs" is false. Wash.Br.54. The verified complaint explains that all Cedar Park employees share its religious beliefs about the sanctity of human life, and they sign an agreement to conduct their professional and personal lives in accord

with them. 5-ER-760 (incorporating 5-ER-789–790). Because the verified complaint is specific, verified by Cedar Park's senior pastor, and based on his personal knowledge, it's treated as "an affidavit for purposes of summary judgment." *Moran v. Selig*, 447 F.3d 748, 759 n.16 (9th Cir. 2006).

When it comes to Cedar Park's claim that Washington law favors some religions over others, the State is again silent. OpeningBr.48–49; *accord* Wash.Br.52–54. But effectively putting up a sign that says "pro-life churches aren't welcome here" isn't an acceptable response to disagreements about abortion. Cedar Park "is a member of the community too." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017). And "official expressions of hostility to religion," like Washington's abortion-coverage requirements for pro-life churches, "are inconsistent with what the Free Exercise Clause requires and must be set aside." *FCA*, 82 F.4th at 690 (cleaned up).

Finally, Washington disputes the relevance of hostile comments made by SB 6219's sponsor, Wash.Br.53–54, and the legislature's refusal to provide churches any meaningful protection, *id.* at 52. To be clear, those factors are sufficient to show Washington's religious hostility, but they're not necessary. OpeningBr.46, 49. SB 6219's impetus was disapproving and penalizing religious opposition to abortion. OpeningBr.43–49. So the abortion-coverage requirement for religious objectors is a religious gerrymander anyway. *Lukumi*, 508 U.S.

at 533. Yet both factors are significant because they display religious animus, OpeningBr.49, and make clear that SB 6219's sponsor and the legislature as a whole *knew* that church's religious beliefs weren't effectively accommodated and *chose* to force them to violate those beliefs anyway.

Washington responds by invoking *Tingley*. Wash.Br.54. But that case is nothing like this one. There, legislators' negative comments were directed at a particular "mode of treatment" not "religious belief[s] [about] homosexuality" or merely quoted a "friend's words" about his personal experience with talk therapy. *Tingley*, 47 F.4th at 1086. The Court didn't view these "stray, out-of-context comments" as religiously hostile. *Id.*

Here, SB 6219's sponsor admitted the law's purpose was cancelling out expanded federal religious exemptions. OpeningBr.45–46. Responding to public concerns about the law's coercive effects and religious costs, the sponsor told churches to pound sand (or go to court) because only employees' abortion access mattered; their religious beliefs were irrelevant. *Id.* at 12, 46. The legislature echoed this disdain by rejecting meaningful religious exceptions to SB 6219 three times. *Id.* at 46. This evidence isn't stray or out of context. It's direct and forthright proof that Washington devised SB 6219 "to persecute or oppress a religion or its practices." *Lukumi*, 508 U.S. at 547.

Because SB 6219 isn't religiously neutral, the Court need not even apply strict scrutiny and should enjoin it for that reason alone. *Kennedy*, 597 U.S. at 525 n.1.

### D. Washington eschews any reliance on the law of the case or the rule of the mandate.

The district court relied on the law of the case and the rule of the mandate in rejecting Cedar Park's general-applicability arguments. 1-ER-021–23. But the court erred on both counts. OpeningBr.51–53. And Washington now abandons any reliance on the law of the case or the rule of the mandate in defending the judgment below. So there's no need for this Court to consider either issue on appeal.

### E. Washington's abortion-coverage requirements can't withstand strict scrutiny.

Strict scrutiny requires Washington to prove that restricting Cedar Park's religious liberty serves "a compelling interest" and is "narrowly tailored to that end." *Kennedy*, 597 U.S. at 532. This is the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). So the standard "is not watered down" but "really means what it says." *Tandon*, 593 U.S. at 65 (quotations omitted). Washington says it's met here, but that claim falls flat.

First, Washington says that "[c]omplaints to the Insurance Commissioner" about a lack of abortion or abortifacient-coverage "have *nothing to do with*" SB 6219's enactment. Wash.Br.55 (emphasis

added). So the State had no "actual problem in need of solving," SB 6219's "burden on [Cedar Park's] religious exercise [isn't] actually necessary to the solution," and Washington's case for strict scrutiny fails. *United States v. Christie*, 825 F.3d 1048, 1057 (9th Cir. 2016) (cleaned up).

Second, Washington asserts compelling interests in spades. Wash.Br.55–56. Yet the State cites only SB 6219's "legislative findings," which list "governmental purposes served by the law," Wash.Br.55, at a sky-high "level of generality," *Fulton*, 593 U.S. at 541. For instance, Washington highlights two particular concerns: (1) "providing better access to health benefits" and (2) "assuring women equal access to such goods, privileges, and advantages." Wash.Br.55 (cleaned up). Such "broadly formulated interests" are insufficient. *Fulton*, 593 U.S. at 541 (quotation omitted). It's not enough for the State to have "a compelling interest in enforcing [SB 6219] generally." *Id.* Washington must show that it has a compelling "interest in denying an exception *to" Cedar Park*. *Id.* But Washington never attempts that particularized showing. *E.g.*, Wash.Br.54–56. That's the end of the matter because the State bears the burden of establishing strict scrutiny is met. *Tandon*, 593 U.S. at 62.

Further, Washington can't show a compelling interest in denying Cedar Park an exception to SB 6219's requirements. Church employees all share Cedar Park's religious beliefs about human life and agree to

live consistently with those beliefs in public and private. 5-ER-760 (incorporating 5-ER-789–790). So Cedar Park's employees give express "consent to [church] government" and are "bound to submit to" the church's religious decision to exclude abortion and abortifacient-contraceptive coverage from its plan. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729 (1871). In this situation, Washington lacks any legitimate—let alone compelling—interest in inserting abortion coverage into Cedar Park's plan, especially as employees are extremely unlikely to use it. *Accord* Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 COLUM. L. REV. 1373, 1374 (1981).

Last, Washington's case for narrow-tailoring is virtually nonexistent and fails to carry its burden. Wash.Br.56. Nor could the State prevail on this score. Before enacting SB 6219's burdensome requirements, Washington never "even considered less restrictive measures" of furthering its interests, which means "it fails … the tailoring prong of the strict scrutiny test." *FCA*, 82 F.4th at 694. And the record is replete with examples of less burdensome alternatives. Washington could, for instance, totally exempt churches like it does providers, facilities, and whenever necessary to keep federal funds. Or the State could pay for entirely separate abortion coverage itself, as Washington does for enrollees in Providence's health plans. Both options would achieve the State's "interests in a manner that does not

burden religion." *Fulton*, 593 U.S. at 541. So SB 6219 doesn't clear the high bar of "least restrictive means." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (quotation omitted).

The upshot is that SB 6219 fails strict scrutiny, just like California's abortion-coverage requirements for churches. *Foothill Church v. Watanabe*, 623 F. Supp. 3d 1079, 1094–95 (E.D. Cal. 2022).

## F. The Free Exercise Clause's text, history, and tradition also demand a religious exception.

Without explanation, Washington chooses not to address the Free Exercise Clause's text, history, and tradition. *But see Kennedy*, 597 U.S. at 536–37. So it's undisputed that all three factors support a religious exception for Cedar Park. Nor could Washington prevail on the merits. OpeningBr.55–58. Textually, the Free Exercise Clause bars the State from "forbidding or hindering [Cedar Park's] unrestrained religious practices or worship," *Fulton*, 593 U.S. at 567 (Alito, J., concurring in the judgment). Yet SB 6219 does both. Historically, "[r]eligious objectors have always had the right to refuse to take up arms or to participate in executions." Life.Legal.Amicus.Br.2. Cedar Park views abortion as a similar type of voluntary killing. Traditionally, religious exemptions expand to cover additional takings of human life—from war service to abortion and then assisted suicide. *Id.* at 19–27. SB 6219's backtracking is inconsistent with our nation's legacy of protecting conscience rights.

In sum, whether courts apply *Smith*'s misguided rule or the proper text-history-and-tradition test, Cedar Park is entitled to a religious exception from SB 6219's abortion-coverage requirements.

## IV. Cedar Park is entitled to summary judgment on its church autonomy claim.

Washington castigates Cedar Park's religious-autonomy claim as "legally unsupportable," Wash.Br.21—without even engaging the myriad cases the church cites in support, OpeningBr.58–63. To show just how wrong that is, Cedar Park adds three more.

First, this Court says there are "cases where the burden on religious liberty is simply too great to be permissible" and "no compelling state interest can justify government intrusion." *Werft v. Desert Sw. Annual Conf. of the United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004) (per curiam) (cleaned up). That encapsulates Cedar Park's religious-autonomy claim.

Second, the Fifth Circuit says that churches have the "fundamental right ... to be free from government interference in their internal management and administration," and that this "constitutional mandate ... override[s]" contrary statutory provisions. *Combs v. Cent. Tex. Annual Conf. of the United Methodist Church*, 173 F.3d 343, 350–51 (5th Cir. 1999). Excluding abortion coverage from Cedar Park's heath plan is one of the internal management decisions that churches must be free to make without state interference.

Last, the Eleventh Circuit reversed a district court ruling that said no "ecclesiastical dispute" exists when a church challenges "financial, operational, and organizational disclosures" mandated by a charitable-solicitation law. *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1537 (11th Cir. 1993) (quotation omitted). These provisions, the court said, "directly violated" the constitutional "principle that civil authorities must abstain from interposing themselves in matters of church organization and governance." *Id.* The same is true here, where the district court said that abortion coverage—a more severe incursion of Cedar Park's religious autonomy—involved no "ecclesiastical decision." 1-ER-027.

Washington suggests that applying the church autonomy doctrine here would be unprecedented. Wash.Br.21. That's pure spin. What's extraordinary is imposing an abortion-coverage mandate on churches. Just four years ago, Washington told the Supreme Court that abortifacient-contraceptive mandates "raise[ ] distinct legal issues" as far as "houses of worship" are concerned. Combined Br. in Opp'n at 20 n.7, *Dep't of Health & Hum. Servs. v. California*, Nos. 19-1038, 19-1040, 19-1053 (U.S. Mar. 20, 2020), https://bit.ly/3nftjgE. The State sings a different tune now, but it was right the first time.

Church autonomy is why the federal government has always exempted houses of worship from the ACA abortifacient-contraceptive mandate. *Hobby Lobby*, 573 U.S. at 698; 80 Fed. Reg. 41,318, 41,325

(July 14, 2015). Neither Washington nor anyone else challenged that exemption, though they challenged plenty of others. *E.g.*, *California v. Azar*, 911 F.3d 558 (9th Cir. 2018). That's because *everyone agreed* that "Supreme Court precedent dictates a[n] … exemption for houses of worship." *Pennsylvania v. President United States*, 930 F.3d 543, 570 n.26 (3d Cir. 2019), *rev'd on other grounds by Little Sisters*, 140 S. Ct. at 2386.

So it's wholly unconvincing for Washington to claim that compelling Cedar Park to cover abortion in its health plan doesn't regulate the church's "internal management decisions" but "the broader insurance market." Wash.Br.21. If that were true, the federal exemption for houses of worship wouldn't exist. And courts would have rejected church autonomy claims related to terminating ministers, clergy salaries, and collective bargaining as regulations of the employment or labor market. OpeningBr.60, 63.

To be clear, Cedar Park isn't saying that churches have "general immunity from secular laws." Wash.Br.57 (quotation omitted). Cedar Park's position is that excluding abortion coverage is "an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012). Or, put differently, rejecting abortion coverage is an aspect "of church government" that is "closely linked" to Cedar Park's "faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-*

*Berru*, 140 S. Ct. 2049, 2060 (2020) (cleaned up). So Washington must respect Cedar Park's "autonomy" in that regard. *Id.*; *accord* Religious Organizations and the Law § 5:13 (2d) (Dec. 2023 Update) (church autonomy applies to "core administrative functions," including "supervision … of personnel" and "control of finances").

Washington offers no response. Wash.Br.56–58. It just treats Cedar Park like a secular for-profit business. "But a church is not the same thing as General Motors or some other Fortune 500 company." *Religious Organizations in the United States: A Study of Identity, Liberty, and the Law* at 808 (James Serritella et al., eds., 2006). Cedar Park was "formed to transmit, model[,] and live out the commitments of the faith," so the "message of [its] actions" needs to "match the confessions on [its] lips and in [its] heart[ ]." Kathleen A. Brady, *The Disappearance of Religion from Debates About Religious Accommodation*, 20 LEWIS & CLARK L. REV. 1093, 1110 (2017). Laws like SB 6219 that require Cedar Park "to assist prohibited conduct … interfere with [the church's] ability … to model and express [its] beliefs. *Id.*

None of this concerned the Washington Legislature because it was solely interested in employees' abortion coverage. OpeningBr.12–13. Yet churches are distinct from secular businesses. Cedar Park's employees "become[ ] a part of the church," "accept[ ] responsibility" for its "religious mission," and "submit to church authority in much the same way as a member." Laycock, *supra*, at 1408–09. Because they are the

church's hands and feet, Cedar Park's employees "owe[ ] a duty of undivided loyalty to [their] employer." *Id.* at 1407. And that's entirely fair because "employees signed on to do the work of the church and to further its mission." Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 U. ILL. L. REV. 839, 868 (2014).

Washington tries to skirt the key differences between churches and for-profit businesses by taking the "neutral principles of law" approach to a whole new level. Wash.Br.56. But *Jones v. Wolf*, 443 U.S. 595 (1979), can't bear the weight that Washington places on it. There, the Supreme Court allowed states "to adopt neutral principles of law as a means of adjudicating a church property dispute." *Id.* at 604. No church buildings or land are at issue here, so *Jones* is irrelevant. Certainly, Washington never explains how examining "deeds" or the law of "implied trusts" would help resolve this case. *Id.* at 600.

*Jones* is merely Washington's excuse for refusing to defer to Cedar Park on questions of faith and doctrine; specifically, SB 6219's harmful effects on both. That's a nonstarter. Even when it comes to property disputes, states must defer to "the authoritative ecclesiastical body" on "doctrinal issue[s]." *Id.* at 604. Washington can't leverage "neutral principles" to replace Cedar Park's answer to religious questions with its own. *Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich*, 426 U.S. 696, 721 (1976) (quotation omitted).

What matters here is SB 6219's devastating effects on religious autonomy. Other than a "ban on churches," the State's requirement that Cedar Park's health plan offer "its own workforce … what the church teaches to be sinful is one of the most serious invasions of church autonomy imaginable." Mark E. Chopko & Michael F. Moses, *Freedom to be a Church: Confronting Challenges to the Right of Church Autonomy*, 3 GEO. J. L. & PUB. POL'Y 387, 447 (2005). If Washington can force Cedar Park "in its own house to" facilitate abortion even though "repugnant to its deeply held religious convictions," then "no church … is safe from the ad hoc nullification of its religious practices and teaching at the hands of the state." *Id.* And that threatens Cedar Park's basic "ability … to exist and to engage its members and society in the church's message and mission." *Id.* at 448.

So a degree of separation between church and state is necessary. The religious autonomy doctrine enforces the boundary "between two separate polities, the secular and the religious," *Korte*, 735 F.3d at 677, ensuring "church[es]' sovereignty over [their] own affairs," *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 463 (D.C. Cir. 1996). In this respect, the doctrine enforces anti-commandeering principles like those guarding states against federal conscription. *Cf. Printz v. United States*, 521 U.S. 898, 928 (1997) (states are "independent and autonomous … entities," not "puppets of a ventriloquist Congress") (quotation omitted);

*New York v. United States*, 505 U.S. 144, 162 (1992) (Congress can't force states "to govern according to [its] instructions").

Washington says that none of this matters because church autonomy is confined to the ministerial exception. Wash.Br.57. That position isn't credible. The church autonomy doctrine originated in *Watson*, which the Supreme Court decided 141 years before it recognized the ministerial exception in *Hosanna Tabor*. 80 U.S. at 727–29. In fact, *Watson*'s principles morphed into Free Exercise Clause requirements 60 years before the ministerial exception took shape. *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). That the Constitution protects religious organizations "from secular control or manipulation" is not up for debate. *Id.* Yet Cedar Park isn't "telling anyone [else] what they can do with their" health plans, the church simply "refus[es] to provide" or facilitate abortion coverage itself. Laycock, *Religious Liberty*, *supra*, at 867.

SB 6219's broadside on religious autonomy reflects "a negative normative" view of churches and their influence. *Masterpiece Cakeshop*, 584 U.S. at 639 (cleaned up); *accord* Wash.Br.21, 58. But that perception is wrong. Overall, churches "interact[ ] with government institutions in ways that … help[ ] reduce what is bad and enhance what is good in societies." *Law, Religion, and Freedom: Conceptualizing a Common Right* at 292 (W. Cole Durham et al., eds., 2021). Their "[r]eligious ideas and motivations inspired abolitionism in the nine-

teenth century and the Social Gospel movement in the late nineteenth and early twentieth centuries." Brady, *supra*, at 1111. Churches also "played a role in the New Deal" and "[t]hey were an essential aspect of the Civil Rights movement." *Id.* Some houses of worship, like Cedar Park, oppose abortion. But that's no reason to demolish the Supreme Court's church autonomy doctrine.

Because the Constitution protects churches' autonomy to make internal management decisions that are closely linked to religious beliefs and doctrine, SB 6219's application to Cedar Park fails.

## V. Cedar Park merits a permanent injunction now.

Cedar Park has shown that it merits a permanent injunction now. OpeningBr.63–64. Washington opposes the church's request but offers no legitimate reason for doing so. Wash.Br.58–59. It seeks *another* remand and still more protected litigation. Five years is enough. This Court has "equitable discretion to reach an issue in the first instance." *Skyline*, 968 F.3d at 754 (quotation omitted). And it should do so here to prevent Cedar Park's irreparable harm from persisting after its merits claims are resolved. Cedar Park respectfully requests that the Court direct entry of a permanent injunction and final judgment in the church's favor to finally bring this litigation to an end.

## CONCLUSION

Cedar Park respectfully requests that the Court reverse the district court's summary-judgment order and final judgment in Washington's favor, reaffirm that the church has standing, hold that Cedar Park is entitled to summary judgment on its free-exercise and church-autonomy claims, and remand with instructions for the district court to issue a permanent injunction and final judgment barring Washington from enforcing its abortion and abortifacient-contraceptive-coverage requirements against Cedar Park and similar religious ministries.

Respectfully submitted,

Dated: March 22, 2024

By: */s/ Rory T. Gray*

KRISTEN K. WAGGONER
JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

JAMES A. CAMPBELL
KEVIN H. THERIOT
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85250
(480) 444-0020
jcampbell@ADFlegal.org
ktheriot@ADFlegal.org

DAVID A. CORTMAN
RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFlegal.org

*Counsel for Plaintiff-Appellant / Cross-Appellee*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2024, I electronically filed the foregoing Third Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Rory T. Gray*
Rory T. Gray

Attorney for Plaintiff-Appellant/Cross-Appellee

March 22, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35560, 23-5585

I am the attorney or self-represented party.

**This brief contains** | 13,115 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

⦿ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Rory T. Gray | **Date** | March 22, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*