Nos. 23-35560, 23-35585

# In the United States Court of Appeals for the Ninth Circuit

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

PLAINTIFF-APPELLANT/CROSS-APPELLEE,

V.

MYORN KREIDLER, IN HIS OFFICIAL CAPACITY AS INSURANCE COMMISSIONER FOR THE STATE OF WASHINGTON; JAY ROBERT INSLEE, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF WASHINGTON,

DEFENDANTS-APPELLEES/CROSS-APPELLANTS.

On Appeal from the United States District Court
for the Western District of Washington
Civil Case No. 3:19-cv-05181-BHS

**BRIEF OF *AMICUS CURIAE*
ETHICS AND PUBLIC POLICY CENTER
SCHOLAR ERIC KNIFFIN IN SUPPORT
OF DEFENDANTS-APPELLANT'S
PETITION FOR REHEARING EN BANC**

ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

April 14, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

INTEREST OF *AMICUS CURIAE* ........................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 2

ARGUMENT ........................................................................................................ 4

    I.   The panel majority rejected the church's claim that Washington's abortion mandate burdens its religious liberty. ............................................................................................ 4

    II.  The majority's analysis, as Judge Callahan's dissent shows, is at loggerheads with the Supreme Court's religious burden analysis in *Hobby Lobby*. ................................................. 7

    III. The panel majority incorrectly claimed that standing was not at issue in *Hobby Lobby*. ...................................................... 11

CONCLUSION ................................................................................................... 14

CERTIFICATE OF COMPLIANCE ......................................................... 15

CERTIFICATE OF SERVICE ................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Mineta,*
 534 U.S. 103 (2001)..............................................................................11

*Archdiocese of St. Louis v. Burwell,*
 28 F. Supp. 3d 944 (E.D. Mo. 2014)....................................................12

*Bernhardt v. Cnty. of Los Angeles,*
 279 F.3d 862 (9th Cir. 2002)................................................................11

*Braidwood Mgmt. Inc. v. Becerra,*
 627 F. Supp. 3d 624 (N.D. Tex. 2022), *aff'd*, 104 F.4th 930 (5th
 Cir. 2024) .............................................................................................12

*Burwell v. Hobby Lobby,*
 573 U.S. 682 (2014)......................................................................passim

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health &
 Hum. Servs.,*
 724 F.3d 377 (3d Cir. 2013) .......................................................... 11, 12

*Hobby Lobby Stores, Inc. v. Sebelius,*
 723 F.3d 1114 (10th Cir. 2013).............................................. 11, 12, 13

*Legatus v. Sebelius,*
 901 F.Supp.2d 980 (E.D. Mich. 2012).................................................12

*Tyndale House Publishers, Inc. v. Sebelius,*
 904 F.Supp.2d 106 (D.D.C. 2012) .......................................................12

## INTEREST OF *AMICUS CURIAE*[1]

Eric Kniffin is a scholar at the Ethics and Public Policy Center ("EPPC"), a nonprofit research institution dedicated to applying the Judeo-Christian moral tradition to critical issues of public policy, law, culture, and politics. EPPC works to promote a culture of life in law and policy, to defend the dignity of the human being from conception to natural death, and to protect religious liberty.

Eric Kniffin has served in the U.S. Department of Justice's Civil Rights Division, at the Becket Fund for Religious Liberty, and in private practice. For more than a decade, Eric represented religious employers in litigation against the U.S. Department of Health and Human Services' ("HHS") contraception mandate, which bears many similarities to the Washington abortion mandate at issue in this case. His Supreme Court amicus briefs in contraception mandate cases explore in detail the errors in HHS's and several circuit courts' claims that the mandate did not

---

[1] No party's counsel authored this brief, no one other than *amicus* and its counsel contributed money for this brief, and all parties have consented to its filing.

burden religious employers' religious exercise.² As a fellow in EPPC's Administrative State Accountability Project ("ASAP"), Eric works on a range of initiatives to protect and strengthen religious liberty.

### INTRODUCTION AND SUMMARY OF ARGUMENT

Cedar Park Assembly of God seeks judicial relief from Washington State laws and regulations that force it to either "directly" or "'indirectly facilitate[]' the provision of abortion services to its employees." Op.14,21. The majority panel accepts that Cedar Park's religious objections are sincere. Op.24. It also recognizes that "some tenuous connection may exist between the disapproving plaintiff and the offense-causing action."

---

² Brief for the Knights of Columbus as *Amicus Curiae*, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), https://www.scotusblog.com/wp-content/uploads/2016/01/Knights-of-Columbus-LSP-Amicus.pdf.

Brief for the Catholic Benefits Association and Catholic Insurance Company as *Amici Curiae*, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), https://www.scotusblog.com/wp-content/uploads/2016/01/Knights-of-Columbus-LSP-Amicus.pdf.

Brief for the Knights of Columbus as *Amicus Curiae*, *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367 (2020), https://www.supremecourt.gov/DocketPDF/19-431/138244/20200316132502671_Little%20Sisters%20v%20Penn%20Amicus%20Brief%20for%20Knights%20of%20Columbus%20in%20support%20of%20Petitioners.pdf.

Op.21. Even still, the majority concluded that this connection is too "attenuated" to give Cedar Park standing. Op.22.

As Judge Callahan notes in her dissent, the Supreme Court's decision in *Hobby Lobby v. Burrell*, 573 U.S. 682 (2014), "forecloses this reasoning." Op.33 (dissent). Though there are direct parallels between the religious employers' alleged burdens in these two cases, the majority's religious burden analysis here does not merely depart from the Supreme Court's reasoning; it actually matches the *Hobby Lobby* dissent beat-for-beat.

The panel majority offers little in response to Judge Callahan's devastating critique, or to explain its refusal to follow the Supreme Court's clear directive that "it is not for us to say that [Cedar Park's] religious beliefs are mistaken or insubstantial. Instead, our 'narrow function . . . is to determine' whether the line drawn reflects "an honest conviction." *Hobby Lobby*, 573 U.S. at 725. The most the majority could muster is the claim that *Hobby Lobby* "did not meaningfully address standing." Op.20 n.13. But while the Supreme Court did not explicitly discuss whether the religious plaintiffs had standing, the two circuit

3

decisions before the Court had done so, as did each of the parties' briefs in *Hobby Lobby*.

The panel majority got it wrong. It claims that Cedar Park has incorrectly concluded that Washington's abortion mandate burdens its religious exercise. But that directly conflicts with the Supreme Court's holding in *Hobby Lobby* that once a court finds that a religious employer has sincerely alleged that an insurance mandate burdens its religious exercise, its "narrow function" comes to an end. The Ninth Circuit should grant Cedar Park's petition to correct this clear error and affirm that Cedar Park has standing.

## ARGUMENT

**I. The panel majority rejected the church's claim that Washington's abortion mandate burdens its religious liberty.**

The panel majority held that Cedar Park Assemblies of God lacked standing to challenge Washington's abortion mandate because the law "enables insurance carriers to accommodate an employer's religious objections." Op.9. Though it recognized that Washington's Parity Act

requires all large group health plans to cover abortion,[3] the majority found that the State's conscientious-objection statute and accompanying regulations "exempt[] employers like Plaintiff from the consequences" of the state abortion mandate." Op.15. Insurance companies can "exclude[] direct coverage for abortion services" from an objecting religious employer's plan and "Washington insurers are free to offer . . . no-abortion health plans." Op.16,19. In short, "Washington's conscientious-objection statute and regulations operate to make Plaintiff's desired no-abortion health coverage possible." Op.16.

But the majority's claim that Washington "accommodate[s] an employer's religious objections" is confusing. Op.9. It admits that Washington guarantees employees "coverage for abortion through . . . the health plan provided by their employer," but then claims that the religious employer's plan "does not itself provide that coverage." Op.21. The majority claims this "distinction is not one of semantics, but of

---

[3] Washington's Parity Act functions as an abortion mandate because "the Affordable Care Act requires employes like [Cedar Park], which offer insurance to employers through a group health plan . . . and which have more than fifty employees, to provide health insurance that includes maternity coverage." Op.10.

5

substance." Op.21. But this distinction is more proclaimed than explained.

The majority reached these conclusions even as it recognized that Cedar Park sincerely thought this arrangement made it complicit with abortion. By Cedar Park's lights, the State's so-called "no-abortion plan" still requires the church to "'indirectly facilitate[]' the provision of abortion services to its employees." Op.21. And the majority found "no reason to doubt" the church's "sincerity." Op.24. It even admitted "some tenuous connection may exist between the disapproving plaintiff and the offense-causing action." Op.21. Nonetheless, the majority held that Cedar Park's alleged burden was too "attenuated" to support standing. Op.21,22.

As the majority saw it, Cedar Park's sincere religious objections were beside the point because what the church was really trying to do was control "the independent action of some third party not before the court." Op.19. It rejected Cedar Park's "'indirect facilitation' theory" as too "attenuated." Op.22. It claimed that Cedar Park's "claimed injury is premised entirely on speculation" and its "highly attenuated chain of possibilities does not satisfy the standing requirement." Op.23–24

6

(cleaned up). "The general disapproval of the actions that others might decide to take does not create standing, even when some tenuous connection may exist between the disapproving plaintiff and the offense-causing action." Op.21.

In short, the panel found that Cedar Pack lacked standing because it found that Washington law made "Plaintiff's desired no-abortion health coverage possible," disregarding the church sincere religious convictions to the contrary. Op.16.

## II. The majority's analysis, as Judge Callahan's dissent shows, is at loggerheads with the Supreme Court's religious burden analysis in *Hobby Lobby*.

Judge Callahan's dissent could be distilled down to two basic points. She begins "with what the district court called 'the crux' of Cedar Park's claimed injury, which is that the Parity Act requires Cedar Park to facilitate its employees' access to abortion coverage." Op.30 (dissent). Judge Callahan even notes the "majority does not dispute that Cedar Park's health plan under the Parity Act will provide abortion coverage." Op.31.

Second, Judge Callahan argued that the majority's claim that "this compelled facilitation of abortion coverage" is "too 'attenuated' to

7

establish a legally cognizable injury" cannot be squared with the Supreme Court's decision in *Hobby Lobby*. Op.31–32. Indeed, there are striking parallels between this case (involving a state abortion insurance mandate) and *Hobby Lobby* (involving a federal contraception insurance mandate). In both cases, government defended its mandate on the basis that it had already done enough to satisfy religious objectors and any remaining burden was too attenuated to support a viable claim.

Judge Callahan ably shows that Cedar Park's religious burden arguments are nearly identical to the arguments the Supreme Court credited in *Hobby Lobby*. In both cases, the requirement to "arrang[e] for [immoral] coverage did not simply mean having to 'pay' for it, but also included having to 'contract' for it." Op.33 (citing *Hobby Lobby*, 573 U.S. at 723 n.33).

> Thus, Cedar Park necessarily facilitates access to abortion simply by entering into a contract with an insurer servicing the State of Washington. For Cedar Park, like the employers in *Hobby Lobby*, this is tantamount to "cooperation in wrongdoing."

Op.34 (cleaned up). "[T]he thrust of Cedar Park's injury remains that it is actually 'providing' a health plan that covers abortion, contrary to its religious beliefs." Op.33.

8

Judge Callahan ably notes the powerful parallels between the alleged religious burdens in these two cases. Yet just as compelling are the remarkable similarities between the majority's reasoning here and the dissent in *Hobby Lobby*, which claimed:

> [T]he connection between the families' religious objections and the contraceptive coverage requirement is too attenuated to rank as substantial. The requirement carries no command that Hobby Lobby or Conestoga purchase or provide the contraceptives they find objectionable.

*Hobby Lobby*, 573 U.S. at 760 (Ginsburg, J., dissenting).

> Importantly, the decisions whether to claim benefits under the plans are made not by Hobby Lobby or Conestoga, but by the covered employees and dependents, in consultation with their health care providers. . . . "[N]o individual decision by an employee and her physician . . . is in any meaningful sense [her employer's] decision or action." *Grote v. Sebelius,* 708 F.3d 850, 865 (7th Cir. 2013) (Rovner, J., dissenting). It is doubtful that Congress, when it specified that burdens must be "substantia[l]," had in mind a linkage thus interrupted by independent decisionmakers (the woman and her health counselor) standing between the challenged government action and the religious exercise claimed to be infringed.

*Id.* at 760–61.

These same arguments—the core of panel majority's analysis—were squarely rejected by, and offered in counterpoint to, the Supreme Court's majority opinion. As Judge Callahan notes, the Court "explained how the contraceptive mandate demanded that the plaintiff corporation

9

engage in conduct that seriously violates their religious beliefs" by making the religious employers "arrange for such coverage." Op.32 (quoting *Hobby Lobby*, 573 U.S. at 720). "The Court recognized that arranging for contraceptive coverage did not simply mean having to 'pay' for it, but also having to 'contract' for it." Op.32–33 (quoting *Hobby Lobby*, 573 U.S. at 723 n.33).

The central takeaway from *Hobby Lobby*'s religious burden analysis, as Judge Callahan notes, is that courts must defer to the sincere testimony of religious parties as to what their religious convictions demand of them:

> The Court explained how the employers' belief that it was "immoral" to provide the contraceptive coverage "implicates a difficult question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of a moral act by another."

Op.33 (quoting *Hobby Lobby*, 573 U.S. at 724). Judge Callahan correctly determined that "*Hobby Lobby* forecloses" the majority's religious burden analysis. *Id*.

10

## III. The panel majority incorrectly claimed that standing was not at issue in *Hobby Lobby*.

The majority has little to offer in response to Judge Callahan's careful analysis and application of the Supreme Court's *Hobby Lobby* decision. It merely asserts, in a footnote, that the Supreme Court "did not meaningfully address standing." Op.20 n.13.

It is true that the Supreme Court did not explicitly hold that Hobby Lobby had standing.[4] Yet that threshold issue, which is never wholly absent from the Court's deliberations, was a central question surrounding the case. Both of the lower court decisions had explicitly discussed standing: the Tenth Circuit ruling en banc that religious plaintiffs' religious burden allegations were sufficient to support standing, while the Third Circuit held that nearly identical allegations did not. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013); *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of*

---

[4] *See Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001) ("We are obliged to examine standing *sua sponte* where standing has erroneously been assumed below."); *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002) (federal courts are "obliged to consider standing *sua sponte*" when it appears questionable, as standing implicates Article III jurisdiction).

11

*Health & Hum. Servs.*, 724 F.3d 377, 387 (3d Cir. 2013). Moreover, all three of the parties' briefs in *Hobby Lobby* included standing arguments. Pet. Br. at 28, 35; Resp. Br. at 12 n.6, 21, 32.15; Reply Br. at 12, *Hobby Lobby v. Burrell*, 573 U.S. 682 (2014).

Additionally, as Judge Jordan noted in his dissent from the Third Circuit's decision in *Conostoga*, many contraception mandate decisions discussed plaintiffs' religious liberty arguments as a standing issue. *Conestoga*, 724 F.3d at 398 (Jordan., J., dissenting) (citing *Hobby Lobby,* 723 F.3d at 1125–26); *Tyndale House Publishers, Inc. v. Sebelius,* 904 F.Supp.2d 106, 114–19 (D.D.C. 2012); *Legatus v. Sebelius,* 901 F.Supp.2d 980, 987–90 (E.D. Mich. 2012)). In this context, the panel's claim that *Hobby Lobby* has nothing to say about standing is unconvincing.

Since *Hobby Lobby*, courts have continued to hold that alleged religious burdens connected to insurance mandates are sufficient to grant religious plaintiffs standing. *See Archdiocese of St. Louis v. Burwell*, 28 F. Supp. 3d 944, 951 (E.D. Mo. 2014) ("Plaintiffs' injury arises when the provision of contraceptive coverage has been facilitated by their actions and their beliefs have thereby been violated. This constitutes a sufficient injury to satisfy the constitutional minimum of standing."); *Braidwood*

12

*Mgmt. Inc. v. Becerra*, 627 F. Supp. 3d 624, 636–37 (N.D. Tex. 2022), *aff'd*, 104 F.4th 930 (5th Cir. 2024) ("the mandates force Braidwood to underwrite coverage for services to which it holds sincere religious objections. This injury is distinct from the pocketbook injury Braidwood would incur in paying for the objectionable services. . . . "[I]t is beyond question" that religious employers have Article III standing to challenge a government mandate that infringes on their religious liberties "by requiring them to lend what their religion teaches to be an impermissible degree of assistance to the commission of what their religion teaches to be a moral wrong." *Hobby Lobby*, 723 F.3d at 1154 (Gorsuch, J., concurring)).

The majority panel's efforts to distinguish the Supreme Court's decision in *Hobby Lobby* hang on its claim that the Court's decision had nothing to do with standing and has no bearing on the standing analysis here. That claim misses the context of the Supreme Court's decision in Hobby Lobby and the way that courts have evaluated religious employers' standing in similar insurance mandate cases.

13

## CONCLUSION

The Court should grant the petition and affirm that Cedar Park has standing to challenge Washington State's abortion mandate.

Respectfully submitted,

s/ Eric N. Kniffin
ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

APRIL 14, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) and 9th Circuit Rule 29-2(c)(2) because this brief contains 2,437 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word Version 2503 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: April 14, 2025

                                              s/ Eric N. Kniffin
                                              Eric N. Kniffin
                                              *Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2025, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

Dated: April 14, 2025

                                              s/ Eric N. Kniffin
                                              Eric N. Kniffin
                                              *Counsel for* Amicus Curiae