**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

*Plaintiff-Appellant / Cross-Appellee*,

v.

PATTY KUDERER, in her official capacity as Insurance Commissioner for the State of Washington; BOB FERGUSON, in his official capacity as Governor of the State of Washington,

*Defendants-Appellees/Cross-Appellants*.

Nos. 23-35560
23-35585

D.C. No.
3:19-cv-05181-BHS

OPINION

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted August 15, 2024
Opinion Filed March 6, 2025
Opinion Withdrawn July 29, 2025
Argued and Submitted January 8, 2026
San Francisco, California

Filed September 14, 2026

Before: Susan P. Graber, Consuelo M. Callahan, and Lucy H. Koh, Circuit Judges.

Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by Judge Callahan

## SUMMARY*

### Standing / Free Exercise

The panel affirmed the district court's summary judgment for Washington state defendants, in an action brought by Cedar Park Assembly of God of Kirkland, Washington ("Cedar Park"), alleging that Washington's Reproductive Parity Act of 2018 (the "Parity Act") and Washington's thirty-year-old conscience statute violate the Free Exercise Clause and Cedar Park's right to religious autonomy.

The Parity Act requires insurance carriers to include, in the health plans that they offer, coverage for all federally approved contraceptives and, if maternity care is covered, for abortions. The Parity Act's 2019 implementing regulations do not diminish or affect any rights provided under Washington's conscience statute, which shields an employer that buys health insurance from any requirement to purchase coverage for a health care service to which the

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

employer objects on either religious or moral grounds. Thus, notwithstanding the Parity Act, the conscience statute enables health carriers to accommodate religious or moral objections to abortion by offering tailored health plans that exclude coverage for abortion services.

Cedar Park is a church that objects, on religious grounds, to abortion and to some forms of contraception. As an employer, Cedar Park purchases for its employees group health insurance that covers comprehensive maternity care. Cedar Park challenges the validity of the Parity Act and the conscience statute, alleging the laws violate the Free Exercise Clause and the Church Autonomy Doctrine to the extent that they require Cedar Park to provide coverage for, pay for, or facilitate access to abortion and certain contraceptives, either directly or indirectly.

In a prior opinion, the panel held that Cedar Park failed to prove standing on the summary judgment record, vacated the district court's judgment, and remanded with instructions to dismiss the action for lack of standing. However, after the Supreme Court issued its decision in *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025), the panel vacated its opinion and reheard oral argument.

The panel first held that in light of the Supreme Court's decision in *Diamond*, Cedar Park's contention that the Parity Act caused it to facilitate abortion indirectly suffices to establish Article III standing.

Turning to the free exercise claim, the panel assumed, without deciding, that Cedar Park established that the challenged laws burden its religious exercise because Cedar Park presently cannot acquire an abortion-excluding plan that it believes would insulate it from the possibility of facilitating access to abortion.

The panel next held that the challenged laws are neutral and generally applicable. As to neutrality, the panel considered the stated objects, text, surrounding circumstances at the time of enactment, and real-world operation, and held that Cedar Park failed to show that the challenged laws target religious conduct or are otherwise the product of hostility toward religion. The panel next analyzed the challenged laws for underinclusiveness and individualized exemptions and concluded that the laws are generally applicable.

Because the challenged laws are neutral and generally applicable, rational basis review applies and Cedar Park concedes that the laws satisfy that standard. Accordingly, the panel held that Cedar Park's free exercise claim fails.

Finally, the panel held that the challenged laws do not violate the church autonomy doctrine because the statutes in question do not deal with employment at the church itself or with matters of internal church governance.

Concurring in part and dissenting in part, Judge Callahan agreed with the majority's conclusion that Cedar Park has standing to sue Washington, but stated the majority erred in holding that Washington's law is consistent with the Constitution. In her view, Washington's law burdens Cedar Park's religious exercise, is neither neutral nor generally applicable, and cannot satisfy the high bar of strict scrutiny. The law thus runs afoul of the First Amendment.

## COUNSEL

Rory T. Gray (argued) and David A. Cortman, Alliance Defending Freedom, Lawrenceville, Georgia; John J. Bursch and Kristen K. Waggoner, Alliance Defending Freedom, Washington, D.C.; James A. Campbell and Kevin H. Theriot, Alliance Defending Freedom, Scottsdale, Arizona; for Plaintiff-Appellant.

Tera M. Heintz (argued), Deputy Solicitor General; Cristina Sepe, Assistant Attorney General; Marta DeLeon, Senior Assistant Attorney General; Robert W. Ferguson, Attorney General; Office of the Washington Attorney General, Olympia, Washington; for Defendants-Appellees.

Joseph D. Spate, Benjamin M. McGrey, and Thomas T. Hydrick, Assistant Deputy Solicitors General; J. Emory Smith Jr., Deputy Solicitor General; Robert D. Cook, Solicitor General; Alan Wilson, South Carolina Attorney General; Office of the South Carolina Attorney General, Columbia, South Carolina; Steve Marshall, Alabama Attorney General, Office of the Alabama Attorney General, Montgomery, Alabama; Treg Taylor, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little Rock, Arkansas; James Uthmeier, Florida Attorney General, Office of the Florida Attorney General, Tampa, Florida; Christopher M. Carr, Georgia Attorney General, Office of the Georgia Attorney General, Atlanta, Georgia; Raúl R. Labrador, Idaho Attorney General, Office of the Idaho Attorney General, Boise, Idaho; Brenna Bird, Iowa Attorney General, Office of the Iowa Attorney General, Des Moines, Iowa; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Jeff Landry and Liz

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 6 of 110



Murrill, Louisiana Attorneys General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Andrew Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Jefferson City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Marty Jackley, South Dakota Attorney General, Office of the South Dakota Attorney General, Pierre, South Dakota; Jonathan Skrmetti, Tennessee Attorney General, Office of the Tennessee Attorney General, Nashville, Tennessee; Ken Paxton, Texas Attorney General, Office of the Texas Attorney General, Austin, Texas; Derek Brown, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Jason Miyares, Virginia Attorney General, Office of the Virginia Attorney General, Richmond, Virginia; Patrick Morrisey and John B. McCuskey, West Virginia Attorneys General, Office of the West Virginia Attorney General, Charleston, West Virginia; for Amici Curiae the State of South Carolina and 17 Other States.

Deborah J. Dewart, Hubert, North Carolina, for Amicus Curiae NC Values Institute.

James Bopp Jr. and Richard E. Coleson, The Bopp Law Firm PC, Terre Haute, Indiana, for Amicus Curiae Oregon Right to Life.

Christopher T. Holinger, Robertson Center for Constitutional Law, Virginia Beach, Virginia, for Amicus Curiae Robertson Center for Constitutional Law.

Ryan Lawson and Emily Jones, Jones Law Firm PLLC, Billings, Montana, for Amicus Curiae Montana Public Policy Center, Inc..

Catherine W. Short and Sheila A. Green, Life Legal Defense Foundation, Ojai, California, for Amicus Curiae Life Legal Defense Foundation.

Daniel W. Bowers, Hilty Bower Haws & Seable PLLC, Nampa, Idaho; William C. Duncan, Sutherland Institute, Salt Lake City, Utah; for Amicus Curiae Sutherland Institute.

Noel J. Francisco, Christopher C. Pagliarella, and Megan L. Owen, Jones Day, Washington, D.C.; Eric C. Rassbach, The Hugh and Hazel Darling Religious Liberty Clinic, Pepperdine University, Caruso School of Law, Malibu, California; for Amici Curiae Christian Legal Society and The Becket Fund for Religious Liberty.

Francesca G. Matozzo and John Meiser, Notre Dame Law School Religious Liberty Clinic, Notre Dame, Indiana, for Amicus Curiae Notre Dame Law School Religious Liberty Clinic.

Samuel T. Grover and Samantha F. Lawrence, Freedom From Religion Foundation Inc., Madison, Wisconsin, for Amicus Curiae Freedom From Religion Foundation.

Bradley Girard and Jenny Samuels, Americans United for Separation of Church and State, Washington, D.C., for Amici Curiae Americans United for Separation of Church and State, The Interfaith Alliance, The Reconstructionist Rabbinical Association, and The Sikh Coalition.

Aida Babahmetovic and Brennen Johnson, Johnson Graffe Keay Moniz & Wick LLP, Seattle, Washington; Christine L. Stanley and Richard Muniz, Planned Parenthood Great

Northwest Hawaii Alaska Indiana Kentucky, Seattle, Washington; Julia Z. Marks, Legal Voice, Seattle, Washington; for Amici Curiae Planned Parenthood Great Northwest Hawaii Alaska Indiana Kentucky, Cedar River Clinics, and Legal Voice.

Taryn M. Darling and Adrien Leavitt, American Civil Liberties Union of Washington Foundation, Seattle, Washington, for Amici Curiae American Civil Liberties Union of Washington Foundation and Northwest Health Law Advocates.

Eric N. Kniffin, Ethics and Public Policy Center, Washington, D.C., for Amicus Curiae Ethics and Public Policy Center Scholar Eric Kniffin.

---

## OPINION

GRABER, Circuit Judge:

Plaintiff Cedar Park Assembly of God of Kirkland, Washington, is a church that objects, on religious grounds, to abortion and to some forms of contraception. As an employer, Plaintiff purchases for its employees group health insurance that covers comprehensive maternity care. Plaintiff challenges the validity of the Reproductive Parity Act of 2018 (the "Parity Act"), a Washington statute that regulates health insurance carriers. The Parity Act requires carriers to include, in the health plans that they offer, coverage for all federally approved contraceptives and, if the health plan covers maternity care, for abortions. Plaintiff also challenges Washington's thirty-year-old conscience statute, which shields an employer that buys health insurance

from any requirement to purchase coverage for a health care service to which the employer objects on either religious or moral grounds. Plaintiff alleges that those laws, taken together, violate the Free Exercise Clause of the First Amendment and Plaintiff's right to religious autonomy to the extent that they require Plaintiff to provide coverage for, pay for, or facilitate access to abortion and certain contraceptives, either directly or indirectly.

The district court held that Plaintiff had standing, but on the merits the court granted summary judgment in favor of Defendants, Washington's insurance commissioner and governor. Plaintiff timely appealed the grant of summary judgment to Defendants, and Defendants timely cross-appealed, arguing that the court erred in its standing analysis. Reviewing de novo, Gonzalez v. U.S. Immigr. & Customs Enf't, 975 F.3d 788, 802 (9th Cir. 2020), we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. Statutory and Regulatory Framework

#### 1. Health Care Facilities, Providers, and Carriers

Washington law describes the distinct roles that health care facilities, health care providers, and health insurance carriers generally play in Washington's health care industry in connection with employers' group insurance plans.

Health care facilities and providers supply health care services to insured individuals. "Health care facilit[ies]" include, among other things, hospitals, nursing homes, and mental health centers. Wash. Rev. Code § 48.43.005(29). The term "health care provider" means a person who is licensed "to practice health or health-related services," such as a doctor. Id. § 48.43.005(30). And Washington law defines "health care service" by reference to health care

facilities and providers: "'Health care service' means that service offered or provided by health care facilities and health care providers relating to the prevention, cure, or treatment of illness, injury, or disease." Id. § 48.43.005(31).

By contrast, health carriers sell health insurance. A "health carrier" includes "an insurance company, insurance service, or insurance organization" that is licensed to provide insurance in Washington and, accordingly, is subject to Washington's insurance regulations. Id. § 48.43.005(32) (defining "[h]ealth carrier," in part, by reference to the term "issuers" as used in 42 U.S.C. §§ 18001–18122); see 42 U.S.C. § 18111 (adopting definitions contained in 42 U.S.C. § 300gg-91); 42 U.S.C. § 300gg-91(b)(2) (defining "health insurance issuer"). Carriers offer and sell "health plans" to employers. A "health plan" is "any policy, contract, or agreement offered by a health carrier to provide, arrange, reimburse, or pay for health care services." Wash. Rev. Code § 48.43.005(33). But the term does not include, among other things, "[e]mployer-sponsored self-funded health plans," supplemental Medicare and Tricare plans, "short-term limited purpose or duration" plans, or "coverage incidental to a property/casualty liability insurance." Id. § 48.43.005(33)(b), (c), (f), (j), (l). An employer purchases and maintains a health plan by paying the carrier a "premium," defined broadly to include any assessment, fee, or charge. See id. § 48.43.005(43).

In sum, an employer like Plaintiff pays a premium to a health carrier in exchange for a health plan that provides coverage to enrolled employees for certain health care services. If an enrolled employee accesses covered services through a health care facility or provider under the health

plan, the carrier—not the employer—pays for those services.[1]

2. The Conscience Statute

Washington's legislature enacted the conscience statute more than three decades ago. An Act Relating to Health Care Reform Improvement ("Conscience Statute"), ch. 265, § 25, 1995 Wash. Sess. Laws 30–31 (codified at Wash. Rev. Code § 48.43.065). That statute aims to balance "the right of conscientious objection to participating in specific health care services" with "the right of individuals enrolled with [health] plans. . . to receive the full range of services" that Washington law recognizes as essential. Wash. Rev. Code § 48.43.065(1). It does so by shielding entities from any requirement to provide, pay for, or purchase coverage for health care services to which they object on religion- or conscience-based grounds while, at the same time, ensuring that all enrollees in health plans receive coverage for and access to essential health care services.

The conscience statute contains two provisions that insulate different entities from any requirement to participate in health care services that they find objectionable. Section 2(a) protects organizations that provide or pay for health care services. Health care facilities and providers cannot be required "to participate in the provision of . . . specific service[s] if they object to so doing for reason of conscience or religion." Id. § 48.43.065(2)(a). And "religiously sponsored health carrier[s]" cannot be required "to participate in the . . . payment for" health care services to

[1] Depending on the health plan's cost-sharing terms—such as co-payments and deductibles, see id. § 48.43.005(20)—the employee also may pay a set amount to access health care services.

which they object. Id. By contrast, section 3(a) protects entities that "purchase" insurance: "[n]o individual or organization with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion." Id. § 48.43.065(3)(a).

Notwithstanding an entity's religious or moral objection, the conscience statute and its implementing regulations require that enrollees in health plans receive timely access to all essential health care services. If an employer objects to purchasing coverage for particular services, the employer's health carrier is responsible for ensuring that individual enrollees have access to the objected-to services and for notifying enrollees about how to obtain those services. See id. § 48.43.065(3)(c); Wash. Admin. Code § 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(1), (3). The carrier might include a notice in an enrollee's health plan documents stating, for example, "Your employer does not provide coverage for these services; however, you can still access them through us, your carrier," and provide a phone number to call for additional information.[2] If a religiously sponsored health carrier itself objects to paying for specific health care services, it is not required to do so, but it still must ensure that enrollees in its health plans have timely access to those objected-to services and must notify enrollees about how to obtain them. Wash. Rev. Code § 48.43.065(2)(b); Wash. Admin. Code § 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(2), (3).

---

[2] Kim Tocco, Forms Program Manager of the Office of the Insurance Commissioner, noted a large-group, abortion-excluding health plan that Kaiser Health Plan Foundation of the Northwest ("Kaiser Northwest") offered outside King County, and she described that plan's mechanism to notify enrollees about how to access objected-to abortion services.

Implementing the conscience statute is thus the responsibility of the health carrier, not the organization that purchases coverage. Based on its business model and its negotiations with the health plan's purchaser, the carrier determines how to provide enrollees with access to essential services that are excluded from the purchaser's health plan due to a religious or moral objection. Before offering a tailored plan, however, the carrier must submit the plan to Washington's insurance commissioner for approval. See Wash. Admin. Code § 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(1) (requiring a health carrier to "file for [a health plan] a full description of the process it will use to recognize an organization['s] . . . exercise of conscience based on a religious belief or conscientious objection to the purchase of coverage for a specific service"); id. § 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(2) (requiring a religiously sponsored health carrier that objects to participating in the provision of certain health care services in its health plan to "file for such a plan a description of the process by which enrollees will have timely access to all services"). The insurance commissioner must approve the carrier's proposed process for implementing the conscience statute if that process (1) complies with the conscience statute's requirement to notify enrollees about their rights to access coverage for services excluded from their health plan outside that plan, (2) ensures that enrollees' access to those services is not impaired, and (3) "relies on sound actuarial principles to distribute risk." Id. § 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(3).

3. The Parity Act

Washington enacted the Parity Act in 2018. Reproductive Parity Act, ch. 119, 2018 Wash. Sess. Laws 689 (codified at Wash. Rev. Code §§ 48.43.072, 48.43.073). That law regulates health carriers and makes reproductive health care services, such as contraceptives and abortion,

more accessible. Id. The legislature found that access to reproductive health care services "provides all Washingtonians with the opportunity to lead healthier and more productive lives," id. § 1(2), and that "[r]estrictions and barriers to health coverage for reproductive health care have a disproportionate impact on low-income women, women of color, immigrant women, and young women," who are "often already disadvantaged in their access to resources, information, and services necessary to prevent an unintended pregnancy or to carry a healthy pregnancy to term," id. § 1(5).

The Parity Act applies to all "health plans" issued or renewed in Washington after January 1, 2019. Wash. Rev. Code §§ 48.43.072(1) (2018), 48.43.073(1) (2018); 2018 Wash. Sess. Laws at 691–92. Read in isolation, without reference to Washington's conscience statute or the Parity Act's implementing regulations, the Parity Act would appear to require health carriers to include coverage for abortion services in all the health plans that they offer to Washington employers if the employers are covered by the federal Patient Protection and Affordable Care Act, 42 U.S.C. §§ 18001–18122 ("Affordable Care Act"). That is because the Affordable Care Act requires employers like Plaintiff—who have more than 50 employees and who choose to purchase a group health plan for those employees—to provide health insurance that includes maternity care coverage. See 26 U.S.C. § 4980H; 42 U.S.C. § 18022(b)(1)(D). And the Parity Act, in turn, requires health plans that cover maternity care to provide

"substantially equivalent coverage to permit the abortion of a pregnancy." Wash. Rev. Code § 48.43.073(1)(a).[3]

The Parity Act also requires that health plans provide coverage for all contraceptives approved by the Food and Drug Administration and for all related services. Id. § 48.43.072(1)(a), (c). That provision covers some contraceptives the use of which runs counter to Plaintiff's religious beliefs.[4]

4. The Implementation of the Challenged Laws

In November 2019, less than a year after the Parity Act took effect, Washington's insurance commissioner issued an implementing regulation to clarify that the Parity Act "does not diminish or affect any rights" provided under the conscience statute. 19-24 Wash. Reg. 39 (Nov. 26, 2019); Wash. Admin. Code § 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(3) (effective Dec. 27, 2019). Thus, notwithstanding the Parity Act, the conscience statute enables health carriers to accommodate religious or moral objections to abortion by offering tailored health plans that exclude coverage for abortion services. As Ms. Tocco—the Forms Program Manager of the Office of the Insurance Commissioner—explained, large employers "have the

[3] An implementing regulation clarifies that, "[f]or the coverage to be substantially equivalent, a health plan . . . must not apply coverage limitations differently for abortion and related services than for maternity care and its related services unless the difference provides the enrollee with access to care and treatment commensurate with the enrollee's specific medical needs, without imposing a surcharge or other additional cost to the enrollee." Wash. Admin. Code § 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(2)(a).

[4] For convenience and brevity, the remainder of this opinion discusses Plaintiff's challenge to the Parity Act's abortion-services provision only. But the same analysis applies to Plaintiff's challenge to the Parity Act's provision pertaining to contraceptives.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 16 of 11



ability to negotiate certain terms" in the health plan they purchase, such as whether abortion coverage is provided. Since 2019, the insurance commissioner has approved several group health plans that do not cover abortion. Ms. Tocco testified that the insurance commissioner has approved "[m]ore than five" health plans that do not cover abortion, including a "small group health plan offered by Premera." Similarly, she testified that the insurance commissioner has approved a large-group, abortion-excluding health plan offered by Kaiser Northwest and that "Providence continues to offer products in the large group market that exclude abortion."

In practice, a carrier may offer an abortion-excluding health plan in two situations. First, a carrier that does not object to paying for abortion services may choose to provide an abortion-excluding plan to an organization that does object to purchasing abortion coverage. In that situation, the carrier must notify enrollees in the organization's health plan about how to access abortion services, and the carrier must provide coverage for those services. See Wash. Rev. Code § 48.43.065(3); Wash. Admin. Code § 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(1), (3). Second, a religiously sponsored health carrier, such as Providence Health Plan, may itself object to paying for abortion services and, accordingly, refuse to provide a health plan that includes abortion coverage. In that situation, the religiously sponsored health carrier still must notify enrollees about how to obtain access to covered abortion services outside the plan. See Wash. Rev. Code § 48.43.065(2)(b); Wash. Admin. Code § 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(2), (3). But the religiously sponsored health carrier is exempt from the conscience statute's additional requirement that a carrier offering an abortion-excluding plan pay for abortion services that enrollees obtain. See Wash. Rev. Code

§ 48.43.065(2)(a), (3)(b); Wash. Admin. Code § 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(1). Enrollees in a religiously sponsored health carrier's abortion-excluding plan, however, still have access to covered abortion services. For example, when an enrollee in a Providence plan seeks an abortion, Providence refers the enrollee to the Washington Department of Health, which pays for that health care service.

If a health carrier offers a plan that does not comply with either of the challenged laws, the carrier may be subject to financial penalties or criminal liability. See Wash. Rev. Code § 48.01.080. Plaintiff concedes, however, that an employer would not be subject to punishment under Washington's laws if it purchased a noncompliant plan. Contra Dissent at 70.

B. Plaintiff and Its Health Plan

Plaintiff is a Christian church with hundreds of members and a large team of employees. It provides health insurance to about 140 people and believes that it has a religious obligation to do so. Plaintiff holds a sincere religious belief that abortion is sinful.

Before the Parity Act's passage, Plaintiff held a group health plan from Kaiser Foundation Health Plan of Washington ("Kaiser Washington") that excluded abortion coverage.[5] In the summer of 2019—after the enactment of the Parity Act but before the insurance commissioner promulgated the implementing regulation that clarified that

[5] Kaiser Washington is not the same entity as Kaiser Northwest, referenced above. Kaiser Washington sells health plans in King and Snohomish Counties, among others, which is where Plaintiff operates. Kaiser Northwest sells health plans in Washington only in Clark and Cowlitz Counties.

conscience-based exemptions are available—Kaiser Washington said that it would not accommodate that exclusion. Allegedly unable to find a suitable replacement, Plaintiff agreed to renew its Kaiser Washington plan even though that plan would cover abortion services from that point forward. Plaintiff continues to hold a plan with Kaiser Washington that covers abortion services.

C. Procedural History

Plaintiff initiated its challenge to the Parity Act in March 2019, and it filed the operative complaint in October of that year. At the pleading stage, the district court dismissed Plaintiff's relevant claims for lack of standing. We reversed, holding that Plaintiff plausibly alleged an injury in fact that was fairly traceable to the Parity Act. Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler, 860 F. App'x 542, 543 (9th Cir. 2021) (unpublished). On remand, the parties engaged in discovery and filed cross-motions for summary judgment. The district court reached the merits of the dispute and entered summary judgment in favor of Defendants. Plaintiff timely appealed, and Defendants, arguing once more that Plaintiff had failed to establish constitutional standing, timely cross-appealed.

We initially held that Plaintiff had failed to prove standing on the summary judgment record, vacated the district court's judgment, and remanded with instructions to dismiss the action for lack of standing. Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler, 130 F.4th 757, 764–69 (9th Cir. 2025). But after the Supreme Court issued its decision in Diamond Alternative Energy, LLC v. EPA, 606 U.S. 100 (2025), we vacated our opinion and reheard oral argument. Cedar Park Assembly of God of

Kirkland, Wash. v. Kuderer, Nos. 23-35560, 23-35585, 2025 WL 2112922 (9th Cir. July 29, 2025) (order).

DISCUSSION

Our discussion proceeds as follows. We first conclude that Plaintiff has Article III standing. On the merits, we assume, without deciding, that Plaintiff has shown a burden on its religious exercise, even though Plaintiff had opportunities to purchase a health plan that does not cover abortion services under which it would not pay, either directly or indirectly, for such services. But the challenged laws are neutral and generally applicable, and Plaintiff concedes that the laws satisfy rational basis review. Accordingly, we conclude that Plaintiff's free exercise claim fails. Finally, we conclude that the challenged laws do not violate the church autonomy doctrine.

A. Article III Standing

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Jones v. L.A. Cent. Plaza LLC, 74 F.4th 1053, 1057 (9th Cir. 2023) (alteration in original) (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000)). We initially held that Plaintiff had failed to prove standing on the summary judgment record. Cedar Park Assembly of God, 130 F.4th at 764–69. Plaintiff argued that it had standing because the Parity Act caused it to facilitate abortion indirectly. We viewed that theory as too attenuated, because "the Parity Act does not increase the theoretical

possibility that an employee or a member of an employee's family would seek an abortion," but instead merely creates a system in which "providing a group health plan might potentially make an employee's hypothetical abortion more affordable than it would be if the employer self-insured." Id. at 768.

In light of Diamond, Plaintiff's theory of indirect facilitation suffices to establish standing. It is a "commonsense economic realit[y]" that, if abortion services were more affordable, Plaintiff's employees or their family members would be more likely to access those services. Diamond, 606 U.S. at 116; see also First Choice Women's Res. Ctrs., Inc. v. Davenport, 146 S. Ct. 1114, 1125 (2026) ("[C]ourts may make 'commonsense inferences' when assessing Article III standing, including inferences about 'third party behavior.'" (quoting Diamond, 606 U.S. at 116)). Because Plaintiff has standing for that reason, we need not and do not consider Plaintiff's other theories as to why it has standing. See Biden v. Nebraska, 600 U.S. 477, 489 (2023) (so holding).

B. Free Exercise of Religion

The Free Exercise Clause of the First Amendment, which applies to the States under the Fourteenth Amendment, Youth 71Five Ministries v. Williams, 160 F.4th 964, 978 (9th Cir. 2025), petition for cert. filed, No. 25-776 (U.S. Dec. 23, 2025), provides that "Congress shall make no law . . . prohibiting the free exercise" of religion, U.S. Const. amend I. The right to exercise one's religion freely, however, "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." Tingley v. Ferguson, 47 F.4th 1055, 1084 (9th Cir. 2022) (quoting Emp. Div., Dep't of Hum. Res. of Or. v. Smith, 494

U.S. 872, 879 (1990)). Thus, even if a law "has the incidental effect of burdening a particular religious practice," we apply rational basis review so long as the law is neutral and generally applicable. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993); see Tingley, 47 F.4th at 1084. For strict scrutiny to apply, Plaintiff must demonstrate that "a government entity has burdened [its] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 525 (2022) (citation omitted).[6]

We address the issues of burden, neutrality, and general applicability in turn.

1. Burden

A burden on religion exists when the government "coerce[s]" individuals "into violating their religious beliefs." Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 449 (1988). Plaintiff contends that the challenged laws burden its religious practice by coercing it to (a) provide insurance coverage for abortion, (b) pay directly or indirectly for abortion services, or (c) facilitate access to abortion services. We conclude that Plaintiff has not shown that the challenged laws pressure it to provide insurance

[6] In Kennedy, the Supreme Court stated that "[a] plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening free exercise." Id. at 525 n.1 (emphasis added) (quoting Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n, 584 U.S. 617, 639 (2018)). In the context of challenges to legislation, however, we have built the "hostility" inquiry into our analysis of neutrality. See Tingley, 47 F.4th at 1086 (concluding that a legislator's comments "d[id] not show a hostility toward religion" when evaluating a law's neutrality). We discuss that alternative theory in Part B.2.c.

coverage for, or to pay for, abortion. But we ultimately assume, without deciding, that Plaintiff has established that the challenged laws burden its religious practice because, at least at this time, Plaintiff cannot acquire an abortion-excluding plan that it believes would insulate it from the possibility of facilitating access to abortion, even though the challenged laws do not prevent health carriers from offering such a plan.

a. Providing Coverage for Abortion Services

The Parity Act does not coerce Plaintiff into providing coverage for abortion services in its group health plan. The reason for that conclusion is simple: the conscience statute's plain text protects Plaintiff from being required to "purchase coverage" for any health care service to which it objects on religious grounds. Wash. Rev. Code § 48.43.065(3)(a). The record reflects some uncertainty in the first several months after the Parity Act took effect as to whether the Act affected Washingtonians' rights under the conscience statute. But by November 2019, less than a year after the Parity Act's effective date, Washington's insurance commissioner dispelled any notion that health plans might be required to include abortion coverage notwithstanding any religious or moral objection to such coverage. See Wash. Admin. Code § 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(3). And the record shows that the commissioner's office has approved for sale several health carriers' abortion-excluding plans.

Why, then, has Plaintiff continued to hold a group health plan from Kaiser Washington that covers abortion directly, in clear violation of its religious beliefs? Plaintiff presents two theories of how the challenged laws have coerced it into doing so. The record supports neither theory.

First, Plaintiff argues that, in the summer of 2019, Kaiser Washington stopped "accommodating any abortion exclusions for fully insured groups" in light of the Parity Act because the carrier was concerned that it might be penalized for violating Washington's Insurance Code. See Wash. Rev. Code § 48.01.080. But the fact that Kaiser Washington initially interpreted the recently enacted Parity Act as potentially requiring it to include abortion coverage in all its health plans does not demonstrate that the challenged laws actually require Plaintiff to purchase direct coverage for abortion.

In 2019, Kaiser Washington offered no health plans that excluded abortion coverage only because it did not yet understand Washington's changed regulatory landscape. Nothing in the record suggests that Kaiser Washington would have refused to sell an abortion-excluding plan if Washington permitted it to offer such a plan. In July 2019, Kaiser Washington told Plaintiff that it was "waiting for further clarification regarding exclusions of abortions for 2019." A month later, the carrier said it was "still interpreting" the Parity Act and was "working hard to understand what [it] can and cannot do for fully insured groups." Around that time—after acknowledging that "the final implementation rules for [the Parity Act] have not yet been released"—Plaintiff asked Kaiser Washington whether it could remove abortion coverage from Plaintiff's health plan if Washington law provided a religious exception to the Parity Act's apparent requirements. Kaiser Washington responded that it could "support a mid-year change" to exclude abortion coverage from Plaintiff's plan. The record does not reflect that Plaintiff ever followed up with Kaiser Washington to request an abortion-excluding plan after the

Parity Act's implementing regulations clarified that such a plan was permissible under Washington law.

No evidence suggests that, after 2019, Kaiser Washington—or any health carrier—refused to sell Plaintiff a health plan that excluded direct coverage for abortion services. Rather, the record demonstrates that health carriers in Washington are willing and able to accommodate employers' religious or moral objections to abortion by offering fully insured group health plans that exclude abortion coverage. For example, Washington's insurance commissioner has approved abortion-excluding plans offered by Providence and Kaiser Northwest, among others.

Second, Plaintiff argues that, even if the challenged laws do not require it to purchase abortion coverage, the laws have prevented it from obtaining an abortion-excluding group health plan that is "comparable" to the one that it had before the Parity Act took effect. Providence and Kaiser Northwest do not offer their abortion-excluding health plans for sale in the counties in which Plaintiff operates. And, according to Plaintiff, other categories of health plans that exclude abortion coverage and that are available to Plaintiff are not comparable to the fully insured plan that it had before the Parity Act.

But Plaintiff does not point to any evidence refuting the fact that, in 2019 and 2020, a different health carrier, Cigna, offered to sell Plaintiff a fully insured group health plan that excluded direct coverage for abortion.[7] As background,

[7] Because Plaintiff has had opportunities to purchase an abortion-excluding health plan that is comparable to the plan that it had before the Parity Act's enactment, we disagree with the dissenting opinion's premise—repeated several times—that the challenged laws have caused Plaintiff to "procure[] and continue[] to hold" a plan with Kaiser

Plaintiff uses an insurance broker to "implement and manage its employee benefits program." Each year, the broker invites several health carriers "to bid fully insured plans" to Plaintiff. In June 2019, the broker presented Plaintiff with Cigna's 2019/2020 plan-year bid for a fully insured health plan and stated that "[e]lective abortions are not covered." Cigna's legal team also asserted in 2019 that, for a fully insured plan, "an employer may exclude coverage for contraceptives and abortion if that employer objects to providing that coverage due to religious or other beliefs." Based on the broker's analysis, Cigna's plan appears to have been nearly $26,000 less expensive than the fully insured plan that Plaintiff purchased from Kaiser Washington in 2019, which covered abortion directly. Kaiser Washington's combined "Negotiated" cost was $916,314, whereas Cigna's combined "Fully Insured" cost was $890,408. About a year later, the broker presented Cigna's bid for the 2020/2021 plan year. Again, Cigna offered Plaintiff a fully insured health plan that Plaintiff's broker stated "exclude[d] coverage for elective abortions." And again, that plan appears to have been thousands of dollars cheaper than the health plan that Plaintiff purchased from Kaiser Washington, which covered abortion directly. Kaiser Washington's combined "Renewal" cost was $1,149,384, whereas Cigna's combined "Fully-Insured" cost was $1,129,515.

On this record, there is an "absence of evidence" to support Plaintiff's claim that the challenged laws coerce it into purchasing direct coverage for abortion. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). Accordingly, because Plaintiff bears the burden of proof at

---

Washington that "directly covers abortion services." Dissent at 72; see id. at 74, 78, 83–84.

trial, it has the burden "to designate specific facts demonstrating the existence" of a genuine dispute. Id. (emphasis added); see also id. ("This burden is not a light one."). In other words, Plaintiff "must do more than show there is some 'metaphysical doubt' as to the material facts." Id. (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Plaintiff has failed to meet its burden as to this issue. Had Plaintiff contacted any health carrier to seek an abortion-excluding plan after November 2019, and had the carrier refused to accommodate Plaintiff's religious objection despite the conscience statute, Plaintiff could have submitted evidence to that effect. And if Plaintiff rejected the cheaper, fully insured, abortion-excluding plans that Cigna offered because those plans somehow coerced Plaintiff into violating its religious beliefs to a greater degree than covering abortion directly through its Kaiser Washington plan, Plaintiff could have submitted evidence substantiating that claim. Plaintiff did neither of those things.

b. Paying for Abortion Services

The challenged laws do not coerce Plaintiff into paying for abortion services directly, through periodic payments, or indirectly, through miscellaneous fees or increased payments. Under the conscience statute's plain text, an employer cannot be required to "purchase coverage" for health care services to which it objects on religious grounds. Wash. Rev. Code § 48.43.065(3)(a); see Wash. Admin. Code § 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(3). And employers purchase and maintain coverage for certain health care services only by paying a "premium" for a health plan, which encompasses "all sums" paid to a health carrier "as consideration," including "[a]ny

assessment," "fee," or "charge." Wash. Rev. Code § 48.43.005(43) (emphases added); see also id. § 48.43.005(33) (defining "health plan").

Nevertheless, Plaintiff asserts that the conscience statute "allows carriers to force houses of worship—like [Plaintiff]—to pay for nominally 'excluded' abortion coverage." Plaintiff's argument goes like this: Under the conscience statute, carriers cannot deny enrollees in Plaintiff's health plan "coverage of, and timely access to, any service or services excluded" from Plaintiff's "benefits package," Wash. Rev. Code § 48.43.065(3)(b)—that is, services excluded from Plaintiff's health plan, see id. § 48.43.005(33) (describing "health carriers" as organizations that offer "health benefit plans"). But section 4 of the conscience statute states that "[n]othing in [the statute] requires a health carrier, health care facility, or health care provider to provide any health care services without appropriate payment of premium or fee." Id. § 48.43.065(4). Plaintiff contends that section 4 "empowers carriers to pass along the cost of covering abortion and [objectionable contraceptives] to houses of worship in the form of increased premiums, 'administrative' or 'overhead' expenses, or other fictitious costs."

Plaintiff's conjecture is premised on a plainly erroneous and ungrammatical reading of section 4 of the conscience statute. The term "appropriate"[8] in that provision modifies the term "payment," not the phrase "premium or fee." Wash. Rev. Code § 48.43.065(4); see Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 152

---

[8] "Appropriate" means "correct or suitable for some purpose or situation," "fit," "proper." See Appropriate, Webster's Third New International Dictionary, Unabridged (1993).

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 28 of 110



(2012) ("When the syntax involves something other than a parallel series of nouns or verbs, a prepositive . . . modifier normally applies only to the nearest reasonable referent."). Properly understood, section 4 means simply that nothing in the conscience statute requires health carriers to pay for health care services that enrollees receive if the health plan's purchaser fails to pay its premium. So, if Plaintiff purchased an abortion-excluding plan and then failed to make its premium payment—that is, failed to make an "appropriate payment"—the conscience statute does not require Plaintiff's carrier to pay for "any health care services" that Plaintiff's employees receive. Wash. Rev. Code § 48.43.065(4) (emphasis added). There is nothing remarkable about the notion that a carrier's duty to pay for covered services accessed by enrollees in a health plan is dependent on the plan's purchaser making premium payments.

In short, section 4 of the conscience statute does not authorize a health carrier to charge a purchaser of an abortion-excluding plan indirectly for abortion services. Because the meaning of section 4 is "plain and unambiguous," our analysis of that provision "can begin and end with [its] text." Bottinelli v. Salazar, 929 F.3d 1196, 1199 (9th Cir. 2019). Still, we note that our interpretation comports with the whole point of the conscience statute: to protect individuals and organizations with religious or moral objections to certain health care services from being forced to pay for coverage for those services. Wash. Rev. Code § 48.43.065(1), (3). We do not think that Washington courts would embrace the ungrammatical interpretation that Plaintiff and the dissenting opinion propose, see Dissent at 84, which would radically undermine the statute's purpose. See State v. Eaton, 229 P.3d 704, 708 (Wash. 2010) ("[W]e

attempt to construe statutes in a way that is consistent with their underlying purpose."); see also Valladolid v. Pac. Operations Offshore, LLP, 604 F.3d 1126, 1133 (9th Cir. 2010) ("It is a cardinal canon of statutory construction that statutes should be interpreted harmoniously with their dominant legislative purpose." (citation omitted)).

Moreover, the undisputed evidence demonstrates that carriers understand that the conscience statute does not allow them to use an objecting employer's premiums to pay for excluded services. For example, in August 2019, Kaiser Washington told Plaintiff that it could remove contraceptive coverage from Plaintiff's plan "such that [Kaiser Washington] will separately pay for the cost of such contraceptives" and related services that enrollees in Plaintiff's plan access. Kaiser Washington made absolutely clear that Plaintiff "would NOT pay for these services via [its] premiums" and instead that "**[Kaiser Washington] would cover the cost of contraceptives**." (bold font in original). Plaintiff received similar assurances from Cigna, the carrier that offered to sell Plaintiff abortion-excluding, fully insured health plans in 2019 and 2020. Referencing the conscience statute, Cigna said that it would "pay for all FDA-approved contraceptive coverage for eligible employees (subscribers and dependents) under a separate contraceptive-only PPO account that is set up for these customers" and that Cigna—not Plaintiff—would "fund the contraceptive coverage." Further, Cigna stated unambiguously that it would "segregate premium revenue collected from [Plaintiff] from the monies used to provide payment for contraceptives." No evidence in the record suggests that Kaiser Washington, Cigna, or any other health

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 30 of 110



carrier would establish different processes for excluded abortion coverage.[9]

Plaintiff and the dissenting opinion can only speculate, without any support in the record, that a carrier might increase Plaintiff's premium or charge shadowy fees—again, in violation of the conscience statute—to account for expenses the carrier would incur if enrollees accessed excluded services. No evidence suggests that any of the several health carriers that offer abortion-excluding plans in Washington has passed along the cost of abortion coverage to any objecting employer through increased premiums or other fees in the way that Plaintiff fears. And no evidence suggests that the carriers will do so.

Unable to point to any evidence, the dissenting opinion asserts that "economic logic" supports Plaintiff's claim that health carriers might pass on the costs of covering abortion services to employers like Plaintiff. Dissent at 86. Although an argument that relies on economic inferences might be sufficient to confer standing or to survive a motion to dismiss, see Diamond, 606 U.S. at 116, it does not raise a genuine dispute of material fact at summary judgment, see Teamsters Loc. Union No. 117 v. Wash. Dep't of Corr., 789 F.3d 979, 994 (9th Cir. 2015) ("Argument without evidence is hollow rhetoric that cannot defeat summary judgment.").

[9] The dissenting opinion's suggestion that we resolve a "plainly disputed factual" issue relies on a misrepresentation of what this opinion says: omitting the phrase "no evidence in the record suggests" from its quotation to imply that we make a factual determination that we do not make. Dissent at 86. Again, the absence of any evidence supporting Plaintiff's theory demonstrates that there is no factual dispute to resolve. See Hokto Kinoko Co. v. Concord Farms, Inc., 738 F.3d 1085, 1098 (9th Cir. 2013) (holding that an "argument, in the absence of evidence, does not create a triable dispute of material fact").

Instead, as we have discussed, Plaintiff is required to "designate specific facts demonstrating the existence of [a] genuine issue[] for trial," In re Oracle, 627 F.3d at 387, and it has failed to do so.

And, at any rate, the dissenting opinion's supposed "economic logic" is suspect. Health carriers have many options to account for costs incurred when they provide employees of an objecting employer with coverage for abortion services—options that do not involve charging the employer, directly or indirectly, for those services. For example, a carrier could treat the costs as an administrative expense that it spreads across each of its health plans except plans purchased by those with religious or moral objections to abortion. See Coverage of Certain Preventive Services under the Affordable Care Act, 78 Fed. Reg. 39870, 39878 (July 2, 2013) (describing that option, in the context of federally mandated contraceptive coverage, and stating that there would be "an imperceptible increase in administrative load" and that "changes in premiums would be negligible"). Or a carrier could simply absorb the costs. In the context of Plaintiff's health plan, additional expenses to the carrier, if any, related to abortion services likely would be minimal, as each of Plaintiff's employees signs a statement agreeing to "refrain from behavior that conflicts or appears inconsistent with evangelical Christian standards as determined in the sole and absolute discretion of [Plaintiff]."

Moreover, a health carrier might save money by ensuring that all enrollees in its health plans have access to contraceptives and abortion services, even if some employers with religious or moral objections exclude coverage for—and do not pay for—those services. Consider the findings that the United States Departments of Treasury, Labor, and Health and Human Services made in 2013 when

promulgating rules related to federal health care law as amended by the Affordable Care Act. See Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39870 (July 2, 2013). The Departments proposed a regulation to accommodate religious employers' objections to federally mandated contraceptive coverage that required carriers to "assume sole responsibility for providing separate payments for contraceptive services directly for [enrollees]." Id. at 39876. The Departments found that carrier-sponsored coverage "is at least cost neutral" for carriers. Id. at 39877 (emphasis added). That finding was predicated on "[s]everal studies [that] estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health." Id. (citations omitted). "The Departments [were] unaware of any studies to the contrary." Id.

At the end of the day, it does not matter whether a health carrier in Washington spreads additional costs to non-objecting health plan purchasers, absorbs those costs, or saves money. Each carrier in Washington has the flexibility to establish a process that suits that carrier's needs and that "[r]ecogniz[es] the exercise of conscience by purchasers" of health plans with religious or moral objections to abortion. Wash. Admin. Code § 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. So long as the process "relies on sound actuarial principles to distribute risk," ensures that enrollees' access to abortion is not impaired, and complies with the conscience statute's notification requirements, the insurance commissioner must approve it. Id. § 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(3).

What does matter is that the conscience statute does not permit health carriers to charge purchasers of health plans for excluded health care services and that no evidence

demonstrates that any carrier offering an abortion-excluding plan in Washington has passed, or will pass, directly or indirectly, the costs of abortion services—which the carrier covers—to any employer that has exercised its rights under the conscience statute. Accordingly, Plaintiff has failed to raise a genuine dispute as to whether the challenged laws coerce it into paying for abortion services. See Sierra Med. Servs. All. v. Kent, 883 F.3d 1216, 1222 (9th Cir. 2018) (explaining that, when the party opposing summary judgment bears the burden of proof at trial, summary judgment is appropriate when "there is an absence of evidence to support the nonmoving party's case" (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986))).

The dissenting opinion argues that we are "bound" by the Supreme Court's decision in Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014), to conclude that the challenged laws burden Plaintiff's religious exercise. Dissent at 79. In the dissenting opinion's view, "[t]here is no meaningful distinction" between the federal regulations challenged in Hobby Lobby and the Washington laws challenged here. Dissent at 80. We disagree. The regulations challenged in Hobby Lobby forced an employer either to purchase direct coverage for health care services to which it objected on religious grounds or to face severe economic consequences. See Hobby Lobby, 573 U.S. at 719–20. As we have explained, the laws challenged here do not require an employer to purchase coverage for abortion services if it finds those services objectionable. Several health carriers offer abortion-excluding health plans to employers in Washington. Plaintiff itself has had the opportunity to purchase a plan that excludes abortion coverage that is comparable to the plan that it had before the Parity Act took effect and that is cheaper than the plan that

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 34 of 110



it chose to purchase after the Parity Act took effect. Because Plaintiff does not argue that those abortion-excluding plans are noncompliant with the Affordable Care Act, the dissenting opinion's speculation about potential financial liability under federal regulations is beside the point. See Dissent at 80–81.

In fact, Washington's laws track the federal "accommodation for nonprofit organizations with religious objections" discussed in Hobby Lobby, which the Supreme Court determined would "not impinge on the plaintiffs' religious belief that providing insurance coverage for [certain contraceptives] violates their religion." Id. at 730–31 (emphasis added). Just like Washington's laws, the federal accommodation protects a religious employer that objects to purchasing certain coverage by requiring the employer's health carrier to "expressly exclude [that] coverage from the group health insurance coverage provided in connection with the group health plan" and to "provide separate payments for any [excluded] services required to be covered[.]" Id. at 731 (citation omitted); see Wash. Rev. Code § 48.43.065(3); Wash. Admin. Code § 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(1). And, just like Washington's laws, the federal accommodation ensures that individual employees "receive [excluded] coverage" and "face minimal logistical and administrative obstacles," because "their employers' insurers [are] responsible for providing information and coverage." Hobby Lobby, 573 U.S. at 731 (citations omitted); see Wash. Rev. Code § 48.43.065(3); Wash. Admin. Code § 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(1).

c. Facilitating Access to Abortion Services

The question remains whether the challenged laws coerce Plaintiff into "facilitating access to" abortion services

in violation of its religious beliefs, even though the laws do not cause Plaintiff to purchase a health plan that covers abortion directly or to pay, even indirectly, for abortion services. To analyze that question, we first must discuss the degree of involvement with abortion that Plaintiff would consider to constitute "facilitating access to" abortion. In doing so, we keep in mind that "it is not for us to say that the line" Plaintiff draws between activities that are consistent and inconsistent with its religious beliefs "[is] an unreasonable one." Hobby Lobby, 573 U.S. at 725 (citation omitted). Instead, we accept Plaintiff's belief that a certain activity "lies on the forbidden side of the line." Id.

We begin by considering the activities that Plaintiff views as not violating its religious beliefs, despite being in some way related to the provision of abortion services. Plaintiff does not assert that its religious beliefs are burdened by the fact that a separate Washington law establishes that each of its employees has the "fundamental right" to have an abortion. Wash. Rev. Code § 9.02.100(2).[10] Plaintiff expressly acknowledges that it does not challenge that statute. And Plaintiff does not believe that it facilitates

[10] More than thirty years ago, the citizens of Washington passed a referendum declaring that "every individual possesses a fundamental right of privacy with respect to personal reproductive decisions." Reproductive Privacy Act, ch. 1, 1992 Wash. Sess. Laws 1 (ratified by referendum vote, as Initiative 120, on Nov. 5, 1991) (codified at Wash. Rev. Code § 9.02.100). Through the referendum, Washingtonians established that every individual in the State has "the fundamental right to choose or refuse to have an abortion." Id. It was the citizens' prerogative to guarantee the right to choice. See Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 302 (2022) (holding that the authority to regulate abortion belongs to the citizens of each State and to their elected representatives).

access to abortion if, for example, one of its employees uses her wages to pay for abortion services.

Plaintiff also does not believe that it would facilitate access to abortion if it were enrolled in a fully insured health plan that Providence, a religiously sponsored health carrier, offers in other counties in Washington. That concession significantly weakens Plaintiff's argument that the challenged laws burden its religious exercise, and it contradicts the dissenting opinion's assertion that the laws "condition[]" Plaintiff's "ability to obtain a group health plan on its willingness to purchase a plan" that would violate its religious beliefs. Dissent at 78. The Parity Act regulates health carriers only, and Plaintiff admits that the Parity Act, operating in conjunction with the conscience statute, permits at least one carrier to offer health plans in Washington that Plaintiff believes would insulate it from facilitating access to abortion in violation of its religious beliefs.

The challenged laws, moreover, do not prevent Plaintiff from purchasing a plan from Providence. The only reason why Plaintiff cannot acquire a Providence health plan is that Providence has made the business decision, at least at this time, not to offer a plan in the counties in which Plaintiff operates. No evidence suggests that the challenged laws—or any Washington law, for that matter—influenced Providence's decision. We nevertheless assume, without deciding, that Plaintiff's current alleged inability to acquire an abortion-excluding plan from a carrier such as Providence can suffice to establish a burden on Plaintiff's religious exercise, even though that inability is primarily, if not exclusively, the result of business decisions by third parties, not the result of the challenged laws.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 37 of 110



Still, we note that Plaintiff's belief that Providence's plans are religiously permissible undercuts each of the three theories that Plaintiff advances, and on which the dissenting opinion relies, to assert that the challenged laws coerce Plaintiff into facilitating access to abortion, even without any indirect payment for coverage. See Dissent at 88–89. Plaintiff's first theory of burden-via-facilitation posits that the challenged laws burden Plaintiff's religious practice because Plaintiff's purchase of a health plan is a but-for cause of its employees having access to covered abortion services. But if Plaintiff chooses to purchase an abortion-excluding plan, it makes no difference whether Plaintiff's health carrier is Kaiser Washington, Cigna, Providence, or any other carrier in Washington—Plaintiff's employees will receive coverage for abortion services outside that plan. In other words, given Plaintiff's representation that the challenged laws would not burden its religious practice if it were able to purchase a plan from Providence, the equivalent access to abortion coverage that Plaintiff's employees would receive outside any health plan that Plaintiff purchases cannot, in itself, be considered a burden.

Plaintiff's second and third theories come from an affidavit by Plaintiff's insurance broker. The broker stated that, in 2019, "all of the plans available to and suitable for [Plaintiff]" of which she was aware "would have provided [Plaintiff's] employees access to abortion and abortion causing drugs through, or as a result of, [Plaintiff's] plan." She "advised" Plaintiff that Cigna's health plan would not "completely exclude abortion and [objectionable contraceptives]" and that those services "would still be part of [Plaintiff's] health insurance plan because of [the Parity Act's] requirements." And she believed that Cigna could not "completely" exclude abortion because (1) "enrollees in

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 38 of 110



[Plaintiff's] health plan would use the same insurance card to obtain [objectionable contraceptives] as non-objectionable drugs" and (2) "health plan documents would include notice to [Plaintiff's] employees of how to obtain abortion and [objectionable contraceptives] as part of their coverage."[11]

Plaintiff's second theory—that the challenged laws would coerce it into facilitating access to abortion under Cigna's abortion-excluding plan because Plaintiff's employees would use the same insurance card both for covered services and for services excluded from the plan—falls apart quickly. The challenged laws do not require health carriers to issue a single card. Nor does the record show that there is a single card for each enrollee in any carrier's abortion-excluding plan. To support the notion that an enrollee would use the same card, Plaintiff's insurance broker cites in her affidavit a single email exchange from 2019. One of Plaintiff's employees asked the broker whether an enrollee would "present the medical center/hospital with the same insurance card" when they tried to obtain contraceptives, or whether "they have a different card." In response, the broker said only that "there wouldn't be different ID Cards" and that "[i]t would work the same way and is an internal process." But that lone assertion is contradicted elsewhere in the record: in 2019, Cigna told the broker that if Plaintiff excluded coverage for contraceptives under the conscience statute, Cigna would "pay for all FDA-approved contraceptive coverage for

[11] It is not clear what Plaintiff's broker meant when she said that employees in an abortion-excluding plan could still obtain abortion "as part of their coverage." To the extent she believed that such employees can obtain covered abortion services as part of their employer's health plan, she is mistaken as a matter of law. See supra Part B.1.a, above.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 39 of 110



eligible employees (subscribers and dependents) under a separate contraceptive-only PPO account that is set up for these customers." (emphasis added).

Assuming at the summary-judgment stage that two separate accounts would result in only a single insurance card, there is no functional difference between Providence's health plans and any abortion-excluding plans that secular carriers like Cigna offer to accommodate an employer's religious objection. If an individual enrolled in a Providence plan goes to a health care provider to access abortion services or obtain contraceptives, the provider must certify that the individual is enrolled in a Providence plan to get reimbursed by the Washington Department of Health. That individual would present a Providence insurance card or its functional equivalent to the provider, to prove that she is a member of a Providence plan.

Plaintiff's third and final theory—that the challenged laws would coerce it into facilitating access to abortion because the carrier of an abortion-excluding plan would provide notice to enrollees about how to obtain access to covered abortion services outside the plan—fails for a similar reason. Just like any other health carrier that offers an abortion-excluding health plan in Washington, Providence provides such notice to enrollees. See Wash. Rev. Code § 48.43.065(2)(b) (requiring a "religiously sponsored health carrier" to provide "written notice to enrollees . . . listing services that the carrier refuses to cover for reason of conscience or religion" and "written information describing how an enrollee may directly access services in an expeditious manner"); id. § 48.43.725(1)(a) (requiring a carrier that provides a health plan that excludes mandatory coverage to "[n]otify each enrollee in writing" of the "benefits the health plan . . . does not cover" and of

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 40 of 110



"[a]lternate ways in which the enrollee[] may access excluded benefits in a timely manner").

d. Conclusion

Four things are clear on this record: First, the challenged laws do not coerce Plaintiff into providing direct coverage for abortion services in violation of its religious beliefs. Since 2019, Plaintiff has chosen to purchase a health plan that provides coverage for abortion directly, although it has had opportunities to purchase a plan that excludes abortion coverage, and nothing in the challenged laws prevents it from obtaining such a plan today. Second, if Plaintiff asks Kaiser Washington to accommodate its religious objections, or if Plaintiff chooses to purchase an abortion-excluding health plan from a different carrier, Plaintiff will not pay for the services to which it objects, even indirectly. Third, the challenged laws do not prevent a religiously sponsored health carrier, such as Providence, from offering health plans that Plaintiff acknowledges would insulate it from the possibility of facilitating access to abortion. Finally, with respect to the theories that Plaintiff offers about how the challenged laws coerce it into facilitating access to abortion, there is no functional difference between a plan that Providence offers and a secular carrier's abortion-excluding plan.

Nevertheless, Plaintiff asserts that it would facilitate access to abortion in violation of its religious beliefs if it were enrolled in a secular carrier's abortion-excluding health plan but not in a plan from Providence. The only relevant distinction that we see between those plans is that, for the former, the carrier itself covers abortion services for enrollees; but, for the latter, the Washington Department of Health covers those services. In the end, it does not matter

why Plaintiff views secular carriers' abortion-excluding plans as religiously impermissible and Providence's plans as religiously permissible. See Fulton v. City of Philadelphia, 593 U.S. 522, 532 (2021) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." (quoting Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 714 (1981))). Our "narrow function . . . in this context" is merely to determine whether the line Plaintiff has drawn reflects "an honest conviction." Hobby Lobby, 573 U.S. at 725 (quoting Thomas, 450 U.S. at 716). Because we have no reason to doubt the sincerity of Plaintiff's conviction, we accept it.

We therefore assume that the challenged laws burden Plaintiff's religious beliefs even though the laws do not prevent Providence from offering its plans in the counties in which Plaintiff operates. We do so because Plaintiff is not presently able to acquire an abortion-excluding plan that it believes would shield it from the possibility of facilitating access to abortion. We next consider whether Plaintiff has shown that the challenged laws are not neutral or generally applicable. See Kennedy, 597 U.S. at 525.

2. Neutrality

A state violates the requirement of neutrality if it enacts legislation that is "hostile to the religious beliefs of affected citizens" or that "passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." Bates v. Pakseresht, 146 F.4th 772, 791 (9th Cir. 2025) (quoting Masterpiece Cakeshop, 584 U.S. at 638). The question central to the "neutrality" inquiry is thus whether "the object of a law is to infringe upon or restrict practices because of

their religious motivation." Church of Lukumi, 508 U.S. at 533 (emphasis added).

To analyze neutrality, we apply a four-part framework that considers a challenged law's stated object, text, surrounding circumstances at the time of enactment, and real-world operation. Tingley, 47 F.4th at 1087. We address each of those factors in turn and conclude that Plaintiff has not shown that the challenged laws target religious conduct or are otherwise the product of hostility toward religion.

a. Stated Object

The stated objects of the challenged laws do not suggest a lack of neutrality. See id. at 1085; see also Olympus Spa v. Armstrong, 169 F.4th 817, 832 (9th Cir. 2026) (amended opinion) (looking to "[t]he law's stated purpose" when analyzing neutrality), petition for cert. filed, No. 26-286 (U.S. Aug. 10, 2026). The Parity Act's legislative findings section ties Washington's abortion-coverage requirement not to religion, but to the protection of the physical, mental, and economic health of women. Parity Act, ch. 119, § 1, 2018 Wash. Sess. Laws 689, 689–90; see Olympus Spa, 169 F.4th at 832 (deeming it significant that "[t]he law's stated purpose . . . makes no mention of religion or religious activities"). And the conscience statute states that its purpose is to "recognize the right of individuals . . . to receive the full range of [health care] services" that Washington law recognizes as essential while also "respect[ing]" those with "conflicting religious and moral beliefs." Conscience Statute, ch. 265, § 25, 1995 Wash. Sess. Laws 30, 30; see Tingley, 47 F.4th at 1085 (concluding that the inclusion of religious exemptions to the law at issue "show[ed] that [Washington] intended to regulate [the

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 43 of 110



relevant individuals] only to the extent they act in a . . . non-religious capacity" (emphasis added)).

The dissenting opinion claims that the Parity Act's findings "demonstrate[] the Parity Act's lack of neutrality." Dissent at 93. Specifically, the dissenting opinion asserts that the Parity Act's statement that "[r]estrictions on abortion coverage interfere" with an individual's "personal, private pregnancy decision making," "well-being," and "constitutionally protected right to safe and legal medical abortion care," Parity Act, ch. 119, § 1(14), 2018 Wash. Sess. Laws 689, 690–91, is a "declaration" that some employers' religious objections to abortion "have negative value," Dissent at 93. But neither the Parity Act nor its findings take aim at employers' objections. Rather, the Parity Act recognizes individuals' interests in accessing abortion services and requires certain health carriers to reduce restrictions on coverage for those services. Together, the challenged laws operate to respect employers' religious or moral objections to purchasing abortion coverage while also ensuring that individuals receive that coverage from another source. As we previously noted, every individual in Washington has a "fundamental right to choose or refuse to have an abortion," Reproductive Privacy Act, ch. 1, 1992 Wash. Sess. Laws 1, and Plaintiff expressly does not challenge that right. Washingtonians' recognition of abortion as a fundamental right, and Washington's efforts to bolster that right, are not hostile toward religion merely because abortion involves "an area of profound moral and religious disagreement." Dissent at 93; see Dobbs, 597 U.S. at 302 ("Abortion presents a profound moral question. The Constitution does not prohibit the citizens of each State from regulating . . . abortion.").

b. Text

"A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." Church of Lukumi, 508 U.S. at 533. Each of the challenged laws passes that test, and the dissenting opinion does not contend otherwise. The Parity Act does not mention religion at all. See Wash. Rev. Code § 48.43.073; Parents for Priv. v. Barr, 949 F.3d 1201, 1235 (9th Cir. 2020) (deeming the law at issue facially neutral because it "ma[de] no reference to any religious practice, conduct, belief, or motivation" (quoting Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1076 (9th Cir. 2015))). And the conscience statute does so only to provide for religious exemptions and non-religious, conscience-based exemptions. See Wash. Rev. Code § 48.43.065; Tingley, 47 F.4th at 1085 (deeming the law at issue facially neutral when it referenced religion only "to clarify that the law d[id] not apply to . . . religious [parties]" (emphasis added)).

c. Circumstances of Enactment

Turning to the circumstances of the challenged laws' enactment, we conclude that nothing in either law's historical background, precipitating events, or legislative history suggests that the law is not neutral. See id.

Washington legislators began proposing the Parity Act in 2012. See H.B. 2330, 62nd Leg., Reg. Sess. (Wash. 2012); S.B. 6185, 62nd Leg., Reg. Sess. (Wash. 2012). Since its inception, the goal of the Parity Act was to ensure that individuals enrolled in certain health plans have "coverage to permit the voluntary termination of a pregnancy." H.B. 2330 at 1; S.B. 6185 at 1; see H.B. 1044, 63rd Leg., Reg. Sess. (Wash. 2013); H.B. 2148, 63rd Leg., Reg. Sess. (Wash. 2014); H.B. 1647, 64th Leg., Reg. Sess. (Wash.

2015); S.B. 5574, 64th Leg., Reg. Sess. (Wash. 2015). It is true, as the dissenting opinion emphasizes, that when Washington's legislature ultimately enacted the Parity Act in 2018, federal agencies had recently issued interim rules implementing expanded religion- and conscience-based exemptions for organizations that purchase insurance subject to the Affordable Care Act. Dissent at 95; see 45 C.F.R. §§ 147.132, 147.133 (2018). But the evidence demonstrates that the Washington legislature was motivated only by a desire to ensure that reproductive health care in the state remained affordable for individuals amid general uncertainty caused by the then-current presidential administration.[12]

Nothing in the Parity Act's legislative history suggests that the legislature was motivated by hostility toward religion. See Masterpiece Cakeshop, 584 U.S. at 634. The legislature's decision not to include in the Parity Act a provision exempting religious employers is neither surprising nor indicative of non-neutral intent. The Parity Act does not regulate employers at all. See Wash. Rev. Code § 48.43.073. And the conscience statute already provided for religious and moral exemptions to insurance requirements, see id. § 48.43.065(3)(a), as the legislature understood when it voted to enact the Parity Act, see Wash. S. Comm. on Health & Long Term Care, S.B. Rep., S.B. 6219, 65th Leg., at 3 (Jan. 25, 2018) (recognizing that, under existing state law, "[n]o individual or organization

[12] See Ashli Blow, In time of Trump, Washington lawmakers want to pass bill mandating abortion coverage, KIRO 7 (January 31, 2018), https://perma.cc/8UFX-JH7X (quoting State Senator Steve Hobbs, the Parity Act's sponsor, as stating that the Washington legislature "should move quickly [to enact the Parity Act] because these days it's really anybody's guess as to what the Trump administration will or won't do next").

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 46 of 110



with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion"); Wash. H. Health Care & Wellness Comm., B. Analysis, S.B. 6219, 65th Leg., at 3 (Feb. 7, 2018) (same).[13]

Nor do various news articles that Plaintiff cites support its contention that the Party Act's sponsor, State Senator Hobbs—let alone the legislature as a whole—was motivated by animosity toward religion. As an initial matter, the articles do not support Plaintiff's characterizations of Hobbs' statements. For example, Plaintiff claims that, in one article,[14] Hobbs "t[old] churches to sue 'if they don't like the [Parity Act].'" Nowhere does the article say that. Rather, the article states only that "Hobbs said employers have the right to file a lawsuit if they don't like the bill," with no mention of a church or religion, and "[h]ealth care is about the individual, not about them."[15] Further, the article does not make clear the context in which Hobbs made that statement.

---

[13] That some religious citizens and organizations opposed the Parity Act because they believed that the Parity Act itself did not include adequate protections for employers with religion- or conscience-based objections to abortion says nothing about the motivation of the Washington legislature, which expressly intended to protect individuals' access to reproductive health care. See Parity Act, ch. 119, § 1, 2018 Wash. Sess. Laws 689, 689–91; cf. Dobbs, 597 U.S. at 254 (stating that it is "quite a leap" to attribute statements made by "a few [non-officeholding] supporters of the new 19th-century abortion laws . . . to all the legislators whose votes were responsible for the enactment of those laws").

[14] Matt Markovich, Catholic Bishops of Wash. ask Gov. Inslee to veto abortion insurance bill, KOMO NEWS (Mar. 5, 2018), https://perma.cc/5L5E-JM55.

[15] Id. (emphasis added).

More fundamentally, even if Plaintiff's framing of the articles were accurate, Plaintiff's reliance on statements by a single state legislator is unwarranted: "[s]tray remarks of individual legislators are among the weakest evidence of legislative intent." Tingley, 47 F.4th at 1087 (emphasis added); see also Dobbs, 597 U.S. at 253–54 ("Even when an argument about legislative motive is backed by statements made by legislators who voted for a law, we have been reluctant to attribute those motives to the legislative body as a whole."). In the context of the Parity Act, the articles cited by Plaintiff come nowhere near raising a genuine dispute about non-neutrality. See CompassCare v. Hochul, 125 F.4th 49, 68 (2d Cir. 2025) (rejecting the plaintiffs' argument that a statement from a law's sponsor that "its purpose was to prevent employers' personal and political beliefs from encroaching on employees' reproductive health care decisions" raised a genuine dispute as to whether the law's "passage was motivated by hostility toward their religious beliefs," where the law's legislative history "reveal[ed] that the purpose of the legislation was to prevent discrimination based on reproductive health care decisions and to promote privacy, rather than to target religion" (citations omitted)).

The Supreme Court's decision in Masterpiece Cakeshop does not alter our conclusion, for two reasons. First, and crucially, the statements in that case were made by commissioners "during the adjudication of the plaintiff's specific case before the commission." Tingley, 47 F.4th at 1086 (citing Masterpiece Cakeshop, 584 U.S. at 635–36); see id. (emphasizing that the Court "acknowledged the distinction between hostile comments made by an adjudicatory body when deciding a case in front of it, and comments made by a legislative body when debating a bill" (citing Masterpiece Cakeshop, 584 U.S. at 636)). Second, in

Masterpiece Cakeshop, the statements specifically about the plaintiff and his religious beliefs were dramatically more "disparag[ing]" than any general comments about employers that a Washington legislator made here. Masterpiece Cakeshop, 584 U.S. at 635. For example, in Masterpiece Cakeshop, a commissioner of the board that held a hearing to determine whether the plaintiff had violated a Colorado anti-discrimination law "went so far as to compare [that plaintiff's] invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust." Id. Nothing remotely comparable happened here. At most, the dissenting opinion suggests that "clue[s]" indicate the "possibility" of hostility toward religion, Dissent at 92, 95; but no case law allows unsupported inferences to constitute a lack of neutrality.

In sum, no direct or circumstantial evidence suggests that Washington's legislature was motivated by an "impermissible hostility toward . . . sincere religious beliefs" when it enacted the challenged laws. Masterpiece Cakeshop, 584 U.S. at 634.

d. Real-World Operation

Looking to "the real-world operation" of the challenged laws, id. at 1087, the question is whether the laws represent a "religious gerrymander," that is, "an impermissible attempt to target religious practices through careful legislative drafting," Parents, 949 F.3d at 1235. Church of Lukumi provides the classic example of a religious gerrymander. There, city ordinances "prohibit[ed] the sacrifice of animals" while simultaneously defining "sacrifice" in such a way as to "exclude[] almost all killings of animals except for religious sacrifice." Church of Lukumi, 508 U.S. at 535–36 (emphases added). And because the ordinances, in their real-

world operation, "prohibited only [religious] sacrifice," they were not neutral. Stormans, 794 F.3d at 1076.

Here, the challenged laws do not accomplish a religious gerrymander because they do not "contain[] so many exemptions that[,] in practice," they exclusively "target[] [Plaintiff's] religious exercise." Tingley, 47 F.4th at 1087. Instead, the Parity Act applies to "health plans" generally, Wash. Rev. Code § 48.43.073, and the conscience statute allows equally for religious objections and non-religious, conscience-based objections, id. § 48.43.065(2)(a), (3)(a).

Plaintiff claims that "only religious people" object to providing coverage for abortion. That claim is inaccurate. Many secular groups and individuals oppose abortion based on scientific, philosophical, or human rights arguments. See generally Brief of 240 Women Scholars and Professionals, and Prolife Feminist Organizations in Support of Petitioners, Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022) (No. 19-1392), 2021 WL 3469798 (joined by, among other individuals and organizations, Secular Pro-Life, a "coalition of people of any faith or no faith who advance secular arguments against abortion" that "is led exclusively by atheist women," and New Wave Feminists, "a consistent life organization that focuses on promoting non-violence from womb to tomb" by "promoting systemic change in areas including but not limited to immigration, racial justice, and human trafficking"). But even if the Parity Act "disproportionately impact[s] religious objectors," Dissent at 95, that result would not reflect an impermissible "religious gerrymander." See Stormans, 794 F.3d at 1077 ("The Free Exercise Clause is not violated even if a particular group, motivated by religion, may be more likely to engage in the proscribed conduct."); cf. id. at 1078, 1079 n.6 (explaining that, even if the defendant commission

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 50 of 110



enacted the challenged rules, which required the timely delivery of all prescription medications by licensed pharmacies, "solely in response to incidents of" religious objections to dispensing emergency contraceptives, "that fact would not necessarily mean that the rules were drafted with the intent of discriminating against religiously motivated conduct," where the commission was "also concerned with the safe and timely delivery of many other drugs, which may or may not engender religious objections" (emphasis omitted)).

3. General Applicability

The question of general applicability addresses whether "the government can or does apply [the law] in a way that disfavors religious activity." Youth 71Five Ministries, 160 F.4th at 980. Broadly speaking, a law is not generally applicable if it (a) is underinclusive or (b) provides "a mechanism for individualized exemptions." Bacon v. Woodward, 104 F.4th 744, 751 (9th Cir. 2024) (quoting Kennedy, 597 U.S. at 526). Applying those standards, we conclude that the challenged laws are generally applicable.

a. Underinclusiveness

A law is underinclusive if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," Fulton, 593 U.S. at 534, thereby treating "comparable secular activity more favorably than religious exercise," Tandon v. Newsom, 593 U.S. 61, 62 (2021). Whether secular and religious activities are "comparable" is evaluated "against the asserted government interest that justifies the regulation at issue," and requires looking at the "risks [the] activities pose, not the reasons" for the conduct." Id.; see also Church of Lukumi, 508 U.S. at 543 (concluding that laws were not

generally applicable where they "fail[ed] to prohibit nonreligious conduct that endanger[ed] [the government's] interests in a similar or greater degree than" religious conduct).

i. The Conscience Statute

Sections 2(a) and 3(a) of the conscience statute are at issue here. Section 2(a) addresses objections raised by entities that provide or pay for a health care service:

> No individual health care provider, religiously sponsored health carrier, or health care facility may be required by law or contract in any circumstances to participate in the provision of or payment for a specific service if they object to so doing for reason of conscience or religion. . . .

Wash. Rev. Code § 48.43.065(2)(a). And section 3(a) concerns objections raised by entities that purchase insurance coverage:

> No individual or organization with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion.

Id. § 48.43.065(3)(a).

Whether section 2(a) or section 3(a) applies depends on whether an entity invokes the conscience statute in its capacity as a health care organization or, instead, as an employer. A health care facility (such a hospital) or provider (such as a doctor) is not required to "provi[de]" a health care

service to a patient if rendering that service violates the entity's conscience or religion. Id. § 48.43.065(2)(a); see also id. § 48.43.005(31) (defining "health care service" as a "service offered or provided by health care facilities and health care providers" (emphasis added)). A religiously sponsored health carrier (such as Providence) is not required to include, in the health plans that it offers for sale, coverage for a particular health care service if "provi[ding]" or "pay[ing] for" that service would violate the carrier's conscience or religious beliefs. Id. § 48.43.065(2)(a); see also id. § 48.43.005(33) (defining "health plan" as "any policy, contract, or agreement offered by a health carrier to provide, arrange, reimburse, or pay for health care services" (emphases added)). And any individual or organization that buys insurance from a health carrier—including a health care facility, provider, or carrier, acting in its capacity as an employer purchasing a group insurance plan[16]—is not

[16] Neither the conscience statute's text nor any evidence in the record supports Plaintiff's and the dissenting opinion's argument that section 2(a) would apply to grant a health care organization a broader exemption than would section 3(a) when that organization purchases insurance coverage for its employees. See Dissent at 99–100. The dissenting opinion nevertheless asserts that our textual interpretation of sections 2(a) and 3(a) "runs afoul of the central rule of summary judgment, that all inferences are to be granted in favor of the nonmovant." Dissent at 101. The dissenting opinion confuses the standards that apply to our interpretation of a statute with those that apply to our review of the evidence in the summary-judgment record. See Comcast of Sacramento I, LLC v. Sacramento Metro. Cable Television Comm'n, 923 F.3d 1163, 1168 (9th Cir. 2019) (explaining that, although we must give the nonmoving party the benefit of all reasonable inferences in its favor, "[t]he interpretation and construction of statutes are questions of law" that we review de novo (citation omitted)). In any event, the record demonstrates that the Office of the Insurance Commissioner rejected the dissenting opinion's favored interpretation as

required to "purchase coverage" for a health care service to which it objects on conscience- or religion-based grounds. Id. § 48.43.065(3)(a); see also id. § 48.43.001 (stating that carriers' health plans "cover[]" health care services (emphasis added)); id. § 48.43.005(43) (defining "premium" to include "all sums charged, received, or deposited by a health carrier as consideration for a health plan or the continuance of a health plan").

Neither section treats non-religious, conscience-based objections to specific health care services more favorably than comparable religious objections. See Tingley, 47 F.4th at 1088. Although sections 2(a) and 3(a) apply to different types of entities operating in distinct capacities, the fact remains that both provisions allow for comparable secular and religious objections. In other words, all health care facilities and all health care providers can object to providing certain health care services on conscience- or religion-based grounds, Wash. Rev. Code § 48.43.065(2)(a), just as all individuals and organizations seeking to obtain insurance coverage can object to purchasing coverage for certain health care services on conscience- or religion-based grounds, id. § 48.43.065(3)(a).[17] As a result, the conscience statute is not underinclusive within the meaning of the Free Exercise Clause. See Parents, 949 F.3d at 1236 (concluding that the policy at issue was generally applicable because it

---

improperly "conflat[ing]" the protections that are "generally available" to any "large group employer," under section 3(a), with the protections that are available to an entity insofar as it acts in the capacity as a health care organization, under section 2(a).

[17] To the extent that section 2(a) of the conscience statute grants protections to a health carrier only if it is "religiously sponsored," id. § 48.43.065(2)(a), the statute treats religious exercise more favorably—not less favorably—than comparable secular activity.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 54 of 110



affected "all students and staff," even though the law's effects on students differed from its effects on staff).

Plaintiff could qualify under section 2(a) if it were a health care facility, a health care provider, or a religiously sponsored health carrier, as well as an employer. In that scenario, section 2(a) would ensure that Plaintiff would not have to provide abortion services or pay providers for abortion services that its health-plan enrollees receive, and section 3(a) would ensure that Plaintiff does not have to purchase abortion coverage for its employees. The dissenting opinion's quibble that Plaintiff "cannot claim the [section] 2(a) accommodation" and "can only avail itself of the [section] 3(a) accommodation," Dissent at 100, does not transform distinctions between different types of entities that interact with the health care industry in distinct ways into disfavorable treatment of religious exercise.

ii. The Parity Act

Plaintiff argues that the Parity Act is underinclusive because it "exempts" certain types of insurance plans from its abortion-coverage requirement. The "exemptions" that Plaintiff identifies fall into two categories. The first includes exceptions created by sections 4 and 5 of the Parity Act itself. Section 4 provides that the law "does not, pursuant to 42 U.S.C. [§] 18054(a)(6), apply to a multistate plan that does not provide coverage for the abortion of a pregnancy." Wash. Rev. Code § 48.43.073(4). And section 5 establishes that the Parity Act will not be applied if doing so would "result[] in noncompliance with federal requirements that are a prescribed condition to the allocation of federal funds to the state." Id. § 48.43.073(5). The second category includes plans that fall outside the definition of "health plan" that the Parity Act—and the rest of Chapter 48.43 of the

Revised Washington Code—incorporate. That definition appears in a different provision of the Revised Washington Code, which Plaintiff does not challenge; it excludes, among other things, "[e]mployer-sponsored self-funded health plans," supplemental Medicare and Tricare plans, "short-term limited purpose or duration" plans, and "coverage incidental to a property/casualty liability insurance." Id. § 48.43.005(33)(b), (c), (f), (j), (l).

Neither category of supposed exemptions, however, "place[s] demands on exclusively religious persons or conduct." Parents, 949 F.3d at 1236; see also Church of Lukumi, 508 U.S. at 543 (explaining that the government "cannot in a selective manner impose burdens only on conduct motivated by religious belief"). The Parity Act regulates all health carriers, and it simply prescribes which types of insurance plans must cover abortion services. Although some types of plans fall outside the Parity Act's scope and thus are not required to include abortion coverage, the Act does not regulate who may contract for any given type of plan. If, for instance, a carrier sells a multistate plan that excludes abortion coverage, nothing in the Parity Act would prevent a religious employer like Plaintiff from accessing that plan to the same extent that a secular employer might. For those reasons alone, the Parity Act is not underinclusive.[18] See Parents, 949 F.3d at 1236 (deeming

[18] Plaintiff provided no evidence of an exemption under section 5 that has been underinclusive as to religion and, in fact, has offered no theory of how that provision might prohibit religious conduct while permitting comparable secular conduct. See Fulton, 593 U.S. at 534. Plaintiff asserts only that the possibility that the Parity Act might not apply to some health plan because of the existence of a conflicting federal funding requirement is sufficient to render the law not generally applicable. But an exemption "only matter[s]" if it permits secular conduct that is

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 56 of 11



the policy at issue "not underinclusive" because "it d[id] not require only religious students to share a locker room with a transgender student who was assigned the opposite sex at birth, nor d[id] [it] require only religious teachers and staff to receive training or to teach about anti-bullying and harassment"); see also Olympus Spa, 169 F.4th at 832–33 (deeming the law at issue "not underinclusive because it impose[d] the same requirements on religious and non-religious organizations alike" (emphasis added)).

Even setting aside that problem, Plaintiff has not raised a genuine dispute as to comparability, for two reasons. First, we have held that exceptions to a state's regulation that merely recognize the supremacy of federal law do not undermine that regulation's general applicability. See Doe, 19 F.4th at 1184 n.3 (Ikuta, J., dissenting) ("Because the vaccine mandate is not applicable to IEP students by force of federal law, we do not take the in-person attendance of

comparable to prohibited religious conduct, Foothills Christian Ministries v. Johnson, 148 F.4th 1040, 1052 (9th Cir. 2025), cert. denied, No. 25-802, 2026 WL 1377110 (U.S. May 18, 2026), and nothing in the record suggests that section 5 might operate in that way. Instead, the record evidence shows that section 5 is meant to ensure Washington's compliance with the Weldon Amendment, a legislative "rider" to a 2004 federal appropriations bill that "prevents federal, state and local governments from receiving certain federal funds if they discriminate against health care [organizations] that refuse to provide, pay for, provide coverage of, or refer for abortions." California ex rel. Lockyer v. United States, 450 F.3d 436, 439 (9th Cir. 2006). In other words, section 5 of the Parity Act functions like section 2(a) of the conscience statute by protecting health care organizations from discrimination because they object—on religious grounds or otherwise—to providing or paying for abortion services. See Ohio v. Becerra, 87 F.4th 759, 774 n.8 (6th Cir. 2023) (describing the Weldon Amendment as a "federal conscience law"). Consequently, no evidence suggests that section 5 "treats religious observers unequally." Parents, 949 F.3d at 1235.

unvaccinated IEP students into account in determining whether the . . . mandate . . . is generally applicable." (emphasis added)); id. at 1179 (majority) ("The dissent recognizes that in-person attendance by unvaccinated students with an IEP is not comparable to in-person attendance by students with religious objections to vaccination because federal law—the IDEA—requires that a school 'follow certain procedures before it can bar students [with IEPs] from in-person attendance.'"). In other words, for purposes of the underinclusiveness inquiry, when a state's regulation does not reach a certain activity because it is governed by federal law, that activity is not comparable to the activities that the state's regulation does reach.

Here, because several of the exceptions to the Parity Act that Plaintiff cites are necessary to ensure that the Act does not conflict with federal law, those exceptions do not undermine the Parity Act's general applicability. To begin, as is clear from the text of section 4, the Parity Act's multistate-plan exception serves to guarantee compliance with 42 U.S.C. § 18054(a)(6) and, thus, to avoid federal preemption.[19] See Wash. Rev. Code § 48.43.073(4). Similarly, federal law prohibits States from regulating self-funded plans, see Scharff v. Raytheon Co. Short Term Disability Plan, 581 F.3d 899, 907 (9th Cir. 2009) ("[S]tate insurance regulation of self-funded plans is preempted by ERISA."), or the benefits offered by Tricare plans, see 10 U.S.C. § 1103(a), so it is not surprising that Washington law

---

[19] Federal law requires that, "with respect to multi-State qualified health plans offered in an Exchange, there [be] at least one such plan that does not provide coverage of services described in [42 U.S.C. § 18023(b)(1)(B)(i)]." 42 U.S.C. § 18054(a)(6). Section 18023(b)(1)(B)(i), in turn, discusses abortion services. See id. § 18023(b)(1)(B)(i).

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 58 of 110



excludes those types of plans from the definition of "health plan" that the Parity Act incorporates, see Wash. Rev. Code § 48.43.005(33)(c), (j).

Second, that the Parity Act does not apply to the remaining types of insurance plans that Plaintiff identifies does not undermine Washington's interest in protecting women's access to contraceptives and reproductive health care services. See Parity Act, ch. 119, § 1, 2018 Wash. Sess. Laws 689, 689–90. Supplemental Medicare and Tricare plans "do not add benefits" but, as the label suggests, only supplement whatever coverage the "base" Medicare and Tricare plans already provide. Consequently, the fact that the Parity Act does not reach supplemental plans has no effect on whether enrollees can access abortion coverage through "base" Medicare and Tricare plans. Similarly, the record demonstrates—and common sense dictates—that "property/casualty liability insurance" does not cover costs associated with maternity care and thus would not cover abortion services even if the Parity Act applied to it. And because "short-term, limited purpose or duration plan[s]" provide no more than three months of coverage, excluding those plans from the Parity Act's requirements affects the coverage available to enrollees on a temporary basis only. See Foothills, 148 F.4th at 1052 ("[A] program that oversees children for only four hours a week does not present a threat to children's health and safety comparable to that of a facility that can operate up to 24 hours a day."), cert. denied, 2026 WL 1377110 (U.S. May 18, 2026); Doe, 19 F.4th at 1178 (finding that medical exemptions to a vaccine requirement were not comparable to religious exemptions to the extent that "the medical exemptions [were] likely to be 'limited in duration'" (citation omitted)).

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 59 of 110



Because the Parity Act neither imposes unique burdens on religious conduct nor permits secular conduct that would undermine Washington's asserted interests in the same way that an even broader religious exemption would, the Parity Act is not underinclusive. See Tingley, 47 F.4th at 1088–89.

b. Individualized Exemptions

A law also fails the "generally applicable" test if it contains a "'mechanism for individualized exemptions' that 'invites the government to consider the particular reasons for a person's conduct.'" Youth 71Five Ministries, 160 F.4th at 980 (quoting Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ., 82 F.4th 664, 687 (9th Cir. 2023) (en banc)); see also Fulton, 593 U.S. at 533. In other words, a law triggers strict scrutiny if it gives the government the "authority 'to decide which reasons for not complying with [the law] are worthy of solicitude' on an ad hoc basis." Fellowship, 82 F.4th at 687 (quoting Fulton, 593 U.S. at 537); see also Bates, 146 F.4th at 796–97 (concluding that the law at issue was not generally applicable "because it incorporate[d] ad hoc decision making based on non-objective criteria" and, thus, "pos[ed] an undue risk of case-by-case discrimination on the basis of religion").

As we previously mentioned, section 5 of the Parity Act states that the Act does not apply insofar as its application conflicts with federal funding requirements. Wash. Rev. Code § 48.43.073(5). In full, the provision states:

> If the application of this section to a health plan or student health plan results in noncompliance with federal requirements that are a prescribed condition to the allocation of federal funds to the state, this

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 60 of 110



> section is inapplicable to the plan to the minimum extent necessary for the state to be in compliance. The inapplicability of this section to a specific health plan or student health plan under this subsection does not affect the operation of this section in other circumstances.

Id.

We reject Plaintiff's and the dissenting opinion's assertion that section 5 constitutes an impermissible "exemption mechanism." Section 5 does not allow the State to create individual exemptions that would destroy general applicability. The record confirms that whether section 5 requires an exemption in a particular case is a narrow legal question, the answer to which turns solely on how, or if, a federal funding requirement applies. No evidence suggests that the insurance commissioner would be "forced to delve into the specific facts and circumstances" or to "consider the particular reasons for a person's conduct," Fellowship, 82 F.4th at 687, 688 (quoting Fulton, 593 U.S. at 533), when making that legal determination.[20] In sum, section 5 does not provide the insurance commissioner with the kind of "broad discretion to grant exemptions on less than clear

[20] Plaintiff's and the dissenting opinion's position, taken to its logical conclusion, would throw into serious question states' ability to include federal savings clause provisions in state laws because such purely legal determinations would constitute "individualized exemptions" that run afoul of general applicability.

considerations" that would run afoul of the principle of general applicability. Id. at 688 (emphases added).[21]

4. Rational Basis Review

Because the challenged laws are neutral and generally applicable, rational basis review applies, and we "must" uphold the laws if they are "rationally related to a legitimate governmental purpose." Parents, 949 F.3d at 1238; see also Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon, 880 F.3d 450, 457 (9th Cir. 2018), as amended, 881 F.3d 792 (9th Cir. 2018) ("Rational basis review is highly deferential to the government, allowing any conceivable rational basis to suffice."). Plaintiff does not contest that the challenged laws "easily satisf[y] that forgiving standard." Foothills, 148 F.4th at 1052; see also Parents, 949 F.3d at 1238 ("Plaintiffs 'have the burden to negate every conceivable basis which might support [the challenged laws].'" (emphasis added) (citation omitted)). For instance, the Parity Act is rationally related to the State's interest in ensuring that insured Washingtonians have improved access to reproductive health care services that support "the reproductive system, the capability to reproduce, and the freedom and services necessary to decide if, when, and how often to do so." See Parity Act, ch. 119, § 1(1), (4), (5), (9), 2018 Wash. Sess. Laws 689, 689–90; see also Roberts v. U.S. Jaycees, 468 U.S. 609, 626 (1984) ("Assuring women equal access to such goods, privileges, and advantages clearly furthers

[21] To the extent that that the dissenting opinion suggests that section 5 incorporates any "discretionary" element, Dissent at 105–06, that discretion lies with the federal government when establishing funding requirements, not with the insurance commissioner when determining as a matter of law whether application of the Parity Act would conflict with those requirements.

compelling state interests."). And the conscience statute advances the State's interest in protecting "every individual['s] . . . fundamental right to exercise their religious beliefs and conscience." Conscience Statute, ch. 265, § 25, 1995 Wash. Sess. Laws 30, 30; see also California v. Azar, 911 F.3d 558, 582 (9th Cir. 2018) ("Protecting religious liberty and conscience is obviously in the public interest.").

C. Church Autonomy Doctrine

The First Amendment's Religion Clauses "protect the 'principle of church autonomy,' which guarantees religious groups' 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" McMahon v. World Vision Inc., 147 F.4th 959, 970 (9th Cir. 2025) (quoting Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 747 (2020)). But that "does not mean that religious institutions enjoy a general immunity from secular laws." Our Lady, 591 U.S. at 746. So, for instance, religious organizations "must abide by neutral and generally applicable state and federal employment laws" except in relation to "certain employees . . . who perform 'important religious functions.'" McMahon, 147 F.4th at 970 (quoting Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 192 (2012)). That "ministerial exception" exists because the hiring or firing of an employee who performs "vital religious duties" that "lie at the very core of [a religious organization's] mission," id. at 975 (citation omitted), is no "mere employment decision" but rather reflects a church's "selection of those who will personify its beliefs" and "shape its . . . faith and mission," Hosanna-Tabor, 545 U.S. at 188. In short, the church autonomy doctrine comes into play when a law intrudes on

"internal management decisions that are essential to the institution's central mission." Our Lady, 591 U.S. at 746.

The challenged laws do not implicate the church autonomy doctrine. Operating in conjunction, the laws require a health insurance carrier to provide coverage for health care services excluded from an organization's health plan due to the organization's religious or moral objection. And the carrier must provide that coverage outside the objecting organization's health plan. In other words, the statutes in question do not deal with employment at the church itself or with matters of internal church governance. Consequently, the challenged laws do not violate the church autonomy doctrine.

**AFFIRMED.**

---

CALLAHAN, Circuit Judge, concurring in part and dissenting in part

The State of Washington has enacted a law that effectively forces Plaintiff Cedar Park Assembly of God of Kirkland, Washington (Cedar Park) to offer a group health insurance plan to its employees that provides them with access to abortion services and all federally approved methods of contraception. Cedar Park objects to offering such a plan because abortion and some methods of contraception violate its sincere religious belief that the sanctity of human life begins at conception. Invoking the First Amendment, Cedar Park seeks to enjoin enforcement of the State's law.

The majority concludes that Cedar Park has standing to sue Washington, and I agree. The majority, however, errs in holding that the State's law is consistent with the Constitution.

When a government law burdens the free exercise of religion, the First Amendment requires that the law be neutral and generally applicable; any law that is not must survive strict scrutiny review. In my view, Washington's law burdens Cedar Park's religious exercise, is neither neutral nor generally applicable, and cannot satisfy the high bar of strict scrutiny. The law thus runs afoul of the First Amendment. I respectfully dissent.

## I

### A

Governments frequently regulate entities involved in the provision of abortion services and contraceptives. Such regulations may address, for example, medical centers, individual healthcare professionals, drug companies, or health insurance carriers (as is the case here). Due to the nature of abortion and contraception, regulations like these often implicate the rights of third parties. *Cf. Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 852 (1992) ("Abortion is a unique act. . . . fraught with consequences for others[.]"), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231, 302 (2022). This dynamic may be seen in the events leading to today's case, which concerns Washington's regulation of health insurance providers in a manner that directly infringes on the religious exercise of a church.

The makings of this case date back to at least 2010, when Congress enacted the Patient Protection and Affordable Care

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 65 of 110



Act (ACA), Pub. L. 111-148, 124 Stat. 119. That law, as relevant here, regulated health insurance providers in a manner that functionally required certain employers to provide their employees with a group health plan that covered "'preventive care and screenings' for women without 'any cost sharing requirements.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 697 (2014) (quoting 42 U.S.C. § 300gg-13(a)(4)). Pursuant to this directive, the United States Department of Health and Human Services (HHS) promulgated a regulation mandating that all "nonexempt employers . . . provide 'coverage, without cost sharing' for 'all Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling.'" *Id.* (quoting 77 Fed. Reg. 8725) (citation modified).

HHS's contraceptive mandate generated controversy. That is because "[a]lthough many of the required, FDA-approved methods of contraception work by preventing the fertilization of an egg, four of those methods . . . may have the effect of preventing an already fertilized egg from developing any further by inhibiting its attachment to the uterus." *Id.* at 697–98.

HHS wholly exempted "religious employers" from the contraceptive mandate. *Id.* at 698. This "category encompasse[d] 'churches, their integrated auxiliaries, and conventions or associations of churches,' as well as 'the exclusively religious activities of any religious order.'" *Id.* (quoting 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii)). This "church exemption" explicitly provided that "group health plans established and maintained by these religious employers (and any group health insurance coverage provided in connection with such plans) are not required to cover contraceptive services." 77 Fed. Reg. 8726.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 66 of 110



Separately, HHS offered a narrower religious accommodation to some nonprofit organizations with religious objections. *Hobby Lobby*, 573 U.S. at 698. To receive an accommodation, an eligible objecting organization needed to "self-certify that it opposes providing coverage for particular contraceptive services." *Id.* at 731 (first citing 45 C.F.R. §§ 147.131(b)(4), (c)(1); and then citing 26 C.F.R. §§ 54.9815–2713A(a)(4), (b)). When the employer provided the self-certification form to its group health insurance issuer, the issuer was required to "exclude contraceptive coverage from the employer's plan and provide plan participants with separate payments for contraceptive services without imposing any cost-sharing requirements on the employer, its insurance plan, or its employee beneficiaries." *Id.* at 682–83. Under this accommodation, plan beneficiaries "would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives" because the plan issuers "would be responsible for providing information and coverage." *Id.* at 732. Thus, "[u]nlike the earlier church exemption, the accommodation did not exempt these religious employers from the contraceptive mandate, but [HHS] construed invocation of the accommodation as compliance with the mandate." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 689–90 (2020) (Alito, J., concurring).

HHS's accommodation framework, however, did not work for everyone. For example, HHS did not offer the accommodation to for-profit employers with religious objections to the mandate, so some of those entities filed suit. *See, e.g.*, *Hobby Lobby*, 573 U.S. at 700–702. Additionally, some other employers—who qualified for the accommodation—sued HHS because they believed that "the

certification form would force them to violate their religious beliefs by 'taking actions that directly cause others to provide contraception or appear to participate in [HHS's] delivery scheme.'" *Little Sisters*, 591 U.S. at 669 (quoting *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151, 1160 (10th Cir. 2015)); *see also Zubik v. Burwell*, 578 U.S. 403 (2016) (per curiam); *Wheaton Coll. v. Burwell*, 573 U.S. 958 (2014).

To address the issues around the contraceptive mandate specifically and to strengthen First Amendment protections more generally, in May 2017 President Trump issued Executive Order 13798, titled "Promoting Free Speech and Religious Liberty." Section 3 of the Order directed the Secretaries of HHS, the Department of Labor, and the Department of the Treasury to consider amending current regulations "to address conscience-based objections to the preventive-care mandate." That October, HHS, Labor, and Treasury jointly issued interim final rules expanding religious-based exemptions for employers and other objecting entities. 82 Fed. Reg. 47,792 (Oct. 13, 2017); *see also* 83 Fed. Reg. 57536, 57592, codified at 45 C.F.R. pt. 147 (Nov. 15, 2018) (establishing final rules). Thus, the administration "made the church exemption available to non-governmental employers who object to the provision of some or all contraceptive services based on sincerely held religious beliefs." *Little Sisters*, 591 U.S. at 691 (Alito, J., concurring) (citing regulations).

**B**

In January 2018, Washington State lawmakers introduced the bill which would eventually become the Reproductive Parity Act (Parity Act). S.B. 6219, 65th Leg., Reg. Sess. (Wash 2018). From the very beginning, the bill

was situated in the context of the ACA, HHS's contraception mandate, and the expanded federal regulations granting religious exemptions to religious employers and organizations. *See* Wash. S. Health & Long-Term Care Comm., Wash. Comm. Rep., *Concerning health plan coverage of reproductive health care*, S. 65, Reg. Sess. (Jan. 12, 2018).

The new bill had two central provisions. Like the contraceptive mandate, the bill "require[d] that health plans provide coverage for all contraceptives approved by the Food and Drug Administration and for all related services." Maj. Op. 15 (citing Wash. Rev. Code § 48.43.072(1)(a),(c)). Additionally, the bill built upon the ACA, by "require[ing] health carriers to include coverage for abortion services in all the health plans that they offer to Washington employers if the employers are covered by the [ACA]." *Id.* at 14 (citing 42 U.S.C. §§ 18001–18122).

The text of the bill contained no exemptions or accommodations for religious- or conscience-based objections. *See* S.B. 6219, 65th Leg., Reg. Sess. (Wash. 2018). In theory, such measures were arguably unnecessary because regulated parties with religious- or conscience-based objections could invoke the protections of the State's 1995 conscience objection statute (the Conscience Statute). The Conscience Statute provides a framework for accommodations to State health insurance laws that "aims to balance 'the right of conscientious objection to participating in specific health care services' with 'the right of individuals enrolled with [health] plans . . . to receive the full range of services' that Washington law recognizes as essential." Maj. Op. 11 (quoting Wash. Rev. Code § 48.43.065(1)).

Washington lawmakers who opposed the bill disagreed that the Conscience Statute would adequately address potential objections, arguing that the proposed law "would violate the constitutionally protected conscious rights of religious organizations and individuals." S. Health & Long-Term Care Comm., Wash. Comm. Rep, *Concerning health plan coverage of reproductive health care*, S. 65, Reg. Sess. (Jan. 12, 2018). Accordingly, the bill's opponents proposed legislative amendments to recognize religious exemptions on at least three occasions; the legislature rejected each proposal. S. Comm. Amd. to PSSB 6219 (S-3824.1/18) (failed), S. Comm. on Health & Long Term Care (S. Rivers), 2018 Reg. Sess. (Wash.), https://app.leg.wa.gov/committeeschedules/Home/Document/135146 [https://perma.cc/K7N5-VUCA]; Substitute S.B. 6219 S. Amd. 380 (Not adopted 1/31/2018), 65th Leg., Reg. Sess. (Wash. 2018); Substitute S.B. 6219 H. Amd. 1311 (Not adopted 2/28/2018), 65th Leg., Reg. Sess. (Wash. 2018).

Washington's governor officially signed the bill into law on June 7, 2018. Reproductive Parity Act, ch. 119, 2018 Wash. Sess. Laws 689 (codified as amended at Wash. Rev. Code §§ 48.43.072, 48.43.073). The Parity Act does not reference the Conscience Statute. *See generally id.* However, the Final Bill Report does reference the Conscience Statute's protections and also directs Washington's Office of the Insurance Commissioner (OIC) to "establish a mechanism to recognize the right of conscience while ensuring enrollees timely access to services and to ensure prompt payment to providers." Wash. Leg., Wash. Final Bill Rep., SSB 6219, Leg. 65, 2d Reg. Sess. (June 22, 2018).

The Parity Act's mandates "appl[y] to all 'health plans' issued or renewed in Washington after January 1, 2019."

Maj. Op. 14 (first citing Wash. Rev. Code §§ 48.43.072(1) (2018), 48.43.073(1) (2018); and then citing 2018 Wash. Sess. Laws at 691–92). Because health plans must be compliant with the ACA, the Parity Act's abortion-coverage mandate applies to Washington employers that hold fully-insured group health plans and have more than 50 employees. *See* Maj. Op. 14–15. Anyone in violation of the Parity Act's abortion-coverage mandate is guilty of a gross misdemeanor, may be fined up to $1,000, and may be imprisoned for up to 364 days, among other penalties. Wash. Rev. Code § 48.01.080. In December 2019, the OIC promulgated regulations implementing the Parity Act, including a provision clarifying that the statute "does not diminish or affect any rights or responsibilities provided under" the Conscience Statute. Wash. Admin. Code § 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(3).

**C**

Cedar Park is a Christian church in Washington. It has over 600 members, hosts services for around 1,500 people every week, and employs over 300 individuals. It provides group health insurance to roughly 135 of its employees who work full-time. The Church has both a religious motivation to provide these employees with health insurance and a legal duty to do so under the ACA. *See* 26 U.S.C. § 4980H; 42 U.S.C. § 18022(b)(1)(D). It thus also is subject to the Parity Act's mandates.

As stated in its Constitution and Bylaws, the Church holds a sincere religious belief that "all human life is sacred and made by God," that human life begins at conception, and that "Christians are called to defend, protect, and value all human life." This sincerely held belief leads Cedar Park to oppose abortion and any contraceptive methods that it

believes facilitate "the ending of the life of a fertilized embryo."

Cedar Park affirms this belief in numerous ways. For example, it has partnered with a local pregnancy center that supports women experiencing unplanned pregnancies and has "facilitated about 1,000 embryo adoptions in recent years." It has also steadfastly sought to procure a health insurance plan for its employees that excludes abortion services and abortifacients.[1] Prior to the Parity Act's enactment, Cedar Park held such a group health plan with Kaiser Permanente (Kaiser).

With the Parity Act's passage, Cedar Park's abortion-excluding, fully insured group health plan issued by Kaiser became presumptively unlawful. Thus, in August 2019, Kaiser informed the Church that when the Church's plan renewed in September 2019, the Church would be required to include abortion coverage as a defined plan benefit. Citing the Parity Act, Kaiser informed Cedar Park that it could not offer a group health plan that excluded abortion services. However, Kaiser "expressed its willingness to eliminate abortion coverage from Cedar Park's health plan" if the Parity Act did not tie its hands.

Cedar Park then tried unsuccessfully to find what it considered an acceptable replacement plan. It could not find an available fully insured group health plan that excluded coverage for abortion services and was sufficiently comparable to its former Kaiser plan, because under

[1] Cedar Park uses the term "abortifacients" to refer to some FDA-approved methods of contraception that it believes cause the destruction of a fertilized embryo and thus violate its religious belief. For brevity and simplicity, in the remainder of this opinion, I refer to Cedar Park's objection as an objection to abortion services generally.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 72 of 110



Washington law, all such plans provide coverage for abortion services one way or another. Nor could it find an alternative type of plan that, while fully excluding coverage for abortion services, would also provide the same coverages it had before without incurring additional costs of up to hundreds of thousands of dollars per year. As a result, Cedar Park procured and continues to hold a Kaiser group health plan that directly covers abortion services. According to Senior Pastor and Church head Jason Smith, "in order to purchase a plan that meets the needs of our employees," "the only choice that we have is to purchase a plan [that covers abortion services] and to do so under . . . great objection."

**D**

In March of 2019, Cedar Park sued Washington and two State officials, seeking to enjoin the Parity Act on the grounds that it violated the First Amendment. The Church has unsuccessfully sought to vindicate its constitutional rights for the last seven years.

Initially, at the pleading stage, the district court dismissed Cedar Park's claims outright for lack of Article III standing. We reversed as to Cedar Park's current claims. *Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler* (Cedar Park I), 860 F. App'x 542, 543 (9th Cir. 2021) (unpublished).

On remand, at summary judgment, the district court ruled that Cedar Park had standing but nonetheless found no First Amendment violations. However, on appeal, we changed course and found that Cedar Park did not have standing but then withdrew our opinion. *Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler* (Cedar Park II), 130 F.4th 757, 764-69 (9th Cir. 2025) (withdrawn by

*Cedar Park Assembly of God of Kirkland, Wash. v. Kuderer*, 146 F.4th 885 (9th Cir. 2025)).

Today, the majority holds that the Church has standing but that its Free Exercise claim fails. In so holding, the majority fails to appreciate the nature of Cedar Park's claim and misreads both the Parity Act and the Conscience Statute. All told, the majority's analysis falls short at every step.

**II**

I begin with Article III standing. I agree that Cedar Park has standing but disagree with the majority's reason why.

The majority concludes that Cedar Park has standing to challenge the Parity Act because "[i]t is a 'commonsense economic realit[y]' that, if abortion services were more affordable, Plaintiff's employees or their family members would be more likely to access those services." Maj. Op. 20 (first quoting *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025); and then citing *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026)). While likely true, this misstates the inquiry at hand. *See Hobby Lobby*, 573 U.S. at 723–24 (rejecting HHS's argument that the contraceptive mandate would only harm the objecting religious employers "if an employee chose to take advantage of the [objected-to] coverage" provided in a health plan).

The sole question that matters for our purposes is whether the Parity Act itself harms Cedar Park's "ability to conduct business in accordance with [its] *religious beliefs*." *See id.* at 686 (emphasis in original). The Parity Act does so, for several reasons. *See Cedar Park II*, 130 F.4th at 772–80 (Callahan, J., dissenting). Because there is substantial overlap between the standing analysis and parts of the Free

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 74 of 110



Exercise analysis below, *see infra* 78–90, I only briefly state the reasons here.

The Parity Act impairs Cedar Park's ability to conduct its affairs in accordance with its religious belief because, through its regulation of Washington health plan issuers, the law effectively requires Cedar Park to purchase a group health plan that covers abortion services. *See Cedar Park II*, 130 F.4th at 772–74 (Callahan, J., dissenting); *see also FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 384–85 (2024) (describing how an unregulated plaintiff may claim standing when "government regulation of a third-party individual or business may be likely to cause injury in fact to [the] unregulated plaintiff"). This injury can be parsed into three discrete harms.

*First*, the Parity Act caused Cedar Park to lose access to its prior, abortion-excluding group health plan that it purchased from Kaiser. *See Cedar Park II*, 130 F.4th at 774–78 (Callahan, J., dissenting); *see also Cedar Park I*, 860 F. App'x at 543 (holding that Cedar Park plausibly alleged a cognizable injury because the Parity Act caused Kaiser to "stop[] offering a plan with abortion coverage restrictions and Cedar Park could not procure comparable replacement coverage" (citing *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020))).

*Second*, the Parity Act coerces Cedar Park into paying for a health plan that provides plan enrollees with abortion services (either as a defined plan benefit or as an undefined but nonexcludable covered service), under the threat of steep financial penalties. *See Cedar Park II*, 130 F.4th at 774–80 (Callahan, J., dissenting). The Church is injured simply by being forced to pay for a health plan that provides such access to abortion services; whether payment eventually

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 75 of 110



results in a plan enrollee actually accessing the service is irrelevant. As the Supreme Court recognized in *Hobby Lobby*, this asserted financial injury "implicates a difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an [allegedly] immoral act by another." 573 U.S. at 724. Our only task is to assess whether this belief "reflects 'an honest conviction,'" not whether it is "mistaken or insubstantial." *Id.* at 725 (quoting *Thomas v. Review Bd. Of Indiana Employment Sec. Div.*, 450 U.S. 707, 716 (1981)).

Cedar Park firmly believes that the act of providing a health plan for which it pays in any way to facilitate access to abortion services violates its sincere religious beliefs. Thus, the relevant question concerns causation: whether the Parity Act either (1) has actually caused the injury to occur or (2) makes it sufficiently likely that it will occur. *See, e.g., Hippocratic Med.*, 602 U.S. at 382. In my view (as I explain further below, *see infra* 78–88), the evidence shows that the Parity Act does both. *See Hippocratic Med.*, 602 U.S. at 384 ("[W]hen the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as . . . customers.").

*Third*, irrespective of any financial harm, the Parity Act injures Cedar Park by requiring the Church to—in its words—"cooperat[e] in wrongdoing." *See Cedar Park II*, 130 F.4th at 772–74 (Callahan, J., dissenting). This cooperation occurs when Cedar Park provides its employees with a health plan covering abortion services as a defined plan benefit. But it would also occur if Cedar Park were to provide its employees with a health plan adjusted for the

Conscience Statute's religious accommodation. That is because, although Cedar Park's plan would not directly cover abortion services, it would still facilitate access to the services by providing plan enrollees with (1) information (in Cedar Park's health plan documents) about alternative ways to access abortion services and (2) a Cedar Park-sponsored health insurance card that enrollees may use to obtain abortion services elsewhere. Again, whether any enrollee actually accesses the services makes no difference to this asserted injury.

In my view, this injury is judicially cognizable. *See Hobby Lobby*, 573 U.S. at 724; *Little Sisters*, 591 U.S. at 693 (Alito, J., concurring) (explaining that "[i]f an employer has a religious objection to the use of a covered contraceptive, and if the employer has a sincere religious belief that compliance with the mandate makes it complicit in that conduct," then courts must honor that belief); *see also, e.g.*, *Detwiler v. Mid-Columbia Med. Ctr.*, 172 F.4th 1072, 1073–81 (9th Cir. 2026) (Forrest, J., dissenting from denial of reh'g en banc) ("[W]hen a case challenges our views of permissible belief, we must not succumb to the temptation to opine."); *Oregon Right to Life v. Stolfi*, 158 F.4th 1013, 1021 (9th Cir. 2025) (quoting *United States v. Seeger*, 380 U.S. 163, 184–85 (1965)) ("Courts are required to give 'great weight'" to an entity's evidence offered to show that the entity's "beliefs 'are, in [its] own scheme of things, religious.'"); *First Choice*, 146 S. Ct. at 1125 ("An injury in fact does not arise only when a defendant causes a tangible harm to a plaintiff, like a physical injury or monetary loss. It can also arise when a defendant burdens a plaintiff's constitutional rights.").

Cedar Park's standing in this case never should have been in doubt. The majority's failure to acknowledge that

the Parity Act harms Cedar Park's "ability to conduct business in accordance with [its] *religious beliefs*" distorts the standing analysis. *See Hobby Lobby*, 573 U.S. at 686. Fortunately, the majority reaches the right result as to standing, even if for the wrong reason. Unfortunately, however, the majority's flawed standing analysis evades the heart of Cedar Park's Free Exercise claim, leading the majority to devalue Cedar Park's religious liberty and bless the State's compulsion of the Church to provide support for practices that violate its core religious beliefs.

## III

The First Amendment to the Constitution, made equally applicable to the States by the Fourteenth Amendment, provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *See Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). The Free Exercise Clause "protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Carson v. Makin*, 596 U.S. 767, 778 (2022) (quoting *Lyng v. Nw. Indian Cemetery Protective Assn.*, 485 U.S. 439, 450 (1988)). This protection extends to government attempts to place "conditions upon a benefit or privilege" that seek to coerce or penalize religious belief. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).

We subject laws that violate these principles to strict scrutiny, "'the most rigid' and 'most searching judicial inquiry' known to constitutional law." *Bates v. Pakseresht*, 146 F.4th 772, 784 (9th Cir. 2025) (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,

600 U.S. 181, 207 n.3 (2023)). "To avoid strict scrutiny, laws that burden religious exercise must be both neutral and generally applicable." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 681 (9th Cir. 2023) (en banc); *see Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990).

The Parity Act must face strict scrutiny because it burdens Cedar Park's religious exercise and is neither neutral nor generally applicable. The majority errs in concluding otherwise.

**A**

**1**

The Parity Act burdens Cedar Park's exercise of religion. It does so by effectively placing religiously coercive conditions upon a State-controlled privilege: the ability to procure a State-approved group health plan. *See Hobby Lobby*, 573 U.S. at 724 (describing the relevant question as "whether the HHS mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*"). Specifically, the Parity Act—through its regulation of health plan issuers—conditions the Church's ability to obtain a group health plan on its willingness to purchase a plan that provides its employees with coverage for abortion services, in violation of its sincere religious belief that the sanctity of human life begins at conception. Conditioning the availability of a privilege in this way, "'effectively penalizes the free exercise' of religion." *Carson*, 596 U.S. at 780 (quoting *Trinity Lutheran*, 582 U.S. at 459); *see, e.g.*, *Bates*, 146 F.4th at 790–91 (finding Oregon policy burdened religious exercise where the policy conditioned potential foster parent's ability to obtain a State-controlled certification on

the applicant's willingness to "affirm and promote an understanding of sexuality and gender identity that is contrary to her sincerely held religious beliefs").

Indeed, we are bound by the Supreme Court's decision in *Hobby Lobby* to reach this holding. There, three religious employers argued that HHS's contraceptive mandate (imposed via regulations on health plan issuers) forced them "to provid[e] health insurance" for their employees covering four methods of contraception that violated the employers' sincere religious belief that life begins at conception. *Hobby Lobby*, 573 U.S. at 701. The Court held that the mandate, "[b]y requiring [the employers] to arrange for such coverage," placed a substantial burden on the objecting employers' religious exercise because it "demands that they engage in conduct that seriously violates their religious beliefs."[2] *Id.* at 720. In reaching this holding, the Court considered whether "non-compliance" with the mandate would "have substantial practical adverse consequences[.]" *Little Sisters*, 591 U.S. at 692 (Alito., J., concurring) (citing

[2] *Hobby Lobby* dealt with a religious exercise challenge raised under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq.*, rather than the First Amendment. 573 U.S. at 688–91. However, the burden analysis under RFRA mirrors the burden analysis under the First Amendment—a commonsense proposition given that RFRA protects "a person's exercise of religion" specifically in furtherance of the Free Exercise Clause of the First Amendment. *See* 42 U.S.C. § 2000bb-1(a); *see also Apache Stronghold v. United States*, 101 F.4th 1036, 1058–61 (9th Cir. 2024) (en banc) (explaining that RFRA's substantial burden standard incorporates the Supreme Court's Free Exercise jurisprudence as to "what counts as a governmental imposition of a substantial burden on religious exercise"). Consistent with this understanding, in *Hobby Lobby* the Supreme Court exclusively relied on its First Amendment jurisprudence to analyze the RFRA burden question. 573 U.S. at 724–26 (collecting cases).

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 80 of 11



*Hobby Lobby*, 573 U.S. at 720–23). And it evaluated whether "compliance" with the mandate would "cause the objecting party to violate its religious beliefs, *as it sincerely understands them*[.]" *Id.* (citing *Hobby Lobby*, 573 U.S. at 723–26) (emphasis in original).

There is no meaningful distinction between the burden on religious liberty recognized in *Hobby Lobby* and the burden that the Parity Act places on Cedar Park here. Non-compliance with the Parity Act's abortion mandate would also require non-compliance with the ACA, thus subjecting Cedar Park to the same "crippling fines of up to $100 per plan participant for each day it doesn't provide [ACA-compliant] coverage" that were the basis of the *Hobby Lobby* plaintiffs' substantial economic penalties. *See* 26 U.S.C. §§ 4980D, 4980H; *see also Hobby Lobby*, 573 U.S. at 720. Yet compliance with the Parity Act's mandate would force Cedar Park to provide its employees with a health plan covering abortion services (irrespective of whether the services are a defined plan benefit), in violation of its sincerely held religious beliefs.[3] *See infra* 83–84. Thus, the

[3] It is true, as the majority notes, that the *Hobby Lobby* plaintiffs religious objections were satisfied with a religious accommodation substantially similar to the accommodation that Washington offers to Cedar Park. Maj. Op. 34. But crucially, while the *Hobby Lobby* accommodation "require[d] the [health plan] issuer to bear the cost of [the objected-to] services, HHS determined that this obligation w[ould] not impose any net expense on issuers[.]" *See* 573 U.S. at 699 (citing 78 Fed. Reg. 39877); *see also id.* at 731 n.38. Washington made no such finding here with respect to its accommodation. To the contrary, the evidence strongly suggests that there are additional costs generated under Washington's regulatory regime for plan issuers offering plans containing a religious accommodation, because Washington pays these costs for plan issuers under some circumstances. If these costs are simply passed on from the issuers to the objecting employers (via

burden analysis—like the standing analysis before it—should have been straightforward.

**2**

Although the majority eventually assumes that the Parity Act burdens Cedar Park's religious exercise, it first asserts an array of arguments seeking to avoid that conclusion. Maj. Op. 21–41. These arguments overlook the heart of Cedar Park's objection to the Parity Act and are otherwise flawed.

The majority's analysis turns on its resolution of a central, disputed aspect of this case—whether Cedar Park pays (directly or indirectly) for any costs associated with the plan's coverage of the objected-to abortion services. *See* Maj. Op. 22–34. The majority concludes that the answer is no. Its conclusion results from its interpretation as to how the Parity Act interacts with Washington's Conscience Statute, and its determination that plan issuers share its understanding of the statutes and act accordingly.

The Conscience Statute provides for two distinct conscience- or religious-based accommodations to laws mandating specific health care services such as the Parity Act. Wash. Rev. Code § 48.43.065(2), (3). It also contains provisions that address the effects of these accommodations on plan enrollees and other entities involved in the provision of healthcare services. *Id.* § 48.43.065(2), (3), (4).

The Conscience Statute's first accommodation (the § (2)(a) accommodation) provides that: "No individual health care provider, religiously sponsored health carrier, or health care facility may be required by law or contract in any

---

increased premiums or undifferentiated fees), *see infra* 84–88, then it makes no meaningful difference that the employer did not have to explicitly purchase abortion services as a defined plan benefit.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 82 of 11



circumstance to participate in the provision of or payment for a specific [health] service if they object to so doing for reason of conscience or religion." *Id.* § 48.43.065(2)(a).

With its second exception (the § (3)(a) accommodation), the Conscience Statute states that: "No individual or organization with a religious or moral tenet opposed to a specific [health] service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion." *Id.* § 48.43.065(3)(a).

The actual effects of the Conscience Statute's provisions, however, remain unclear. To mitigate the effect of the § (2)(a) accommodation on plan enrollees, the Conscience Statute states that the exception is "not intended to result in an enrollee being denied timely access to any service included in the basic health plan services." *Id.* § 48.43.065(2)(b). Accordingly, health plan issuers that offer plans recognizing this accommodation must still provide enrollees with "written information describing how an enrollee may directly access [the] services in an expeditious manner[.]" *Id.* § 48.43.065(2)(b)(ii).

Similarly, to counteract the effect of the § (3)(a) accommodation on plan enrollees, the Conscience Statute mandates that an "employer's or another individual's exercise of" this accommodation "shall not result in an enrollee being denied coverage of, and timely access to, any service or services excluded from their benefits package." *Id.* § 48.43.065(3)(b). Health plan issuers are responsible for ensuring that plan enrollees have access to the services. *Id.* § 48.43.065(3)(c).

Finally, to address any effects on entities involved in the provision of healthcare services, the Conscience Statute

states that "[n]othing in this section requires a health carrier, health care facility, or health care provider to provide any health care services without appropriate payment of [a] premium or fee." *Id.* § 48.43.065(4).

Relying on the Conscience Statute's § (3)(a) accommodation, the majority argues that the Parity Act does not coerce Cedar Park into providing coverage for abortion services for its employees because "the conscience statute's plain text protects Plaintiff from being required to 'purchase coverage' for any health care service to which it objects on religious grounds." Maj. Op. 22 (quoting Wash. Rev. Code § 48.43.065(3)(a)); *see also id.* at 26. Although Cedar Park currently purchases a Parity Act-compliant health plan in which it directly pays for abortion services as a defined plan benefit, the majority claims that the Church need not do so. *Id.* at 22–26. In the majority's opinion, Cedar Park has freely chosen to maintain its current health plan because the record supposedly shows that it could have used the § (3)(a) accommodation to purchase an abortion-excluding health plan that is comparable to its previous Kaiser plan. *See id.*

The problem with the majority's position is that it fails to recognize the core distinction between Cedar Park's former Kaiser plan and any Parity Act-compliant health plan that Cedar Park could obtain honoring its § (3)(a) accommodation request—even if the plans are financially comparable, the new plan under the Parity Act must still provide plan enrollees with access to abortion services. *See* Wash. Rev. Code § 48.43.065(3)(b). As far as Cedar Park is concerned, this basic fact—that no Parity Act-compliant plan can *actually* exclude abortion coverage—makes any Parity Act-compliant plan that Cedar Park could purchase insufficiently comparable to its prior Kaiser plan. *See* Oral Argument 1:43–3:58. The Parity Act thus coerces the

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 84 of 110



Church into purchasing a fully insured health plan that, one way or another, covers abortion services.

So, if all health plans available to Cedar Park inevitably cover abortion services, then the natural question is: who is paying for those services? At present, Cedar Park pays for the services directly as a defined plan benefit. But even if the Church could obtain a financially comparable plan that honors its § (3)(a) accommodation request, Cedar Park may well still find itself *indirectly* paying the costs generated by the objected-to abortion services via an "appropriate payment of a premium or fee." Wash. Rev. Code § 48.43.065(4). A plan issuer, which must provide coverage for abortion services to plan enrollees notwithstanding the employer's objection, would reasonably pass along the additional costs of abortion coverage in this way. Indeed:

> [T]he state conceded that Cedar Park might have to indirectly pay for the newly required abortion coverage, and a prior Washington Attorney General acknowledged as much. *See* Wash. Att'y Gen. Op. 2002 No. 5 (explaining that the conscience statute does not "preclude all mechanisms whereby an employer would provide payments to others without direct purchase of the services to which the employer objects"). And, as the district court pointed out, if the insurer and employee are not required to pay for the abortion coverage, and the state itself is not paying, "the cost must be falling back on the employer."

*Cedar Park II*, 130 F.4th at 779 (Callahan, J., dissenting).

The majority responds that it "do[es] not think that Washington courts would embrace" an interpretation of the Conscience Statute that would allow for this result. Maj. Op. 28 (citing *State v. Eaton*, 229 P.3d 704, 708 (Wash. 2010)). The majority also hypothesizes that, rather than legally increase plan premiums or charge nondescript fees, health insurers may (1) absorb any extra costs themselves; (2) raise costs on other, non-objecting, health plan purchasers; or (3) save money overall (and thus have no extra financial burden to pass along) by providing abortion services. *See* Maj. Op. 31–32.

The majority's assumptions cannot bear the weight of scrutiny. I doubt that Washington courts would avoid the plain text to reach what the majority suggests is the correct policy result. This is especially true here because directly "purchas[ing] coverage" for a specific service is distinct from paying "an appropriate premium or fee" related to any of the diffuse costs (administrative, logistical, etc.) of covering the specific service. The majority advances its preferred reading of the statute to conclude that an "appropriate payment of premium or fee" cannot include a higher premium or additional fees caused by increased expenses related to the objected-to health services, but the statute itself contains no such limitation.[4] *See* Maj. Op. 27–29; Wash. Rev. Code § 48.43.065(4). Moreover, the majority's reading still leaves unaddressed the reasonable likelihood that "if the insurer and employee are not required

[4] I agree with the majority that the term "appropriate," as used here, "modifies the term 'payment,' *not* the phrase 'premium or fee.'" Maj. Op. 27 (citations omitted). But that says nothing about whether a plan issuer may adjust the premium or fee to absorb increased expenses caused by the issuer's mandatory provision of the objected-to health services.

to pay for the abortion coverage, and the state itself is not paying, [then] the cost must be falling back on the employer." *Cedar Park II*, 130 F.4th at 779 (Callahan, J., dissenting) (internal quotation marks omitted).

As the district court noted, Washington has "not explain[ed] who *would* pay for abortion services provided to an insured under Cedar Park's policy," nor made "clear how or by whom that cost would be paid while complying with the [Conscience] [S]tatute's requirement that an insurer cannot be forced to cover that service 'without appropriate payment of premium or fee.'" This notably contrasts with the State's decision to pay the cost of abortion services for individuals holding plans subject to the Conscience Statute's § (2)(a) accommodation.

Given the legal option to do so, a reasonable health plan issuer would likely pass on the costs of covering abortion services. To deny this economic logic, the majority first points to evidence showing that some plan issuers have agreed to themselves pay (and thus, not to charge Cedar Park either directly or indirectly) for the limited methods of contraception that Cedar Park objects to covering in its health plans. Maj. Op. 29. The majority infers from this undisputed evidence the plainly disputed factual premise that no carrier "would establish different processes for excluded abortion coverage." Maj. Op. 29–30. But this is a weak inference, especially because the Parity Act's contraception mandate raises different considerations for plan issuers than does the Parity Act's abortion services mandate. The most important difference is that the Parity Act's contraception mandate dovetails with HHS's contraception mandate. As noted, federal regulations now grant exceptions from HHS's contraception mandate to objecting religious employers. *See* 83 Fed. Reg. 57536,

57592. Accordingly, for plan issuers to follow Washington law on this issue and enforce a contraception mandate would risk placing them uncomfortably at odds with federal regulations.

The majority next speculates that rather than use the available legal loophole, Washington health plan issuers may instead decide to either "treat the [increased] costs as an administrative expense that it spreads across each of its health plans" purchased by non-objecting health plan issuers, or "simply absorb the costs" themselves. Maj. Op. 31. There is no good reason to assume plan issuers would adopt either of these approaches. Other plan purchasers may themselves take issue with cost increases in their own plans unrelated to services for their own employees. And the majority's belief in health plan issuers' willingness to simply absorb extra costs is debatable.

The majority faults Cedar Park for failing to counter its economic speculation with any hard "evidence demonstrat[ing] that any health carrier offering an abortion-excluding plan in Washington has passed, or will pass, directly or indirectly, the costs of abortion services . . . to any employer that has exercised its rights under the conscience statute." *Id.* at 32–33. However, the majority errs by "misplac[ing] the burden on Cedar Park." *Cedar Park II*, 130 F.4th at 779 (Callahan, J., dissenting). The evidence shows that providing coverage for abortion services generates costs, and it is Washington—as the party seeking summary judgment—that has the burden of showing that plan issuers would not indirectly pass on those costs to employers like Cedar Park. Washington fails to carry that burden, given that it conceded that the Church might indirectly pay for the newly required abortion coverage and so "there was no earthly reason for Cedar Park to produce

evidence" to challenge this point. *Id.* The majority thus lacks a sufficient basis to definitively rule that "the undisputed evidence demonstrates that carriers understand that the conscience statute does not allow them to use an objecting employer's premiums to pay for excluded services." Maj. Op. 29.

Finally, the majority posits that "a health carrier might save money by ensuring that all enrollees in its health plans have access to contraceptives and abortion services, even if some employers with religious or moral objections exclude coverage for—and do not pay for—those services." Maj. Op. 31. The majority draws this assumption not from Washington's evidence or argument but from its own assessment of economic analysis offered, under different circumstances, by federal agencies in relation to the ACA and the contraceptive mandate. *Id.* (citing Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39870 (July 2, 2013)). The majority's hypothesis is unproven with respect to this case (especially as to the abortion mandate here), and again impermissibly draws an inference in favor of Washington to resolve a disputed material fact at summary judgment.

Yet even assuming that Cedar Park need not pay (directly or indirectly) for any costs associated with abortion services in its health plan, Cedar Park originally argued that the Conscience Statute's exceptions would still not sufficiently alleviate the burden on Cedar Park's religious exercise. As mentioned, any plan that Cedar Park would be able to purchase—even providing for the relevant Conscience Statute exemption—would still require providing plan enrollees with (1) information about how to obtain funded abortion services through the plan issuer and (2) a Cedar Park plan insurance card that enrollees could use to obtain

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 89 of 11



abortion services. *See* Wash. Rev. Code § 48.43.065(3)(b). Cedar Park's health plan would therefore remain the but-for cause of Cedar Park's employees having access to abortion services, and "[t]hus, Cedar Park necessarily facilitates access to [the services] simply by entering into a contract with an insurer servicing the State of Washington." *Cedar Park II*, 130 F.4th at 773–74 (Callahan, J., dissenting).

According to the Church, being forced by the Parity Act to contract for a health plan that facilitates abortion services in this way burdens its religious exercise because "the church is 'cooperating in wrongdoing.'" *Id.* at 773. This accords with the beliefs of other organizations that raised non-monetary, facilitation-of-abortion type concerns with HHS's contraceptive mandate's self-certification form. *See, e.g.*, *Little Sisters*, 591 U.S. at 669 (describing the history of such challenges from "[r]eligious nonprofit organizations and educational institutions across the country").

In the majority's view, Cedar Park "significantly weaken[ed]" its facilitation-of-abortion position by conceding that it would accept a health plan subject to Conscience Statute's § (2)(a) accommodation. Maj. Op. 36. Cedar Park infers that plans subject to that exception do not allow the employer to be indirectly charged for abortion services. This is a reasonable inference, because Washington offers to pay the cost of abortion services for individuals holding plans subject to the § (2)(a) accommodation.

It is not clear to me that Cedar Park conceded that a plan subject to the § (2)(a) accommodation would *fully* accommodate its religious objections. While Cedar Park's counsel indicated that the Church would accept such a plan over the plan it currently holds, I do not take that position to do away with Cedar Park's consistent claim throughout this

litigation that it objects to "paying for, facilitating access to, or providing insurance coverage for abortion . . . under any circumstance, whether that complicity is direct, indirect, or somewhere in between." If Cedar Park did not, in fact, concede its objection to the non-monetary requirements that it perceives as "cooperation in wrongdoing," then those requirements would certainly burden Cedar Park's religious exercise. *See supra* 75–76; *see also Little Sisters*, 591 U.S. at 695 (Alito, J., concurring) ("Where to draw the line in a chain of causation that leads to objectionable conduct is a difficult moral question, and our cases have made it clear that courts cannot override the sincere religious beliefs of an objecting party on that question." (citing *Hobby Lobby*, 573 U.S. at 723–26; *Thomas*, 450 U.S. at 715–16)).

Either way, however, the result is the same: the Parity Act burdens Cedar Park's religious exercise. The statute does so by coercively conditioning Cedar Park's ability to procure a State-approved health plan upon Cedar Park's willingness to give up its religious objection to providing its employees with a plan that provides access to abortion services.

**B**

**1**

I next consider whether the Parity Act is neutral towards religion, and conclude that it is not.

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022). Even if a policy does not overtly discriminate against religion, "the

Free Exercise Clause 'forbids subtle departures from neutrality,' and 'covert suppression of particular religious beliefs.'" *Fellowship*, 82 F.4th at 690 (quoting *Lukumi*, 508 U.S. at 546). "A finding that [the State] acted with an unconstitutional motive is not essential to [this] analysis." *Bates*, 146 F.4th at 795.

To assess a law's neutrality, we look to the text of the law and also "examine 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Fellowship*, 82 F.4th at 690 (quoting *Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018)). We consider "the totality of the circumstances surrounding [the law's] application, including 'the effect of [the] law in its real operation,' which 'is strong evidence of its object.'" *Bates*, 146 F.4th at 791 (quoting *Lukumi*, 508 U.S. at 535, 540).

A faithful application of these principles reveals that the Parity Act is not neutral towards religion. In effect, the law is "hostile to the religious beliefs of affected citizens" and "passes judgment upon [and] presupposes the illegitimacy of religious beliefs and practices." *See Masterpiece Cakeshop*, 584 U.S. at 638 (citing *Lukumi*, 508 U.S. at 534).

To begin, consider that "[a]bortion presents a profound moral issue on which Americans hold sharply conflicting views." *Dobbs*, 597 U.S. at 223; *see also Roe v. Wade,* 410 U.S. 113, 116 (1973) (noting its "awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views . . . and of the deep and seemingly absolute convictions that the subject inspires"), *overruled by Dobbs*, 597 U.S. at 302. As the Supreme Court has put it,

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 92 of 110



"[m]en and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage." *Casey*, 505 U.S. at 850.

*Dobbs* "return[ed] the issue of abortion to the people's elected representatives," 597 U.S. at 232, and Washington recognizes its residents' "right to choose to have an abortion[.]" Wash. Rev. Code § 9.02.110. However, no State's authority to protect some of its residents' interests under State law includes a license to infringe on other residents' First Amendment rights under the federal constitution. *Cf., e.g.*, *First Choice*, 146 S. Ct. at 1126 (holding that New Jersey's effort to protect access to reproductive health care by enforcing a subpoena against a religious nonprofit "injures the group's First Amendment" rights); *Chiles v. Salazar*, 607 U.S. 627, 654 (2026) (concluding that Colorado's attempt to protect teenagers "struggling with issues of gender identity or sexual orientation" by regulating the speech of a licensed counselor "censor[ed] speech based on viewpoint" and was subject to strict scrutiny under the First Amendment). The Parity Act runs afoul of this principle because it operates to force objecting religious employers—including churches, like Cedar Park—to facilitate their employees' access to affordable abortion services.

The first clue as to the Parity Act's purpose is the statute's declaration that all "[r]estrictions on abortion coverage interfere with a woman's personal, private pregnancy decision making, with his or her health and well-being, and with his or her constitutionally protected right to safe and legal medical abortion care." Parity Act, ch. 119, § 1(14), 2018 Wash. Sess. Laws. Such restrictions, of course, include religious-based objections by employers to

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 93 of 110



funding or otherwise facilitating abortion coverage for their employees. The State's declaration that all such objections have negative value—asserted as the indisputable truth in an area of profound moral and religious disagreement—demonstrates the Parity Act's lack of neutrality.

This policy declaration is "unmistakably normative" because it is "clearly designed to present certain values and beliefs as things to be . . . rejected." *Mahmoud*, 606 U.S. at 550; *see also Bates*, 146 F.4th at 790. Objections by religious employers to paying for or facilitating abortion services through their healthcare plans are well known, which Washington understood when it passed the Parity Act. *See supra* 67–70; *see also*, *e.g.*, *Little Sisters*, 591 U.S. at 669–70 (collecting cases). For the State to argue that the Parity Act's declared purpose and attendant mandates do not "presuppose the illegitimacy of [contrary] religious beliefs," *Masterpiece Cakeshop*, 584 U.S. at 638, simply "does not pass the straight-face test[,]" *Fellowship*, 82 F.4th at 692.

At oral argument, Washington argued that the Parity Act's declared policy does not betray a lack of neutrality because the State enacted the statute with the belief that the Conscience Statute would sufficiently accommodate religious and conscientious objectors. Oral Arg. 28:45–29:15. However, Washington was well aware of the uncertainty caused by the relationship between the statutes, along with concerns that the Conscience Statute provided insufficient protection. *See supra* 68–69. For example, legislators proposed multiple amendments to the Parity Act to insert a religious exemption into the Parity Act's text, outside groups raised concerns about the Parity Act's lack of a religious exemption, and a former Attorney General had previously opined that health plan issuers could indirectly charge objecting employers. *See supra* 68–69. Additionally,

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 94 of 110



the sufficiency of such an accommodation (as opposed to a full "church exemption") was the subject of a national legal fight. *See supra* 64–67.

The Parity Act's departure from neutral principles becomes even more apparent when looking at both the totality of the circumstances surrounding its enactment and its real-world effects. To start, take the circumstances behind the Parity Act's enactment. Multiple sources of evidence in the record raise questions as to the statute's underlying object. Specifically, (1) the Parity Act's passage on the heels of new federal regulations expanding religious exemptions for employers to the ACA's contraceptive mandate, (2) the legislature's rejection of any exemption for religious employers, and (3) news articles containing comments made by the Parity Act's sponsor in the Washington State Senate.[5] This cumulative evidence shows that Washington likely enacted the Parity Act in an attempt to counteract possible

[5] Cedar Park presented one news article which shows that, prior to the Parity Act's passage, the State senator who sponsored the bill publicly promoted it as a way for the State to address whatever acts "the Trump administration will or won't do next." Ashli Blow, *In time of Trump, Washington lawmakers want to pass bill mandating abortion coverage*, KIRO 7 News (Jan. 31, 2018), https://perma.cc/8UFX-JH7X.

Cedar Park offered a second news article which shows that the same senator, addressing the issue of religious employers who may object to the law's mandates, allegedly stated that those employers could file a lawsuit and that "[h]ealth care is about the individual, not about them." Matt Markovich, *Catholic Bishops of Wash. Ask Gov. Inslee to Veto Abortion Insurance Bill*, KOMO News (Mar. 5, 2018), https://perma.cc/5L5E-JM55. That same article describes public opposition to the Parity Act by Washington-based Catholic Bishops and the Executive Director of the Washington State Catholic Conference for the law's failure to provide sufficient protection for those with religious- and conscience-based objections. *Id.*

federal protections for the religious rights of employers to object to government-mandated coverage for abortion-related services in their health plans.

This possibility is strengthened by evidence suggesting that the Parity Act was not enacted as a response to any problems on the ground in Washington, given that the State acknowledges that it had not received any complaints related to an employer refusing to provide their employees with healthcare plans covering abortion services. Additionally, the Parity Act's real-world effect further supports finding a lack of neutrality. The record suggests that the Parity Act's mandates disproportionately impact religious objectors, as it appears that only religious employers have objected to the Parity Act's mandates.

**2**

The majority acknowledges these issues yet employs a divide-and-conquer approach to deny their importance. *See* Maj. Op. 42–50. None of the majority's arguments are persuasive.

*First*, as to the circumstances of the Parity Act's enactment, the majority disregards the timing of the Parity Act's passage, claiming that the evidence shows that the "Washington legislature was motivated only by a desire to ensure that reproductive health care in the state remained affordable for individuals amid *general* uncertainty caused by the then-current presidential administration." Maj. Op. 45 (emphasis in original). But this argument turns a blind eye to the very specific "uncertainty" at hand: changes to federal law that granted the wholesale church exemption from HHS's contraceptive mandate to other religious employers. *See* 82 Fed. Reg. 47,792 (Oct. 13, 2017). Washington's passage of the Parity Act immediately

following this federal regulatory change suggests that one purpose of the Parity Act was to counter protections that religious employers had recently received through federal regulations.

*Second*, regarding the legislature's rejection of religious exemptions in the Parity Act, the majority says that this is "neither surprising nor indicative of non-neutral intent," because the Parity Act does not regulate employers and the Conscience Statute provides protection for employers. Maj. Op. 45. But as explained above, the Parity Act (like the contraception mandate) regulates insurers in a way that functionally regulates religious employers. The majority's reliance on the fact that health plan issuers (and not religious employers) are the formal object of regulation under the Parity Act ignores the fact that "[w]hen the government prohibits or impedes Company A from using Company B's product, then both Company A and Company B might be deemed objects of the government action at issue." *Diamond Alternative Energy*, 606 U.S. at 115. And again, Washington was well aware of the uncertainty surrounding the protections offered by the Conscience Statute. *See supra* 68–69.

*Third*, as for news articles containing statements made by the Parity Act's sponsor, the majority makes two arguments. The majority first dismisses the articles presented by Cedar Park by concluding that "the articles do not support Plaintiff's characterizations of" the statements made by the State senator. Maj. Op. 46. But this resolves a factual question properly left for the factfinder to evaluate together with the rest of Cedar Park's evidence of non-neutrality. The majority next contends that, "more fundamentally," statements by a single State legislator are insufficient evidence of legislative intent. Maj. Op. 47 (first

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 97 of 11



quoting *Tingley*, 47 F.4th at 1087; and then citing *Dobbs*, 597 U.S. at 253–54). Yet the majority cannot avoid the fact that the Parity Act's sponsor specifically stated that his purpose of moving the legislation was to counter potential future actions by President Trump, in light of the administration's expansion of religious exemptions to HHS's contraceptive mandate. Regardless of the weight of these individual items of evidence, they remain relevant and probative of the essential question here—whether the Parity Act's object was to counter those exemptions for religious employers.

*Fourth*, the majority brushes aside the disproportionate impact on religious employers, claiming that such a "result would not reflect an impermissible 'religious gerrymander.'" Maj. Op. 49–50 (first quoting *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1077 (9th Cir. 2015); and then quoting *id.* at 1078, 1079 n.6). This fails to appropriately value—in combination with the other evidence at hand—legitimate evidence of disproportionate impact that precedent directs us to consider, because "the effect of a law in its real operation is strong evidence of its object." *Lukumi*, 508 U.S. at 535; *see also Bates*, 146 F.4th at 794 (considering a challenged policy's disproportionate impact on individuals with "traditional religious views").

* * *

"Considering all the circumstances in the record as a whole[,]" the Parity Act is not neutral towards religious exercise. *See Bates,* 146 F.4th at 795. The record strongly suggests that the law operates as a counter to federal regulations that expanded employers' religious exemptions from paying for or facilitating abortion services in their group health care plans. In my view, the evidence at minimum raises a serious dispute as to that question, making

summary judgment inappropriate. And while Washington's overt motivation may not have been specifically hostile towards religion, that does not necessarily make the Parity Act neutral towards religion. *See id.* (finding an Oregon policy lacked neutrality in operation despite the fact that Oregon may not have acted "out of hostility or animus toward religion"). The majority therefore errs in resolving this disputed, dispositive fact in Washington's favor and holding that the evidence proves that the Parity Act is neutral towards religion.

**C**

In addition to its lack of neutrality, the Parity Act is not generally applicable and therefore requires strict scrutiny review for this reason as well. A law does not apply generally "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way, or if it provides a mechanism for individualized exceptions." *Kennedy*, 597 U.S. at 526 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021)); *see Fellowship*, 82 F.4th at 686. The Parity Act does both.

**1**

As an initial matter, the statute prohibits Cedar Park's desired religious conduct while permitting secular conduct that undermines Washington's asserted interests in similar fashion. In determining how the Parity Act does so, we judge any relevant permitted secular conduct "against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam); *Fellowship*, 82 F.4th at 686.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 99 of 110



The State's asserted interest, as explained in the Parity Act, is to increase economic parity in reproductive health care services. The Parity Act advances this interest by requiring every State-approved health plan to cover all FDA-approved methods of contraception and to cover abortion services. Cedar Park's desired religious conduct is to purchase a fully insured health plan that covers maternity care but does not require the Church to pay for or otherwise facilitate abortion services. The question is whether the Parity Act permits other entities to purchase such a plan, for secular reasons. It does, at least as to the payment issue.

The Parity Act (via the Conscience Statute's § (2)(a) accommodation) permits some employers, for secular reasons, to obtain a group health plan for their employees that does not require them "in *any circumstances* to participate in the provision of or payment for" abortion services. *See* Wash. Rev. Code § 48.43.065(2)(a) (emphasis added). Specifically, the Conscience Statute likely allows secularly-motivated health care facilities and individual health care providers to obtain such a plan for their own employees. *Id.*

A few brief examples help to illustrate how this happens. Imagine that a small venture capital firm purchases a local hospital and maintains its operations. The firm also decides to provide an employer-sponsored, fully insured health plan for its employees, which is subject to the Parity Act. The firm has a moral, but not religious, objection to providing abortion services to employees. Under the § (2)(a) accommodation, which applies to "[h]ealth care facilit[ies]," the firm can plausibly—for secular reasons—purchase and provide a health plan that does not require it under "any circumstances to participate in the provision of or payment for" abortion services for their employees. *See* Wash. Rev.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 100 of 110



Code § 48.43.005(29) (defining the term "[h]ealth care facility" to include, for example, organizations such as licensed hospitals, nursing homes, drug and alcohol treatment facilities, home health agencies).

Consider another example: a solo medical practitioner who decides to start her own practice. With internal growth and smart business development, the practice grows larger and more successful. The practice, like the firm, provides a group health plan to its employees that is subject to the Parity Act. The practice also has a moral objection to providing abortion services to its employees. Under the § (2)(a) accommodation, which also applies to "individual health care providers," the practice may invoke the same monetary protections that the firm could receive. *See* Wash. Rev. Code § 48.43.005(30) (defining "[h]ealth care provider" as "[a] person" "practicing health care services" in Washington "consistent with state law" and that person's employees and agents).

Cedar Park, by contrast, cannot claim the § (2)(a) accommodation that the venture capital firm and the medical practice can claim. Instead, the Church can only avail itself of the § (3)(a) accommodation, which protects it from being "required to purchase coverage" directly for abortion services. But as noted, health plan issuers may still indirectly charge the Church for abortion services that enrollees must be able to access due to their ownership of a Cedar Park-provided health plan. *See supra* 84–88.

The majority dismisses hypothetical scenarios such as these out of hand, arguing that "[n]either the conscience statute's text nor any evidence in the record supports" a finding that § (2)(a) of the Conscience Statute grants a broader exemption to individual health care providers, health

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 101 of 110



care facilities, or religious health plan issuers when those entities "*purchase[] insurance coverage for their employees*." Maj. Op. 52–53 n.16. But the majority's ipse dixit conclusion does not align with the plain text of the statute and is not supported by any Washington case law foreclosing such an interpretation.

The record establishes that the Washington OIC, in fact, does not know whether a situation like either hypothetical has "ever come before the Insurance Commissioner for evaluation." While the issue may be unsettled, the majority's reading of the statute conflicts with the plain text of the Conscience Statute's § (2)(a) exception, as the terms "health care facility" and "health care provider" are defined under Sections 48.43.005(29) and (30) of the Washington Revised Code. And the majority's conclusion as to how the Washington OIC would understand and apply the statute runs afoul of the central rule of summary judgment, that all inferences are to be granted in favor of the nonmovant. *See* Fed. R. Civ. P. 56.

The majority further argues that even if the Conscience Statute's § (2)(a) and § (3)(a) accommodations are different, "[n]either section treats non-religious, conscience-based objections to specific health care services more favorably than comparable religious objections." Maj. Op. 53 (citing *Tingley*, 47 F.4th at 1088). Put differently, "*all* health care facilities and *all* health care providers can object to providing certain health care services on conscience- *or* religion-based grounds . . . just as all individuals and organizations seeking to obtain insurance coverage can object to purchasing coverage for certain health care services on conscience- or religion-based grounds[.]" *Id.* at 53. Thus, in the majority's view, "although [the accommodations] apply to different types of entities operating in distinct

capacities" each accommodation is nonetheless generally applicable. *Id.* at 53.

This argument errs because its approach to comparability relies on an outdated framework that was rejected by the Supreme Court in *Tandon*, 593 U.S. at 63–64 (overruling *Tandon v. Newsom*, 992 F.3d 916, 919–20, 922–24 (9th Cir. 2021)). Utilizing the comparability framework that the majority relies on here, this court previously limited its analysis of challenged government regulations to "whether the[y] . . . 'treat[] religious observers unequally[.]'" *Tandon v. Newsom*, 992 F.3d at 919–20, 922–24 (quoting *Parents*, 949 F.3d at 1235). Instead of this restrained analysis, which like the majority today rested on "distinctions between different types of entities," Maj. Op. 54, the Supreme Court has directed us to assess whether a regulation "treat[s] *any* comparable secular activity more favorably than religious exercise," *Tandon*, 593 U.S. at 62 (citation omitted). Religious exercise is not evaluated in the abstract but is the proposed religious activity of *the specific plaintiff*. *Id.* at 63–64. And "[w]hether two activities are comparable . . . must be judged against the asserted government interest that justifies the regulation at issue." *Id.* at 62.

As detailed above, the Conscience Statute's § (2)(a) accommodation treats some secular activity more favorably than *Cedar Park's* desired religious exercise. That secular activity is relevantly comparable because it risks undermining the Parity Act's interest in a similar way as does *Cedar Park's* desired religious conduct. *See id.* at 62–64; *Fellowship*, 82 F.4th at 689. The fact that the § (2)(a) accommodation permits *other* entities to engage in their own comparable religious conduct does not change the fact that *Cedar Park* is not allowed to engage in the same conduct.

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 103 of 110



Washington counters with three arguments of its own. It first claims that, because it is a separate law, the Conscience Statute's asserted interests must be judged separately from the Parity Act's asserted interests. That argument, however, makes little sense given that Washington's position in this litigation is that the Conscience Statute should be read together with the Parity Act, such that the former law can relieve the religious burden imposed by the latter one. Wash. Admin. Code § 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(3); Oral Arg. 28:45–29:15.

Next, Washington argues that the § (2)(a) accommodation is not broader than the § (3)(a) accommodation. However, as noted, the § (3)(a) accommodation allows a health plan issuer to indirectly charge the Church for abortion services that enrollees must have access to through their enrollment in a Cedar Park-sponsored health plan. *See supra* 23–28. In contrast, the § (2)(a) accommodation does not allow for such charges "*in any circumstances*." The record appears to support Cedar Park's claim that this distinction makes a difference, because the evidence shows that Washington itself pays the cost of abortion services for plans excluding those services pursuant to the § (2)(a) accommodation.

Washington's final argument is that, even if the Conscience Statute grants broader protection to certain entities that qualify for the § (2)(a) accommodation, those entities are not similarly situated to Cedar Park. The State's argument is premised upon the idea that the health care providers, religiously sponsored health carriers, and health care facilities are "in the business of providing health services, while religious organizations [like Cedar Park] merely purchase health coverage." However, this argument fails to recognize that the plain text of the § (2)(a) accommodation would allow those entities to invoke the

accommodation in their role as employers. *See supra* 99–100.

**2**

The Parity Act also creates an impermissible mechanism for individualized exceptions. "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (citation modified) (quoting *Smith*, 494 U.S. at 884). The mechanism need not grant the government "'unfettered' discretion" in making this determination: "the mere *existence* of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable, regardless of the actual exercise." *Fellowship*, 82 F.4th at 687–88 (emphasis added) (citing *Fulton*, 593 U.S. at 537). In other words, a law is not generally applicable if it provides an exemption that requires the government to "delve into the specific facts and circumstances or to 'consider the particular reasons' for such 'individualized exemptions.'" *Id.* at 688 (quoting *Fulton*, 593 U.S. at 533).

The Parity Act's mechanism for individualized exceptions comes in the form of its reservation to the State of the right to exempt any health plan from the statute's mandates whenever applying the mandates would put the State's federal funds at risk. *See* Wash. Rev. Code § 48.43.073(5). The exemption provides:

> If the application of this section to a health plan . . . results in noncompliance with federal requirements that are a prescribed condition to the allocation of federal funds to the state, this section is inapplicable to the

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 105 of 110



> plan to the minimum extent necessary for the state to be in compliance. The inapplicability of this section to a specific health plan . . . under this subsection does not affect the operation of this section in other circumstances.

Wash. Rev. Code § 48.43.073(5).

Neither Washington nor the majority contests that the federal funds exemption can grant some qualifying entities appropriate relief from the Parity Act's mandates. *See generally* Maj. Op. 59–61. Instead, both try to restrict the exemption's discretionary reach, stating that its applicability "in a particular case is a narrow legal question, the answer to which turns solely on how, or if, a federal funding requirement applies." Maj. Op. 60.

While the question may be narrow in one sense, it nonetheless "incorporates ad hoc decision making" because the State can adjust its determination in response to whatever funding conditions Congress or the Executive Branch may impose. *See Bates*, 146 F.4th at 797. Washington's OIC lacks any objective, predetermined criteria to make its determination, and has no internal policy for proceeding with reviews of individual cases. That the State may turn to its lawyers to determine the reach of a future federal funding requirement does not change the fact that Washington does not presently know what requirements it may need to agree to, or under what criteria it will then need to evaluate individual cases.

The majority seeks to place any discretion that may exist in this arrangement "with the federal government when establishing funding requirements, not with the insurance

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 106 of 110



commissioner[.]" Maj. Op. 61 n.21. But that obscures the basic point: Washington explicitly grants itself a discretionary mechanism to make individualized exemptions to the Parity Act's requirements based on presently unknown criteria. In fact, because of the indeterminate and discretionary nature of the federal funds exception, it is even possible that a future condition on federal funds in the health insurance context could provide for broader protection for religious exercise, such as the Church seeks here. *See, e.g.*, *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1938 (2026) (describing certain conditions on federal funds for state prisons imposed by the Religious Land Use and Institutionalized Persons Act of 2000, including a "condition requir[ing] prison systems to refrain from imposing 'substantial burden[s] on the religious exercise[s]' of state prisoners" (citing 42 U.S.C. §§ 2000cc–1(a), (b)(1))). Thus, even if the federal funds exemption does not provide for discretion that is "completely unfettered, there is ample discretion nonetheless." *Bates*, 146 F.4th at 797 (citing *Fellowship*, 82 F.4th at 687).

The majority separately contends that "record evidence shows that [the Parity Act's federal funds exemption] is meant to ensure Washington's compliance with the Weldon Amendment, a legislative 'rider' to a 2004 federal appropriations bill that 'prevents federal, state and local governments from receiving certain federal funds if they discriminate against health care organizations that refuse to provide, pay for, provide coverage of, or refer for abortions.'" Maj. Op. 55–56 n.18. (quoting *California ex rel. Lockyer v. United States*, 450 F.3d 436, 439 (9th Cir. 2006)). But the text of the federal funds exemption does not limit its application to only compliance with the Weldon Amendment. *See* Wash. Rev. Code § 48.43.073(5).

Case: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 107 of 110



Washington also argues that the federal funds exemption "simply makes clear that the applicable federal laws control, consistent with the Supremacy Clause." But this argument conflates federal legislation enacted under Congress's Article I spending power with statutes adopted pursuant to Congress's other enumerated powers.

"Unlike other enumerated powers," Congress's power under the Spending Clause does not "include 'the power to issue direct orders to the governments of the States.'" *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 370 (2025) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n.*, 584 U.S. 453, 471 (2018)). Instead, "Spending Clause legislation, [such as] Medicaid[,] offers the States a bargain: Congress provides federal funds in exchange for the State's agreement to spend them in accordance with congressionally imposed conditions." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 323 (2015); *see also Landor*, 146 S. Ct. at 1941 ("Time and time again, from at least 1845 to the present, our precedents have stressed the centrality of consent in this field."). Thus, if Washington does not wish to abide by the conditions attached to any particular federal funds offered under Spending Clause legislation, then it may reject the deal. Or, if Washington believes that any funding conditions are unconstitutionally coercive, then it can try to invalidate the conditions in court. Either way, the State cannot claim to accept federal funds and the attendant conditions on the theory that the Supremacy Clause forces it to do so.

* * *

At the end of the day, the Parity Act is not generally applicable for several reasons. Accordingly, Washington's refusal to accommodate the Church's religious objections to

the Parity Act's mandates—even to the same extent that it allows for relief to other entities—is another reason that we must review the law through the lens of strict scrutiny.

**D**

To overcome strict scrutiny review, the Parity Act "must be 'narrowly tailored' to advance a 'compelling governmental interest.'" *Fellowship*, 82 F.4th at 694 (quoting *Lukumi*, 508 U.S. at 531–32). Washington points to "14 different governmental purposes served by the law," including "providing better access to health benefits and '[a]ssuring women equal access to such goods, privileges, and advantages.'" Cedar Park responds that, under *Fulton*, 593 U.S. at 541, "Washington must show that it has a compelling 'interest in denying an exemption to' *Cedar Park*" specifically.

However, even assuming that Washington has met its burden to show a compelling government interest, it fails to demonstrate that the Parity Act is sufficiently narrowly tailored. To meet that standard, Washington must show that it "considered less restrictive measures than those implemented here." *Fellowship*, 82 F.4th at 694; *see also Thomas*, 450 U.S. at 718. "The least-restrictive-means standard is exceptionally demanding[.]" *Hobby Lobby*, 573 U.S. at 728.

Washington's sole argument that the Parity Act is narrowly tailored is to point to the religious accommodations in the Conscience Statute. But as discussed, the Conscience Statute's § (3)(a) accommodation that is available to Cedar Park is more restrictive than both (1) the Conscience Statute's § (2)(a) accommodation available to some other entities and (2) the rejected amendments to the Parity Act that would have provided employers like Cedar Park with

religious exemptions. Moreover, contrary to counsel's assertion at oral argument, this is not "the exact compromise" that the federal government relied on with respect to the ACA's contraceptive mandate. Instead, Washington's decision to rely on the Conscience Statute's approach to religious accommodations stands in stark contrast to the approach taken by HHS in enforcing its contraceptive mandate, which allowed a complete church exemption. The State makes no argument for why any of these alternative approaches could not have sufficed, and therefore the Parity Act cannot be deemed the least restrictive measure available.

**IV**

In my view, strict scrutiny should apply to the Parity Act. The statute cannot survive that review, and therefore Cedar Park should prevail on its Free Exercise claim.[6]

I would further hold that Cedar Park meets all the requirements for a permanent injunction. To receive such an injunction, a plaintiff must show (1) an irreparable injury; (2) the inadequacy of remedies available at law; (3) that the balance of hardships between the parties favors the plaintiff; and (4) that a permanent injunction would not disservice the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Although the district court did not reach the issue of injunctive relief, the record shows that Cedar Park meets all the required factors. Therefore, I would exercise our equitable discretion to decide this issue, *see Skyline*, 968 F.3d at 754, given that it can be easily resolved

---

[6] Because I would conclude that Cedar Park succeeds on the merits of its Free Exercise claim, I do not reach the merits of Cedar Park's Church Autonomy claim.

ase: 23-35560, 09/14/2026, ID: 12957171, DktEntry: 161-1, Page 110 of 11



on the current record and that this litigation has dragged on now for over seven years.

To begin, Cedar Park has shown irreparable harm, because "[i]t is axiomatic that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Fellowship*, 82 F.4th at 694 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam)). Next, Cedar Park cannot obtain an adequate remedy at law, because "[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages." *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008). Finally, as I see it, "[t]he remaining . . . injunction factors—the balance of the equities and the public interest—merge and further favor [Cedar Park]." *See Bates*, 146 F.4th at 801.

## V

For these reasons, I would reverse and remand with instructions to grant appropriate injunctive relief and enter judgment for Cedar Park. But at minimum, we should reverse the district court's grant of summary judgment for Washington because of the disputed material facts, and remand for further proceedings. Instead, by affirming summary judgment, the majority sanctions the State's coercion of a Church into paying for or otherwise facilitating access to abortion services, in violation of the Church's sincere religious belief. Because that result cannot be squared with the First Amendment's guarantee of the free exercise of religion, I respectfully dissent.